**Nos. 01-256 T and 01-257 T**
**(Judge Charles Lettow)**

---

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

# MOTION OF THE UNITED STATES FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

---


NATHAN J. HOCHMAN
Assistant Attorney General
DAVID GUSTAFSON
G. ROBSON STEWART
Attorneys
Department of Justice, Tax Division
Court of Federal Claims Trial Section
P.O. Box 26
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6493

Page

## TABLE OF CONTENTS


Motion of the United States for Summary Judgment . . . . . 1

Brief of the United States in Support of its Motion for Summary Judgment . . . . . 3

Question Presented . . . . . 4

Statutes and Regulations Involved . . . . . 4

Procedural Background of the Case . . . . . 5

Summary of Argument . . . . . 5

Statement of Facts . . . . . 8

Standard of Review . . . . . 13

Argument . . . . . 14

I. THE TREASURIES SHORT SALE OBLIGATIONS CONSTITUTE LIABILITIES THAT MUST BE INCLUDED IN THE BASIS OF THE PARTNERSHIP . . . . . 14

A. Introduction . . . . . 14

B. Partnership's Basis in Partnership Assets - "Inside Basis" . . . . . 17

C. Partner's Basis in its Partnership Interest - "Outside Basis" . . . . . 17

D. The Effect of Liabilities on the Calculation of Outside Basis . . . . . 18

1. The Rule under § 752 . . . . . 19

2. Application of § 752(b) - - MIR's assumption of the obligation to close the short sale reduces MORI's outside basis because MIR is taking responsibility for the replacement of the Treasuries and, because that transfer of the obligation is a benefit to MORI, it is as if MIR is paying cash to MORI . . . . . 19

**Page**

**(Continuation):**


3. Application of § 752(a) - - With the obligation to close the short sale now residing in MIR, MORI and JBS increase their basis by their shares of the partnership's obligation to close the short sales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4. Application of § 752(b) to the closing of the short sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II. DEFENDANT'S LEGAL POSITION IS SUPPORTED BY THE PLAIN LANGUAGE OF THE STATUTE, THE CASE LAW, AND ADMINISTRATIVE RULINGS . . . . . . . . . . . . . . . . . . . . . 22

A. A plain reading of § 752 supports the Government's position . . . . . . . . 22

B. The IRS's consistent position is that when, as here, an obligation creates or increases the basis of any of the obligor's assets, that obligation is a "liability" under § 752 . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C. The case law supports the Government's position . . . . . . . . . . . . . . . . . 27

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Appendix A:

Internal Revenue Code of 1986 (26 U.S.C.):

§ 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1
§ 357 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3
§ 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5
§ 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A6
§ 705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A9
§ 708 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A10
§ 721 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A10
§ 722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A11
§ 723 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A11
§ 732 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A12

**Page**

§ 733 . . . . . . . . . . A13
§ 742 . . . . . . . . . . A13
§ 752 . . . . . . . . . . A14

Appendix B:

Chart 1, Marriott's Claimed Basis Calculations . . . . . . . . . . B1
Chart 2, Basis Calculations Including the Short Sale Obligations . . . . . . . . . . B2

**TABLE OF AUTHORITIES**

**Cases:**

*ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999) . . . . . . . . . . 7

*American Tobacco Co. v. Patterson*, 456 U.S. 63 (1982) . . . . . . . . . . 22

*Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998) . . . . . . . . . . 26

*Colm Producer, Inc. v. United States*, 460 F. Supp. 2d 713 (N.D. Tex. 2006 ) *appeal pending, Kornman & Assoc. v. United States*, No. 06-11422 (5th Cir. July 31, 2007)) . . . . . . . . . . 8, 29

*Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006), *cert.denied*, 127 S. Ct. 1261 (2007) . . . . . . . . . . 8

*Delong v. Dep't of Health & Human Servs.*, 264 F.3d 1334 (Fed. Cir. 2001), *cert. denied,* 536 U.S. 958 (2002) . . . . . . . . . . 22

*Deputy v. du Pont,* 308 U.S. 488 (1940) . . . . . . . . . . 26, 28

*Kornman & Assoc. v. United States*, No. 06-11422 (5th Cir. July 31, 2007) . . . . . . . . . . 8

*Jading Trading, LLC v. United States*, No. 03-2146 WL 4553043 ( Fed. Cl. 2007) . . . . . . . . . . 8

*Laney v. Comm'r*, 674 F.2d 342 (5th Cir. 1982), *aff'g in part and rev'g in part on another ground* T.C. Memo. 1979-491 . . . . . . . . . . 24

**Page**

*New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934) . . . . . . . . . . . . . . . . . . . . . . . . 13

*NovaCare v. United States*, 52 Fed. Cl. 165 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Salina Partnership, LP v. Comm'r*, T.C. Memo 2000-352, 80 T.C.M. (CCH) 686 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 23,27

*United Savings Assoc. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Zlotnick v. TIE Communications*, 836 F.2d 818 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . 15

**Statutes:**

Internal Revenue Code of 1986 (26 U.S.C.):

§ 357 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§ 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

§ 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28

§ 705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20, 24, 28

§ 708 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 28

§ 721 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

§ 722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29

§ 723 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 732 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

§ 733 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

§ 742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

§ 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

**Page**

**Statutes (Continuation):**

§ 1001 . . . . . . . . . . 6, 27

§§ 1011 - 1016 . . . . . . . . . . 6

§ 6223 . . . . . . . . . . 14

§ 6225 . . . . . . . . . . 14

§ 6226 . . . . . . . . . . 1, 4

§ 6229 . . . . . . . . . . 14

**Miscellaneous:**

12 C.F.R.§ 220.12(c)(1) . . . . . . . . . . 26

H.R. Rep No. 98-861 (1984), 1984-3 (Vol. 2) C.B. 110 . . . . . . . . . . 23

IRS Notice 2000-44, 200-36 I.R.B 255, 200-2-2 C.B. 255 . . . . . . . . . . 5

Prop. Treas. Reg. § 1.752-1(a)(1)(ii), 68 Fed. Reg. 37434 (2003 . . . . . . . . . . 24

Rev. Rul 88-77, 1988-2 C.B. 128 . . . . . . . . . . 23, 24, 25

Rev. Rul. 95-26, 1995-1 C.B. 131 . . . . . . . . . . 25, 26

Rev. Rul. 95-45, 1995-1 C.B. 53 . . . . . . . . . . 25

Treasury Regulations (26 C.F.R.):

§ 1.708-1(b)(1)(iv) . . . . . . . . . . 16

§ 1.752-1(a)(4), T.D. 9207, 2005-1 C.B. 1344 . . . . . . . . . . 25

§ 1.752-1(d) . . . . . . . . . . 20

§ 1.752-1T(g), 1989-1 C.B. 180 . . . . . . . . . . 24

**Page**

**Miscellaneous (Continuation):**

2 Bittker & Lokken, Federal Taxation of Income, Estates And Gifts ¶ 54.3.1, at 54-21 (2d ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Black Law Dictionary* (6th ed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Christopher Pietruszkiewicz, *Of Summonses, Required Records and Artificial Entities: Liberating the IRS from Itself*, 73 Miss. L.J. 921 & n.2 (2004) . . . . . . . . . . 5

*Corporate Tax Shelters or Plus Ca Change, Plus C'est La Meme Chose,"* Michael S. Powlen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Raj Tanden *431 Practising Law Institute Tax Law and Estate Planning Course Handbook* 1003, 1020 (October-November 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Laura E. Cunningham & Noel B. Cunningham, *The Logic of Subchapter K* 105 (2d ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Robert Bird & Alan Tucker, *Tax Sham or Prudent Investment: Deconstructing the Government's Pyrrhic Victory in Salina Partnership v. Commissioner,* 22 Va. Tax. Rev. 231, 253 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Zachary Knepper, Future-Priced Convertible Securities and the Outlook for "Death Spiral" Securities Fraud Litigation,* 26 Whittier L. Rev. 359, 371 & n.79 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Nos. 01-256 T and 01-257 T**
**(Judge Charles Lettow)**

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**.

## MOTION OF THE UNITED STATES FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims, defendant, the United States, moves for summary judgment in defendant's favor on the grounds that this case presents no genuine issue of material fact and defendant is entitled to judgment as a matter of law.

These cases are filed pursuant to § 6226 of the Internal Revenue Code of 1986, for readjustment of the partnership items set forth by the Commissioner of Internal Revenue in Notices of Final Partnership Administrative Adjustment. If defendant prevails on this motion for

summary judgment, the Notices of Final Partnership Administrative Adjustment should be sustained and an appropriate order entered.[1]

In support of its motion, defendant relies upon the accompanying brief (with Appendices A and B), Defendant's Proposed Findings of Uncontroverted Fact, and the exhibits attached to the Declaration of G. Robson Stewart, filed herewith.

Respectfully submitted,

*s/G. Robson Stewart*
G. ROBSON STEWART
U.S. Department of Justice - Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, DC 20044
tel: (202) 307-6493
fax: (202) 514-9440

NATHAN J. HOCHMAN
Acting Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

*s/David Gustafson*
Of Counsel

Dated: February 1, 2008

[1] In the Notice of Final Partnership Administrative Adjustment for the tax period ending December 30, 1994, the Commissioner made an adjustment of $17,507 relating to an interest expense deduction. This adjustment is raised in Fed. Cl. No. 01-257 T but not Fed. Cl. No. 01-256 T. Defendant's counsel believes that this is merely a computational adjustment that can be resolved by the parties after the resolution of this motion for summary judgment involving the primary $75,000,000 adjustment.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Nos. 01-256 T and 01-257 T**
**(Judge Charles Lettow)**

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**.

**BRIEF FOR THE UNITED STATES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Through these partnership actions, Marriot International Inc. (Marriott) claims a purported tax *loss* of almost $70 million based on a subsidiary's short-term *profitable* investment in U.S. Treasuries. Marriott engineered this feat by having one of its subsidiaries enter into several short sales of U.S. Treasuries (borrowing Treasuries from a broker and then selling the borrowed Treasuries), and then contributing the cash received from the short sales to a partnership–but without accounting for the binding legal obligation to replace the borrowed Treasuries (*i.e.*, close the short sales). Marriott claims that it did not have to account for the obligation to close the short sales at the time the short sale proceeds were contributed to the partnership because the value of the obligation was contingent–*i.e.*, Marriott did not know how *much* it would cost to close the short sales until the short sales were closed at a later date. Under the applicable law,

however, the obligation to close the short sales constituted a binding legal liability which must be taken into account by the partnership. When the obligation to close the short sales is taken into account by the partnership, the tax losses claimed by MIR vanish as quickly as they materialized.

## QUESTION PRESENTED

Through pre-arranged transactions, two Marriott-controlled entities contributed mortgage notes and short-sale obligations to a partnership, Marriott International Resorts, L.P., (MIR).[2] After one of the subsidiaries transferred its partnership interest to another Marriott-controlled entity, the mortgage notes ultimately were sold with a real economic loss of $522,093. Asserting that short-sale obligations are not liabilities under the partnership basis rules of § 752, plaintiff claims it realized a tax loss on the sale of the mortgage notes in the amount of $69,442,568.[3] Is the obligation to close a short sale a liability under § 752?[4]

## STATUTES AND REGULATIONS INVOLVED

The primary statute involved in this case is § 752 of the Internal Revenue Code. The relevant statutes are set forth in Appendix A.

---

[2] Under § 6226, the partnership is neither the plaintiff nor a party to this proceeding. *Chef's Choice Produce Ltd. v. Commissioner*, 95 T.C. 388, 394-95 (1990), *Barbados #6 Ltd. v. Commissioner* , 85 TC 900, n.1 (1985).

[3] On its partnership return (Form 1065) for the period ended December 30, 1994, MIR reported a loss on the sale of the Mortgage Notes of $71,189,461. For purposes of this motion, the discrepancy between the MIR tax return and the Complaint does not need to be resolved.

[4] Except as otherwise noted, all sections cited herein refer to the Internal Revenue Code of 1986, 26 U.S.C. (the "Code") in effect during the periods in issue. Relevant sections are reproduced in Appendix A attached hereton.

## PROCEDURAL BACKGROUND OF THE CASE

The Complaints in this case were filed on April 30, 2001. The first Complaint (Fed. Cl. No. 01-256 T) involves MIR's the short taxable year ending October 28, 1994. The second Complaint (Fed. Cl. No. 01-257 T) involves MIR's short taxable year ending December 30, 1994. The cases were consolidated on May 25, 2001. This is a so-called "TEFRA" partnership proceeding, filed pursuant to § 6226. The issue in this case is whether the partners are permitted to take a tax loss of $71,189,461 claimed on MIR's partnership income tax return for the period ending December 31, 1994. Complaint, ¶ 33 (Fed. Cl. No. 01-256 T); Complaint, ¶ 33 (Fed. Cl. No. 01-257 T).

## SUMMARY OF ARGUMENT

This case involves a tax shelter that was marketed to corporate taxpayers. *See* IRS Notice 2000-44, 2002-2 C.B. 255.[5] This type of tax shelter is referred to by several names including "Basis Pump" or "Son of BOSS."[6]

In this case, Marriott followed a script for a series of orchestrated transactions which had been proposed by an investment banking firm aimed at artificially increasing Marriott's deductible tax basis in a subsidiary partnership interest, in order to create an enormous non-

---

[5] *See also* Michael S. Powlen and Raj Tanden, "Corporate Tax Shelters or Plus Ca Change, Plus C'est La Meme Chose", 431 Practising Law Institute Tax Law and Estate Planning Course Handbook 1003, 1020 (October-November 1998) (rating this transaction an "X" using the movie ratings scale (*i.e.*, G, PG, PG-13, R, and X)).

[6] BOSS is an acronym for Bond and Options Sales Strategy and refers to an abusive tax shelter intended to generate non-economic tax losses. *See* Christopher Pietruszkiewicz, "Of Summonses, Required Records and Artificial Entities: Liberating the IRS from Itself," 73 Miss. L.J. 921 & n.2 (2004).

economic tax loss.[7] At the heart of this scheme is the claim that the obligation to close a short sales of U.S. Treasuries is not a liability for purposes of computing partnership tax basis. The essential steps orchestrated by Marriott to achieve this alleged result were as follows:[8]

1. Two Marriott subsidiaries (MORI and JBS) form a partnership (MIR) and MORI has a 99% interest in MIR.

2. MORI enters into two short sales of U.S. Treasuries with the broker that introduced Marriott to the tax shelter strategy, and invests the short sale proceeds of $73 million in repurchase obligations (Repos) with the same broker.

3. MORI contributes (a) $83 million in time-share mortgage notes, (b) the proceeds from the two short sales ($73 million in Repos), and (c) the obligation to close the short sales to MIR. MORI calculates its purported tax basis in MIR by adding the value of the mortgage notes and the Repos (for a total of $156 million), but ignoring the short sale obligation.

4. MIR sells the Repos and use the proceeds to close the short sales (*i.e.*, to buy back the Treasury securities that were sold short and replace the borrowed Treasury securities) for a $1 million trading gain–thereby increasing the subsidiary's purported basis in MIR to $157 million–and not reducing that basis by the amount the partnership used to close the short sales.

5. MORI's interest in MIR is transferred to another Marriott subsidiary (MICC), which causes a "technical termination" of MIR under § 708(b)(1)(B), and MICC gets the purported $157 million basis, of which $153 million is assigned to the time-share mortgage notes.

6. MICC and JBS form a new MIR partnership and contribute the time-share mortgage notes to the new MIR. MICC's purported basis in the mortgage notes is carried over to the new MIR, and it allocates a purported basis to the mortgage notes of $153 million.

---

[7] Generally, "basis" is a concept that is fundamental to the tax reporting of gain or loss on a transaction. Normally, gain or loss is calculated by subtracting "basis" from the "amount realized." § 1001(a). The "basis" of property is usually the cost of the property which can be adjusted up or down, based on differing sets of circumstances. §§ 1011-1016.

[8] The amounts used in this description are approximate.

7. The new MIR sells the most of the time-share mortgage notes to a third-party for $82 million, resulting in a cash loss of less than $1 million. The mortgage notes sold, however, have a purported tax basis of $151 million, so the sale results in a claimed tax loss of $71 million.

Thus, Marriott's strategy transformed the sale of the time-share mortgage notes that resulted in a tangible economic loss of less than $1 million into a sale with a claimed non-economic tax loss of $71 million. Marriott claims that its contrived events involving the short sales of Treasuries and the transfers of interests among various subsidiaries produced a spectral tax loss that is 13,600% greater than the actual loss on the mortgage notes sale. Marriott conjures this illusion by asserting that the obligation to close a short sale is <u>not</u> a "liability" under § 752 for the purposes of calculating partnership basis.

Marriott's legal position is not correct. "Tax losses . . which are purely an artifact of tax accounting methods and which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations." *ACM Partnership v. Commissioner*, 157 F.3d 231, 252 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999). In this case, the plain meaning of the term "liability," contained in § 752, does encompass the obligation to close a short sale, because one who borrows securities in a short sale has an unconditional legal obligation to replace the borrowed property. This obligation is not contingent, as Marriott erroneously contends. An obligation to close a short sale is a binding legal obligation to replace the borrowed property, *not* to return a sum of money. Thus, the borrower's obligation is fixed at the time the short sale occurs. That the cost of satisfying the obligation may fluctuate with the market does not make the obligation itself contingent. Consequently, the obligation to close a short sale is a "liability" under § 752(a) and (b), as the two cases on the issue -- *Salina Partnership, LP v. Comm'r*, T.C. Memo. 2000-352, 80 T.C.M.

(CCH) 686 (2000), and *Colm Producer, Inc. v. United States*, 460 F.Supp.2d 713 (N.D. Tex. 2006 ) *appeal pending, Kornman & Assoc. v. United States*, No. 06-11422 (5th Cir. July 31, 2007)) -- have held. Accordingly, when MIR's partnership tax basis is computed to reflect the partnership's closing of the short sales, Marriott's claimed tax loss evaporates.

## STATEMENT OF FACTS[9]

Plaintiff, Marriott International Resorts, LP, (MIR) is a Delaware limited partnership with its principal place of business located in Montgomery County, Maryland. (PF 1.)[10] For the tax period ending October 28, 1994, Marriott International JBS Corporation (JBS) and Marriott Ownership Resorts, Inc. (MORI) were MIR's general partner and limited partner, respectively. (PF 2.) For the tax period ending December 30, 1994, JBS and Marriott International Capital Corporation ( MICC) were MIR's general partner and limited partner, respectively. (PF 3.) JBS, MORI, and MICC were, at all times relevant to this case, controlled subsidiaries of Marriott International, Inc. (PF 4.)

During the periods in issue, MORI engaged in the business of selling timeshare interests in resort properties. (PF 5.) As part of this business, MORI offered buyers the opportunity to

---

[9] Only for purposes of this motion for summary judgment, defendant assumes that the allegations in plaintiff's Complaints are true and accurate. Defendant also assumes that additional information contained in this fact statement, which was derived from documents produced by plaintiff and third-parties, and deposition testimony, is true and accurate. If this case proceeds to trial, however, defendant reserves the right to challenge the truth, accuracy, and/or credibility of all such allegations and information. Moreover, defendant reserves the right to challenge the transactions engineered by Marriott on the grounds that they were factual shams and/or they lack economic substance. See *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1347 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 1261 (2007); *Jade Trading, LLC v. United States*, No. 03-2164 T, WL 4553043 (Fed.Cl., December 21, 2007).

[10] References to "PF" are to defendant's proposed findings of uncontroverted facts filed with this brief.

finance their purchases by having the buyer execute a promissory note, secured by a mortgage on the timeshare unit ("Mortgage Notes") (PF 6.) On November 22, 1993, MORI, and another Marriott entity, MTMG Corporation, entered into an agreement with Teachers Insurance and Annuity Association of America ("TIAA") –an unrelated third party--in which the Marriott entities agreed to sell and TIAA agreed to buy up to $175,000,000 of Mortgage Notes. (PF 7. )

On January 3, 1994, Philip Hamon of the investment banking firm CS First Boston, faxed to Lester Pulse, the Tax Director of Marriott International, an "Executive Summary" which set forth a blueprint for a series of transactions that were designed to enable Marriott to create a non-economic loss for Federal income tax purposes based on the premise that a short-sale obligation is not considered a liability for partnership tax basis purposes. (PF 8.) The transactions described in CS First Boston tax loss blueprint consist of the following steps (PF 9):

- Marriott International (MI) sells short 2-year Treasuries and invests the proceeds in intermediate term Treasuries.
- MI, as a limited partner, and another Marriott entity, as the general partner, form a partnership.
- MI contributes the intermediate term Treasuries and short sale obligations to the partnership and the general partner contributes some cash.
- The partnership obtains additional assets and subsequently sells the intermediate term Treasuries and closes the short sale obligation on the 2-year Treasuries.
- MI transfers its partnership interest to another subsidiary on which no gain or loss is recognized.
- The partnership interest transfer results in a technical termination of the partnership which causes a deemed distribution of the assets to each partner and a re-contribution of the assets to a new partnership.
- The tax basis of the partnership assets takes on the high outside tax basis of MI's interest based on the value of the intermediate term Treasuries which is not reduced by the short sale obligation.
- The assets later are sold at a loss as a result of the artificially high tax basis and through its subsidiary MI recognizes the tax benefit of the non-economic loss.

On or about on April 25, 1994, MORI established a short position[11] in five-year Treasury securities with a face amount of $65,000,000 (the "First Short Sale"). (PF 10.) The First Short Sale was executed through CS First Boston. (PF 11.) MORI received cash proceeds in the amount of $63,703,816 that were invested through CS First Boston in repurchase obligations ("Repos") yielding a fixed return. (PF 12.) On May 6, 1994, JBS was incorporated.[12] (PF 13.) On May 6, 1994, MORI and JBS entered into a partnership agreement and created MIR with the filing of a Certificate of Limited Partnership.[13] (PF 14.) JBS was the general partner of MIR holding a 1% interest, and MORI was a limited partner of MIR holding a 99% interest. (PF 15.)

On or about on May 6, 1994, MORI contributed to MIR (1) the Repos, (2) Mortgage Notes, and (3) the obligations to close the First Short Sale. (PF 16.) Also, on or about on May 6, 1994, JBS contributed $1,000,000. (PF 17.)

On or about on August 15, 1994, MORI established another short position in five-year Treasury securities with a face amount of $10,000,000 (the Second Short Sale). (PF 18.) The Second Short Sale was also executed through CS First Boston. (PF 19.) MORI received cash proceeds in the amount of $9,463,451 that were invested through CS First Boston in Repos. (PF 20.) On August 16, 1994, MORI contributed to MIR (1) the Repos, (2) Mortgage Notes with a

---

[11] A short sale has been defined as "consisting of two transactions: (1) the taxpayer's sale of property (typically, securities) borrowed from another person (typically, a broker) and (2) the subsequent closing out of the short position by the taxpayer's delivery of securities to the person who loaned the securities that were sold." *Salina Partnership L.P.*, 80 T.C.M. (CCH) 686, 690, n. 5, *citing* 2 Bittker & Lokken, Federal Taxation of Income, Estates And Gifts ¶ 54.3.1, at 54-21 (2d ed. 1990).

[12] There is documentary evidence that this actually occurred on May 9, 1994. However, for purposes of this motion, defendant will assume the allegation in the Complaint to be true because for the present legal argument, the difference in dates is of no consequence.

[13] There is documentary evidence that this actually occurred on May 11, 1994.

face amount of approximately $11,900,000, and (3) the obligation to close the Second Short Sale to MIR. (PF 21.) On October 1, 1994, MORI contributed additional Mortgage Notes with a face amount of approximately $6,200,000. (PF 22.)

On September 29, 1994, MIR closed the First Short Sale with CS First Boston by purchasing replacement Treasuries with a face amount of $65,000,000 at a cost of $62,667,034. (PF 23.) On October 17, 1994, MIR closed the Second Short Sale with CS First Boston by purchasing replacement Treasuries with a face amount of $10,000,000 at a cost of $9,279,811.[14] (PF 23.) The short sales were closed by liquidating the Repos and using those funds to buy back the Treasury securities that were "returned" to CS First Boston. In connection with the Treasuries short sale and Repo transactions, Marriott paid CS First Boston a "structuring fee" of $200,000 and expenses of $22,540.22, and paid a bid-ask spread of $50,000 on the trades, for a total transaction cost of $272,540.22. (PF 24.)

On October 28, 1994, MORI transferred its entire partnership interest in MIR to MICC. (PF 25.) The transfer of MORI's interest in MIR to MICC triggered a technical termination of MIR under § 708(b)(1)(B). (PF 26.) Under § 708(b)(1)(B), the termination resulted in a deemed distribution of MIR's assets to its partners (JBS and MICC) followed by the creation of a new partnership by JBS and MICC, and contribution of the MIR assets to the new partnership–which also was named MIR. (PF 27.) The actual assets held by MIR prior to, and after, the termination were the Mortgage Notes, $1 million cash, and a receivable with a face amount of $3,303,164. (PF 27.)

[14] The net gain on the short sales reported by MIR after trading and transaction costs was $819,532.

Prior to the termination, MICC had a purported basis of $159,444,635 (*i.e.*, not reduced by the obligation to close the shorts sales by purchasing replacement Treasuries) in its interest in MIR, which consisted of the bases of the Mortgage Notes, the Repos, and minor adjustments due to MIR's operations (*i.e.*, interest and investment income). (PF 28.) After the termination, JBS's and MICC's partnership bases were allocated to the new MIR's assets (the Mortgage Notes, cash, and the receivable). Thus, the new MIR was assigned a purported basis in the Mortgage Notes of $155,141,472. (PF 29.)

On or about on November 14, 1994, MIR conveyed the Mortgage Notes to a grantor trust and the received a Certificate in the Trust representing all of the interest in the Trust other than the Residual interest in the Trust. (PF 30.) On this date, MIR sold to TIAA the certificate for an amount realized of $81,452,111. (PF 31.) The fair market value of the interest sold to TIAA was $81,974,204, thus the loss on the sale was $522,093. (PF 31.) The purported basis of the Mortgage Notes interest sold to TIAA was $150,894,679 (*i.e.*, not reduced by the obligation to close the shorts sales by purchasing replacement Treasuries). (PF 32.)

On its partnership return (Form 1065) for the period ended December 30, 1994, MIR reported a loss on the of the Mortgage Notes of $71,189,461.[15] (PF 33.) On February 2, 2001, the IRS issued a Notice of Final Partnership Administrative Adjustment ("FPAA") with respect to MIR's taxable year ended October 28, 1994. (PF 34.) In the FPAA for MIR's October 28, 1994, taxable year, the IRS reduced the partnership basis by $75,000,000 to reflect the obligation to return the Treasuries sold short to CS First Boston. (PF 35.) On February 2, 2001, the IRS issued

---

[15] In the Complaint (¶ 33), however, Marriott states that the loss on the sale of the Mortgage Notes was $69,442,568 ($81,452,111 - $150,894,679). For purposes of this motion, the discrepancy between the MIR tax return and the Complaint does not need to be resolved.

an FPAA with respect to MIR's taxable year ended December 30, 1994. (PF 36.) In the FPAA for MIR's December 30, 1994, taxable year, the IRS determined that MIR realized a gain on the sale of the Mortgage Notes of $1,757,378, instead of the loss reported on the MIR Form 1065 of $71,189,461. (PF 37.) This determination was based on the reduction in the partnership basis of $75,000,000 which reflected the obligation to return the Treasuries sold short to CS First Boston. (PF 37.)

STANDARD OF REVIEW

This is a motion for summary judgment filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims. Summary judgment is appropriate when the record could not lead a rational trier of fact to find for the nonmoving party and there is no genuine issue for trial. "In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings." *NovaCare v. United States*, 52 Fed.Cl. 165, 169 (2002).

The particular tax item at issue here is a claimed tax loss of $71,189,461 on the sale of the Mortgage Notes, which manifests itself as a "deduction" on a partnership tax return. "Whether and to what extent deductions shall be allowed depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).

## ARGUMENT

## I.

## THE TREASURIES SHORT SALE OBLIGATIONS CONSTITUTE LIABILITIES THAT MUST BE INCLUDED IN THE BASIS OF THE PARTNERSHIP

### A. Introduction

This TEFRA partnership proceeding involves a "Son of BOSS" tax shelter.[16] In a Son of BOSS tax shelter, a partner contributes encumbered property to the partnership, which expressly assumes the associated obligation. The partner, however, computes his tax basis in this partnership interest as equal to the value of the contributed property without reducing that value by the amount of the encumbrance--*i.e.*, the partner fails to adjust its basis in its partnership interest under § 752(a) and (b), which ultimately results in partnership assets with a vastly overstated basis. When the assets with the "pumped" basis are sold, they generate a large non-economic tax loss.

In this case, Marriott used the short-sale variant of the Son of BOSS scheme to create an enormous artificial tax loss without any corresponding economic loss. Marriott followed a script proposed by CS First Boston to use the short sale of Treasuries to create an artificially high basis in certain assets which were then sold at a tax loss that far out-weighed any real economic loss. "'Selling short' . . . involves two separate transactions: the short sale itself and the subsequent

[16] A TEFRA partnership proceeding is a proceeding to determine the correctness of the partnership's reporting of "partnership items" on its annual information return. When the IRS disagrees with a partnership's reporting of any partnership item, it must issue an FPAA (final partnership administrative adjustment) before making any assessments against the partners attributable to this item. §§ 6223(a)(2), (d)(2), 6225(a). The timely mailing of the FPAA suspends the running of the limitations period for assessing any income taxes that are attributable to any partnership item or affected item. § 6229(d).

covering purchase." *Zlotnick v. TIE Communications*, 836 F.2d 818, 820 (3d Cir. 1988). In the first transaction, the investor sells securities that he does not own; he typically does this by borrowing the securities from a facilitating broker. "The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed [securities]." *Id.* The short sale thus gives rise to the second transaction -- the covering purchase. The short seller typically makes this covering purchase using the funds he received from selling the borrowed securities. If the securities decline after the short sale, as anticipated, the investor does not need to use all the proceeds from the short sale to make the covering purchase. *Id.* Thus, the two transactions are offsetting–the sale of borrowed securities and their ultimate replacement with identical securities. The only unknown element prior to the close of the short sale is the *cost* of the replacement securities.

In this case, MORI's short sale of Treasuries with a face value of $75 million through CS First Boston generated sale proceeds of $73 million and gave rise to a binding legal obligation for MORI to return to CS First Boston Treasuries with a face value of $75 million. MORI then contributed the short-sale proceeds to MIR which Marriott manipulated, through various transactions, in an attempt to "pump up" the basis of time share mortgage notes Marriott had agreed to sell to TIAA. Thus, Marriott reported that it incurred a capital *loss* of $71 million as a result of the short sales, the partnership transactions involving various subsidiaries, and the sale of mortgage notes.

Marriot reaches this incredible conclusion by taking the position that MORI had a basis of approximately $157 million in its partnership interest in MIR as a result of the contribution of the short-sale proceeds and the mortgage notes to MIR, of which $155 million was assigned to the

time share mortgage notes. Marriott asserts that it does not have to account for the obligation to close the short sales in MORI's basis in MIR.[17] Thus, after MORI's interest in MIR was transferred to MICC, the new MIR was formed, and the mortgage notes ultimately were sold to TIAA, Marriott claims that it realized a non-economic tax loss of $71 million, even though it realized a real economic loss on the sale of the mortgage notes of only $522,093.[18]

---

[17] Contained in Appendix B is Chart 1, which tracks Marriott's claimed basis calculations.

[18] Following the January 4, 1994, script provided by CS First Boston, Marriott forced a "technical termination" of MIR by transferring MORI's partnership interest in MIR to MICC in a § 351 exchange and then forming the new MIR. This step was vital in order to shift the inflated outside basis of MORI to the basis of MIR's assets under § 708(b)(1)(B), which provides that a partnership terminates when fifty percent or more of the total interest in the partnership is sold or exchanged. The transfer of fifty percent or more of a taxpayer's interest in a partnership to a corporation wholly owned by the taxpayer in a transaction qualifying under § 351 is an exchange that terminates the partnership under § 708(b)(1)(B), and under § 362 MICC takes a basis in the partnership equal to the basis MORI had in MIR. Under former Treas. Reg. § 1.708-1(b)(1)(iv)(T.D. 6175 was amended by T.D. 8717 on May 8, 1997), the effect of the technical termination is twofold. The partnership is deemed to distribute its property to the transferee partner and remaining partners. Under § 732(b), the partners take a substituted basis for the constructively distributed partnership property equal to their preexisting bases for their partnership interests. Under § 732(c) this substituted basis is then allocated among those properties in proportion to their respective adjusted bases in the hands of the partnership.

In this case, MORI transferred its 99% MIR partnership interest to MICC which caused a technical termination for tax purposes. Therefore, MIR is deemed to distribute the timeshare mortgages, with a basis of $83,300,000, and the cash, with a basis of $1,000,000, to the transferee partner, MICC, and the remaining partner, JBS, in proportion to their respective interests in the partnership, 99% and 1% respectively. At the time of the termination, MORI had a purported outside basis of $156,500,000 and JBS had a outside basis of $1,000,000. Hence, MICC took an outside basis of $156,500,000 and JBS retained its outside basis of $1,000,000. When MICC and JBS are deemed to contribute the assets to the "new" tax partnership, MIR took a carryover basis of $156,500,000 in the assets--primarily the mortgage notes--which were then sold for $81,452,111.

When MIR's assumption of MORI's obligation to replace the $75 million face value of Treasuries is properly taken into account in the partnership basis calculation, however, the fictitious $71 million loss on the mortgage notes sale is eliminated.[19] As we shall demonstrate, the critical premise of Marriott's argument, *i.e.*, that the obligation to replace borrowed securities with equivalent securities is a contingent obligation entirely outside the scope of § 752 for purposes of basis calculation, is wrong and, accordingly, the argument in support of the fictional $69 million loss fails.

**B. <u>Partnership's Basis in Partnership Assets - "Inside Basis"</u>**

The partnership's basis in its assets is referred to as "inside basis". Generally, § 723 provides the rule for calculating inside basis:

> The basis of property contributed to a partnership by a partner shall be the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time.

**C. <u>Partner's Basis in its Partnership Interest - "Outside Basis"</u>**

The issue presented in this motion for summary judgment involves the application of the partnership basis calculations of Subchapter K of the Internal Revenue Code.[20] Section 705 sets forth the equation for calculating a partner's basis in the interest it owns in the partnership–*i.e.*,

---

[19] Contained in Appendix B is Chart 2, which tracks the basis calculations that include the short-sale obligations.

[20] Under Treas, Reg. § 301.6231(a)(3)-1(a)(4), items relating to contributions and distributions from a partnership are partnership items to the extent that a determination of such items can be made from determinations that the partnership is required to make. Under Treas. Reg. § 301.6231(a)(3)-1(c)(2)(iv), the partnership needs to determine the basis to the partnership of contributed property, including necessary preliminary determinations such as the partner's basis in the contributed property. *Nussdorf v. Commissioner,* 129 T.C. 30, 41 (2007), *Cemco Investors LLC v. U.S.*, No. 04-C-8211, 2007 WL 951944, at *6 (N.D. Ill. Mar. 27, 2007).

"outside basis"--and that rule provides that basis is calculated by applying § 722 for "contributions to a partnership" or § 742 for "transfers of a partnership interest." Section 722 provides:

> The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time.

Section 705 then states that once the outside basis is determined under § 722 or § 742, the basis is increased by the partner's respective share of income items. The basis calculation continues by decreasing basis by (1) "distributions" that are set forth in § 733,[21] (2) losses of the partnership, and (3) certain expenditures of the partnership which are not deductible in computing taxable income and not properly chargeable to a capital account.[22]

**D. <u>The Effect of Liabilities on the Calculation of Outside Basis</u>**

Under the aggregate notion of partnership taxation, partnership liabilities must be allocated among the partners.[23] This is accomplished through §752, which treats a partner's increase in his/her share of partnership liabilities as a contribution of money by the partner, or a partner's decrease in his/her share of partnership liabilities as a distribution of cash to the partner.[24] What is particularly significant under the facts of this case, is the treatment of the

---

[21] "Distributions" mean money or property that the partnership transfers to its partners.

[22] A charitable contribution is an example of a partnership expenditure which is not deductible and which is not chargeable to a capital account, and hence decreases outside basis.

[23] See Laura E. Cunningham & Noel B. Cunningham, *The Logic of Subchapter K* 105 (2d ed. 2000).

[24] If a partner contributes partnership property in which he has a cost basis of $100, in exchange for a 50% interest in the partnership, he will have a basis of $100 in his 50%

decrease in a partner's liabilities when the short sale is closed and the obligation to replace the borrowed securities is extinguished. Under § 752(b), the decrease in a partner's share of liabilities that results from covering the short sale is considered a distribution of money to the partner and should result in a decrease in basis in the partnership.

**1. The Rule under § 752**

Section 752 provides for adjustments to the calculation of outside basis for transactions involving "liabilities." Section 752 provides, in relevant part:

> (a) Increase in Partner's Liabilities. - Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
>
> (b) Decrease in Partner's Liabilities. - Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

Since the obligation to close the short sales were part and parcel of the proceeds that resulted from the short sales, and both the obligations and the proceeds from the short sales were contributed to the partnership, the MIR partners' share of the obligations/liabilities are affected.

---

partnership interest. If the contributed property was encumbered by a liability of $80, his basis in the partnership will instead be $60, which is calculated as follows: $100 basis for the cost of the contributed property, less $80 for the liability assumed by the partnership, plus $40 for his 50% share of what is now a partnership liability. The adjustment appropriately reflects the economic effect of the liability. If partnership liabilities are involved, § 752(a) and (b) adjusts this initial outside basis to reflect the partners' respective shares of those liabilities. The omission of an obligation from partnership liabilities under § 752 creates a claim by the participant that his outside basis remained $100 because no adjustment is made for the partnership's assumption of the obligation under § 752(b). In this way, a Son of BOSS participant artificially inflates his outside basis by the amount of the omitted obligation and the participant claims an artificial tax benefit in the form of a built-in capital loss equal to the omitted obligation–all without any meaningful economic investment.

**2. Application of § 752(b) - - MIR's assumption of the obligation to close the short sale reduces MORI's outside basis because MIR is taking responsibility for the replacement of the Treasuries and, because that transfer of the obligation is a benefit to MORI, it is as if MIR is paying cash to MORI**

Section 752(b) provides that any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities is considered a distribution of money to the partner by the partnership. Therefore, in combination with §§705(a)(2) and 733(1), § 752(b) has the effect of decreasing the partner's adjusted basis in a partnership interest by the amount of the reduction in the partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities. Treas. Reg. § 1.752-1(d), (effective for liabilities incurred after December 27, 1991).

In this case, the short sales obligations became liabilities of the partnership. MORI contributed the obligations to close the short sales to MIR on or about on May 6, 1994, and August 16, 1994. Indeed, the proceeds from the short sales were contributed to MIR, along with the obligations. Treating MIR's assumption of the obligation to close the short sale as an assumption of a liability under § 752(b) results in a deemed distribution to MORI which reduces its outside basis by that obligation to replace the shorted $75,000,000 in Treasuries. In other words, when MIR assumed MORI's obligation to close the short sales, MORI was required to reduce its outside basis by the obligation to replace the shorted $75,000,000 in Treasuries.

**3. Application of § 752(a) - - With the obligation to close the short sale now residing in MIR, MORI and JBS increase their basis by their shares of the partnership's obligations to close the short sale**

Section 752(a) provides that any increase in a partner's share of the partnership's liabilities is considered a contribution of money to the partnership by the partner. Under § 722, the computation of a partner's outside basis in the partnership interest received includes the

amount of money it contributes. Therefore, § 752(a) has the effect of increasing the partner's outside basis by the amount of the increase in the partner's share of the partnership's liabilities. Under § 752(a), MORI's outside basis is increased by its share of the liability assumed by MIR (*i.e.*, the amount to close the short sales), which is approximately $74,250,000 (99% of $75,000,000). MORI held a 99% interest in MIR.

**4. Application of § 752(b) to the closing of the short sales**

The final step in the transaction was to close MIR's obligation to return Treasury securities with a face amount of $75,000,000 to CS First Boston. MIR closed the short sales by liquidating the Repos and using the proceeds to purchase the Treasury securities that it returned to CS First Boston. Thus, when MIR closed the short sales, MIR's liabilities were reduced by $75,000,000. Because the partnership liabilities are reduced, under § 752(b), a reduction in the partners' share of the partnership liabilities is treated as a distribution by MIR of $75,000,000 to its partners. This distribution decreases MORI's and JBS's outside basis in MIR. Accordingly, after the deemed distribution, MORI's basis in its MIR partnership interest equaled $81,500,000 ($155,750,000 less (99 percent of $75,000,000))–not the $156,500,000 claimed by Marriott.

## II.

## DEFENDANT'S LEGAL POSITION IS SUPPORTED BY THE PLAIN LANGUAGE OF THE STATUTE, THE CASE LAW, AND ADMINISTRATIVE RULINGS

### A. A plain reading of § 752 supports the Government's position

Construction of a statute begins with its plain language. *Delong v. Dep't of Health & Human Servs.*, 264 F.3d 1334, 1339 (Fed. Cir. 2001), *cert. denied*, 536 U.S. 958 (2002). The Supreme Court has stated (*American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)):

> As in all cases involving statutory construction, 'our starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used. Thus, absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.

The question is whether the obligation to close the short sale is a "liability" within the meaning of § 752. Black's Law Dictionary 914 (6th ed.) defines "liability" as follows (citations omitted):

> Liability. The word is a broad legal term. It has been referred to as of the most comprehensive significance, including almost every character of hazard or responsibility, absolute, contingent, and likely. It has been defined to mean: all character of debts and obligations, amenability or responsibility; an obligation one is bound in law or justice to perform; an obligation which may or may not ripen into a debt; and kind of debt or liability, either absolute or contingent, express or implied; condition of being actually or potentially subject to an obligation; condition of being responsible for a possible or actual loss, penatly, evil, expense, or burden; condition which creates a duty to perform an act immediately or in the future; duty to pay money or perform some other service; duty which must at least eventually be performed; estate tax; every kind of legal obligation, responsibility, or duty; fixed liability; legal responsibility; penalty for failure to pay tax when due; present, current, future, fixed or contingent debts; punishment; responsibility for torts; tax; that which one is under obligation to pay, or for which one is liability; the state of being bound in law and justice to do something which may be enforced by action; unliquidated claim.

In light of the clear meaning of liability, Marriott's effort to cast a binding legal obligation to replace securities borrowed from a brokerage firm as anything other than a liability must be ignored, especially in light of its tax avoidance purpose.

Moreover, Marriott's position would produce a result that is inconsistent with the tax statute. As discussed by the Tax Court (*Salina*, T.C. Memo. 2000-352, 80 T.C.M. (CCH) 686, 696 n. 15 (2000) (citations omitted)):

> In an effort to avoid distortions in income tax reporting associated with the blending of the entity and aggregate approaches within subchapter K, Congress enacted a number of provisions that generally are intended to equate the aggregate of the partnership's inside bases in its assets with the aggregate of its partners' outside bases in their partnership interests.

Defendant's position is consistent with the general Congressional intent that is reflected in the 1984 legislative history underlying the amendment to § 704(c). It is evident that Congress contemplated consistent definitions of the word "liability" under § 752 and § 357(c)(3). *See* H.R. Rep. No. 98-861, at 856-857 (1984), *reprinted in* 1984-3 (Vol. 2) C.B. 110, 111. Section 357(c) provides rules regarding the assumption of a liability in corporate reorganization. Under § 357(c)(3)(B), obligations that result in the creation, or an increase in the basis, of any property are treated as liabilities for purposes of that section. *See* Rev. Rul. 88-77, 1988-2 C.B. 128. Statutory construction "is a holistic endeavor" and the meaning of a provision is "clarified by the remainder of the statutory scheme . . . [when] only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

In *Salina*, at 696 n. 15, the Tax Court, quoting a tax treatise, explained:

> If a partnership borrows money, the basis of its assets increases by the amount of cash received, even though the receipt of the borrowed funds is not income. By treating the partners as contributing cash in an amount equal to their shares of the debt, inside/outside basis equality is preserved and distortions are avoided. If a liability for borrowed money were not added to the partners' bases, they could be taxed on a distribution of the borrowed cash even though there is no gain inherent in the partnership's assets. A similar result could occur if a partnership incurs a purchase money liability to acquire property, since the liability is added to the partnership's basis in the property. McKee, *supra*, par. 7.01[1], at

7-2; *see Laney v. Comm'r*, 674 F.2d 342, 345-346 (5th Cir. 1982), *aff'g in part and rev'g in part on another ground* T.C. Memo. 1979-491.

In this case, MORI borrowed the Treasuries from CS First Boston, sold them (*i.e.*, the short sale transactions), and received the proceeds from the short sale. Contributing the short sale proceeds to MIR, MORI increased its outside basis in MIR by the amount of the short sale proceeds. Accordingly, the corresponding short sale liability, which gave rise to the increase in basis, must be factored into the MIR basis calculation.

## B. <u>The IRS's consistent position is that when, as here, an obligation creates or increases the basis of any of the obligor's assets, that obligation is a "liability" under § 752</u>

The IRS has consistently ruled that when, as here, an obligation creates or increases the basis of the obligor's assets, that obligation is a liability under § 752. The IRS espoused this position as early as 1988. In Rev. Rul. 88-77, 1988-2 C.B. 128, 129, it defined liability under § 752 to "include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to any immediate deduction to the partnership, or, under section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest."

In 1989, the Treasury Department promulgated a temporary regulation containing a similar definition of "liability" under § 752. Temp. Treas. Reg. § 1.752-1T(g), 1989-1 C.B. 180, 192, provided as follows:

> [U]nder section 752, an obligation is a liability of the obligor for purposes of section 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such obligation gives rise to--
>
> (1) The creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);

> (2) A deduction that is taken into account in computing the taxable income of the obligor; or
>
> (3) An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.[[25]]

For reasons that are unclear, the final regulations adopted in 1991 did not contain a definition of "liability." See 1992-1 C.B. 218

In Rev. Rul. 95-26, 1995-1 C.B. 131, the IRS, relying, in part, on Rev. Rul. 88-77, ruled that a partnership's short sale of securities creates a partnership liability under § 752. The IRS reasoned that a short sale creates an obligation on the part of the seller to return the borrowed property. In addition, the short sale produces cash, and the cash is a partnership asset that increases the partnership's basis in its assets. Therefore, the short sale creates a liability under § 752 to the extent that the proceeds of the short sale increases the partnership's basis in its assets, and the partners' bases in their partnership interests were increased under § 722 to reflect their shares of the liability under § 752.[26] *Accord,* Rev. Rul. 95-45, 1995-1 C.B. 53 ("The initial proceeds of an open short sale are . . . an asset of the short seller, increasing the aggregate

---

[25] In 2003, the IRS issued a proposed regulation containing a similar definition, which was adopted in 2005. Prop. Treas. Reg. § 1.752-1(a)(1)(ii), 68 Fed. Reg. 37434, 37436 (2003); Treas. Reg. § 1.752-1(a)(4), T.D. 9207, 2005-1 C.B. 1344, 1354. Under Treas. Reg. § 1.752-1(a)(4)(i)(A), an obligation is a "liability" under § 752 if, *inter alia*, incurring the obligation "[c]reates or increases the basis of any of the obligor's assets (including cash)." In addition, an "obligation" is "any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code" and includes an obligation under a short sale. Treas. Reg. § 1.752-1(a)(4)(ii). The new definition applies to liabilities incurred or assumed by a partnership on or after June 24, 2003 (*id.* § 1.752-1(a)(4)(iv)), and, therefore, is inapplicable here.

[26] In Rev. Rul. 95-26, the Commissioner correctly cited *Deputy v. du Pont*, 308 U.S. 488 (1940), for the principle that a short sale creates an obligation. *See id.* at 497 ("Clearly respondent owed an obligation to the Delaware Company").

adjusted basis of its total assets by the amount of the proceeds. Because the obligation on the part of the seller to return the borrowed securities resulted in an increase in the adjusted basis of its assets, the obligation is treated as a liability").

Regulatory realities also support the IRS's treatment of the obligation to close the short sale as a liability under § 752. Regulation T[27] requires a short seller to have a margin account and to maintain margin levels exceeding the value of any short-selling activity. See 12 C.F.R. § 220.12(c)(1); Zachary Knepper, "Future-Priced Convertible Securities and the Outlook for 'Death Spiral' Securities Fraud Litigation," 26 Whittier L. Rev. 359, 371 & n.79 (2004); *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 240 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998). *Cf*. Rev. Rul. 95-26, 1995-1 C.B. at 132 (noting that after the short sale, the investor "leaves the cash proceeds from the sale with the broker-dealer as collateral and deposits additional cash as further collateral with the broker-dealer"). These margin requirements prevent the short seller from transferring the proceeds of the short sale until the underlying indebtedness is satisfied. In this case, the short sale proceeds were invested in the Repos, which satisfied the collateral margin requirements for the short sales. Thus, the short sale obligations could not be severed from the Repos that CS First Boston held as collateral. Only Marriott (and other tax shelter participants) take the position that such obligations are not bona fide economic liabilities.

[27] Regulation T is a Federal Reserve Board regulation governing customer cash accounts and the amount of credit that brokerage firms and dealers may extend to customers to purchase securities.

## C. The case law supports the Government's position

In *Salina*, T.C. Memo. 2000-352, 80 T.C.M. (CCH) 686 (2000), the Tax Court found that the obligation to close a short sale constitutes a liability for partnership basis purposes.[28] The taxpayer in *Salina*, Florida Power, took the same legal position as Marriott that the obligation to close a short sale is not a liability for purposes of § 752 and arranged a set of events which manufactured a current capital gain and future offsetting ordinary losses. Florida Power had a considerable unrelated capital loss in the year of the transaction which it could "wash" against the manufactured capital gain. The transaction was intended to allow Florida Power to circumvent the capital loss limitations. Corporate taxpayers may not claim capital losses in excess of capital gains. Hence, Florida Power attempted to "refresh" its capital loss and use it as an ordinary loss in future years. Ordinary losses do not have the same limitation as capital losses.

The ordering of events in *Salina* was a little different than in the present case. This different ordering theoretically permitted the taxpayer to manufacture a paper gain, instead of a paper loss. The Tax Court did not permit the result sought by the taxpayer. In *Salina*, the events occurred as follows:

1. Pallico (general partner with 99%) and Caraville (limited partner with 1%) formed Salina Partnership by contributing $74,250,000 and $750,000, respectively.

2. Salina Partnership sold short $350,000,000 of Treasury Notes, receiving $344,000,000 in proceeds, which were invested in $75,000,000 of Treasury Notes. The entities did not treat the obligation to close the short sale as a liability. This

[28] The Tax Court's decision in *Salina* has received favorable review. See e.g., Robert Bird & Alan Tucker, Tax Sham or Prudent Investment: Deconstructing the Government's Pyrrhic Victory in Salina Partnership v. Commissioner, 22 Va. Tax Rev. 231, 253 (2002) ("The Court Properly Concluded that Salina's Short Sale Constituted a 'Liability' Pursuant to Section 752").

created a disparity between inside basis ($419,000,000) and Pallico and Caraville's outside basis ($75,000,000).

3. Florida Power bought the 98% interest in Salina Partnership from Pallico. The transfer of the partnership interest caused a technical termination under § 708(b)(1)(B). The partnership was treated as distributing its assets, to which the partners would allocate their outside basis. The partners were then treated as contributing the assets to a new partnership. If the short sale obligation were treated as a liability, there would be inside-outside basis parity and the termination would not leave the partnership with built-in gain assets. Because the parties did not treat the obligation to close the short sale as a liability, Florida Power took an outside basis of $73,507,500.

4. Salina Partnership closed the short positions. When Salina used the $344,000,000 proceeds to close the short sale (buy back the sold Treasuries and return them to the broker), the partnership was relieved of a liability which caused it to have a gain under § 1001. Under §§ 702 and 704, this $350,000,000 gain was distributed to its partners. Because Florida Power had a low basis in its partnership interest (outside basis), it recognized a gain from the distribution. Florida Power then increased its outside basis by the amount of the gain under § 705.

In *Salina*, the Tax Court concluded that "in absence of any indication that Congress intended otherwise, we apply the term taking into account its plain and ordinary meaning." *Salina*, 80 T.C.M. (CCH) at 700 (citing *Deputy v. du Pont*, 308 U.S. at 498.) After referring to a definition of "liability" in Black's Law Dictionary, the Tax Court explained (*Salina* 80 T.C.M. at at 700):

> Based on the aforementioned meaning of the term "liability", and consistent with the policy underling Section 752, we hold that Salina's obligation to close its short sale by replacing Treasury bills that it borrowed from Goldman Sachs and ABN represented a partnership liability within the meaning of section 752. In particular, as part and parcel of its short sale of the Treaury bills, Salina had a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN.

More recently, the same result was reached in *Colm Producer, Inc.*, 460 F.Supp.2d 713. In *Colm*, another Son of BOSS tax shelter was at issue. The question presented on plaintiff's motion for summary judgment was whether the short-sale obligations should be considered partnership

liabilities under § 752. In *Colm*, the taxpayer artificially inflated his outside basis in a partnership by $100 million, by making a contribution of the proceeds from a short sale of $100 million of Treasury notes without accounting for the obligation to replace the Treasury notes. *Colm*, 460 F. Supp.2d at 713-714. The district court expressly rejected the taxpayer's argument that the liability to replace the borrowed Treasury notes was a contingent liability. Relying on *Salina* and the plain meaning of the term "liabilities," the district court also held that the short sale obligations assumed by the partnership in that case were partnership liabilities under § 752.

Marriott's position that the short sales are contingent obligations relies primarily on the same superficial analogy to contingent liabilities rejected in *Colm* and *Salina.* The obligation to cover the short sales, however, was never contingent. MIR had a binding legal obligation to replace the Treasuries sold short. Because MIR increased its tax basis by the amount of the short sale proceeds, the corresponding short sale obligation is fundamentally the same as more conventional purchase-money financing that would be included in partnership liabilities under § 752. The short sale proceeds (the Repos) that were used to increase the MORI's outside basis under § 722 were acquired only because of the obligations Marriott now seeks to ignore. Unlike short sales, a liability that is truly contingent does not immediately create or increase the borrower's tax basis in any property precisely because the obligation is contingent. Thus, Marriott's claim that the obligation to close the short sales may be disregarded for partnership tax basis is groundless.

## CONCLUSION

Because the statute, the applicable administrative rulings, and the case law support the Government's interpretation and application of § 752, defendant respectfully requests that its motion for summary judgment be granted.

Respectfully submitted,

*s/G. Robson Stewart*
G. ROBSON STEWART
U.S. Department of Justice - Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, DC 20044
tel: (202) 307-6493
fax: (202) 514-9440

NATHAN J. HOCHMAN
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

*s/David Gustafson*
Of Counsel

Dated: February 1, 2008

# APPENDIX A

## § 351. Transfer to corporation controlled by transferor

**(a) General rule.**--No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

**(b) Receipt of property.**--If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock permitted to be received under subsection (a), other property or money, then--

**(1)** gain (if any) to such recipient shall be recognized, but not in excess of--

**(A)** the amount of money received, plus
**(B)** the fair market value of such other property received; and

**(2)** no loss to such recipient shall be recognized.

**(c) Special rule.**--In determining control, for purposes of this section, the fact that any corporate transferor distributes part or all of the stock which it receives in the exchange to its shareholders shall not be taken into account.

**(d) Services, certain indebtedness, and accrued interest not treated as property.**--For purposes of this section, stock issued for--

**(1)** services,
**(2)** indebtedness of the transferee corporation which is not evidenced by a security, or
**(3)** interest on indebtedness of the transferee corporation which accrued on or after the beginning of the transferor's holding period for the debt,

shall not be considered as issued in return for property.

**(e) Exceptions.**--This section shall not apply to--

**(1) Transfer of property to an investment company.**--A transfer of property to an investment company.
**(2) Title 11 or similar case.**--A transfer of property of a debtor pursuant to a plan while the debtor is under the jurisdiction of a court in a title 11 or similar case (within the meaning of section 368(a)(3)(A)), to the extent that the stock received in the exchange is used to satisfy the indebtedness of such debtor.

**(f) Treatment of controlled corporation.**--If--

**(1)** property is transferred to a corporation (hereinafter in this subsection referred to as the "controlled corporation") in an exchange with respect to which gain or loss is not recognized (in whole or in part) to the transferor under this section, and
**(2)** such exchange is not in pursuance of a plan of reorganization,

section 311 shall apply to any transfer in such exchange by the controlled corporation in the same manner as if such transfer were a distribution to which subpart A of part I applies.

**(g) Cross references.--**

(1) For special rule where another party to the exchange assumes a liability, or acquires property subject to a liability, see section 357.
(2) For the basis of stock or property received in an exchange to which this section applies, see sections 358 and 362.

(3) For special rule in the case of an exchange described in this section but which results in a gift, see section 2501 and following.
(4) For special rule in the case of an exchange described in this section but which has the effect of the payment of compensation by the corporation or by a transferor, see section 61(a)(1).
(5) For coordination of this section with section 304, see section 304(b)(3).

**§ 357. Assumption of liability**

**(a) General rule.**--Except as provided in subsections (b) and (c), if--

**(1)** the taxpayer receives property which would be permitted to be received under section 351 or 361 without the recognition of gain if it were the sole consideration, and
**(2)** as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability,

then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351 or 361, as the case may be.

**(b) Tax avoidance purpose.--**

**(1) In general.**--If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)--

**(A)** was a purpose to avoid Federal income tax on the exchange, or
**(B)** if not such purpose, was not a bona fide business purpose,

then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section 351 or 361 (as the case may be), be considered as money received by the taxpayer on the exchange.

**(2) Burden of proof.**--In any suit or proceeding where the burden is on the taxpayer to prove such assumption or acquisition is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

**(c) Liabilities in excess of basis.--**

**(1) In general.**--In the case of an exchange--

**(A)** to which section 351 applies, or
**(B)** to which section 361 applies by reason of a plan of reorganization within the meaning of section 368(a)(1)(D),

if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

**(2) Exceptions.**--Paragraph (1) shall not apply to any exchange--

**(A)** to which subsection (b)(1) of this section applies, or
**(B)** which is pursuant to a plan of reorganization within the meaning of section 368(a)(1)(G) where no former shareholder of the transferor corporation receives any consideration for his stock.

**(3) Certain liabilities excluded.--**

**(A) In general.**--If a taxpayer transfers, in an exchange to which section 351 applies, a liability the payment of which either--

**(i)** would give rise to a deduction, or
**(ii)** would be described in section 736(a),

then, for purposes of paragraph (1), the amount of such liability shall be excluded in determining the amount of liabilities assumed or to which the property transferred is subject.

**(B) Exception.**--Subparagraph (A) shall not apply to any liability to the extent that the incurrence of the liability resulted in the creation of, or an increase in, the basis of any property.

**§ 702. Income and credits of partner**

**(a) General rule.**--In determining his income tax, each partner shall take into account separately his distributive share of the partnership's--

**(1)** gains and losses from sales or exchanges of capital assets held for not more than 1 year,
**(2)** gains and losses from sales or exchanges of capital assets held for more than 1 year,
**(3)** gains and losses from sales or exchanges of property described in section 1231 (relating to certain property used in a trade or business and involuntary conversions),
**(4)** charitable contributions (as defined in section 170(c)),
**(5)** dividends with respect to which there is a deduction under part VIII of subchapter B,
**(6)** taxes, described in section 901, paid or accrued to foreign countries and to possessions of the United States,
**(7)** other items of income, gain, loss, deduction, or credit, to the extent provided by regulations prescribed by the Secretary, and
**(8)** taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection.

**(b) Character of items constituting distributive share.**--The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (7) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership.

**(c) Gross income of a partner.**--In any case where it is necessary to determine the gross income of a partner for purposes of this title, such amount shall include his distributive share of the gross income of the partnership.

**(d) Cross reference.**--

For rules relating to procedures for determining the tax treatment of partnership items see subchapter C of chapter 63 (section 6221 and following).

**§ 704. Partner's distributive share**

**(a) Effect of partnership agreement.**--A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement.

**(b) Determination of distributive share.**--A partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances), if--

**(1)** the partnership agreement does not provide as to the partner's distributive share of income, gain, loss, deduction, or credit (or item thereof), or
**(2)** the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect.

**(c) Contributed property.--**

**(1) In general.**--Under regulations prescribed by the Secretary--

**(A)** income, gain, loss, and deduction with respect to property contributed to the partnership by a partner shall be shared among the partners so as to take account of the variation between the basis of the property to the partnership and its fair market value at the time of contribution, and

**(B)** if any property so contributed is distributed (directly or indirectly) by the partnership (other than to the contributing partner) within 5 years of being contributed--

**(i)** the contributing partner shall be treated as recognizing gain or loss (as the case may be) from the sale of such property in an amount equal to the gain or loss which would have been allocated to such partner under subparagraph (A) by reason of the variation described in subparagraph (A) if the property had been sold at its fair market value at the time of the distribution,
**(ii)** the character of such gain or loss shall be determined by reference to the character of the gain or loss which would have resulted if such property had been sold by the partnership to the distributee, and
**(iii)** appropriate adjustments shall be made to the adjusted basis of the contributing partner's interest in the partnership and to the adjusted basis of the property distributed to reflect any gain or loss recognized under this subparagraph.

**(2) Special rule for distributions where gain or loss would not be recognized outside partnerships.**--Under regulations prescribed by the Secretary, if--

**(A)** property contributed by a partner (hereinafter referred to as the "contributing partner") is distributed by the partnership to another partner, and

**(B)** other property of a like kind (within the meaning of section 1031) is distributed by the partnership to the contributing partner not later than the earlier of--

**(i)** the 180th day after the date of the distribution described in subparagraph (A), or
**(ii)** the due date (determined with regard to extensions) for the contributing partner's return of the tax imposed by this chapter for the taxable year in which the distribution described in subparagraph (A) occurs,

then to the extent of the value of the property described in subparagraph (B), paragraph (1)(B) shall be applied as if the contributing partner had contributed to the partnership the property described in subparagraph (B).

**(3) Other rules.**--Under regulations prescribed by the Secretary, rules similar to the rules of paragraph (1) shall apply to contributions by a partner (using the cash receipts and disbursements method of accounting) of accounts payable and other accrued but unpaid items. Any reference in paragraph (1) or (2) to the contributing partner shall be treated as including a reference to any successor of such partner.

**(d) Limitation on allowance of losses.**--A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership.

**(e) Family partnerships.**--

**(1) Recognition of interest created by purchase or gift.**--A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

**(2) Distributive share of donee includible in gross income.**--In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service.

**(3) Purchase of interest by member of family.**--For purposes of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be

donated capital. The "family" of any individual shall include only his spouse, ancestors, and lineal descendants, and any trusts for the primary benefit of such persons.

**(f) Cross reference.--**

For rules in the case of the sale, exchange, liquidation, or reduction of a partner's interest, see section 706(c)(2).

**§ 705. Determination of basis of partner's interest**

**(a) General rule.**--The adjusted basis of a partner's interest in a partnership shall, except as provided in subsection (b), be the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests)--

**(1)** increased by the sum of his distributive share for the taxable year and prior taxable years of--

**(A)** taxable income of the partnership as determined under section 703(a),
**(B)** income of the partnership exempt from tax under this title, and
**(C)** the excess of the deductions for depletion over the basis of the property subject to depletion;

**(2)** decreased (but not below zero) by distributions by the partnership as provided in section 733 and by the sum of his distributive share for the taxable year and prior taxable years of--

**(A)** losses of the partnership, and
**(B)** expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account; and

**(3)** decreased (but not below zero) by the amount of the partner's deduction for depletion for any partnership oil and gas property to the extent such deduction does not exceed the proportionate share of the adjusted basis of such property allocated to such partner under section 613A(c)(7)(D).

**(b) Alternative rule.**--The Secretary shall prescribe by regulations the circumstances under which the adjusted basis of a partner's interest in a partnership may be determined by reference to his proportionate share of the adjusted basis of partnership property upon a termination of the partnership.

**§ 708. Continuation of partnership**

**(a) General rule.**--For purposes of this subchapter, an existing partnership shall be considered as continuing if it is not terminated.

**(b) Termination.--**

**(1) General rule.**--For purposes of subsection (a), a partnership shall be considered as terminated only if--

**(A)** no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or
**(B)** within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.

**(2) Special rules.--**

**(A) Merger or consolidation.**--In the case of the merger or consolidation of two or more partnerships, the resulting partnership shall, for purposes of this section, be considered the continuation of any merging or consolidating partnership whose members own an interest of more than 50 percent in the capital and profits of the resulting partnership.

**(B) Division of a partnership.**--In the case of a division of a partnership into two or more partnerships, the resulting partnerships (other than any resulting partnership the members of which had an interest of 50 percent or less in the capital and profits of the prior partnership) shall, for purposes of this section, be considered a continuation of the prior partnership.

**§ 721. Nonrecognition of gain or loss on contribution**

**(a) General rule.**--No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership.

**(b) Special rule.**--Subsection (a) shall not apply to gain realized on a transfer of property to a partnership which would be treated as an investment company (within the meaning of section 351) if the partnership were incorporated.

**§ 722. Basis of contributing partner's interest**

The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time.

**§ 723. Basis of property contributed to partnership**

The basis of property contributed to a partnership by a partner shall be the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time.

**§ 732. Basis of distributed property other than money**

**(a) Distributions other than in liquidation of a partner's interest.--**

**(1) General rule.**--The basis of property (other than money) distributed by a partnership to a partner other than in liquidation of the partner's interest shall, except as provided in paragraph (2), be its adjusted basis to the partnership immediately before such distribution.
**(2) Limitation.**--The basis to the distributee partner of property to which paragraph (1) is applicable shall not exceed the adjusted basis of such partner's interest in the partnership reduced by any money distributed in the same transaction.

**(b) Distributions in liquidation.**--The basis of property (other than money) distributed by a partnership to a partner in liquidation of the partner's interest shall be an amount equal to the adjusted basis of such partner's interest in the partnership reduced by any money distributed in the same transaction.

**(c) Allocation of basis.**--The basis of distributed properties to which subsection (a)(2) or subsection (b) is applicable shall be allocated--

**(1)** first to any unrealized receivables (as defined in section 751(c)) and inventory items (as defined in section 751(d)(2)) in an amount equal to the adjusted basis of each such property to the partnership (or if the basis to be allocated is less than the sum of the adjusted bases of such properties to the partnership, in proportion to such bases), and
**(2)** to the extent of any remaining basis, to any other distributed properties in proportion to their adjusted bases to the partnership.

**(d) Special partnership basis to transferee.**--For purposes of subsections (a), (b), and (c), a partner who acquired all or a part of his interest by a transfer with respect to which the election provided in section 754 is not in effect, and to whom a distribution of property (other than money) is made with respect to the transferred interest within 2 years after such transfer, may elect, under regulations prescribed by the Secretary, to treat as the adjusted partnership basis of such property the adjusted basis such property would have if the adjustment provided in section 743(b) were in effect with respect to the partnership property. The Secretary may by regulations require the application of this subsection in the case of a distribution to a transferee partner, whether or not made within 2 years after the transfer, if at the time of the transfer the fair market value of the partnership property (other than money) exceeded 110 percent of its adjusted basis to the partnership.

**(e) Exception.--**This section shall not apply to the extent that a distribution is treated as a sale or exchange of property under section 751(b) (relating to unrealized receivables and inventory items).

**§ 733. Basis of distributee partner's interest**

In the case of a distribution by a partnership to a partner other than in liquidation of a partner's interest, the adjusted basis to such partner of his interest in the partnership shall be reduced (but not below zero) by--

**(1)** the amount of any money distributed to such partner, and

**(2)** the amount of the basis to such partner of distributed property other than money, as determined under section 732.

**§ 742. Basis of transferee partner's interest**

The basis of an interest in a partnership acquired other than by contribution shall be determined under part II of subchapter O (sec. 1011 and following).

**§ 752. Treatment of certain liabilities**

**(a) Increase in partner's liabilities.**--Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

**(b) Decrease in partner's liabilities.**--Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

**(c) Liability to which property is subject.**--For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

**(d) Sale or exchange of an interest.**--In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

# APPENDIX B

## CHART 1

### MARRIOTT’S CLAIMED BASIS CALCULATIONS

| MORI's Outside Basis in MIR (excluding short sale obligations) | | | |
|---|---|---|---|
| May 6, 1994 | Timeshare mortgages | $65,200,000 | 722 |
| May 6, 1994 | Proceeds from first short sale | $63,700,000 | 722 |
| August 16, 1994 | Proceeds from second short sale | $9,500,000 | 722 |
| August 16, 1994 | Timeshare mortgages | $11,900,000 | 722 |
| October 1, 1994 | Timeshare mortgages | $6,200,000 | 722 |
| | | | |
| | MORI's Total Outside Basis | $156,500,000 | |

| MIR's Inside Basis in Its Partnership Assets (excluding short sale obligations) | | | |
|---|---|---|---|
| May 6, 1994 | Cash contributed by JBS | $1,000,000 | 723 |
| May 6, 1994 | Time-share mortgages contributed by MORI | $65,200,000 | 723 |
| May 6, 1994 | Proceeds from first short sale contributed by MORI | $63,700,000 | 723 |
| August 16, 1994 | Proceeds from second short sale contributed by MORI | $9,500,000 | 723 |
| August 16, 1994 | Timeshare mortgages contributed by MORI | $11,900,000 | 723 |
| September 29, 1994 | Payment to close second short sale | ($65,000,000) | |
| October 1, 1994 | Timeshare mortgages contributed by MORI | $6,200,000 | 723 |
| October 17, 1994 | Payment to close first short sale | ($10,000,000) | |
| | | | |
| | MIR's Total Inside Basis | $82,500,000 | |

## CHART 2

## BASIS CALCULATIONS INCLUDING THE SHORT SALE OBLIGATIONS

| JBS's Outside Basis (including short sale obligations) | | | |
|---|---|---|---|
| May 6, 1994 | Cash contributed to MIR | $1,000,000 | 722 |
| May 6, 1994 | 1% of obligation to cover first short sale | $650,000 | 752(a) |
| August 16, 1994 | 1% of obligation to cover second short sale | $100,000 | 752(a) |
| September 29, 1994 | Deemed distribution regarding first short sale close | ($650,000) | 752(b) |
| October 17, 1994 | Deemed distribution regarding second short sale close | ($100,000) | 752(b) |
| | | | |
| | JBS's Total Outside Basis | $1,000,000 | |

| MORI's Outside Basis (including short sale obligations) | | | |
|---|---|---|---|
| May 6, 1994 | Timeshare mortgages | $65,200,000 | 722 |
| May 6, 1994 | Proceeds from first short sale (rounded) | $63,700,000 | 722 |
| May 6, 1994 | Release of obligation to cover short sale | ($65,000,000) | 752(b) |
| May 6, 1994 | 99% of obligation to cover short sale | $64,350,000 | 752(a) |
| August 16, 1994 | Proceeds from second short sale (rounded) | $9,500,000 | 722 |
| August 16, 1994 | Release of obligation to cover short sale | ($10,000,000) | 752(b) |
| August 16, 1994 | 99% of obligation to cover short sale | $9,900,000 | 752(a) |
| August 16, 1994 | Timeshare mortgages | $11,900,000 | 722 |
| September 29, 1994 | Deemed distribution regarding first short sale close | ($64,350,000) | 752(b) |
| October 1, 1994 | Timeshare mortgages | $6,200,000 | 722 |
| October 17, 1994 | Deemed distribution regarding second short sale close | ($9,900,000) | 752(b) |
| | | | |
| | MORI's Total Outside Basis | $81,500,000 | |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

**Nos. 01-256 T and 01-257 T**
**(Judge Lettow)**

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

# DECLARATION OF G. ROBSON STEWART

---

I, G. Robson Stewart, being of legal age and pursuant to 28 U.S.C., Section 1746, declare as follows:

1. I am the Department of Justice trial attorney assigned to defend the above-captioned case and I have in my possession relevant Department of Justice and Internal Revenue Service files.

2. Attached hereto are true and accurate copies of the following documents:

Exhibit 1 - MTMG Corp. Purchase Agreement dated November 22, 1993.

Exhibit 2 - Letter dated November 22, 1993, from Marriott Ownership Resorts, Inc., to Teachers Insurance and Annuity Association of America.

Exhibit 3 - Facsimile dated January 1, 1994, from Phil Hamon at CS First Boston to Lester Pulse at Marriott International.

Exhibit 4 - Letter dated June 24, 1994, from Phil Hamon at CS First Boston to Michael Dearing at Marriott Ownerships Resorts, Inc., re: original intent of the parties ("original intent letter").

Exhibit 5 - Letter dated June 24, 1994, from Phil Hamon at CS First Boston to Michael Dearing at Marriott Ownerships Resorts, Inc., re: letter agreement ("agreement letter").

Exhibit 6 - Letter dated July 8, 1994, from Brit Bartter at CS First Boston to Michael Dearing at Marriott International, Inc.

Exhibit 7 - Certificate of Incorporation of Marriott International JBS Corporation.

Exhibit 8 - Marriott International Resorts, L.P., limited partnership agreement.

Exhibit 9 - Facsimile dated September 29, 1994, from Timothy Lu at CS First Boston to Michael Dearing at Marriott.

Exhibit 10 - Facsimile dated October 12, 1994, from Timothy Lu at CS First Boston to Michael Dearing at Marriott Ownership Resorts, Inc.

Exhibit 11 - Marriott International Resorts, L.P., partnership return (Form 1065) for the taxable year ended October 28, 1994.

Exhibit 12 - Marriott International Resorts, L.P., partnership return (Form 1065) for the taxable year ended December 30, 1994.

I declare under penalty of perjury, that the foregoing is true and correct. Executed in Washington, D.C., on February 1, 2008.

G. ROBSON STEWART
Trial Attorney, Tax Division
U.S. Department of Justice

# Defendant's Exhibit 1

B&W Draft 11/22/93
Marked to show changes
from Draft of 11/18/93

MTMG CORPORATION

PASS-THROUGH CERTIFICATES

SERIES 1993-A, 1994-A, 1994-B, 1994-C and 1994-D

PURCHASE AGREEMENT

Dated November 22, 1993

39900.00007\PURAG.8

## Table of Contents


| | | Page |
|---|---|---|
| 1. | The Certificates | 1 |
| 2. | Purchase and Sale of the Certificates | 2 |
| 3. | The Closings; Delivery of the Certificates | 2 |
| 4. | Conditions of the Purchaser's Obligation | 3 |
| 5. | Representations and Warranties | 8 |
| 6. | Expenses | 12 |
| 7. | The Purchaser's Representations | 14 |
| 8. | Investigations with Respect to Representations and Warranties | 15 |
| 9. | Payments | 15 |
| 10. | Indemnification and Contribution | 15 |
| 11. | Notices | 18 |
| 12. | Miscellaneous | 18 |

SCHEDULES AND EXHIBITS

| | |
|---|---|
| Exhibit A | Forms of Opinion of Counsel to the Company, the Servicer and Marriott. |
| Exhibit B | MORI Notice. |
| Exhibit C | Form of Opinion of Brown & Wood As To Bankruptcy-Related Matters. |
| Exhibit D | Form of Opinion of Counsel to the Trustee. |
| Exhibit E | [Reserved] |
| Exhibit F | Form of Opinion of Special Florida Tax Counsel. |
| Exhibit G | Forms of Certificates of the Company, the Servicer and Marriott. |
| Exhibit H | Form of Certificates of Sun Bank, National Association. |
| Exhibit I | Form of Pricing Agreement. |

MTMG CORPORATION

PASS-THROUGH Certificates

Series 1993-A, 1994-A, 1994-B, 1994-C and 1994-D

# PURCHASE AGREEMENT

MTMG Corporation, a Delaware corporation (the "Company"), a wholly owned subsidiary of Marriott Ownership Resorts, Inc., a Delaware corporation ("MORI"), and MORI each hereby agrees with Teachers Insurance and Annuity Association of America, a New York corporation (the "Purchaser"), as follows.

1. The Certificates. The Company and MORI have each authorized the execution and delivery to Sun Bank, National Association, as trustee (the "Trustee"), of five Pooling and Servicing Agreements (each a "Pooling Agreement", and collectively the "Pooling Agreements") providing for the creation of five separate trusts (each a "Trust", and collectively the "Trusts") and for the issuance and sale of five separate series of pass-through certificates (each a "Series", and collectively the "Certificates") that evidence undivided interests in (a) five separate pools of mortgage loans (each a "Pool" and collectively the "Mortgage Loans") owned or to be acquired from MORI (subject to their meeting certain criteria set forth herein and in the related Pooling Agreement) by the Company, serviced by MORI (in such capacity, the "Servicer") and secured by first mortgage liens or deeds of trust on timeshare estates which are part of certain timeshare resorts (each, a "Resort") and which comprise or will comprise all of the Mortgage Loans originated or to be originated by MORI with respect to the Resorts prior to December 1, 1994, and (b) certain other assets required to be transferred and assigned to the Trustee pursuant to the Pooling Agreements. The Mortgage Loans to be included in any Pool will be described in a separate Private Placement Memorandum (each a "PPM") provided in connection with each issuance of a Series. Each Mortgage Loan and Resort shall conform to the representations and warranties set forth in the related Pooling Agreements. The cut-off date for each Series (each a "Cut-Off Date") shall be set forth in a notice (the "MORI Notice") given by MORI to the Purchaser not later than 10 days prior to the Closing Date (as defined below) with respect to each Series (except in the case of the initial Series, in which case, the related MORI Notice shall be given on the date hereof), a form of which is attached hereto as Exhibit B. The initial Series of Mortgage Loans shall have an aggregate unpaid principal balance of approximately $70,000,000 as of its Cut-Off Date, after giving effect to payments of principal made before such Cut-Off Date. Each Series of Mortgage Loans, other than the initial Series, will have an aggregate principal balance of not less than $15 million, as of the respective Cut-Off Date for such Series of Certificates,

after giving effect to principal payments made prior to the related Cut-Off Date. The aggregate principal balance of the Mortgage Loans comprising all five pools will not be greater than $175 million. The Company, MORI and Marriott International, Inc. ("Marriott") are sometimes hereinafter referred to collectively as the "Marriott Parties".

2. Purchase and Sale of the Certificates. In reliance upon the representations and warranties contained herein and in the Agreements (as defined below) and subject to the terms and conditions set forth herein, the Company agrees to sell to the Purchaser, and the Purchaser agrees to purchase from the Company, the Certificates of each Series. The Certificates to be purchased with respect to each Series will be purchased at the price (the "Purchase Price") set forth in a Pricing Agreement dated no later than two business days prior to the respective Closing Date. The Purchase Price for each Series shall equal (a) the outstanding pool balance of the pool of Mortgage Loans transferred to and with respect to such Trust pursuant to the related Pooling Agreement at the related Cut-Off Date, after giving effect to all payments of principal with respect to such Mortgage Loans made after the Cut-Off Date and before the first day of the month in which the Closing Date occurs, multiplied by (b) the Purchase Price Percentage set forth in the related Pricing Agreement plus (c) interest accrued on the amount calculated pursuant to clause (a) at the Pass-Through Rate set forth in the Pricing Agreement from and including the first day of the month in which the Closing Date occurs up to, but not including, the related Closing Date. The Purchase Price Percentage and the Pass-Through Rate with respect to each Series shall be set to provide to the Purchaser a bond equivalent yield equal to 240 basis points over the average of the average yields on U.S. Treasury securities, adjusted to a constant maturity of four years, as published on Bloomberg on each of the five consecutive Business Days immediately following the date of the MORI Notice, and shall be based on the Bloomberg system for pricing asset-backed securities. The Purchase Price for each Series shall be payable to the Company (x) by wire transfer in immediately available Federal funds to the bank account specified by the Company at least two Business Days prior to the Closing Date, or (y) in such other manner as shall be agreed upon by the Purchaser and the Company.

3. The Closings; Delivery of the Certificates. The purchase and sale of a single Series of Certificates pursuant hereto (each a "Closing") shall be held on or prior to the date set forth in the related MORI Notice or such other date as shall be mutually acceptable to the Company and the Purchaser (each such date a "Closing Date"); provided that no Closing Date shall be within 60 days of the Closing Date of the previous Series and provided further that no Closing Date shall occur after December 14, 1994. Each Closing shall take place at the office of Brown & Wood at 10:00 a.m. New York City time on a Closing Date or at such other

place in New York City as the Purchaser shall designate. At each Closing, the Company will deliver to the Purchaser, against payment of the Purchase Price therefor, a Certificate in the denomination equal to the aggregate principal balance of the mortgage loans in the related Pool registered in the Purchaser's name, or in the name of its nominee; provided, however, that if the Purchaser requests the Company in writing not less than three Business Days prior to the related Closing Date to issue to the Purchaser Certificates in other denominations (authorized pursuant to Section 7.01 of the Pooling Agreement) that equal in the aggregate the denomination mentioned in this sentence, the Company will comply with such request.

4. Conditions of the Purchaser's Obligation. The obligation of the Purchaser set forth in Section 2 to purchase any Series of Certificates on the related Closing Date shall be subject to the accuracy of the representations and warranties as of the date hereof and such Closing Date that are made (a) on the part of any of the Marriott Parties or Sun Bank, National Association ("Sun Bank"), as Trustee, and contained in this Purchase Agreement, the Pooling Agreements and the Collateral Security Agreements dated as of the dates of the related Pooling Agreements among the Company, MORI and Sun Bank, as Collateral Agent (the "Collateral Agreements"), (b) by Marriott in the related Guaranty Agreement dated the related Closing Date, among Marriott, the Company and the Trustee (the "Guaranty Agreement") and (c) by MORI in the related Letter Agreement (each, a "MORI Letter Agreement") dated the related Closing Date, subject to the accuracy of the statements made by any of the Marriott Parties in any certificates furnished pursuant to the provisions thereof, and to the following additional conditions:

(i) The Company and MORI shall each have complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied by it at or prior to the related Closing Date under this Purchase Agreement, the related Pooling Agreement and the related Collateral Agreement, and Sun Bank shall have complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied by it at or prior to each Closing Date under the related Pooling Agreement and Collateral Agreement.

(ii) (a) G & S Consulting Network, Inc., or such other firm as may be mutually agreed upon by the Company and the Purchaser, shall have completed a review of such documentation relating to the relevant Pool of Mortgage Loans as the Purchaser may deem appropriate, (b) on the basis of such review, nothing shall have come to the attention of the Purchaser that causes it to conclude that there is any breach of or inaccuracy in the representations and warranties of any of the Marriott

Parties set forth in any agreement relating to the Pool reviewed or the Series issued with respect thereto to which it is party and (c) the Purchaser shall have completed, and be satisfied (in its sole discretion) with the results of, the Purchaser's investigation with respect to such transaction as a whole.

(iii) The related Pooling Agreement and Collateral Agreement shall each have been duly authorized, executed and delivered by each of the Company, MORI and Sun Bank, shall be in full force and effect and shall constitute a legal, valid and binding agreement of each of the Company, MORI and Sun Bank, enforceable against each of them in accordance with its terms, subject to bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and subject, with respect to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law, and no event shall have occurred which constitutes or, with the passage of time or with notice or both, would constitute a default thereunder, and the Purchaser and its special counsel shall each have received one fully executed copy of each such Agreement.

(iv) Each of the Assignments delivered with respect to a Series shall have been duly authorized, executed and delivered by MORI or the Company, as the case may be, shall be in full force and effect and shall constitute a legal, valid and binding agreement of MORI or the Company, as the case may be, enforceable against MORI or the Company, as the case may be, in accordance with its terms, subject to bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and subject, with respect to enforceability to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or as law, and no event shall have occurred which constitutes or, with the passage of time or with notice or both would constitute a default thereunder, and the Purchaser and its special counsel shall each have received one fully executed copy of each thereof.

(v) Each of the related Guaranty Agreement and the related MORI Letter Agreement shall have been duly authorized, executed and delivered by Marriott or MORI, as appropriate, shall be in full force and effect and shall constitute a legal, valid and binding agreement of Marriott or MORI, as appropriate, enforceable against Marriott or MORI, as appropriate, in accordance with its terms, subject to bankruptcy, insolvency, reorganization

or other similar laws affecting the enforcement of creditors' rights generally and subject, with respect to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law, and no event shall have occurred which constitutes or, with the passage of time or with notice or both, would constitute a default under such agreement, and the Purchaser and its special counsel shall each have received one fully executed copy of such agreement.

(vi) The Purchaser shall have received a favorable opinion of counsel for the Company, MORI and Marriott dated the Closing Date and substantially in the forms of Exhibit A-1, A-2, A-3 and A-4, respectively, hereto.

(vii) The Purchaser shall have received a favorable opinion dated the Closing Date of special counsel to the Company in each state in which the Mortgage Loans are located with respect to such Series, in form and substance satisfactory to the Purchaser.

(viii) The Purchaser shall have received a favorable opinion in respect of certain bankruptcy-related matters from Brown & Wood, dated the closing Date and substantially in the form of Exhibit C hereto.

(ix) The Purchaser shall have received a favorable opinion of counsel to Sun Bank, as Trustee and as Collateral Agent, dated the Closing Date and substantially in the form of Exhibit D hereto.

(x) The Purchaser shall have received a favorable opinion of counsel to Sun Bank, as Collateral Agent, as to the security interest of the Collateral Agent, in the Reserve Account, dated the Closing Date and substantially in the form of Exhibit F hereto.

(xi) The Purchaser shall have received a favorable opinion of counsel to the Letter of Credit Bank as to enforceability of the Letters of Credit, in form and substance satisfactory to the Purchaser.

(xii) The Purchaser shall have received an opinion of its special counsel, in form and substance acceptable to it.

(xiii) The Company, MORI and Marriott shall each have delivered to the Purchaser a certificate, dated the Closing Date and executed by both the Chairman of the Board, the President or the Executive or any Vice President and the Secretary or any Assistant Secretary of

the Company, MORI or Marriott, as the case may be, substantially in the form of Exhibit G-1 hereto (with respect to the Company), Exhibit G-2 hereto (with respect to MORI) and Exhibit G-3 hereto (with respect to Marriott).

(xiv) Sun Bank shall have delivered to the Purchaser a certificate dated the Closing Date and executed by both the Chairman of the Board, the President or the Executive or any Vice President and the Secretary or any Assistant Secretary of Sun Bank, substantially in the form of Exhibit H hereto.

(xv) Each of the Marriott Parties and Sun Bank shall have delivered to the Purchaser a Secretary's Certificate as to the charter, by-laws, board resolutions and other related corporate matters of those respective Persons, in form and substance acceptable to the Purchaser.

(xvi) The Trustee shall have provided evidence satisfactory to the Purchaser that it has received the Mortgage Instrument pursuant to Section 2.01 of the Pooling Agreement with respect to each Mortgage Loan relating thereto.

(xvii) The Certificates shall have been rated "A" by Duff & Phelps Credit Rating Co., or have been rated the rating deemed equivalent to such rating by such other Rating Agency as may rate any Series pursuant to the mutual agreement of the Grantor and the Purchaser.

(xviii) Camp Dresser & McKee, or such other company as shall be appointed for such purpose by the Grantor, pursuant to a mutual agreement between the Grantor and the Purchaser, shall have furnished a Phase I environmental report in respect of the Mortgaged Properties acceptable to the Purchaser.

(xix) The Company or another Marriott Party shall have paid all taxes, fees and governmental charges, if any, due in connection with (a) the execution and delivery of the related Pooling Agreement, the related Collateral Agreement, the related Guaranty Agreement, the related MORI Letter Agreement, this Purchase Agreement and any Assignment (collectively, the "Agreements"), (b) execution and delivery of any Reserve Letter of Credit or Repurchase Letter of Credit pursuant to any of the Agreements, (c) the sale, assignment and transfer by MORI of the Mortgage Loans to the Company, (d) the sale, assignment and transfer by the Company of the related

Mortgage Loans to the Trusts and (e) the execution, delivery, issuance and sale of the related Series.

(xx) The purchase of and payment for the related Series shall be permitted by all laws regulating investments to which the Purchaser may be subject, without recourse to provisions (such as the present provisions of Section 1405(a)(8) of the New York Insurance Law) permitting limited investments without restriction as to the character of the particular investment.

(xxi) The Company shall have applied for a private placement number for the Certificates of the related Series.

(xxii) All opinions, certificates and other documents incident to, and all proceedings in connection with the transactions contemplated by, any of the Agreements shall be satisfactory in form and substance to the Purchaser and its special counsel. The Purchaser and its special counsel shall have received copies of all documents and other information as they may reasonably request, in form and substance satisfactory to the Purchaser and its special counsel, with respect to such transactions and the taking of all proceedings in connection therewith.

(xxiii) The Purchaser shall have received a receipt or other evidence satisfactory to it from Sun Bank confirming the receipt by Sun Bank of (a) the deposit of funds into the Reserve Account in the amount specified in Section 3(a) of the related Collateral Agreement and (b) the initial deposit of funds into the Collection Account pursuant to Section 3.05(a) of the related Pooling Agreement.

(xxiv) The Purchaser shall have received from Prentice Hall Corporation System ("Prentice Hall") evidence satisfactory to the Purchaser that Prentice Hall has accepted the appointment by the Company and MORI of it as Process Agent (as defined below).

(xxv) The weighted average of the interest rates on the Mortgage Loans comprising any Pool shall not be less than the sum of (a) the interest rate payable on the Certificates of the related Series, (b) the Trustee Fee Rate, (c) the Servicing Fee Percent (each as defined in the related Pooling Agreement) and (d) 2.0%. The Servicing Fee Percent with respect to any Pool shall not be less than fifty basis points.

(xxvi) The Marriott Parties shall have duly authorized executed and delivered such further agreements, opinions, documents or instruments as may be necessary to the accomplishment of the purposes set forth herein and in the Agreements and as shall reasonably have been requested by the Purchaser.

If any of the conditions specified in this Section 4 shall not have been fulfilled when and as provided by this Purchase Agreement, or if any of the opinions and certificates mentioned above or elsewhere in this Purchase Agreement shall not be satisfactory in form and substance to the Purchaser and special counsel to the Purchaser, this Purchase Agreement and all obligations of the Purchaser hereunder with respect to the affected Series may be cancelled at, or at any time prior to, the related Closing Date by the Purchaser. Notice of such cancellation shall be given to the Company in writing, or by telephone confirmed in writing. Such cancellation shall be without prejudice to any rights, claims or remedies that the Purchaser and the Company may have pursuant to this Purchase Agreement or otherwise against the Company or the Purchaser, as the case may be, or any other person by reason of such cancellation and without prejudice to any rights, claims or remedies that the Company or the Purchaser may have pursuant to the other Agreements relating to any other Series against the Purchaser or the Company, as the case may be, or against any other person with respect to such other Agreements.

5. <u>Representations and Warranties</u>. (a) The Company represents and warrants to the Purchaser, with respect to the initial Series as of the date hereof and, with respect to each of the remaining Series to be closed in 1994, as of the related Closing Date, as follows:

(i) Each of the Agreements with respect to each Series to which it is a party has been or will have been by the related Closing Date duly authorized, executed and delivered by the Company and, assuming due execution and delivery by the other parties thereto, constitutes or will constitute a legal, valid and binding agreement of the Company enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The Certificates, when executed, issued, authenticated and delivered in accordance with the related Pooling Agreement and sold to and paid for by the Purchaser as provided herein, will be validly issued and outstanding and entitled to the benefits of the related Pooling Agreement and will constitute valid instruments enforceable in accordance with their terms. Upon

delivery to the Purchaser of the related Certificates, the Purchaser will be vested with sole beneficial ownership of and all equitable rights, title and interest in and to the related Trust Estate, free and clear of any equity, lien, encumbrance, pledge, charge security interest or other claim (legal title to the Mortgage Loans being held by the Trustee for the benefit of the relevant Certificateholders as provided in the related Pooling Agreement).

(ii) Neither the issuance or sale of the Certificates of the relevant Series, nor the consummation of any other of the transactions contemplated in any of the related Agreements to which it is a party or will be a party pursuant to the this Purchase Agreement, nor the execution, delivery or performance of the terms of any of such Agreements, will (a) result in the breach of any term or provision of the certificate of incorporation or by-laws of the Company, (b) conflict with, result in a breach or violation of or the acceleration of indebtedness under or constitute a default under, the terms of any other Pooling Agreement, indenture, agreement or instrument to which the Company is a party or will be a party pursuant to this Purchase Agreement or by which it is bound or will be bound pursuant to this Purchase Agreement, or any statute or regulation applicable to the Company or any order applicable to the Company of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Company or (c) result in the creation or imposition of any lien, charge or encumbrance upon the relevant Pool, Series or any property or assets of the Company. The Company is not and will not be a party to, bound by or in breach or violation of any other Pooling Agreement, indenture, agreement or instrument, or subject to or in violation of any applicable statute or regulation or any order of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects, or may in the future materially and adversely affect, (a) the ability of the Company to perform its obligations under any of the Agreements to which it is a party or (b) the business, operations, financial condition, prospects, properties, mortgages or assets of the Company.

(iii) No consent, approval, authorization of, registration or filing with, or notice to, any governmental or regulatory authority, agency, department, commission, board, bureau, body or instrumentality is required for the execution, delivery or performance of or compliance by the Company with any of the Agreements to which it is a party or will be a party pursuant to this

Purchase Agreement or the Certificates, or the offer, issue, sale or delivery of the certificate, or the consummation by the Company of any other transaction contemplated under any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement. No tax, assessment or other governmental charge will become payable by the Purchaser as a result of (a) the execution, delivery or performance of any such Agreements, (b) the sale, assignment and transfer to the Trust of the relevant Pool and other property required to be remitted by the Company for deposit in the relevant Collection Account pursuant to the relevant Pooling Agreement or (c) the execution, delivery, issuance and sale of the relevant Series and neither the ownership of the relevant Pool and such other property required to be remitted for deposit in the relevant Collection Account nor the servicing thereof by the Servicer pursuant to the relevant Pooling Agreement will, in and of itself, result in the Purchaser becoming subject to taxation or being deemed to be doing business in any jurisdiction in which any Mortgaged Property is located.

(iv) There is no action, suit or proceeding against, or investigation of, the Company pending or threatened, before any court, administrative agency or other tribunal which, either individually or in the aggregate, (a) may result in any material adverse change in the business, operations, financial condition, prospects, properties, or assets of the Company or in any impairment of the right or ability of the Company to carry on its business substantially as now conducted, or (b) asserts the invalidity of any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement or the relevant Series or (c) seeks to prevent the issuance of the relevant Series or the consummation of any of the transactions contemplated by any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement or (d) which might materially and adversely affect the performance by the Company of its obligations under, or the validity or enforceability of, any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement or the relevant Series or (e) would cause the description of the federal income tax consequences of the purchase, ownership and disposition of the relevant Series in the related PPM prepared by MORI and delivered to the relevant initial Certificateholders under the heading "Certain Federal Income Tax Consequences" to be incorrect.

(v) None of the Marriott Parties, nor any Affiliate of any of the Marriott Parties, nor any person

authorized or employed by any of the Marriott Parties has, directly or indirectly, sold or offered for sale or disposed of, or attempted or offered to sell or dispose of, Certificates of any Series, or solicited offers to buy any Certificates from, or otherwise approached or negotiated with respect thereto with, any person or persons other than the Purchaser and not more than 25 other Persons. None of the Marriott Parties, nor any Affiliate of any of the Marriott Parties will, directly or indirectly, offer or sell any Certificates or similar security in a manner which would render the issuance and sale of Certificates of any Series pursuant to this Purchase Agreement a violation of Section 5 of the Securities Act of 1933, as amended (the "Act"), or require registration pursuant thereto, nor will it authorize any person to act in such manner. Each offering and sale of a Series are exempt from the registration requirements of the Act. No Pooling Agreement will be required to be qualified under the Trust Indenture Act of 1939, as amended.

(vi) No Trust is, and no issuance and sale of Certificates of any Series in the manner contemplated by this Purchase Agreement and the related Pooling Agreement will cause any of the Trusts to be, subject to registration or regulation as an investment company or affiliate of an investment company under the Investment Company Act of 1940, as amended.

(vii) Each Mortgage Loan, when identified to the relevant Pool, assigned to the relevant Trust and included in the Trust Estate underlying the Certificates of the related Series, will have been delivered to the Trustee, together with an Assignment thereof by the Company, which immediately prior to such Assignment will own full legal and equitable title to such Mortgage Loan, free and clear of any lien, charge, encumbrance or participation or ownership interest in favor of any other Person. Upon endorsement and delivery to the Trustee of the executed original Mortgage Notes and execution and delivery of the recorded Assignments pursuant to Section 2.01(a) of the related Pooling Agreement, all of the Company's right, title and interest in and to such Pool will be validly and effectively transferred to the Trustee.

(viii) The Company will not, directly or indirectly, apply any part of the proceeds of the sale of any Series for the purpose (whether immediate, incidental or ultimate) of purchasing or carrying any "margin securities" within the meaning of Regulation G (12 CFR

Part 207), promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(ix) None of the Agreements, the PPMs or any other agreement, document, certificate or statement furnished to the Purchaser or the Trustee by or on behalf of the Company pursuant to any of the Agreements, contains or will contain any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading. There are no facts known to the Company which, individually or in the aggregate, materially adversely affect, or which (aside from general economic trends) may reasonably be expected to materially adversely affect in the future, the condition, business or prospects of the Company, or which may impair the Company's ability to perform its obligations under any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement, which have not been or will not be disclosed herein or therein or in the relevant certificates and other documents furnished to the Purchaser by or on behalf of the Company pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(B) The representations and warranties to be made by the Company in Sections 2.02 and 2.03 of each Pooling Agreement are hereby included in this Purchase Agreement to the same extent as if fully set forth herein. The representations and warranties to be made by MORI in Section 5.01 of each Pooling Agreement are hereby included in this Purchase Agreement to the same extent as if fully set forth herein. The representations and warranties made by the Company and MORI with respect to Mortgage Loans to be originated and acquired after the date hereof, and with respect to the Resorts and any Additional Resorts which may in the future be included among Resorts whose Mortgaged Properties may secure Mortgage Loans to be originated and acquired after the date hereof, which representations and warranties are set forth in Schedules I and II hereof, respectively, are hereby included in this Purchase Agreement to the same extent as if fully set forth at this place.

6. <u>Expenses</u>. (A) Whether or not the transactions contemplated hereby shall be consummated, MORI will pay, cause to be paid, or reimburse the Purchaser upon demand for, all reasonable expenses (including, without limitation, all reasonable out-of-pocket expenses which the Purchaser, in its sole discretion, may incur) in connection with any of the Agreements and the transactions contemplated by any of the Agreements and the relevant Series of Certificates and the transactions contemplated thereby, incurred on or prior to the related Closing Dates (whether or not paid), including, without limitation (i) the cost of printing or otherwise preparing and reproducing the Agreements and the

Certificates and all exhibits to any of the Agreements, (ii) the cost of the performance by any of the Marriott Parties of all agreements and conditions contained in any of the Agreements on its part to be performed or satisfied, (iii) the cost of obtaining private placement numbers for the Certificates and the cost of delivering to the Purchaser's home office the Certificates purchased by the Purchaser, (iv) any and all payment or liability with respect to, and loss with respect to or resulting from, the non-payment or delayed payment of any and all placement fees or other liability which any of the Marriott Parties may be or become obligated to pay any agent, finder or broker in connection with any transaction, (v) the reasonable legal fees, expenses and disbursements of special counsel to the Purchaser, (vi) the reasonable fees, expenses and disbursements of [G & S Consulting Network, Inc.], the underwriter employed by the Purchaser, (vii) any expenses incurred by the Purchaser relating to or arising out of the sale or transfer of the Servicer's rights, obligations and responsibilities in connection with the servicing of any Pool and (viii) the fees and expenses of Sun Bank and any agent of Sun Bank and the fees and disbursements of counsel to Sun Bank, in connection with the execution and delivery of the Pooling Agreements, the Collateral Agreements and the Certificates.

(B) MORI will pay, cause to be paid, or reimburse the Certificateholders upon demand for, all expenses (including without limitation, all reasonable out-of-pocket expenses which such Certificateholders, in their sole discretion, may incur) in connection with any amendment to or waiver of any of the Agreements or such Certificateholders' Certificates which are initiated by any of the Marriott Parties (whether or not such amendments or waivers become effective), including, without limitation, (i) the cost of printing or otherwise preparing and reproducing the Agreements and any Certificates subsequently issued under the Agreements and all exhibits to any of the Agreements, (ii) the cost of the performance by any of the Marriott Parties of all agreements and conditions contained in any of the Agreements on its part to be performed or satisfied, (iii) the cost of delivering to such Certificateholders' home offices the Certificates purchased by such Certificateholders, (iv) the legal fees, expenses and disbursements of one separate special counsel to the Certificateholders of Certificates of any Series, (v) any expenses incurred by such Certificateholders relating to or arising out of the sale of the Servicer's rights, obligations and responsibilities in connection with the servicing of each Pool and (vi) the fees and expenses of Sun Bank and any agent of Sun Bank and the fees and disbursements of counsel to Sun Bank in connection with any amendment to or waiver of a Pooling Agreement, Collateral Agreement or such Certificateholders' Certificates.

(C) The Company will also pay, and will save the Certificateholders harmless from, any and all liabilities with respect to nonpayment or delay in payment of, any taxes, fees and

charges which may be payable to any governmental body or regulatory authority in connection with (i) the execution and delivery of any of the Agreements relating to the relevant Series, (ii) the transfer by the Company of each Pool to the relevant Trust, (iii) the execution, delivery, issuance and sale of each Series, (iv) any amendment or waiver initiated by any of the Marriott Parties (whether or not the same are ever declared effective) under or in respect of any of the Agreements or any Series, other than transfer taxes or taxes on or measured by the Certificateholders' income or profits and (v) any reasonable costs and expenses incurred by any Certificateholders defending against the same.

(D) The Company will also pay or reimburse each Certificateholder upon demand for, all reasonable expenses (including, without limitation, all reasonable out-of-pocket expenses which such Certificateholder, in its sole discretion, may incur) in connection with the enforcement by such Certificateholder of this Purchase Agreement, the relevant Pooling Agreement, the relevant Collateral Agreement and such Certificateholders' Certificates and the transactions contemplated hereby or thereby, in the event of any failure by the Company to comply with the provisions hereof or thereof or with any suit for or the collection of any overdue amount payable by the Company under this Purchase Agreement, the relevant Pooling Agreement, the relevant Collateral Agreement and such Certificateholders' Certificates.

7. <u>The Purchaser's Representations</u>. (a) The Purchaser represents to the Company as follows:

(i) The Purchaser is acquiring each Series for its own account and not with a view to or for sale in connection with any distribution thereof. Subject to the express provisions of this Purchase Agreement, the disposition of any Series shall at all times be within the control of the owner thereof. The acquisition of any Series by the Purchaser on the relevant Closing Date shall constitute the Purchaser's reaffirmation of such representation. The Purchaser agrees that any sale or other transfer of any Series will be made by it only when such sale or other transfer is made pursuant to an effective registration under the Act or when such sale or other transfer is otherwise made in compliance with or pursuant to an exemption from the Act. The Purchaser is an accredited investor within the meaning of the Act.

(ii) The funds used by the Purchaser to purchase any Series are and will be from the general account of an insurance company.

(b) The obligation of the Company to sell to the Purchaser any Series of Certificates (after the initial Series) on the related Closing Date shall be subject to the delivery by the Purchaser on such Closing Date of a representation letter to the

effect that the Purchaser is an accredited investor within the meaning of the Act as of such date.

8. Investigations with Respect to Representations and Warranties. The Purchaser shall have no obligation on or prior to the Closing Date to verify, confirm, or otherwise make any investigation as to the accuracy of the representations and warranties contained in any of the Agreements or otherwise made in writing by or on behalf of any of the Marriott Parties in connection with the transactions contemplated under any of the Agreements and all other agreements, and the representations and warranties contained in any of the Agreements or otherwise made in writing by or on behalf of any of the Marriott Parties in connection with the transactions contemplated in any of the Agreements shall (a) be deemed to be material and to have been relied upon by the Purchaser, notwithstanding any investigation heretofore or hereafter made by the Purchaser or any agent on behalf of the Purchaser and (b) survive the execution and delivery of this Purchase Agreement, any investigation at any time made by the Purchaser or any agent on its behalf, the sale and purchase of all of the Certificates and payment therefor by the Purchaser and execution and delivery of all the other Agreements.

9. Payments. The Purchaser has requested, and the Company hereby acknowledges, that the Company shall cause the Trustee to make all distributions on or with respect to all of the Certificates to the Purchaser, so long as the Purchaser shall be the registered owner of the Certificates (or any Certificates exchanged therefor), by electronic funds transfer in immediately available funds at the opening of business on the date on which such distributions are due through the Automated Clearing House system to the following account of the Purchaser (or such other account as the Purchaser may from time to time designate in writing) together with sufficient information (including interest rate, designation of the Certificates and the issuer thereof, total payment and principal and interest portions of such payment) to identify the source of such payment including the nominee names in which the Certificates may be held: Morgan Guaranty Trust Company, New York, New York, ABA Number 021000238, for deposit to the account of Teachers Insurance and Annuity Association of America Account No. 121-85-001. The Company shall enter into an agreement similar to that contained in this Section with any other institutional investor (or nominee thereof) who shall legitimately hold any Certificate.

10. Indemnification and Contribution. (A) Whether or not all of the Certificates are purchased by the Purchaser or any of the other transactions contemplated hereunder are consummated, the Company hereby agrees to indemnify and hold harmless the Purchaser, its affiliates and any of their respective directors, officers, agents and employees and each other person, if any, controlling any of the foregoing (within the meaning of either Section 15 of the

Act or Section 20 of the Exchange Act) (each an "Indemnified Person") from and against any losses, claims, damages, payments, costs, taxes (including interest, penalties and additions to tax), liabilities, obligations and expenses (including, but not limited to, all legal fees and expenses, and any and all other expenses incurred in investigating, preparing or defending against any action, suit or proceeding, pending, commenced or threatened) (collectively, "Damages") to which any Indemnified Person may become subject as provided in the following clauses (i) and (ii): (i) Damages, whether incurred directly or indirectly, by withholding or offset or otherwise as a result, solely or in part, of any obligor or payor with respect to any Mortgage Loan being a citizen or resident of, or making any payment from, any country (or political subdivision thereof) or any place other than the "United States" (as defined in section 7701(a)(9) of the Internal Revenue Code of 1986), including, without limitation, any Damages arising out of any applicable exchange control or withholding tax laws, rules or regulations and (ii) Damages arising out of, in connection with or relating in any way to (a) the assertion by any Person of any claim (other than any claim alleging the violation of any environmental statute, order or regulation) against such Indemnified Person relating to the ownership, operation, repair, use or maintenance of any Condominium Project or Mortgaged Property, which claim is the result of any action or omission of the Company or any Affiliate of the Company, (b) the assertion by any Person of any claim alleging the violation of any environmental statute, order or regulation, which alleged violation is the result of any action or omission of the Company or any Affiliate of the Company, (c) the breach of any of the covenants, representations or warranties made by or on behalf of the Company in any of the Agreements other than the representations or warranties made by the Company in Sections 2.01 and 2.03 of each of the Pooling Agreements or (d) the noncompliance of the Mortgage Loans or the sale of the Mortgage Loans or the Mortgaged Properties with any applicable law. The Company further agrees that the indemnification, contribution and reimbursement obligations set forth in this Section 10 shall apply whether or not the Indemnified Person is a formal party to any such lawsuits, claims or other proceedings. The Company further agrees promptly upon demand by an Indemnified Person, at any time or from time to time, to reimburse such Indemnified Person for, or pay, any Damages as to which the Company has indemnified such Indemnified Person pursuant to this Purchase Agreement. The Company will not be responsible for any Damages to the extent that a court of competent jurisdiction shall have determined that such Damages resulted primarily from such Indemnified Person's negligence or willful misconduct and such determination is final and nonappealable.

The indemnity, contribution and expense reimbursement obligations of the Company under this Section 10 shall be in addition to any liability it may otherwise have at law or in equity.

(B) Promptly after receipt by an Indemnified Person of notice of the commencement of any action or proceeding, such Indemnified Person will, if a claim in respect thereof is to be made against the Company hereunder, notify the Company in writing of the commencement thereof; but the Indemnified Person's failure so to notify the Company will not relieve the Company from any lability that it may have to any Indemnified Person under this Section 10. In case any such action or proceeding shall be brought against any Indemnified Person, the Company shall be entitled to participate therein and the Company shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Person and the payment of all expenses. The Indemnified Person shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (i) the Company has agreed to pay such fees and expenses, (ii) the Company shall have failed to assume the good faith and diligent defense of such action or proceeding or to employ counsel reasonably satisfactory to the Indemnified Person in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Person and the Company and the Indemnified Person shall have been advised by the Purchaser's special counsel that either (a) the counsel selected by the Company to represent such Indemnified Person has, in the judgment of such Counsel, a conflict of interest or (b) claims and defenses not available to, or divergent from the interests of, the Company are available to such Indemnified Person (in which case, if the Indemnified Person notifies the Company in writing that the Indemnified Person elects to employ separate counsel at the expense of the Company, the Company shall not have the right to assume the defense of such action or proceeding on behalf of the Indemnified Person, it being understood, however, that the Company shall not, in connection with any one such action or proceedings or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Persons, which firm shall be designated in writing by a majority in interest of the Indemnified Persons). If the Company assumes the defense of any such action or proceeding, the Company shall not enter into any settlement affecting any Indemnified Party the terms of which require anything other than the payment of Damages without the prior written consent of the Indemnified Party, which consent shall not unreasonably be withheld or delayed.

(C) If the indemnification provided for in clause (A) of this Section 10 is unavailable to an Indemnified Person in respect of any Damages, then the Company, in lieu of indemnifying such Indemnified Person, shall contribute to the amount paid or payable by such Indemnified Person as a result of such Damages in such proportion as is appropriate to reflect the relative fault of the

Company on the one hand and of the Indemnified Person on the other hand in connection with the statements, actions, circumstances or omissions that resulted in such Damages, as well as any other relevant equitable consideration. The relative fault of the Company on the one hand and of the Indemnified Person on the other hand shall be determined by reference to, among other things, (i) the relative benefits received by the Company on the one hand and the Indemnified Person on the other from the transactions and (ii) the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statements, actions, circumstances or omissions. The amount paid or payable by a party as a result of the Damages referred to above shall be deemed to include any legal or other fees or expenses incurred by such party in connection with investigating or defending any such claim.

Each of the Company and the Purchaser agrees that it would not be just and equitable if contribution pursuant to the immediately preceding paragraph were determined by any method of allocation which does not take into account the equitable considerations referred to in such paragraph. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

11. Notices. All notices and other communications hereunder shall be in writing and shall be sent by facsimile transmission and by overnight mail delivered by a nationally recognized overnight delivery service, addressed (a) if to the Purchaser, to 730 Third Avenue New York, New York 10017, to the attention of Securities Division, Third Floor, or to such other address as the Purchaser shall have furnished to the Company in writing, (b) if to the Company, to 10400 Fernwood Road, Bethesda, Maryland 20817 Attention: Treasury Department - Treasurer, Law Department - Associate General Counsel, or to such other address as the Company shall have furnished to the Purchaser in writing or (c) if to MORI, to 1200 U.S. 98 South, Suite 20, Lakeland, Florida 33801, Attention: Finance - MTMG 1993-A or to such other address as MORI shall have furnished to the Purchaser in writing. Any notice so given by registered or certified mail shall be deemed to have been given five days after being deposited in a depository of the United States mails. Any notice given by means of a nationally recognized overnight delivery service shall be deemed to have been given upon receipt thereof as evidenced by confirmation of receipt provided by such nationally recognized overnight delivery service.

12. Miscellaneous. (A) THIS PURCHASE AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(B) ANY ACTION OR PROCEEDING AGAINST THE COMPANY OR MORI RELATING IN ANY WAY TO THIS AGREEMENT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF NEW YORK, COUNTY OF NEW YORK, OR OF

THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK AND EACH OF THE COMPANY AND MORI IRREVOCABLY SUBMITS TO THE JURISDICTION OF EACH SUCH COURT (AND ANY APPELLATE COURT FROM ANY THEREOF) IN RESPECT OF ANY SUCH ACTION OR PROCEEDING. EACH OF THE COMPANY AND MORI IRREVOCABLY APPOINTS PRENTICE HALL, 15 COLUMBUS CIRCLE, NEW YORK, N.Y. 10019 AS ITS AGENT (THE "PROCESS AGENT") TO RECEIVE SERVICE OF PROCESS OR OTHER LEGAL SUMMONS FOR PURPOSES OF ANY SUCH ACTION OR PROCEEDING IN THE STATE OF NEW YORK. SO LONG AS THE COMPANY OR MORI HAS ANY OBLIGATION UNDER THIS AGREEMENT, IT WILL MAINTAIN A DULY APPOINTED AGENT IN NEW YORK CITY FOR THE SERVICE OF SUCH PROCESS OR SUMMONS. SUCH SERVICE MAY BE MADE BY MAILING OR DELIVERING A COPY OF SUCH PROCESS TO THE COMPANY OR MORI, AS THE CASE MAY BE, IN CARE OF THE PROCESS AGENT AT THE ADDRESS SPECIFIED ABOVE FOR SUCH PROCESS AGENT, AND THE COMPANY AND MORI EACH HEREBY IRREVOCABLY AUTHORIZES AND DIRECTS SUCH PROCESS AGENT TO ACCEPT SUCH SERVICE ON ITS BEHALF. AS AN ALTERNATIVE METHOD OF SERVICE, THE COMPANY AND MORI EACH ALSO IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING IN THE SATE OF NEW YORK BY THE MAILING OF COPIES OF SUCH PROCESS TO THE COMPANY MORI, AS THE CASE MAY BE, AT ITS ADDRESS AS PROVIDED FOR NOTICES HEREUNDER.

EACH OF THE COMPANY AND MORI IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK, OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT COURT OF NEW YORK, AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Nothing in this Section 12(B) shall affect the right of the Purchaser to serve legal process in any other manner permitted by law or affect the right of the Purchaser to bring any action or proceeding against the Company or MORI or their respective property in the courts of other jurisdictions.

(C) The Agreements supersede all prior agreements and understandings relating to the subject matter hereof.

(D) The headings in this Purchase Agreement are for purposes of reference only and shall not limit or define the meaning hereof.

(E) This Purchase Agreement shall be binding upon the respective successors and assigns of the parties hereto and shall inure to the benefit of and be enforceable by any registered owner or owners at the time of each Certificates then issued, or any part thereof. No right or duty under this Agreement may be assigned or delegated by the Company or MORI without the written consent of the Purchaser.

(F) Except as otherwise provided in the final paragraph of Section 4, this Purchase Agreement may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change waiver, discharge or termination is sought.

(G) This Purchase Agreement may be executed simultaneously in several counterparts, or by different parties in separate counterparts, each of which counterparts shall be an original, but all of which shall collectively constitute one and the same instrument.

(H) Teachers Insurance and Annuity Association of America ("Teachers") shall have the right to substitute one of its wholly-owned subsidiaries as the purchaser of any Series to be purchased by it hereunder, by written notice delivered to the Company, which notice shall be signed by Teachers and such subsidiary and shall contain such subsidiary's agreement to be bound by this Purchase Agreement and to all other related Agreements. The Company agrees that, upon receipt of any such notice, whenever the word "Purchaser" is used in this Purchase Agreement in reference to Teachers or whenever Teachers is referred to by its own name or any other name or term in the related Pooling Agreement or in any document, instrument, certificate, opinion or paper delivered pursuant hereto or thereto, such reference shall be deemed to refer to such subsidiary in lieu of Teachers. In the event that such subsidiary is so substituted hereunder and thereafter transfers any Certificates or any portion thereof to Teachers, upon receipt by the Company of notice of such transfer, whenever the word "Purchaser" is used in this Purchase Agreement in reference to Teachers or whenever Teachers is referred to by its own name or any other name or term in the related Pooling Agreement or in any document, instrument, certificate, opinion or paper delivered pursuant hereto or thereto, such reference shall be deemed to refer to such subsidiary in lieu of Teachers only to the extent it retains any portion of such Certificates, and shall be deemed to refer to Teachers to the extent Teachers owns all or any portion of such Certificates, and Teachers and such subsidiary shall each have all the rights of an original purchaser of Certificates under this Purchase Agreement and such other Agreements.

IN WITNESS WHEREOF, the parties hereto have caused this Purchase Agreement to be duly executed all as of the date first written above.

MTMG CORPORATION

Attest:

By: ______________________
Name: WARD R. COOPER
Title: ASSISTANT SECRETARY

By: ______________________
Name: Michael E. Dearing
Title: Vice President

MARRIOTT OWNERSHIP RESORTS, INC.

Attest:

By: ______________________
Name: WARD R. COOPER
Title: ASSISTANT SECRETARY

By: ______________________
Name: Michael E. Dearing
Title: Vice President

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA

Attest:

By: ______________________
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Purchase Agreement to be duly executed all as of the date first written above.

MTMS CORPORATION

Attest:

By:________________________
Name:
Title:

By:________________________
Name:
Title:

MARRIOTT OWNERSHIP RESORTS, INC.

Attest:

By:________________________
Name:
Title:

By:________________________
Name:
Title:

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA

Attest:

By: [signature]
Name: Barry M. Johnson
Title: Director-Private Placements

# Defendant's Exhibit 2

MARRIOTT OWNERSHIP RESORTS, INC.

November 22, 1993

Teachers Insurance and
Annuity Association of America
730 Third Avenue
New York, New York 10017

Sun Bank, National Association,
as Trustee under the
Pooling and Servicing Agreement
referred to below
225 E. Robinson Street
Suite 350
Orlando, Florida 32802-0044

Ladies and Gentlemen:

MTMG Corporation, a Delaware corporation that is our wholly-owned subsidiary ("MTMG"), proposes to sell to Teachers Insurance and Annuity Association of America (the "Purchaser") $69,201,992.31 aggregate principal amount of Marriott Timeshare Pass-Through Certificates, Series 1993-A (the "Certificates"). Pursuant to the terms of the Purchase Agreement dated November 1, 1993 (the "Purchase Agreement") among MTMG, the Purchaser and ourselves, Marriott Ownership Resorts, Inc. ("MORI"), it is a condition precedent to the purchase by the Purchaser of the Certificates that MORI shall have executed and delivered this letter agreement (this "Agreement"). In consideration of the premises and in order to induce the Purchaser to purchase the Certificates, MORI hereby agrees as follows (all capitalized terms not defined herein shall have the meanings ascribed to them in the Pooling and Servicing Agreement dated as of November 1, 1993 (the "Pooling and Servicing Agreement") among MTMG, MORI and Sun Bank, National Association, as trustee (the "Trustee")):

1. MORI does hereby, as primary obligor and not as surety only, irrevocably, absolutely and unconditionally

guarantee to each of the Purchaser and the Trustee, for the express benefit of all Holders of Certificates from time to time, the due and punctual payment of (a) each amount which MTMG, as Grantor, is obligated to pay pursuant to Sections 2.01, 2.06 and 2.08 of the Pooling and Servicing Agreement, and (b) each amount which MTMG is obligated to pay pursuant to MTMG's obligation under the Purchase Agreement to indemnify each Indemnified Person (as defined in the Purchase Agreement) for (i) Damages (as defined in the Purchase Agreement) arising out of or relating in any way to the noncompliance of the Mortgage Loans or of the sale of the Mortgaged Properties or the Mortgage Loans with respect to any applicable law and (ii) Damages, whether incurred directly or indirectly, by withholding or offset or otherwise as a result, solely or in part, of any obligor or payor with respect to any Mortgage Loan being a citizen or resident of, or making any payment from, any country (or political subdivision thereof) or any place other than the "United States" (as defined in section 7701(a)(9) of the Internal Revenue Code of 1986), including, without limitation, any Damages arising out of any applicable exchange control or withholding tax laws, rules or regulations. The obligations of MORI described in this Paragraph 1 are sometimes hereinafter referred to as the "Guaranteed Obligations."

2. MORI agrees that, upon failure by MTMG to pay punctually or when due any part of the Guaranteed Obligations, MORI shall forthwith on demand pay the amount not so paid.

3. The obligations of MORI under this Agreement shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, impaired or otherwise affected by (i) any extension, renewal, settlement, compromise, waiver or release by any Person of the performance or observance of any of the agreements, covenants, terms or conditions contained in the Pooling and Servicing Agreement, the Collateral Security Agreement dated as of November 1, 1993 among MTMG, MORI and Sun Bank, National Association, as collateral agent (the "Collateral Agreement"), the Purchase Agreement or the separate Guaranty Agreement (the "Guaranty Agreement") of Marriott International, Inc. ("Marriott"), dated the date hereof and addressed to the Trustee and the Purchaser (collectively, the "Agreements"); (ii) any change in the corporate existence or structure of MTMG, MORI or Marriott (collectively, the "Marriott Parties") or the transfer by any Person of its interest in any Marriott Party; (iii) the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets or the marshalling of assets and liabilities of any Marriott Party, or any assignment for the benefit of creditors, or any receivership, insolvency, bankruptcy, reorganization, arrangement, composition

or readjustment of, or other similar proceeding affecting, any Marriott Party or any of their respective assets or any resulting release or discharge of any Marriott Party from the performance or observation of any agreement, covenant, term or condition contained in any of the Agreements; (iv) the release, substitution or replacement of any property subject to the Pooling and Servicing Agreement or the substitution, replacement, acceptance, release, non-perfection or invalidity of any security for any obligation of any Marriott Party under any of the Agreements, the replacement of MORI as Servicer under the Pooling and Servicing Agreement or the assumption of any obligation under any of the Agreements by any other party or the discharge of any obligor under any of the Agreements; (v) any modification or amendment or termination of or supplement to any of the Agreements; <u>provided</u>, <u>however</u>, that any amendment to any of the Agreements (made pursuant to the terms of such Agreement) that modifies any obligation of MTMG that is guaranteed under this Agreement shall be given effect under this Agreement; (vi) the existence of any claim, set-off or other right which MORI may have at any time against MTMG, Marriott or any other Person, whether in connection herewith or with any unrelated transactions; (vii) any invalidity or unenforceability of any of the Agreements; (viii) any other act or omission to act or delay of any kind by any Marriott Party, the Purchaser, the Trustee, any Certificateholder or any other Person; (ix) any circumstance which might otherwise constitute a legal or equitable defense or discharge of a guarantor or surety; or (x) any other cause, whether similar or dissimilar to the foregoing.

4. MORI's obligations under this Agreement shall remain in full force and effect until all amounts payable by MTMG under the Pooling and Servicing Agreement and the Purchase Agreement shall have been paid in full. If at any time any such amount is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of MTMG or otherwise, MORI's obligations under this Agreement with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

5. MORI irrevocably waives acceptance of this Agreement, presentment, demand, protest and notice of any kind, as well as any requirement that at any time any action be taken by any Person first against MTMG, Marriott (under the Guaranty Agreement or otherwise) or any other Person. MORI further agrees that this Agreement constitutes a continuing guarantee and a guarantee of payment and performance when due and not of collection.

6. MORI represents, warrants and covenants that:

(a) MORI is, and at all times during the term of each of this Agreement, the Purchase Agreement, the Pooling and Servicing Agreement and the Collateral Agreement (collectively, the "MORI Agreements") will be, a corporation duly organized and validly existing in good standing under the laws of its jurisdiction of incorporation and is, and at all times during the term of each of the MORI Agreements will be, duly qualified to do business as a foreign corporation and in good standing under the laws of each jurisdiction where the character of its property, the nature of its business or the performance of its obligations under any of the MORI Agreements makes such qualification necessary except where the failure to be so qualified will not have a material adverse effect on the business of MORI, its ability to perform its obligations under any of the MORI Agreements or any document or transaction contemplated by any of the MORI Agreements, or the validity or enforceability of the Mortgage Loans.

(b) MORI has, and at all times during the term of each of the MORI Agreements will have, all requisite corporate power and authority to own its properties, to conduct its business (except where the failure to have such power and authority does not and will not have a material adverse effect on its business), to execute and deliver each of the MORI Agreements and to perform all of its obligations under each of the MORI Agreements.

(c) MORI holds, and at all times during the term of each of the MORI Agreements will hold, all material licenses, certificates, franchises and permits from all governmental authorities necessary for the conduct of its business and has received no notice of proceedings relating to the revocation of any such license, certificate, franchise or permit, which individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would materially and adversely affect its ability to perform its obligations under any of the MORI Agreements, any other documents or transactions contemplated under any of the MORI Agreements, or the validity or enforceability of the Mortgage Loans.

(d) The execution, delivery and performance of each of the MORI Agreements are within MORI's corporate powers and have been duly authorized by all necessary corporate action of MORI and each of the MORI Agreements has been duly executed and delivered by MORI and constitutes the legal, valid and binding agreement of MORI enforceable against MORI in accordance with its terms subject, as to the enforcement of remedies, to bankruptcy, insolvency, reorganization,

moratorium and other similar laws affecting the enforceability of creditors' rights generally applicable in the event of the bankruptcy, insolvency or reorganization of MORI and to general principles of equity.

(e) Neither the consummation of any of the transactions contemplated in any of the MORI Agreements, nor the execution, delivery and performance by MORI of any of the MORI Agreements do or will (i) violate any of the provisions of the articles of incorporation or by-laws of MORI, (ii) violate any provision of any law, governmental rule or regulation currently in effect applicable to MORI or its properties or by which MORI or its properties may be bound or affected, (iii) violate any judgment, decree, writ, injunction, award, determination or order currently in effect applicable to MORI or its properties or by which MORI or its properties may be bound or affected, (iv) conflict with, or result in a breach of, or constitute a default under, any of the provisions of any indenture, mortgage, deed of trust, contract or other instrument to which MORI is a party or by which it is bound or (v) result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, mortgage, deed of trust, contract or other instrument.

(f) No consent, approval, order or authorization of, and no filing with or notice to, any court or other governmental authority in respect of MORI is required in connection with the authorization, execution, delivery or performance by MORI of any of the MORI Agreements or any of the other documents or transactions contemplated under any of the MORI Agreements.

(g) MORI is not in default under any material agreement, contract, instrument or indenture to which MORI is a party or by which it is or its properties are bound, or subject to or in violation of any statute, or of any order or regulation of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the ability of MORI to perform its obligations under any of the MORI Agreements or the business, operations, financial condition, prospects, properties or assets of MORI; and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such agreement, contract, instrument or indenture, or such a violation of any statute, or of any order or regulation of any court, administrative agency, arbitrator or governmental body.

(h) Since September 30, 1993, there has been no change in the business, operations, financial condition, properties or assets of MORI which would have a material adverse effect on MORI's ability to perform its obligations under any of the MORI Agreements or any other documents or adversely affect the transactions contemplated under any of the MORI Agreements or such other documents.

(i) There is no action, suit or proceeding against, or investigation of, MORI pending or threatened, before any court, administrative agency or other tribunal which, either individually or in the aggregate, (A) may result in any material adverse change in the business, operations, financial condition, prospects, properties, or assets of MORI or in any impairment of the right or ability of MORI to carry on its business substantially as now conducted, or (B) asserts the invalidity of any of the MORI Agreements or (C) seeks to prevent the issuance of the Certificates or the consummation of any of the transactions contemplated by any of the MORI Agreements or (D) which might materially and adversely affect the performance by MORI of its obligations under, or the validity or enforceability of, any of the MORI Agreements or (E) would cause the description of the federal income tax consequences of the purchase, ownership and disposition of the Certificates in the Private Placement Memorandum prepared by MTMG and delivered to the initial Certificateholder under the heading "Certain Federal Income Tax Consequences" to be incorrect.

(j) Neither the Pooling and Servicing Agreement, the Collateral Agreement, the Purchase Agreement, the Private Placement Memorandum dated November 22, 1993 and delivered to the initial Certificateholder or this Agreement, nor any other agreement, document, certificate or statement furnished to the Purchaser or the Trustee by or on behalf of MORI pursuant to any of them, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading. There are no facts known to MORI which, individually or in the aggregate, materially adversely affect, or which (aside from general economic trends) may reasonably be expected to materially adversely affect in the future, the condition, business or prospects of MORI, or which may impair the ability of MORI to perform its obligations under each of the MORI Agreements, which have not been disclosed herein or therein or in the certificates and other documents furnished to the Purchaser by or on behalf of MORI pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(k) Neither MORI nor MTMG is aware that any Mortgagor has withheld any portion of payments of Monthly P&I because of the requirements of a foreign taxing authority and no foreign taxing authority has contacted MORI or MTMG concerning a withholding or other foreign tax liability.

(l) MORI agrees to pay or cause MTMG to timely pay all taxes to which MTMG may at any time be subject if failure to pay the same might or could result in a Lien on any of the assets of MTMG.

7. MORI irrevocably waives in perpetuity any claim or other right which it may now or hereafter acquire against MTMG or Marriott that arises from the existence, payment, performance or enforcement of MORI's obligations under this Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, any right to participate in any claim or remedy of the Trust or any Certificateholder against MTMG, Marriott or any collateral which the Trust or any Certificateholder may acquire, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from MTMG or Marriott, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim or other rights. The provisions of this Section 7 shall survive the termination of the Trust pursuant to Article XI of the Pooling and Servicing Agreement. If any amount shall be paid to MORI in violation of this Section 7, such amount shall be deemed to have been paid to MORI for the benefit of, and shall be held in trust for the benefit of, and forthwith be paid over to, (i) if such amount is paid prior to the termination of the Trust pursuant to Article XI of the Pooling and Servicing Agreement, the Certificateholders, the Grantor and the Servicer, in the priority set forth in Section 6.04 of the Pooling and Servicing Agreement, to be credited and applied to the payment of the Certificates and all other amounts to be distributed pursuant to Section 6.04 of the Pooling and Servicing Agreement in accordance with the terms of the Pooling and Servicing Agreement; <u>provided</u>, <u>however</u>, that in no event shall any of such amount be paid in respect of the Interest Shortfall Advance or (ii) if such amount is paid after the termination of the Trust pursuant to Article XI of the Pooling and Servicing Agreement, MTMG. MORI acknowledges that it will receive direct and indirect benefits from the issuance of the Certificates and that the waiver set forth in this Section 7 is knowingly made in contemplation of such benefits.

8. MORI agrees, until the termination of the Pooling and Servicing Agreement, to maintain its sales operations at a

level sufficient to enable it, so long as it is Servicer, to use best efforts to sell Foreclosure Property.

9. If at any time during the term of the Pooling and Servicing Agreement, MORI receives any Insurance Proceeds, MORI shall, not later than the second Business Day following the date of receipt thereof, deposit such Insurance Proceeds into the Collection Account.

10. MORI shall indemnify and hold harmless the Trust and the Certificateholders from and against any taxes, fees and governmental charges that may at any time be asserted against any of such Persons in connection with the assignment of the Mortgage Loans to MTMG.

11. MORI will deliver to each Certificateholder copies of its audited annual financial statements within a reasonable time after such statements have been prepared in final form and in any event within 120 days after the end of its fiscal year. MORI will deliver to each Certificateholder copies of its unaudited quarterly financial statements prepared in the ordinary course of business within a reasonable time after such statements have been prepared in final form and in any event within 50 days after the end of the period covered by such statement.

12. All notices hereunder shall be hand delivered or sent by overnight courier and telecopy (i) if to MORI to 1200 U.S. 98 South, Suite 20, Lakeland, Florida 33801, to the attention of Finance - MTMG 1993-A or to such other address as MORI shall have furnished to the Purchaser and the Trustee in writing, (ii) if to the Purchaser, to 730 Third Avenue, New York, New York 10017, to the attention of Senior Vice President, Securities Division, Third Floor or to such other address as the Purchaser shall have furnished to MORI and the Trustee in writing and (iii) if to the Trustee, to 225 East Robinson Street, Suite 350, Orlando, Florida 32802 or to such other address as the Trustee shall have furnished to the Purchaser and MORI in writing.

13. No failure on the part either of the Purchaser, the Trustee or any Certificateholder to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

14. This Agreement shall be binding upon MORI, its successors and assigns and shall inure to the benefit of and be enforceable by each of the Purchaser, the Trustee and each

Certificateholder and their respective successors, transferees and assigns. The obligations of MORI under this Agreement shall survive the termination of the Agreements.

15. MORI hereby irrevocably submits to the nonexclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York State Court sitting in New York City for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby. MORI irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in any such a court has been brought in an inconvenient forum. MORI hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

16. This Agreement may not be changed or terminated orally, but only by a written instrument signed by MORI, the Purchaser and the Trustee. No consent to any departure by MORI from the terms of this Agreement shall be effective unless the same shall be in writing and signed by the Purchaser and the Trustee. So long as the Purchaser is the only Holder of Certificates, the Trustee agrees to consent to any such change, termination or waiver if so directed by the Purchaser. In any other case, the Trustee shall consent or refrain from consenting as directed by the Majority Holders. The Trustee shall have the right to decline to follow any such direction if the Trustee, in accordance with an opinion of counsel reasonably acceptable to the Trustee and the Majority Holders, determines that such change, termination or waiver would result in the Trustee incurring personal liability for which it is not adequately indemnified.

17. This Agreement may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument.

18. This Agreement shall in all respects be governed by and construed in accordance with, the laws of the State of New York. If any provision of this Agreement shall be held to be invalid by any court of competent jurisdiction, the invalidity of such provision shall not affect any of the remaining provisions.

19. So long as the Purchaser is the only Holder of Certificates, it shall have the right to enforce this Agreement in an action or proceeding brought by it independently of any action or proceeding brought by the Trustee and without joining

the Trustee to such action or proceeding brought by it. In any other case, the Trustee shall enforce or refrain from enforcing this Agreement as directed by the Majority Holders.

20. MORI will pay or reimburse the Purchaser, the Trustee and/or the Majority Holders, as the case may be, upon demand for, all expenses (including, without limitation, all reasonable legal and out-of-pocket expenses which the Purchaser, the Trustee and/or the Majority Holders, as the case may be, in the sole discretion of the Purchaser, the Trustee and/or the Majority Holders, as the case may be, may incur) in connection with the enforcement by the Purchaser, the Trustee and/or the Majority Holders, as the case may be, of this Agreement and the transactions contemplated hereby in the event of any failure by MORI to comply with the provisions hereof or with any suit for or the collection of any overdue amount payable by MORI under this Agreement.

Very truly yours,

MARRIOTT OWNERSHIP RESORTS, INC.

By: [signature]
Name: Michael Deering
Title: Vice President

Acknowledged:

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA

By: ____________________
Name:
Title:

SUN BANK, NATIONAL ASSOCIATION, as Trustee under the Pooling and Servicing Agreement

By: [signature]
Name: DEBORAH MOREYRA
Title: VICE PRESIDENT

# Defendant's Exhibit 3

01/03/94 14:26 ☎312 750 0661 CHICAGO EPUB 🄯002

# CS First Boston

227 West Monroe Street
Chicago, Illinois 60606
(312) 750-3000

**PLEASE DELIVER A.S.A.P.**
**Confidential**

# CHICAGO
## Investment Banking

Telecopy Number 312/750-0661 ☐
Telecopy Number 312/750-1824 ☐
Telecopy Number 312/750-1829 ☐

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank You.

**Date:** 1/3/94

**To:** Lester Pulse

**Company:** Marriott International

**Telecopy #:** 301 380-6962 **Phone:**

**From:** Phil Hamo

**Phone:**

**Comments:** RK 73-524 PLR 9319005
[illegible] $50
Shiel [illegible] $100
[illegible] $.25
close [illegible] $20 loss

**Number of Pages, Including Cover Sheet:**

MAR - 008660

**Any Problems, Please Call:**

January 1994

CONFIDENTIAL

Materials Prepared for Discussion

# Marriott International

Marriott International

# Executive Summary

- Marriott International desires to hedge its exposure in interest sensitive assets presently owned and/or to be acquired. After an evaluation of its financial risks, Marriott International enters into a series of security transactions to be managed by CS First Boston as part of an overall plan to manage financial risks inherent in its business. One strategy will involve selling short 2-year Treasuries and investing the proceeds in intermediate term Treasuries as a hedge against future increases in interest rates. The short obligation is not considered to be a "liability" for tax purposes. An alternative might include the same strategy using foreign currencies against the U.S. dollar. Any strategy will involve some risks and be designed to earn a profit.

- Marriott International enters into the trade discussed above. Subsequently, a partnership is formed with Marriott International as a limited partner to reflect any investments and obligations on a net basis on the company's financial statements. Marriott International will own 95 percent of the partnership and a third party will own 5 percent. As its capital contribution, Marriott International contributes intermediate term Treasuries subject to the short sale obligation for the 2-year Treasuries. The General Partner contributes cash for its capital contribution.

- The partnership acquires interests in other assets as part of its overall financial strategy. Subsequently, the Partnership sells the intermediate term Treasuries and closes the short obligation relating to the 2-year Treasuries.

MAR - 008663

Marriott International

# Executive Summary

- In order to further isolate the investment risks of the strategy, Marriott International contributes its limited partnership interest to a lower tier subsidiary. No gain or loss is recognized to either Marriott International or to its subsidiary as a result of the transfer.
- The transfer to its subsidiary results in a technical termination of the partnership solely for federal income tax purposes. Such a termination causes a deemed distribution of the partnership asset to each partner and a deemed re-contribution into a newly formed partnership. The tax basis of the asset deemed distributed takes on the high outside tax basis of Marriott International's partnership interest, which basis carries over to the new partnership. This result reflects the high basis which arose when the intermediate term Treasuries were contributed to the original partnership, which was not reduced by the short sale obligation.
- The partnership depreciates the high basis assets or sells it at a loss sometime in the future. Marriott International through the investment in a partnership by its subsidiary recognizes the tax benefit of the high basis in its consolidated return.

MAR - 008664

## Marriott International

### Step 1




- Marriott International sells short $100 million of 2-year Treasuries.
- Using the proceeds, Marriott International invests in 5-year Treasuries.

CS First Boston

33050004.CT.

MAR - 008665

## Marriott International

### Step 2




- Marriott International contributes the Treasuries for a 95% Limited Partnership Interest.
- The General Partner contributes cash for a 5% General Partnership Interest.

## Marriott International

### Step 3




- LTD Partnership #1 acquires other low basis assets from Marriott or acquires other assets for use by it or a Marriott affiliate.
- LTD Partnership #1 sells 5-year Treasuries and closes out short position in 2-year Treasuries.

MAR - 008667

## Marriott International

**Step 4**




- Marriott International transfers its 95% LP interest to a subsidiary in a tax-free contribution.
- The transfer causes a technical termination of LTD Partnership #1.

MAR - 008668

## Marriott International

### Step 5




- The technical termination of the old partnership causes deemed distribution of assets to Marriott International.
- Distributed assets have substituted basis of Marriott International's LP partnership interest.
- Marriott International re-contributes assets to new partnership (LTD Partnership #2).

MAR - 008669

## Marriott International

### Step 6




- LTD Partnership #2 depreciates the high basis assets or sells them at a loss.
- Marriott International gains 95% of losses from LTD Partnership #2.
- LTD Partnership #2 reflected as "net investment" by Marriott International on its financial statements.

# Defendant's Exhibit 4

CS FIRST BOSTON

CS First Boston Corporation

55 East 52nd Street
New York, NY 10055-0186
Telephone 212 909 2000

June 24, 1994

Mr. Michael Dearing
Vice President, Corporate Finance
Marriott Ownership Resorts, Inc.
Marriott Drive
Dept. 924.11
Washington, D.C. 20058

Dear Michael:

This letter outlines our understanding of the original intent of the parties with respect to Marriott Ownership Resorts, Inc.'s initiating a financial management strategy to hedge the interest rate exposure relating to the Mori Notes received in connection with the sales of resort timesharing interests. As outlined in a letter dated April 4, 1994 and addressed to you, Marriott was interested in entering into a transaction in which CS First Boston would execute a short sale for Marriott of $65 million face amount of the current 5 year U.S. Treasury Note and invest the funds through a repurchase transaction in a 30-day Eurodollar equivalent investments (Repos adjusted to 30-day LIBOR basis). The transaction which the parties entered into was initially identified as a "rate lock" transaction.

Shortly after sending to you our standard form of documentation for a rate lock transaction, you raised the question as to whether the rate lock agreement resulted in Marriott having a direct interest in both the short sale and repo transactions. Our standard form rate lock documentation, in your opinion, did not make it clear that the short sale and repo transaction were being booked for the account of and on behalf of Marriott. You returned our form of document with comments reflecting more clearly the nature of the short sale and repo transaction, which comments began the discussions leading up to this letter of understanding.

Each of Marriott and CS First Boston acknowledge that the original intent of the parties was to establish a short position in U.S. Treasury Securities for Marriott and to invest the proceeds of that short sale in a repo transaction. For the avoidance of doubt as to the nature of the transaction, CS First Boston agrees to cancel and correct the books and records of CS First Boston to reflect the rate lock transaction as a short sale executed for the account of Marriott as of the date of the original trade, namely, April 25, 1994. In addition, CS First Boston will execute the corresponding repo transaction for the account of Marriott on the date of the next roll-over of the outstanding repo transaction. CS First Boston will assume all costs and expenses (up to a maximum of $50,000, over which amount Marriott will be solely responsible for paying such costs and expenses) associated with the execution of the cancel and correct and the corresponding repo transaction for the account of Marriott.

CS FIRST BOSTON

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of Marriott and CS First Boston further agree that (i) the agreement to rebook the transactions as described above does not in any way reflect a change in the original intent of the parties to execute a short sale and corresponding repo transaction for Marriott, but rather, clarifies that both a short sale and a repo transaction are to be booked for the account of Marriott, (ii) neither Marriott nor CS First Boston will hold the other liable as a result of, and each hereby waives any and all claims, causes of action or other remedies which may be asserted against the other arising from, the original execution and booking of the transaction as a rate lock agreement and the agreement hereunder to cancel and correct the transaction in the manner described above.

This letter agreement will be governed by and construed in accordance with the laws of the State of New York (without regard to principles of conflict of laws). If you have any questions with respect to the foregoing, please feel free to call Philip Hamon at 212-909-4804.

If the foregoing correctly states your understanding of the agreement between us, please execute the enclosed counterpart of this letter and return it to Phil Hamon at which time this letter will become a binding agreement.

Sincerely,

CS FIRST BOSTON CORPORATION

By: Philip J. Hamon
Director

ACCEPTED AND AGREED TO
as of the date first written above

MARRIOTT OWNERSHIP RESORTS, INC.

By: M. E. Dearing
Vice President

41710083.ctd

# Defendant's Exhibit 5

CS FIRST BOSTON

CS First Boston Corporation

55 East 52nd Street
New York, NY 10055-0186
Telephone 212 909 2000

June 24, 1994

Mr. Michael Dearing
Vice President
Marriott Ownership Resorts, Inc.
10400 Fernwood Road
Bethesda, MD 20058

Dear Michael:

This letter agreement is effective as of March 1, 1994 and confirms that CS First Boston Corporation ("CS First Boston") was engaged by Marriott Ownership Resorts, Inc. (the "Company") to assist the Company in connection with initiating a financial management strategy to hedge the interest rate exposure relating to certain notes (hereinafter referred to as "MORI Notes") received in connection with the sales of resort timesharing interest. The Company has hedged approximately $65 million of MORI Notes in 1994 (the "Transaction"). We understand that subsequent to entering into the hedge the Company assigned its interest in the Transaction to an affiliated partnership (the "Partnership").

In connection with CS First Boston's engagement, the Company has made available to CS First Boston information concerning the Company and its subsidiaries and affiliates reasonably necessary for CS First Boston to perform its obligations hereunder and provided CS First Boston with reasonable access to the directors, officers, employees, accountants, and counsel (collectively, "Representatives"), it being understood that CS First Boston was entitled to rely upon such information supplied by the Company and its Representatives without any independent investigation or verification thereof. All non-public information concerning the Company given to CS First Boston has been used by CS First Boston solely in the course of the performance of its services hereunder and will be treated confidentially by CS First Boston for as long as the non-public information remains non-public. Except as otherwise required by law, CS First Boston will not disclose such non-public information to any third party without the Company's consent for so long as it remains non-public.

The Company has agreed to pay CS First Boston as follows:

(i) In addition to the commissions related to the securities trades, a structuring fee in the amount of $250,000, payable upon closing.

(ii) The Company agrees promptly to reimburse CS First Boston for all reasonable out-of-pocket expenses incurred in connection with its role hereunder, including attorney's fees, if any, and the fees of any other advisors retained by CS First Boston with the prior approval of the Company.

CS FIRST BOSTON

Since CS First Boston acted on behalf of the Company in connection with its engagement hereunder, the Company has entered into a separate letter agreement, providing for the indemnification by Marriott International, Inc. of CS First Boston and certain related persons and entities (the "Indemnity Letter").

The Company further understands that if CS First Boston is asked to act for the Company in any other formal additional capacity, then the terms of any such additional engagement(s) will be embodied in one or more separate written agreements, containing provisions and terms to be mutually agreed upon. Except as otherwise agreed to in writing, the indemnification provisions of this agreement and any such additional engagement shall remain in full force and effect regardless of any completion, modification, or termination of CS First Boston's engagements.

It is expressly understood by the Company and Marriott International, Inc. ("MII") that CS First Boston is acting hereunder solely to assist the Company in developing and implementing a strategy to hedge the Company's interest rate exposure relating to the MORI Notes. It is also expressly understood by the Company and MII that CS First Boston is not providing any financial reporting, tax or legal advice in connection with its engagement hereunder or otherwise. CS First Boston understands that the Company has obtained at its sole expense competent financial reporting, legal and tax professionals to advise the Company on those aspects of the Transaction and the Partnership. In that regard, the Company accepts full responsibility for any financial reporting, tax or legal matters relating to the Company's involvement in the Transaction and to the Partnership. The Company and MII agree to indemnify and hold harmless CS First Boston and its affiliates and their respective directors, officers, agents and employees from and against, and agrees that CS First Boston and such other persons shall have no liability to the Company or MII or the Partnership or the owners, parents, affiliates, security holders or creditors of either for, any fines, penalties, charges or other losses which may be incurred by or imposed upon any of them or upon CS First Boston (or any of the related persons or entities referred to above) with respect to any financial reporting, Federal, State or local income or other tax or legal aspects of the Partnership or the Transaction (excluding any licensing, registration, reporting, recordkeeping, capital or other requirements or rules governing the conduct of CS First Boston (or any such related person or entity) as broker, dealer or investment advisor under any securities laws and excluding any income taxes incurred by CS First Boston (or any such related person or entity, as a result of services performed hereunder), and for any legal or accounting fees incurred in connection therewith. This indemnity shall not in any way limit, or prejudice CS First Boston's rights under, the Indemnity Letter referred to above.

CS First Boston's engagement hereunder commenced on March 1, 1994 and shall terminate on July 1, 1994 or such date as the parties may agree to. The paragraph of this letter beginning "It is expressly understood" and the Company's obligation to (i) pay the Fee provided for herein and (ii) reimburse expenses to the extent provided for herein and to indemnify CS First Boston, its employees, and certain related persons and entities as provided in the separate letter agreement referred to above survive the termination of the engagement.

CS FIRST BOSTON

We appreciate the opportunity to work with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this letter.

Very truly yours,

CS FIRST BOSTON CORPORATION

By Philip J. Hamm
Name: Philip J. Hamm
Title: Director

Acknowledged and Agreed:

MARRIOTT OWNERSHIP RESORTS, INC.

By M. E. Dearing
Name: M. E. Dearing
Title: Vice President

MARRIOTT INTERNATIONAL, INC.

By M. E. Dearing
Name: M. E. Dearing
Title: Vice President, Corporate Finance

# Defendant's Exhibit 6

CS First Boston

Brit J. Bartter
*Managing Director*

CS First Boston Corporation
227 West Monroe Street
Chicago, IL 60606-5018
Telephone 312 750 3020

July 8, 1994

Mr. Michael E. Dearing
Vice President - Corporate Finance
Marriott International, Inc.
10400 Fernwood Road
Bethesda, MD 20058

Dear Mike:

Enclosed is the invoice for the recent short sale transaction.

Thank you again for selecting CS First Boston. We look forward to many more opportunities to work with Marriott!

Sincerely,

Brit

BJB/kam
Enclosure

| Post-it™ Fax Note 7671 | Date 8/18/94 # of pages ▶ 7 |
|---|---|
| To Mercedes Infante | From Kim Calhoun |
| Co./Dept. | Co. |
| Phone # | Phone # 301-380-1379 |
| Fax # 813-284-5430 | Fax # |

MAR-LL-0008853

# CS FIRST BOSTON

Park Avenue Plaza
New York, NY 10055
(212) 909-2000

In account with Marriott International, Inc.
10400 Fernwood Road
Bethesda, MD 20058

Attention: Michael E. Dearing
Vice President - Corporate Finance

Reference MF43
Date: 7/08/94

For services rendered in connection with

Per letter of engagement and letter of understanding both dated June 24, 1994.

| | |
|---|---|
| Structuring Fee: | $200,000.00 |
| Out-of-pocket Expenses: | 22,540.22 |
| TOTAL: | $222,540.22 |

OK to Pay

M.E. Dearing

*Please remit via wire:*
CITIBANK
20 Exchange Place
New York, NY
For the Account of CS First Boston
Account Number: 09253506
ABA Number: 021000089
Attn: Barbara Wentworth

*Or by check:*
CS First Boston
Accounting Department
Attn: Barbara Wentworth
Five World Trade Center, 8th Floor
New York, NY 10048

MAR-LL-0008854

Marriott
LAW DEPARTMENT

Ward R. Cooper
Assistant General Counsel
301/380-7824

Copies to: [redacted]
Griff Lindsay
Dawn Morton

MAR-LL-0008855

CS FIRST BOSTON

CS First Boston Corporation

55 East 52nd Street
New York, NY 10055-0186
Telephone 212 909 2000

June 24, 1994

Mr. Michael Dearing
Vice President
Marriott Ownership Resorts, Inc.
10400 Fernwood Road
Bethesda, MD 20058

Dear Michael:

This letter agreement is effective as of March 1, 1994 and confirms that CS First Boston Corporation ("CS First Boston") was engaged by Marriott Ownership Resorts, Inc. (the "Company") to assist the Company in connection with initiating a financial management strategy to hedge the interest rate exposure relating to certain notes (hereinafter referred to as "MORI Notes") received in connection with the sales of resort timesharing interest. The Company has hedged approximately $65 million of MORI Notes in 1994 (the "Transaction"). We understand that subsequent to entering into the hedge the Company assigned its interest in the Transaction to an affiliated partnership (the "Partnership").

In connection with CS First Boston's engagement, the Company has made available to CS First Boston information concerning the Company and its subsidiaries and affiliates reasonably necessary for CS First Boston to perform its obligations hereunder and provided CS First Boston with reasonable access to the directors, officers, employees, accountants, and counsel (collectively, "Representatives"), it being understood that CS First Boston was entitled to rely upon such information supplied by the Company and its Representatives without any independent investigation or verification thereof. All non-public information concerning the Company given to CS First Boston has been used by CS First Boston solely in the course of the performance of its services hereunder and will be treated confidentially by CS First Boston for as long as the non-public information remains non-public. Except as otherwise required by law, CS First Boston will not disclose such non-public information to any third party without the Company's consent for so long as it remains non-public.

The Company has agreed to pay CS First Boston as follows:

(i) In addition to the commissions related to the securities trades, a structuring fee in the amount of $250,000, payable upon closing.

(ii) The Company agrees promptly to reimburse CS First Boston for all reasonable out-of-pocket expenses incurred in connection with its role hereunder, including attorney's fees, if any, and the fees of any other advisors retained by CS First Boston with the prior approval of the Company.

MAR-LL-0008856

41740072.CTD/1

CS FIRST BOSTON

Since CS First Boston acted on behalf of the Company in connection with its engagement hereunder, the Company has entered into a separate letter agreement, providing for the indemnification by Marriott International, Inc. of CS First Boston and certain related persons and entities (the "Indemnity Letter").

The Company further understands that if CS First Boston is asked to act for the Company in any other formal additional capacity, then the terms of any such additional engagement(s) will be embodied in one or more separate written agreements, containing provisions and terms to be mutually agreed upon. Except as otherwise agreed to in writing, the indemnification provisions of this agreement and any such additional engagement shall remain in full force and effect regardless of any completion, modification, or termination of CS First Boston's engagements.

It is expressly understood by the Company and Marriott International, Inc. ("MII") that CS First Boston is acting hereunder solely to assist the Company in developing and implementing a strategy to hedge the Company's interest rate exposure relating to the MORI Notes. It is also expressly understood by the Company and MII that CS First Boston is not providing any financial reporting, tax or legal advice in connection with its engagement hereunder or otherwise. CS First Boston understands that the Company has obtained at its sole expense competent financial reporting, legal and tax professionals to advise the Company on those aspects of the Transaction and the Partnership. In that regard, the Company accepts full responsibility for any financial reporting, tax or legal matters relating to the Company's involvement in the Transaction and to the Partnership. The Company and MII agree to indemnify and hold harmless CS First Boston and its affiliates and their respective directors, officers, agents and employees from and against, and agrees that CS First Boston and such other persons shall have no liability to the Company or MII or the Partnership or the owners, parents, affiliates, security holders or creditors of either for, any fines, penalties, charges or other losses which may be incurred by or imposed upon any of them or upon CS First Boston (or any of the related persons or entities referred to above) with respect to any financial reporting, Federal, State or local income or other tax or legal aspects of the Partnership or the Transaction (excluding any licensing, registration, reporting, recordkeeping, capital or other requirements or rules governing the conduct of CS First Boston (or any such related person or entity) as broker, dealer or investment advisor under any securities laws and excluding any income taxes incurred by CS First Boston (or any such related person or entity, as a result of services performed hereunder), and for any legal or accounting fees incurred in connection therewith. This indemnity shall not in any way limit, or prejudice CS First Boston's rights under, the Indemnity Letter referred to above.

CS First Boston's engagement hereunder commenced on March 1, 1994 and shall terminate on July 1, 1994 or such date as the parties may agree to. The paragraph of this letter beginning "It is expressly understood" and the Company's obligation to (i) pay the Fee provided for herein and (ii) reimburse expenses to the extent provided for herein and to indemnify CS First Boston, its employees, and certain related persons and entities as provided in the separate letter agreement referred to above survive the termination of the engagement.

CS FIRST BOSTON

We appreciate the opportunity to work with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this letter.

Very truly yours,

CS FIRST BOSTON CORPORATION

By Philip J. Hamm
Name: Philip J. Hamm
Title: Director

Acknowledged and Agreed:

MARRIOTT OWNERSHIP RESORTS, INC.

By M. E. Dearing
Name: M. E. Dearing
Title: Vice President

MARRIOTT INTERNATIONAL, INC.

By M. E. Dearing
Name: M. E. Dearing
Title: Vice President, Corporate Finance

Date: ____________________

TO: CS First Boston Corporation
Park Avenue Plaza
New York, New York 10055

In connection with your engagement (the "engagement") to advise and assist our subsidiary, Marriott Ownership Resorts, Inc. with implementing a structured hedging strategy relating to MORI Notes, we agree to indemnify and hold harmless CS First Boston ("you") and its affiliates, the respective directors, officers, partners, agents and employees of CS First Boston and its affiliates, and each other person, if any, controlling CS First Boston or any of its affiliates (collectively, "Indemnified Persons"), from and against, and we agree that no Indemnified Person shall have any liability to us or our owners, parents, affiliates, security holders or creditors for, any losses, claims, damages or liabilities (including actions or proceedings in respect thereof) (collectively "Losses") (A) related to or arising out of (i) our actions or failures to act (including statements or omissions made, or information provided, by us or our agents) or (ii) actions or failures to act by an Indemnified Person with our consent or in reliance on our actions or failures to act, or (B) otherwise related to or arising out of the engagement or your performance thereof, except that this clause (B) shall not apply to any Losses that are finally judicially determined to have resulted primarily from your bad faith or negligence or willful misconduct. If such indemnification is for any reason not available, we agree to contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by us and by you with respect to the engagement or, if such allocation is judicially determined unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of us on the one hand and of you on the other hand, provided, however, that, to the extent permitted by applicable law, and except for losses described in the exception to clause (B) above, the Indemnified Persons shall not be responsible for amounts which in the aggregate are in excess of the amount of all fees actually received by you from us in connection with the engagement. Relative benefits to us, on the one hand, and you, on the other hand, with respect to the engagement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by us or our security holders, as the case may be, pursuant to the transaction(s), whether or not consummated, contemplated by the engagement bears to (ii) all fees or commissions (including transaction spreads) paid or proposed to be paid to you by us in connection with the engagement.

We will reimburse each Indemnified Person for all expenses (including reasonable fees and disbursements of counsel) as they are incurred by such Indemnified Person in connection with investigating, preparing for or defending any action, claim or proceeding ("Action") referred to above (or enforcing this agreement or any related engagement agreement), whether or not in connection with pending or threatened litigation in which any Indemnified Person is a party, and whether or not such Action is initiated or brought by you. We further agree that we will not settle or compromise or consent to the entry of any judgment in any pending or threatened Action in respect of which indemnification may be sought hereunder (whether or not an Indemnified Person is a party therein) unless we have given you reasonable prior written notice thereof and used all reasonable efforts, after consultation with you, to obtain an unconditional release of each Indemnified Person from all liability arising therefrom.

Our obligations hereunder shall be in addition to any rights that any Indemnified Person may have at common law or otherwise. Solely for the purpose of enforcing this agreement, we hereby consent to personal jurisdiction and to service and venue in any court in which any claim which is subject to this agreement is brought against any Indemnified Person. We acknowledge that in connection with the engagement you are acting as an independent contractor with duties owing solely to us. YOU HEREBY AGREE, AND WE HEREBY AGREE ON OUR OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF OUR SECURITY HOLDERS, TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTER-CLAIM OR ACTION ARISING OUT OF THE ENGAGEMENT, YOUR PERFORMANCE THEREOF OR THIS AGREEMENT.

The provisions of this agreement shall apply to the engagement (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement. This agreement and any other agreements relating to the engagement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles.

Very truly yours,

Client: MARRIOTT INTERNATIONAL, INC.

By: M. E. Dearing
Name: M. E. Dearing
Title: Vice President, Corporate Finance

Accepted and Agreed:

CS FIRST BOSTON CORPORATION

By: Philip J. Hahn
Name: Philip J. Hahn
Title: Director

MAR-LL-0008859

41740072.CTD/4

TOTAL P.07

P.007

# Defendant's Exhibit 7

**State of Delaware**

# Office of the Secretary of State

I, WILLIAM T. QUILLEN, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "MARRIOTT INTERNATIONAL JBS CORPORATION", FILED IN THIS OFFICE ON THE NINTH DAY OF MAY, A.D. 1994, AT 3:45 O'CLOCK P.M.

A CERTIFIED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE KENT COUNTY RECORDER OF DEEDS FOR RECORDING.

William T. Quillen

*William T. Quillen, Secretary of State*

2401079 8100

944081919

AUTHENTICATION: 7114422

DATE: 05-10-94

# CERTIFICATE OF INCORPORATION

# OF

# MARRIOTT INTERNATIONAL JBS CORPORATION

The undersigned, a natural person, for the purpose of organizing a corporation for conducting the business and promoting the purposes hereinafter stated, under the provisions and subject to the requirements of the laws of the State of Delaware (particularly Chapter 1, Title 8 of the Delaware Code and the acts amendatory thereof and supplemental thereto, and known, identified and referred to as the "General Corporation Law of the State of Delaware"), hereby certifies that:

FIRST: The name of the corporation (hereinafter called the "corporation") is

MARRIOTT INTERNATIONAL JBS CORPORATION

SECOND: The address, including street, number, city, and county, of the registered office of the corporation in the State of Delaware is 32 Loockerman Square, Suite L-100, City of Dover, County of Kent; and the name of the registered agent of the corporation in the State of Delaware at such address is The Prentice-Hall Corporation System, Inc.

THIRD: The nature of the business and of the purposes to be conducted and promoted by the corporation, which shall be in addition to the authority of the corporation to conduct any lawful business, to promote any lawful purpose, and to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, is as follows:

To be the general partner in a limited partnership.

To carry on and conduct a general food and beverage business; to operate in connection therewith facilities for the manufacture, productions, processing, storage, distribution, and sale of foods and beverages and any other related items; to sell at wholesale and retail; to operate such facilities on its own account, under management contracts with others, or

under franchise, or in any other legitimate capacity; to engage in the business of providing and promoting entertainments, amusements, and other means of recreation.

To carry on and conduct a general hotel business; to operate in connection therewith hotels, motels, inns, taverns, and other places of lodging of every kind and description; and to provide and operate facilities necessary or desirable in connection therewith; and to operate such facilities on its own account, under management contracts with others, or under franchises, or in any other legitimate capacity.

To acquire, by purchase, exchange, lease, franchise, license, or any other lawful manner, and to build, own, operate, manage, sell, lease, mortgage, or otherwise dispose of, the facilities and properties which are, or may be, required in the conduct of such general food and beverage business and hotel business and all other businesses related thereto, also to purchase, acquire, own, hold, use, lease (either as lessor or lessee), rent, sublet, grant, sell, exchange, subdivide, mortgage, encumber, deed in trust, manage, improve, develop, maintain, construct, operate and generally deal in, any and all real estate, improved and unimproved, stores, office buildings, apartment houses, shopping centers, commercial buildings, restaurants, hotels, garages, warehouses, manufacturing plants, and other buildings of any kind or description, and any and all other property of every kind or description, real, personal, and mixed, and any interest or right therein, wheresoever situated.

To manufacture, purchase, or acquire in any lawful manner, and to hold, own, mortgage, pledge, sell, lease, rent, transfer, or in any manner dispose of, and to deal and trade in, goods, wares, merchandise, including equipment, furniture and fixtures, and property of any and every class and description.

To acquire the good will, business, rights and property, franchises, and assets of every kind, with or without undertaking the whole or any part of the liabilities, of any person, firm, association, or corporation; and to acquire any property or business as a going concern or otherwise by (i) purchase of the assets thereof wholly or in part, (ii) by acquisition

of the shares or any part thereof, or (iii) in any other manner; and to pay for the same in cash, the stock of this corporation, bonds, or otherwise; to hold, maintain and operate, or in any manner dispose of the whole or any part of the good will, business, rights, and property so acquired; and to conduct in any lawful manner the whole or any part of any business so acquired, and to exercise all the powers necessary or convenient in and about the conduct and management of such business.

To apply for, purchase, or in any manner to acquire, and to hold, own, use and operate, and to sell, assign, transfer, or in any manner dispose of, and to grant licenses, franchises, or other rights in respect of, and in any manner deal with, any and all rights, trade and service marks, systems, inventions, improvements, and processes used in connection with or secured under letters patent or copyrights of the United States or other countries, or otherwise, and to work, operate, or develop the same, and to carry on any business, manufacturing or otherwise, which may directly or indirectly effectuate these objects or any of them.

To guarantee, purchase, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of the shares of the capital stock of, or any bonds, securities, or evidences of indebtedness created by any other corporation or corporations of this State or any other state, country, nation, or government and while owner of said stock, to exercise all the rights, powers, and privileges of ownership, including the right to vote thereon, to the same extent as natural persons might or could do, and to promote or to aid in any manner, financially or otherwise, any corporation of which any shares of stock, bonds, notes, debentures, or other securities or evidences of indebtedness are held directly or indirectly by this corporation, and for this purpose to guarantee the contracts, dividends, shares, bonds, notes, debentures, and other obligations of such other corporations.

To issue bonds, debentures, or obligations from time to time for any of the objects or purposes of the corporation and to secure the same by mortgage, pledge, deed of trust, or otherwise, including, but without limitation, bonds, debentures, and other obligations convertible into other securities of the corporation.

To act as a general partner, limited partner, or joint venturer of a partnership or joint venture that proposes to conduct a business that the corporation would engage in singly.

To conduct business in any of the States, territories, colonies, or dependencies of the United States, in the District of Columbia, and in any and all foreign countries, to have one or more offices therein, and therein to hold, purchase, mortgage, and convey real and personal property, without limit as to the amount.

To do any or all of the things herein set forth to the same extent as a natural person might or could do and in any part of the world, as principals, agents, contractors, trustees, or otherwise, and either alone or in company with others.

To purchase, hold, and reissue any of the shares of its capital stock.

To exercise all powers enumerated in the General Corporation Law of Delaware; and, in addition, to exercise all powers granted by any other law or by this certificate of incorporation, together with any powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the business or purposes set forth herein.

FOURTH: The total number of shares of stock which the corporation shall have authority to issue is One Hundred (100), all of which are without par value. All such shares are of one class and are shares of Common Stock.

No holder of any of the shares of the stock of the corporation, whether now or hereafter authorized and issued, shall be entitled as of right to purchase or subscribe for (1) any unissued stock of any class, or (2) any additional shares of any class to be issued by reason of any increase of the authorized capital stock of the corporation of any class, or (3) bonds, certificates of indebtedness, debentures or other securities convertible into stock of the corporation, or carrying any right to purchase stock of any class, but any such unissued stock or such additional authorized issue of any stock or of other securities convertible into stock, or carrying any right to purchase stock, may be issued and disposed of pursuant to resolution of the Board of Directors to such persons, firms,

corporations or associations and upon such terms as may be deemed advisable by the Board of Directors in the exercise of its discretion.

FIFTH: The name and the mailing address of the incorporator is as follows:

| NAME | MAILING ADDRESS |
|---|---|
| Richard Vorosmarti | 1090 Vermont Avenue<br>Washington, D.C. 20005 |

SIXTH: The corporation is to have perpetual existence.

SEVENTH: Whenever a compromise or arrangement is proposed between this corporation and its creditors or any class of them and/or between this corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this corporation under the provisions of Section 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this corporation, as the case may be, and also on this corporation.

EIGHTH: For the management of the business and for the conduct of the affairs of the corporation, and in further definition, limitation and regulation of the powers of the corporation and of its directors and of its stockholders or any class thereof, as the case may be, it is further provided:

1. The management of the business and the conduct of the affairs of the corporation shall be vested in its Board of Directors. The number of directors which shall constitute the whole Board of Directors shall be fixed by, or in the manner provided in, the By-Laws. The phrase "whole Board" and the phrase "total number of directors" shall be deemed to have the same meaning, to wit, the total number of directors which the corporation would have if there were no vacancies. No election of directors need be by written ballot.

2. After the original or other By-Laws of the corporation have been adopted, amended, or repealed, as the case may be, in accordance with the provisions of Section 109 of the General Corporation Law of the State of Delaware, and after the corporation has received any payment for any of its stock, the power to adopt, amend, or repeal the By-Laws of the corporation may be exercised by the Board of Directors of the corporation; provided, however, that any provision for the classification of directors of the corporation for staggered terms pursuant to the provisions of subsection (d) of Section 141 of the General Corporation Law of the State of Delaware shall be set forth in an initial By-Law or in a By-Law adopted by the stockholders entitled to vote of the corporation unless provisions for such classification shall be set forth in this certificate of incorporation.

3. Whenever the corporation shall be authorized to issue only one class of stock, each outstanding share shall entitle the holder thereof to notice of, and the right to vote at, any meeting of stockholders. Whenever the corporation shall be authorized to issue more than one class of stock, no outstanding share of any class of stock which is denied voting power under the provisions of the certificate of incorporation shall entitle the holder thereof to the right to vote at any meeting of stockholders except as the provisions of paragraph (2) of subsection (b) of Section 242 of the General Corporation Law of the State of Delaware shall otherwise require; provided, that no share of any such class which is otherwise denied voting power shall entitle the holder thereof to vote upon the increase or decrease in the number of authorized shares of said class.

NINTH: The personal liability of the directors of the corporation is hereby eliminated to the fullest extent

permitted by paragraph (7) of subsection (b) of Section 102 of the General Corporation Law of the State of Delaware, as the same may be amended and supplemented.

TENTH: No director of the corporation shall be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

ELEVENTH: From time to time any of the provisions of this certificate of incorporation may be amended, altered or repealed, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted in the manner and at the time prescribed by said laws, and all rights at any time conferred upon the stockholders of the corporation by this certificate of incorporation are granted subject to the provisions of this Article ELEVENTH.

Signed on May 9th, 1994.

Richard Vorosmarti
Incorporator

# Defendant's Exhibit 8

# AGREEMENT OF LIMITED PARTNERSHIP
# OF
# MARRIOTT INTERNATIONAL RESORTS, L.P.

The undersigned General Partner and Limited Partner hereby form a limited partnership pursuant to and in accordance with the Delaware Revised Uniform Limited Partnership Act (6 Del. C. §17-101, et seq.), and hereby agree as follows:

1. Name. The name of the limited partnership (the "Partnership") is Marriott International Resorts, L.P.

2. Purpose. The Partnership is organized for the purpose of carrying out any lawful business which this partnership may deem proper or appropriate.

3. Registered Office. The registered office of the Partnership in the State of Delaware is c/o The Prentice-Hall Corporation Systems, Inc., 32 Loockerman Square, Suite L-100, Dover, County of Kent, Delaware 19901.

4. Registered Agent. The name and address of the agent for service of process on the Partnership in the State of Delaware is The Prentice-Hall Corporation System, Inc., 32 Loockerman Square, Suite L-100, Dover, County of Kent, Delaware 19901.

5. Partners. The names and business, residence or mailing addresses of the General Partner and the Limited Partner are as follows:

General Partner

Marriott International JBS Corporation
10400 Fernwood Road
Bethesda, Maryland 20817

Limited Partner

Marriott Ownership Resorts, Inc.
10400 Fernwood Road
Bethesda, Maryland 20817

6. Percentage Interest. The percentage interest ("Percentage Interest") of the General Partner and the Limited Partner is 1% and 99%, respectively.

7. Powers. The powers of the General Partner include all powers, statutory and otherwise, possessed by general partners under the laws of the State of Delaware.

8. Term. The term of the Partnership shall continue in full force and effect from the date of the filing of the original Certificate of Limited Partnership until December 31, 2094 or at such earlier time if (a) the partners of the Partnership (the "Partners") unanimously so

determine, (b) the Partnership sells or otherwise disposes of its interest in all or substantially all of its property, (c) an event of dissolution has occurred under the Delaware Revised Uniform Limited Partnership Act or (d) upon the removal, withdrawal or dissolution of any General Partner unless continued by any other General Partner.

9. Capital Contribution by General Partner. The General Partner shall make a Capital Contribution in the amount of $1 million in cash.

10. Capital Contribution by Limited Partner. The Limited Partner shall make herewith, effective as of the Effective Date, a Capital Contribution as follows:

(i) all its right, title, and interest in certain mortgage loans dated on or before March 31, 1994, as determined by MORI which comprise all of the mortgage loans secured by first mortgage liens or deeds of trust on timeshare estates which are part of certain timeshare resorts; and

(ii) all its right, title, and interest to the proceeds of the short sale by MORI of certain Treasury obligations through its agent, CS First Boston on April 25, 1994, as well as all its right, title, and interest in any investment of such proceeds and the earnings thereon. In connection therewith, the Partnership shall also assume the obligations of MORI arising in connection with the aforesaid short sale of Treasury obligations. All of the rights and obligations of MORI being herein described and transferred to the Partnership are those arising in connection with the transactions described in the "Treasury Short Sale and Investment Agreement" between MORI and CS First Boston, effective April 25, 1994.

11. Capital Accounts. The Capital Contributions of the Partners shall be credited to their respective capital accounts, which shall be established and maintained in accordance with rules contained in Treasury Regulation sections 1.704-1 and 1.704-3 as in effect on the date hereof.

12. Additional Contributions. No Partner is required to make any additional capital contribution to the Partnership other than MORI which shall be required to contribute from time to time hereafter additional mortgage notes receivable and obligations receivable it obtains from purchasers of MORI's timeshare units subsequent to March 31, 1994, and prior to September 30, 1994. It is further agreed that MORI shall, in connection with the contribution of such additional receivables, also contribute the rights and obligations it derives from other transactions similar to those described in the aforementioned "Treasury Short Sale and Investment Agreement," to the extent that such transactions are entered into for the purpose of hedging the potential adverse effect on the value of the receivables from shifts in interest rates.

13. Allocations of Profit and Losses. Subject to the provisions of Section 11 hereof, the Partnership's profits and losses shall be allocated in proportion to the Percentage Interests of the Partners. Any deduction for actual or imputed interest in respect of any amounts borrowed to acquire investments permitted hereunder shall be allocated solely to the General Partner.

14. <u>Distributions</u>. At the time determined by the General Partner, but at least once during each fiscal year, the General Partner shall cause the Partnership to distribute any cash held by it which is not reasonably necessary for the operation of the Partnership, such cash being distributed to the Partners in proportion to their Percentage Interests.

15. <u>Assignments</u>. The Limited Partner may assign all or any part of its partnership interest with the consent of the General Partner and withdraw from the Partnership.

16. <u>Effective Date</u>. The Effective Date is May 6, 1994.

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement of Limited Partnership on May 10, 1994, effective as of the Effective Date.

<u>GENERAL PARTNER</u>
Marriott International JBS Corporation

By:______________________
M. Lester Pulse
Vice President

<u>Limited Partner:</u>
Marriott Ownership Resorts, Inc.

By:______________________
Michael E. Dearing
Vice President

# Defendant's Exhibit 9

SEP 29 '94 05:46PM P.1

# CS FIRST BOSTON

**Park Avenue Plaza**
**New York, New York 10055**
**Telephone: (212) 909-2000**
**Telecopy: (212) 318-1225**

To: Mr. Michael Dearing

Company: Marriott

Fax #: 301-380-5067

**From: Timothy Q. Lu, (212) 909-3324**

Date: 9/29/94

No. of Pages *(including cover sheet)*: 2

**Remarks:**

If there are any problems receiving this transmission, please call (212) 909-3324 or (212) 909-4218.

SEP 29 '94 05:46PM P.2

CS FIRST BOSTON

CS First Boston Corporation

55 East 52nd Street
New York, NY 10055-0186
Telephone 212 909 2000

September 29, 1994
Mr. Michael Dearing
Vice President, Corporate Finance
Marriott Ownership resorts, Inc.
Marriott Drive
Dept. 924.11
Washington, D.C. 20058

via fax: (301) 380-5067

Dear Michael:

This is a summary of Marriott's repurchase of the 5.125% due 4/30/1998 US reference Treasury this morning.

| | |
|---|---|
| Reference Treasury: | US Treasury 5 1/8% due April 30, 1998 |
| Notional Amount: | $65 MM |
| Trade Date: | September 29, 1994 |
| Settlement Date: | September 30, 1994 |
| Price: | 94 6.5/32% |
| Yield: | 6.979% |

Due to the unwinding of the Rate Lock transaction with CS First Boston, Marriott is responsible for the payment of $50,000 bid/ask spread. Therefore, Marriott's final purchase price of 94.280048% (or 6.953% in yield) reflects this payment.

If there are any questions regarding this transaction, please don't hesitate to call us at (212) 909-4015 and (212) 909-3324.

Sincerely,

Paul S. Galnt

Timothy Q. Lu

# Defendant's Exhibit 10

# CS FIRST BOSTON

**Park Avenue Plaza**
**New York, New York 10055**
**Telephone: (212) 909-2000**
**Telecopy: (212) 318-1225 or1294**

To: Mr. Michael Dearing

Company: Marriott Ownership Resorts, Inc.

Fax #: 301-380-5067

From: **Timothy Q. Lu, - (212) 909-3324**

Date: 10/12/94

No. of Pages *(including cover sheet)*: 5

Remarks:

Unwinding Confirmation
P&L Estimate

If there are any problems receiving this transmission, please call (212) 909-3324 or (212) 909-4218. Thank you.

OCT 12 '94 11:57AM P.2

CS First Boston

CS First Boston Corporation

55 East 52nd Street
New York, NY 10055-0186
Telephone 212 909 2000

October 12, 1994
Mr. Michael Dearing
Vice President, Corporate Finance
Marriott Ownership resorts, Inc.
Marriott Drive
Dept. 924.11
Washington, D.C. 20058

via fax: (301) 380-5067

Dear Michael:

This is a summary of Marriott's repurchase of the 4.75% due 8/31/1998 US reference Treasury this morning.

| | |
|---|---|
| Reference Treasury: | US Treasury 4.75% due August 31, 1998 |
| Notional Amount: | $10 MM |
| Trade Date: | October 12, 1994 |
| Regular Settlement Date: | October 13, 1994 |
| Settlement Date: | October 17, 1994 |
| Price: | 92 6/32% |
| Yield: | 7.085% |
| Term Repo from 10/13 to 10/17 (bid): | 4.5% |

If there are any questions regarding this transaction, please don't hesitate to call us at (212) 909-4015 and (212) 909-3324.

Sincerely,

Paul S. Galant

Timothy Q. Lu

MAR - 008624

OCT 12 '94 11:57AM P.3

CS First Boston
TFI Financial Engineering

October 12, 1994

**P&L Estimate**
**of**
**Marriott Treasury Short Position**

Marriott sold $10 MM of the 4.75% due 8/31/98 Treasury note on August 15, 1994. The bonds were borrowed from CS First Boston's Repo desk at the following Repo rates:

| Period | Repo rate |
|---|---|
| from 8/16 to 9/16 | 4.125% |
| from 9/16 to 10/17 | 4.125% |

On October 12, 1994, Marriott covered the $10 MM short position in the 4.75% due 8/31/1998 Treasury note at a price of 92.1875%. The bid side repo rate from 10/13/94 to 10/17/94 is 4.5%.

Period 1 (8/16/94 - 9/16/94)

| | |
|---|---|
| Short sell price: | 92.453125% |
| Last coupon date: | February 28, 1994 |
| Next coupon date: | August 31, 1994 |
| Regular settlement date of sell: | August 16, 1994 |
| Date at the end of 1st period: | September 16, 1994 |
| # of days from regular settlement date to next coupon date: | 15 days |
| # of days from next coupon date to 9/16/94: | 16 days |
| # of days between last and next coupon dates: | 184 days |
| # of days between next two coupon dates: | 181 days |
| # of days from last coupon date to regular settlement date: | 169 days |
| Accrued Interest: | =0.5*4.75% * 169/184<br>=2.181386%<br>$218,139 |
| Invoice Price: | =92.453125% + 2.181386%<br>=94.634511%<br>$9,463,451 |
| Coupon Interest Expenses: | =0.5*4.75%*(15/184 + 16/181)<br>=0.403559%<br>$40,356 |
| Interest Gain on Repo Rate: | =94.634511% *4.125% * (15+16)/360<br>- 0.5*4.75%*4.125%*16/360<br>=0.331796%<br>$33,180 |
| Net Loss without Price Movement: | =$40,356 - $33,180 = $7,176 |
| Forward Price on 9/16/94: | =92.453125%-0.403559%+0.331796%<br>=92.381362 |

41080074.ctc

MAR - 008625

<u>Period 2</u> (9/16/94 - 10/17/94)

| | |
|---|---|
| Short sell price: | 92.381362 |
| Last coupon date: | August 31, 1994 |
| Next coupon date: | February 28, 1995 |
| Regular settlement date of sell: | September 16, 1994 |
| Date at the end of 2st period: | October 17, 1994 |
| # of days from regular settlement date to 10/17: | 31 days |
| # of days between last and next coupon dates: | 181 days |
| # of days from last coupon date to regular settlement date: | 16 days |
| Accrued Interest: | =0.5*4.75% * 16/181<br>=0.209945%<br>$20,994 |
| Invoice Price: | =92.381362% + 0.209945%<br>=92.591307%<br>$9,259,131 |
| Coupon Interest Expenses: | =0.5*4.75%*(31/181)<br>=0.406768%<br>$40,677 |
| Interest Gain on Repo Rate: | =92.591307% *4.125% * 31/360<br>=0.328892%<br>$32,889 |
| Net Loss without Price Movement: | =$40,677 - $32,889<br>=$7,788 |
| Forward Price on 10/17/94: | =92.381362%-0.406768%+0.328892%<br>=92.303486 |

<u>Period 3</u> (10/13/94 - 10/17/94)

| | |
|---|---|
| Repurchase price: | 92.1875% |
| Last coupon date: | August 31, 1994 |
| Next coupon date: | February 28, 1995 |
| Regular settlement date of repurchase: | October 13, 1994 |
| Date at the end of 2st period: | October 17, 1994 |
| # of days from regular settlement date to 10/17: | 4 days |
| # of days between last and next coupon dates: | 181 days |
| # of days from last coupon date to regular settlement date: | 43 days |
| Accrued Interest: | =0.5*4.75% * 43/181<br>=0.5642265%<br>$56,423 |

41080074.clc

MAR - 008626

| | |
|---|---|
| Invoice Price: | =92.1875% + 0.5642265%<br>=92.751727%<br>$9,275,173 |
| Coupon Interest Gain: | =0.5*4.75%*(4/181)<br>=0.052486%<br>$5,249 |
| Interest Expenses on Repo Rate: | =92.751727% *4.5% * 4/360<br>=0.046376%<br>$4,638 |
| Net Gain of Positive Carry: | =$5,249 - $4,638<br>=$611 |
| Forward Price on 10/17/94: | =92.1875%-0.052486%+0.046376%<br>=92.18139% |

<u>Net P&L</u>

| | |
|---|---|
| Gain due to Price Movement: | =92.453125%-92.1875%<br>=0.265625%<br>$26,563 |
| Loss due Negative Carry: | =-$7,176-$7,788+$611<br>= 14,353 |
| Net Profit of Transaction: | =$26,563 - 14,353<br>=$12,210 |

The above calculation is a theoretical estimate. The actual payment amount to Marriott may be slightly different from the figure above.

# Defendant's Exhibit 11

Form **1065** U.S. Partnership Return of Income — OMB No. 1545-0099 — **1994**

Department of the Treasury Internal Revenue Service

For calendar year 1994, or tax year beginning May 6, 1994, ending Oct. 28, 1994

▶ See separate instructions.

A Principal business activity: Mortgage Notes

B Principal product or service: Mortgage Notes

C Business code number: 8999

Use the IRS label. Otherwise, please print or type.

Marriott International Resorts, LP
One Marriott Drive; Dept. 924.13
Washington, DC 20058

E Date business started: 5/6/94

F Total assets (see Specific Instr.): 0

G Check applicable boxes: (1) [X] Initial return (2) [X] Final return (3) [ ] Change in address (4) [ ] Amended return

H Check accounting method: (1) [ ] Cash (2) [X] Accrual (3) [ ] Other (specify) ▶

I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 2

**Caution:** Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| Section | Line | Description | | | Amount |
|---|---|---|---|---|---|
| Income | 1a | Gross receipts or sales | 1a | | |
| | b | Less returns and allowances | 1b | 1c | 0 |
| | 2 | Cost of goods sold (Schedule A, line 8) | | 2 | |
| | 3 | Gross profit. Subtract line 2 from line 1c | | 3 | 0 |
| | 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach schedule) | | 4 | |
| | 5 | Net farm profit (loss) (attach Schedule F (Form 1040)) | | 5 | |
| | 6 | Net gain (loss) from Form 4797, Part II, line 20 | | 6 | |
| | 7 | Other income (loss) (see instructions) (attach schedule) Statement #1 | | 7 | 3,056,201 |
| | 8 | **Total income (loss).** Combine lines 3 through 7 | | 8 | 3,056,201 |
| Deductions (see instructions for limitations) | 9 | Salaries and wages (other than to partners) (less employment credits) | | 9 | |
| | 10 | Guaranteed payments to partners | | 10 | |
| | 11 | Repairs and maintenance | | 11 | |
| | 12 | Bad debts | | 12 | |
| | 13 | Rent | | 13 | |
| | 14 | Taxes and licenses | | 14 | |
| | 15 | Interest | | 15 | |
| | 16a | Depreciation (see instructions) | 16a | | |
| | b | Less depreciation reported on Schedule A and elsewhere on return | 16b | 16c | 0 |
| | 17 | Depletion (Do not deduct oil and gas depletion.) | | 17 | |
| | 18 | Retirement plans, etc. | | 18 | |
| | 19 | Employee benefit programs | | 19 | |
| | 20 | Other deductions (attach schedule) | | 20 | |
| | 21 | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | 21 | 0 |
| | 22 | **Ordinary income (loss)** from trade or business activities. Subtract line 21 from line 8 | | 22 | 3,056,201 |

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of general partner or limited liability company member ▶ Date 10/15/95

**Paid Preparer's Use Only**

Preparer's signature ▶ | Date | Check if self-employed ▶ [ ] | Preparer's social security no.

Firm's name (or yours if self-employed) and address ▶ | E.I. No. ▶ | ZIP code ▶

D193 For Paperwork Reduction Act Notice, see instr.

MAR-004715

Form **1065** (1994)

Form **8800** (Rev. August 1992) Department of the Treasury Internal Revenue Service

# Application for Additional Extension of Time To File U.S. Return for a Partnership, REMIC, or Certain Trusts

▶ File a separate application for each return.

OMB No. 1545-1057 Expires 7-31-95

Please type or print. File the original and one copy by the due date for filing the return for which an extension is requested. (See instructions.)

Name: MARRIOTT INTERNATIONAL RESORTS, LP

Employer identification number: 52 : 1881181

Number, street, and room or suite no. (If a P.O. box, see instructions.): ONE MARRIOTT DRIVE; DEPARTMENT 52-924.13

City or town, state, and ZIP code: WASHINGTON, D.C. 20058

1 An additional extension of time until 10-16-, 19 95, is requested to file (check only one): ☐ Form 1041 ☒ Form 1065 ☐ Form 1066

If the entity does not have an office or place of business in the United States, check this box . . . . . . . . ▶ ☐

2a For calendar year 19 ....., or other tax year beginning May 6, 19 94, and ending Oct. 28, 19 94.

b If this tax year is for less than 12 months, check reason: ☒ Initial return ☒ Final return ☐ Change in accounting period

3 Was a previous extension of time to file granted for this tax year? ☒ Yes ☐ No

4 If yes, previous extension was granted until ..........., 19 ........

5 State in detail why you need an extension. ADDITIONAL TIME IS NEEDED IN WHICH TO ACCUMULATE ALL THE INFORMATION NECESSARY FOR THE PREPARATION OF THE RETURN. ACCORDINGLY, THIS PARTNERSHIP RESPECTFULLY REQUESTS AN EXTENSION OF TIME UNTIL IN WHICH TO FILE A COMPLETE AND ACCURATE RETURN.

POSTMARK DATE 07 17 95 — RECEIVED DATE 07 20 95 — 28 PSC PHILA., PA

## Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶ [signature] Title ▶ ASSISTANT SECRETARY Date ▶ 7/15/95

File original and one copy. The IRS will show below whether or not your application is approved and will return the copy.

**Notice to Applicant—To Be Completed by the IRS.**

☑ We HAVE approved this application. Please attach this form to your return.

☐ We HAVE NOT approved this application. However, we have granted a 10-day grace period from the later of the date shown below or the due date of your return (including any prior extension). This grace period is considered to be a valid extension of time for elections otherwise required to be made on a timely return. Please attach this form to your return.

☐ We HAVE NOT approved your application. After considering the reasons stated in item 5, above, we cannot grant your request for an extension of time to file. We are not granting a 10-day grace period.

☐ We cannot consider your application because it was filed after the due date of the return for which an extension was requested.

☑ Other: APPROVED 3-MONTH EXTENSION GRANTED

[signature] Director By: 519 Date

If you want a copy of this form to be returned to an address other than that shown above, please enter the address to which the copy should be sent.

Please Type or Print

Name

Number, street, and room or suite no. (or P.O. box number if mail is not delivered to street address)

City or town, state, and ZIP code

MAR-004716

## Schedule A Cost of Goods Sold

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | |
| 2 | Purchases less cost of items withdrawn for personal use | 2 | |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs (see instructions) (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) | 5 | |
| 6 | Total. Add lines 1 through 5 | 6 | 0 |
| 7 | Inventory at end of year | 7 | |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 0 |

9a Check all methods used for valuing closing inventory:
- (i) ☐ Cost
- (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4
- (iii) ☐ Writedown of "subnormal" goods as described in Regulations section 1.471-2(c)
- (iv) ☐ Other (specify method used and attach explanation) ▶

b Check this box if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) N/A ▶ ☐

c Do the rules of section 263A (for property produced or acquired for resale) apply to the partnership? N/A ☐ Yes ☐ No

d Was there any change in determining quantities, cost, or valuations between opening and closing inventory? N/A ☐ Yes ☐ No
If "Yes", attach explanation.

## Schedule B Other Information

| | | Yes | No |
|---|---|---|---|
| 1 | What type of entity is filing this return? Check the applicable box ▶ ☐ General partnership ☒ Limited partnership ☐ Limited liability company | | |
| 2 | Are any partners in this partnership also partnerships? | | X |
| 3 | Is this partnership a partner in another partnership? | | X |
| 4 | Is this partnership subject to the consolidated audit procedures of sections 6221 through 6233? If "Yes," see Designation of Tax Matters Partner below | | X |
| 5 | Does this partnership meet ALL THREE of the following requirements? a The partnership's total receipts for the tax year were less than $250,000; b The partnership's total assets at the end of the tax year were less than $600,000; AND c Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; Item F on page 1 of Form 1065; or Item J on Schedule K-1 | | X |
| 6 | Does this partnership have any foreign partners? | | X |
| 7 | Is this partnership a publicly traded partnership as defined in section 469(k)(2)? | | X |
| 8 | Has this partnership filed, or is it required to file, Form 8264, Application for Registration of a Tax Shelter? | | X |
| 9 | At any time during calendar year 1994, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? (See the instructions for exceptions and filing requirements for form TD F 90-22.1.) If "Yes," enter the name of the foreign country. ▶ | | X |
| 10 | Was the partnership the grantor of, or transferor to, a foreign trust that existed during the current tax year, whether or not the partnership or any partner has any beneficial interest in it? If "Yes," you may have to file Forms 3520, 3520-A, or 926 | | X |
| 11 | Was there a distribution of property or a transfer (e.g., by sale or death) of a partnership interest during the tax year? If "Yes," you may elect to adjust the basis of the partnership's assets under section 754 by attaching the statement described under Elections Made By the Partnership | X | |

**Designation of Tax Matters Partner** (See instructions.)

Enter below the general partner designated as the tax matters partner (TMP) for the tax year of this return:

Name of designated TMP ▶ Marriott International JBS Corp. Identifying number of TMP ▶ 52-1876318

Address of designated TMP ▶ One Marriott Drive; Dept. 924.13
Washington, DC 20058

MAR-004717

## Schedule K Partners' Shares of Income, Credits, Deductions, Etc.

| | | (a) Distributive share items | | (b) Total amount |
|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities (page 1, line 22) | 1 | 3,056,201 |
| | 2 | Net income (loss) from rental real estate activities (attach Form 8825) | 2 | |
| | 3a | Gross income from other rental activities — 3a | | |
| | b | Expenses from other rental activities (attach schedule) — 3b | | |
| | c | Net income (loss) from other rental activities. Subtract line 3b from line 3a | 3c | 0 |
| | 4 | Portfolio income (loss) (see instructions): a Interest income | 4a | 1,157,454 |
| | b | Dividend income | 4b | |
| | c | Royalty income | 4c | |
| | d | Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | 4d | |
| | e | Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | 4e | |
| | f | Other portfolio income (loss) (attach schedule) Statement #1 | 4f | 819,532 |
| | 5 | Guaranteed payments to partners | 5 | |
| | 6 | Net gain (loss) under section 1231 (other than due to casualty or theft) (attach Form 4797) | 6 | |
| | 7 | Other income (loss) (attach schedule) | 7 | |
| Deductions | 8 | Charitable contributions (see instructions) (attach schedule) | 8 | |
| | 9 | Section 179 expense deduction (attach Form 4562) | 9 | |
| | 10 | Deductions related to portfolio income (see instructions) (itemize) Statement #1 | 10 | 222,540 |
| | 11 | Other deductions (attach schedule) | 11 | |
| Investment Interest | 12a | Interest expense on investment debts | 12a | 1,507,483 |
| | b | (1) Investment income included on lines 4a, 4b, 4c, and 4f above | 12b(1) | 1,976,986 |
| | | (2) Investment expenses included on line 10 above | 12b(2) | 222,540 |
| Credits | 13a | Credit for income tax withheld | 13a | |
| | b | Low-income housing credit (see instructions): | | |
| | | (1) From partnerships to which section 42(j)(5) applies for property placed in service before 1990 | 13b(1) | |
| | | (2) Other than on line 13b(1) for property placed in service before 1990 | 13b(2) | |
| | | (3) From partnerships to which section 42(j)(5) applies for property placed in service after 1989 | 13b(3) | |
| | | (4) Other than on line 13b(3) for property placed in service after 1989 | 13b(4) | |
| | c | Qualified rehabilitation expenditures related to rental real estate activities (attach Form 3468) | 13c | |
| | d | Credits (other than credits shown on lines 13b & 13c) related to rental real estate activities (see instr.) | 13d | |
| | e | Credits related to other rental activities (see instructions) | 13e | |
| | 14 | Other credits (see instructions) | 14 | |
| Self-Employment | 15a | Net earnings (loss) from self-employment | 15a | |
| | b | Gross farming or fishing income | 15b | |
| | c | Gross nonfarm income | 15c | |
| Adjustments and Tax Preference Items | 16a | Depreciation adjustment on property placed in service after 1986 | 16a | |
| | b | Adjusted gain or loss | 16b | |
| | c | Depletion (other than oil and gas) | 16c | |
| | d | (1) Gross income from oil, gas, and geothermal properties | 16d(1) | |
| | | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | |
| | e | Other adjustments and tax preference items (attach schedule) | 16e | |
| Foreign Taxes | 17a | Type of income ▶ b Foreign country or U.S. possession ▶ | | |
| | c | Total gross income from sources outside the United States (attach schedule) | 17c | |
| | d | Total applicable deductions and losses (attach schedule) | 17d | |
| | e | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 17e | |
| | f | Reduction in taxes available for credit (attach schedule) | 17f | |
| | g | Other foreign tax information (attach schedule) | 17g | |
| Other | 18a | Total expenditures to which a section 59(e) election may apply | 18a | |
| | b | Type of expenditures ▶ | | |
| | 19 | Tax-exempt interest income | 19 | |
| | 20 | Other tax-exempt income | 20 | |
| | 21 | Nondeductible expenses | 21 | |
| | 22 | Other items and amounts required to be reported separately to partners (see instr.) (attach sched.) | | |
| Analysis | 23a | Income (loss). Combine lines 1 through 7 in column (b). From the result, subtract the sum of lines 8 thru 12a, 17e, and 18a | 23a | 3,303,164 |

| b Analysis by type of partner: | (a) Corporate | (b) Individual i. Active | (b) Individual ii. Passive | (c) Partnership | (d) Exempt organization | (e) Nominee/Other |
|---|---|---|---|---|---|---|
| (1) General partners | 33,032 | | | | | |
| (2) Limited partners | 3,270,132 | | | | | |

Case 1:01-cv-00256-CFL Document 87-3 Filed 02/01/2008 Page 19 of 44



**Note:** If Question 5 of Schedule B is answered "Yes," the partnership is not required to complete Schedules L, M-1, and M-2.

## Schedule L Balance Sheets

| | Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|---|
| 1 | Cash | | | | |
| 2a | Trade notes and accounts receivable | | | | |
| b | Less allowance for bad debts | | 0 | | 0 |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets (attach schedule) | | | | |
| 7 | Mortgage and real estate loans | | | | |
| 8 | Other investments (attach schedule) | | | | |
| 9a | Buildings and other depreciable assets | | | | |
| b | Less accumulated depreciation | | 0 | | 0 |
| 10a | Depletable assets | | | | |
| b | Less accumulated depletion | | 0 | | 0 |
| 11 | Land (net of any amortization) | | | | |
| 12a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | | 0 | | 0 |
| 13 | Other assets (attach schedule) | | | | |
| 14 | Total assets | | 0 | | 0 |
| | **Liabilities and Capital** | | | | |
| 15 | Accounts payable | | | | |
| 16 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 | Other current liabilities (attach schedule) | | | | |
| 18 | All nonrecourse loans | | | | |
| 19 | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 20 | Other liabilities (attach schedule) | | | | |
| 21 | Partners' capital accounts | | | | |
| 22 | Total liabilities and capital | | 0 | | 0 |

## Schedule M-1 Reconciliation of Income (Loss) per Books With Income (Loss) per Return (see instructions)

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | 3,303,164 | 6 | Income recorded on books this year not incl. on Sch. K, lines 1 though 7 (itemize): a Tax-exempt interest $ | 0 |
| 2 | Income included on Schedule K, lines 1 through 4, 6, and 7, not recorded on books this year (itemize): | 0 | 7 | Deductions included on Sch. K, lines 1 through 12a, 17e, and 18a, not charged against book income this year (itemize): a Depreciation $ | 0 |
| 3 | Guaranteed payments (other than health insurance) | | 8 | Add lines 6 and 7 | 0 |
| 4 | Expenses recorded on books this year not included on Schedule K, lines 1 through 12a, 17e, and 18a (itemize): a Depreciation $ b Travel & entertainment $ | 0 | 9 | Income (loss) (Schedule K, line 23a). Subtract line 8 from line 5 | 3,303,164 |
| 5 | Add lines 1 through 4 | 3,303,164 | | | |

## Schedule M-2 Analysis of Partners' Capital Accounts

| | | | | | |
|---|---|---|---|---|---|
| 1 | Balance at beginning of year | 0 | 6 | Distributions: a Cash | |
| 2 | Capital contributed during year | 159,277,308 | | b Property | 162,580,472 |
| 3 | Net income (loss) per books | 3,303,164 | 7 | Other decreases (itemize): | 0 |
| 4 | Other increases (itemize): | 0 | 8 | Add lines 6 and 7 | 162,580,472 |
| 5 | Add lines 1 through 4 | 162,580,472 | 9 | Balance at end of year. Subtract line 8 from line 5 | 0 |

**SCHEDULE K-1 (Form 1065)** Department of the Treasury, Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 1994 or tax year beginning May 6, 1994, and ending Oct. 28, 19 94

OMB No. 1545-0099

**1994**

Partner's identifying number ▶ 52-1876318

Partnership's identifying number ▶ 52-1881181

Partner's name, address, and ZIP code

Marriott International JBS Corp.
One Marriott Drive; Dept. 924.13
Washington, DC 20058

Partnership's name, address, and ZIP code

Marriott International Resorts, LP
One Marriott Drive; Dept. 924.13
Washington, DC 20058

**A** This partner is a [X] general partner [ ] limited partner [ ] limited liability company member

**B** What type of entity is this partner? ▶ Corporation

**C** Is this partner a [X] domestic or a [ ] foreign partner?

**D** Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | 1% | 0% |
| Loss sharing | 1% | 0% |
| Ownership of capital | 1% | 0% |

**E** IRS Center where partnership filed return: Phila. PA

**F** Partner's share of liabilities (see instructions):

Nonrecourse . . . . . . . . . . . . . . . . ________

Qualified nonrecourse financing . . . . . . ________

Other . . . . . . . . . . . . . . . . . . ________

**G** Tax shelter registration number ▶ ________

**H** Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) . . . . . [ ]

**I** Check applicable boxes: (1) [X] Final K-1 (2) [ ] Amended K-1

**J** Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 0 | 1,000,000 | 33,032 | 1,033,032 | 0 |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | 30,562 | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 | Net income (loss) from rental real estate activities | 2 | | |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest | 4a | 11,575 | Sch. B, Part I, line 1 |
| | b | Dividends | 4b | | Sch. B, Part II, line 5 |
| | c | Royalties | 4c | | Sch. E, Part I, line 4 |
| | d | Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) or (g) |
| | e | Net long-term capital gain (loss) | 4e | | Sch. D, line 13, col. (f) or (g) |
| | f | Other portfolio income (loss) (attach schedule) | 4f | 8,195 | Enter on appl. line of your return. |
| | 5 | Guaranteed payments to partner | 5 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 | Net gain (loss) under section 1231 (other than due to casualty or theft) | 6 | | |
| | 7 | Other income (loss) (attach schedule) | 7 | | Enter on appl. line of your return. |
| Deductions | 8 | Charitable contributions (see instructions) (attach schedule) | 8 | | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income (attach schedule) | 10 | 2,225 | |
| | 11 | Other deductions (attach schedule) | 11 | | |
| Investment Interest | 12a | Interest expense on investment debts | 12a | 15,075 | Form 4952, line 1 |
| | b | (1) Investment income included on lines 4a, 4b, 4c, and 4f above | b(1) | 19,770 | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | | (2) Investment expenses included on line 10 above | b(2) | 2,225 | |
| Credits | 13a | Credit for income tax withheld | 13a | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b | Low-income housing credit: | | | |
| | | (1) From section 42(j)(5) partnerships for property placed in service before 1990 | b(1) | | Form 8586, line 5 |
| | | (2) Other than on line 13b(1) for property placed in service before 1990 | b(2) | | |
| | | (3) From section 42(j)(5) partnerships for property placed in service after 1989 | b(3) | | |
| | | (4) Other than on line 13b(3) for property placed in service after 1989 | b(4) | | |
| | c | Qualified rehabilitation expenditures related to rental real estate activities (see instructions) | 13c | | |
| | d | Credits (other than credits shown on lines 13b and 13c) related to rental real estate activities (see instructions) | 13d | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | e | Credits related to other rental activities (see instructions) | 13e | | |
| | 14 | Other credits (see instructions) | 14 | | |

MAR-004720

D193 For Paperwork Reduction Act Notice, see instr. CS1 Form 1065 Schedule K-1 (1994)

| | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Self-employment | 15a Net earnings (loss) from self-employment | 15a | | Sch. SE, Section A or B |
| | b Gross farming or fishing income | 15b | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | c Gross nonfarm income | 15c | | |
| Adjustments and Tax Preference Items | 16a Depreciation adjustment on property placed in service after 1986 | 16a | | See Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b Adjusted gain or loss | 16b | | |
| | c Depletion (other than oil and gas) | 16c | | |
| | d (1) Gross income from oil, gas, and geothermal properties | d(1) | | |
| | (2) Deductions allocable to oil, gas, and geothermal properties | d(2) | | |
| | e Other adjustments and tax preference items (attach schedule) | 16e | | |
| Foreign Taxes | 17a Type of income ▶ | | | Form 1116, check boxes |
| | b Name of foreign country or U.S. possession ▶ | | | |
| | c Total gross income from sources outside the United States (attach schedule) | 17c | | Form 1116, Part I |
| | d Total applicable deductions and losses (attach schedule) | 17d | | |
| | e Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 17e | | Form 1116, Part II |
| | f Reduction in taxes available for credit (attach schedule) | 17f | | Form 1116, Part III |
| | g Other foreign tax information (attach schedule) | 17g | | See Instructions for Form 1116. |
| Other | 18a Total expenditures to which a section 59(e) election may apply | 18a | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b Type of expenditures ▶ | | | |
| | 19 Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 Other tax-exempt income | 20 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 Nondeductible expenses | 21 | | |
| | 22 Recapture of low-income housing credit: | | | |
| | a From section 42(j)(5) partnerships | 22a | | Form 8611, line 8 |
| | b Other than on line 22a | 22b | | |

**Supplemental Information**

23 Supplemental information required to be reported separately to each partner (attach additional schedules if more space is needed):

MAR-004721

SCHEDULE K-1 (Form 1065)
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, Etc.

▶ See separate instructions.

For calendar year 1994 or tax year beginning May 6, , 1994, and ending Oct. 28 , 19 94

OMB No. 1545-0099

1994

Partner's identifying number ▶ 52-1320904

Partnership's identifying number ▶ 52-1881181

Partner's name, address, and ZIP code

Marriott Ownership Resorts, Inc.
One Marriott Drive; Dept. 924.13
Washington, DC 20058

Partnership's name, address, and ZIP code

Marriott International Resorts, LP
One Marriott Drive; Dept. 924.13
Washington, DC 20058

A This partner is a ☐ general partner ☒ limited partner ☐ limited liability company member

B What type of entity is this partner? . . . ▶ Corporation

C Is this partner a ☒ domestic or a ☐ foreign partner?

D Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | 99% | 0% |
| Loss sharing | 99% | 0% |
| Ownership of capital | 99% | 0% |

E IRS Center where partnership filed return: Phil. PA

F Partner's share of liabilities (see instructions):
Nonrecourse . . . . . . . . . . . . . . . . . . $
Qualified nonrecourse financing . . . . . . $
Other . . . . . . . . . . . . . . . . . . . . . . . $

G Tax shelter registration number ▶

H Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) . . . . . . ☐

I Check applicable boxes: (1) ☒ Final K-1 (2) ☐ Amended K-1

J Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 0 | 158,277,308 | 3,270,132 | 161,547,440 | 0 |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | 3,025,639 | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 | Net income (loss) from rental real estate activities | 2 | | |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest | 4a | 1,145,879 | Sch. B, Part I, line 1 |
| | b | Dividends | 4b | | Sch. B, Part II, line 5 |
| | c | Royalties | 4c | | Sch. E, Part I, line 4 |
| | d | Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) or (g) |
| | e | Net long-term capital gain (loss) | 4e | | Sch. D, line 13, col. (f) or (g) |
| | f | Other portfolio income (loss) (attach schedule) | 4f | 811,337 | Enter on appl. line of your return. |
| | 5 | Guaranteed payments to partner | 5 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 | Net gain (loss) under section 1231 (other than due to casualty or theft) | 6 | | |
| | 7 | Other income (loss) (attach schedule) | 7 | | Enter on appl. line of your return. |
| Deductions | 8 | Charitable contributions (see instructions) (attach schedule) | 8 | | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income (attach schedule) | 10 | 220,315 | |
| | 11 | Other deductions (attach schedule) | 11 | | |
| Investment Interest | 12a | Interest expense on investment debts | 12a | 1,492,408 | Form 4952, line 1 |
| | b | (1) Investment income included on lines 4a, 4b, 4c, and 4f above | b(1) | 1,957,216 | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | | (2) Investment expenses included on line 10 above | b(2) | 220,315 | |
| Credits | 13a | Credit for income tax withheld | 13a | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b | Low-income housing credit: | | | |
| | | (1) From section 42(j)(5) partnerships for property placed in service before 1990 | b(1) | | Form 8586, line 5 |
| | | (2) Other than on line 13b(1) for property placed in service before 1990 | b(2) | | |
| | | (3) From section 42(j)(5) partnerships for property placed in service after 1989 | b(3) | | |
| | | (4) Other than on line 13b(3) for property placed in service after 1989 | b(4) | | |
| | c | Qualified rehabilitation expenditures related to rental real estate activities (see instructions) | 13c | | |
| | d | Credits (other than credits shown on lines 13b and 13c) related to rental real estate activities (see instructions) | 13d | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | e | Credits related to other rental activities (see instructions) | 13e | | |
| | 14 | Other credits (see instructions) | 14 | | |

MAR-004722

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Self-employment | 15a | Net earnings (loss) from self-employment | 15a | | Sch. SE, Section A or B |
| | b | Gross farming or fishing income | 15b | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Gross nonfarm income | 15c | | |
| Adjustments and Tax Preference Items | 16a | Depreciation adjustment on property placed in service after 1986 | 16a | | See Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b | Adjusted gain or loss | 16b | | |
| | c | Depletion (other than oil and gas) | 16c | | |
| | d | (1) Gross income from oil, gas, and geothermal properties | d(1) | | |
| | | (2) Deductions allocable to oil, gas, and geothermal properties | d(2) | | |
| | e | Other adjustments and tax preference items (attach schedule) | 16e | | |
| Foreign Taxes | 17a | Type of income ▶ | | | Form 1116, check boxes |
| | b | Name of foreign country or U.S. possession ▶ | | | |
| | c | Total gross income from sources outside the United States (attach schedule) | 17c | | Form 1116, Part I |
| | d | Total applicable deductions and losses (attach schedule) | 17d | | |
| | e | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 17e | | Form 1116, Part II |
| | f | Reduction in taxes available for credit (attach schedule) | 17f | | Form 1116, Part III |
| | g | Other foreign tax information (attach schedule) | 17g | | See Instructions for Form 1116. |
| Other | 18a | Total expenditures to which a section 59(e) election may apply | 18a | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b | Type of expenditures ▶ | | | |
| | 19 | Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 | Other tax-exempt income | 20 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 | Nondeductible expenses | 21 | | |
| | 22 | Recapture of low-income housing credit: | | | |
| | a | From section 42(j)(5) partnerships | 22a | | Form 8611, line 8 |
| | b | Other than on line 22a | 22b | | |

**Supplemental Information**

23 Supplemental information required to be reported separately to each partner (attach additional schedules if more space is needed):

MAR-004723

**MARRIOTT INTERNATIONAL RESORTS, LP**
**EIN: 52-1881181**

**For the Tax Year Beginning May 6, 1994 and Ended October 28, 1994**

**Form 1065 Supporting Schedules** — **Statement # 1**

**Line 7 - Page 1 - Other Income**

| | |
|---|---|
| Interest Income | 3,056,201 |
| Total Other Income | 3,056,201 |

**Line 4f - Page 3 - Other portfolio income**

| | |
|---|---|
| Gain from Short Sale of Treasury Notes | 819,532 |
| Total Other portfolio income | 819,532 |

**Line 10 - Page 3 - Deductions related to portfolio income**

| | |
|---|---|
| Brokers' Fee | 222,540 |
| Total Deductions related to portfolio income | 222,540 |

MARRIOTT INTERNATIONAL RESORTS, LP
EIN: 52-1881181

Statement Attached to and made part of Partnership Returns of Income for the taxable year beginning May 6, 1994 and ended October 28, 1994

I.R.C. § 195 Statement

Marriott International Resorts, LP hereby elects to amortize start-up expenditures over a period of 60 months beginning May 6, 1994 in accordance with I.R.C. § 195(b) .

MARRIOTT INTERNATIONAL RESORTS, LP
EIN: 52-1881181

Statement Attached to and made part of Partnership Returns of Income for the taxable year beginning May 6, 1994 and ended October 28, 1994

I.R.C. Sec. 709(b)(1) Statement

In accordance with I.R.C. Reg. § 1.709-1(b)(1), Marriott International Resorts, LP hereby elects to amortize its organizational expenditures over a period of 60 months beginning May 6, 1994.

MARRIOTT INTERNATIONAL RESORTS, LP
EIN: 52-1881181

Statement Attached to and made part of Partnership Returns of Income for the taxable year beginning May 6, 1994 and ended October 28, 1994

I.R.C. § 706 Statement

In accordance with I.R.C. Reg. §§1.706-1(b) and 1.441-2T(e), Marriott International Resorts, LP hereby adopts a 52-53 week taxable year ending on the Friday closest to December 31 as its taxable year, the majority tax year.

MARRIOTT INTERNATIONAL RESORTS, LP
EIN: 52-1881181

Statement Attached to and made part of Partnership Returns of Income for the taxable year beginning May 6, 1994 and ended October 28, 1994

I.R.C. § 446 Statement

Marriott International Resorts, LP hereby elects the accrual method of accounting in accordance with I.R.C. §446.

# Defendant's Exhibit 12

Form **1065** U.S. Partnership Return of Income

OMB No. 1545-0099

**1994**

Department of the Treasury
Internal Revenue Service

For calendar year 1994, or tax year beginning Oct. 29, 1994, ending Dec. 30, 1994

▶ See separate instructions.

A Principal business activity: Mortgage Notes

B Principal product or service: Mortgage Notes

C Business code number: 8999

Use the IRS label. Otherwise, please print or type.

Marriott International Resorts, LP
One Marriott Drive; Dept. 924.13
Washington, DC 20058

E Date business started: 10/29/94

F Total assets (see Specific Instr.): 7,453,580

G Check applicable boxes: (1) [X] Initial return (2) [ ] Final return (3) [ ] Change in address (4) [ ] Amended return

H Check accounting method: (1) [ ] Cash (2) [X] Accrual (3) [ ] Other (specify) ▶

I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 2

**Caution:** Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | |
|---|---|---|---|
| **Income** | 1a Gross receipts or sales | 1a | |
| | b Less returns and allowances | 1b | |
| | | 1c | 0 |
| | 2 Cost of goods sold (Schedule A, line 8) | 2 | |
| | 3 Gross profit. Subtract line 2 from line 1c | 3 | 0 |
| | 4 Ordinary income (loss) from other partnerships, estates, and trusts (attach schedule) | 4 | |
| | 5 Net farm profit (loss) (attach Schedule F (Form 1040)) | 5 | |
| | 6 Net gain (loss) from Form 4797, Part II, line 20 | 6 | |
| | 7 Other income (loss) (see instructions) (attach schedule) Statement #1 | 7 | (70,836,454) |
| | 8 **Total income (loss).** Combine lines 3 through 7 | 8 | (70,836,454) |
| **Deductions (see instructions for limitations)** | 9 Salaries and wages (other than to partners) (less employment credits) | 9 | |
| | 10 Guaranteed payments to partners | 10 | |
| | 11 Repairs and maintenance | 11 | |
| | 12 Bad debts | 12 | |
| | 13 Rent | 13 | |
| | 14 Taxes and licenses | 14 | |
| | 15 Interest | 15 | 36,951 |
| | 16a Depreciation (see instructions) | 16a | |
| | b Less depreciation reported on Schedule A and elsewhere on return | 16b | |
| | | 16c | 0 |
| | 17 Depletion (**Do not deduct oil and gas depletion.**) | 17 | |
| | 18 Retirement plans, etc. | 18 | |
| | 19 Employee benefit programs | 19 | |
| | 20 Other deductions (attach schedule) | 20 | |
| | 21 **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | 21 | 36,951 |
| | 22 **Ordinary income (loss)** from trade or business activities. Subtract line 21 from line 8 | 22 | (70,873,405) |

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of general partner or limited liability company member ▶ 10/15/95 Date

**Paid Preparer's Use Only**

Preparer's signature ▶ | Date | Check if self-employed ▶ [ ] | Preparer's social security no.

Firm's name (or yours if self-employed) and address ▶ | E.I. No. ▶ | ZIP code ▶

D193 For Paperwork Reduction Act Notice, see instr.

MAR-004410

Form **8800** (Rev. August 1992)

Department of the Treasury Internal Revenue Service

# Application for Additional Extension of Time To File U.S. Return for a Partnership, REMIC, or Certain Trusts

▶ File a separate application for each return.

OMB No. 1545-1057 Expires 7-31-95

Please type or print.

File the original and one copy by the due date for filing the return for which an extension is requested. (See instructions.)

Name: MARRIOTT INTERNATIONAL RESORTS, LP

Employer identification number: 52 : 1901155

Number, street, and room or suite no. (If a P.O. box, see instructions.): ONE MARRIOTT DRIVE; DEPARTMENT 52-924.13

City or town, state, and ZIP code: WASHINGTON, D.C. 20058

1 An additional extension of time until October 15, 19 95, is requested to file (check only one):
☐ Form 1041 ☐ Form 1065 ☒ Form 1066

If the entity does not have an office or place of business in the United States, check this box ▶ ☐

2a For calendar year 19 ....., or other tax year beginning Oct. 29, 19 94, and ending Dec. 31, 1994

b If this tax year is for less than 12 months, check reason: ☒ Initial return ☐ Final return ☐ Change in accounting period

3 Was a previous extension of time to file granted for this tax year? ☒ Yes ☐ No

4 If yes, previous extension was granted until July 15, 19 95.

5 State in detail why you need an extension. ADDITIONAL TIME IS NEEDED IN WHICH TO ACCUMULATE ALL THE INFORMATION NECESSARY FOR THE PREPARATION OF THE RETURN. ACCORDINGLY, THIS PARTNERSHIP RESPECTFULLY REQUESTS AN EXTENSION OF TIME UNTIL OCTOBER 15, 1995 IN WHICH TO FILE A COMPLETE AND ACCURATE RETURN.

## Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶ [signature] Title ▶ ASSISTANT SECRETARY Date ▶ 7/15/95

File original and one copy. The IRS will show below whether or not your application is approved and will return the copy.

**Notice to Applicant—To Be Completed by the IRS.**

☐ We HAVE approved this application. Please attach this form to your return.

☐ We HAVE NOT approved this application. However, we have granted a 10-day grace period from the later of the date shown below or the due date of your return (including any prior extension). This grace period is considered to be a valid extension of time for elections otherwise required to be made on a timely return. Please attach this form to your return.

☐ We HAVE NOT approved your application. After considering the reasons stated in item 5, above, we cannot grant your request for an extension of time to file. We are not granting a 10-day grace period.

☐ We cannot consider your application because it was filed after the due date of the return for which an extension was requested.

☐ Other: ..............................

MAR-004411

Director ______________ By: ______________ Date

If you want a copy of this form to be returned to an address other than that shown above, please enter the address to which the copy should be sent.

Please Type or Print

Name

Number, street, and room or suite no. (or P.O. box number if mail is not delivered to street address)

City or town, state, and ZIP code

For Paperwork Reduction Act Notice, see back of form. Cat. No. 64938X Form 8800 (Rev. 8-92)

Form **8736** (Rev. October 1992)
Department of the Treasury
Internal Revenue Service

# Application for Automatic Extension of Time To File U.S. Return for a Partnership, REMIC, or for Certain Trusts

▶ File a separate application for each return.

OMB No. 1545-1054
Expires 10-31-95

Please type or print

File by the due date for filing the return for which an extension is requested. (See instructions.)

Name: MARRIOTT INTERNATIONAL RESORTS, LP

Employer identification number: 52 1901155

Number, street, and room or suite no. (If a P.O. box, see instructions.): ONE MARRIOTT DRIVE; DEPARTMENT 52-924.13

City or town, state, and ZIP code: WASHINGTON, D.C. 20058

1 An automatic extension of 3 months is requested to file (check only one):
☐ Form 1041 ☒ Form 1065 ☐ Form 1066

If the entity does not have an office or place of business in the United States, check this box . . . . . . . . ▶ ☐

2a For calendar year 19......., or other tax year beginning Oct. 29, 1994, and ending Dec. 30, 1994.

b If this tax year is for less than 12 months, check reason:
☒ Initial return ☐ Final return ☐ Change in accounting period

3 If this extension is requested for Form 1041 or Form 1066, enter the following amounts:

a Tentative total tax from Form 1041 or Form 1066 (see instructions) . . . . . . . . . . . . . $ ______

b Refundable credits and estimated tax payments, including any prior year overpayment allowed as a credit, from Form 1041 (see instructions). REMICs, enter -0- . . . . . . . . . . . . . . . $ ______

c Balance due. Subtract line 3b from line 3a. If zero or less, enter -0-. Include payment with Form 8736 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ $

Caution: *Interest will be charged on any tax not paid by the regular due date of Forms 1041 and 1066 from the due date until the tax is paid.*

## Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete; and that I am authorized to prepare this form.

Signature ▶ [signature] Title ▶ ASSISTANT SECRETARY Date ▶ 4/15/95

## Paperwork Reduction Act Notice

We ask for the information on this form to carry out the Internal Revenue laws of the United States. You are required to give us the information. We need it to ensure that you are complying with these laws and to allow us to figure and collect the right amount of tax.

The time needed to complete and file this form will vary depending on individual circumstances. The estimated average time is:

| | |
|---|---|
| Recordkeeping | 3 hr., 7 min. |
| Learning about the law or the form | 24 min. |
| Preparing, copying, assembling, and sending the form to the IRS | 28 min. |

If you have comments concerning the accuracy of these time estimates or suggestions for making this form more simple, we would be happy to hear from you. You can write to both the Internal Revenue Service, Washington, DC 20224, Attention: IRS Reports Clearance Officer, T:FP; and the Office of Management and Budget, Paperwork Reduction Project (1545-1054), Washington, DC 20503. DO NOT send Form 8736 to either of these offices. Instead, see Where To File on page 2.

## General Instructions

*(Section references are to the Internal Revenue Code unless otherwise noted.)*

### Purpose of Form

Form 8736 is used to request an automatic 3-month extension of time to file a return by:

- Trusts filing Form 1041, U.S. Fiduciary Income Tax Return,
- Partnerships filing Form 1065, U.S. Partnership Return of Income, and
- Real estate mortgage investment conduits (REMICs) filing Form 1066, U.S. Real Estate Mortgage Investment Conduit Income Tax Return.

If granted, the automatic extension will extend the due date of the return to the 15th day of the 3rd month following the month in which the regular due date falls. The automatic 3-month extension period includes any 2-month extension granted under Regulations section 1.6081-5 to certain foreign partnerships.

Note: *Estates filing Form 1041 should not file this form. Instead, they should request an extension using Form 2758, Application for Extension of Time To File Certain Excise, Income, Information, and Other Returns.*

MAR-004412

Cat. No 64907Y Form 8736 (Rev. 10-92)

## Schedule A Cost of Goods Sold

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | |
| 2 | Purchases less cost of items withdrawn for personal use | 2 | |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs (see instructions) (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) | 5 | |
| 6 | **Total.** Add lines 1 through 5 | 6 | 0 |
| 7 | Inventory at end of year | 7 | |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 0 |

9a Check all methods used for valuing closing inventory:

(i) ☐ Cost

(ii) ☐ Lower of cost or market as described in Regulations section 1.471-4

(iii) ☐ Writedown of "subnormal" goods as described in Regulations section 1.471-2(c)

(iv) ☐ Other (specify method used and attach explanation) ▶

b Check this box if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) N/A ▶ ☐

c Do the rules of section 263A (for property produced or acquired for resale) apply to the partnership? N/A ☐ Yes ☐ No

d Was there any change in determining quantities, cost, or valuations between opening and closing inventory? N/A ☐ Yes ☐ No
If "Yes", attach explanation.

## Schedule B Other Information

| | | Yes | No |
|---|---|---|---|
| 1 | What type of entity is filing this return? Check the applicable box ▶ ☐ General partnership ☒ Limited partnership ☐ Limited liability company | | |
| 2 | Are any partners in this partnership also partnerships? | | X |
| 3 | Is this partnership a partner in another partnership? | | X |
| 4 | Is this partnership subject to the consolidated audit procedures of sections 6221 through 6233? If "Yes," see **Designation of Tax Matters Partner** below | | X |
| 5 | Does this partnership meet **ALL THREE** of the following requirements? | | |
| a | The partnership's total receipts for the tax year were less than $250,000; | | |
| b | The partnership's total assets at the end of the tax year were less than $600,000; **AND** | | |
| c | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; Item F on page 1 of Form 1065; or Item J on Schedule K-1 | | X |
| 6 | Does this partnership have any foreign partners? | | X |
| 7 | Is this partnership a publicly traded partnership as defined in section 469(k)(2)? | | X |
| 8 | Has this partnership filed, or is it required to file, **Form 8264,** Application for Registration of a Tax Shelter? | | X |
| 9 | At any time during calendar year 1994, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? (See the instructions for exceptions and filing requirements for form TD F 90-22.1.) If "Yes," enter the name of the foreign country. ▶ | | X |
| 10 | Was the partnership the grantor of, or transferor to, a foreign trust that existed during the current tax year, whether or not the partnership or any partner has any beneficial interest in it? If "Yes," you may have to file Forms 3520, 3520-A, or 926 | | X |
| 11 | Was there a distribution of property or a transfer (e.g., by sale or death) of a partnership interest during the tax year? If "Yes," you may elect to adjust the basis of the partnership's assets under section 754 by attaching the statement described under Elections Made By the Partnership | | X |

**Designation of Tax Matters Partner** (See instructions.)

Enter below the general partner designated as the tax matters partner (TMP) for the tax year of this return:

Name of designated TMP ▶ Marriott International JBS Corp.

Identifying number of TMP ▶ 52-1876318

Address of designated TMP ▶ One Marriott Drive; Dept. 924.13
Washington, DC 20058

MAR-004413

**Schedule K** Partners' Share of Income, Credits, Deductions, Etc.

| Section | | (a) Distributive share items | Line | (b) Total amount |
|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities (page 1, line 22) | 1 | (70,873,405) |
| | 2 | Net income (loss) from rental real estate activities (attach Form 8825) | 2 | |
| | 3a | Gross income from other rental activities ... 3a | | |
| | b | Expenses from other rental activities (attach schedule) ... 3b | | |
| | c | Net income (loss) from other rental activities. Subtract line 3b from line 3a | 3c | 0 |
| | 4 | Portfolio income (loss) (see instructions): a Interest income | 4a | |
| | b | Dividend income | 4b | |
| | c | Royalty income | 4c | |
| | d | Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | 4d | |
| | e | Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | 4e | |
| | f | Other portfolio income (loss) (attach schedule) | 4f | |
| | 5 | Guaranteed payments to partners | 5 | |
| | 6 | Net gain (loss) under section 1231 (other than due to casualty or theft) (attach Form 4797) | 6 | |
| | 7 | Other income (loss) (attach schedule) | 7 | |
| Deductions | 8 | Charitable contributions (see instructions) (attach schedule) | 8 | |
| | 9 | Section 179 expense deduction (attach Form 4562) | 9 | |
| | 10 | Deductions related to portfolio income (see instructions) (itemize) | 10 | |
| | 11 | Other deductions (attach schedule) | 11 | |
| Investment Interest | 12a | Interest expense on investment debts | 12a | |
| | b | (1) Investment income included on lines 4a, 4b, 4c, and 4f above | 12b(1) | 0 |
| | | (2) Investment expenses included on line 10 above | 12b(2) | |
| Credits | 13a | Credit for income tax withheld | 13a | |
| | b | Low-income housing credit (see instructions): | | |
| | | (1) From partnerships to which section 42(j)(5) applies for property placed in service before 1990 | 13b(1) | |
| | | (2) Other than on line 13b(1) for property placed in service before 1990 | 13b(2) | |
| | | (3) From partnerships to which section 42(j)(5) applies for property placed in service after 1989 | 13b(3) | |
| | | (4) Other than on line 13b(3) for property placed in service after 1989 | 13b(4) | |
| | c | Qualified rehabilitation expenditures related to rental real estate activities (attach Form 3468) | 13c | |
| | d | Credits (other than credits shown on lines 13b & 13c) related to rental real estate activities (see instr.) | 13d | |
| | e | Credits related to other rental activities (see instructions) | 13e | |
| | 14 | Other credits (see instructions) | 14 | |
| Self-Employment | 15a | Net earnings (loss) from self-employment | 15a | |
| | b | Gross farming or fishing income | 15b | |
| | c | Gross nonfarm income | 15c | |
| Adjustments and Tax Preference Items | 16a | Depreciation adjustment on property placed in service after 1986 | 16a | |
| | b | Adjusted gain or loss | 16b | |
| | c | Depletion (other than oil and gas) | 16c | |
| | d | (1) Gross income from oil, gas, and geothermal properties | 16d(1) | |
| | | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | |
| | e | Other adjustments and tax preference items (attach schedule) | 16e | |
| Foreign Taxes | 17a | Type of income ▶ ________ b Foreign country or U.S. possession ▶ ________ | | |
| | c | Total gross income from sources outside the United States (attach schedule) | 17c | |
| | d | Total applicable deductions and losses (attach schedule) | 17d | |
| | e | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 17e | |
| | f | Reduction in taxes available for credit (attach schedule) | 17f | |
| | g | Other foreign tax information (attach schedule) | 17g | |
| Other | 18a | Total expenditures to which a section 59(e) election may apply | 18a | |
| | b | Type of expenditures ▶ ________ | | |
| | 19 | Tax-exempt interest income | 19 | |
| | 20 | Other tax-exempt income | 20 | |
| | 21 | Nondeductible expenses | 21 | |
| | 22 | Other items and amounts required to be reported separately to partners (see instr.) (attach sched.) | | |
| Analysis | 23a | Income (loss). Combine lines 1 through 7 in column (b). From the result, subtract the sum of lines 8 thru 12a, 17e, and 18a | 23a | (70,873,405) |

b Analysis by type of partner:

| | (a) Corporate | (b) Individual: i. Active | (b) Individual: ii. Passive | (c) Partnership | (d) Exempt organization | (e) Nominee/Other |
|---|---|---|---|---|---|---|
| (1) General partners | (708,734) | | | | | |
| (2) Limited partners | (70164671) | | | | | |

For Paperwork Reduction Act Notice, see instr. CS1 Form **1065** (1994)

MAR-004414

Note: If Question 5 of Schedule B is answered "Yes," the partnership is not required to complete Schedules L, M-1, and M-2.

## Schedule L Balance Sheets

| Assets | Beginning of tax year (a) | Beginning of tax year (b) | End of tax year (c) | End of tax year (d) |
|---|---|---|---|---|
| 1 Cash | | | | 133,433 |
| 2a Trade notes and accounts receivable | | | | |
| b Less allowance for bad debts | | 0 | | 0 |
| 3 Inventories | | | | |
| 4 U.S. government obligations | | | | |
| 5 Tax-exempt securities | | | | |
| 6 Other current assets (attach schedule) | | | | |
| 7 Mortgage and real estate loans | | | | |
| 8 Other investments (attach schedule) | | | | |
| 9a Buildings and other depreciable assets | | | | |
| b Less accumulated depreciation | | 0 | | 0 |
| 10a Depletable assets | | | | |
| b Less accumulated depletion | | 0 | | 0 |
| 11 Land (net of any amortization) | | | | |
| 12a Intangible assets (amortizable only) | | | | |
| b Less accumulated amortization | | 0 | | 0 |
| 13 Other assets (attach schedule) See | Statement #1 | | | 7,320,147 |
| 14 Total assets | | 0 | | 7,453,580 |
| **Liabilities and Capital** | | | | |
| 15 Accounts payable | | | | 246,459 |
| 16 Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 Other current liabilities (attach schedule) | | | | |
| 18 All nonrecourse loans | | | | |
| 19 Mortgages, notes, bonds payable in 1 year or more | | | | |
| 20 Other liabilities (attach schedule) | | | | |
| 21 Partners' capital accounts | | | | 7,207,121 |
| 22 Total liabilities and capital | | 0 | | 7,453,580 |

## Schedule M-1 Reconciliation of Income (Loss) per Books With Income (Loss) per Return (see instructions)

| | | | |
|---|---|---|---|
| 1 Net income (loss) per books | (70,873,405) | 6 Income recorded on books this year not incl. on Sch. K, lines 1 though 7 (itemize): a Tax-exempt interest $ | 0 |
| 2 Income included on Schedule K, lines 1 through 4, 6, and 7, not recorded on books this year (itemize): | 0 | 7 Deductions included on Sch. K, lines 1 through 12a, 17e, and 18a, not charged against book income this year (itemize): a Depreciation $ | 0 |
| 3 Guaranteed payments (other than health insurance) | | 8 Add lines 6 and 7 | 0 |
| 4 Expenses recorded on books this year not included on Schedule K, lines 1 through 12a, 17e, and 18a (itemize): a Depreciation $ b Travel & entertainment $ | 0 | 9 Income (loss) (Schedule K, line 23a). Subtract line 8 from line 5 | (70,873,405) |
| 5 Add lines 1 through 4 | (70,873,405) | | |

## Schedule M-2 Analysis of Partners' Capital Accounts

| | | | |
|---|---|---|---|
| 1 Balance at beginning of year | 0 | 6 Distributions: a Cash | 84,499,946 |
| 2 Capital contributed during year | 162,580,472 | b Property | |
| 3 Net income (loss) per books | (70,873,405) | 7 Other decreases (itemize): | 0 |
| 4 Other increases (itemize): | 0 | 8 Add lines 6 and 7 | 84,499,946 |
| 5 Add lines 1 through 4 | 91,707,067 | 9 Balance at end of year. Subtract line 8 from line 5 | 7,207,121 |



MAR-004415

# SCHEDULE K-1 (Form 1065) Partner's Share of Income, Credits, Deductions, etc.

Department of the Treasury
Internal Revenue Service

▶ See separate instructions.

For calendar year 1994 or tax year beginning Oct. 29, 1994, and ending Dec. 30, 19 94

OMB No. 1545-0099

1994

Partner's identifying number ▶ 52-1876318

Partnership's identifying number ▶ 52-1901155

Partner's name, address, and ZIP code

Marriott International JBS Corp.
One Marriott Drive; Dept. 924.13
Washington, DC 20058

Partnership's name, address, and ZIP code

Marriott International Resorts, LP
One Marriott Drive; Dept. 924.13
Washington, DC 20058

**A** This partner is a [X] general partner [ ] limited partner [ ] limited liability company member

**B** What type of entity is this partner? ▶ Corporation

**C** Is this partner a [X] domestic or a [ ] foreign partner?

**D** Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | % | 1% |
| Loss sharing | % | 1% |
| Ownership of capital | % | 1% |

**E** IRS Center where partnership filed return: Phil. PA

**F** Partner's share of liabilities (see instructions):

Nonrecourse ..........

Qualified nonrecourse financing ..........

Other .......... 2,465

**G** Tax shelter registration number ▶

**H** Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) .......... [ ]

**I** Check applicable boxes: (1) [ ] Final K-1 (2) [ ] Amended K-1

**J** Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 0 | 1,033,032 | (708,734) | 844,999 | (520,701) |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | (708,734) | |
| | 2 | Net income (loss) from rental real estate activities | 2 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest | 4a | | Sch. B, Part I, line 1 |
| | b | Dividends | 4b | | Sch. B, Part II, line 5 |
| | c | Royalties | 4c | | Sch. E, Part I, line 4 |
| | d | Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) or (g) |
| | e | Net long-term capital gain (loss) | 4e | | Sch. D, line 13, col. (f) or (g) |
| | f | Other portfolio income (loss) (attach schedule) | 4f | | Enter on appl. line of your return. |
| | 5 | Guaranteed payments to partner | 5 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 | Net gain (loss) under section 1231 (other than due to casualty or theft) | 6 | | |
| | 7 | Other income (loss) (attach schedule) | 7 | | Enter on appl. line of your return. |
| Deductions | 8 | Charitable contributions (see instructions) (attach schedule) | 8 | | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income (attach schedule) | 10 | | |
| | 11 | Other deductions (attach schedule) | 11 | | |
| Investment Interest | 12a | Interest expense on investment debts | 12a | | Form 4952, line 1 |
| | b | (1) Investment income included on lines 4a, 4b, 4c, and 4f above | b(1) | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | | (2) Investment expenses included on line 10 above | b(2) | | |
| Credits | 13a | Credit for income tax withheld | 13a | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b | Low-income housing credit: | | | |
| | | (1) From section 42(j)(5) partnerships for property placed in service before 1990 | b(1) | | Form 8586, line 5 |
| | | (2) Other than on line 13b(1) for property placed in service before 1990 | b(2) | | |
| | | (3) From section 42(j)(5) partnerships for property placed in service after 1989 | b(3) | | |
| | | (4) Other than on line 13b(3) for property placed in service after 1989 | b(4) | | |
| | c | Qualified rehabilitation expenditures related to rental real estate activities (see instructions) | 13c | | |
| | d | Credits (other than credits shown on lines 13b and 13c) related to rental real estate activities (see instructions) | 13d | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | e | Credits related to other rental activities (see instructions) | 13e | | |
| | 14 | Other credits (see instructions) | 14 | | |

MAR-004416

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Self-employment | 15a | Net earnings (loss) from self-employment | 15a | | Sch. SE, Section A or B |
| | b | Gross farming or fishing income | 15b | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Gross nonfarm income | 15c | | |
| Adjustments and Tax Preference Items | 16a | Depreciation adjustment on property placed in service after 1986 | 16a | | See Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b | Adjusted gain or loss | 16b | | |
| | c | Depletion (other than oil and gas) | 16c | | |
| | d | (1) Gross income from oil, gas, and geothermal properties | d(1) | | |
| | | (2) Deductions allocable to oil, gas, and geothermal properties | d(2) | | |
| | e | Other adjustments and tax preference items (attach schedule) | 16e | | |
| Foreign Taxes | 17a | Type of income ▶ | | | Form 1116, check boxes |
| | b | Name of foreign country or U.S. possession ▶ | | | |
| | c | Total gross income from sources outside the United States (attach schedule) | 17c | | Form 1116, Part I |
| | d | Total applicable deductions and losses (attach schedule) | 17d | | |
| | e | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 17e | | Form 1116, Part II |
| | f | Reduction in taxes available for credit (attach schedule) | 17f | | Form 1116, Part III |
| | g | Other foreign tax information (attach schedule) | 17g | | See Instructions for Form 1116. |
| Other | 18a | Total expenditures to which a section 59(e) election may apply | 18a | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b | Type of expenditures ▶ | | | |
| | 19 | Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 | Other tax-exempt income | 20 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 | Nondeductible expenses | 21 | | |
| | 22 | Recapture of low-income housing credit: | | | |
| | a | From section 42(j)(5) partnerships | 22a | | Form 8611, line 8 |
| | b | Other than on line 22a | 22b | | |

**Supplemental Information**

23 Supplemental information required to be reported separately to each partner (attach additional schedules if more space is needed):

MAR-004417

SCHEDULE K-1 (Form 1065)
Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 1994 or tax year beginning Oct. 29, 1994, and ending Dec. 30, 19 94

OMB No. 1545-0099

1994

Partner's identifying number ▶ 52-1853234

Partnership's identifying number ▶ 52-1901155

Partner's name, address, and ZIP code

Marriott International Capital Corp.
One Marriott Drive; Dept. 924.13
Washington, DC 20058

Partnership's name, address, and ZIP code

Marriott International Resorts, LP
One Marriott Drive; Dept. 924.13
Washington, DC 20058

A This partner is a ☐ general partner ☒ limited partner ☐ limited liability company member

B What type of entity is this partner? ▶ Corporation

C Is this partner a ☒ domestic or a ☐ foreign partner?

D Enter partner's percentage of:

| | (i) Before change or termination | (ii) End of year |
|---|---|---|
| Profit sharing | % | 99% |
| Loss sharing | % | 99% |
| Ownership of capital | % | 99% |

E IRS Center where partnership filed return: Phil. PA

F Partner's share of liabilities (see instructions):

Nonrecourse ..........

Qualified nonrecourse financing ..........

Other .......... 243,994

G Tax shelter registration number ▶

H Check here if this partnership is a publicly traded partnership as defined in section 469(k)(2) ☐

I Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

J Analysis of partner's capital account:

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Partner's share of lines 3, 4, and 7, Form 1065, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year (combine columns (a) through (d)) |
|---|---|---|---|---|
| 0 | 161,547,440 | (70,164,671) | 83,654,947 | 7,727,822 |

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities | 1 | (70,164,671) | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 2 | Net income (loss) from rental real estate activities | 2 | | |
| | 3 | Net income (loss) from other rental activities | 3 | | |
| | 4 | Portfolio income (loss): | | | |
| | a | Interest | 4a | | Sch. B, Part I, line 1 |
| | b | Dividends | 4b | | Sch. B, Part II, line 5 |
| | c | Royalties | 4c | | Sch. E, Part I, line 4 |
| | d | Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) or (g) |
| | e | Net long-term capital gain (loss) | 4e | | Sch. D, line 13, col. (f) or (g) |
| | f | Other portfolio income (loss) (attach schedule) | 4f | | Enter on appl. line of your return. |
| | 5 | Guaranteed payments to partner | 5 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 6 | Net gain (loss) under section 1231 (other than due to casualty or theft) | 6 | | |
| | 7 | Other income (loss) (attach schedule) | 7 | | Enter on appl. line of your return. |
| Deductions | 8 | Charitable contributions (see instructions) (attach schedule) | 8 | | Sch. A, line 15 or 16 |
| | 9 | Section 179 expense deduction | 9 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 10 | Deductions related to portfolio income (attach schedule) | 10 | | |
| | 11 | Other deductions (attach schedule) | 11 | | |
| Investment Interest | 12a | Interest expense on investment debts | 12a | | Form 4952, line 1 |
| | b | (1) Investment income included on lines 4a, 4b, 4c, and 4f above | b(1) | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | | (2) Investment expenses included on line 10 above | b(2) | | |
| Credits | 13a | Credit for income tax withheld | 13a | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b | Low-income housing credit: | | | |
| | | (1) From section 42(j)(5) partnerships for property placed in service before 1990 | b(1) | | Form 8586, line 5 |
| | | (2) Other than on line 13b(1) for property placed in service before 1990 | b(2) | | |
| | | (3) From section 42(j)(5) partnerships for property placed in service after 1989 | b(3) | | |
| | | (4) Other than on line 13b(3) for property placed in service after 1989 | b(4) | | |
| | c | Qualified rehabilitation expenditures related to rental real estate activities (see instructions) | 13c | | |
| | d | Credits (other than credits shown on lines 13b and 13c) related to rental real estate activities (see instructions) | 13d | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | e | Credits related to other rental activities (see instructions) | 13e | | |
| | 14 | Other credits (see instructions) | 14 | | |

MAR-004418

| | | (a) Distributive share item | | (b) Amount | (c) 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|---|
| Self-employment | 15a | Net earnings (loss) from self-employment | 15a | | Sch. SE, Section A or B |
| | b | Gross farming or fishing income | 15b | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | c | Gross nonfarm income | 15c | | |
| Adjustments and Tax Preference Items | 16a | Depreciation adjustment on property placed in service after 1986 | 16a | | See Partner's Instructions for Schedule K-1 (Form 1065) and Instructions for Form 6251. |
| | b | Adjusted gain or loss | 16b | | |
| | c | Depletion (other than oil and gas) | 16c | | |
| | d | (1) Gross income from oil, gas, and geothermal properties | d(1) | | |
| | | (2) Deductions allocable to oil, gas, and geothermal properties | d(2) | | |
| | e | Other adjustments and tax preference items (attach schedule) | 16e | | |
| Foreign Taxes | 17a | Type of income ▶ | | | Form 1116, check boxes |
| | b | Name of foreign country or U.S. possession ▶ | | | |
| | c | Total gross income from sources outside the United States (attach schedule) | 17c | | Form 1116, Part I |
| | d | Total applicable deductions and losses (attach schedule) | 17d | | |
| | e | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 17e | | Form 1116, Part II |
| | f | Reduction in taxes available for credit (attach schedule) | 17f | | Form 1116, Part III |
| | g | Other foreign tax information (attach schedule) | 17g | | See Instructions for Form 1116. |
| Other | 18a | Total expenditures to which a section 59(e) election may apply | 18a | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | b | Type of expenditures ▶ | | | |
| | 19 | Tax-exempt interest income | 19 | | Form 1040, line 8b |
| | 20 | Other tax-exempt income | 20 | | See Partner's Instructions for Schedule K-1 (Form 1065). |
| | 21 | Nondeductible expenses | 21 | | |
| | 22 | Recapture of low-income housing credit: | | | |
| | a | From section 42(j)(5) partnerships | 22a | | Form 8611, line 8 |
| | b | Other than on line 22a | 22b | | |

**Supplemental Information**

23 Supplemental information required to be reported separately to each partner (attach additional schedules if more space is needed):

MAR-004419

**MARRIOTT INTERNATIONAL RESORTS, LP**
**EIN: 52-1901155**

**For the Tax Year Beginning October 29, 1994 and Ended December 30, 1994**

| **Form 1065 Supporting Schedules** | **Statement #1** |
|---|---|

Line 7 - Page 1 - Other Income

| | |
|---|---|
| Interest Income | 352,517 |
| Loss on Sale of Timeshare Notes | (71,189,461) |
| Miscellaneous Trust Income | 490 |
| Total Other Income | (70,836,454) |

| Schedule L - Line 13 - Other Assets | Beginning | Ending |
|---|---|---|
| Fees Receivable | - | 4,132,086 |
| Due from Marriott | - | 3,188,061 |
| | - | 7,320,147 |

MARRIOTT INTERNATIONAL RESORTS, LP
EIN: 52-1901155

Statement Attached to and made part of Partnership Returns of Income for the taxable year beginning October 29, 1994 and ended December 30, 1994

I.R.C. § 195 Statement

Marriott International Resorts, LP hereby elects to amortize start-up expenditures over a period of 60 months beginning October 29, 1994 in accordance with I.R.C. § 195(b) .

**MARRIOTT INTERNATIONAL RESORTS, LP**
**EIN: 52-1901155**

**Statement Attached to and made part of Partnership Returns of Income for the taxable year beginning October 29, 1994 and ended December 30, 1994**

**I.R.C. Sec. 709(b)(1) Statement**

In accordance with I.R.C. Reg. § 1.709-1(b)(1), Marriott International Resorts, LP hereby elects to amortize its organizational expenditures over a period of 60 months beginning October 29, 1994.

MARRIOTT INTERNATIONAL RESORTS, LP
EIN: 52-1901155

Statement Attached to and made part of Partnership Returns of Income for the taxable year beginning October 29, 1994 and ended December 30, 1994

I.R.C. § 706 Statement

In accordance with I.R.C. Reg. §§1.706-1(b) and 1.441-2T(e), Marriott International Resorts, LP hereby adopts a 52-53 week taxable year ending on the Friday closest to December 31 as its taxable year, the majority tax year.

MARRIOTT INTERNATIONAL RESORTS, LP
EIN: 52-1901155

Statement Attached to and made part of Partnership Returns of Income for the taxable year beginning October 29, 1994 and ended December 30, 1994

I.R.C. § 446 Statement

Marriott International Resorts, LP hereby elects the accrual method of accounting in accordance with I.R.C. §446.