**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**Nos. 01-256 T and 01-257 T**
**(Judge Lettow)**

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

# DECLARATION OF G. ROBSON STEWART

---

I, G. Robson Stewart, being of legal age and pursuant to 28 U.S.C., Section 1746, declare as follows:

1. I am the Department of Justice trial attorney assigned to defend the above-captioned case and I have in my possession relevant Department of Justice and Internal Revenue Service files.

2. Attached hereto are true and accurate copies of the following documents:

Exhibit 1 - MTMG Corp. Purchase Agreement dated November 22, 1993.

Exhibit 2 - Letter dated November 22, 1993, from Marriott Ownership Resorts, Inc., to Teachers Insurance and Annuity Association of America.

Exhibit 3 - Facsimile dated January 1, 1994, from Phil Hamon at CS First Boston to Lester Pulse at Marriott International.

Exhibit 4 - Letter dated June 24, 1994, from Phil Hamon at CS First Boston to Michael Dearing at Marriott Ownerships Resorts, Inc., re: original intent of the parties ("original intent letter").

Exhibit 5 - Letter dated June 24, 1994, from Phil Hamon at CS First Boston to Michael Dearing at Marriott Ownerships Resorts, Inc., re: letter agreement ("agreement letter").

Exhibit 6 - Letter dated July 8, 1994, from Brit Bartter at CS First Boston to Michael Dearing at Marriott International, Inc.

Exhibit 7 - Certificate of Incorporation of Marriott International JBS Corporation.

Exhibit 8 - Marriott International Resorts, L.P., limited partnership agreement.

Exhibit 9 - Facsimile dated September 29, 1994, from Timothy Lu at CS First Boston to Michael Dearing at Marriott.

Exhibit 10 - Facsimile dated October 12, 1994, from Timothy Lu at CS First Boston to Michael Dearing at Marriott Ownership Resorts, Inc.

Exhibit 11 - Marriott International Resorts, L.P., partnership return (Form 1065) for the taxable year ended October 28, 1994.

Exhibit 12 - Marriott International Resorts, L.P., partnership return (Form 1065) for the taxable year ended December 30, 1994.

I declare under penalty of perjury, that the foregoing is true and correct. Executed in Washington, D.C., on February 1, 2008.

G. ROBSON STEWART
Trial Attorney, Tax Division
U.S. Department of Justice

# Defendant's Exhibit 1

B&W Draft 11/22/93
Marked to show changes
from Draft of 11/18/93

---

MTMG CORPORATION

PASS-THROUGH CERTIFICATES

SERIES 1993-A, 1994-A, 1994-B, 1994-C and 1994-D

---

# PURCHASE AGREEMENT

Dated November 22, 1993

---

39900.00007\PURAG.8

## Table of Contents


| | | Page |
|---|---|---|
| 1. | The Certificates | 1 |
| 2. | Purchase and Sale of the Certificates | 2 |
| 3. | The Closings; Delivery of the Certificates | 2 |
| 4. | Conditions of the Purchaser's Obligation | 3 |
| 5. | Representations and Warranties | 8 |
| 6. | Expenses | 12 |
| 7. | The Purchaser's Representations | 14 |
| 8. | Investigations with Respect to Representations and Warranties | 15 |
| 9. | Payments | 15 |
| 10. | Indemnification and Contribution | 15 |
| 11. | Notices | 18 |
| 12. | Miscellaneous | 18 |

SCHEDULES AND EXHIBITS

| | |
|---|---|
| Exhibit A | Forms of Opinion of Counsel to the Company, the Servicer and Marriott. |
| Exhibit B | MORI Notice. |
| Exhibit C | Form of Opinion of Brown & Wood As To Bankruptcy-Related Matters. |
| Exhibit D | Form of Opinion of Counsel to the Trustee. |
| Exhibit E | [Reserved] |
| Exhibit F | Form of Opinion of Special Florida Tax Counsel. |
| Exhibit G | Forms of Certificates of the Company, the Servicer and Marriott. |
| Exhibit H | Form of Certificates of Sun Bank, National Association. |
| Exhibit I | Form of Pricing Agreement. |

MTMG CORPORATION

PASS-THROUGH Certificates

Series 1993-A, 1994-A, 1994-B, 1994-C and 1994-D

PURCHASE AGREEMENT

MTMG Corporation, a Delaware corporation (the "Company"), a wholly owned subsidiary of Marriott Ownership Resorts, Inc., a Delaware corporation ("MORI"), and MORI each hereby agrees with Teachers Insurance and Annuity Association of America, a New York corporation (the "Purchaser"), as follows.

1. The Certificates. The Company and MORI have each authorized the execution and delivery to Sun Bank, National Association, as trustee (the "Trustee"), of five Pooling and Servicing Agreements (each a "Pooling Agreement", and collectively the "Pooling Agreements") providing for the creation of five separate trusts (each a "Trust", and collectively the "Trusts") and for the issuance and sale of five separate series of pass-through certificates (each a "Series", and collectively the "Certificates") that evidence undivided interests in (a) five separate pools of mortgage loans (each a "Pool" and collectively the "Mortgage Loans") owned or to be acquired from MORI (subject to their meeting certain criteria set forth herein and in the related Pooling Agreement) by the Company, serviced by MORI (in such capacity, the "Servicer") and secured by first mortgage liens or deeds of trust on timeshare estates which are part of certain timeshare resorts (each, a "Resort") and which comprise or will comprise all of the Mortgage Loans originated or to be originated by MORI with respect to the Resorts prior to December 1, 1994, and (b) certain other assets required to be transferred and assigned to the Trustee pursuant to the Pooling Agreements. The Mortgage Loans to be included in any Pool will be described in a separate Private Placement Memorandum (each a "PPM") provided in connection with each issuance of a Series. Each Mortgage Loan and Resort shall conform to the representations and warranties set forth in the related Pooling Agreements. The cut-off date for each Series (each a "Cut-Off Date") shall be set forth in a notice (the "MORI Notice") given by MORI to the Purchaser not later than 10 days prior to the Closing Date (as defined below) with respect to each Series (except in the case of the initial Series, in which case, the related MORI Notice shall be given on the date hereof), a form of which is attached hereto as Exhibit B. The initial Series of Mortgage Loans shall have an aggregate unpaid principal balance of approximately $70,000,000 as of its Cut-Off Date, after giving effect to payments of principal made before such Cut-Off Date. Each Series of Mortgage Loans, other than the initial Series, will have an aggregate principal balance of not less than $15 million, as of the respective Cut-Off Date for such Series of Certificates,

after giving effect to principal payments made prior to the related Cut-Off Date. The aggregate principal balance of the Mortgage Loans comprising all five pools will not be greater than $175 million. The Company, MORI and Marriott International, Inc. ("Marriott") are sometimes hereinafter referred to collectively as the "Marriott Parties".

2. <u>Purchase and Sale of the Certificates</u>. In reliance upon the representations and warranties contained herein and in the Agreements (as defined below) and subject to the terms and conditions set forth herein, the Company agrees to sell to the Purchaser, and the Purchaser agrees to purchase from the Company, the Certificates of each Series. The Certificates to be purchased with respect to each Series will be purchased at the price (the "Purchase Price") set forth in a Pricing Agreement dated no later than two business days prior to the respective Closing Date. The Purchase Price for each Series shall equal (a) the outstanding pool balance of the pool of Mortgage Loans transferred to and with respect to such Trust pursuant to the related Pooling Agreement at the related Cut-Off Date, after giving effect to all payments of principal with respect to such Mortgage Loans made after the Cut-Off Date and before the first day of the month in which the Closing Date occurs, multiplied by (b) the Purchase Price Percentage set forth in the related Pricing Agreement <u>plus</u> (c) interest accrued on the amount calculated pursuant to clause (a) at the Pass-Through Rate set forth in the Pricing Agreement from and including the first day of the month in which the Closing Date occurs up to, but not including, the related Closing Date. The Purchase Price Percentage and the Pass-Through Rate with respect to each Series shall be set to provide to the Purchaser a bond equivalent yield equal to 240 basis points over the average of the average yields on U.S. Treasury securities, adjusted to a constant maturity of four years, as published on Bloomberg on each of the five consecutive Business Days immediately following the date of the MORI Notice, and shall be based on the Bloomberg system for pricing asset-backed securities. The Purchase Price for each Series shall be payable to the Company (x) by wire transfer in immediately available Federal funds to the bank account specified by the Company at least two Business Days prior to the Closing Date, or (y) in such other manner as shall be agreed upon by the Purchaser and the Company.

3. <u>The Closings; Delivery of the Certificates</u>. The purchase and sale of a single Series of Certificates pursuant hereto (each a "Closing") shall be held on or prior to the date set forth in the related MORI Notice or such other date as shall be mutually acceptable to the Company and the Purchaser (each such date a "Closing Date"); <u>provided</u> that no Closing Date shall be within 60 days of the Closing Date of the previous Series and <u>provided further</u> that no Closing Date shall occur after December 14, 1994. Each Closing shall take place at the office of Brown & Wood at 10:00 a.m. New York City time on a Closing Date or at such other

place in New York City as the Purchaser shall designate. At each Closing, the Company will deliver to the Purchaser, against payment of the Purchase Price therefor, a Certificate in the denomination equal to the aggregate principal balance of the mortgage loans in the related Pool registered in the Purchaser's name, or in the name of its nominee; provided, however, that if the Purchaser requests the Company in writing not less than three Business Days prior to the related Closing Date to issue to the Purchaser Certificates in other denominations (authorized pursuant to Section 7.01 of the Pooling Agreement) that equal in the aggregate the denomination mentioned in this sentence, the Company will comply with such request.

4. <u>Conditions of the Purchaser's Obligation</u>. The obligation of the Purchaser set forth in Section 2 to purchase any Series of Certificates on the related Closing Date shall be subject to the accuracy of the representations and warranties as of the date hereof and such Closing Date that are made (a) on the part of any of the Marriott Parties or Sun Bank, National Association ("Sun Bank"), as Trustee, and contained in this Purchase Agreement, the Pooling Agreements and the Collateral Security Agreements dated as of the dates of the related Pooling Agreements among the Company, MORI and Sun Bank, as Collateral Agent (the "Collateral Agreements"), (b) by Marriott in the related Guaranty Agreement dated the related Closing Date, among Marriott, the Company and the Trustee (the "Guaranty Agreement") and (c) by MORI in the related Letter Agreement (each, a "MORI Letter Agreement") dated the related Closing Date, subject to the accuracy of the statements made by any of the Marriott Parties in any certificates furnished pursuant to the provisions thereof, and to the following additional conditions:

(i) The Company and MORI shall each have complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied by it at or prior to the related Closing Date under this Purchase Agreement, the related Pooling Agreement and the related Collateral Agreement, and Sun Bank shall have complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied by it at or prior to each Closing Date under the related Pooling Agreement and Collateral Agreement.

(ii) (a) G & S Consulting Network, Inc., or such other firm as may be mutually agreed upon by the Company and the Purchaser, shall have completed a review of such documentation relating to the relevant Pool of Mortgage Loans as the Purchaser may deem appropriate, (b) on the basis of such review, nothing shall have come to the attention of the Purchaser that causes it to conclude that there is any breach of or inaccuracy in the representations and warranties of any of the Marriott

Parties set forth in any agreement relating to the Pool reviewed or the Series issued with respect thereto to which it is party and (c) the Purchaser shall have completed, and be satisfied (in its sole discretion) with the results of, the Purchaser's investigation with respect to such transaction as a whole.

(iii) The related Pooling Agreement and Collateral Agreement shall each have been duly authorized, executed and delivered by each of the Company, MORI and Sun Bank, shall be in full force and effect and shall constitute a legal, valid and binding agreement of each of the Company, MORI and Sun Bank, enforceable against each of them in accordance with its terms, subject to bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and subject, with respect to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law, and no event shall have occurred which constitutes or, with the passage of time or with notice or both, would constitute a default thereunder, and the Purchaser and its special counsel shall each have received one fully executed copy of each such Agreement.

(iv) Each of the Assignments delivered with respect to a Series shall have been duly authorized, executed and delivered by MORI or the Company, as the case may be, shall be in full force and effect and shall constitute a legal, valid and binding agreement of MORI or the Company, as the case may be, enforceable against MORI or the Company, as the case may be, in accordance with its terms, subject to bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and subject, with respect to enforceability to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or as law, and no event shall have occurred which constitutes or, with the passage of time or with notice or both would constitute a default thereunder, and the Purchaser and its special counsel shall each have received one fully executed copy of each thereof.

(v) Each of the related Guaranty Agreement and the related MORI Letter Agreement shall have been duly authorized, executed and delivered by Marriott or MORI, as appropriate, shall be in full force and effect and shall constitute a legal, valid and binding agreement of Marriott or MORI, as appropriate, enforceable against Marriott or MORI, as appropriate, in accordance with its terms, subject to bankruptcy, insolvency, reorganization

or other similar laws affecting the enforcement of creditors' rights generally and subject, with respect to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law, and no event shall have occurred which constitutes or, with the passage of time or with notice or both, would constitute a default under such agreement, and the Purchaser and its special counsel shall each have received one fully executed copy of such agreement.

(vi) The Purchaser shall have received a favorable opinion of counsel for the Company, MORI and Marriott dated the Closing Date and substantially in the forms of Exhibit A-1, A-2, A-3 and A-4, respectively, hereto.

(vii) The Purchaser shall have received a favorable opinion dated the Closing Date of special counsel to the Company in each state in which the Mortgage Loans are located with respect to such Series, in form and substance satisfactory to the Purchaser.

(viii) The Purchaser shall have received a favorable opinion in respect of certain bankruptcy-related matters from Brown & Wood, dated the closing Date and substantially in the form of Exhibit C hereto.

(ix) The Purchaser shall have received a favorable opinion of counsel to Sun Bank, as Trustee and as Collateral Agent, dated the Closing Date and substantially in the form of Exhibit D hereto.

(x) The Purchaser shall have received a favorable opinion of counsel to Sun Bank, as Collateral Agent, as to the security interest of the Collateral Agent, in the Reserve Account, dated the Closing Date and substantially in the form of Exhibit F hereto.

(xi) The Purchaser shall have received a favorable opinion of counsel to the Letter of Credit Bank as to enforceability of the Letters of Credit, in form and substance satisfactory to the Purchaser.

(xii) The Purchaser shall have received an opinion of its special counsel, in form and substance acceptable to it.

(xiii) The Company, MORI and Marriott shall each have delivered to the Purchaser a certificate, dated the Closing Date and executed by both the Chairman of the Board, the President or the Executive or any Vice President and the Secretary or any Assistant Secretary of

the Company, MORI or Marriott, as the case may be, substantially in the form of Exhibit G-1 hereto (with respect to the Company), Exhibit G-2 hereto (with respect to MORI) and Exhibit G-3 hereto (with respect to Marriott).

(xiv) Sun Bank shall have delivered to the Purchaser a certificate dated the Closing Date and executed by both the Chairman of the Board, the President or the Executive or any Vice President and the Secretary or any Assistant Secretary of Sun Bank, substantially in the form of Exhibit H hereto.

(xv) Each of the Marriott Parties and Sun Bank shall have delivered to the Purchaser a Secretary's Certificate as to the charter, by-laws, board resolutions and other related corporate matters of those respective Persons, in form and substance acceptable to the Purchaser.

(xvi) The Trustee shall have provided evidence satisfactory to the Purchaser that it has received the Mortgage Instrument pursuant to Section 2.01 of the Pooling Agreement with respect to each Mortgage Loan relating thereto.

(xvii) The Certificates shall have been rated "A" by Duff & Phelps Credit Rating Co., or have been rated the rating deemed equivalent to such rating by such other Rating Agency as may rate any Series pursuant to the mutual agreement of the Grantor and the Purchaser.

(xviii) Camp Dresser & McKee, or such other company as shall be appointed for such purpose by the Grantor, pursuant to a mutual agreement between the Grantor and the Purchaser, shall have furnished a Phase I environmental report in respect of the Mortgaged Properties acceptable to the Purchaser.

(xix) The Company or another Marriott Party shall have paid all taxes, fees and governmental charges, if any, due in connection with (a) the execution and delivery of the related Pooling Agreement, the related Collateral Agreement, the related Guaranty Agreement, the related MORI Letter Agreement, this Purchase Agreement and any Assignment (collectively, the "Agreements"), (b) execution and delivery of any Reserve Letter of Credit or Repurchase Letter of Credit pursuant to any of the Agreements, (c) the sale, assignment and transfer by MORI of the Mortgage Loans to the Company, (d) the sale, assignment and transfer by the Company of the related

Mortgage Loans to the Trusts and (e) the execution, delivery, issuance and sale of the related Series.

(xx) The purchase of and payment for the related Series shall be permitted by all laws regulating investments to which the Purchaser may be subject, without recourse to provisions (such as the present provisions of Section 1405(a)(8) of the New York Insurance Law) permitting limited investments without restriction as to the character of the particular investment.

(xxi) The Company shall have applied for a private placement number for the Certificates of the related Series.

(xxii) All opinions, certificates and other documents incident to, and all proceedings in connection with the transactions contemplated by, any of the Agreements shall be satisfactory in form and substance to the Purchaser and its special counsel. The Purchaser and its special counsel shall have received copies of all documents and other information as they may reasonably request, in form and substance satisfactory to the Purchaser and its special counsel, with respect to such transactions and the taking of all proceedings in connection therewith.

(xxiii) The Purchaser shall have received a receipt or other evidence satisfactory to it from Sun Bank confirming the receipt by Sun Bank of (a) the deposit of funds into the Reserve Account in the amount specified in Section 3(a) of the related Collateral Agreement and (b) the initial deposit of funds into the Collection Account pursuant to Section 3.05(a) of the related Pooling Agreement.

(xxiv) The Purchaser shall have received from Prentice Hall Corporation System ("Prentice Hall") evidence satisfactory to the Purchaser that Prentice Hall has accepted the appointment by the Company and MORI of it as Process Agent (as defined below).

(xxv) The weighted average of the interest rates on the Mortgage Loans comprising any Pool shall not be less than the sum of (a) the interest rate payable on the Certificates of the related Series, (b) the Trustee Fee Rate, (c) the Servicing Fee Percent (each as defined in the related Pooling Agreement) and (d) 2.0%. The Servicing Fee Percent with respect to any Pool shall not be less than fifty basis points.

(xxvi) The Marriott Parties shall have duly authorized executed and delivered such further agreements, opinions, documents or instruments as may be necessary to the accomplishment of the purposes set forth herein and in the Agreements and as shall reasonably have been requested by the Purchaser.

If any of the conditions specified in this Section 4 shall not have been fulfilled when and as provided by this Purchase Agreement, or if any of the opinions and certificates mentioned above or elsewhere in this Purchase Agreement shall not be satisfactory in form and substance to the Purchaser and special counsel to the Purchaser, this Purchase Agreement and all obligations of the Purchaser hereunder with respect to the affected Series may be cancelled at, or at any time prior to, the related Closing Date by the Purchaser. Notice of such cancellation shall be given to the Company in writing, or by telephone confirmed in writing. Such cancellation shall be without prejudice to any rights, claims or remedies that the Purchaser and the Company may have pursuant to this Purchase Agreement or otherwise against the Company or the Purchaser, as the case may be, or any other person by reason of such cancellation and without prejudice to any rights, claims or remedies that the Company or the Purchaser may have pursuant to the other Agreements relating to any other Series against the Purchaser or the Company, as the case may be, or against any other person with respect to such other Agreements.

5. Representations and Warranties. (a) The Company represents and warrants to the Purchaser, with respect to the initial Series as of the date hereof and, with respect to each of the remaining Series to be closed in 1994, as of the related Closing Date, as follows:

(i) Each of the Agreements with respect to each Series to which it is a party has been or will have been by the related Closing Date duly authorized, executed and delivered by the Company and, assuming due execution and delivery by the other parties thereto, constitutes or will constitute a legal, valid and binding agreement of the Company enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The Certificates, when executed, issued, authenticated and delivered in accordance with the related Pooling Agreement and sold to and paid for by the Purchaser as provided herein, will be validly issued and outstanding and entitled to the benefits of the related Pooling Agreement and will constitute valid instruments enforceable in accordance with their terms. Upon

delivery to the Purchaser of the related Certificates, the Purchaser will be vested with sole beneficial ownership of and all equitable rights, title and interest in and to the related Trust Estate, free and clear of any equity, lien, encumbrance, pledge, charge security interest or other claim (legal title to the Mortgage Loans being held by the Trustee for the benefit of the relevant Certificateholders as provided in the related Pooling Agreement).

(ii) Neither the issuance or sale of the Certificates of the relevant Series, nor the consummation of any other of the transactions contemplated in any of the related Agreements to which it is a party or will be a party pursuant to the this Purchase Agreement, nor the execution, delivery or performance of the terms of any of such Agreements, will (a) result in the breach of any term or provision of the certificate of incorporation or by-laws of the Company, (b) conflict with, result in a breach or violation of or the acceleration of indebtedness under or constitute a default under, the terms of any other Pooling Agreement, indenture, agreement or instrument to which the Company is a party or will be a party pursuant to this Purchase Agreement or by which it is bound or will be bound pursuant to this Purchase Agreement, or any statute or regulation applicable to the Company or any order applicable to the Company of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Company or (c) result in the creation or imposition of any lien, charge or encumbrance upon the relevant Pool, Series or any property or assets of the Company. The Company is not and will not be a party to, bound by or in breach or violation of any other Pooling Agreement, indenture, agreement or instrument, or subject to or in violation of any applicable statute or regulation or any order of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects, or may in the future materially and adversely affect, (a) the ability of the Company to perform its obligations under any of the Agreements to which it is a party or (b) the business, operations, financial condition, prospects, properties, mortgages or assets of the Company.

(iii) No consent, approval, authorization of, registration or filing with, or notice to, any governmental or regulatory authority, agency, department, commission, board, bureau, body or instrumentality is required for the execution, delivery or performance of or compliance by the Company with any of the Agreements to which it is a party or will be a party pursuant to this

Purchase Agreement or the Certificates, or the offer, issue, sale or delivery of the certificate, or the consummation by the Company of any other transaction contemplated under any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement. No tax, assessment or other governmental charge will become payable by the Purchaser as a result of (a) the execution, delivery or performance of any such Agreements, (b) the sale, assignment and transfer to the Trust of the relevant Pool and other property required to be remitted by the Company for deposit in the relevant Collection Account pursuant to the relevant Pooling Agreement or (c) the execution, delivery, issuance and sale of the relevant Series and neither the ownership of the relevant Pool and such other property required to be remitted for deposit in the relevant Collection Account nor the servicing thereof by the Servicer pursuant to the relevant Pooling Agreement will, in and of itself, result in the Purchaser becoming subject to taxation or being deemed to be doing business in any jurisdiction in which any Mortgaged Property is located.

(iv) There is no action, suit or proceeding against, or investigation of, the Company pending or threatened, before any court, administrative agency or other tribunal which, either individually or in the aggregate, (a) may result in any material adverse change in the business, operations, financial condition, prospects, properties, or assets of the Company or in any impairment of the right or ability of the Company to carry on its business substantially as now conducted, or (b) asserts the invalidity of any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement or the relevant Series or (c) seeks to prevent the issuance of the relevant Series or the consummation of any of the transactions contemplated by any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement or (d) which might materially and adversely affect the performance by the Company of its obligations under, or the validity or enforceability of, any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement or the relevant Series or (e) would cause the description of the federal income tax consequences of the purchase, ownership and disposition of the relevant Series in the related PPM prepared by MORI and delivered to the relevant initial Certificateholders under the heading "Certain Federal Income Tax Consequences" to be incorrect.

(v) None of the Marriott Parties, nor any Affiliate of any of the Marriott Parties, nor any person

authorized or employed by any of the Marriott Parties has, directly or indirectly, sold or offered for sale or disposed of, or attempted or offered to sell or dispose of, Certificates of any Series, or solicited offers to buy any Certificates from, or otherwise approached or negotiated with respect thereto with, any person or persons other than the Purchaser and not more than 25 other Persons. None of the Marriott Parties, nor any Affiliate of any of the Marriott Parties will, directly or indirectly, offer or sell any Certificates or similar security in a manner which would render the issuance and sale of Certificates of any Series pursuant to this Purchase Agreement a violation of Section 5 of the Securities Act of 1933, as amended (the "Act"), or require registration pursuant thereto, nor will it authorize any person to act in such manner. Each offering and sale of a Series are exempt from the registration requirements of the Act. No Pooling Agreement will be required to be qualified under the Trust Indenture Act of 1939, as amended.

(vi) No Trust is, and no issuance and sale of Certificates of any Series in the manner contemplated by this Purchase Agreement and the related Pooling Agreement will cause any of the Trusts to be, subject to registration or regulation as an investment company or affiliate of an investment company under the Investment Company Act of 1940, as amended.

(vii) Each Mortgage Loan, when identified to the relevant Pool, assigned to the relevant Trust and included in the Trust Estate underlying the Certificates of the related Series, will have been delivered to the Trustee, together with an Assignment thereof by the Company, which immediately prior to such Assignment will own full legal and equitable title to such Mortgage Loan, free and clear of any lien, charge, encumbrance or participation or ownership interest in favor of any other Person. Upon endorsement and delivery to the Trustee of the executed original Mortgage Notes and execution and delivery of the recorded Assignments pursuant to Section 2.01(a) of the related Pooling Agreement, all of the Company's right, title and interest in and to such Pool will be validly and effectively transferred to the Trustee.

(viii) The Company will not, directly or indirectly, apply any part of the proceeds of the sale of any Series for the purpose (whether immediate, incidental or ultimate) of purchasing or carrying any "margin securities" within the meaning of Regulation G (12 CFR

Part 207), promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(ix) None of the Agreements, the PPMs or any other agreement, document, certificate or statement furnished to the Purchaser or the Trustee by or on behalf of the Company pursuant to any of the Agreements, contains or will contain any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading. There are no facts known to the Company which, individually or in the aggregate, materially adversely affect, or which (aside from general economic trends) may reasonably be expected to materially adversely affect in the future, the condition, business or prospects of the Company, or which may impair the Company's ability to perform its obligations under any of the Agreements to which it is a party or will be a party pursuant to this Purchase Agreement, which have not been or will not be disclosed herein or therein or in the relevant certificates and other documents furnished to the Purchaser by or on behalf of the Company pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(B) The representations and warranties to be made by the Company in Sections 2.02 and 2.03 of each Pooling Agreement are hereby included in this Purchase Agreement to the same extent as if fully set forth herein. The representations and warranties to be made by MORI in Section 5.01 of each Pooling Agreement are hereby included in this Purchase Agreement to the same extent as if fully set forth herein. The representations and warranties made by the Company and MORI with respect to Mortgage Loans to be originated and acquired after the date hereof, and with respect to the Resorts and any Additional Resorts which may in the future be included among Resorts whose Mortgaged Properties may secure Mortgage Loans to be originated and acquired after the date hereof, which representations and warranties are set forth in Schedules I and II hereof, respectively, are hereby included in this Purchase Agreement to the same extent as if fully set forth at this place.

6. <u>Expenses</u>. (A) Whether or not the transactions contemplated hereby shall be consummated, MORI will pay, cause to be paid, or reimburse the Purchaser upon demand for, all reasonable expenses (including, without limitation, all reasonable out-of-pocket expenses which the Purchaser, in its sole discretion, may incur) in connection with any of the Agreements and the transactions contemplated by any of the Agreements and the relevant Series of Certificates and the transactions contemplated thereby, incurred on or prior to the related Closing Dates (whether or not paid), including, without limitation (i) the cost of printing or otherwise preparing and reproducing the Agreements and the

Certificates and all exhibits to any of the Agreements, (ii) the cost of the performance by any of the Marriott Parties of all agreements and conditions contained in any of the Agreements on its part to be performed or satisfied, (iii) the cost of obtaining private placement numbers for the Certificates and the cost of delivering to the Purchaser's home office the Certificates purchased by the Purchaser, (iv) any and all payment or liability with respect to, and loss with respect to or resulting from, the non-payment or delayed payment of any and all placement fees or other liability which any of the Marriott Parties may be or become obligated to pay any agent, finder or broker in connection with any transaction, (v) the reasonable legal fees, expenses and disbursements of special counsel to the Purchaser, (vi) the reasonable fees, expenses and disbursements of [G & S Consulting Network, Inc.], the underwriter employed by the Purchaser, (vii) any expenses incurred by the Purchaser relating to or arising out of the sale or transfer of the Servicer's rights, obligations and responsibilities in connection with the servicing of any Pool and (viii) the fees and expenses of Sun Bank and any agent of Sun Bank and the fees and disbursements of counsel to Sun Bank, in connection with the execution and delivery of the Pooling Agreements, the Collateral Agreements and the Certificates.

(B) MORI will pay, cause to be paid, or reimburse the Certificateholders upon demand for, all expenses (including without limitation, all reasonable out-of-pocket expenses which such Certificateholders, in their sole discretion, may incur) in connection with any amendment to or waiver of any of the Agreements or such Certificateholders' Certificates which are initiated by any of the Marriott Parties (whether or not such amendments or waivers become effective), including, without limitation, (i) the cost of printing or otherwise preparing and reproducing the Agreements and any Certificates subsequently issued under the Agreements and all exhibits to any of the Agreements, (ii) the cost of the performance by any of the Marriott Parties of all agreements and conditions contained in any of the Agreements on its part to be performed or satisfied, (iii) the cost of delivering to such Certificateholders' home offices the Certificates purchased by such Certificateholders, (iv) the legal fees, expenses and disbursements of one separate special counsel to the Certificateholders of Certificates of any Series, (v) any expenses incurred by such Certificateholders relating to or arising out of the sale of the Servicer's rights, obligations and responsibilities in connection with the servicing of each Pool and (vi) the fees and expenses of Sun Bank and any agent of Sun Bank and the fees and disbursements of counsel to Sun Bank in connection with any amendment to or waiver of a Pooling Agreement, Collateral Agreement or such Certificateholders' Certificates.

(C) The Company will also pay, and will save the Certificateholders harmless from, any and all liabilities with respect to nonpayment or delay in payment of, any taxes, fees and

charges which may be payable to any governmental body or regulatory authority in connection with (i) the execution and delivery of any of the Agreements relating to the relevant Series, (ii) the transfer by the Company of each Pool to the relevant Trust, (iii) the execution, delivery, issuance and sale of each Series, (iv) any amendment or waiver initiated by any of the Marriott Parties (whether or not the same are ever declared effective) under or in respect of any of the Agreements or any Series, other than transfer taxes or taxes on or measured by the Certificateholders' income or profits and (v) any reasonable costs and expenses incurred by any Certificateholders defending against the same.

(D) The Company will also pay or reimburse each Certificateholder upon demand for, all reasonable expenses (including, without limitation, all reasonable out-of-pocket expenses which such Certificateholder, in its sole discretion, may incur) in connection with the enforcement by such Certificateholder of this Purchase Agreement, the relevant Pooling Agreement, the relevant Collateral Agreement and such Certificateholders' Certificates and the transactions contemplated hereby or thereby, in the event of any failure by the Company to comply with the provisions hereof or thereof or with any suit for or the collection of any overdue amount payable by the Company under this Purchase Agreement, the relevant Pooling Agreement, the relevant Collateral Agreement and such Certificateholders' Certificates.

7. <u>The Purchaser's Representations</u>. (a) The Purchaser represents to the Company as follows:

(i) The Purchaser is acquiring each Series for its own account and not with a view to or for sale in connection with any distribution thereof. Subject to the express provisions of this Purchase Agreement, the disposition of any Series shall at all times be within the control of the owner thereof. The acquisition of any Series by the Purchaser on the relevant Closing Date shall constitute the Purchaser's reaffirmation of such representation. The Purchaser agrees that any sale or other transfer of any Series will be made by it only when such sale or other transfer is made pursuant to an effective registration under the Act or when such sale or other transfer is otherwise made in compliance with or pursuant to an exemption from the Act. The Purchaser is an accredited investor within the meaning of the Act.

(ii) The funds used by the Purchaser to purchase any Series are and will be from the general account of an insurance company.

(b) The obligation of the Company to sell to the Purchaser any Series of Certificates (after the initial Series) on the related Closing Date shall be subject to the delivery by the Purchaser on such Closing Date of a representation letter to the

effect that the Purchaser is an accredited investor within the meaning of the Act as of such date.

8. Investigations with Respect to Representations and Warranties. The Purchaser shall have no obligation on or prior to the Closing Date to verify, confirm, or otherwise make any investigation as to the accuracy of the representations and warranties contained in any of the Agreements or otherwise made in writing by or on behalf of any of the Marriott Parties in connection with the transactions contemplated under any of the Agreements and all other agreements, and the representations and warranties contained in any of the Agreements or otherwise made in writing by or on behalf of any of the Marriott Parties in connection with the transactions contemplated in any of the Agreements shall (a) be deemed to be material and to have been relied upon by the Purchaser, notwithstanding any investigation heretofore or hereafter made by the Purchaser or any agent on behalf of the Purchaser and (b) survive the execution and delivery of this Purchase Agreement, any investigation at any time made by the Purchaser or any agent on its behalf, the sale and purchase of all of the Certificates and payment therefor by the Purchaser and execution and delivery of all the other Agreements.

9. Payments. The Purchaser has requested, and the Company hereby acknowledges, that the Company shall cause the Trustee to make all distributions on or with respect to all of the Certificates to the Purchaser, so long as the Purchaser shall be the registered owner of the Certificates (or any Certificates exchanged therefor), by electronic funds transfer in immediately available funds at the opening of business on the date on which such distributions are due through the Automated Clearing House system to the following account of the Purchaser (or such Other account as the Purchaser may from time to time designate in writing) together with sufficient information (including interest rate, designation of the Certificates and the issuer thereof, total payment and principal and interest portions of such payment) to identify the source of such payment including the nominee names in which the Certificates may be held: Morgan Guaranty Trust Company, New York, New York, ABA Number 021000238, for deposit to the account of Teachers Insurance and Annuity Association of America Account No. 121-85-001. The Company shall enter into an agreement similar to that contained in this Section with any other institutional investor (or nominee thereof) who shall legitimately hold any Certificate.

10. Indemnification and Contribution. (A) Whether or not all of the Certificates are purchased by the Purchaser or any of the other transactions contemplated hereunder are consummated, the Company hereby agrees to indemnify and hold harmless the Purchaser, its affiliates and any of their respective directors, officers, agents and employees and each other person, if any, controlling any of the foregoing (within the meaning of either Section 15 of the

Act or Section 20 of the Exchange Act) (each an "Indemnified Person") from and against any losses, claims, damages, payments, costs, taxes (including interest, penalties and additions to tax), liabilities, obligations and expenses (including, but not limited to, all legal fees and expenses, and any and all other expenses incurred in investigating, preparing or defending against any action, suit or proceeding, pending, commenced or threatened) (collectively, "Damages") to which any Indemnified Person may become subject as provided in the following clauses (i) and (ii): (i) Damages, whether incurred directly or indirectly, by withholding or offset or otherwise as a result, solely or in part, of any obligor or payor with respect to any Mortgage Loan being a citizen or resident of, or making any payment from, any country (or political subdivision thereof) or any place other than the "United States" (as defined in section 7701(a)(9) of the Internal Revenue Code of 1986), including, without limitation, any Damages arising out of any applicable exchange control or withholding tax laws, rules or regulations and (ii) Damages arising out of, in connection with or relating in any way to (a) the assertion by any Person of any claim (other than any claim alleging the violation of any environmental statute, order or regulation) against such Indemnified Person relating to the ownership, operation, repair, use or maintenance of any Condominium Project or Mortgaged Property, which claim is the result of any action or omission of the Company or any Affiliate of the Company, (b) the assertion by any Person of any claim alleging the violation of any environmental statute, order or regulation, which alleged violation is the result of any action or omission of the Company or any Affiliate of the Company, (c) the breach of any of the covenants, representations or warranties made by or on behalf of the Company in any of the Agreements other than the representations or warranties made by the Company in Sections 2.01 and 2.03 of each of the Pooling Agreements or (d) the noncompliance of the Mortgage Loans or the sale of the Mortgage Loans or the Mortgaged Properties with any applicable law. The Company further agrees that the indemnification, contribution and reimbursement obligations set forth in this Section 10 shall apply whether or not the Indemnified Person is a formal party to any such lawsuits, claims or other proceedings. The Company further agrees promptly upon demand by an Indemnified Person, at any time or from time to time, to reimburse such Indemnified Person for, or pay, any Damages as to which the Company has indemnified such Indemnified Person pursuant to this Purchase Agreement. The Company will not be responsible for any Damages to the extent that a court of competent jurisdiction shall have determined that such Damages resulted primarily from such Indemnified Person's negligence or willful misconduct and such determination is final and nonappealable.

The indemnity, contribution and expense reimbursement obligations of the Company under this Section 10 shall be in addition to any liability it may otherwise have at law or in equity.

(B) Promptly after receipt by an Indemnified Person of notice of the commencement of any action or proceeding, such Indemnified Person will, if a claim in respect thereof is to be made against the Company hereunder, notify the Company in writing of the commencement thereof; but the Indemnified Person's failure so to notify the Company will not relieve the Company from any lability that it may have to any Indemnified Person under this Section 10. In case any such action or proceeding shall be brought against any Indemnified Person, the Company shall be entitled to participate therein and the Company shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Person and the payment of all expenses. The Indemnified Person shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (i) the Company has agreed to pay such fees and expenses, (ii) the Company shall have failed to assume the good faith and diligent defense of such action or proceeding or to employ counsel reasonably satisfactory to the Indemnified Person in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Person and the Company and the Indemnified Person shall have been advised by the Purchaser's special counsel that either (a) the counsel selected by the Company to represent such Indemnified Person has, in the judgment of such Counsel, a conflict of interest or (b) claims and defenses not available to, or divergent from the interests of, the Company are available to such Indemnified Person (in which case, if the Indemnified Person notifies the Company in writing that the Indemnified Person elects to employ separate counsel at the expense of the Company, the Company shall not have the right to assume the defense of such action or proceeding on behalf of the Indemnified Person, it being understood, however, that the Company shall not, in connection with any one such action or proceedings or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Persons, which firm shall be designated in writing by a majority in interest of the Indemnified Persons). If the Company assumes the defense of any such action or proceeding, the Company shall not enter into any settlement affecting any Indemnified Party the terms of which require anything other than the payment of Damages without the prior written consent of the Indemnified Party, which consent shall not unreasonably be withheld or delayed.

(C) If the indemnification provided for in clause (A) of this Section 10 is unavailable to an Indemnified Person in respect of any Damages, then the Company, in lieu of indemnifying such Indemnified Person, shall contribute to the amount paid or payable by such Indemnified Person as a result of such Damages in such proportion as is appropriate to reflect the relative fault of the

Company on the one hand and of the Indemnified Person on the other hand in connection with the statements, actions, circumstances or omissions that resulted in such Damages, as well as any other relevant equitable consideration. The relative fault of the Company on the one hand and of the Indemnified Person on the other hand shall be determined by reference to, among other things, (i) the relative benefits received by the Company on the one hand and the Indemnified Person on the other from the transactions and (ii) the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statements, actions, circumstances or omissions. The amount paid or payable by a party as a result of the Damages referred to above shall be deemed to include any legal or other fees or expenses incurred by such party in connection with investigating or defending any such claim.

Each of the Company and the Purchaser agrees that it would not be just and equitable if contribution pursuant to the immediately preceding paragraph were determined by any method of allocation which does not take into account the equitable considerations referred to in such paragraph. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

11. Notices. All notices and other communications hereunder shall be in writing and shall be sent by facsimile transmission and by overnight mail delivered by a nationally recognized overnight delivery service, addressed (a) if to the Purchaser, to 730 Third Avenue New York, New York 10017, to the attention of Securities Division, Third Floor, or to such other address as the Purchaser shall have furnished to the Company in writing, (b) if to the Company, to 10400 Fernwood Road, Bethesda, Maryland 20817 Attention: Treasury Department - Treasurer, Law Department - Associate General Counsel, or to such other address as the Company shall have furnished to the Purchaser in writing or (c) if to MORI, to 1200 U.S. 98 South, Suite 20, Lakeland, Florida 33801, Attention: Finance - MTMG 1993-A or to such other address as MORI shall have furnished to the Purchaser in writing. Any notice so given by registered or certified mail shall be deemed to have been given five days after being deposited in a depository of the United States mails. Any notice given by means of a nationally recognized overnight delivery service shall be deemed to have been given upon receipt thereof as evidenced by confirmation of receipt provided by such nationally recognized overnight delivery service.

12. Miscellaneous. (A) THIS PURCHASE AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(B) ANY ACTION OR PROCEEDING AGAINST THE COMPANY OR MORI RELATING IN ANY WAY TO THIS AGREEMENT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF NEW YORK, COUNTY OF NEW YORK, OR OF

THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK AND EACH OF THE COMPANY AND MORI IRREVOCABLY SUBMITS TO THE JURISDICTION OF EACH SUCH COURT (AND ANY APPELLATE COURT FROM ANY THEREOF) IN RESPECT OF ANY SUCH ACTION OR PROCEEDING. EACH OF THE COMPANY AND MORI IRREVOCABLY APPOINTS PRENTICE HALL, 15 COLUMBUS CIRCLE, NEW YORK, N.Y. 10019 AS ITS AGENT (THE "PROCESS AGENT") TO RECEIVE SERVICE OF PROCESS OR OTHER LEGAL SUMMONS FOR PURPOSES OF ANY SUCH ACTION OR PROCEEDING IN THE STATE OF NEW YORK. SO LONG AS THE COMPANY OR MORI HAS ANY OBLIGATION UNDER THIS AGREEMENT, IT WILL MAINTAIN A DULY APPOINTED AGENT IN NEW YORK CITY FOR THE SERVICE OF SUCH PROCESS OR SUMMONS. SUCH SERVICE MAY BE MADE BY MAILING OR DELIVERING A COPY OF SUCH PROCESS TO THE COMPANY OR MORI, AS THE CASE MAY BE, IN CARE OF THE PROCESS AGENT AT THE ADDRESS SPECIFIED ABOVE FOR SUCH PROCESS AGENT, AND THE COMPANY AND MORI EACH HEREBY IRREVOCABLY AUTHORIZES AND DIRECTS SUCH PROCESS AGENT TO ACCEPT SUCH SERVICE ON ITS BEHALF. AS AN ALTERNATIVE METHOD OF SERVICE, THE COMPANY AND MORI EACH ALSO IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING IN THE SATE OF NEW YORK BY THE MAILING OF COPIES OF SUCH PROCESS TO THE COMPANY MORI, AS THE CASE MAY BE, AT ITS ADDRESS AS PROVIDED FOR NOTICES HEREUNDER.

EACH OF THE COMPANY AND MORI IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK, OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT COURT OF NEW YORK, AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Nothing in this Section 12(B) shall affect the right of the Purchaser to serve legal process in any other manner permitted by law or affect the right of the Purchaser to bring any action or proceeding against the Company or MORI or their respective property in the courts of other jurisdictions.

(C) The Agreements supersede all prior agreements and understandings relating to the subject matter hereof.

(D) The headings in this Purchase Agreement are for purposes of reference only and shall not limit or define the meaning hereof.

(E) This Purchase Agreement shall be binding upon the respective successors and assigns of the parties hereto and shall inure to the benefit of and be enforceable by any registered owner or owners at the time of each Certificates then issued, or any part thereof. No right or duty under this Agreement may be assigned or delegated by the Company or MORI without the written consent of the Purchaser.

(F) Except as otherwise provided in the final paragraph of Section 4, this Purchase Agreement may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change waiver, discharge or termination is sought.

(G) This Purchase Agreement may be executed simultaneously in several counterparts, or by different parties in separate counterparts, each of which counterparts shall be an original, but all of which shall collectively constitute one and the same instrument.

(H) Teachers Insurance and Annuity Association of America ("Teachers") shall have the right to substitute one of its wholly-owned subsidiaries as the purchaser of any Series to be purchased by it hereunder, by written notice delivered to the Company, which notice shall be signed by Teachers and such subsidiary and shall contain such subsidiary's agreement to be bound by this Purchase Agreement and to all other related Agreements. The Company agrees that, upon receipt of any such notice, whenever the word "Purchaser" is used in this Purchase Agreement in reference to Teachers or whenever Teachers is referred to by its own name or any other name or term in the related Pooling Agreement or in any document, instrument, certificate, opinion or paper delivered pursuant hereto or thereto, such reference shall be deemed to refer to such subsidiary in lieu of Teachers. In the event that such subsidiary is so substituted hereunder and thereafter transfers any Certificates or any portion thereof to Teachers, upon receipt by the Company of notice of such transfer, whenever the word "Purchaser" is used in this Purchase Agreement in reference to Teachers or whenever Teachers is referred to by its own name or any other name or term in the related Pooling Agreement or in any document, instrument, certificate, opinion or paper delivered pursuant hereto or thereto, such reference shall be deemed to refer to such subsidiary in lieu of Teachers only to the extent it retains any portion of such Certificates, and shall be deemed to refer to Teachers to the extent Teachers owns all or any portion of such Certificates, and Teachers and such subsidiary shall each have all the rights of an original purchaser of Certificates under this Purchase Agreement and such other Agreements.

IN WITNESS WHEREOF, the parties hereto have caused this Purchase Agreement to be duly executed all as of the date first written above.

MTMG CORPORATION

Attest:

By: ______________________
Name: Ward R. Cooper
Title: Assistant Secretary

By: ______________________
Name: Michael E. Dearing
Title: Vice President

MARRIOTT OWNERSHIP RESORTS, INC.

Attest:

By: ______________________
Name: Ward R. Cooper
Title: Assistant Secretary

By: ______________________
Name: Michael E. Dearing
Title: Vice President

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA

Attest:

By: ______________________
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Purchase Agreement to be duly executed all as of the date first written above.

MTMS CORPORATION

Attest:

By:__________________
Name:
Title:

By:__________________
Name:
Title:

MARRIOTT OWNERSHIP RESORTS, INC.

Attest:

By:__________________
Name:
Title:

By:__________________
Name:
Title:

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA

Attest:

By: [signature]
Name: Barry M. Johnson
Title: Director-Private Placements

# Defendant's Exhibit 2

**MARRIOTT OWNERSHIP RESORTS, INC.**

November 22, 1993

Teachers Insurance and
Annuity Association of America
730 Third Avenue
New York, New York 10017

Sun Bank, National Association,
as Trustee under the
Pooling and Servicing Agreement
referred to below
225 E. Robinson Street
Suite 350
Orlando, Florida 32802-0044

Ladies and Gentlemen:

MTMG Corporation, a Delaware corporation that is our wholly-owned subsidiary ("MTMG"), proposes to sell to Teachers Insurance and Annuity Association of America (the "Purchaser") $69,201,992.31 aggregate principal amount of Marriott Timeshare Pass-Through Certificates, Series 1993-A (the "Certificates"). Pursuant to the terms of the Purchase Agreement dated November 1, 1993 (the "Purchase Agreement") among MTMG, the Purchaser and ourselves, Marriott Ownership Resorts, Inc. ("MORI"), it is a condition precedent to the purchase by the Purchaser of the Certificates that MORI shall have executed and delivered this letter agreement (this "Agreement"). In consideration of the premises and in order to induce the Purchaser to purchase the Certificates, MORI hereby agrees as follows (all capitalized terms not defined herein shall have the meanings ascribed to them in the Pooling and Servicing Agreement dated as of November 1, 1993 (the "Pooling and Servicing Agreement") among MTMG, MORI and Sun Bank, National Association, as trustee (the "Trustee")):

1. MORI does hereby, as primary obligor and not as surety only, irrevocably, absolutely and unconditionally

guarantee to each of the Purchaser and the Trustee, for the express benefit of all Holders of Certificates from time to time, the due and punctual payment of (a) each amount which MTMG, as Grantor, is obligated to pay pursuant to Sections 2.01, 2.06 and 2.08 of the Pooling and Servicing Agreement, and (b) each amount which MTMG is obligated to pay pursuant to MTMG's obligation under the Purchase Agreement to indemnify each Indemnified Person (as defined in the Purchase Agreement) for (i) Damages (as defined in the Purchase Agreement) arising out of or relating in any way to the noncompliance of the Mortgage Loans or of the sale of the Mortgaged Properties or the Mortgage Loans with respect to any applicable law and (ii) Damages, whether incurred directly or indirectly, by withholding or offset or otherwise as a result, solely or in part, of any obligor or payor with respect to any Mortgage Loan being a citizen or resident of, or making any payment from, any country (or political subdivision thereof) or any place other than the "United States" (as defined in section 7701(a)(9) of the Internal Revenue Code of 1986), including, without limitation, any Damages arising out of any applicable exchange control or withholding tax laws, rules or regulations. The obligations of MORI described in this Paragraph 1 are sometimes hereinafter referred to as the "Guaranteed Obligations."

2. MORI agrees that, upon failure by MTMG to pay punctually or when due any part of the Guaranteed Obligations, MORI shall forthwith on demand pay the amount not so paid.

3. The obligations of MORI under this Agreement shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, impaired or otherwise affected by (i) any extension, renewal, settlement, compromise, waiver or release by any Person of the performance or observance of any of the agreements, covenants, terms or conditions contained in the Pooling and Servicing Agreement, the Collateral Security Agreement dated as of November 1, 1993 among MTMG, MORI and Sun Bank, National Association, as collateral agent (the "Collateral Agreement"), the Purchase Agreement or the separate Guaranty Agreement (the "Guaranty Agreement") of Marriott International, Inc. ("Marriott"), dated the date hereof and addressed to the Trustee and the Purchaser (collectively, the "Agreements"); (ii) any change in the corporate existence or structure of MTMG, MORI or Marriott (collectively, the "Marriott Parties") or the transfer by any Person of its interest in any Marriott Party; (iii) the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets or the marshalling of assets and liabilities of any Marriott Party, or any assignment for the benefit of creditors, or any receivership, insolvency, bankruptcy, reorganization, arrangement, composition

or readjustment of, or other similar proceeding affecting, any Marriott Party or any of their respective assets or any resulting release or discharge of any Marriott Party from the performance or observation of any agreement, covenant, term or condition contained in any of the Agreements; (iv) the release, substitution or replacement of any property subject to the Pooling and Servicing Agreement or the substitution, replacement, acceptance, release, non-perfection or invalidity of any security for any obligation of any Marriott Party under any of the Agreements, the replacement of MORI as Servicer under the Pooling and Servicing Agreement or the assumption of any obligation under any of the Agreements by any other party or the discharge of any obligor under any of the Agreements; (v) any modification or amendment or termination of or supplement to any of the Agreements; provided, however, that any amendment to any of the Agreements (made pursuant to the terms of such Agreement) that modifies any obligation of MTMG that is guaranteed under this Agreement shall be given effect under this Agreement; (vi) the existence of any claim, set-off or other right which MORI may have at any time against MTMG, Marriott or any other Person, whether in connection herewith or with any unrelated transactions; (vii) any invalidity or unenforceability of any of the Agreements; (viii) any other act or omission to act or delay of any kind by any Marriott Party, the Purchaser, the Trustee, any Certificateholder or any other Person; (ix) any circumstance which might otherwise constitute a legal or equitable defense or discharge of a guarantor or surety; or (x) any other cause, whether similar or dissimilar to the foregoing.

4. MORI's obligations under this Agreement shall remain in full force and effect until all amounts payable by MTMG under the Pooling and Servicing Agreement and the Purchase Agreement shall have been paid in full. If at any time any such amount is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of MTMG or otherwise, MORI's obligations under this Agreement with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

5. MORI irrevocably waives acceptance of this Agreement, presentment, demand, protest and notice of any kind, as well as any requirement that at any time any action be taken by any Person first against MTMG, Marriott (under the Guaranty Agreement or otherwise) or any other Person. MORI further agrees that this Agreement constitutes a continuing guarantee and a guarantee of payment and performance when due and not of collection.

6. MORI represents, warrants and covenants that:

(a) MORI is, and at all times during the term of each of this Agreement, the Purchase Agreement, the Pooling and Servicing Agreement and the Collateral Agreement (collectively, the "MORI Agreements") will be, a corporation duly organized and validly existing in good standing under the laws of its jurisdiction of incorporation and is, and at all times during the term of each of the MORI Agreements will be, duly qualified to do business as a foreign corporation and in good standing under the laws of each jurisdiction where the character of its property, the nature of its business or the performance of its obligations under any of the MORI Agreements makes such qualification necessary except where the failure to be so qualified will not have a material adverse effect on the business of MORI, its ability to perform its obligations under any of the MORI Agreements or any document or transaction contemplated by any of the MORI Agreements, or the validity or enforceability of the Mortgage Loans.

(b) MORI has, and at all times during the term of each of the MORI Agreements will have, all requisite corporate power and authority to own its properties, to conduct its business (except where the failure to have such power and authority does not and will not have a material adverse effect on its business), to execute and deliver each of the MORI Agreements and to perform all of its obligations under each of the MORI Agreements.

(c) MORI holds, and at all times during the term of each of the MORI Agreements will hold, all material licenses, certificates, franchises and permits from all governmental authorities necessary for the conduct of its business and has received no notice of proceedings relating to the revocation of any such license, certificate, franchise or permit, which individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would materially and adversely affect its ability to perform its obligations under any of the MORI Agreements, any other documents or transactions contemplated under any of the MORI Agreements, or the validity or enforceability of the Mortgage Loans.

(d) The execution, delivery and performance of each of the MORI Agreements are within MORI's corporate powers and have been duly authorized by all necessary corporate action of MORI and each of the MORI Agreements has been duly executed and delivered by MORI and constitutes the legal, valid and binding agreement of MORI enforceable against MORI in accordance with its terms subject, as to the enforcement of remedies, to bankruptcy, insolvency, reorganization,

moratorium and other similar laws affecting the enforceability of creditors' rights generally applicable in the event of the bankruptcy, insolvency or reorganization of MORI and to general principles of equity.

(e) Neither the consummation of any of the transactions contemplated in any of the MORI Agreements, nor the execution, delivery and performance by MORI of any of the MORI Agreements do or will (i) violate any of the provisions of the articles of incorporation or by-laws of MORI, (ii) violate any provision of any law, governmental rule or regulation currently in effect applicable to MORI or its properties or by which MORI or its properties may be bound or affected, (iii) violate any judgment, decree, writ, injunction, award, determination or order currently in effect applicable to MORI or its properties or by which MORI or its properties may be bound or affected, (iv) conflict with, or result in a breach of, or constitute a default under, any of the provisions of any indenture, mortgage, deed of trust, contract or other instrument to which MORI is a party or by which it is bound or (v) result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, mortgage, deed of trust, contract or other instrument.

(f) No consent, approval, order or authorization of, and no filing with or notice to, any court or other governmental authority in respect of MORI is required in connection with the authorization, execution, delivery or performance by MORI of any of the MORI Agreements or any of the other documents or transactions contemplated under any of the MORI Agreements.

(g) MORI is not in default under any material agreement, contract, instrument or indenture to which MORI is a party or by which it is or its properties are bound, or subject to or in violation of any statute, or of any order or regulation of any court, administrative agency, arbitrator or governmental body which would have a material adverse effect on the ability of MORI to perform its obligations under any of the MORI Agreements or the business, operations, financial condition, prospects, properties or assets of MORI; and no event has occurred which with notice or lapse of time or both would constitute such a default with respect to any such agreement, contract, instrument or indenture, or such a violation of any statute, or of any order or regulation of any court, administrative agency, arbitrator or governmental body.

(h) Since September 30, 1993, there has been no change in the business, operations, financial condition, properties or assets of MORI which would have a material adverse effect on MORI's ability to perform its obligations under any of the MORI Agreements or any other documents or adversely affect the transactions contemplated under any of the MORI Agreements or such other documents.

(i) There is no action, suit or proceeding against, or investigation of, MORI pending or threatened, before any court, administrative agency or other tribunal which, either individually or in the aggregate, (A) may result in any material adverse change in the business, operations, financial condition, prospects, properties, or assets of MORI or in any impairment of the right or ability of MORI to carry on its business substantially as now conducted, or (B) asserts the invalidity of any of the MORI Agreements or (C) seeks to prevent the issuance of the Certificates or the consummation of any of the transactions contemplated by any of the MORI Agreements or (D) which might materially and adversely affect the performance by MORI of its obligations under, or the validity or enforceability of, any of the MORI Agreements or (E) would cause the description of the federal income tax consequences of the purchase, ownership and disposition of the Certificates in the Private Placement Memorandum prepared by MTMG and delivered to the initial Certificateholder under the heading "Certain Federal Income Tax Consequences" to be incorrect.

(j) Neither the Pooling and Servicing Agreement, the Collateral Agreement, the Purchase Agreement, the Private Placement Memorandum dated November 22, 1993 and delivered to the initial Certificateholder or this Agreement, nor any other agreement, document, certificate or statement furnished to the Purchaser or the Trustee by or on behalf of MORI pursuant to any of them, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading. There are no facts known to MORI which, individually or in the aggregate, materially adversely affect, or which (aside from general economic trends) may reasonably be expected to materially adversely affect in the future, the condition, business or prospects of MORI, or which may impair the ability of MORI to perform its obligations under each of the MORI Agreements, which have not been disclosed herein or therein or in the certificates and other documents furnished to the Purchaser by or on behalf of MORI pursuant hereto or thereto specifically for use in connection with the transactions contemplated hereby or thereby.

(k) Neither MORI nor MTMG is aware that any Mortgagor has withheld any portion of payments of Monthly P&I because of the requirements of a foreign taxing authority and no foreign taxing authority has contacted MORI or MTMG concerning a withholding or other foreign tax liability.

(l) MORI agrees to pay or cause MTMG to timely pay all taxes to which MTMG may at any time be subject if failure to pay the same might or could result in a Lien on any of the assets of MTMG.

7. MORI irrevocably waives in perpetuity any claim or other right which it may now or hereafter acquire against MTMG or Marriott that arises from the existence, payment, performance or enforcement of MORI's obligations under this Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, any right to participate in any claim or remedy of the Trust or any Certificateholder against MTMG, Marriott or any collateral which the Trust or any Certificateholder may acquire, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from MTMG or Marriott, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim or other rights. The provisions of this Section 7 shall survive the termination of the Trust pursuant to Article XI of the Pooling and Servicing Agreement. If any amount shall be paid to MORI in violation of this Section 7, such amount shall be deemed to have been paid to MORI for the benefit of, and shall be held in trust for the benefit of, and forthwith be paid over to, (i) if such amount is paid prior to the termination of the Trust pursuant to Article XI of the Pooling and Servicing Agreement, the Certificateholders, the Grantor and the Servicer, in the priority set forth in Section 6.04 of the Pooling and Servicing Agreement, to be credited and applied to the payment of the Certificates and all other amounts to be distributed pursuant to Section 6.04 of the Pooling and Servicing Agreement in accordance with the terms of the Pooling and Servicing Agreement; <u>provided</u>, <u>however</u>, that in no event shall any of such amount be paid in respect of the Interest Shortfall Advance or (ii) if such amount is paid after the termination of the Trust pursuant to Article XI of the Pooling and Servicing Agreement, MTMG. MORI acknowledges that it will receive direct and indirect benefits from the issuance of the Certificates and that the waiver set forth in this Section 7 is knowingly made in contemplation of such benefits.

8. MORI agrees, until the termination of the Pooling and Servicing Agreement, to maintain its sales operations at a

level sufficient to enable it, so long as it is Servicer, to use best efforts to sell Foreclosure Property.

9. If at any time during the term of the Pooling and Servicing Agreement, MORI receives any Insurance Proceeds, MORI shall, not later than the second Business Day following the date of receipt thereof, deposit such Insurance Proceeds into the Collection Account.

10. MORI shall indemnify and hold harmless the Trust and the Certificateholders from and against any taxes, fees and governmental charges that may at any time be asserted against any of such Persons in connection with the assignment of the Mortgage Loans to MTMG.

11. MORI will deliver to each Certificateholder copies of its audited annual financial statements within a reasonable time after such statements have been prepared in final form and in any event within 120 days after the end of its fiscal year. MORI will deliver to each Certificateholder copies of its unaudited quarterly financial statements prepared in the ordinary course of business within a reasonable time after such statements have been prepared in final form and in any event within 50 days after the end of the period covered by such statement.

12. All notices hereunder shall be hand delivered or sent by overnight courier and telecopy (i) if to MORI to 1200 U.S. 98 South, Suite 20, Lakeland, Florida 33801, to the attention of Finance - MTMG 1993-A or to such other address as MORI shall have furnished to the Purchaser and the Trustee in writing, (ii) if to the Purchaser, to 730 Third Avenue, New York, New York 10017, to the attention of Senior Vice President, Securities Division, Third Floor or to such other address as the Purchaser shall have furnished to MORI and the Trustee in writing and (iii) if to the Trustee, to 225 East Robinson Street, Suite 350, Orlando, Florida 32802 or to such other address as the Trustee shall have furnished to the Purchaser and MORI in writing.

13. No failure on the part either of the Purchaser, the Trustee or any Certificateholder to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

14. This Agreement shall be binding upon MORI, its successors and assigns and shall inure to the benefit of and be enforceable by each of the Purchaser, the Trustee and each

Certificateholder and their respective successors, transferees and assigns. The obligations of MORI under this Agreement shall survive the termination of the Agreements.

15. MORI hereby irrevocably submits to the nonexclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York State Court sitting in New York City for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby. MORI irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in any such a court has been brought in an inconvenient forum. MORI hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

16. This Agreement may not be changed or terminated orally, but only by a written instrument signed by MORI, the Purchaser and the Trustee. No consent to any departure by MORI from the terms of this Agreement shall be effective unless the same shall be in writing and signed by the Purchaser and the Trustee. So long as the Purchaser is the only Holder of Certificates, the Trustee agrees to consent to any such change, termination or waiver if so directed by the Purchaser. In any other case, the Trustee shall consent or refrain from consenting as directed by the Majority Holders. The Trustee shall have the right to decline to follow any such direction if the Trustee, in accordance with an opinion of counsel reasonably acceptable to the Trustee and the Majority Holders, determines that such change, termination or waiver would result in the Trustee incurring personal liability for which it is not adequately indemnified.

17. This Agreement may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument.

18. This Agreement shall in all respects be governed by and construed in accordance with, the laws of the State of New York. If any provision of this Agreement shall be held to be invalid by any court of competent jurisdiction, the invalidity of such provision shall not affect any of the remaining provisions.

19. So long as the Purchaser is the only Holder of Certificates, it shall have the right to enforce this Agreement in an action or proceeding brought by it independently of any action or proceeding brought by the Trustee and without joining

the Trustee to such action or proceeding brought by it. In any other case, the Trustee shall enforce or refrain from enforcing this Agreement as directed by the Majority Holders.

20. MORI will pay or reimburse the Purchaser, the Trustee and/or the Majority Holders, as the case may be, upon demand for, all expenses (including, without limitation, all reasonable legal and out-of-pocket expenses which the Purchaser, the Trustee and/or the Majority Holders, as the case may be, in the sole discretion of the Purchaser, the Trustee and/or the Majority Holders, as the case may be, may incur) in connection with the enforcement by the Purchaser, the Trustee and/or the Majority Holders, as the case may be, of this Agreement and the transactions contemplated hereby in the event of any failure by MORI to comply with the provisions hereof or with any suit for or the collection of any overdue amount payable by MORI under this Agreement.

Very truly yours,

MARRIOTT OWNERSHIP RESORTS, INC.

By: [signature]
Name: Michael Deering
Title: Vice President

Acknowledged:

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA

By: ____________________
Name:
Title:

SUN BANK, NATIONAL ASSOCIATION, as Trustee under the Pooling and Servicing Agreement

By: [signature]
Name: DEBORAH MOREYRA
Title: VICE PRESIDENT

# Defendant's Exhibit 3

01/03/94 14:26 ☎312 750 0661 CHICAGO EPUB 002

**CS FIRST BOSTON**
227 West Monroe Street
Chicago, Illinois 60606
(312) 750-3000

**PLEASE DELIVER A.S.A.P.**
**Confidential**

# CHICAGO
## Investment Banking

Telecopy Number 312/750-0661 ☐
Telecopy Number 312/750-1824 ☐
Telecopy Number 312/750-1829 ☐

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank You.

**Date:** 1/3/94

**To:** Lester Pulse

**Company:** Marriott International

**Telecopy #:** 301 380-6962 **Phone:**

**From:** Phil Hamm

**Phone:**

**Comments:** RK 73-524 PLR 9319005
bun ☺ $50
Shirt ☺ $100
draft ☺ $.25
close wrk $20 loss

**Number of Pages, Including Cover Sheet:**

MAR - 008660

**Any Problems, Please Call:**

January 1994

CONFIDENTIAL

Materials Prepared for Discussion

# Marriott International

# Executive Summary

- Marriott International desires to hedge its exposure in interest sensitive assets presently owned and/or to be acquired. After an evaluation of its financial risks, Marriott International enters into a series of security transactions to be managed by CS First Boston as part of an overall plan to manage financial risks inherent in its business. One strategy will involve selling short 2-year Treasuries and investing the proceeds in intermediate term Treasuries as a hedge against future increases in interest rates. The short obligation is not considered to be a "liability" for tax purposes. An alternative might include the same strategy using foreign currencies against the U.S. dollar. Any strategy will involve some risks and be designed to earn a profit.
- Marriott International enters into the trade discussed above. Subsequently, a partnership is formed with Marriott International as a limited partner to reflect any investments and obligations on a net basis on the company's financial statements. Marriott International will own 95 percent of the partnership and a third party will own 5 percent. As its capital contribution, Marriott International contributes intermediate term Treasuries subject to the short sale obligation for the 2-year Treasuries. The General Partner contributes cash for its capital contribution.
- The partnership acquires interests in other assets as part of its overall financial strategy. Subsequently, the Partnership sells the intermediate term Treasuries and closes the short obligation relating to the 2-year Treasuries.

MAR - 008663

Marriott International

# Executive Summary

- In order to further isolate the investment risks of the strategy, Marriott International contributes its limited partnership interest to a lower tier subsidiary. No gain or loss is recognized to either Marriott International or to its subsidiary as a result of the transfer.
- The transfer to its subsidiary results in a technical termination of the partnership solely for federal income tax purposes. Such a termination causes a deemed distribution of the partnership asset to each partner and a deemed re-contribution into a newly formed partnership. The tax basis of the asset deemed distributed takes on the high outside tax basis of Marriott International's partnership interest, which basis carries over to the new partnership. This result reflects the high basis which arose when the intermediate term Treasuries were contributed to the original partnership, which was not reduced by the short sale obligation.
- The partnership depreciates the high basis assets or sells it at a loss sometime in the future. Marriott International through the investment in a partnership by its subsidiary recognizes the tax benefit of the high basis in its consolidated return.

## Marriott International

### Step 1




- Marriott International sells short $100 million of 2-year Treasuries.
- Using the proceeds, Marriott International invests in 5-year Treasuries.

MAR - 008665

## Marriott International

### Step 2




- Marriott International contributes the Treasuries for a 95% Limited Partnership Interest.
- The General Partner contributes cash for a 5% General Partnership Interest.

MAR - 008666

## Marriott International

### Step 3




- LTD Partnership #1 acquires other low basis assets from Marriott or acquires other assets for use by it or a Marriott affiliate.
- LTD Partnership #1 sells 5-year Treasuries and closes out short position in 2-year Treasuries.

MAR - 008667

## Marriott International

**Step 4**




- Marriott International transfers its 95% LP interest to a subsidiary in a tax-free contribution.
- The transfer causes a technical termination of LTD Partnership #1.

MAR - 008668

## Marriott International

### Step 5




- The technical termination of the old partnership causes deemed distribution of assets to Marriott International.
- Distributed assets have substituted basis of Marriott International's LP partnership interest.
- Marriott International re-contributes assets to new partnership (LTD Partnership #2).

MAR - 008669

## Marriott International

### Step 6




- LTD Partnership #2 depreciates the high basis assets or sells them at a loss.
- Marriott International gains 95% of losses from LTD Partnership #2.
- LTD Partnership #2 reflected as "net investment" by Marriott International on its financial statements.

# Defendant's Exhibit 4

CS FIRST BOSTON

CS First Boston Corporation

55 East 52nd Street
New York, NY 10055-0186
Telephone 212 909 2000

June 24, 1994

Mr. Michael Dearing
Vice President, Corporate Finance
Marriott Ownership Resorts, Inc.
Marriott Drive
Dept. 924.11
Washington, D.C. 20058

Dear Michael:

This letter outlines our understanding of the original intent of the parties with respect to Marriott Ownership Resorts, Inc.'s initiating a financial management strategy to hedge the interest rate exposure relating to the Mori Notes received in connection with the sales of resort timesharing interests. As outlined in a letter dated April 4, 1994 and addressed to you, Marriott was interested in entering into a transaction in which CS First Boston would execute a short sale for Marriott of $65 million face amount of the current 5 year U.S. Treasury Note and invest the funds through a repurchase transaction in a 30-day Eurodollar equivalent investments (Repos adjusted to 30-day LIBOR basis). The transaction which the parties entered into was initially identified as a "rate lock" transaction.

Shortly after sending to you our standard form of documentation for a rate lock transaction, you raised the question as to whether the rate lock agreement resulted in Marriott having a direct interest in both the short sale and repo transactions. Our standard form rate lock documentation, in your opinion, did not make it clear that the short sale and repo transaction were being booked for the account of and on behalf of Marriott. You returned our form of document with comments reflecting more clearly the nature of the short sale and repo transaction, which comments began the discussions leading up to this letter of understanding.

Each of Marriott and CS First Boston acknowledge that the original intent of the parties was to establish a short position in U.S. Treasury Securities for Marriott and to invest the proceeds of that short sale in a repo transaction. For the avoidance of doubt as to the nature of the transaction, CS First Boston agrees to cancel and correct the books and records of CS First Boston to reflect the rate lock transaction as a short sale executed for the account of Marriott as of the date of the original trade, namely, April 25, 1994. In addition, CS First Boston will execute the corresponding repo transaction for the account of Marriott on the date of the next roll-over of the outstanding repo transaction. CS First Boston will assume all costs and expenses (up to a maximum of $50,000, over which amount Marriott will be solely responsible for paying such costs and expenses) associated with the execution of the cancel and correct and the corresponding repo transaction for the account of Marriott.

CS FIRST BOSTON

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of Marriott and CS First Boston further agree that (i) the agreement to rebook the transactions as described above does not in any way reflect a change in the original intent of the parties to execute a short sale and corresponding repo transaction for Marriott, but rather, clarifies that both a short sale and a repo transaction are to be booked for the account of Marriott, (ii) neither Marriott nor CS First Boston will hold the other liable as a result of, and each hereby waives any and all claims, causes of action or other remedies which may be asserted against the other arising from, the original execution and booking of the transaction as a rate lock agreement and the agreement hereunder to cancel and correct the transaction in the manner described above.

This letter agreement will be governed by and construed in accordance with the laws of the State of New York (without regard to principles of conflict of laws). If you have any questions with respect to the foregoing, please feel free to call Philip Hamon at 212-909-4804.

If the foregoing correctly states your understanding of the agreement between us, please execute the enclosed counterpart of this letter and return it to Phil Hamon at which time this letter will become a binding agreement.

Sincerely,

CS FIRST BOSTON CORPORATION

By: Philip J. Hamon
Director

ACCEPTED AND AGREED TO
as of the date first written above

MARRIOTT OWNERSHIP RESORTS, INC.

By: M. E. Dearing
Vice President

41710083.ctd

# Defendant's Exhibit 5

CS FIRST BOSTON

CS First Boston Corporation

55 East 52nd Street
New York, NY 10055-0186
Telephone 212 909 2000

June 24, 1994

Mr. Michael Dearing
Vice President
Marriott Ownership Resorts, Inc.
10400 Fernwood Road
Bethesda, MD 20058

Dear Michael:

This letter agreement is effective as of March 1, 1994 and confirms that CS First Boston Corporation ("CS First Boston") was engaged by Marriott Ownership Resorts, Inc. (the "Company") to assist the Company in connection with initiating a financial management strategy to hedge the interest rate exposure relating to certain notes (hereinafter referred to as "MORI Notes") received in connection with the sales of resort timesharing interest. The Company has hedged approximately $65 million of MORI Notes in 1994 (the "Transaction"). We understand that subsequent to entering into the hedge the Company assigned its interest in the Transaction to an affiliated partnership (the "Partnership").

In connection with CS First Boston's engagement, the Company has made available to CS First Boston information concerning the Company and its subsidiaries and affiliates reasonably necessary for CS First Boston to perform its obligations hereunder and provided CS First Boston with reasonable access to the directors, officers, employees, accountants, and counsel (collectively, "Representatives"), it being understood that CS First Boston was entitled to rely upon such information supplied by the Company and its Representatives without any independent investigation or verification thereof. All non-public information concerning the Company given to CS First Boston has been used by CS First Boston solely in the course of the performance of its services hereunder and will be treated confidentially by CS First Boston for as long as the non-public information remains non-public. Except as otherwise required by law, CS First Boston will not disclose such non-public information to any third party without the Company's consent for so long as it remains non-public.

The Company has agreed to pay CS First Boston as follows:

(i) In addition to the commissions related to the securities trades, a structuring fee in the amount of $250,000, payable upon closing.

(ii) The Company agrees promptly to reimburse CS First Boston for all reasonable out-of-pocket expenses incurred in connection with its role hereunder, including attorney's fees, if any, and the fees of any other advisors retained by CS First Boston with the prior approval of the Company.

41740072.CTD/1

CS FIRST BOSTON

Since CS First Boston acted on behalf of the Company in connection with its engagement hereunder, the Company has entered into a separate letter agreement, providing for the indemnification by Marriott International, Inc. of CS First Boston and certain related persons and entities (the "Indemnity Letter").

The Company further understands that if CS First Boston is asked to act for the Company in any other formal additional capacity, then the terms of any such additional engagement(s) will be embodied in one or more separate written agreements, containing provisions and terms to be mutually agreed upon. Except as otherwise agreed to in writing, the indemnification provisions of this agreement and any such additional engagement shall remain in full force and effect regardless of any completion, modification, or termination of CS First Boston's engagements.

It is expressly understood by the Company and Marriott International, Inc. ("MII") that CS First Boston is acting hereunder solely to assist the Company in developing and implementing a strategy to hedge the Company's interest rate exposure relating to the MORI Notes. It is also expressly understood by the Company and MII that CS First Boston is not providing any financial reporting, tax or legal advice in connection with its engagement hereunder or otherwise. CS First Boston understands that the Company has obtained at its sole expense competent financial reporting, legal and tax professionals to advise the Company on those aspects of the Transaction and the Partnership. In that regard, the Company accepts full responsibility for any financial reporting, tax or legal matters relating to the Company's involvement in the Transaction and to the Partnership. The Company and MII agree to indemnify and hold harmless CS First Boston and its affiliates and their respective directors, officers, agents and employees from and against, and agrees that CS First Boston and such other persons shall have no liability to the Company or MII or the Partnership or the owners, parents, affiliates, security holders or creditors of either for, any fines, penalties, charges or other losses which may be incurred by or imposed upon any of them or upon CS First Boston (or any of the related persons or entities referred to above) with respect to any financial reporting, Federal, State or local income or other tax or legal aspects of the Partnership or the Transaction (excluding any licensing, registration, reporting, recordkeeping, capital or other requirements or rules governing the conduct of CS First Boston (or any such related person or entity) as broker, dealer or investment advisor under any securities laws and excluding any income taxes incurred by CS First Boston (or any such related person or entity, as a result of services performed hereunder), and for any legal or accounting fees incurred in connection therewith. This indemnity shall not in any way limit, or prejudice CS First Boston's rights under, the Indemnity Letter referred to above.

CS First Boston's engagement hereunder commenced on March 1, 1994 and shall terminate on July 1, 1994 or such date as the parties may agree to. The paragraph of this letter beginning "It is expressly understood" and the Company's obligation to (i) pay the Fee provided for herein and (ii) reimburse expenses to the extent provided for herein and to indemnify CS First Boston, its employees, and certain related persons and entities as provided in the separate letter agreement referred to above survive the termination of the engagement.

CS FIRST BOSTON

We appreciate the opportunity to work with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this letter.

Very truly yours,

CS FIRST BOSTON CORPORATION

By Philip J. Hamm
Name: Philip J. Hamm
Title: Director

Acknowledged and Agreed:

MARRIOTT OWNERSHIP RESORTS, INC.

By M. E. Dearing
Name: M. E. Dearing
Title: Vice President

MARRIOTT INTERNATIONAL, INC.

By M. E. Dearing
Name: M. E. Dearing
Title: Vice President, Corporate Finance

# Defendant's Exhibit 6

CS First Boston

Brit J. Bartter
*Managing Director*

CS First Boston Corporation
227 West Monroe Street
Chicago, IL 60606-5018
Telephone 312 750 3020

July 8, 1994

Mr. Michael E. Dearing
Vice President - Corporate Finance
Marriott International, Inc.
10400 Fernwood Road
Bethesda, MD 20058

Dear Mike:

Enclosed is the invoice for the recent short sale transaction.

Thank you again for selecting CS First Boston. We look forward to many more opportunities to work with Marriott!

Sincerely,

Brit

BJB/kam
Enclosure

| Post-it™ Fax Note 7671 | Date 8/18/94 # of pages ▶ 7 |
|---|---|
| To Mercedes Infante | From Kim Callicutt |
| Co./Dept. | Co. |
| Phone # | Phone # 301-380-1379 |
| Fax # 813-284-5430 | Fax # |

MAR-LL-0008853

08-18-1994 15:32 FROM MARRIOTT TREASURY TO 91212328454302 P.02

# CS FIRST BOSTON

Park Avenue Plaza
New York, NY 10055
(212) 909-2000

In account with Marriott International, Inc.
10400 Fernwood Road
Bethesda, MD 20058

Attention: Michael E. Dearing
Vice President - Corporate Finance

Reference MF43
Date: 7/08/94

For services rendered in connection with

Per letter of engagement and letter of understanding both dated June 24, 1994.

| | |
|---|---|
| Structuring Fee: | $200,000.00 |
| Out-of-pocket Expenses: | 22,540.22 |
| TOTAL: | $222,540.22 |

OK to Pay
M.E. Dearing

*Please remit via wire:*
CITIBANK
20 Exchange Place
New York, NY
For the Account of CS First Boston
Account Number: 09253506
ABA Number: 021000089
Attn: Barbara Wentworth

*Or by check:*
CS First Boston
Accounting Department
Attn: Barbara Wentworth
Five World Trade Center, 8th Floor
New York, NY 10048

MAR-LL-0008854

Marriott
LAW DEPARTMENT

Ward R. Cooper
Assistant General Counsel
301/380-7824

Copies to: [redacted]
Griff Lindsay
Dawn Morton

MAR-LL-0008855

CS FIRST BOSTON

CS First Boston Corporation

55 East 52nd Street
New York, NY 10055-0186
Telephone 212 909 2000

June 24, 1994

Mr. Michael Dearing
Vice President
Marriott Ownership Resorts, Inc.
10400 Fernwood Road
Bethesda, MD 20058

Dear Michael:

This letter agreement is effective as of March 1, 1994 and confirms that CS First Boston Corporation ("CS First Boston") was engaged by Marriott Ownership Resorts, Inc. (the "Company") to assist the Company in connection with initiating a financial management strategy to hedge the interest rate exposure relating to certain notes (hereinafter referred to as "MORI Notes") received in connection with the sales of resort timesharing interest. The Company has hedged approximately $65 million of MORI Notes in 1994 (the "Transaction"). We understand that subsequent to entering into the hedge the Company assigned its interest in the Transaction to an affiliated partnership (the "Partnership").

In connection with CS First Boston's engagement, the Company has made available to CS First Boston information concerning the Company and its subsidiaries and affiliates reasonably necessary for CS First Boston to perform its obligations hereunder and provided CS First Boston with reasonable access to the directors, officers, employees, accountants, and counsel (collectively, "Representatives"), it being understood that CS First Boston was entitled to rely upon such information supplied by the Company and its Representatives without any independent investigation or verification thereof. All non-public information concerning the Company given to CS First Boston has been used by CS First Boston solely in the course of the performance of its services hereunder and will be treated confidentially by CS First Boston for as long as the non-public information remains non-public. Except as otherwise required by law, CS First Boston will not disclose such non-public information to any third party without the Company's consent for so long as it remains non-public.

The Company has agreed to pay CS First Boston as follows:

(i) In addition to the commissions related to the securities trades, a structuring fee in the amount of $250,000, payable upon closing.

(ii) The Company agrees promptly to reimburse CS First Boston for all reasonable out-of-pocket expenses incurred in connection with its role hereunder, including attorney's fees, if any, and the fees of any other advisors retained by CS First Boston with the prior approval of the Company.

MAR-LL-0008856

41740072.CTD/1

CS First Boston

Since CS First Boston acted on behalf of the Company in connection with its engagement hereunder, the Company has entered into a separate letter agreement, providing for the indemnification by Marriott International, Inc. of CS First Boston and certain related persons and entities (the "Indemnity Letter").

The Company further understands that if CS First Boston is asked to act for the Company in any other formal additional capacity, then the terms of any such additional engagement(s) will be embodied in one or more separate written agreements, containing provisions and terms to be mutually agreed upon. Except as otherwise agreed to in writing, the indemnification provisions of this agreement and any such additional engagement shall remain in full force and effect regardless of any completion, modification, or termination of CS First Boston's engagements.

It is expressly understood by the Company and Marriott International, Inc. ("MII") that CS First Boston is acting hereunder solely to assist the Company in developing and implementing a strategy to hedge the Company's interest rate exposure relating to the MORI Notes. It is also expressly understood by the Company and MII that CS First Boston is not providing any financial reporting, tax or legal advice in connection with its engagement hereunder or otherwise. CS First Boston understands that the Company has obtained at its sole expense competent financial reporting, legal and tax professionals to advise the Company on those aspects of the Transaction and the Partnership. In that regard, the Company accepts full responsibility for any financial reporting, tax or legal matters relating to the Company's involvement in the Transaction and to the Partnership. The Company and MII agree to indemnify and hold harmless CS First Boston and its affiliates and their respective directors, officers, agents and employees from and against, and agrees that CS First Boston and such other persons shall have no liability to the Company or MII or the Partnership or the owners, parents, affiliates, security holders or creditors of either for, any fines, penalties, charges or other losses which may be incurred by or imposed upon any of them or upon CS First Boston (or any of the related persons or entities referred to above) with respect to any financial reporting, Federal, State or local income or other tax or legal aspects of the Partnership or the Transaction (excluding any licensing, registration, reporting, recordkeeping, capital or other requirements or rules governing the conduct of CS First Boston (or any such related person or entity) as broker, dealer or investment advisor under any securities laws and excluding any income taxes incurred by CS First Boston (or any such related person or entity, as a result of services performed hereunder), and for any legal or accounting fees incurred in connection therewith. This indemnity shall not in any way limit, or prejudice CS First Boston's rights under, the Indemnity Letter referred to above.

CS First Boston's engagement hereunder commenced on March 1, 1994 and shall terminate on July 1, 1994 or such date as the parties may agree to. The paragraph of this letter beginning "It is expressly understood" and the Company's obligation to (i) pay the Fee provided for herein and (ii) reimburse expenses to the extent provided for herein and to indemnify CS First Boston, its employees, and certain related persons and entities as provided in the separate letter agreement referred to above survive the termination of the engagement.

CS FIRST BOSTON

We appreciate the opportunity to work with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this letter.

Very truly yours,

CS FIRST BOSTON CORPORATION

By Philip J. Hamm
Name: Philip J. Hamm
Title: Director

Acknowledged and Agreed:

MARRIOTT OWNERSHIP RESORTS, INC.

By M. E. Dearing
Name: M. E. Dearing
Title: Vice President

MARRIOTT INTERNATIONAL, INC.

By M. E. Dearing
Name: M. E. Dearing
Title: Vice President, Corporate Finance

Date: ______________________

TO: CS First Boston Corporation
Park Avenue Plaza
New York, New York 10055

In connection with your engagement (the "engagement") to advise and assist our subsidiary, Marriott Ownership Resorts, Inc. with implementing a structured hedging strategy relating to MORI Notes, we agree to indemnify and hold harmless CS First Boston ("you") and its affiliates, the respective directors, officers, partners, agents and employees of CS First Boston and its affiliates, and each other person, if any, controlling CS First Boston or any of its affiliates (collectively, "Indemnified Persons"), from and against, and we agree that no Indemnified Person shall have any liability to us or our owners, parents, affiliates, security holders or creditors for, any losses, claims, damages or liabilities (including actions or proceedings in respect thereof) (collectively "Losses") (A) related to or arising out of (i) our actions or failures to act (including statements or omissions made, or information provided, by us or our agents) or (ii) actions or failures to act by an Indemnified Person with our consent or in reliance on our actions or failures to act, or (B) otherwise related to or arising out of the engagement or your performance thereof, except that this clause (B) shall not apply to any Losses that are finally judicially determined to have resulted primarily from your bad faith or negligence or willful misconduct. If such indemnification is for any reason not available, we agree to contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by us and by you with respect to the engagement or, if such allocation is judicially determined unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of us on the one hand and of you on the other hand, provided, however, that, to the extent permitted by applicable law, and except for losses described in the exception to clause (B) above, the Indemnified Persons shall not be responsible for amounts which in the aggregate are in excess of the amount of all fees actually received by you from us in connection with the engagement. Relative benefits to us, on the one hand, and you, on the other hand, with respect to the engagement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by us or our security holders, as the case may be, pursuant to the transaction(s), whether or not consummated, contemplated by the engagement bears to (ii) all fees or commissions (including transaction spreads) paid or proposed to be paid to you by us in connection with the engagement.

We will reimburse each Indemnified Person for all expenses (including reasonable fees and disbursements of counsel) as they are incurred by such Indemnified Person in connection with investigating, preparing for or defending any action, claim or proceeding ("Action") referred to above (or enforcing this agreement or any related engagement agreement), whether or not in connection with pending or threatened litigation in which any Indemnified Person is a party, and whether or not such Action is initiated or brought by you. We further agree that we will not settle or compromise or consent to the entry of any judgment in any pending or threatened Action in respect of which indemnification may be sought hereunder (whether or not an Indemnified Person is a party therein) unless we have given you reasonable prior written notice thereof and used all reasonable efforts, after consultation with you, to obtain an unconditional release of each Indemnified Person from all liability arising therefrom.

Our obligations hereunder shall be in addition to any rights that any Indemnified Person may have at common law or otherwise. Solely for the purpose of enforcing this agreement, we hereby consent to personal jurisdiction and to service and venue in any court in which any claim which is subject to this agreement is brought against any Indemnified Person. We acknowledge that in connection with the engagement you are acting as an independent contractor with duties owing solely to us. YOU HEREBY AGREE, AND WE HEREBY AGREE ON OUR OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF OUR SECURITY HOLDERS, TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTER-CLAIM OR ACTION ARISING OUT OF THE ENGAGEMENT, YOUR PERFORMANCE THEREOF OR THIS AGREEMENT.

The provisions of this agreement shall apply to the engagement (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement. This agreement and any other agreements relating to the engagement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles.

Very truly yours,

Client: MARRIOTT INTERNATIONAL, INC.

By: M. E. Dearing
Name: M. E. Dearing
Title: Vice President, Corporate Finance

Accepted and Agreed:

CS FIRST BOSTON CORPORATION

By: Philip J. Hahn
Name: Philip J. Hahn
Title: Director

MAR-LL-0008859

41740072.CTD/4

TOTAL P.07

P.007

# Defendant's Exhibit 7

**State of Delaware**

# Office of the Secretary of State

I, WILLIAM T. QUILLEN, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "MARRIOTT INTERNATIONAL JBS CORPORATION", FILED IN THIS OFFICE ON THE NINTH DAY OF MAY, A.D. 1994, AT 3:45 O'CLOCK P.M.

A CERTIFIED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE KENT COUNTY RECORDER OF DEEDS FOR RECORDING.

William T. Quillen

*William T. Quillen, Secretary of State*

2401079 8100

944081919

AUTHENTICATION: 7114422

DATE: 05-10-94

MAR - 009208

# CERTIFICATE OF INCORPORATION

# OF

# MARRIOTT INTERNATIONAL JBS CORPORATION

The undersigned, a natural person, for the purpose of organizing a corporation for conducting the business and promoting the purposes hereinafter stated, under the provisions and subject to the requirements of the laws of the State of Delaware (particularly Chapter 1, Title 8 of the Delaware Code and the acts amendatory thereof and supplemental thereto, and known, identified and referred to as the "General Corporation Law of the State of Delaware"), hereby certifies that:

FIRST: The name of the corporation (hereinafter called the "corporation") is

MARRIOTT INTERNATIONAL JBS CORPORATION

SECOND: The address, including street, number, city, and county, of the registered office of the corporation in the State of Delaware is 32 Loockerman Square, Suite L-100, City of Dover, County of Kent; and the name of the registered agent of the corporation in the State of Delaware at such address is The Prentice-Hall Corporation System, Inc.

THIRD: The nature of the business and of the purposes to be conducted and promoted by the corporation, which shall be in addition to the authority of the corporation to conduct any lawful business, to promote any lawful purpose, and to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, is as follows:

To be the general partner in a limited partnership.

To carry on and conduct a general food and beverage business; to operate in connection therewith facilities for the manufacture, productions, processing, storage, distribution, and sale of foods and beverages and any other related items; to sell at wholesale and retail; to operate such facilities on its own account, under management contracts with others, or

under franchise, or in any other legitimate capacity; to engage in the business of providing and promoting entertainments, amusements, and other means of recreation.

To carry on and conduct a general hotel business; to operate in connection therewith hotels, motels, inns, taverns, and other places of lodging of every kind and description; and to provide and operate facilities necessary or desirable in connection therewith; and to operate such facilities on its own account, under management contracts with others, or under franchises, or in any other legitimate capacity.

To acquire, by purchase, exchange, lease, franchise, license, or any other lawful manner, and to build, own, operate, manage, sell, lease, mortgage, or otherwise dispose of, the facilities and properties which are, or may be, required in the conduct of such general food and beverage business and hotel business and all other businesses related thereto, also to purchase, acquire, own, hold, use, lease (either as lessor or lessee), rent, sublet, grant, sell, exchange, subdivide, mortgage, encumber, deed in trust, manage, improve, develop, maintain, construct, operate and generally deal in, any and all real estate, improved and unimproved, stores, office buildings, apartment houses, shopping centers, commercial buildings, restaurants, hotels, garages, warehouses, manufacturing plants, and other buildings of any kind or description, and any and all other property of every kind or description, real, personal, and mixed, and any interest or right therein, wheresoever situated.

To manufacture, purchase, or acquire in any lawful manner, and to hold, own, mortgage, pledge, sell, lease, rent, transfer, or in any manner dispose of, and to deal and trade in, goods, wares, merchandise, including equipment, furniture and fixtures, and property of any and every class and description.

To acquire the good will, business, rights and property, franchises, and assets of every kind, with or without undertaking the whole or any part of the liabilities, of any person, firm, association, or corporation; and to acquire any property or business as a going concern or otherwise by (i) purchase of the assets thereof wholly or in part, (ii) by acquisition

of the shares or any part thereof, or (iii) in any other manner; and to pay for the same in cash, the stock of this corporation, bonds, or otherwise; to hold, maintain and operate, or in any manner dispose of the whole or any part of the good will, business, rights, and property so acquired; and to conduct in any lawful manner the whole or any part of any business so acquired, and to exercise all the powers necessary or convenient in and about the conduct and management of such business.

To apply for, purchase, or in any manner to acquire, and to hold, own, use and operate, and to sell, assign, transfer, or in any manner dispose of, and to grant licenses, franchises, or other rights in respect of, and in any manner deal with, any and all rights, trade and service marks, systems, inventions, improvements, and processes used in connection with or secured under letters patent or copyrights of the United States or other countries, or otherwise, and to work, operate, or develop the same, and to carry on any business, manufacturing or otherwise, which may directly or indirectly effectuate these objects or any of them.

To guarantee, purchase, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of the shares of the capital stock of, or any bonds, securities, or evidences of indebtedness created by any other corporation or corporations of this State or any other state, country, nation, or government and while owner of said stock, to exercise all the rights, powers, and privileges of ownership, including the right to vote thereon, to the same extent as natural persons might or could do, and to promote or to aid in any manner, financially or otherwise, any corporation of which any shares of stock, bonds, notes, debentures, or other securities or evidences of indebtedness are held directly or indirectly by this corporation, and for this purpose to guarantee the contracts, dividends, shares, bonds, notes, debentures, and other obligations of such other corporations.

To issue bonds, debentures, or obligations from time to time for any of the objects or purposes of the corporation and to secure the same by mortgage, pledge, deed of trust, or otherwise, including, but without limitation, bonds, debentures, and other obligations convertible into other securities of the corporation.

To act as a general partner, limited partner, or joint venturer of a partnership or joint venture that proposes to conduct a business that the corporation would engage in singly.

To conduct business in any of the States, territories, colonies, or dependencies of the United States, in the District of Columbia, and in any and all foreign countries, to have one or more offices therein, and therein to hold, purchase, mortgage, and convey real and personal property, without limit as to the amount.

To do any or all of the things herein set forth to the same extent as a natural person might or could do and in any part of the world, as principals, agents, contractors, trustees, or otherwise, and either alone or in company with others.

To purchase, hold, and reissue any of the shares of its capital stock.

To exercise all powers enumerated in the General Corporation Law of Delaware; and, in addition, to exercise all powers granted by any other law or by this certificate of incorporation, together with any powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the business or purposes set forth herein.

FOURTH: The total number of shares of stock which the corporation shall have authority to issue is One Hundred (100), all of which are without par value. All such shares are of one class and are shares of Common Stock.

No holder of any of the shares of the stock of the corporation, whether now or hereafter authorized and issued, shall be entitled as of right to purchase or subscribe for (1) any unissued stock of any class, or (2) any additional shares of any class to be issued by reason of any increase of the authorized capital stock of the corporation of any class, or (3) bonds, certificates of indebtedness, debentures or other securities convertible into stock of the corporation, or carrying any right to purchase stock of any class, but any such unissued stock or such additional authorized issue of any stock or of other securities convertible into stock, or carrying any right to purchase stock, may be issued and disposed of pursuant to resolution of the Board of Directors to such persons, firms,

corporations or associations and upon such terms as may be deemed advisable by the Board of Directors in the exercise of its discretion.

FIFTH: The name and the mailing address of the incorporator is as follows:

| NAME | MAILING ADDRESS |
|---|---|
| Richard Vorosmarti | 1090 Vermont Avenue<br>Washington, D.C. 20005 |

SIXTH: The corporation is to have perpetual existence.

SEVENTH: Whenever a compromise or arrangement is proposed between this corporation and its creditors or any class of them and/or between this corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this corporation under the provisions of Section 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this corporation, as the case may be, and also on this corporation.

EIGHTH: For the management of the business and for the conduct of the affairs of the corporation, and in further definition, limitation and regulation of the powers of the corporation and of its directors and of its stockholders or any class thereof, as the case may be, it is further provided:

1. The management of the business and the conduct of the affairs of the corporation shall be vested in its Board of Directors. The number of directors which shall constitute the whole Board of Directors shall be fixed by, or in the manner provided in, the By-Laws. The phrase "whole Board" and the phrase "total number of directors" shall be deemed to have the same meaning, to wit, the total number of directors which the corporation would have if there were no vacancies. No election of directors need be by written ballot.

2. After the original or other By-Laws of the corporation have been adopted, amended, or repealed, as the case may be, in accordance with the provisions of Section 109 of the General Corporation Law of the State of Delaware, and after the corporation has received any payment for any of its stock, the power to adopt, amend, or repeal the By-Laws of the corporation may be exercised by the Board of Directors of the corporation; provided, however, that any provision for the classification of directors of the corporation for staggered terms pursuant to the provisions of subsection (d) of Section 141 of the General Corporation Law of the State of Delaware shall be set forth in an initial By-Law or in a By-Law adopted by the stockholders entitled to vote of the corporation unless provisions for such classification shall be set forth in this certificate of incorporation.

3. Whenever the corporation shall be authorized to issue only one class of stock, each outstanding share shall entitle the holder thereof to notice of, and the right to vote at, any meeting of stockholders. Whenever the corporation shall be authorized to issue more than one class of stock, no outstanding share of any class of stock which is denied voting power under the provisions of the certificate of incorporation shall entitle the holder thereof to the right to vote at any meeting of stockholders except as the provisions of paragraph (2) of subsection (b) of Section 242 of the General Corporation Law of the State of Delaware shall otherwise require; provided, that no share of any such class which is otherwise denied voting power shall entitle the holder thereof to vote upon the increase or decrease in the number of authorized shares of said class.

NINTH: The personal liability of the directors of the corporation is hereby eliminated to the fullest extent

permitted by paragraph (7) of subsection (b) of Section 102 of the General Corporation Law of the State of Delaware, as the same may be amended and supplemented.

TENTH: No director of the corporation shall be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

ELEVENTH: From time to time any of the provisions of this certificate of incorporation may be amended, altered or repealed, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted in the manner and at the time prescribed by said laws, and all rights at any time conferred upon the stockholders of the corporation by this certificate of incorporation are granted subject to the provisions of this Article ELEVENTH.

Signed on May 9th, 1994.

Richard Vorosmarti
Incorporator