**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Nos. 01-256 T and 01-257 T**
**(Judge Charles Lettow)**

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**.

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Defendant, the United States, in accordance with Rule 56(h) of the Rules of the Court of Federal Claims, submits the following proposed findings of uncontroverted fact:[1]

1. Marriott International Resorts, LP ("MIR" or the "Partnership") is a Delaware limited partnership with its principal place of business located in Montgomery County,

[1] Only for purposes of this motion for summary judgment, defendant assumes that the allegations in plaintiff's Complaints are true and accurate. Defendant also assumes that additional information contained in this fact statement, which was derived from documents produced by plaintiff and third-parties, and deposition testimony, is true and accurate. If this case proceeds to trial, however, defendant reserves the right to challenge the truth, accuracy, and/or credibility of all such allegations and information. Moreover, defendant reserves the right to challenge the transactions engineered by Marriott on the grounds that they were factual shams and/or they lack economic substance. See *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1347 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 1261 (2007); *Jade Trading, LLC v. United States*, No. 03-2164 T, WL 4553043 (Fed.Cl., December 21, 2007).

Maryland. (Compl. ¶¶ 1, 4.)[2]

2. For the tax period ending October 28, 1994, Marriott International JBS Corporation ("JBS") and Marriott Ownership Resorts, Inc. ("MORI") were MIR's general partner and limited partner, respectively. (Compl. ¶¶ 1, 15.)

3. For the tax period ending December 30, 1994, JBS and another Marriott subsidiary, Marriott International Capital Corporation ("MICC"), were MIR's general partner and limited partner, respectively.

4. JBS, MORI, MIR, and MICC, were at all times relevant to this case subsidiaries of Marriott International, Inc. (Compl. ¶¶ 15, 24.)

5. During the periods in issue, MORI engaged in the business of selling timeshare interests in resort properties. (Compl. ¶ 9.)

6. As part of this business, MORI offered buyers the opportunity to finance their purchases by having the buyer execute a promissory note, secured by a mortgage on the timeshare unit ("Mortgage Notes"). (Compl. ¶ 9.)

7. On November 22, 1993, MORI, and another Marriott entity, MTMG Corporation, entered into an agreement with Teachers Insurance and Annuity Association of America ("TIAA") in which the Marriott entities agreed to sell to TIAA up to $175,000,000 of Mortgage Notes. (Def. Exs. 1, 2.)[3]

8. On January 3, 1994, Philip Hamon of the investment banking firm CS First Boston, faxed

---

[2] Except as otherwise noted, the Complaint referenced herein is that filed in Case No. 01-256 T.

[3] Defendant's exhibits ("Def. Exs.") are attached to the Declarartion of G. Robson Stewart, filed herewith.

to Lester Pulse, the Tax Director of Marriott International an "Executive Summary" which set forth a blueprint for a series of transaction that were designed to enable Marriott to create a loss for Federal income tax purposes based on the premise that a short-sale obligation is not considered a liability for partnership tax basis purposes. (Def. Ex. 3.)

9. The transactions described in the CS First Boston tax loss blueprint consisted of the following steps (Def. Ex. 3, see also Def. Exs. 4, 5.):

- Marriott International (MI) sells short 2-year Treasuries and invests the proceeds in intermediate-term Treasuries.
- MI, as a limited partner, and another Marriott entity, as the general partner, form a partnership.
- MI contributes the intermediate-term Treasuries and short-sale obligations to the partnership and the general partner contributes some cash.
- The partnership obtains additional assets and subsequently sells the intermediate term Treasuries and closes the short sale obligation on the 2-year Treasuries.
- MI transfers its partnership interest to another Marriott subsidiary on which no gain or loss is recognized.
- The partnership interest transfer results in a technical termination of the partnership which causes a deemed distribution of the assets to each partner and a re-contribution of the assets to a new partnership.
- The tax basis of the assets takes on the high outside tax basis of MI's interest based on the value of the intermediate term Treasuries which is not reduced by the short- sale obligation.
- The assets later are sold at a loss as a result of the high tax basis and through its subsidiary MI recognizes the tax benefit of the loss.

10. On or about on April 25, 1994, MORI established a short position in five-year Treasury securities with a face amount of $65,000,000 ("First Short Sale"). (Compl. ¶ 13.)

11. The First Short Sale was executed through CS First Boston. ( Def. Ex. 6.)

12. MORI received cash proceeds in the amount of $63,703,816 that were invest in repurchase obligations ("Repos") yielding a fixed return.[4] (Compl. ¶ 13.)

[4] The Repos were repurchase transactions in 30-day Eurodollar equivalent investments adjusted to the prevailing 30-day LIBOR rate. (Def. Ex. 4.)

13. On May 9, 1994, JBS was incorporated in the State of Delaware. (Def. Ex. 7.)

14. On May 6, 1994, MORI and JBS formed the MIR partnership. (Compl. ¶ 15; Def. Ex. 8.)

15. JBS was the general partner of MIR holding a 1% interest, and MORI was a limited partner of MIR holding a 99% interest. (Compl. ¶ 22.)

16. On or about on May 6, 1994, MORI contributed to MIR (1) the Repos, (2) the Mortgage Notes, and (3) the obligations to close the First Short Sale. (Compl. ¶ 16, 17; Def. Ex. 8.)

17. On or about on May 6, 1994, JBS contributed $1,000,000 to MIR. (Compl. ¶ 18.)

18. On or about on August 15, 1994, MORI established a short position in five-year Treasury securities with a face amount of $10,000,000 (the Second Short Sale). (Compl. ¶ 14.)

19. The Second Short Sale was also executed through CS First Boston. (Def. Ex. 6.)

20. MORI received cash proceeds in the amount of $9,463,451 that were invested in repurchase obligations yielding a fixed return (Repos). (Compl. ¶ 14.)

21. On August 16, 1994, MORI contributed to MIR: (1) the Repos, (2) Mortgage Notes with a face amount of approximately $11,900,000, and (3) the obligation to close the Second Short Sale. (Compl. ¶ 19, 20.)

22. On October 1, 1994, MORI contributed to MIR Mortgage Notes with a face amount of approximately $6,200,000. (Compl. ¶ 21.)

23. On September 29, 1994, MIR closed the First Short Sale with CS First Boston by purchasing replacement Treasuries (with the funds invested in the Repos) with a face amount of $65,000,000 at a cost of $62,667,034. (Def. Ex. 9.) On October 17, 1994, MIR closed the Second Short Sale with CS First Boston by purchasing replacement Treasuries (with the funds invested in the Repos) with a face amount of $10,000,000 at a cost of $9,279,811. (Compl. ¶ 23, Def. Ex. 10.) On its partnership return (Form 1065) for the

period ended October 28, 1994, MIR reported a trading gain of $819,532 on the Treasuries short sales. (Def. Ex. 11.)

24. In connection with the Treasuries short sales and Repos transactions, Marriott paid CS First Boston a "structuring fee" of $200,000 and expenses of $22,540.22, and paid a bid-ask spread of $50,000 on the trades, for a total transaction cost of $272,540.22. (Def. Exs. 6, 9, 11.)

25. On October 28, 1994, MORI transferred its entire partnership interest in MIR to MICC. (Compl. ¶ 24.)

26. The transfer of MORI's interest in MIR to MICC triggered a technical termination of MIR under § 708(b)(1)(B). (Compl. ¶ 25.)

27. Under § 708(b)(1)(B), the termination resulted in a deemed distribution of MIR's assets to its partners (JBS and MICC) followed by the creation of a new partnership by JBS and MICC, and contribution of the MIR assets to the new partnership–which also was named MIR. (Compl. ¶ 26.) The actual assets held by MIR prior to, and after, the termination were the Mortgage Notes, $1 million cash, and a receivable with a face amount of $3,303,164. (Compl. ¶ 27.)

28. Prior to the termination, MICC had a purported basis of $159,444,635 in its interest in MIR (*i.e.*, not reduced by the obligation to close the shorts sales by purchasing replacement Treasuries), which consisted of the bases of the Mortgage Notes, the Repos, and minor adjustments due to MIR's operations (*i.e.*, interest and investment income). (Compl. ¶ 27.)

29. After the termination, JBS's and MICC's partnership bases were allocated to the new MIR's assets (the Mortgage Notes, cash, and the receivable). Thus, the new MIR was

assigned a purported basis in the Mortgage Notes of $155,141,472. (Compl. ¶ 29.)

30. On or about on November 14, 1994, MIR conveyed the Mortgage Notes to a grantor trust and the received a Certificate in the Trust representing all of the interest in the Trust other than the Residual interest in the Trust. (Compl. ¶ 30, 31.)

31. On the same date, MIR sold to TIAA the certificate for $81,974,204 less transaction fees of $522,092, for a net amount of $81,452,111. (Compl. ¶ 31.) The fair market value of the interest sold to TIAA was $81,974,204; thus the cash loss on the sale was $522,093. (Compl. ¶ 32.)

32. The purported basis of the Mortgage Notes interest sold to TIAA was $150,894,679 (*i.e.*, not reduced by the obligation to close the shorts sales by purchasing replacement Treasuries). (Compl. ¶ 32.)

33. On its partnership return (Form 1065) for the period ended December 30, 1994, MIR reported a loss on the of the Mortgage Notes of $71,189,461.[5] (Def. Ex. 12.)

34. On February 2, 2001, the IRS issued a Notice of Final Partnership Administrative Adjustment ("FPAA") with respect to MIR's taxable year ended October 28, 1994. (Compl. ¶ 35, Compl. Ex. A.)

35. In the FPAA for MIR's October 28, 1994, taxable year, the IRS reduced the partnership basis by $75,000,000 to reflect the obligation to return the Treasuries sold short to CS First Boston. (Compl. Ex. A.)

36. On February 2, 2001, the IRS issued a Notice of Final Partnership Administrative

[5] In the Complaint (¶ 33), however, Marriott states that the loss on the sale of the Mortgage Notes was $69,442,568 ($81,452,111 - $150,894,679). For purposes of this motion, the discrepancy between the MIR tax return and the Complaint does not need to be resolved.

Adjustment ("FPAA") with respect to MIR's taxable year ended December 30, 1994. (Compl. No. 01-257 T ¶ 35, Compl. No. 01-257 T Ex. A.)

37. In the FPAA for MIR's December 30, 1994, taxable year, the IRS determined that MIR realized a gain on the sale of the Mortgage Notes of $1,757,378, instead of the loss reported on the MIR Form 1065 of $71,189,461. This determination was based on the reduction in the partnership basis of $75,000,000 which reflected the obligation to return the Treasuries sold short to CS First Boston. (Compl. No. 01-257 T Ex. A.)

Respectfully submitted,

*s/G. Robson Stewart*

G. ROBSON STEWART
U.S. Department of Justice - Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, DC 20044
tel: (202) 307-6493
fax: (202) 514-9440

NATHAN J. HOCHMAN
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

*s/David Gustafson*
Of Counsel

Dated: February 1, 2008