IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner, | |
| Plaintiffs, | Nos. 01-256T and 01-257T<br>Judge Charles F. Lettow |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Harold J. Heltzer
Robert L. Willmore
Alex E. Sadler
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2915
Fax: (202) 628-5116

March 27, 2008

# TABLE OF CONTENTS

PLAINTIFFS' CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT ..........1

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ..........3

QUESTION PRESENTED ..........4

STATEMENT OF THE CASE ..........4

STANDARD OF REVIEW ..........9

ARGUMENT ..........10

A. Defendant's Position That The Obligation To Close A Short Sale Constitutes A "Liability" For Purposes Of Section 752 Was First Announced In A 1995 Revenue Ruling Published After The Transactions At Issue Here. That Revenue Ruling, In Which The IRS Implemented A Policy Position Urged By The Treasury Department, States A View Directly Inconsistent With Numerous Judicial Rulings Which Preceded It In Which Courts Adopted The IRS's Argument That Contingent Obligations Are Not "Liabilities" Under Section 752. ..........10

1. In A Well Established Line Of Cases, The IRS Argued And The Courts Agreed That Contingent Obligations – That Is, Obligations Uncertain As To Liability And/Or Amount – Are Not Considered "Liabilities" For Purposes Of Code Section 752. ..........10

2. The Obligation To Close A Short Sale Of Borrowed Securities By Purchasing And Then Returning Replacement Securities To The Lender Of Those Securities Is By Its Very Nature A Contingent Obligation Because The Cost Of Closing The Short Sale Cannot Be Determined Until The Replacement Securities Have Been Purchased By The Short Seller. ..........17

3. In 1995, The IRS At The Urging Of The Treasury Department Issued A Revenue Ruling Holding That The Obligation To Close A Short Sale Is A "Liability" Under Section 752 Even Though The IRS Clearly Understood That This Conclusion Was Inconsistent With Its Position That Contingent Obligations Are Not "Liabilities" Under Section 752. ..........21

4. Contrary To Defendant's Argument, The Change Of Position Announced In Rev. Rul. 95-26 Was Not Consistent With Either Rev. Rul. 88-77 Or The Definition of Liability In The Treasury Department's 1989 Temporary Regulations, Which Dealt With An Entirely Different Issue Involving Cash Basis Taxpayers. ..........23

B. Because The Obligation To Purchase And Return Securities Borrowed To Implement A Short Sale Is A Contingent Obligation, That Obligation Cannot Be A "Liability" For Purposes Of Section 752. ...............27

1. In Its Recent Decision In *Jade Trading, LLC v. United States*, The Court Of Federal Claims Confirmed That Contingent Obligations Do Not Constitute "Liabilities" For Purposes Of Section 752. Other Recent Decisions By Refund Tribunals Have Reached The Same Conclusion. ..........27

2. Rev. Rul. 95-26 Does Not Evidence Thoroughness Of Consideration, Employs Flawed And Invalid Reasoning, And Is Directly Inconsistent With The Long Line Of Cases In Which Courts Adopted The IRS's Position That A Contingent Obligation Cannot Be A "Liability" For Purposes Of Section 752. Accordingly, Rev. Rul. 95-26 Does Not Have The "Power To Persuade" And Is Not Entitled To Any *Skidmore* Deference. ...........35

3. Defendant's Basis Mismatch Argument Is A Result-Oriented Principle That The Government Only Emphasizes If And When It Benefits The Government. ..........41

C. Defendant's Characterization Of The Short Sale Transactions As "Son of BOSS" Transactions Is Unsupported By The Record, Ignores Fundamental Aspects Of The Short Sale Transactions, And Is Completely Irrelevant To The Merits Of The Legal Issues Presented By The Pending Motions..........43

CONCLUSION..........45

APPENDIX A:

Internal Revenue Code of 1986, 26 U.S.C.:

§ 351..........A-1

§ 357(c)..........A-3

§ 358(a)(1)..........A-5

§ 722 .......... A-5

§ 733(1) .......... A-5

§ 752 .......... A-6

§ 754 .......... A-6

§ 1233 .......... A-7

ATTACHMENT

Declaration of Harold J. Heltzer with Plaintiffs' Exhibits 1-9

## TABLE OF AUTHORITIES

### CASES

*Aeroquip-Vickers, Inc. v. Commissioner*, 347 F.3d 173 (6th Cir. 2003) .......... 36

*America Online, Inc. v. United States*, 64 Fed. Cl. 571 (2005) ........................ 36

*Ammex, Inc. v. United States*, 367 F.3d 530 (6th Cir. 2004) ........................... 40

*Amp Inc. v. United States*, 185 F.3d 1333 (Fed. Cir. 1999) ........................ 40-41

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................ 9

*Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982) .......................... 15, 34

*Cemco Investors, LLC v. United States*, 2007-1 USTC ¶ 50,385 (N.D. Ill. 2007), *aff'd*, 515 F.3d 749 (7th Cir. 2008) ................................. 28-30, 33

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).......................................................................................................... 35

*Christensen v. Harris County*, 529 U.S. 576 (2000) ........................................ 36

*COLM Producer, Inc. v. United States*, 460 F. Supp. 2d 713 (N.D. Tex. 2006), *appeal pending*, *Kornman & Assoc. Inc. v. United States*, No. 06-11422 (5th Cir.).......................................................................... 31-33

*Deputy v. du Pont*, 308 U.S. 488 (1940).......................................................... 38

*Dixon v. United States*, 381 U.S. 68 (1965) ..................................................... 35

*Dunway v. Commissioner*, 124 T.C. 80 (2005) ................................................ 33

*Federal Nat'l Mtg. Ass'n v. United States*, 379 F.3d 1303 (Fed. Cir. 2004)................................................................................................... 36-37

*Fox v. Commissioner*, 80 T.C. 972 (1983*), aff'd sub nom. Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984) ....................................... 15, 34

*Gibson Prods. Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981) .... 15, 32, 34

*Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975) ...........................*passim*

*Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (2007) ...... 27-28, 30, 33-34

*Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006) ........................................... 30-31, 33, 34, 41

*La Rue v. Commissioner*, 90 T.C. 465 (1988) ..........................................*passim*

*Long v. Commissioner*, 71 T.C. 1 (1978), *aff'd in part and rev'd in part on other issues*, 660 F.2d 416 (10th Cir. 1981)................................... *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ......... 9

*Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed. Cir. 1987)........................................................................................................ 9

*Newman v. Commissioner*, 68 T.C. 494 (1977) ............................................... 34

*Nico v. Commissioner*, 67 T.C. 647 (1977), *rev'd on other grounds*, 565 F.2d 1234 (2d Cir. 1977) ........................................................................ 33

*Officemax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005) .................. 36-37

*Omohundro v. United States*, 300 F.3d 1065 (9th Cir. 2002).......................... 36

*Provost v. United States*, 269 U.S. 443 (1926)................................................ 38

*Salina Partnership L.P. v. Commissioner*, 80 T.C.M. (CCH) 686 (2000) ......................................................................................... 22, 33, 42

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......................................... 36, 40

*St. Louis Bank for Coops v. United States*, 624 F.2d 1041 (1980)................... 36

*Tedoken v. Commissioner*, 84 T.C.M. (CCH) 657 (2002) ................................ 36

*USA Choice Internet Serv., LLC v. United States*, 73 Fed. Cl. 780 (2006)..................................................................................................... 35

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001) .... 36, 40

*United States v. Mead Corp.*, 533 U.S. 218 (2001).......................................... 36

*Western Co. of N. America v. United States*, 323 F.3d 1024 (Fed. Cir. 2003)....................................................................................................... 35

**STATUTES**

Internal Revenue Code of 1986, 26 U.S.C.:

§ 351 .......... 24

§ 357(c) .......... 24-25

§ 358(a)(1) .......... 24

§ 722 .......... 11

§ 733(1) .......... 11

§ 752 .......... *passim*

§ 754 .......... 42

§ 1233 .......... 18

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 861, 98th Cong., 2d Sess. 856-57 (1984) .......... 25

**TREASURY AND IRS MATERIALS**

Treas. Reg. § 1.461-1(a)(2)(i) .......... 12

Treas. Reg. § 1.752-1(a)(4)(ii) (2003) .......... 29

Treas. Reg. § 1.1233-1(a)(1) .......... 18

Treas. Reg. § 601.601(d)(2)(i)(a) .......... 35

Temp. Treas. Reg. § 1.752-1T(g), T.D. 8237, 1989-1 C.B. 180, 192 (Dec. 30, 1988) .......... 24, 26

Notice of Proposed Rulemaking, 68 Fed. Reg. 37,434 (June 24, 2003) .......... 29

Notice of Proposed Rulemaking, 56 Fed. Reg. 36,704 (July 31, 1991) .......... 26

Rev. Rul. 2002-44, 2002-2 C.B. 84 .......... 38

Rev. Rul. 95-26, 1995-1 C.B. 131 .......... *passim*

Rev. Rul. 88-77, 1988-2 C.B. 128 .................................................. 21, 24-26, 37

Rev. Rul. 73-301, 1973-2 C.B. 215 .................................................. 14

Rev. Rul. 60-345, 1960-2 C.B. 211 .................................................. 24-25

G.C.M. 33,948 (Oct. 22, 1968) .................................................. 14

**MISCELLANEOUS**

Alice W. Cunningham, Short-Sale Obligations and Basis in Partnership Interests, 72 Tax Notes 1663, 1669 (1996) ............................ 39

1 William S. McKee, William F. Nelson & Robert L. Whitmire, Federal Taxation of Partnerships and Partners ¶ 7.01[1] (3d ed. 2004) ..... 38-39, 42

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner,** | |
| **Plaintiffs,** | **Nos. 01-256T and 01-257T** <br> **Judge Charles F. Lettow** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**PLAINTIFFS' CROSS-MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

For the reasons set forth in the accompanying Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment, Plaintiffs respectfully move for partial summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims. Specifically, Plaintiffs move that the Court rule that the obligation of Marriott International Resorts, L.P. to close the two short-sale hedging transactions at issue in this case is a contingent obligation and, therefore, does not constitute a "liability" within the meaning of section 752 of the Internal Revenue Code (26 U.S.C. § 752).

In addition to the aforementioned Memorandum (with Appendix A), Plaintiffs in support of this Motion submit Plaintiffs' Proposed Findings of Uncontroverted

Facts, Plaintiffs' Response To Defendant's Proposed Findings of Uncontroverted Facts, and exhibits attached to the Declaration of Harold J. Heltzer, filed herewith.

Respectfully submitted

March 27, 2008

s/Harold J. Heltzer

Harold J. Heltzer (Attorney of Record)
Robert L. Willmore
Alex E. Sadler
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2915
Fax: (202) 628-5116

Counsel for Plaintiffs

5021578

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner,** | |
| **Plaintiffs,** | **Nos. 01-256T and 01-257T** |
| | **Judge Charles F. Lettow** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs respectfully submit this Memorandum in opposition to Defendant's Motion for Summary Judgment and in support of Plaintiffs' Cross-Motion for Partial Summary Judgment. Both motions address the issue of whether the obligation of Marriott International Resorts, L.P. ("MIR") to close two 1994 short sale hedging transactions was a "liability" within the meaning of Section 752 of the Internal Revenue Code. Defendant, relying largely on a position first articulated by the Internal Revenue Service ("IRS") in a 1995 revenue ruling, contends that this obligation was a "liability" within the meaning of Section 752. Plaintiffs, relying on a long line of cases in which the courts adopted the IRS's position that a contingent obligation cannot constitute a "liability" for purposes of Section 752, contend that, because this obligation was by its very nature a contingent (rather than fixed and

certain) obligation, it cannot be a "liability" under section 752. For the reasons set forth below, Plaintiffs respectfully request that Defendant's motion be denied and Plaintiffs' cross-motion be granted.

## QUESTION PRESENTED

In 1994, Plaintiffs entered into two short sale transactions involving U.S. Treasury Notes for the purpose of hedging interest rate risks associated with holding a portfolio of fixed-rate mortgages generated through Plaintiffs' time-share business. The legal question presented by both parties' motions is whether the obligation of MIR to close these two short sale hedging transactions by purchasing and then returning replacement Treasury Notes was a contingent obligation (that is, an obligation uncertain as to liability and/or amount), and, therefore, did not constitute a "liability" within the meaning of Section 752 of the Internal Revenue Code.

## STATEMENT OF THE CASE

During the period at issue, Marriott Ownership Resorts Inc. ("MORI"), a wholly-owned subsidiary of Marriott International, Inc. ("Marriott"), was engaged in the business of selling time-share interests in resort properties. (DPF 5.[1]) As part of that business, MORI offered buyers the opportunity to finance their purchases by having the buyer execute a promissory note, secured by a mortgage on the time-

1 Defendant's Proposed Findings of Uncontroverted Facts are cited as "DPF," and Plaintiffs' Proposed Findings of Uncontroverted Facts are cited as "PPF." As explained in Plaintiffs' Proposed Findings of Uncontroverted Facts, Plaintiffs will cite to Defendant's Proposed Findings of Uncontroverted Facts to the extent Plaintiffs have agreed to those proposed findings.

share unit ("Mortgage Notes"). (DPF 6.) These Mortgage Notes bore interest at a fixed rate. (PPF 1.)

In this time frame, MORI periodically sold securitized portfolios of its Mortgage Notes to Teachers Insurance and Annuity Association of America ("TIAA") using a bankruptcy remote special-purpose entity. (DPF 7; PPF 4; PPF 5.) The transactions were priced to provide TIAA a yield of 240 basis points (a 2.4% spread) above average yields on U.S. Treasury securities adjusted to a constant maturity of four years. (PPF 2.) Accordingly, in order to provide TIAA with the specified yield over U.S. Treasury securities, the amount to be received by Marriott from TIAA would fall if interest rates rose between the time the Mortgage Notes were issued and the time of the sale to TIAA. (PPF 3.)

Marriott International Resorts, LP ("MIR") served as the bankruptcy remote special-purpose entity for the sale of the securitized portfolio of Mortgage Notes to TIAA in 1994. (PPF 6.) Marriott needed to use a bankruptcy remote special-purpose entity for the sale to TIAA in order to obtain the highest possible credit rating, and thereby the highest possible price, for the securitized portfolio of Mortgage Notes. (PPF 5.)

In late 1993, Marriott was spun off from its former parent, Marriott Corporation. (PPF 7.) During 1994, while the new Marriott was determining its financial policies, it decided to hold onto the Mortgage Notes, which were earning an attractive rate of interest. (PPF 8.) Marriott was concerned, however, that during the period it was holding the Mortgage Notes, an increase in interest rates

could result in Marriott receiving substantially less for those Mortgage Notes when they were ultimately sold to TIAA. (PPF 3; PPF 9.)

Early in 1994, one of Marriott's advisers, CS First Boston, provided tax planning advice to Marriott that included a short sale of U.S. Treasury securities. (PPF 15.) While Marriott did not engage in the transaction proposed by CS First Boston (PPF 16), it did thereby become aware that one way in which it could reduce the interest-rate risk of holding the Mortgage Notes was through a hedge involving a short sale of U.S. Treasury securities, and that such a short sale hedge could also provide significant tax benefits. (PPF 15.)

Authorization was sought and obtained from Marriott's Corporate Growth Committee on April 22, 1994, to implement an interest rate hedge using a Treasury Note short sale with respect to the then accumulated MORI Mortgage Notes of approximately $65 million. (PPF 10.) Authorization was also sought and obtained for additional possible short sale hedges as MORI accumulated additional Mortgage Notes, but in no event would the short sales exceed MORI's actual mortgage exposure. (PPF 11.)

On or about April 25, 1994, MORI sold short ("First Short Sale") five-year U.S. Treasury securities with a face amount of $65,000,000 and received cash proceeds of $63,703,816. (DPF 10, 12.) As noted, the size of the short sale reflected the volume of Mortgage Notes MORI had accumulated. (PPF 8; PPF 10.)

These cash proceeds were then invested in repurchase obligations ("Repos") that adjusted to the prevailing 30-day LIBOR rate. (DPF 12.) That is, the interest

rate reset every 30 days. (DPF 12, n.4.) As a result, the Repos had a constant value, which was unlike the Mortgage Notes, whose value fluctuated with prevailing interest rates.

The 1% general partner of MIR was Marriott International JBS Corporation ("JBS"), and the 99% limited partner of MIR was MORI. (DPF 2; DPF 15.) On or about May 6, 1994, MORI contributed to MIR (1) Mortgage Notes with a face amount of approximately $65,200,000 and (2) the Repos. (DPF 16, as counter-proposed by Plaintiffs.) MIR assumed MORI's obligation to close the First Short Sale. (DPF 16, as counter-proposed by Plaintiffs.) JBS contributed $1,000,000 to MIR. (DPF 17.)

Subsequently, MORI accumulated additional Mortgage Notes. On or about August 15, 1994, MORI sold short ("Second Short Sale") five-year U.S. Treasury securities with a face amount of $10,000,000 and received cash proceeds of $9,463,451 that MORI also invested in Repos. (DPF 18, 20.) On August 16, 1994, MORI contributed to MIR (1) Mortgage Notes with a face amount of approximately $11,900,000 and (2) the Repos. (DPF 21, as counter-proposed by Plaintiffs.) As with the First Short Sale, MIR assumed MORI's obligation to close the Second Short Sale. (DPF 21, as counter-proposed by Plaintiffs.)

Five months after the First Short Sale, MIR closed the First Short Sale on September 29, 1994, by purchasing replacement U.S. Treasury securities with a face amount of $65,000,000 at a cost of $62,667,034. (DPF 23.) Two months after the Second Short Sale, MIR closed the Second Short Sale on October 17, 1994, by

purchasing replacement U.S. Treasury securities with a face amount of $10,000,000 at a cost of $9,279,811. (DPF 23.)

As Marriott had anticipated, interest rates in fact rose during this time period. (PPF 13.) The two short sales accomplished their hedging purpose; that is, the gain from the short sales offset the reduction in the sales price of the Mortgage Notes to TIAA caused by the increase in interest rates. (PPF 14.)

On October 28, 1994, MORI transferred its 99% partnership interest in MIR to Marriott International Capital Corporation ("MICC"). (DPF 25.) This resulted in a termination of the MIR partnership for Federal income tax purposes. (DPF 26.) Consistent with the then prevailing IRS position and court decisions that indicated that contingent obligations did not constitute "liabilities" under Code Section 752, MORI's basis in MIR reflected the basis of the contributed Mortgage Notes and Repos, but was not reduced by the assumed obligation to close the short sales. In the termination, the basis of MORI (and then MICC) for the MIR partnership interest was transferred to MIR's assets, i.e., the Mortgage Notes. Since this basis was higher than the fair market value of the Mortgage Notes, MIR recognized a loss on the sale of the notes for their fair market value to TIAA. This loss was passed through to MICC and JBS and was reflected in the 1994 Marriott consolidated Federal income tax return. It is this loss that is in dispute in the case.

## STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A "genuine" dispute is one that "may reasonably be resolved in favor of either party." Id. at 250. A "material fact" is one that would affect the outcome of a case. Id. at 248. In determining whether there is a genuine issue regarding a material fact, the court must resolve all inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

With respect to cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). To the extent there is a genuine issue regarding a material fact, both motions must be denied. Id.

## ARGUMENT

The legal issue presented by the two pending motions is whether a contingent obligation, such as the obligation to close a short sale by returning the borrowed security to the lender of the security, is a "liability" within the meaning of Section 752 of the Code.[2] As discussed below, the IRS for many years successfully and repeatedly argued in the courts that a contingent obligation is not a "liability" for purposes of Section 752. Only in 1995 – a year after the transactions at issue in this case – did the IRS, with respect to short sale transactions, change its position by adopting a revenue ruling urged by the Treasury Department. But this revenue ruling should not be accorded any deference given that it is inconsistent (as the IRS plainly understood at the time) with the broader legal principle which had already been well established in the courts.

### A. Defendant's Position That The Obligation To Close A Short Sale Constitutes A "Liability" For Purposes Of Section 752 Was First Announced In A 1995 Revenue Ruling Published After The Transactions At Issue Here. That Revenue Ruling, In Which The IRS Implemented A Policy Position Urged By The Treasury Department, States A View Directly Inconsistent With Numerous Judicial Rulings Which Preceded It In Which Courts Adopted The IRS's Argument That Contingent Obligations Are Not "Liabilities" Under Section 752.

#### 1. In A Well Established Line Of Cases, The IRS Argued And The Courts Agreed That Contingent Obligations – That Is, Obligations Uncertain As To Liability And/Or Amount – Are Not Considered "Liabilities" For Purposes Of Code Section 752.

---

2 All references to the Code refer to the Internal Revenue Code of 1986, 26 U.S.C., as amended. Copies of pertinent Code sections are included in the Appendix.

Section 752 is part of subchapter K of the Code, which governs the income taxation of partners and partnerships. The Section provides for adjustments to the tax basis of a partner's interest in a partnership resulting from the assumption of a liability from the partnership or contribution of a liability to the partnership. Specifically, Section 752 provides as follows:

> (a) INCREASE IN PARTNER'S LIABILITIES.—Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
>
> (b) DECREASE IN PARTNER'S LIABILITIES.—Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

Pursuant to Section 752, an increase in a partner's share of liabilities is treated as a contribution of money that increases the partner's basis for the partnership interest[3] under Code section 722, while a decrease in a partner's share of liabilities is treated as a distribution of money that decreases the partner's basis for the partnership interest under Code section 733(1). The term "liabilities," however, is not defined for this purpose.

For decades, the IRS consistently took the position that the term "liability" for partnership tax purposes referred only to the fixed and certain obligations of a partnership, such as indebtedness. In contrast to fixed obligations such as

---

3 A partner's basis for his partnership interest is commonly referred to as "outside basis," and the partnership's basis for its assets is commonly referred to as "inside basis."

indebtedness, it was the IRS's longstanding position that contingent obligations – that is, where the fact or amount of the taxpayer's obligation was not fixed – were not liabilities under Section 752. For example, as discussed below, in La Rue v. Commissioner, 90 T.C. 465 (1988), the IRS successfully argued that a brokerage partnership's obligation to purchase securities for customers' accounts (which is the economic equivalent of closing a short sale) was not a Section 752 liability because the cost of satisfying that obligation was contingent upon future fluctuations in share prices. Id. at 479-80.

The IRS's refusal to recognize contingent obligations as partnership liabilities was predicated in large part on the so-called "all-events" test, a fundamental tenet of tax accounting under which an expense cannot be deducted from income until all events have occurred fixing the fact and amount of liability. The "all-events" test thus determines the year in which income and deductions may be taken into account by taxpayers who elect the accrual method of accounting. Under that test, a fixed liability does not exist until the fact of liability is established and the amount is determinable with reasonable accuracy.[4]

Perhaps not surprisingly, the IRS's position on what type of obligation can constitute a "liability" for purposes of Section 752 invariably worked to the

---

4 See Treas. Reg. § 1.461-1(a)(2)(i) ("Under an accrual method of accounting, a liability . . . is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability").

detriment of taxpayers, in that it prevented taxpayers from taking a contingent obligation as an expense against the partnership's taxable income or recognizing the obligation as a liability for partnership tax purposes. The IRS successfully and repeatedly maintained this position in tax disputes before the United States Tax Court and various refund tribunals.

A seminal case in this regard is Helmer v. Commissioner, 34 T.C.M. (CCH) 727 (1975), in which the IRS prevailed on its "liability" position with respect to a partnership's distribution of an option premium. There, a partnership received a cash option premium for granting a call option to a third party, and then distributed the premium to its partners in the same year even though the option had neither been exercised nor expired. The IRS successfully contended that the outside basis should not be increased to reflect the partnership's receipt of the option premium because no Section 752 "liability" existed, even though the inside basis had been increased by the amount of the premium.

The Tax Court agreed with the IRS's position in Helmer, notwithstanding the obvious resulting disparity between inside and outside basis. Id. at 730-31. Of particular pertinence to the facts of this case, the Tax Court arrived at this conclusion even though the partnership had a legally enforceable obligation to deliver the optioned property if and when the option was exercised. But, because the taxpayer had neither a fixed liability to repay the funds received nor a fixed

liability to deliver the optioned property, there was no "liability" within the meaning of Section 752. Id.[5]

Another frequently cited case in which the IRS prevailed in its Section 752 "liability" position is Long v. Commissioner, 71 T.C. 1 (1978), aff'd in part and rev'd in part on other issues, 660 F.2d 416 (10th Cir. 1981), which dealt with an estate's recognition of taxable gain on the liquidation of the decedent's partnership interest. The question there turned on whether certain claims against the partnership in litigation could be considered "liabilities" includable in the estate's outside basis under Section 752. Because these claims had been in litigation at the time of the decedent's death, the Tax Court held that the claims were not sufficiently definite to be treated as liabilities that could be included in the decedent's outside basis. Id. at 7-8 ("Although they may be considered 'liabilities' in the generic sense of the term, contingent or contested liabilities . . . are not 'liabilities' for partnership basis

---

5 The IRS's position that contingent obligations do not constitute Section 752 "liabilities" predates Helmer. In a 1968 General Counsel Memorandum involving the question of whether partners can increase their basis in a partnership by reason of the partnership's obligation to perform under a contract, the IRS stated that "[t]he liabilities referred to in Section 752 of the Code are those liabilities which arise from a debtor-creditor relationship with a sum certain due at a fixed or determinable date of maturity." G.C.M. 33,948 (Oct. 22, 1968). In other words, only debt obligations are "liabilities" under Section 752. This position was subsequently confirmed in a published ruling, Rev. Rul. 73-301, 1973-2 C.B. 215.

It also is worth noting that the reason the partners were seeking to increase their basis was because the partnership had distributed progress payments to them for yet to be performed contractual obligations. The G.C.M. thus had the result (as in Helmer) of creating a mismatch between outside and inside basis – a result obviously inconsistent with the Government's argument here that outside and inside basis should always match.

purposes at least until they have become fixed or liquidated. . . . Those liabilities should be taken into account only when they are fixed or paid.").[6]

The IRS successfully argued for its position regarding what type of obligation constitutes a Section 752 "liability" in many other cases as well; always, of course, to the detriment of the taxpayer. See Brountas v. Commissioner, 692 F.2d 152, 158 (1st Cir. 1982) (Breyer, J.) (holding that nonrecourse obligations to be satisfied only out of oil production payments are contingent obligations that are not liabilities within the meaning of Section 752); Gibson Prods. Co. v. United States, 637 F.2d 1041, 1045 (5th Cir. 1981) (holding that, because a partnership's liability on a nonrecourse note is contingent upon possible future oil and gas production, it is not a liability for purposes of Section 752); Fox v. Commissioner, 80 T.C. 972, 1020 (1983), aff'd sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984) (holding that nonrecourse notes are too speculative to be considered true liabilities of a partnership because the notes are payable only from the proceeds of book royalties dependent on the success of the books as a commercial enterprise).

Perhaps the most instructive of these cases for the two motions before the Court is La Rue v. Commissioner, 90 T.C. 465 (1988), in that the obligations in that case were the economic equivalent of the short sale obligations at issue here. In La Rue, the Tax Court addressed whether reserves reflecting certain "back office"

---

6 This holding was expressly affirmed by the Tenth Circuit. 660 F.2d at 419 ("[The Tax Court] held that because the lawsuit claims against the partnership were indefinite and contingent liabilities, they should not be recognized for basis adjustment purposes until the exact amounts of the liabilities were established. . . . We agree with this approach and holding.").

errors of a brokerage partnership were liabilities that could be included in the outside basis of its partners' interests upon the acquisition of their interests by a third party. The partners contended that the reserve for these "back office" errors was a Section 752 liability that increased their outside bases. Id. at 477-78.

The "back office" errors at issue in La Rue included the brokerage's failure to execute numerous trade orders by its customers. The brokerage's resulting obligation was identical to that of closing a short sale, i.e., definite securities had to be purchased and delivered by the brokerage. The amount of this obligation was computed just like a short sale: "[g]ain or loss was incurred on these transactions measured by the difference between the customer's contract price [equivalent to short sale proceeds] and what the broker had to pay to obtain the securities." Id. at 468. As noted by the court, "[t]he precise amount of gain or loss was not determinable until the securities in question were actually bought or sold." Id. at 474-75.

The Tax Court accepted the IRS's argument that these obligations were not Section 752 liabilities. Citing its opinion in Long, the Tax Court held that the "all-events" test determines when a liability is includible in basis under Section 752. Id. at 478. Under that test, a liability can only be included in basis "for the taxable year in which all the events have occurred which determine the fact of liability and the amount thereof can be determined with reasonable accuracy." Id. The Tax Court concluded that the "all events" test was not satisfied because the amount of the liabilities were not determinable with reasonable accuracy "until the securities

are actually purchased . . . and the transaction closed." Id. at 479. As the Tax Court explained:

> Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.
>
> . . . .
>
> [T]he exact amount of loss or gain was not determinable until actual purchase or sale. Valuation of the claims may be a purely ministerial matter because of the ready market for securities, but it is not readily determinable until the purchase or sale occurs. . . . Accrual accounting requires that the amount be determinable with 'reasonable accuracy.' A loss is not determinable until the securities are actually purchased or sold, and the transaction closed.

Id. at 479-80 (footnote omitted; emphasis added).

Accordingly, the Tax Court concluded that the reserves were not a fixed obligation that could be included in bases as a Section 752 "liability." Id. It seems beyond reasonable dispute that this holding simply cannot be reconciled with the argument the Government now makes in its Motion for Summary Judgment.

**2. The Obligation To Close A Short Sale Of Borrowed Securities By Purchasing And Then Returning Replacement Securities To The Lender Of Those Securities Is By Its Very Nature A Contingent Obligation Because The Cost Of Closing The Short Sale Cannot Be Determined Until The Replacement Securities Have Been Purchased By The Short Seller.**

A short sale is a sale of a security that the seller must borrow in order to deliver. The short seller, in turn, has an executory obligation to return the borrowed security to the lender at an unspecified point in the future. Short sales can be done for speculative reasons (i.e., where the short seller expects the value of the security to decline) or, as was the case here, to hedge the risk that the value of an asset held by the short seller will decline. The obligation to close a short sale by

purchasing the replacement security in order to return that security to the lender is by its very nature a contingent obligation because the cost of that obligation cannot be determined until the replacement security has been purchased.

A short sale is recognized to be a contingent obligation and treated as such for Federal income tax purposes. The timing and amount of a short sale obligation are not determinable until the borrowed securities are actually returned to the securities lender. Indeed, in some cases there is no need to close a short sale, which may remain open indefinitely. Because the short seller's gain or loss cannot be determined until the short sale is closed, the Code and Treasury Regulations treat short sales as tax-deferred "open" transactions that do not give rise to taxable income or loss until the short sale is closed. See Code § 1233; Treas. Reg. § 1.1233-1(a)(1) ("For income tax purposes a short sale is not deemed to be consummated until delivery of property to close the short sale.").

With respect to the contingent nature of short sales, Plaintiffs refer the Court to the expert witness report submitted in this case by Dr. Owen A. Lamont, a recognized expert on short sale transactions.[7] In his expert report, Dr. Lamont (1) explains the mechanics of short selling generally, and (2) offers his opinions regarding the nature of the obligation that is created when a security is borrowed in order to short it. See Plaintiffs' Exhibit 8.

---

[7] Attached as Exhibit 8 to the Declaration of Harold J. Heltzer is the Declaration of Owen A. Lamont attesting to and appending his Expert Witness Report dated October, 2003 ("Lamont Expert Report"). Dr. Lamont was deposed by Defendant's counsel on January 29, 2004, regarding the matters covered in his expert witness report.

With respect to the mechanics of short selling, at pages 2 through 4 of his expert report Dr. Lamont describes the various steps of a short sale, as well as the purposes for which short sales are typically undertaken (e.g., speculation and hedging).

At pages 4 through 9 of his expert report, Dr. Lamont describes the contingent nature of short selling. His opinions are succinctly set forth in his Summary:

> Borrowing a security and selling it short creates a contingent obligation. The value of the obligation, the timing of the obligation, and how the obligation is fulfilled are uncertain. The value of the loan fluctuates with the price of the borrowed security. The timing of the obligation is also unknown, and is not completely under the control of the short seller. The lender may demand the return of the borrowed security at any time. External events, such as squeezes or adverse price movements that decrease the collateral of the short seller, can force the short seller to close his position. The short seller is obliged to return the security to the lender, but in some cases this may not be necessary. The securities loan can be stretched out indefinitely. If the issuing company goes bankrupt, the loan might be terminated without actually returning the borrowed security.

Plaintiffs' Exhibit 8, at 3; Lamont Expert Report, at 2.

In this report, Dr. Lamont notes that, with respect to the price risk short sellers face (i.e., the risk that the price of the security will rise), short sellers "never know exactly at what price they will cover [return the replacement security], when they will cover, or what event might force them to cover." Lamont Expert Report, at 4-5.[8] In that regard, the short seller does not necessarily control when he will close

---

[8] An additional financial risk the short seller faces is holding costs, which increase the longer he takes to cover. Id.

the short position. Since short sales are typically day-by-day, the lender can demand that the securities be returned at any point (the "recall risk" or "buy-in risk"). Id. In addition, the short seller may be forced to close the short sale to the extent he cannot (or will not) post additional collateral as the value of the borrowed security rises. Id. at 6.[9]

In addition, there are some circumstances where a short sale is never closed or is not closed for many years. One such circumstance is where the security ceases to have value, a so-called "terminal short." Id. at 7-8. Another circumstance is where the borrower does not want to close the short sale in order to defer recognition of capital gains tax, and the lender does not demand the return of the security because he is receiving income from the security's loan. In such a situation, the short sale can remain open for years. Id. at 8.

Moreover, as discussed above, Defendant's position that the obligation to close a short sale is not a contingent liability because the borrower is obligated to return replacement securities cannot be reconciled with the holding of La Rue. In that case, the brokerage, in order to correct its "back office" errors, had an undisputed legal obligation to purchase and deliver specific securities. The Tax Court was quite clear that, although there was no contingency regarding the fact of liability, the obligation was still a contingent obligation (and thus not a Section 752

---

9 As Dr. Lamont notes in his expert report, these events can cause a so-called "short squeeze," when many short sellers are required to cover their positions at the same time. Id. at 6. Such a short squeeze apparently occurred in 1991 with respect to two-year Treasury Notes when Salomon Brothers nearly cornered the supply of those securities. Id. at 7.

"liability") because the cost of the obligation could not be determined until the securities to be delivered were actually purchased.

**3. In 1995, The IRS At The Urging Of The Treasury Department Issued A Revenue Ruling Holding That The Obligation To Close A Short Sale Is A "Liability" Under Section 752 Even Though The IRS Clearly Understood That This Conclusion Was Inconsistent With Its Position That Contingent Obligations Are Not "Liabilities" Under Section 752.**

In Rev. Rul. 95-26, 1995-1 C.B. 131, issued a year after Marriott engaged in the hedging short sales at issue here, the IRS suddenly reversed its position regarding contingent obligations and held that the obligation to close a short sale would be treated as a "liability" under Code Section 752. The reasoning proffered in Rev. Rul. 95-26 for this outcome was twofold: (1) a short sale creates an "obligation" to return the securities that were borrowed to effect the sale, and (2) the cash proceeds of the short sale create partnership assets, thereby increasing basis and bringing the obligation within the definition of a liability set out in Rev. Rul. 88-77, 1988-2 C.B. 128.[10] The ruling's rationale appears to be that, because the short sale proceeds create basis, they create a "liability" even though the proceeds remain untaxed in the recipient's hands until closure of the sale.

Apparently, the reason for the IRS's change of its long-standing position in 1995 was that the Treasury Department felt a revenue ruling was needed to invalidate transactions where the contingent nature of the short sale might actually

---

10 Rev. Rul. 88-77 is discussed in subsection 4, infra.

benefit taxpayers. As stated in an IRS memorandum produced in this litigation explaining the need to publish Rev. Rul. 95-26:

> **SOURCE:** This project was established at the request of Treasury.
>
> **REASON FOR PUBLICATION:** Publication is needed because some taxpayers are engaging in short sales through partnerships with the hope of avoiding a basis increase in their partnership interests. This would enable taxpayers to create gains that can be offset by losses that would otherwise expire.

See Exhibit 4 to the Declaration of Harold J. Heltzer.

While the transaction described in Plaintiffs' Exhibit 4 is different from the short sale transactions at issue in this case,[11] the point remains that the IRS issued Rev. Rul. 95-26 for the explicit purpose of reaching a specific policy result desired by the Treasury Department – even though that result was based on reasoning that was directly contrary to a position that the IRS had consistently taken at the expense of countless taxpayers.

Through what was essentially an exercise of administrative fiat (but obviously without the benefit of public notice and comment that would have accompanied Treasury Regulations), the IRS simply attempted to change the law with respect to how contingent obligations should be treated – at least with respect to short sales – for partnership tax purposes.

It is not possible to reconcile the position of Rev. Rul. 95-26 with the IRS's interpretation of Section 752 over the previous decades other than to note that both

---

11 The fact pattern that the Treasury Department was concerned about seems to be similar to that of the Salina case discussed infra.

positions have the result of serving the Government's interest in increasing taxable income. There is simply no principled distinction, for example, between a short sale obligation and the contingent obligation at issue in La Rue, or, for that matter, the numerous other contingent obligations that the IRS had previously concluded were not partnership liabilities under Section 752. Indeed, the result-driven genesis of Rev. Rul. 95-26 was openly acknowledged in another IRS document produced in this litigation in which the Treasury Department's position was summarized:

> Treasury wants reach right result re outside basis too: a basis kick-up there too, no matter how get to that result, and only way there is § 752: using it to cram through result: understands it is not an entirely clean way of doing it.

See Exhibit 5 to the Declaration of Harold J. Heltzer (emphasis added).

Simply put, Plaintiffs' Exhibit 5 shows that the IRS clearly understood that the ruling the Treasury Department was urging was inconsistent with the IRS's long-standing position, but that Treasury wanted to reach that result "no matter how [to] get to that result." And, as noted there, the "only way" to get to that result was through Section 752, which would be used to "cram through [that] result" even though Treasury understood that it was "not an entirely clean way of doing it."

**4. Contrary To Defendant's Argument, The Change Of Position Announced In Rev. Rul. 95-26 Was Not Consistent With Either Rev. Rul. 88-77 Or The Definition of Liability In The Treasury Department's 1989 Temporary Regulations, Which Dealt With An Entirely Different Issue Involving Cash Basis Taxpayers.**

In its summary judgment brief (at 24-26), Defendant takes the position that Rev. Rul. 95-26 was not in fact a change in position regarding the definition of "liability" under Section 752, but rather was consistent with a definition of

"liability" provided in a 1988 revenue ruling, Rev. Rul. 88-77, 1988-2 C.B. 128, 129, and repeated in a 1989 Temporary Treasury Regulation, Temp. Treas. Reg. § 1.752-1T(g), T.D. 8237, 1989-1 C.B. 180, 192 (Dec. 30, 1988). In relevant part, Rev. Rul. 88-77 and the 1989 temporary regulation defined a partnership liability to include an obligation only if and to the extent that the obligation created or increased basis in partnership assets. Defendant contends that, because the proceeds generated by a short sale create basis in partnership assets, a short sale satisfies this definition.

Defendant's argument, however, completely misconstrues Rev. Rul. 88-77 and the 1989 temporary regulation, neither of which had anything to do with the treatment of contingent obligations such as short sales. Rather, both were issued at the specific direction of Congress to limit the scope of what constituted a "liability" when a cash basis taxpayer transferred its accounts payable to a related entity.[12] By way of brief background, until 1978 a literal reading of Section 357(c), which covers transfers to controlled corporations, treated such accounts payable as liabilities. The IRS similarly treated accounts payable of cash basis partnerships as Section 752 liabilities. Rev. Rul. 60-345, 1960-2 C.B. 211. This treatment could generate gain to the transferring taxpayer, even though it had never been able to

---

12 Under Code Section 351, a transfer of property to a corporation controlled by the transferor in exchange for corporate stock is generally tax-free. The transferor takes a basis in the stock equal to the basis of the transferred property. Code Section 358(a)(1). However, if liabilities are assumed by the corporate transferee in connection with the transfer, basis is reduced by the amount of the liabilities assumed. Id. If the assumed liabilities exceed the basis of the transferred assets, the transferor is required to recognize gain to that extent under Code Section 357(c).

deduct the payables since it used the cash method. This result was widely regarded as harsh and unfair, prompting Congress in 1978 to enact Section 357(c)(3), which provided that deductible liabilities of a cash basis taxpayer were excluded from Section 357(c), except for liabilities that created basis. With respect to partnerships, Congress admonished the IRS in the legislative history accompanying the Tax Reform Act of 1984 to revoke Rev. Rul. 60-345 in favor of an interpretation of Section 752 that was consistent with Section 357(c). See H.R. Rep. No. 861, 98th Cong., 2d Sess. 856-57 (1984), 1984-3 (Vol. 2) C.B. 110, 111.

The IRS finally responded to the 1984 legislative history when it issued Rev. Rul. 88-77, 1988-2 C.B. 128, which revoked Rev. Rul. 60-345 and, by analogy to Section 357(c), limited a partnership liability to include an obligation "only if and to the extent that" incurring the liability created or increased basis in partnership assets, gave rise to an immediate deduction, or decreased a partner's basis in his partnership interest. 1988-2 C.B. 128, 129. There is no indication in Rev. Rul. 88-77 that the IRS was in any way changing its longstanding interpretation of Section 752 to exclude contingent obligations. Indeed, there is no suggestion that the IRS was doing anything other than modifying the definition of the term "liability" to exclude cash basis payables that did not meet certain conditions. This is confirmed by the holding of Rev. Rul. 88-77: "For purposes of computing the adjusted basis of a partner's interest in a cash basis partnership, accrued but unpaid expenses and accounts payable are not 'liabilities of a partnership' or 'partnership liabilities' within the meaning of section 752 of the Code." Id.

A few weeks later, the Treasury Department promulgated Temp. Treas. Reg. § 1.752-1T(g), which included a definition of "liability" that was virtually identical to that in Rev. Rul. 88-77. See T.D. 8237, 1989-1 C.B. 180, 192 (Dec. 30, 1988). There is again absolutely no indication that the IRS was changing its interpretation of Section 752 with respect to contingent obligations. In this regard, the Treasury Department's preamble made no broad statement that the temporary regulation was redefining the term "liability" beyond its traditional parameters, as one would expect if such a significant change had been intended. Moreover, all references to "liability" in the preamble speak in terms of "debt" or payments to "creditors." In short, like Rev. Rul. 88-77, the 1989 temporary regulation dealt only with Congress' mandate to exclude certain cash basis payables from the definition of liabilities under Section 752.[13]

Accordingly, contrary to Defendant's argument, the obvious purpose of Rev. Rul. 88-77 and the 1989 temporary regulation was not to expand the definition of "liability" under Section 752 to include contingent obligations, but to narrow the definition of "liability" to permit cash method taxpayers to contribute a business to a partnership without risking immediate recognition of taxable income.

---

13 When the Treasury Department issued proposed regulations under Section 752 in 1991, the temporary regulation's definition of "liability" was omitted without explanation. 56 Fed. Reg. 36,704 (July 31, 1991). The 1991 proposed regulations did not revoke Rev. Rul. 88-77, which remained in effect.

## B. Because The Obligation To Purchase And Return Securities Borrowed To Implement A Short Sale Is A Contingent Obligation, That Obligation Cannot Be A "Liability" For Purposes Of Section 752.

### 1. In Its Recent Decision In *Jade Trading, LLC v. United States*, The Court Of Federal Claims Confirmed That Contingent Obligations Do Not Constitute "Liabilities" For Purposes Of Section 752. Other Recent Decisions By Refund Tribunals Have Reached The Same Conclusion.

In December of last year, Judge Williams of this Court confirmed in Jade Trading, LLC v. United States, 80 Fed. Cl. 11 (2007), that a contingent obligation is not considered to be a "liability" for purposes of Section 752. In that case, the taxpayer entered into a "spread" transaction involving offsetting foreign currency options. The taxpayer contributed its purchased option to Jade Trading (which was treated as a partnership), and Jade Trading assumed the taxpayer's obligation under the sold option. The issue before Judge Williams was whether the obligation assumed by Jade Trading was a "liability" under Section 752.

In its consideration of the issue, the Court in Jade Trading expressly rejected the Government's argument that the assumed obligation was a Section 752 "liability." Specifically, the Court observed:

> In *Helmer*, the Tax Court held that a contingent obligation such as an option was not a liability under *section 752* because a partnership's obligation under the option does not become fixed until the option is exercised. *Helmer*'s reasoning that contingent obligations are not liabilities was applied in subsequent cases. *Salina P'ship L.P. v. Comm'r*, 80 T.C.M. (CCH) 686, 697 (2000) (recognizing *Helmer* stands for the general proposition that amounts owed or paid to a partnership in an open transaction for tax purposes do not generate adjustments to the partners' bases in their partnership interests until the transaction is closed and the tax characteristics of the transaction can be determined.); *see also LaRue v. Comm'r*, 90 T.C. 465, 479-80 (1988) (non-fixed obligations of a partnership could not be used to

> adjust the partners' bases under *section 752*); *Long v. Comm'r*, 71 T.C. 1 (1978) (stating that contested or contingent liabilities such as claims were not liabilities within the meaning of *section 752*); *see generally CEMCO Investors, LLC v. United States*, No. 04-8211, 2007 U.S. Dist. LEXIS 22246 (N.D. Ill. Mar. 27, 2007), *appeal docketed*, No. 07-2220 (7th Cir. May 25, 2007) (recognizing that *Helmer* was good law prior to *Notice 2000-44*, permitting a taxpayer to ignore a short option as a liability under *section 752*).
>
> Thus, under *Helmer* and its progeny, the sold call option contributed to Jade would not be considered a liability for purposes of *section 752* and the inflated bases resulting from the Ervin LLC's contribution of the spread transaction to Jade complied with *section 752*.

Id. at 44-45 (footnote omitted). In a footnote to this discussion, the Court also addressed the 1995 IRS memorandum discussed in subsection A.3. above:

> Plaintiffs further rely on an internal IRS memorandum known as the "Helmer/Cram Memo" drafted by former IRS attorney Richard Starke interpreting the decision in *Helmer*. . . . . Two pages of this memorandum were inadvertently produced in *Marriott Int'l Resorts, L.P. v. United States*, 63 Fed. Cl. 144, 145-46 (2004), resulting in a subject-matter waiver of the entire document. . . . The IRS memorandum concludes that an option is not a liability for tax purposes, stating:
>
>> Existing authority is contrary to a position that options create liabilities. *Helmer* held that no partnership liability is created upon receipt of option payments by a partnership; payments received were without restrictions except that upon exercise of the options the amounts would be applied against the purchase price.

Id. at 44, n.65 (citations omitted).

In the above quoted passage from Jade Trading, the Court cites Cemco Investors, which arrived at the same conclusion. Cemco Investors, LLC v. United States, 2007-1 U.S.T.C. ¶ 50,385 (N.D. Ill. 2007), aff'd, 515 F.3d 749 (7th Cir. 2008). In Cemco Investors, the District Court, citing Helmer, Long and La Rue (among

other cases), agreed with the taxpayer that "[u]ntil recently, the law respecting whether an option contract should be treated as a liability under section 752 actually supported [the taxpayer's] position." Id. at p. 87,973. Nonetheless, the Government prevailed in Cemco Investors in light of Treasury Regulations promulgated in 2003 that define the term "liability," and apply that definition retroactively to assumptions of liability by partnerships going back to October of 1999.

As discussed in Cemco Investors, this new definition promulgated in 2003 defines the term "liability" to include "any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code. " Treas. Reg. § 1.752-1(a)(4)(ii) (2003) (emphasis added). As the notice discussing this new definition observes, under this definition, the term liability includes "obligations under a short sale." Notice of Proposed Rulemaking, 68 Fed. Reg. 37,434 (June 24, 2003). Tellingly, the notice also concedes that "[t]he definition of liability contained in these proposed regulations does *not* follow *Helmer v. Commissioner."* Id. (emphasis added).

It is noteworthy, in this regard, that, during the oral argument in Cemco Investors before a panel of the Seventh Circuit,[14] counsel for the Government conceded that the law on the Section 752 "liability" issue prior to the effectiveness of

---

[14] A recording of the oral argument in Cemco Investors is available on the Seventh Circuit's website. The quoted passage can be found at approximately 26 minutes into the argument.

the new regulations supported the taxpayer's position. As stated there by Government's counsel during the argument:

> We have to draw a little bit of a distinction between the technical application of the section 752 rules regarding, you know, is a contingent liability taken into account for purposes of 752? That's sort of a technical issue, and prior to the retroactive effective date of these new regulations, the answer to that question—the case law supported the position that section 752 did not apply to contingent obligations.

In its recent decision affirming Cemco Investors (515 F.3d 749), the Seventh Circuit did not determine the proper interpretation of the law prior to the adoption of these Treasury Regulations, but instead simply decided that those regulations could in fact be applied retroactively to the transaction at issue.

Another recent decision that addressed this issue is Klamath Strategic Investment Fund, LLC v. United States, 440 F. Supp.2d 608 (E.D. Tex. 2006), which dealt with a taxpayer's contingent obligation to repay a "loan premium." Citing Helmer, Long and La Rue, the Court in Klamath arrived at the same conclusion regarding the meaning of the term "liability" as did the Court of Federal Claims in Jade Trading and the District Court in Cemco Investors. Id. at 614-17. In ruling against the Government on the parties' cross-motions for partial summary judgment, the court held that taxpayers were entitled to rely on the IRS's position. Id. at 625-26 (in that the IRS had successfully asserted in litigation for two decades

that contingent obligations were not liabilities under Section 752, taxpayers "could justifiably rely on [these Section 752 cases] when making tax decisions").[15]

A recent decision that at first blush seems to support the Government's position – but in fact does not – is COLM Producer, Inc. v. United States, 460 F. Supp.2d 713 (N.D. Tex. 2006), appeal pending, Kornman & Assoc. Inc. v. United States, No. 06-11422 (5th Cir.). There, the taxpayer (COLM) asserted that the obligation to close a short sale was not a liability under Section 752. The taxpayer's obligation had been assumed by a partnership, Valiant, that was 99.9% owned by another partnership, GMK, in which the taxpayer had a 99.9% interest. GMK sold the interest in Valiant to another party, Czerwinski. The District Court held that:

> Although COLM correctly states that "liability" within the meaning of *section 752* does not encompass contingent obligations, COLM erroneously concludes that the obligation to replace the borrowed T-Notes constitutes a contingent obligation. The cases on which COLM relies stand for the proposition that liabilities that are contingent as to the obligation itself or as to the amount of the obligation do not qualify as "liabilities" for purposes of *section 752*. However, the obligation to close a short sale by replacing the borrowed T-Notes is not contingent in this way. First, the existence of the obligation to replace the borrowed T-Notes was not itself contingent; the obligation existed as a legally enforceable obligation when GMK sold Valiant to Czerwinski. Second, the amount of the obligation became fixed at the moment GMK sold Valiant because at that time GMK could determine its gain or loss on the short sale transaction according to the current market rates for T-Notes; any future fluctuations in the interest rates affected

---

15 Citing La Rue, the court in Klamath also specifically rejected the Government's argument that the rule that a contingent obligation does not constitute a Section 752 "liability" only applies in those situations where the liability may never actually be incurred. As noted by the court, "[t]he government's proposed distinctions are not borne out by the cases." Id. at 617-18.

> the gain or loss of the short sale transaction only as to Czerwinski, not GMK.

Id. at 716 (footnote omitted).[16]

Thus, the court recognized that, in order to constitute a Section 752 "liability," an obligation had to be established as matter of definite liability and had to be fixed in amount. The court mistakenly believed that the "fixed in amount" requirement was met at the time of sale of Valiant, and ruled accordingly. However, even the Government recognizes that the court erred in this regard. In its appellate brief in COLM (at p. 21), the Government concedes:[17]

> We agree with appellants that the District Court erred in using, *sua sponte*, the date of sale of a partnership interest to determine whether a partnership obligation is fixed or contingent. The proper time for determining whether an obligation is fixed is the date the obligation becomes a partnership obligation.

In light of this concession by the Government,[18] the analytical framework set forth in COLM in fact supports Plaintiffs' position, because, under that analysis, the obligation to close the short sale was not fixed in amount at the time it was

---

16 The omitted footnote summarizes the holdings of La Rue, Long, Helmer and Gibson Products. The Court's summary of the holding in La Rue is particularly worth noting: "clarifying that a fixed and definite contractual liability does not amount to a 'liability' under *section 752* until the cost of that obligation becomes fixed in amount" (emphasis added). Id. at 716 n.1.

17 See Exhibit 9 to the Declaration of Harold J. Heltzer.

18 The Government goes on to argue in its appellate brief (at p. 22) that "the obligation to replace the borrowed T-Notes was a fixed obligation at all times." However, this directly contradicts the holding in La Rue that, although the fact of the obligation may be definite and fixed, the amount of that obligation is not.

contributed to the partnership. Thus, Jade Trading, Cemco Investors, Klamath, and COLM all support Plaintiffs' position here.

The one decision which supports the Government's legal position is the 2000 Tax Court Memorandum in Salina Partnership LP v. Commissioner, 80 T.C.M. (CCH) 686 (2000).[19] That case involved the issue of whether the obligation to close a short sale constituted a "liability" under Section 752. While the court held in favor of the Government, the court's analysis is, at best, superficial. For example, the Salina court did not go through the careful analysis of the prior case law that the Court of Federal Claims did in Jade Trading or the District Courts did in Cemco Investors and Klamath. Rather, the "authority" upon which the Salina court ultimately based its holding was Black's Law Dictionary, which defined "liability" in the following terms:

> 1. The quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment. * * * 2. A financial or pecuniary obligation * * *.

80 T.C.M. at 700.

While relying on this very broad definition in Black's Law Dictionary, the Salina court did not discuss, much less analyze, the Tax Court's opinion in La Rue, even though the obligation in La Rue was the economic equivalent of the obligation

[19] Tax Court Memorandum opinions may be cited, but are not considered controlling precedent. See Dunway v. Commissioner, 124 T.C. 80, 87 (2005); Nico v. Commissioner, 67 T.C. 647, 654 (1977), rev'd on other grounds, 565 F.2d 1234 (2d Cir. 1977).

to close a short sale.[20] This is remarkable given that a Tax Court Memorandum cannot overrule a Tax Court Opinion and the precedents cited therein. See Newman v. Commissioner, 68 T.C. 494, 504 n.4 (1977).[21]

The simple, yet dispositive, response to this use of the above quoted definition from Black's Law Dictionary is that such an analytical approach cannot possibly be right since, under that definition of "liability," all the cases discussed above – Helmer, Long, La Rue, Brountas, Gibson, Fox, Jade Trading, Cemco Investors, and Klamath – would have been wrongly decided given that the obligation in each of these cases would qualify as a "liability" under the quoted definition. Perhaps that is why the Tax Court in Long – yet another Tax Court opinion the Salina court failed to discuss – expressly rejected defining the term "'liabilities' in the generic sense of the term." 71 T.C. at 7-8.

---

20 La Rue is only cited in a passing reference. Id. at 696.

21 The Salina court does discuss Helmer at some length, and concludes that its decision is not inconsistent with Helmer. It is difficult to square that conclusion, however, with the Government's statement in the Notice accompanying its 2003 proposed regulations that the expanded definition of liability (which brings short sales within the ambit of Section 752) "does not follow *Helmer v. Commissioner*." See p. 29, supra. See also Klamath, supra, at 620 ("[F]rom this Court's view, the promulgation [of the 2003 Regulation] – and the statements made in conjunction with the promulgation – is compelling evidence that the IRS knew it was seeking to change settled law . . . .").

**2. Rev. Rul. 95-26 Does Not Evidence Thoroughness Of Consideration, Employs Flawed And Invalid Reasoning, And Is Directly Inconsistent With The Long Line Of Cases In Which Courts Adopted The IRS's Position That A Contingent Obligation Cannot Be A "Liability" For Purposes Of Section 752. Accordingly, Rev. Rul. 95-26 Does Not Have The "Power To Persuade" And Is Not Entitled To Any *Skidmore* Deference.**

Revenue rulings "have only such force as Congress chooses to give them, and Congress has not given them the force of law." Dixon v. United States, 381 U.S. 68, 73 (1965); USA Choice Internet Serv., LLC v. United States, 73 Fed. Cl. 780, 792 (2006) ("Revenue rulings lack the force of law.") (citations omitted). Rather, revenue rulings provide only the IRS's position regarding how the law should be interpreted. See Treas. Reg. § 601.601(d)(2)(i)(a) (defining a revenue ruling as "an official interpretation by the [IRS] . . . published for the information and guidance of taxpayers, [IRS] officials, and others concerned."); Western Co. of N. America v. United States, 323 F.3d 1024, 1032 (Fed. Cir. 2003) ("[R]evenue rulings merely represent the position of the United States and do not bind this court.") (citations omitted).

Since revenue rulings lack the force of law, they are not entitled to Chevron deference, under which courts defer to an agency's reasonable interpretation of an ambiguous statute.[22] Rather, revenue rulings are given "limited reliance, denominated 'Skidmore deference,'" under which they "are entitled to deference 'only to the extent that those interpretations have the 'power to persuade.''"

---

[22] Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44 (1984).

America Online, Inc. v. United States, 64 Fed. Cl. 571, 580 (2005) (quoting Christensen v. Harris County, 529 U.S. 576, 587 (2000) (in turn quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).[23] Under Skidmore, the weight to be given an agency interpretation turns on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." United States v. Mead Corp., 533 U.S. 218, 228 (2001) (quoting Skidmore, 323 U.S. at 140). "Agencies in the end receive *Skidmore* respect because of the persuasiveness of their reasoning, not in spite of it." Officemax, Inc. v. United States, 428 F.3d 583, 595 (6th Cir. 2005).

Rev. Rul. 95-26 does not withstand scrutiny under any of the Skidmore factors and, ultimately, is unpersuasive and undeserving of judicial deference. Neither the face of the ruling nor the circumstances surrounding its issuance suggest any "thoroughness evident in its consideration." To the contrary, the "analysis" of Rev. Rul. 95-26 consists, in total, of four sentences and contains

---

23 While the Supreme Court has deferred ruling on whether revenue rulings are entitled to deference, see United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 219 (2001), several courts have agreed with this Court's conclusion that revenue rulings are entitled, at most, to Skidmore deference. See Aeroquip-Vickers, Inc. v. Commissioner, 347 F.3d 173, 181 (6th Cir. 2003); Omohundro v. United States, 300 F.3d 1065, 1068 (9th Cir. 2002); Tedoken v. Commissioner, 84 T.C.M. (CCH) 657, 660 (2002). Furthermore, the Federal Circuit has held that revenue procedures, which are "promulgated with a comparable degree of formality and care" as revenue rulings, are entitled to Skidmore deference, Federal Nat'l Mtg. Ass'n v. United States, 379 F.3d 1303, 1307-09 (Fed. Cir. 2004), and before Chevron the Court of Claims accorded Skidmore deference to revenue rulings. St. Louis Bank for Coops v. United States, 624 F.2d 1041, 1050-51 (1980).

absolutely no discussion of cases such as Helmer, Long, and La Rue excluding contingent obligations from the definition of "liabilities" under Section 752.[24] Cf. Officemax, Inc., 428 F.3d at 594 ("[T]he one-page analysis in this revenue ruling does not contain the traditional hallmarks for receiving deference."); accord Federal Nat'l Mtg. Ass'n v. United States, 379 F.3d 1303, 1309 (Fed. Cir. 2004) (declining to give deference to a conclusory IRS revenue procedure). Furthermore, as shown above, the IRS's own administrative record establishes that Rev. Rul. 95-26, far from embodying a rigorous analysis of Section 752, was a policy-driven attempt to "cram through" a desired result. See pp. 21-23, supra; Plaintiffs' Exhibits 4 & 5.

There also is no validity in the reasoning employed in Rev. Rul. 95-26, which the IRS itself acknowledged was "not an entirely clean way" of accomplishing the result sought by the Treasury Department. Id. The ruling's purported logic is that, since the cash received by a short selling partnership when (and if) it sells the borrowed securities creates basis to the partnership, the obligation to cover the short sale meets the definition of a "liability" under Rev. Rul. 88-77. However, this

---

[24] The "analysis" of Rev. Rul. 95-26, in its entirety, is as follows:

> A short sale creates an obligation on the part of the seller to return the borrowed securities. See, e.g., Deputy v. du Pont, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118 (a short sale creates an obligation although not an indebtedness). In addition, the cash received in the short sale is an asset of the partnership. Thus, the basis of the partnership's assets is increased. Therefore, [the partnership's] short sale creates a liability under § 752, and the adjusted bases of the partnership interests of [the partners] are increased under § 722 to reflect their shares of the liability under § 752.

Rev. Rul. 95-26, 1995-1 C.B. 131.

reasoning is fundamentally flawed, in that it conflates the first two components of a short sale, those being (1) the short seller's borrowing of the securities, which gives rise to the obligation to cover, and (2) the short seller's sale of the borrowed securities, which gives rise to basis-increasing proceeds. Both the courts and the IRS have recognized these components as representing separate and distinct transactions. See, e.g., Provost v. United States, 269 U.S. 443, 453 (1926) (defining a short sale as comprised of several separate and independent transactions); Rev. Rul. 2002-44, 2002-2 C.B. 84 (same). The first stage – the securities borrowing and resulting obligation to return replacement securities – does not give rise to any cash proceeds. Deputy v. du Pont, 308 U.S. 488, 497 (1940) (rejecting the argument that the cash generated in a short sale is attributable to the borrowing of the securities). Rather, it is the sale proceeds, when and if the short seller sells the borrowed securities, which create basis.[25] Rev. Rul. 95-26 completely blurs this distinction,

---

[25] This criticism of Rev. Rul. 95-26 is also expressed in a leading treatise on partnership taxation:

> [T]he assertion that a short sale creates a § 752 liability ignores the statutory scheme for the taxation of short sales. In form and fact a short sale is two transactions, a borrowing of securities, offset by an obligation to deliver identical securities back to the lender; and a sale of the borrowed securities for money. It seems clear that the borrowing of securities does not increase the borrower's basis. . . .
>
> In a short sale, the borrowed securities . . . are actually sold for cash. It is the sale, not the borrowing, that gives rise to an increase in the partnership's assets. Under the peculiar rules governing short sales, the "basis" of the securities that are sold is simply not relevant to the taxation of the transaction, because the tax consequences of the sale are deferred and ultimately determined by reference to the cost of

(continued...)

collapsing the borrowing and sale transactions in order to justify the desired result. See Alice W. Cunningham, Short-Sale Obligations and Basis in Partnership Interests, 72 Tax Notes 1663, 1669 (1996) ("The commissioner's syllogism . . . confuses the sale, which produces the proceeds, with the securities borrowing. Because it is the sale, not the borrowing, that gives rise to the cash and creates additional basis, there is no liability to which section 752 status can attach.").

The IRS's attempt in Rev. Rul. 95-26 to tie the sale proceeds to the short sale obligation is flawed for other reasons as well. First, there is no requirement that a securities borrower ever sell the borrowed securities. Such a borrower, for example, might use the securities as collateral for a cash loan, in which case the borrowing would not result in any cash proceeds. Furthermore, there is absolutely no correlation between the sale proceeds and the cost of the short seller's obligation to replace the borrowed securities. As this case demonstrates (Marriott made a profit on its short sales), a short seller may have to pay significantly more or less than the sale proceeds to purchase the replacement securities needed to cover the short sale.

---

(continued)

> the securities that are used to repay the loan (which are not the securities that were originally sold). Because the tax consequences of a short sale are kept open, a short sale is like an option, which the Service has successfully argued in *Helmer* does not create a liability for § 752 purposes even though the basis of the optionor is increased by the tax-deferred option premium.
>
> 1 William S. McKee, William F. Nelson & Robert L. Whitmire, Federal Taxation of Partnerships and Partners ¶ 7.01[1], pp. 7-6 to -7 (3d ed. 2004) (footnotes omitted).

For these reasons, the IRS's effort to "deem" the short sale proceeds as equivalent to the cost of a short seller's obligation is both superficial and misleading.

In light of the long line of cases discussed above, Defendant cannot credibly dispute that Rev. Rul. 95-26 represented a marked departure from the IRS's longstanding interpretation of "liabilities" under Section 752. In that Rev. Rul. 95-26 contradicted every preceding IRS pronouncement and litigation position regarding the definition of partnership liabilities since the enactment of Section 752 in 1954, it bears no resemblance to revenue rulings reflecting a reasonable, consistent, and longstanding interpretation of a statute, to which the courts have accorded deference. See, e.g., United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 220 (2001) (deferring to the IRS's "steady interpretation of its own 61-year-old regulation implementing a 62-year-old statute"); Ammex, Inc. v. United States, 367 F.3d 530, 535 (6th Cir. 2004) (giving Skidmore deference to the IRS's "longstanding and sensible" statutory interpretation). To the contrary, Rev. Rul. 95-26 was a calculated response to a transaction that the Treasury Department considered problematic and intended to challenge, and is thus akin to revenue rulings reflecting the IRS's anticipated litigation position, to which courts do not accord any deference. As stated by the Federal Circuit in Amp Inc. v. United States:

> A revenue ruling issued at a time when the I.R.S. is preparing to litigate is often self-serving and not generally entitled to deference by the courts. *See Tandy Corp. v. Commissioner*, 92 T.C. 1165, 1170, 1989 WL 56149 (1989). This is especially true when the ruling cites no authority and is inconsistent with regulations and other pronouncements of the I.R.S. See id. at 1170-71.

185 F.3d 1333, 1338-39 (Fed. Cir. 1999). For the same reasons, Rev. Rul. 95-26 is unpersuasive and undeserving of deference.

### 3. Defendant's Basis Mismatch Argument Is A Result-Oriented Principle That The Government Only Emphasizes If And When It Benefits The Government.

The Government makes much in its brief (at 23-24) regarding the need to ensure that there is a match between inside and outside partnership basis. But, as noted above in the discussion of Helmer, Long and La Rue, the Government has been only too happy to allow a mismatch of outside and inside partnership basis when it serves the Government's interest of increasing tax revenues. This point was made emphatically by the District Court in Klamath in its rejection of the Government's basis mismatch argument in that case:

> The government's argument regarding the mismatch between inside and outside basis is unavailing. The positions the government took in the 752 Cases resulted in the same disparity between inside and outside basis that it protests will occur here under Plaintiffs' position. *See*, *e.g., Helmer v. Comm'r,* T.C. Memo 1975-160, 34 T.C.M. (CCH) 727 (1975). The only difference between the 752 Cases regarding liability and this case is that the taxpayer is receiving the benefit rather than the IRS.
>
> It is clear from the record that the government has often and consistently relied on the principle that a "liability" under *Section 752* does not include an obligation that is contingent. The government has applied this principle when it works to its benefit (to increase taxes owed). This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed). This Court's analysis of "liability" under *Section 752* will not vary in meaning simply based on whose ox is being gored.

440 F. Supp. 2d at 619.

Defendant quotes Salina for the principle that it is desirable to have outside and inside partnership basis match. The quotation from Salina in Defendant's brief (at 23-24) relies, in turn, on a leading partnership tax treatise that in fact expresses this view. What the court in Salina, however, fails to mention is that the very same section in that treatise criticizes the reasoning and result of Rev. Rul. 95-26 as suffering of problematic logic and as inconsistent with prior IRS rulings. See 1 William S. McKee, William F. Nelson & Robert L. Whitmire, Federal Taxation of Partnerships and Partners ¶ 7.01[1], pp. 7-5 to -8 (3d ed. 2004). Thus, while the treatise opines that it is generally desirable that outside and inside partnership basis match, it also expressly recognizes that Rev. Rul. 95-26 was both poorly considered and directly inconsistent with prior rulings.

Finally, Defendant's argument that inside and outside partnership basis should correspond simply ignores the reality that discrepancies between inside and outside partnership basis occur routinely. To give one common example, if a partnership has appreciated assets and one of the partners sells his interest in the partnership to another person at a price that reflects the assets' fair market value, the outside basis of the partnership will be stepped up to reflect the higher value, even though the inside basis of the partnership assets will remain the same unless a Section 754 election is in place. Quite simply, outside and inside partnership basis often do not match, a result that Defendant apparently finds perfectly acceptable as long as it benefits Defendant.

**C. Defendant's Characterization Of The Short Sale Transactions As "Son of BOSS" Transactions Is Unsupported By The Record, Ignores Fundamental Aspects Of The Short Sale Transactions, And Is Completely Irrelevant To The Merits Of The Legal Issues Presented By The Pending Motions.**

Repeatedly in its brief, Defendant refers to Marriott's short sale hedging transactions as "Son of BOSS" transactions, referring to a specific category of tax shelter with regard to which there has been substantial litigation in the courts. The transactions at issue here, however, are not "Son of BOSS" transactions, and simply calling them that repeatedly does not make it so.

The typical "Son of BOSS" transaction is a highly structured transaction that is all financial mechanics with no underlying business purpose other than to achieve the sought-after tax benefit. These transactions are prepackaged and mass-marketed tax products created by accounting and/or investment firms for taxpayers who are seeking to eliminate an often unexpected or windfall taxable gain or income. There are almost always substantial fees involved for the promoter that structured the transaction and the law or accounting firm that provided the supporting tax opinion. After transaction costs are taken into account (and, often, even without transaction costs taken into account), these "Son of BOSS" transactions are structured in such a manner that they cannot generate a pre-tax profit. Because "Son of BOSS" transactions are typically designed to exactly offset a specific item of taxable gain or income, the size of the tax loss generated by the transaction is directly related to the amount of the taxable gain or income the taxpayer is seeking to offset. Moreover, it appears that many of these transactions

are designed to avoid detection on audit. And, significantly, to the extent a short sale is part of the "Son of BOSS" transaction, it almost always is open for a few days at most, rarely more than a week. That is because the short sale serves no business purpose, but is simply part of the financial mechanics to generate the tax loss.

None of this is true for Marriott's short sale hedging transactions. The record here is clear, and the Government cannot credibly dispute it, that the short sale transactions were used for a very real and significant business purpose; that is, to hedge the interest rate risk associated with holding a large portfolio of fixed-rate mortgages generated by Marriott's time-share business. The amount of the short sales had nothing to do with attempting to eliminate a specific amount of gain or income, but was directly related to the amount of mortgages with respect to which Marriott was creating an interest rate hedge. The transactions were indisputably profitable on a pre-tax basis, and the transaction costs were quite reasonable. Contrary to the Defendant's suggestion in its brief, the transactions were not sold to Marriot by a promoter. And the short sales were open for a number of months so that they could accomplish the interest rate hedging function for which they were intended. That is, the short sale transactions were tied directly into Marriott's business operations, and constituted a bona fide economic hedge with real economic effects over a substantial period of time. And, Marriott did not seek to hide these short sale hedging transactions from audit, but specifically disclosed them on its return. This is all plainly evident from the record – a record Defendant only mentions in passing while repeatedly labeling these transactions as "Son of BOSS."

The simple fact, however, is that none of this is really relevant to the merits of the two motions currently pending before the Court. Defendant's ad hominem characterization of the short sale hedging transactions as "Son of BOSS" transactions appears to be little more than an effort to cast these transactions in a negative light. The fact that Defendant apparently believes such to be necessary may ultimately say more about Defendant's confidence in the merits of its Section 752 legal arguments than it does about the propriety of the short sale hedging transactions at issue here.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that Defendant's Motion for Summary Judgment be denied and that Plaintiffs' Cross-Motion for Partial Summary Judgment be granted.

Respectfully submitted,

March 27, 2008

s/Harold J. Heltzer
Harold J. Heltzer (Attorney of Record)
Robert L. Willmore
Alex E. Sadler
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2915
Fax: (202) 628-5116

Counsel for Plaintiffs

5024565

# APPENDIX A

## § 351. Transfer to corporation controlled by transferor

**(a) General rule.**--No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

**(b) Receipt of property.**--If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock permitted to be received under subsection (a), other property or money, then--

**(1)** gain (if any) to such recipient shall be recognized, but not in excess of--

**(A)** the amount of money received, plus--
**(B)** the fair market value of such other property received; and

**(2)** no loss to such recipient shall be recognized.

**(c) Special rule.**--In determining control, for purposes of this section, the fact that any corporate transferor distributes part or all of the stock which it receives in the exchange to its shareholders shall not be taken into account.

**(d) Services, certain indebtedness, and accrued interest not treated as property.**--For purposes of this section, stock issued for--

**(1)** services,
**(2)** indebtedness of the transferee corporation which is not evidenced by a security, or
**(3)** interest on indebtedness of the transferee corporation which accrued on or after the beginning of the transferor's holding period for the debt,

shall not be considered as issued in return for property.

**(e) Exceptions.**--This section shall not apply to--

**(1) Transfer of property to an investment company.**--A transfer of property to an investment company.
**(2) Title 11 or similar case.**--A transfer of property of a debtor pursuant to a plan while the debtor is under the jurisdiction of a court in a title 11 or similar case (within the meaning of section 368(a)(3)(A)), to the extent that the stock received in the exchange is used to satisfy the indebtedness of such debtor.

**(f) Treatment of controlled corporation.**--If--

**(1)** property is transferred to a corporation (hereinafter in this subsection referred to as the "controlled corporation") in an exchange with respect to which gain or loss is not recognized (in whole or in part) to the transferor under this section, and

**(2)** such exchange is not in pursuance of a plan of reorganization,

section 311 shall apply to any transfer in such exchange by the controlled corporation in the same manner as if such transfer were a distribution to which subpart A of part I applies.

**(g) Cross references.**--

**(1)** For special rule where another party to the exchange assumes a liability, or acquires property subject to a liability, see section 357.

**(2)** For the basis of stock or property received in an exchange to which this section applies, see sections 358 and 362.

**(3)** For special rule in the case of an exchange described in this section but which results in a gift, see section 2501 and following.

**(4)** For special rule in the case of an exchange described in this section but which has the effect of the payment of compensation by the corporation or by a transferor, see section 61(a)(1).

**(5)** For coordination of this section with section 304, see section 304(b)(3).

**§ 357. Assumption of liability**

**(a) General rule**.--Except as provided in subsections (b) and (c), if--

**(1)** the taxpayer receives property which would be permitted to be received under section 351 or 361 without the recognition of gain if it were the sole consideration, and
**(2)** as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability,

then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351 or 361, as the case may be.

**(b) Tax avoidance purpose.**--

**(1) In general.**--If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)--

**(A)** was a purpose to avoid Federal income tax on the exchange, or
**(B)** if not such purpose, was not a bona fide business purpose,

then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section 351 or 361 (as the case may be), be considered as money received by the taxpayer on the exchange.

**(2) Burden of proof.**--In any suit or proceeding where the burden is on the taxpayer to prove such assumption or acquisition is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

**(c) Liabilities in excess of basis.**--

**(1) In general.**--In the case of an exchange--

**(A)** to which section 351 applies, or
**(B)** to which section 361 applies by reason of a plan of reorganization within the meaning of section 368(a)(1)(D),

if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

**(2) Exceptions.**--Paragraph (1) shall not apply to any exchange--

**(A)** to which subsection (b)(1) of this section applies, or

**(B)** which is pursuant to a plan of reorganization within the meaning of section 368(a)(1)(G) where no former shareholder of the transferor corporation receives any consideration for his stock.

**(3) Certain liabilities excluded.**--

**(A) In general.**--If a taxpayer transfers, in an exchange to which section 351 applies, a liability the payment of which either--

**(i)** would give rise to a deduction, or
**(ii)** would be described in section 736(a),

then, for purposes of paragraph (1), the amount of such liability shall be excluded in determining the amount of liabilities assumed or to which the property transferred is subject.

**(B) Exception.**--Subparagraph (A) shall not apply to any liability to the extent that the incurrence of the liability resulted in the creation of, or an increase in, the basis of any property.

**§ 358. Basis To Distributees**

**(a) General Rule.**--In the case of an exchange to which section 351, 354, 355, 356, or 361 applies--

**(1) Nonrecognition Property.**--The basis of the property permitted to be received under such section without the recognition of gain or loss shall be the same as that of the property exchanged --

**(A)** decreased by --

**(i)** the fair market value of any other property (except money) received by the taxpayer,
**(ii)** the amount of any money received by the taxpayer, and
**(iii)** the amount of loss to the taxpayer which was recognized on such exchange, and

**(B)** increased by --

**(i)** the amount which was treated as a dividend, and
**(ii)** the amount of gain to the taxpayer which was recognized on such exchange (not including any portion of such gain which was treated as a dividend).

**§ 722. Basis of contributing partner's interest**

The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time.

**§ 733. Basis of distributee partner's interest**

In the case of a distribution by a partnership to a partner other than in liquidation of a partner's interest, the adjusted basis to such partner of his interest in the partnership shall be reduced (but not below zero) by--

**(1)** the amount of any money distributed to such partner, and

**(2)** the amount of the basis to such partner of distributed property other than money, as determined under section 732.

**§ 752. Treatment of certain liabilities**

**(a) Increase in partner's liabilities.**--Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

**(b) Decrease in partner's liabilities.**--Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

**(c) Liability to which property is subject.**--For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

**(d) Sale or exchange of an interest.**--In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

**§ 754. Manner of electing optional adjustment to basis of partnership property.**

If a partnership files an election, in accordance with regulations prescribed by the Secretary, the basis of partnership property shall be adjusted, in the case of a distribution of property, in the manner provided in section 734 and, in the case of a transfer of a partnership interest, in the manner provided in section 743. Such an election shall apply with respect to all distributions of property by the partnership and to all transfers of interests in the partnership during the taxable year with respect to which such election was filed and all subsequent taxable years. Such election may be revoked by the partnership, subject to such limitations as may be provided by regulations prescribed by the Secretary.

**§ 1233. Gains and losses from short sales.**

**(a) Capital assets.**--For purposes of this subtitle, gain or loss from the short sale of property shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of the taxpayer.

**(b) Short-term gains and holding periods.** --If gain or loss from a short sale is considered as gain or loss from the sale or exchange of a capital asset under subsection (a) and if on the date of such short sale substantially identical property has been held by the taxpayer for not more than 1 year (determined without regard to the effect, under paragraph (2) of this subsection, of such short sale on the holding period), or if substantially identical property is acquired by the taxpayer after such short sale and on or before the date of the closing thereof --

**(1)** any gain on the closing of such short sale shall be considered as a gain on the sale or exchange of a capital asset held for not more than 1 year (notwithstanding the period of time any property used to close such short sale has been held); and

**(2)** the holding period of such substantially identical property shall be considered to begin (notwithstanding section 1223, relating to the holding period of property) on the date of the closing of the short sale, or on the date of a sale, gift, or other disposition of such property, whichever date occurs first. This paragraph shall apply to such substantially identical property in the order of the dates of the acquisition of such property, but only to so much of such property as does not exceed the quantity sold short.

For purposes of this subsection, the acquisition of an option to sell property at a fixed price shall be considered as a short sale, and the exercise or failure to exercise such option shall be considered as a closing of such short sale.

**(c) Certain options to sell.** --Subsection (b) shall not include an option to sell property at a fixed price acquired on the same day on which the property identified as intended to be used in exercising such option is acquired and which, if exercised, is exercised through the sale of the property so identified. If the option is not exercised, the cost of the option shall be added to the basis of the property with which the option is identified. This subsection shall apply only to options acquired after August 16, 1954.

**(d) Long-term losses.** --If on the date of such short sale substantially identical property has been held by the taxpayer for more than 1 year, any loss

on the closing of such short sale shall be considered as a loss on the sale or exchange of a capital asset held for more than 1 year (notwithstanding the period of time any property used to close such short sale has been held, and notwithstanding section 1234).

**(e) Rules for application of section.**--

**(1)** Subsection (b)(1) or (d) shall not apply to the gain or loss, respectively, on any quantity of property used to close such short sale which is in excess of the quantity of the substantially identical property referred to in the applicable subsection.

**(2)** For purposes of subsections (b) and (d) --

**(A)** the term "property" includes only stocks and securities (including stocks and securities dealt with on a "when issued" basis), and commodity futures, which are capital assets in the hands of the taxpayer, but does not include any position to which section 1092(b) applies;

**(B)** in the case of futures transactions in any commodity on or subject to the rules of a board of trade or commodity exchange, a commodity future requiring delivery in 1 calendar month shall not be considered as property substantially identical to another commodity future requiring delivery in a different calendar month; and

**(C)** in the case of a short sale of property by an individual, the term "taxpayer", in the application of this subsection and subsections (b) and (d), shall be read as "taxpayer or his spouse"; but an individual who is legally separated from the taxpayer under a decree of divorce or of separate maintenance shall not be considered as the spouse of the taxpayer;

**(3)** Where the taxpayer enters into 2 commodity futures transactions on the same day, one requiring delivery by him in one market and the other requiring delivery to him of the same (or substantially identical) commodity in the same calendar month in a different market, and the taxpayer subsequently closes both such transactions on the same day, subsections (b) and (d) shall have no application to so much of the commodity involved in either such transaction as does not exceed in quantity the commodity involved in the other.

**(4)(A)** In the case of a taxpayer who is a dealer in securities (within the meaning of section 1236) --

**(i)** if, on the date of a short sale of stock, substantially identical property which is a capital asset in the hands of the taxpayer has been held for not more than 1 year, and
**(ii)** if such short sale is closed more than 20 days after the date on which it was made,

subsection (b)(2) shall apply in respect of the holding period of such substantially identical property.

**(B)** For purposes of subparagraph (A) --

**(i)** the last sentence of subsection (b) applies; and
**(ii)** the term "stock" means any share or certificate of stock in a corporation, any bond or other evidence of indebtedness which is convertible into any such share or certificate, or any evidence of an interest in, or right to subscribe to or purchase, any of the foregoing.

**(f) Arbitrage operations in securities**. --In the case of a short sale which had been entered into as an arbitrage operation, to which sale the rule of subsection (b)(2) would apply except as otherwise provided in this subsection --

**(1)** subsection (b)(2) shall apply first to substantially identical assets acquired for arbitrage operations held at the close of business on the day such sale is made, and only to the extent that the quantity sold short exceeds the substantially identical assets acquired for arbitrage operations held at the close of business on the day such sale is made, shall the holding period of any other such identical assets held by the taxpayer be affected;

**(2)** in the event that assets acquired for arbitrage operations are disposed of in such manner as to create a net short position in assets acquired for arbitrage operations, such net short position shall be deemed to constitute a short sale made on that day;

**(3)** for the purpose of paragraphs (1) and (2) of this subsection the taxpayer will be deemed as of the close of any business day to hold property which he is or will be entitled to receive or acquire by virtue of any other asset acquired for arbitrage operations or by virtue of any contract he has entered into in an arbitrage operation; and

**(4)** for the purpose of this subsection arbitrage operations are transactions involving the purchase and sale of assets for the purpose of profiting from a current difference between the price of the asset purchased and the price of the asset sold, and in which the asset purchased, if not identical to the asset sold, is such that by virtue thereof the taxpayer is, or will be, entitled to acquire assets identical to the assets sold. Such operations must be clearly identified by the taxpayer in his records as arbitrage operations on the day of the transaction or as soon thereafter as may be practicable. Assets acquired for arbitrage operations will include stocks and securities and the right to acquire stocks and securities.

**(g) Hedging transactions.** --This section shall not apply in the case of a hedging transaction in commodity futures.

5158544

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner, Plaintiffs, | |
| v. | Nos. 01-256T and 01-257T<br>Judge Charles F. Lettow |
| THE UNITED STATES, Defendant. | |

**DECLARATION OF HAROLD J. HELTZER**

I, Harold J. Heltzer, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am counsel of record for Plaintiffs in these actions, and am submitting this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Plaintiffs' Cross-Motion for Partial Summary Judgment.

2. Attached hereto are true and accurate copies of the following documents:

Exhibit 1 – Plaintiff's Responses to Defendant's First Set of Interrogatories, dated October 8, 2002, as verified by M. Lester Pulse, Jr.

Exhibit 2 – Memorandum to Growth Committee re "Hedging MORI Note Exposure" (MAR-008866-69), produced by Plaintiffs

Exhibit 3 – Memorandum to Corporate Growth Committee re "MORI Note Sale to TIAA Closed" (MAR-008870), produced by Plaintiffs

Exhibit 4 – Background Information Note to Rev. Rul. 95-26 (011000-03), produced by Defendant

Exhibit 5 – Internal Revenue Service Meeting Notes (010810-11), produced by Defendant

3. Further attached hereto as Exhibit 6 are deposition transcript excerpts from the deposition of M. Lester Pulse, Jr. taken in these actions on December 11, 2002.

4. Further attached hereto as Exhibit 7 are deposition transcript excerpts from the deposition of Michael E. Dearing, taken in these actions on December 12, 2002.

5. Further attached hereto as Exhibit 8 is the Declaration of Dr. Owen Lamont, one of Plaintiffs' designated expert witnesses, along with his appended expert witness report previously produced to Defendant.

6. Further attached hereto as Exhibit 9 is an excerpt from Defendant-Appellee's Brief, filed July 2007, in Kornman & Assoc. Inc. v. United States, No. 06-11422 (5th Cir.).

7. I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 25, 2008, at Washington, D.C.

Harold J. Heltzer

5118808

# Plaintiffs' Exhibit 1

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, TAX MATTERS PARTNER<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Nos. 01-256T and 01-257T<br>Judge Marion Blank Horn |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

In accordance with Rules 26 and 33 of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff hereby responds to defendant's first set of interrogatories as follows:

## GENERAL OBJECTIONS

The following objections apply to, and are hereby incorporated within, each of plaintiff's responses to defendant's first set of interrogatories:

1. Plaintiff objects to defendant's interrogatories to the extent they seek information protected by the attorney-client privilege, the work product doctrine, RCFC 26(a)(4)(B), or any other applicable privilege.

2. Plaintiff objects to defendant's "Instructions" and "Definitions" to the extent that they purport to impose obligations beyond those set forth in RCFC 26 and 33.

3. Plaintiff objects to defendant's definitions of "Time-Share Note Sale Transaction," "Short-Sale Transaction" and "Partnership Transaction," in that these definitions incorrectly seek to define the events and circumstances underlying this suit as separate and distinct transactions.

**RESPONSES**

INTERROGATORY NO. 1:

Describe each and every reason (*e.g.*, business, financial, accounting, economic, or tax) for which plaintiff entered into the "Short-Sale Transaction," including each and every reason (*e.g.*, business, financial, accounting, economic, or tax) for entering into the "Short-Sale Transaction" as a whole, as well as each and every reason (*e.g.*, business, financial, accounting, economic, or tax) for (a) plaintiff's short sales of Treasury securities, (b) plaintiff's investments of proceeds from short sales into repurchase obligations, (c) plaintiff's formation and capitalization of the MIR partnerships, (d) plaintiff's contributions of Treasury securities to the MIR partnerships, (e) plaintiff's transfers of short sale obligations to MIR partnerships, (f) plaintiff's transfers of repurchase obligations to the MIR partnerships, and (g) plaintiff's transfers of any partnership interests in MIR.

RESPONSE:

See plaintiff's General Objections. Plaintiff also objects to the use of the term "each and every" as overly broad and unduly burdensome. See, e.g., Steil v. Humana Kansas City, Inc., 197 F.R.D. 445 (D. Kan. 2000); IBP, Inc. v. Mercantile Bank of Topeka, 179 F.R.D. 316 (D. Kan. 1998). Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

Plaintiff entered into the "Short-Sale Transaction" as a whole in order to hedge its exposure to the interest rate risks associated with holding the Mortgages[1] until their sale to Teachers Insurance and Annuity Association of America ("TIAA") in November of 1994. Specifically, the transactions, including the short sales of the Treasury securities described in the Complaints in these actions, were intended to protect Marriott against the risk that interest rates would rise during the period prior to the sale of the Mortgages to TIAA, which would cause the value of the fixed-rate Mortgages to decline, possibly substantially. The cash proceeds from the Treasury security short sales were invested in Repos[2] during this holding period in order to earn a return on those proceeds while the hedges involving the Treasury securities short sales were in place. The investment of the proceeds in Repos completed the hedge by replacing a fixed-rate asset with a variable-rate asset. MIR was an essential element of these transactions because the securitization of the Mortgages (which was necessary to sell the Mortgages to TIAA) effectively required the use of a bankruptcy remote special purpose entity.[3] The use of a bankruptcy remote special purpose entity resulted in a higher credit rating by the rating

---

1 As used in these responses, the term "Mortgages" refers to the mortgages that were securitized and then sold to TIAA in 1994 in the form of a certificate in a grantor trust, as described in the Complaints in these actions.

2 As used in these responses, "Repos" refers to the repurchase obligations described in paragraphs 13 and 14 of the Complaints in these actions.

3 See generally Financial Accounting Standard 125 (MAR-009251 - MAR-009308). While the Standard was formally issued in 1996, it reflects the pre-existing commercial practice in this area.

agencies, which ensured that plaintiff would receive the highest possible price for the 1994 Mortgages. Moreover, as a practical matter, the use of a bankruptcy remote special purpose entity was necessary in order to be able to accomplish the sale of the Mortgages to TIAA. As set forth in the Complaints in these actions, MORI in 1994 transferred the Mortgages, as well as the associated Repos and short sale obligations, to MIR.[4] The transfer of the Mortgages to MIR was necessary, as noted, to ensure that TIAA would be purchasing the Mortgages from a bankruptcy remote special purpose entity. The concurrent transfer of the associated Repos and short sale obligations to MIR was appropriate in that the Repos and short sale obligations were being used to hedge the interest rate risk associated with the transferred Mortgages; that is, the same entity (MIR) would hold both the assets being hedged (the Mortgages), as well as the proceeds of the hedge (the Repos) and the obligation to close the hedge. With respect to MORI's transfer of its partnership interest in MIR to MICC, that transfer was consistent with MICC's function as the Marriott subsidiary primarily responsible for providing financing, credit, lending, and related financial services for Marriott properties and for holding debt and

---

4 The interrogatory appears to indicate that the Treasury securities were also transferred by MORI to MIR. In fact, no Treasury securities were ever transferred to MIR. As set forth in the Complaints in these actions, the Treasury securities were sold in the course of the short sale transactions, and the proceeds from those sales were then invested in Repos. Accordingly, there were no Treasury securities to transfer.

equity investments that Marriott made to owners and developers of Marriott properties. Plaintiff recognized that certain aspects of the "Short-Sale Transaction," such as the use of a limited partnership form for MIR, would receive advantageous tax treatment under the Internal Revenue Code, and, as a matter of prudent tax planning, engaged in the transactions in a manner that resulted in the realization of those advantages. However, as the above indicates, the overall purpose of these transactions was to accomplish the securitization and sale of the Mortgages to TIAA on the most favorable terms Marriott could achieve, while at the same time protecting Marriott from the possible adverse consequences of interest rate increases before the sale of the Mortgages was consummated.

INTERROGATORY NO. 2:

State the reasons (*e.g.*, business, financial, accounting, economic, or tax) for the incorporation or creation, as well as the business activities, of (a) Marriott International Resorts, L.P. ("MIR"), (b) Marriott International JBS Corporation ("JBS"), (c) Marriott International Capital Corporation ("MICC"), (d) the second MIR partnership, and (e) any corporate successor of any of these entities.

RESPONSE:

See plaintiff's General Objections. Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

See plaintiff's response to Interrogatory No. 1. As noted in plaintiff's response to the previous interrogatory, MIR was created to serve as the bankruptcy remote special purpose entity necessary to obtain the highest available credit rating for the securitized Mortgages and to accomplish the sale of the Mortgages to TIAA. JBS was organized for the specific purpose of serving as the general partner of MIR

(JBS also is MIR's tax matters partner). MICC was incorporated in December of 1993 specifically to provide credit, lending, and related financial services for Marriott properties, and to hold debt and equity investments that Marriott made to owners and developers of Marriott properties. In addition to its role as a partner in MIR, MICC also engages in other investment and financing activities such as providing mortgage loans and credit support to developers of Marriott properties. As set forth in the Complaints in these actions, the "second MIR partnership" was a result of the technical termination of the partnership pursuant to Internal Revenue Code section 708(b)(1)(B) caused by the transfer of MORI's interest in MIR to MICC. This termination resulted in the deemed liquidation of the original MIR partnership for Federal income tax purposes and the deemed distribution of its assets to the partners, followed by the deemed creation of the "second MIR partnership" for Federal income tax purposes and the deemed contribution of the assets to the partnership.[5] With respect to the transfer of MORI's interest in MIR to MICC, as it relates to MICC's function in Marriott, see plaintiff's response to Interrogatory No. 1.

INTERROGATORY NO. 3:

Identify each and every person who provided to plaintiff or received from plaintiff any information and/or advice regarding the tax implications of the "Short-Sale Transaction" and the "Time-Share Note Sale Transaction" during calendar years 1993, 1994, and/or 1995.

---

5 None of these entities have a "corporate successor," at least so far as plaintiff understands the import of Interrogatory no. 2.

RESPONSE:

See plaintiff's General Objections. Plaintiff also objects to the use of the term "each and every" as overly broad and unduly burdensome. See, e.g., Steil v. Humana Kansas City, Inc., 197 F.R.D. 445 (D. Kan. 2000); IBP, Inc. v. Mercantile Bank of Topeka, 179 F.R.D. 316 (D. Kan. 1998). Plaintiff further objects to the term "any information" as vague and ambiguous. Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

The referenced transactions were disclosed to Arthur Andersen LLP ("Andersen") in its capacity as Marriott's outside independent auditor. However, Andersen did not provide Marriott with any Federal income tax planning or advice related to the transactions. See generally September 10, 2002 Affidavit of M. Lester Pulse, Jr. submitted in support of the Memorandum of Law of Andersen and the Memorandum of Law of Plaintiff in opposition to defendant's motion to compel subpoena duces tecum. Per the representations of Andersen's counsel (White & Case LLP), defendant has already obtained from Andersen all responsive documents in Andersen's tax files related to its review of the transactions.

In early 1994, CS First Boston ("CSFB") provided Marriott with a description and analysis of a proposed transaction which would have resulted in certain tax benefits. While Marriott did not implement that proposed transaction, some aspects of CSFB's analysis were considered in planning the transactions at issue in these cases. The key individuals at CSFB who were involved in these discussions in early 1994 were Phil Hamon, Roy Hahn and Charles Edelstein.

Several law firms provided Marriott with legal advice related to various Federal and/or state tax issues involving the securitization and sale of the Mortgages to TIAA. These firms are all identified in the 1994 Closing Binder (MAR-000001 - MAR-001682) previously produced to defendant as part of plaintiff's initial disclosure. See also MAR-009075 and MAR-009140 - 41 (law firms on 1994 MORI Working Group List), previously produced to defendant as part of plaintiff's initial disclosure.

INTERROGATORY NO. 4:

Explain how MIR treated the contributions of the (1) short positions in the Treasury Notes, (2) the proceeds from the short positions in the Treasury Notes, (3) the repurchase obligations (*i.e.*, "repos"), and (4) the liabilities to replace the shorted Treasury Notes for financial reporting and/or accounting purposes during the calendar years 1993, 1994, and 1995.

RESPONSE:

See plaintiff's General Objections. Plaintiff also objects to the interrogatory on the grounds that it is vague and confusing in several respects. Specifically, plaintiff objects to: (1) the distinction in the interrogatory between "financial reporting" and "accounting" purposes, which is a distinction plaintiff does not understand; (2) the apparent distinction in the interrogatory between the "proceeds from the short positions" and the "repurchase obligations," since the proceeds were invested in the repurchase obligations (the Repos); (3) the use in the interrogatory of the term "liabilities," since that is not the correct term for plaintiff's obligation to close the short positions; and (4) the references in the interrogatory to 1993 and

1995, since the transactions took place in 1994. Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

For accounting purposes, MIR treated the contribution of the Repos and the assumption of the obligation to close the short sales by including in its own accounts the income from the Repos, the expense of paying interest to the short-sale lender, and the gain from closing the short sales. Documents reflecting this treatment are attached hereto (MAR-013159 - 62). MIR did not issue separate financial reports but was consolidated in the Marriott International, Inc. group for financial reporting purposes.

INTERROGATORY NO. 5:

Explain plaintiff's calculation of the basis of the time-share mortgages that were contributed to MIR (and state the total amount of all time-share mortgages) during the calendar year 1994.

RESPONSE:

See plaintiff's General Objections. Plaintiff also objects to the interrogatory on the grounds that it is vague and confusing. Specifically, plaintiff does not understand what defendant means by its reference to "the total amount of all time-share mortgages." If defendant is referring to the aggregate face amount of all the Mortgages sold to TIAA in 1994, that aggregate face amount is set forth in the Complaints in these actions, as well as in the 1994 Closing Binder previously produced to defendant, and those documents provide the requested information (see RCFC 33(d)). If defendant means something else by its reference to "the total amount of all time-share mortgages," plaintiff does not understand the

interrogatory. Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

With respect to the calculation of the basis of the time-share mortgages contributed to MIR during 1994, that calculation is set forth in MAR-009193, previously produced to defendant as part of plaintiff's initial disclosure.[6] See RCFC 33(d).

Respectfully submitted,

Dated: October 8, 2002

Harold J. Heltzer
(Counsel of Record)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2565
(202) 628-5116 (facsimile)

Attorney for Plaintiff

Of Counsel:

Howard M. Weinman
Robert L. Willmore
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 2004-2595

---

6 As defendant is aware, there was an error in the original calculation, which was subsequently corrected by plaintiff and disclosed to the IRS Examination team on audit. Both calculations are reflected on the referenced document.

# VERIFICATION

I hereby verify that I have reviewed the foregoing Plaintiff's Responses to Defendant's First Set of Interrogatories, and that the responses contained therein are true and correct to the best of my knowledge, information and belief.

M. Lester Pulse, Jr.
Senior Vice President - Taxes
Marriott International, Inc.

SUBSCRIBED AND SWORN BEFORE ME

on this 7th day of October, 2002

Paula Niswander
Notary Public

PAULA NISWANDER
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires February 2, 2003

CA0520 R-3 PD 13 FY 94 PERIOD BEGIN 12/03/94 END 12/30/94 MARRIOTT CORPORATION CORPORATION LEDGER BY ACCOUNT RUN: 01/13/95 PAGE 2117 H04

| ACCOUNT NAME | CORP UNIT | ACCOUNT | PERIOD AMOUNT | YEAR TO DATE AMOUNT | 2971109313897097 |
|---|---|---|---|---|---|
| MORI-CASH DEPOSITORY | 297 38 97097 | 1109.31 | .00 | 81,269.97 | |
| | ACCT TOTAL | 1109 | .00 * | 81,269.97 * | |
| | CLASS TOTAL | 11 | .00 * | 81,269.97 * | |
| MORI - SUN FEES REC-91A | 297 38 97097 | 1960.01 | 56,786.59- | 56,786.59- | |
| MORI SUN FEES REC - 94A | 297 38 97097 | 1960.16 | .00 | 2,311,868.93 | |
| | ACCT TOTAL | 1960 | 56,786.59-* | 2,255,082.34 * | |
| MORI SUN- COLLECTION 94A | 297 38 97097 | 1962.05 | 7,185.83 | 10,786.65 | |
| | ACCT TOTAL | 1962 | 7,185.83 * | 10,786.65 * | |
| MORI - ESCROW PRIMARY | 297 38 97097 | 1963.30 | 600.06- | 52,163.13 | |
| | ACCT TOTAL | 1963 | 600.06-* | 52,163.13 * | |
| | CLASS TOTAL | 19 | 50,200.82-* | 2,318,032.12 * | |
| | GROUP TOTAL | 1 | 50,200.82-* | 2,399,302.09 * | |
| CORP CASH CLEARING | 297 85 800 | 2010.01 | 243,962.78 | 84,354,000.40 | |
| | ACCT TOTAL | 2010 | 243,962.78 * | 84,354,000.40 * | |
| CORP CASH CLEARING | 297 85 800 | 2012.21 | .00 | 24,369.00- | |
| | ACCT TOTAL | 2012 | .00 * | 24,369.00-* | |
| CORP CASH CLEARING | 297 85 800 | 2014.71 | 57,386.65 | 83,236,359.45 | |
| | ACCT TOTAL | 2014 | 57,386.65 * | 83,236,359.45 * | |
| I/C ACCTS PAY SYSTEM | 297 85 800 | 2070.05 | 4,405.22 | 00 | |
| I/C FEEDER SYSTEMS NET | 297 85 800 | 2070.13 | 128,682.15- | 128,682.15- | |
| | ACCT TOTAL | 2070 | 124,276.93-* | 128,682.15-* | |
| | CLASS TOTAL | 20 | 177,072.50 * | 964,589.80 * | |
| MORI - ACCR LIABILITIES | 297 38 97097 | 2198.18 | 124,766.43 | 246,459.35- | |
| | ACCT TOTAL | 2198 | 124,766.43 * | 246,459.35-* | |
| | CLASS TOTAL | 21 | 124,766.43 * | 246,459.35 * | |
| | GROUP TOTAL | 2 | 301,838.93 * | 718,130.45 * | |
| INT INCOME-1994A | 297 38 97097 | 3812.57 | 7,185.83- | 2,872,980.26 | |

| ACCOUNT NAME | CORP UNIT | ACCOUNT | PERIOD AMOUNT | YEAR TO DATE AMOUNT | 2973812573897097 |
|---|---|---|---|---|---|
| | ACCT TOTAL | 3812 | 7,185.83-* | 2,872,980.26-* | |
| | CLASS TOTAL | 38 | 7,185.83-* | 2,872,980.26-* | |
| | GROUP TOTAL | 3 | 7,185.83-* | 2,872,980.26-* | |
| MORI TRUST EXPENSE 1994A | 297 38 97097 | 6932.29 | 489.50- | 489.50- | |
| | ACCT TOTAL | 6932 | 489.50-* | 489.50-* | |
| | CLASS TOTAL | 69 | 489.50-* | 489.50-* | |
| | GROUP TOTAL | 6 | 489.50-* | 489.50-* | |
| GAIN/LOSS ON MARKET | 297 85 82201 | 8001.31 | 819,532.00- | 819,532.00- | |
| | ACCT TOTAL | 8001 | 819,532.00-* | 819,532.00-* | |
| INTEREST INCOME - TNOTES | 297 85 82201 | 8006.10 | 1,157,454.00- | 1,157,454.00- | |
| INTERSET EXPENSE- TNOTES | 297 85 82201 | 8006.20 | 1,507,483.00 | 1,507,483.00 | |
| | ACCT TOTAL | 8006 | 350,029.00 * | 350,029.00 * | |
| | CLASS TOTAL | 80 | 469,503.00-* | 469,503.00-* | |
| OTHER MISC. EXPENSE | 297 85 800 | 8320.47 | 225,540.22 | 225,540.22 | |
| | ACCT TOTAL | 8320 | 225,540.22 * | 225,540.22 * | |
| | CLASS TOTAL | 83 | 225,540.22 * | 225,540.22 * | |
| | GROUP TOTAL | 8 | 243,962.78-* | 243,962.78-* | |
| CORP 297 | TOTAL | | .00 * | .00 * | |

1st 5th

C.C. 5 1

*DIVISION NUMBER IS REQUIRED.

Marriott

# DISTRIBUTION TICKET

VENDOR NO.

| WK | PD | YR |
|---|---|---|
| 5 | 13 | 94 |

| UNIT (DIV* UNIT DEPT) | CORP. | ACCOUNT (PRIM SEC) | A.E. COST CODE | INVOICE DATE | INVOICE NUMBER | AMOUNT |
|---|---|---|---|---|---|---|
| 8582201 | 001 | 8006110 | | | Int Inc | 1157454.00 |
| 8582201 | 001 | 8006210 | | | Int Exp. | (1507483.00) |
| 8582201 | 001 | 8001311 | | | mk to mkt | 819532.00 |
| " | 297 | 8006110 | | | Int Inc | (1157454.00) |
| " | 297 | 8006120 | | | Int Exp | 1507483.00 |
| " | 297 | 8001311 | | | mk to mkt | (819532.00) |

To move treasury short sale P&L activity to appropriate Corp - MORI Corp.

CC: Mercedes Infante @ MORI
Nancy Berg

JOURNAL DESCRIPTION:

PREPARED BY

APPROVED BY

CA-099
REV 11/87

THIS FORM MAY NOT BE USED FOR AE. ENTRIES.
Double lines across the page should be drawn to separate individual entries.
"Continued" should be written at the bottom of the ticket when an entry is continued on the next page.

UNIT NO 85 82201 DISTRICT 001
LOCATION NAME INT & FINANCE

MARRIOTT CORPORATION
WEEKLY DISTRIBUTION SUMMARY

1ST COPY S. WARNER 2ND COPY D. SISK
WK 5 PD 12 YR 94 PAGE 16708
WEEK ENDING 12/02/94

| ACCOUNT MAJR SB | CORP | VENDOR NUMBER | NAME | | INVOICE NUMBER | DATE | BATCH | W K | CURRENT WEEK | % | PERIOD TO DATE % | YEAR TO DATE | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8001 10 | | | INT INC MISC | | | | | A | | | 17,364.43- | 386,271.99- | |
| 8001 11 | | | N/R INT INCOME | | | | | A | | | 207,750.50- | 828,298.93- | |
| 8001 17 | | | HH LOC | | | | | A | | | 1,179,166.90- | 12,773,688.32- | |
| 8001 18 | | | HH LOC FEES | | | | | A | | | 363,378.05- | 4,322,290.77- | |
| 8001 19 | | | PHIL CC MORT | | | | | A | | | 525,905.81- | 4,447,684.74- | |
| 8001 20 | 001 | 999120 | JOURNAL ENTRY | LATE FEE | PD6-10 | | A999T | 5 | 3,717.00- | | | | |
| 8001 20 | 001 | 999120 | JOURNAL ENTRY | REV PD6-9 | | | A999T | 5 | 4,346.00 | | | | |
| 8001 20 | 523 | 999120 | JOURNAL ENTRY | RECLASS | | | H474T | 5 | 137,654.04 | | | | |
| 8001 20 | | | INT INC-MKT SEC | | | | | A | 138,283.04 * | | 87,190.17- | 270,622.51- | |
| 8001 22 | | | CASH RESERVE INC | | | | | A | | | 230,448.00- | 1,522,952.45- | |
| 8001 31 | | | GAIN/LOSS ON MARKET | | | | | A | | | | 819,532.00- | |
| 8001 | | | INTEREST INC TAX | | | | | A | 138,283.04 ** | | 2,611,203.86- | 25,371,341.71- | |
| | | | | | | | | B | | | 2,079,000- | 23,020,000- | |
| | | | | | | | | LY | | | 1,926,690- | 14,224,248- | |
| 8006 10 | | | INTEREST INCOME - TNOTES | | | | | A | | | | 1,157,454.00- | |
| 8006 20 | | | INTERSET EXPENSE- TNOTES | | | | | A | | | | 1,507,483.00 | |
| 8006 | | | INT I/E FORN SUB | | | | | A | | | | 350,029.00 | |
| | | | | | | | | LY | | | | 11,473,456- | |
| 8007 | | | INCOME I/E FN SB | | | | | LY | | | | 11,473,456 | |
| 8010 01 | | | INTEREST EXPENSE | | | | | A | | | | 3,502,729.17 | |
| 8010 | | | INTEREST EXPENSE | | | | | A | | | | 3,502,729.17 | |
| | | | | | | | | B | | | 170,000 | 1,853,000 | |
| 8014 | | | INT EXP SEC EQUP | | | | | B | | | 63,000 | 796,000 | |
| 8015 | | | INT EXP SEC RLES | | | | | A | | | 65,011.77 | 804,292.38 | |
| | | | | | | | | LY | | | 77,396 | 27,486,399 | |
| 8016 01 | | | SENIOR NOTES FIXED | | | | | A | | | 778,846.15 | 9,346,153.80 | |
| 8016 | | | SENIOR NOTES-1977 | | | | | A | | | 778,846.15 | 9,346,153.80 | |
| | | | | | | | | B | | | 779,000 | 9,346,000 | |
| | | | | | | | | LY | | | | 110,907,473 | |
| 8017 | | | INT EXP UNSC DEB | | | | | B | | | 15,000 | 173,000 | |
| | | | | | | | | LY | | | | 26,892 | |
| 8018 01 | 001 | 999120 | JOURNAL ENTRY | | 0000 | 0 | B200T | 5 | 71,917.81- | | | | |
| 8018 01 | | | INT EXP UNSC GEN | | | | | A | 71,917.81-* | | 292.94- | 17,284.62 | |
| 8018 03 | | | UNSEC L.T.-FLOATING | | | | | A | | | | 174,400.56 | |
| 8018 05 | | | SPECIAL RAR ACCRU | | | | | A | | | 233,547.68 | 2,041,229.80 | |
| 8018 10 | 001 | 999120 | JOURNAL ENTRY | | | | B200T | 5 | 71,917.81 | | | | |
| 8018 10 | | | COMMITMENT FEES | | | | | A | 71,917.81 * | | 71,917.81 | 1,551,059.09 | |
| 8018 11 | | | UNSECURED LT-FIXED | | | | | A | | | 14,526.06 | 174,312.72 | |
| 8018 18 | | | REVOLVER INTEREST | | | | | A | | | | 1,629,545.24 | |
| 8018 24 | | | COMMERCIAL PAPER | | | | | A | | | 996,543.92 | 7,632,014.48 | |
| 8018 25 | | | BEDFORD SLS BONDS | | | | | A | | | 6,824.68 | 70,926.69 | |
| 8018 | | | INT EXP UNSC GEN | | | | | A | | | 1,323,066.81 | 13,290,773.00 | |
| | | | | | | | | B | | | 926,000 | 10,685,000 | |
| | | | | | | | | LY | | | 2,221,492 | 32,561,855 | |
| 8019 01 | 001 | 999120 | JOURNAL ENTRY | PHLP-BANK | | | B200T | 5 | 175,992.60 | | | | |
| 8019 01 | 864 | 999120 | JOURNAL ENTRY | PHLP | | | B200T | 5 | 4,253.08 | | | | |
| 8019 01 | | | INT CAP LEASE OBL | | | | | A | 180,245.68 * | | 200,739.98 | 2,312,175.56 | |
| 8019 | | | INT EXP LEASE OBL | | | | | A | 180,245.68 ** | | 200,739.98 | 2,312,175.56 | |
| | | | | | | | | B | | | 201,000 | 2,407,000 | |
| | | | | | | | | LY | | | 406,421 | 2,894,440 | |
| 8031 01 | 001 | 999120 | JOURNAL ENTRY | KAUAI HTLS | | | F330T | 5 | 37,360.00- | | | | |
| 8031 01 | 471 | 999120 | JOURNAL ENTRY | MORI EST12 | | | F330T | 5 | 73,535.00- | | | | |
| 8031 01 | 471 | 999120 | JOURNAL ENTRY | MORI ADJ11 | | | F330T | 5 | 680.00- | | | | |
| 8031 01 | 471 | 999120 | JOURNAL ENTRY | KAUAI MORI | | | F330T | 5 | 253,672.00- | | | | |
| 8031 01 | 706 | 999120 | JOURNAL ENTRY | SLS | | | F330T | 5 | 25,202.00- | | | | |
| 8031 01 | 706 | 000000 | | CAP INTRST | 120894 | | F370 | 5 | 48,351.83- | | | | |
| 8031 01 | 706 | 000000 | | CAP INTRST | 120894 | | F370 | 5 | 37,580.71- | | | | |

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing Plaintiff's Responses to Defendant's First Set of Interrogatories was served on counsel for Defendant this 8th day of October, 2002, by mailing a true copy of same via first-class U.S. mail, postage-prepaid, upon:

Charles M. Ruchelman, Esq.
U.S. Department of Justice
Tax Division
P.O. Box 26
Ben Franklin Station
Washington, DC 20044

Robert L. Willmore

1940489

# Plaintiffs' Exhibit 2

# MEMORANDUM

**TO:** Growth Committee

**FROM:** Michael A. Stein, Lester Pulse, Raymond G. Murphy, Michael E. Dearing

**DATE:** April 22, 1994

**SUBJECT:** **Hedging MORI Note Exposure**

Per the terms of an existing purchase agreement, Marriott International ("MI") will sell to Teachers Insurance and Annuity Association ("TIAA") MORI mortgages with a face value of approximately $91,000,000 in December 1994. The purpose of this memo is to request Growth Committee approval to enter into a transaction to hedge the interest rate exposure related to the anticipated sale. The proposed transaction provides Marriott International a cost-effective means to prudently manage a significant interest rate exposure in a particularly volatile environment.

**TIAA Purchase Agreement**

In November 1993, MI entered into an agreement with TIAA whereby MI agreed to sell and TIAA agreed to buy up to $105,000,000 of MORI mortgages in 1994. The yield to be received by TIAA on the purchased mortgage portfolio will be set at a 2.4% spread over the four-year Treasury yield at the time of the sale. The difference between (1) the average mortgage yield (set when the original mortgages were written) and (2) the above-described yield to be paid to TIAA is retained by MI (the "Excess Amount"). Thus, for example, if the average yield on the mortgage portfolio were 11.2% (as it is today) and the four-year Treasury were 6.2% (today's level), the yield to TIAA would be 8.6% (2.4% spread plus 6.2% Treasury) and the Excess Amount for MI would be 2.6% (11.2% average mortgage yield less 8.6% yield to TIAA).

We originally anticipated executing a series of quarterly transactions so that our MORI mortgage inventory would never be held in significant amounts for long periods. Recently, however, in view of (1) the extent of MI investment capacity and (2) the significant profit contributed by the MORI mortgages, we elected to consolidate the 1994 sales into a single larger sale (approximately $91,000,000) near year-end.

**Interest Rate Exposure**

Each MORI mortgage bears a fixed rate of interest set at the time of issuance at a spread (5.0% to 5.5%) over the then-current matched-maturity Treasury yield. Thus, our portfolio yields a fixed rate of interest. On the liability side, we are financing this growing fixed-rate portfolio with floating rate borrowings under our revolving credit facility.

In the case of MORI mortgages, we are in essentially the same position as any mortgage banker: we have a relatively short holding period (say, eight months) and we are financing relatively long-term fixed-rate assets with short-term floating-rate debt. Like mortgage bankers, we have two kinds of interest rate exposure: (1) value of the fixed-rate asset, and (2) spread between the fixed and floating rates during the holding period.

<u>1. Value of the Fixed Rate Asset</u>
Since the yield to be received by TIAA on the purchased mortgage portfolio is set at the time of sale, any changes in the four-year Treasury yield between mortgage origination and sale impact MI via changes in the Excess Amount. This is a direct economic exposure for MI since the value of the Excess Amount depends on the level of interest rates on the sale date.

<u>2. Spread Between the Fixed and Floating Rates</u>
During the holding period (approximately eight months), MI earns the spread between the mortgage yield (approximately 11.2% today) and the cost of borrowing under the revolving credit facility (approximately 4.2% today). If short-term interest rates change over the holding period, then the spread earned by MI changes by the same amount: if floating rates rise 1.0% then our spread declines by 1.0% and vice versa. This interest rate exposure impacts both cash flow and earnings during the holding period.

**Planned Hedging Program**

The proposed transaction will offset both types of exposure described above. Immediately subsequent to your approval, we plan to enter into a short sale of approximately $65,000,000 (the amount of our current MORI mortgage portfolio) of 4.5 year Treasury notes and to invest the proceeds in floating-rate money market instruments. As we accumulate additional MORI mortgages between today and December 1994, we will increase our short position commensurately. This is ~~exactly~~ the sort ~~of~~ "rate-lock" hedge transaction typically undertaken by mortgage bankers facing this kind of interest rate exposure.



MAR - 008867

Note that the $65,000,000 initial short sale is intended to cover our current exposure only. As we accumulate additional mortgages, our interest rate exposure will increase until we do another short sale (probably in the third quarter). At no time will the short position exceed our actual MORI mortgage exposure.

During the holding period, any fluctuations in our borrowing costs are hedged by our floating rate investments. Thus, if short-term rates rise by 1%, for example, the increase in our borrowing costs is exactly offset by increased interest earnings on our short-term investments. The net effect is to lock in the current interest rate spread (approximately 7.0% today).

At the sale date, any gain or loss in the value of the Excess Amount due to interest rate changes during the holding period will be offset by an equal but opposite gain or loss on the closing of our short Treasury position:

| Yield Curve | Value Impact on Excess Amount | Gain on Close of Short Position | Net Impact |
|---|---|---|---|
| up 1% | ($3,567,000) | $3,580,000 | ($13,000) |
| no change | 0 | 0 | 0 |
| down 1% | 3,567,000 | ( 3,580,000) | 13,000 |

**Financial Reporting**

The accounting literature requires that the value of our short position be "marked to market." Thus, as interest rates rise (fall), we will record gains (losses) equal to the corresponding change in the value of our short position. Any gain or loss in the value of the MORI mortgage portfolio (due to interest rate fluctuations) will be deferred until the sale is actually completed (in the fourth quarter).

The net effect is that, while the proposed hedging plan protects the value of our MORI mortgage portfolio, we will be exposed to potential book gains and losses during the second and third quarters. Any such gains and losses would be offset in the fourth quarter when we complete the sale to TIAA. For example, if interest rates were to fall 1.0% between the time we do the initial $65,000,000 short sale (second quarter) and the final Teachers sale (fourth quarter), we would record quarterly pre-tax charges against earnings totalling $3,580,000 while the gain on sale in the fourth quarter would be greater by the same $3,580,000. On an annual basis, there would be no P&L impact.

Note that it is declines in interest rates that trigger book losses. Our intention in setting up the hedge has been to protect against what we believe to be the more likely rising interest rate scenario.

**Next Steps**

Upon Growth Committee approval, we will proceed with the proposed hedging program. We anticipate closing our short position coincident with the pricing of the TIAA sale transaction in fourth quarter.

# Plaintiffs' Exhibit 3

**M E M O R A N D U M**

**TO:** Corporate Growth Committee

**FROM:** Michael E. Dearing

**DATE:** December 7, 1994

**SUBJECT: MORI Note Sale to TIAA Closed**

In accordance with the Purchase Agreement signed in November 1993, Marriott International sold $83,277,308 of MORI mortgages to Teachers Insurance and Annuity Association on November 14 at an "all-in" pre-tax gain of $2.7M. The purpose of this memo is to summarize the results of the sale and the associated interest rate hedge transaction.

The terms of the TIAA Purchase Agreement called for the yield to TIAA to be set immediately prior to sale based on then-current market interest rates. In view of this interest rate exposure, we sought and received Corporate Growth Committee approval at the April 22 meeting to hedge our position via a short sale of approximately $75,000,000 of Treasury notes.

In fact, by the time the TIAA yield was set in early October, the Treasury yield had risen 0.8% resulting in a pre-tax gain of approximately $820,000 on the hedge (i.e., the Treasury short sale) which offset the interest-rate-driven decline in the gain on the sale of the MORI mortgages.

In summary, our hedging objective was met; the sum of (a) the actual pre-tax gain on sale ($1.9M) and (b) the pre-tax gain on the hedge ($0.8M) approximately equals the pre-tax gain on sale MI would have realized had interest rates not risen between April and October.

# Plaintiffs' Exhibit 4

# BACKGROUND INFORMATION NOTE
(PAGE 1)

Case Name: Short Sales

Control Number: TR-33-000105-93 Branch Symbols: CC:DOM:P&SI:1

## RECORD OF CLEARANCE

Initiator: Mary A. Berman Phone: 622-3050

Branch Reviewer: David R. Haglund Phone: 622-3050

| DOMESTIC COORDINATION | | OTHER COORDINATION | |
|---|---|---|---|
| ACC(FS) Reviewer | Date: | Name (Symbols) | Date: |
| Curtis Wilson | 06/23/93 | Regina Oldak CC:EBEO | 02/07/94 |
| Other Reviewer (Symbols) | Date: | Name (Symbols) | Date: |
| Alan Munro CC:DOM:FI&P | 02/04/94 | | / / |

## ASSISTANT CHIEF COUNSEL

Date Submitted: 10/28/94 Date Cleared: 11/03/94

Other Contact Person (Phone): ______ ( - )

## ASSOCIATE CHIEF COUNSEL

Date Submitted: 11/10/94 Date Cleared: 11/17/94

## CHIEF COUNSEL

Date Submitted: / / Date Cleared: / /

## COMMISSIONER

Date Submitted: / / Date Cleared: / /

## TREASURY

Date Submitted: / / Date Cleared: / /

Macro Form Revised 02/94

Background Information Note

**HOLDING:** The proposed revenue ruling holds that short sales of securities as described in the ruling create partnership liabilities under § 752.

**BACKGROUND:** Rev. Rul. 88-77, 1988-2 C.B. 129, defines a liability for purposes of § 752. On December 30, 1988, the Service published temporary regulations under § 752. The temporary regulations incorporated the definition of a liability contained in Rev. Rul. 88-77. On December 20, 1991, the Service published final regulations under § 752. The final regulations do not include a definition of a liability. The definition of a liability was dropped from the regulation for purposes of simplicity and brevity. It was not dropped with an intent to change the definition. It was believed that the regulations did not need a separate definition of a liability because it would only duplicate the definition contained in Rev. Rul. 88-77.

**SOURCE:** This project was established at the request of Treasury.

**REASON FOR PUBLICATION:** Publication is needed because some taxpayers are engaging in short sales through partnerships with the hope of avoiding a basis increase in their partnership interests. This would enable taxpayers to create gains that can be offset by losses that would otherwise expire. These transactions are inconsistent with the Service's position that partnership liabilities are created and therefore the partners' bases are increased.

A short sale is a contractual arrangement under which the seller is obligated to make delivery of a specified amount of specified property at some date in the future. The usual form of a short sale transaction is the seller borrowing property that is immediately sold on the open market.

The potential for abuse can be illustrated as follows: A, an individual, with losses about to expire, forms a 50/50 partnership with B, an investment bank. A and B each contribute $100. The partnership borrows securities from its securities broker-dealer and sells them short for $500. The $500 is deposited with the securities broker-dealer and listed as an asset on the partnership's books. Before the short sale closes, B sells B's 50% interest, causing a § 708(b)(1)(B) termination. By taking the position that a partnership liability is not created, A's basis is not increased beyond A's initial contribution of $100. Therefore, on the deemed distribution under § 708(b)(1)(B), A has a gain of $250 (distribution of $350 minus a basis of $100). This gain allows A to use the losses.

The Service position is that the obligation creates a partnership liability and, therefore, each partner's share is included in its adjusted basis. As a result, A's basis prior to the termination includes A's share of the partnership liability resulting in a total basis of $350, and no gain is realized on the termination.

**PENDING REGULATIONS:** There are no proposed, temporary, or draft regulations that cover the issue in this revenue ruling.

The proposed subchapter K anti-abuse regulation under § 701 could provide an alternative basis to challenge a taxpayer's position in a case like the one described above. However, we believe that the technical position asserted in the proposed ruling is convincing. To include a discussion of the anti-abuse regulation in the proposed ruling could suggest otherwise. Furthermore, the issue of whether a short sale creates a liability under § 752 can arise where the short sale is not engaged in with an improper view, and the ruling is drafted so as to raise only the technical issue.

**CONTRA ARGUMENTS:** There are two contra arguments to the publication of the proposed revenue ruling. First, the definition of a liability as stated in Rev. Rul. 88-77 may not generally be considered as including short sales. Rev. Rul. 88-77 provides that the term "liability" includes an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings). The classic example of this type of partnership liability is a mortgage on real property. The borrowing leg of a short sale of securities does not meet the definition in Rev. Rul. 88-77 because the mere borrowing of stock does not increase the basis of a partnership asset. However, in the other leg of the transaction, the borrower converts the borrowed stock into cash, which has basis, without the recognition of income. Therefore, we believe that the transaction creates the type of obligation intended in the definition of a liability set forth in Rev. Rul. 88-77. Also see, e.g., Deputy v. du Pont, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118 (a short sale creates an obligation although not an indebtedness). The term "liability" is broader than the term "indebtedness." Accordingly, the holding in Deputy v. du Pont supports the holding in this ruling.

A second contra argument is that, if the Service considers these transactions to be partnership liabilities, taxpayers can structure transactions using short sales that provide basis for partners whenever needed. However, even without the proposed revenue ruling, alternatives such as loans exist to provide partnerships with additional basis. Because short sales fall within the definition of a partnership liability set forth in Rev. Rul. 88-77, it is appropriate that a partner include in basis the partner's share of the liability.

**COORDINATION:** CC:EBEO published a companion revenue ruling, Rev. Rul. 95-8, 1995-4 I.R.B. 29, addressing whether short sale transactions give rise to unrelated business taxable income (UBTI) under § 512. We have coordinated with CC:EBEO and their counterparts at XLC. They have concluded that their position is not affected by our proposed ruling.

**RESEARCH STATEMENT:** The attached proposed revenue ruling has been researched by the originator through February 28, 1995.

for [signature]
Chief, Branch 1 (CC:DOM:P&SI)

3/1/95
Date

Attachments:
Rev. Rul. 88-77
Rev. Rul. 95-8

# Plaintiffs' Exhibit 5

Questions I might be asked.
That RR 88-77.
Significance of partnership case Helmer (probably find significance below).
Similarity to deep-in-the-money options.
P&SI says there is no relevant case under § 357, but mentions Bongiovanni.
Maybe to do.
RR 80-199, 1980-2 C.B. 122: announces IRS will follow Focht, not Bongiovanni.
Says its interpretation of "liability" applies only in § 351 regime, not elsewhere.
Conference with Crouch 1/9/95.
RR 95-8 just issued by EBEO: income from a short sale is not UBTI [I reviewed it; it cites a S. Ct. case under § 163 that the obligation to replace stock borrowed in a short sale is not "indebtedness", and the UBTI rules require indebtedness, so there is no UBTI.]
Brown etc. have asked Corporate how short sales would be treated under the liability rules of §§ 351, 357.
Conference with Jackal, FI&P, P&SI, Treasury, Crouch 1/9/95.
[These are very loose notes; I was not sure who represented who and heard a lot of vaguely reminiscent partnership tax law.]
RR 95-8 says a short sale does not create indebtedness, so income from short sale not UBTI.
So Brown is reluctant to say a short sale generates a liability.
Can it be an obligation without being indebtedness?
Brown suggested writing a regulation to cover all these questions.
Brown mentioned uncovered options. How would one be handled? Would the problem ever arise without a deep-in-the-money option? A '75 ('78?) case: people formed a partnership. The partnership got $1t for writing an option to sell its land. Option was fixed price. We tried say § 731 gain because partnership distributed the cash to partners. Partners said no, should be a § 752 liability there. But court said no, no obligation to repay. Certainly if the option were exercised, the partnership must transfer the land. [Case apparently called Helmer, discussed in McKee.]
If did it without a partnership, no gain.
Options and short sales have lot in common. In both cases bet (he seems, Treasury guy, say) same, though maybe different magnitude and cost.
Should we say short sale creates liability when an option does not? Worried about adverse selection: if want basis and gain, rely on Helmer using short sale, if not use option.
FI&P might say all options obligations [liabilities?]?
Mentions 446-5 [a regulation?] [get feeling quite important here]. FI&P apparently says every option, whether deep-in-money or not, is a § 752 obligation [liability?]. Others apparently disagree. (That is apparently at odds with Helmer; hence they are talking about maybe doing this as a regulation (overruling a case) rather than just a RR (or something).)
But P&SI has problems with that FI&P view.
P&SI wants keep "liabilities" narrow, not blow § 752 wide open.
Treasury does not like giving taxpayers selectivity [so we have FI&P, P&SI, Treasury positions: but does Treasury want handle it by going in same direction as FI&P?].
P&SI says there is no relevant case under § 357 (but mentions something like Bongiovanni). Jackal mentions a recent S corporation basis case (maybe Hitchins): S corporation did not formally substitute its note for shareholder's (?) debt, but essentially . . . : court talked about varying meanings of "liability".
They are trying to figure out what Brown's feeling was at last meeting.
What did he say: if options and short sales are the same, he does not want us handling them differently. Did he say that? Apparently Brown's worried this proposed ruling and RR 95-8 seem run in opposite directions. Re Helmer, etc., if we had to choose one poison or another, he tended agree with Helmer (a position IRS perhaps needs, lesser of two evils).

Jackal: different answers at partner and partnership levels: Jackal does not like, thinks Helmer bad idea, thinks contrary to direction in which we are going.
Brown said Helmer's bad if just do § 705 only [believe McKee discusses this], so our ruling should say basis increase under § 752, not just § 705 [apparently McKee makes same point].
FI&P willing put out short sale ruling and say nothing about options. FI&P had argued against the EBEO ruling [95-8] as inconsistent with this proposed ruling, same thing worrying Brown. [Apparently a question whether to delete deep-in-money option language from RR. Jackal: we cannot mention them and leave them at that.]
Treasury [apparently] opposes leaving it open with possibly one rule for short sales but latitude for taxpayers re options (and does not think can do same for options in a RR, need regulation to overrule Helmer).
Whole issue is mismatch between inside and outside basis. Good [?] basis inside because agreed to do this in future [or because partnership has the cash?]: Treasury wants reach right result re outside basis too: a basis kick-up there too, no matter how get to that result, and only way there is § 752: using it to cram through result: understands it is not an entirely clean way of doing it.
P&SI does not want to broaden § 752, v. Treasury wants consistency if done inside or outside partnership.
Talked about meeting again next week [to try reach a consensus?].

Conference with Crouch 1/9/95.

- Make sure there are no cases on point under § 351, 357.
- Then decide whether Corporate wants the result to go one way or the other.
- Consider § 357(b) too.

Review of P&SI's briefing memo for 3/7/95 meeting with Brown.

- Executive summary.
  - Issue: does short sale by partnership create partnership liability under § 752?
  - RR 88-77: § 752 liabilities include an obligation to extent incurring it creates or increases basis of any partnership assets (including cash attributable to borrowings).
  - The cash received in the short sale increases the partnership's asset basis. Hence short sale creates a liability.
  - Recommendation: issue the RR.
- Attachment to Chief Counsel Meeting Request Form.
  - Issue.
    - Original draft RR addressed both short sales and deep-in-money puts; held both created § 752 liabilities.
    - EBEO RR ruled short sales create obligations but not debt-financed property re § 514.
    - Chief Counsel asked that further consideration be given to (1) draft RR position on treatment of other arrangements such as options and deep-in-money puts, (2) possibility of addressing short sales under § 705(b) rather than § 752.
  - Treatment of other arrangements.
    - Options.
      - "Existing authority is contrary to a position that options create liabilities". Helmer held that no partnership liability is created upon receipt of option payments by a partnership; payments received were without restrictions except that upon exercise of the options the amounts would be applied against the purchase price.
      - "While we agree that existing authority prevents treating options as creating liabilities in the proposed RR, further consideration of the appropriateness of expanding the definition of liability is recommended. We recommend, in view of connection between liability definition under §§ 752

# Plaintiffs' Exhibit 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - -x

ORIGINAL

MARRIOTT INTERNATIONAL RESORTS, :
LP; MARRIOTT INTERNATIONAL JBS :
CORPORATION, TAX MATTERS PARTNER, : Nos. 01-256 T
Plaintiffs, : and 01-257 T
vs. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - -x

DEPOSITION OF LESTER PULSE

Washington, DC
Wednesday, December 11, 2002

REPORTED BY:
VICKY J. STALLSWORTH

Deposition of LESTER PULSE, called for examination pursuant to notice of deposition, on Wednesday, December 11, 2002, in Washington, DC, at the offices of Crowell & Moring, 1001 Pennsylvania Avenue NW, at 9:21 a.m., before VICKY J. STALLSWORTH, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

ROBERT L. WILLMORE, ESQ.
HAROLD J. HELTZER, ESQ.
Crowell & Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595
202-624-2915
On behalf of Plaintiffs

--continued--

APPEARANCES (CONTINUED):

CHARLES M. RUCHELMAN, ESQ.
ROZELLA OLIVER, ESQ.
ROBERT NOAH, ESQ.
CRYSTAL MILLER, ESQ.
U.S. Department of Justice
555 4th Street NW, Room 8112
Washington, DC 20001
202-616-3423
On behalf of Defendant

P R O C E E D I N G S

Whereupon,

LESTER PULSE

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. RUCHELMAN:

Q Good morning, Mr. Pulse.
A Good morning.
Q My name is Charles Ruchelman. I'm an attorney with the Department of Justice tax division. And this is your deposition in the case of Marriott International Resorts Limited Partnership, which is docketed in the United States Court of Federal Claims, Docket Number 01-256 T and 01-257 T.
What we're going to do today is I'm going to ask you a few questions about what you know about the facts and the allegations in this case.
Have you ever been deposed before? Have you ever given testimony at a deposition before?
A Yes.

mortgage pool sale?

A Other than ultimately becoming a partner in the partnership, I don't have any other recollection of MICC.

Q Okay. Was MICC involved in any other of the mortgage pool sales, the 1995-A transaction, the 1993-A transaction, the 1992-A transaction? Any of those?

A I don't believe so.

Q Let's talk about the term "hedging" for a moment. Do you understand what that term means?

A Well, I understood what it meant in the context of this transaction.

Q Okay. What is that? "This" meaning 1994-A mortgage pool transaction.

A The 1994 time-share note transaction.

Q Okay.

A We were concerned with interest rates rising and affecting the value of the asset. And we decided to put a hedge on it. So that's how I would -- that's all I can give you on the definition of "hedging."

A I have a recollection in '95. But I'm not -- I can't give you the details since I wasn't involved with the transaction. But it seemed like it may well have been hedging activity going on in '95.

Q Okay. Are you familiar with the term "bankruptcy remote entity"?

A I've heard those words before.

Q Okay. Are you familiar with those words in the context of this case, of this transaction, the 1994-A transaction?

A I've heard those words used in this transaction, yes.

Q Are you aware or were you aware in 1994 that a bankruptcy remote entity was used in the 1994-A transaction?

A I think in '94, my best recollection was there was an attempt to use the entity we could use to best allow us to get the highest price we could get on the mortgages.

I heard the term "bankruptcy remote" used in '94 and to the present. I've heard that term

used quite a bit both inside Marriott and outside Marriott. But my best recollection of what was happening in '94 was we were trying to do the right thing in terms of value.

Q Uh-huh.

A And whether that the partnership we used was bankruptcy remote, so forth and so on, only went to the point of view where we were trying to extract the highest value on the mortgages. That's my recollection of how that term came to me.

Q Right. Right. How would use of the bankruptcy remote entity provide the highest value in the transaction?

A Given my limited expertise on that, I can tell you what I thought in '94 was happening, and I think today happened, was it gave the buyer the highest security we could give the buyer in terms of the mortgages and hence allowed us to receive the highest price.

Q Okay. And you said it was a partnership used for that purpose.

A Yes.

included First Boston and probably did. I started with Marriott in '85.

Q Right.

A And my best guess is I've had some relationship with First Boston and other firms throughout my career at Marriott.

Q Okay. Let's just back up a little bit. You've referred to the spin-off a lot. Can you tell me what that means? What was the spin-off?

A Well, in '93, in essence, Marriott International was created essentially as a manager of the Marriott properties. And that entity was spun off, distributed to our shareholders I believe in October of '93.

Q Okay.

A The entity that transferred Marriott International is now known as Host Marriott, and they're essentially in material terms the owner of a number of Marriott properties.

Q Okay. What was the initial entity called? It was called Marriott Corporation.

A Yes.

A As we did the transaction --
Q Okay.
A -- that I see.
Q From your perspective, was this a tax planning presentation or a business planning presentation?
A My general sense in looking at it now is that it is attempting to do both.
Q Okay.
A But it does it in a very abstract unidentifiable to me way since it has no interrelationship with our business, our real interest rate risk or anything associated with Marriott.
Q Okay.
A Any company who looks at this document, one can argue all companies have interest rate risks. You can make a loose argument as they tried to do that this might make sense in terms of short reinvesting, so on.
Q I see.
A I'm certain then and I'm quite certain now

looking at this that this is not the transaction we did.

Q Okay. After reviewing this document, did you conclude that Marriott could achieve significant tax savings by structuring a transaction this way, as set out in Exhibit 164?

MR. WILLMORE: Objection.

THE WITNESS: No. The only thing I concluded, as I recall looking at this document, I was quite intrigued by the idea of a short obligation not being a liability for tax purposes. That's the main thing that as I went through this document I looked at and thought about, "is that true or not under the tax law?"

BY MR. RUCHELMAN:

Q Okay.

A And I believe from that I did do some checking in terms of that, that generalized concept.

Q I see.

A That before then I don't have any recollection that I -- I may have been familiar with this concept; I may not. But when I saw this, I

A -- is given the date of this and the date of this spin-off we were doing, it's entirely clear to me now why I was not paying a lot of attention to MTMG.

Q Okay.

A I will tell you, looking at A, B, C and D --

Q Right.

A -- and using some forward evidence I had with the company and what we have done with time-share notes since '94 --

Q Right.

A -- we typically sell time-share notes on a quarterly basis.

Q Okay.

A As a rule, today, at least for the last couple of three years.

Q I see.

A I believe what was happening in '94, and my recollection goes to the growth committee submission that we made on the '94 transaction, I believe that submission indicates or was discussed

at the meeting, how did we end up with this volume of notes.

Q Okay.

A What was -- why do we have this big a note pile sitting on our balance sheet.

I believe the fundamental reason, as I recall, is, and I keep coming back to the spin-off, not to obfuscate anything, but ~~to~~ the spin off changed the entire financial structure in creating Marriott International, wherein we had very little debt. And there was, I'm certain, the growth committee -- it's either in the document or we discussed it, the discussion was very simple. Why don't we hold these notes and earn the high interest? Why are we selling them off and keeping just the residual? Why not keep the entire spread?

And I believe at that time, in '94, the year went along, the notes piled up. I think at the time the growth committee made the decision, no, we want to recycle the capital. We want to sell the notes.

Q Okay.

A So my best recollection is we didn't have these tranches in '94.

Q Right.

A We had one transaction near the end of the year.

Q And --

A And I believe that's why.

Q Okay. And you said there was some growth committee discussion or in the memo --

A That's my recollection.

Q Right. As to why Marriott was holding the notes. Do you recall when in time that was, what month in 1994? Was it earlier in the year or was it towards the end in November when the sale to Teachers was done?

A I have no recollection as to the fundamental decisions as to who was in charge of how many notes was being produced and how that volume was growing.

Q Okay.

A I do have a distinct recollection though in '94, and I believe it was at the growth committee

meeting, with respect to this transaction, there was a long discussion about should we sell or not.

Q Okay.

A And it went to the spreads form and it went to the fact that our balance sheet, prior to the spin-off, we were very highly levered at a lot of debt. It was easy to sell time-share notes at that point. Post-spin-off, we had very little debt. So there was less of a need to recycling capital than before.

Q Okay.

A So there's a sequence going on here of a new Marriott International, people grappling with these issues --

Q Right.

A -- and so forth.

Q So if the sales were made on a quarterly basis, the '94-A note sale would have been around April 1st, and the '94-B would have been around June 1st. Is that how it would work?

A It would generally, hypothetically --

Q Okay.

years '93, '94 and '95."

And part of the response is on the bottom of page 7, which says "in early 1994, CS First Boston provided Marriott with a description and analysis of a proposed transaction which would have resulted in certain tax benefits. While Marriott did not implement that proposed transaction, some aspects of CSFB's analysis were considered in planning the transactions at issue in these cases."

And the question I have about this is how can you say in this response -- how can Marriott say that Marriott did not implement that proposed transaction?

A This answer drives off of a January '94 document that Phil Hamon sent --

Q Okay.

A -- to somebody in the company. I guess it came to me as I recall. It is my view that, in the ~~looks~~ loose sense, if you want to call that a proposed transaction, small T, I suppose you can. But, again, the only element of that document that I saw that piqued my interest at all was the ability to

hedge through short sale.

So it is my view that the transaction, little T, in that document we did not execute.

Q But CS First Boston executed the trades for you.

A They executed the trades, right.

Q How was that different? They proposed a plan for corporate structures. They proposed trades, Treasury notes, and Marriott basically did those items.

MR. WILLMORE: I'm going to object. That mischaracterizes both the testimony and the record.

BY MR. RUCHELMAN:

Q That's my question.

A Let me describe to you what they didn't propose.

Q Okay.

A Was a bona fide and necessary need to hedge time-share notes. They didn't propose that we had developed a large volume in these notes that needed hedging, because in my view, the volume was developed because we had the capacity to hold the

notes. They knew nothing about that, didn't develop that. They didn't develop the fact that MIR sold the notes to teachers, remains in existence today with the residual interest. They didn't develop any of that.

So in the wild substance of the transaction as I describe the transaction, the ultimate -- the entire transaction, it didn't describe that transaction at all.

Q So who developed it, then? How did it come to --

A The business was ongoing. The business was not created. The time-share notes were not created.

Q Right.

A This was not created for a tax planning strategy. The simple fact of the matter is that this hedge, which was executed in the form of a short sale --

Q Right.

A -- was embedded in a bona fide business activity, and was needed to protect ourselves from a

diminution in value of these notes, and the tax consequences resulted from that. And First Boston never described that type of transaction at all in my mind in the January '94 document.

Q But someone wedded the facts, Marriott's financial position, Marriott being in the mortgage note business, Marriott looking to sell the -- pooling and selling the mortgage notes -- somebody wedded those facts to the tax benefits of creating a partnership, contributing the mortgage notes to the partnership and the short sale and the obligation to close the short sale to the partnership, and the transfer from MORI to MICC -- someone wedded those facts to those structures to create a multimillion dollar tax loss.

Who was that?

A Well, I've told you that in substance Mike Dearing and I --

Q Okay.

A -- did the transaction.

Q Okay.

A -- in a material sense.

Q And Mr. Dearing from the finance side and Mr. Pulse from the tax side.

A Yes.

Q Now, why does Marriott care whether CS First Boston gets any credit for this transaction?

A You're --

MR. WILLMORE: Objection. What do you mean by credit?

BY MR. RUCHELMAN:

Q Well, why not say Marriott implemented the transaction that CS First Boston proposed?

A Because that would be false.

Q And it's false because?

A When you say proposed --

Q Right.

A -- I take that to mean you're talking about the January '94 document --

Q Okay.

A -- that came in early '94.

Q Right.

A In my view, to argue that that transaction was executed is false. That transaction was not

executed. What was executed is what we did. And what we did in a material sense is associated with a business activity and had economic substance, and would have been done with or without a tax planning strategy.

Q A tax what?

A Tax planning strategy.

Q So you view that January document as a tax planning strategy?

MR. WILLMORE: Objection. Mischaracterization of testimony.

THE WITNESS: I view that document, again, what piqued my interest in the document was the expression that hedging in the form of a short sale could have tax ramifications that we needed to study, assuming that there was an existing and overwhelming business purpose to execute the hedge.

BY MR. RUCHELMAN:

Q Okay. Let's take a look at Exhibit 288. Are you familiar with this document?

A No, I'm not.

Q Let's take a look at Exhibit 406. Have

tranches or series of mortgage pool transactions, the '93A, '94A, '94B, C, D.

Do you recall that discussion?

A Yes.

Q And you indicated that Marriott decided to hold the mortgages rather than sell them in the quarterly basis because Marriott had the capital to do it.

MR. WILLMORE: Objection. Mischaracterizes the testimony.

THE WITNESS: I think what I indicated is given the newness of the company and what I perceived at the time really to be an evolving process, not only with respect to time-share notes but with respect to the financial policies of how we were going to operate Marriott International, the volume of these time-share notes because the activity of the business was picking up ended up to be what it was.

BY MR. RUCHELMAN:

Q Okay.

A But it was not at this point in time,

thinking about the present case, it was not as critical to us for a couple of reasons.

One, we were able to carry those notes and the corresponding debt without it getting anywhere near losing our investment grade status on the ~~bottom~~ bond market. And the spreads were attractive, ~~Bar/was paying 4~~ paying 400 or 500 basis points more than the Treasury bill. That number was a heck of a lot more than our bar. So for some reason, it made some sense to keep those notes until we decided what the financial policies of Marriott International were going to be.

Q And that's when Marriott changed its corporate mind and decided to sell the '94A pool in November of '94, once it had determined what the financial policy of Marriott was going to be?

A I'm not sure it was finally determined at that point ~~of view~~ in time. But certainly at that point in time, we decided to sell that mortgage portfolio.

Q And if you felt that the spread was positive for Marriott -- it was attractive for Marriott, the spread that you discussed, why enter

into a hedge with the short sale transaction as you did with CS First Boston?

MR. WILLMORE: Objection.

THE WITNESS: Again, my understanding of the hedge was to protect the value of the asset we had. We clearly had a view. If you go back to the '93 TIAA agreement, there must have been a view that there was a possibility we could be doing more transactions. And it seemed prudent at the time, given the sizes of this loan portfolio, and we were going forward in '94, whether we actually executed a transaction with teachers or not, certainly it was on the radar, there's a possibility we could sell these mortgages.

And it made no sense to let that fixed-rate asset sit out there in an environment where I believe at that time the company thought the bias of interest rates was to go up, which is what happened, not because we can foresee the future.

Q Right.

A But my recollection is we actually thought at that point in time the environment indicated to

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

x M Zestur Pula Jr

Subscribed and sworn to before me this 29 day of January, 2003.

x Paula Niswander

Notary Public

My commission expires: PAULA NISWANDER
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires February 2, 2003

ERRATA SHEET

DEPOSITION OF: Lester Pulse

DATE OF DEPOSITION: 11 December 2002 PAGE 1 of 3 Pages

| PAGE | LINE | CORRECTION (Type or print) |
|---|---|---|
| 16 | 2 | Add "amounts" after "de minimis" |
| 16 | 2 | "minimum" changed to "minimums" |
| 16 | 6 | Strike "is" |
| 21 | 7 | "that" changed to "the" |
| 21 | 7 | "papers" changed to "paper" |
| 22 | 6 | Strike extra "is" |
| 25 | 1 | "finances" changed to "financing" |
| 35 | 20 | "mortgage" changed to "mortgages" |
| 37 | 14 | Strike "in all its sense" |
| 44 | 2 | "settlement" changed to "transaction" |
| 45 | 8 | "partner" changed to "partnership" |
| 46 | 12 | "standing" changed to "planning" |
| 65 | 2 | "wherefrom" changed to "from which" |
| 66 | 7 | Add "of the" after "disposition" |
| 67 | 7 | Add "Resorts, Inc." after "Ownership" |
| 68 | 22 | "subsidiaries" changed to "some purpose" |
| 70 | 2 | "management" changed to "matters partner" |
| 77 | 16 | Strike "end" |
| 94 | 21 | "fax" changed to "facts" |
| 96 | 16 | "no idea" changed to "know" |
| 116 | 8 | "to" changed to "the" |
| 119 | 14 | "marks" changed to "is March" |
| 135 | 15 | Add "interest" after "partnership" |

# ERRATA SHEET

**DEPOSITION OF:** Lester Pulse

**DATE OF DEPOSITION:** 11 December 2002 **PAGE** 2 **of** 3 **Pages**

| PAGE | LINE | CORRECTION (Type or print) |
|---|---|---|
| 148 | 3 | "merit" changed to "Marriott" |
| 153 | 10 | "market" changed to "mark" |
| 154 | 3 | "market" changed to "mark" |
| 163 | 7 | Strike the 1st "was" |
| 165 | 11 | "Barters" changed to "Partners" |
| 169 | 9 | "or" changed to "for" |
| 180 | 2 | "speaker national" changed to "International" |
| 196 | 11 | "ability" changed to "taxability" |
| 206 | 7 | "partner" changed to "department" |
| 207 | 12 | "Grif" changed to "Griff" |
| 207 | 13 | "Don" changed to "Dawn" |
| 214 | 1 | Add "purpose" after "business" |
| 226 | 1 | "Grif" changed to "Griff" |
| 236 | 19 | "looks" changed to "loose" |
| 242 | 19 | "Grif" changed to "Griff" |
| 242 | 19 | "Don" changed to "Dawn" |
| 243 | 1 | "Grif" changed to "Griff" |
| 243 | 1 | "Don" changed to "Dawn" |
| 243 | 10 | "Grif" changed to "Griff" |
| 243 | 10 | "down" changed to "Dawn" |
| 243 | 14 | 2nd "Mr." changed to "Ms." |
| 250 | 14 | "really" changed to "rarely" |
| 260 | 3 | "gap" changed to "GAAP" |

# ERRATA SHEET

**DEPOSITION OF:** Lester Pulse

**DATE OF DEPOSITION:** 11 December 2002 **PAGE** 3 **of** 3 **Pages**

| PAGE | LINE | CORRECTION (Type or print) |
|---|---|---|
| 264 | 2 | "Owner" changed to "Owned" |
| 264 | 4 | "Owner" changed to "Owned" |
| 266 | 17 | "year" changed to "air" |
| 273 | 8 | "insurance" changed to "inside" |
| 273 | 8 | "object" changed to "in the" |
| 280 | 6 | "bottom" changed to "bond" |
| 280 | 6 | "." changed to "," |
| 280 | 7 | "Bar was paying 4" changed to "paying 400" |
| 280 | 18 | "of view" changed to "in time" |
| 283 | 11 | "Buudoin" changed to "Baudoin" |
| 283 | 13 | "Buudoin" changed to "Baudoin" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Plaintiffs' Exhibit 7

COURT OF FEDERAL CLAIMS SECTION



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

- - - - - - - - - - - - - -x

MARRIOTT INTERNATIONAL :
RESORTS, et al., :
Plaintiffs, : Numbers 01-256 T
vs. : and 01-257 T
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - x

DEPOSITION OF MICHAEL E. DEARING

Washington D.C.
Thursday, December 12, 2002

REPORTED BY:
BRENDA SMONSKEY

Deposition of MICHAEL E. DEARING, called for examination pursuant to notice of deposition, on Thursday, December 12, 2002, in Washington, D.C., at the offices of Crowell & Moring, 1001 Pennsylvania Avenue, Northwest, at 9:35 a.m., before BRENDA SMONSKEY, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

ROBERT L. WILLMORE, ESQ.
HAROLD J. HELTZER, ESQ.
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
On behalf of Plaintiffs

-- continued --

APPEARANCES (CONTINUED):

ROZELLA A. OLIVER, ESQ.
CHARLES M. RUCHELMAN, ESQ.
ROBERT NOAH, ESQ.
United States Department of Justice
P.O. Box 26
Ben Franklin Station
Washington, D.C. 20044
On behalf of Defendant

ALSO PRESENT: Crystal Miller

P R O C E E D I N G S

Whereupon,

MICHAEL E. DEARING

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. OLIVER:

Q Good morning, Mr. Dearing. My name is Rozella Oliver. I'm an attorney with the Justice Department Tax Division. Along with my co-counsel Charles Ruchelman, I'm representing the United States in this action brought in the Court of Federal Claims in the cases of Marriott International Resorts, LP versus United States, Federal Claim Number 01-256 T and 01-257 T. This deposition is being taken pursuant to the rules of the Court of Federal Claims.

I'm going to ask you questions today to find out what you know about the facts and allegations in this lawsuit.

Have you ever been deposed before?

A Yes.

MORI note sale program was being analyzed.

Q When you say "spin-off," can you explain what you mean by that, the spin-off of Marriott International?

A In I believe it was October of 1993, Marriott Corporation spun off Marriott International.

Q What is Marriott International or how is it different from the old Marriott Corporation?

A Prior to October '94, Marriott Corporation --

Q October --

A October of '93. Excuse me. Marriott Corporation owned a significant amount of hotel real estate, and it was also a hotel management company.

The effect of the spin-off was that Marriott International, the spun-off company, was the management company, the hotel management company, while Marriott Corporation, later renamed Host Marriott, was primarily a hotel real estate ownership company.

Q Do you know as a result of the spin-off

the number of note sales?

A As I said, I don't specifically recall discussions with Barry Johnson about the number or timing of note sales in 1994.

Q Just to back up a little, can you tell me who Barry Johnson is?

A Barry Johnson was the business person at Teachers who had primary responsibility for the time-share note sales between Marriott and Teachers.

Q Was he your primary contact at Teachers?

A Yes.

Q From Marriott's perspective, what would have been the benefits of doing one note sale in 1994 as opposed to multiple?

A Well, the longer we held the notes, the more income, more interest income we would have received, since during the period of the hold we got the interest income. So one factor that was a favorable factor in terms of holding would be the interest income coming from the notes.

There would be lower transaction costs associated with doing fewer as opposed to more

time-share notes. But, again, I have to say that any such decision wouldn't have been unilateral on the part of Marriott. It would have been made in dialogue with Teachers.

Q But your testimony today is that you cannot recall any such dialogues with Barry Johnson at Teachers?

A That is correct.

Q And you don't recall any documents that memorialize such discussions?

A That too is correct.

Q And you don't know of any documents that memorialize the decision to do one note sale as opposed to multiple sales in 1994?

A I would like to clarify that I'm sure there are documents that talk about the note sale. But if you mean documents that specifically discuss the decision as to whether there should be one or two or three or four within '94, I don't specifically recall documents dealing with that point.

Q In the 1991 note sale to Teachers, was

set up and whether the partnership was a necessary component. The part that I was focused on from a business standpoint was making sure the interest rate exposure on the portfolio was protected.

Q Could you have done the hedge without setting up a partnership?

A I really don't recall the exploration of alternative structures. Understand, the way this happened was there was an intent to protect the interest rate exposure we had on the time-share note portfolio.

Based on taking into account all the advice from the accountants and First Boston and our counsel, we set up up in the way that made the most sense. As to that particular component, I don't recall the advice.

Q Do you know if the decision to have a partnership was driven by TIAA or Teachers' needs in the note sale in 1994?

A I don't recall particularly. I do recall that they had a persistent desire to make sure that there was a bankruptcy-remote unit involved so that

they would be protected from the time-share mortgage pool being dragged back into a bankruptcy estate on the part of the seller or seller's affiliates.

Q In the prior sales to TIAA, what was the grantor that was used to effectuate the sale to TIAA?

A As I recall, MTMG was the grantor in some of those deals. I'm not sure whether it was in all of them.

Q MTMG, was that a partnership or a corporation?

A I think it was a corporation. Again, the decision as to the exact form of these units, whether they were corporations or LLCs or partnerships, wasn't something that I was primarily focused on.

The way in which those organizational units were incorporated or structured and the various forms that they took, we took the advice of our counsel and our accountants and our financial advisors on what was the most logical way to set it up. My focus was the business objective.

invest in other assets.

Q So had that capacity increased or decreased?

A What this reference is is that our current estimate for the amount of investment capacity as well as what the other uses of it are, what this is saying is that the best current use or one of the better current uses for our investment capacity would be to stay invested in the MORI time-share mortgages for the course of the year.

Q So to hold on to them longer rather than execute quarterly sales?

A Right.

Q The second reason given in this paragraph is "the significant profit contributed by the MORI mortgages." What does that mean?

A That's the interest spread, the difference between the interest income on the mortgage portfolio and the cost of carrying those mortgages, the interest expense related to the related debt.

Q Now, it says that recently one and two occurred or were occurring. Was that something that

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

x [signature]

Subscribed and sworn to before me this 31st day of January, 20 03.

x [signature]
Notary Public

My commission expires: 1/19/05.

LAURA L. PEARCE
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
MY COMMISSION EXPIRES JAN. 19, 2005

# ERRATA SHEET

DEPOSITION OF: Michael E. Dearing

DATE OF DEPOSITION: 12 December 2002 PAGE 1 of 1 Pages

| PAGE | LINE | CORRECTION (Type or print) |
|---|---|---|
| 89 | 13 | "partner" changed to "part" |
| 99 | 8 | "Don" changed to "Dawn" |
| 99 | 15 | "Don" changed to "Dawn" |
| 100 | 7 | "Don" changed to "Dawn" |
| 108 | 20 | "NED" changed to "MED" |
| 113 | 13 | "LPPs" changed to "LPs" |
| 134 | 3 | "stretch" changed to "structure" |
| 160 | 20 | "lot" changed to "lock" |
| 161 | 9 | "Don" changed to "Dawn" |
| 161 | 10 | "Don" changed to "Dawn" |
| 197 | 20 | "Principals" changed to "Principles" |
| 198 | 15 | Add "a" after "with" |
| 198 | 16 | "Aircraft" changed to "aircraft" |
| 202 | 9 | "Don" changed to "Dawn" |

# Plaintiffs' Exhibit 8

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner, Plaintiffs, | Nos. 01-256T and 01-257T |
| v. | Judge Charles F. Lettow |
| THE UNITED STATES, Defendant. | |

## DECLARATION OF OWEN A. LAMONT

I, Owen A. Lamont, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am submitting this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Plaintiffs' Cross-Motion for Partial Summary Judgment in these cases. I have personal knowledge regarding the matters set forth in this Declaration.

2. I have a B.A. in Economics and Government (with honors) from Oberlin College (1988), a Ph.D. in Economics from the Massachusetts Institute of Technology (1994), and have taught at the Princeton University Department of Economics, the University of Chicago Graduate School of Business, and the Yale School of Management. My CV is attached as part of Exhibit A.

3. Over the years, I have done substantial work related to short selling, including the publication of articles and papers regarding short selling, research with respect to short selling, and testimony before the National Association of Securities Dealers (NASD) and the U.S. House of Representatives regarding issues relating to short selling.

4. I was retained in 2003 by Plaintiffs as a testifying expert witness with respect to these cases. Pursuant to that retention, I was asked to prepare an expert witness report (1) explaining the mechanics of short selling generally, and (2) offering any opinions regarding the nature of the obligation that is created when one borrows a security in order to short it.

5. My expert witness report regarding these two matters was submitted in these cases in October of 2003. I was subsequently deposed by counsel for Defendant on January 29, 2004, regarding the matters covered in my expert report.

6. A copy of my expert witness report in these cases is attached as Exhibit A. It accurately reflects my conclusions and opinions regarding the matters addressed in the report. My expert report also sets forth my qualifications.

7. In Part III of my expert report ("Mechanics of Short Selling"), I explain the basic mechanics of short selling, as well as the motives for short selling.

8. In Part IV of my expert report ("Contingent Nature of Short Selling"), I explain the risks and contingencies associated with short selling. My opinions in this regard are accurately summarized in the "Summary of My Opinions" on page 2 of my expert report, which states as follows:

Borrowing a security and selling it short creates a contingent obligation. The value of the obligation, the timing of the obligation, and how the obligation is fulfilled are uncertain. The value of the loan fluctuates with the price of the borrowed security. The timing of the obligation is also unknown, and is not completely under the control of the short seller. The lender may demand the return of the borrowed security at any time. External events, such as squeezes or adverse price movements that decrease the collateral of the short seller, can force the short seller to close his position. The short seller is obliged to return the security to the lender, but in some cases this may not be necessary. The securities loan can be stretched out indefinitely. If the issuing company goes bankrupt, the loan might be terminated without actually returning the borrowed security.

9. I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19, 2008, at Chestnut Hill, Massachusetts.

Owen A. Lamont

# Exhibit A to
# Declaration of Owen A. Lamont

In the Matter of

Marriott International Resorts, L.P.,
Marriott International JBS Corporation

v.

The United States

United States Court of Federal Claims
Nos. 01-256T and 01-257T

Expert Witness Report of
Dr. Owen A. Lamont

October 2003

Owen A. Lamont
October 23, 2003

## I QUALIFICATIONS

My name is Owen A. Lamont. For the academic year 2003-2004, I am Visiting Professor of Finance at Yale School of Management. For the academic year 2004-2005, I will be Professor of Finance at the Yale School of Management. I am also a Research Associate at the National Bureau of Economic Research. Previously, I have been Associate Professor of Finance at the University of Chicago Graduate School of Business, Assistant Professor of Economics at Princeton University, and Associate Economist at the Boston Company Economic Advisors. I obtained a B.A. in Economics and Government (with honors) from Oberlin College in 1988, and a Ph.D. in Economics from the Massachusetts Institute of Technology in 1994.

My research is in empirical finance. I have published 16 papers in academic journals on topics such as stock returns, bond returns, closed-end funds, and corporate diversification. Most recently my work has focused on short selling. I have published two articles on short sale constraints (with Charles M. Jones, Short Sale Constraints and Stock Returns, *Journal of Financial Economics*, November 2002, and with Richard H. Thaler, Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs, *Journal of Political Economy*, April 2003), and have a third working paper on the subject (Go Down Fighting: Short sellers vs. Firms, November 2002).

I have received numerous prizes and awards for research, including fellowships from the National Science Foundation and the Alfred P. Sloan Foundation. I have presented my research at many universities, practitioner groups, and government institutions around the world. On the topic of short selling, I have addressed the NASD and have given testimony to the U.S. House of Representatives. I attach my CV as Appendix A, which lists all my publications and testimony.

Counsel for Marriott International has asked me to prepare this statement in order (1) to explain the mechanics of short selling generally and (2) to offer my opinions regarding the nature of the obligation that is created when one borrows a security in order to short it. I am being paid my customary rate, $800/hour, for work on this case.

## II SUMMARY OF MY OPINIONS

Borrowing a security and selling it short creates a contingent obligation. The value of the obligation, the timing of the obligation, and how the obligation is fulfilled are uncertain. The value of the loan fluctuates with the price of the borrowed security. The timing of the obligation is also unknown, and is not completely under the control of the short seller. The lender may demand the return of the borrowed security at any time. External events, such as squeezes or adverse price movements that decrease the collateral of the short seller, can force the short seller to close his position. The short seller is obliged to return the security to the lender, but in some cases this may not be necessary. The securities loan can be stretched out indefinitely. If the issuing company goes bankrupt, the loan might be terminated without actually returning the borrowed security.

The rest of this statement discusses my opinions in more detail. A list of the documents considered in preparing this statement is included in Appendix B.

## III MECHANICS OF SHORT SELLING

Short selling occurs when an investor sells a security that he does not currently own.[1] This transaction is accomplished by borrowing the security from a current owner, and selling it to a new buyer. Later, when the short seller wishes to end his short position, he will buy the security back, and return the security to the original lender. The short seller doesn't need to return precisely the same security that he borrowed, but can return an

[1] It some cases, an investor may sell short a security that he currently owns. For example, the investor would own shares in stock XYZ, but would nevertheless borrow shares of stock XYZ from another current owner, and sell them. Thus, the investor would simultaneously have both a long and short position in stock XYZ. In the past this transaction, known as "shorting against the box," was sometimes done for tax reasons.

identical security instead. When the short seller buys the security back and returns it to the lender, he is said to "cover" the short sale, thus closing his short position.

One motive for short selling is that the short seller believes the security will fall in price, and wishes to speculate on the price movement. Suppose the price of the security is $100 and the short seller thinks that it may fall. The short seller will borrow the security from an existing owner and sell the borrowed security to a new owner for $100. If the price of the security falls to $90 the following day, the short seller can then buy the security back, and return the security to the original lender. Since the short seller sold at $100 but bought at $90, he makes a $10 profit, not counting the expenses incurred. Like an investor who buys a security hoping to sell it after it has risen in price, the short seller is following a "buy low, sell high" strategy. The main difference is that the short seller reverses the chronological order of the transactions, selling it first, and buying it back later. Like all taxable investors, short sellers pay taxes on the profits they realize under current tax rules.

In addition to speculation, another motive for short selling is hedging. If an investor owns one security but wishes to hedge some of the price risk, he can short a similar security to reduce risk. There are also more technical motives for shorting, having to do with the need to deliver securities that one does not currently have in inventory.

Before selling short, the short seller must borrow the security from an existing owner. The first step is to find a willing lender. For some securities, such as small stocks that are not widely held by institutions or securities that are in great demand for borrowing, it can be difficult to find a lender. Various financial intermediaries attempt to match borrowers and lenders. Once the short seller has found a lender, the short seller (the borrower) and the existing owner (the lender) negotiate an agreement as to the terms of this loan. This agreement specifies the (1) duration of the loan, (2) the collateral provided by the borrower to the lender, and (3) any payments made by either side.

A typical agreement in the equity market would be as follows. Suppose A lends shares to B and B sells short the stock. (1) The duration of the loan is one day, though the loan can be renewed in subsequent days. (2) When the sale is made, the cash generated by the short sale does not go to B but rather to A, to serve as collateral for the loan. In addition to providing the short sale proceeds to A, B also must provide additional collateral, typically 2%, so that A gets 102% of the value of the security as collateral. Sometimes a lender will require even more collateral. This collateral is typically in the form of cash. As the price of the security rises, B will be required to provide additional collateral to A. When the loan is closed, A repays cash to B and B returns the shares to A. (3) In a typical loan, B receives some interest payment on the cash deposited with A. The rate paid is called the rebate rate, because A rebates the interest earned on the cash to B. For typical equity loans, the rebate rate is slightly below the riskless overnight rate. The difference between the rebate and the overnight rate serves as a fee that A gets in return for lending his shares. This difference is a cost for B, a holding cost that is paid periodically.

In this transaction, A is no longer the legal owner of the security, and so he does not receive any distributions (such as dividends or interest payments) generated by the security. Thus B is responsible for compensating A for this lost payment. If the stock pays a dividend of $1, then B must pay $1 to A (ignoring tax complications). These payments are another cost that B must pay to maintain his position.

## IV CONTINGENT NATURE OF SHORT SELLING

Short selling can be risky. For those who are shorting for speculative reasons, the most obvious risk is that instead of falling in price the security rises in price. If one sells short at $100, and then the security rises in price to $150, one has lost $50.

Although short selling can in general reduce risk when used for hedging, a variety of features of the securities lending market create uncertainty about the short position. Short

sellers never know exactly at what price they will cover, when they will cover, or what events might force them to cover.

A short seller may cover the next day, or he may not cover for months or even years. This time uncertainty creates another source of financial risk, because the short seller faces holding costs. As mentioned previously, one holding cost is the difference between the rebate rate and the riskless interest rate. Suppose this cost comes to $10 a year, and suppose the short seller sells at $100 and covers at $90. If the price falls immediately, then the short seller makes $10 (since he does not have to pay the yearly holding cost). If the price falls over the course of a year, the short seller breaks even (since he has paid one year's worth of cost). If the price falls in two years, the short seller loses $10. So even if the short seller believed the price would fall for certain by $10, uncertainty about the speed at which it falls creates financial risk.

Two events can force the short seller to involuntarily close the short position. First, if the lender demands that the short seller return the borrowed securities, the short seller will be forced to cover unless he is able to find a new lender. This event, called recall risk or buy-in risk, can occur because lending agreements are not indefinite but rather have end points. In the U.S., the term of a standard equity loan is one day, though the loans are usually renewed for subsequent days. That means on any day, either the lender (the owner of the security) or the borrower (the short seller) can decide to end the lending relationship. The lender of the stock has the right to demand the return of his shares at any time. If the stock lender decides to sell his shares (or for some other reason calls in his loan) after the shares have risen in price, the short sellers may be forced to close their position at a loss if they are unable to find other shares to borrow. This risk has long been recognized as a major problem for short sellers.

Even if the short-seller is able to find a new lender, the terms of the loan could change drastically. Securities that many short sellers wish to borrow are called "hot" or "special." Hot securities will be very expensive to borrow (assuming that one can even find a lender). In some cases, if a security becomes very expensive to borrow, a short seller may want to close his position because it is too expensive to maintain.

Second, a short seller may be forced to close his position because his net worth falls. Short sellers are required to post additional collateral as the value of the borrowed security rises. If the short seller cannot provide the additional collateral, he must close his position. Thus dramatic rises in the price of the shorted security can ruin a short seller. If the price rises, he may run out of money and be forced to cover his position. Thus if the short seller sells the security at $100, and it rises to $150, he may be forced to close his position. If the security later falls back to $90, the short seller does not benefit because he was not able to maintain his position.

Either of these two events can cause a "short squeeze," which I define as a situation when short sellers are forced to cover their positions at the same time, either due to inability to borrow the security or inability to maintain adequate collateral. A different, broader definition is that a short squeeze occurs whenever the price of a security rises and short sellers cover for whatever reason. Either because of lower wealth, increased risk aversion, or fear of further price rises, the short seller covers his position, increasing the demand for the security and driving the price further up.

Sometimes market manipulation can cause a short squeeze. An extreme form of buy-in risk is the "corner". Suppose B borrows bonds from A and sells them short. Now A acquires all available bonds and demands that B returns the borrowed bonds. In this case the only way B can return the bonds is to buy them (at an inflated price) from A.

Short squeezes and corners can occur in both the stock and bond market. Cornering is illegal and probably rare. Corners probably occurred in U.S. equity markets more frequently in the late 19th and early 20th century, a prominent late case being the Stutz

Motor corner of 1920 (Meeker, 1932). Two recent cases in the U.S. occurred in the late 1980's. The president of Southland Communications was tried and convicted for driving the stock price up in 1989 by cornering the firm's stock through secret trades (Lansner, 1998). In another case, the SEC determined that two individuals had orchestrated a corner in Chase Medical in 1988, and that they controlled 108% of the public float (Norris, 1989). In the Treasury market, a short squeeze apparently occurred in 1991 when Salomon Brothers nearly cornered the supply of a certain two-year note. Salomon admitted controlling 94% of the supply of this note, in violation of Treasury regulations. This squeeze caused prices to be significantly higher than normal (see Jegadeesh, 1993).

Short squeezes do not necessarily reflect market manipulation, they can also occur naturally. In the Treasury market, short squeezes come about when a particular government security is hard to borrow. This might occur if many investors wish to hedge out interest rate risk by shorting a particular benchmark Treasury issue, but for some reason there are not enough of this issue available for borrowing. In rare instances, governments intervene to relieve disruptive short squeezes in the fixed income market, a recent example being the U.S. Treasury market in October 2001 (see Ip and Zuckerman, 2001). The U.S. Treasury resolved the squeeze in a particular Treasury bond by issuing more of it, thus allowing short sellers the ability to borrow the now cheap and plentiful bond.

Short squeezes are about forcing the short seller to prematurely close his short position and return the borrowed security. On the opposite end of the spectrum, under some circumstances the short seller may never need to return the borrowed security. This could occur for two reasons.

First, if the borrowed security ceases to have value, the lender and the borrower may agree to terminate the securities loan without return of the borrowed security. In the equity market, a "terminal short" is when short sellers hold their positions until the price has fallen all the way down to zero. If the issuer goes bankrupt, the borrowed security usually ceases to have any value. In this case, the short seller and the securities lender

usually agree that the value of the security is zero, and thus it is not necessary for the borrowed security to be returned. This event, sometimes called a "deemed buy-in," is the same as if the borrower had repurchased the security for a price of zero and returned it to the lender. For tax purposes, the IRS currently requires that when the security is "substantially worthless" a taxable event occurs, and the short seller pays taxes as if he had returned the security at a price of zero.[2] Alternatively, the borrower and lender might agree on some small positive price to close the short position. In any case, actually repurchasing the security and returning it is not necessary (and indeed, may be impractical if the security no longer trades). Thus, some short positions never close.

Second, in principle, each day the lender and borrower can agree to renew the loan, stretching out the short position indefinitely. Thus in principle the security need never be returned. The short seller and lender just maintain the loan (and therefore the short position) indefinitely. Although it is not common, because eventually the lender wants to sell his securities and thus demands return of his securities, in some cases the short position can stretch on for years. Opdyke (2003) mentions Boston Chicken as an example of this phenomenon. Boston Chicken went bankrupt in 1998, but apparently some short sellers still have not closed their positions, and some lenders have not demanded return of their shares. Maintaining the loan would be in the interest of the short seller because by avoiding covering his position, he avoids paying capital gains tax.[3] Maintaining the loan might be in the interest of a (tax-exempt) lender because he may still receive income from the securities loan, income the borrower is willing to pay since it is more than offset by the reduced taxes.

---

2 This requirement was imposed recently. In prior years, in cases where the security became worthless and was never delivered back to the lender, the short seller paid no taxes on his profits. Gelband (1991) and Pollard (1987).

3 Since Opdyke (2003) reports that Boston Chicken is quoted at 10 cents a share, apparently it is not "substantially worthless" and the IRS rule does not apply.

A

**Appendix A**

Owen A. Lamont
Yale School of Management
135 Prospect Street
PO Box 208200
New Haven CT 06520-8200

(203) 432 3069, (203) 432 6970 fax
owen.lamont@yale.edu
http://mba.yale.edu/faculty/others/lamont.htm

**EMPLOYMENT**

Yale School of Management: Visiting Professor of Finance, 2003-present

**PREVIOUS POSITIONS**

The Boston Company Economic Advisors: Research Associate, 1988-89;
Associate Economist, 1989-90
Princeton University: Assistant Professor of Economics, 1994-95
University of Chicago Graduate School of Business: Assistant Professor of Finance, 1995-98; Associate Professor of Finance, 1998-2003

**EDUCATION**

B.A., Oberlin College, (with Honors) in Economics and Government, May 1988
Ph.D. in Economics, Massachusetts Institute of Technology, May 1994
Dissertation: Corporate Finance and Macroeconomics
Advisors: Olivier Jean Blanchard and Jeremy Stein

**RESEARCH INTERESTS**

Imperfect capital markets. Short selling. Security prices, expected returns, and reaction to news. Diversified firms and internal capital markets. Macroeconomic fluctuations and investment.

**TEACHING**

Princeton University, Department of Economics,
1994-95, Ph.D. Course in Macroeconomics
1994-95, Ph.D. Course in Finance
University of Chicago, Graduate School of Business,
1995-99, MBA Course in Corporate Finance
1998-2003, MBA Course in Portfolio Management (created new course)
Yale School of Management
2003-present, MBA Course in Behavioral Finance (created new course)

## HONORS AND FELLOWSHIPS

Philips Fellow in Economics, Oberlin College, 1987-88
Phi Beta Kappa, Oberlin College, 1987
National Science Foundation Graduate Fellowship, 1990-93
Alfred P. Sloan Foundation Dissertation Fellowship, 1993-94
MIT World Economics Laboratory Grant, 1994
Research Associate, National Bureau of Economic Research, 2003-present; Faculty Research Fellow, 1995-2003 (in Monetary Economics starting 1995, in Asset Pricing starting 1998, in Corporate Finance starting 1998, in Economic Fluctuations and Growth starting 2001).
FMC Scholar, University of Chicago Graduate School of Business, 1996-97
National Science Foundation CAREER grant ($213,472), "Expectations, the Stock Market, and Investment," 1998-2002
Alfred P. Sloan Research Fellow, 2000-02
Institute for Quantitative Research in Finance ("Q Group") Research Grant, 2001

## PAPER PRIZES

Academic Competition of the Chicago Quantitative Alliance: First Prize, 1996, "Macroeconomic News and Bond Market Volatility"; Second Prize, 1997, "Financial Constraints and Stock Returns"; Second Prize, 1998, "Economic Tracking Portfolios"

Smith Breeden Prize, *Journal of Finance*: Distinguished Paper Prize, 1997, "Cash Flow and Investment: Evidence from Internal Capital Markets"

Michael J. Borrelli, CFA Research Grant Award, co-sponsored by the Investment Analysts Society of Chicago and Association of Investment Management and Research, 2001, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs"

Jensen Prize for Corporate Finance and Organizations, *Journal of Financial Economics*: First Prize, 2002, "Does Diversification Destroy Value? Evidence from Industry Shocks"

## PROFESSIONAL ACTIVITIES

Associate Editor, The Journal of Investing, 2001-present
Co-organizer, NBER Asset Pricing Meeting, Summer 2001
Session Organizer, American Economic Association Annual Meeting, 2001
Nominating Committee, American Finance Association, 2002
Program Committee, Western Finance Association, 2001-2002
Program Committee and Session Chair, American Finance Association Annual Meeting, 2003
Testimony on short selling and hedge funds before U.S. House of Representatives, Committee on Financial Services, May 22, 2003

**Appendix A**

**PUBLICATIONS IN REFERRED JOURNALS**

1. Credit Conditions and the Cyclical Behavior of Inventories (with Anil K. Kashyap and Jeremy C. Stein), *Quarterly Journal of Economics*, August 1994

2. Corporate Debt Overhang and Macroeconomic Expectations, *American Economic Review*, December 1995

3. Relative Price Variability and Inflation: Evidence fromU.S.Cities (with Guy Debelle), *Journal of Political Economy*, February 1997

4. Cash Flow and Investment: Evidence from Internal Capital Markets, *Journal of Finance*, March 1997 [reprinted in *Empirical Corporate Finance*, 2001, edited by Michael J. Brennan]

5. Macroeconomic News and Bond Market Volatility (with Charles M. Jones and Robin Lumsdaine), *Journal of Financial Economics*, March 1998

6. Investor Reaction to Salient News In Closed-End Country Funds (with Peter Klibanoff and Thierry Wizman), *Journal of Finance*, April 1998 [reprinted in *Behavioral Finance*, 2001, edited by Hersh Shefrin]

7. Earnings and Expected Returns, *Journal of Finance*, October 1998

8. Leverage and House-Price Dynamics in U.S. Cities (with Jeremy C. Stein), *Rand Journal of Economics*, Autumn 1999

9. Investment Plans and Stock Returns, *Journal of Finance*, December 2000

10. Financial Constraints and Stock Returns (with Christopher Polk and Jesus Saa-Requejo), *Review of Financial Studies*, Summer 2001

11. The Diversification Discount: Cash Flows vs. Returns (with Christopher Polk), *Journal of Finance*, October 2001

12. Economic Tracking Portfolios, *Journal of Econometrics*, November 2001

13. Does Diversification Destroy Value? Evidence from Industry Shocks (with Christopher Polk), *Journal of Financial Economics*, January 2002

14. Macroeconomic Forecasts and Microeconomic Forecasters, *Journal of Economic Behavior and Organization*, July 2002

15. Short Sale Constraints and Stock Returns (with Charles M. Jones), *Journal of Financial Economics*, November 2002

**Appendix A**

**PUBLICATIONS IN REFERRED JOURNALS, CONTINUED**

16. Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs (with Richard H. Thaler), *Journal of* Political *Economy*, April 2003.

**WORKING PAPERS**

1. Evaluating value weighting: Corporate events and market timing, February 2002

2. Go down fighting: Short sellers vs. firms, November 2002

**OTHER WORK**

1. Do '*Shortages'* Cause Inflation? in *Reducing Inflation: Motivation and Strategy*, edited by Christina D. Romer and David H. Romer, University of Chicago Press, 1997

2. Comment on "e-*Capital*: The Link between the Stock Market and the Labor Market in the 1990s" by Robert E. Hall, *Brookings Papers on Economic Activity*, 2:2000

3. Palm and 3Com: A pricing conundrum, *Financial Times* June 18, 2001, *Mastering investment supplement*. [reprinted in *Mastering investment*, 2002, edited by James Pickford, and in *Introducing Investments: a personal finance approach*, forthcoming, by Keith Redhead]

4. Discussion of "*Perspectives* on Behavioral Finance: Does Irrationality Disappear with Wealth? Evidence from Expectations and Actions" by Annette Vissing-Jorgensen, *NBER Macroeconomics Annual 2003*, edited by Mark Gertler and Kenneth Rogoff

5. Anomalies: The law of one *price* in financial markets, (with Richard H. Thaler), *Journal of Economic Perspectives*, forthcoming

October 23, 2003

B

**Appendix B**

## MATERIALS CONSIDERED

http://www.sec.gov/rules/concept/34-42037.htm

Asensio, Manuel P., 2001, *Sold Short: Uncovering Deception in the Markets*

D'Avolio, Gene, 2002, The Market for Borrowing Stock, *Journal of Financial Economics*, November 2002.

Drave, Ed, 1993, "The Long (and Short) of Short Selling. (Short Selling of Stock as an Investment Strategy)," 14 September 1993, FW, p. 58.

Duffie, D., 1996. Special Repo Rates. *Journal of Finance* 51, 493-526.

Duffie, Darrell, Garleanu, Nicolae, Pedersen, Lasse Heje, Securities Lending, Shorting, and Pricing, *Journal of Financial Economics*, November 2002.

Fabozzi, Frank, 1997, ed., Securities Lending and Repurchase Agreements, Frank J. Fabozzi Associates, New Hope, Pennsylvania

Geczy, Christopher C., David K. Musto, and Adam V. Reed, 2002, Stocks are Special Too: An Analysis of the Equity Lending Market, *Journal of Financial Economics*, November 2002.

Gelband, Joseph F., 1991, "Worthless, but When? – The Key to Tax Breaks on No-Value Shares," 3 June 1991, Barron's, p. 33

H.R. 2014, P.L. 105-34; H.R. Conf. Rep. No. 105-220, 105th Cong., 1st Sess. 217 (1997)

Internal Revenue Code section 1233 (2003)

Ip, Greg and Gregory Zuckerman, 2001, "Treasury Sale Averts a Crisis in `Repo' Market --- Unscheduled Auction of $6 Billion in Notes Is a Department First," The Wall Street Journal, 5 October 2001, p. C1.

Jegadeesh, Narasimhan, 1993, Treasury Auction Bids and the Salomon Squeeze, *Journal of Finance* 48, 1403-1419.

Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in 1997 (JCS-23-97), December 17, 1997.

Joint Committee on Taxation, Summary of Revenue Provisions of H.R. 2014 ("Taxpayer Relief Act of 1997") (JCX-40-97), August 1, 1997.

Jones, Charles M., and Owen A. Lamont, Short Sale Constraints and Stock Returns, *Journal of Financial Economics*, November 2002

**Appendix B**

Lamont, Owen A., 2002, Go Down Fighting: Short Sellers vs. Firms, working paper.

Lamont, Owen A., and Richard H. Thaler, 2003. Can the Market Add and Subtract? Mispricing in Tech Stock Carve-outs, forthcoming *Journal of Political Economy*

Lansner, Jonathan, 1998, "Bull Market a Bear for Short Sellers," Austin American-Statesman, 03/28/1998

Meeker, J., 1932. Short Selling. Harper & Brothers Publishers, New York.

Merrick, John J. Jr., Narayan Y. Naik, and Pradeep K. Yadav, 2002, Strategic Trading Behavior, Price Distortion and Market Depth in a Manipulated Market: Anatomy of a Squeeze, working paper.

Norris, Floyd, 1989, Market Place; Cost for the Shorts in Chase Medical, The New York Times, September 8, 1989, Section D; Page 6

Opdyke, Jeff. D., 2003, "At WorldCom, Shares May Die, But They Might Not Fade Away," 15 April 2003, The Wall Street Journal, p. C3

Pollard, John K. Jr., 1987, "Sell High, Buy Low – A Short Course in the Art of Sell Short," 27, July 1987, Barron's.

<u>Report of Special Study of Securities Markets of the Securities and Exchange Commission (Part 2)</u>, H.R. Rep. No. 88-95, 88th Cong., 1st Sess. (1963).

<u>Short-Selling Activity In the Stock Market: Market Effects and the Need for Regulation (Part 1)</u>, H.R. Rep. No. 102-414, 102d Cong., 1st Sess. (1991).

# Plaintiffs' Exhibit 9

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 06-11422

KORNMAN & ASSOCIATES INC., as tax matters partner for Valiant Investments 99-100, LP, a TEFRA Partnership;
Plaintiff-Appellant
v.
UNITED STATES OF AMERICA,
Defendant-Appellee

COLM PRODUCER INC., as tax matters partner for GMK-GMK II, LP, a TEFRA Partnership;
Plaintiff-Appellant
v.
UNITED STATES OF AMERICA,
Defendant-Appellee

ETTMAN FAMILY TRUST I, a 5-percent group of Valiant Investments 99-100, LP, a TEFRA Partnership;
Plaintiff-Appellant
v.
UNITED STATES OF AMERICA,
Defendant-Appellee

ETTMAN FAMILY TRUST I, a partner for GMK-GMK II, LP, a TEFRA Partnership;
Plaintiff-Appellant
v.
UNITED STATES OF AMERICA,
Defendant-Appellee

ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS

BRIEF FOR THE APPELLEE

## JURISDICTIONAL STATEMENT

On September 25, 2003, the Internal Revenue Service mailed notices of final partnership administrative adjustment ("FPAA") to

realized. Treas. Reg. § 1.752-1(h). *See also* Treas. Reg. § 1.1001-2(a)(1), Example (3).

As indicated above, appellants maintain that Czerwinski's assumption of GMK's obligation to replace the borrowed T-Notes with a face value of $100 million to DLJ as part of his purchase of GMK's interest in Valiant is not treated under § 752(d) as an additional amount realized by GMK on the sale because the obligation was a contingent one and, as such, outside the scope of § 752. Appellants further contend in this regard that whether an obligation acquired by a partnership pursuant to a contribution by a partner of encumbered property to the partnership is contingent or fixed must be determined at the time of such contribution and that the District Court here erred in determining, *sua sponte*, that the relevant date in this case was the date that GMK sold its interest in Valiant to Czerwinski.

We agree with appellants that the District Court erred in using, *sua sponte*, the date of sale of a partnership interest to determine whether a partnership obligation is fixed or contingent. The proper time for determining whether an obligation is fixed is the date the obligation becomes a partnership obligation. In this case, the obligation to replace the borrowed property became a partnership obligation on December 27, 1999, when the Trust transferred the brokerage account (containing approximately $104,000,000 in cash but

subject to the obligation to replace the borrowed T-Notes) to Valiant. As we shall demonstrate, however, the obligation to replace the borrowed T-Notes was a fixed obligation at all times. It was a fixed obligation when the short sale occurred, when the Trust transferred the brokerage account to Valiant, and at all times thereafter. Thus, the District Court was correct in its holding that the obligation to close the short sale was a "liability" within the meaning of § 752.

**B. An obligation to close a short sale is a fixed liability because one who borrows securities in a short sale has a legal obligation to replace the borrowed property with equivalent property**

It is axiomatic that "[t]he task of resolving [a] dispute over the meaning of . . . [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). Section 752, however, does not define the term "liability."[8] Thus, the District Court correctly relied

---

[8] Section 752, as well as the other partnership provisions of Subchapter K of the Internal Revenue Code, was enacted as part of the Internal Revenue Code of 1954. *See* Act of August 16, 1954, Pub. L. No. 591, 68A Stat. 3, 251. The legislative history does not elucidate the meaning of "liability." It merely explains that § 752 was intended to deal with the effect on a partner of his assumption of partnership liabilities and the partnership's assumption of his liabilities. *See* S. Rep. No. 83-1622 at 405 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4621, 5047 (emphasis added). *Accord* H.R. Rep. No. 83-1337 at A236-237 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017, 4376-4377 (1954).

*Capital Holdings v. United States*, 330 F. Supp. 2d 122, 171 (D. Conn. 2004), *aff'd on other grounds by unpublished op.*, 96 A.F.T.R.2d (RIA) 6344 (2d Cir. 2005). For this reason alone, the District Court's judgment should be affirmed.

## CONCLUSION

For the reasons stated, the District Court judgment should be affirmed. If this Court should reverse the grant of summary judgment to the Government, the case should be remanded for trial of the Government's contentions that the transactions giving rise to the claimed artificial loss were devoid of economic substance and that the IRS properly recast these transactions under Treas. Reg. § 1.701-2.

Respectfully submitted,

RICHARD T. MORRISON
*Acting Assistant Attorney General*

GILBERT S. ROTHENBERG
*Acting Deputy Assistant Attorney General*

Joan I. Oppenheimer

RICHARD FARBER (202) 514-2959
JOAN I. OPPENHEIMER (202) 514-2954
*Attorneys*
*Tax Division*
*Department of Justice*
*Post Office Box 502*
*Washington, D.C. 20044*

*Of Counsel*:

RICHARD ROPER, III
*United States Attorney*

JULY 2007