**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner,** | ) | |
| **Plaintiffs,** | ) | **Nos. 01-256T and 01-257T** |
| | ) | **Judge Charles F. Lettow** |
| **v.** | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DECLARATION OF HAROLD J. HELTZER**

I, Harold J. Heltzer, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am counsel of record for Plaintiffs in these actions, and am submitting this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Plaintiffs' Cross-Motion for Partial Summary Judgment.

2. Attached hereto are true and accurate copies of the following documents:

Exhibit 1 – Plaintiff's Responses to Defendant's First Set of Interrogatories, dated October 8, 2002, as verified by M. Lester Pulse, Jr.

Exhibit 2 – Memorandum to Growth Committee re "Hedging MORI Note Exposure" (MAR-008866-69), produced by Plaintiffs

Exhibit 3 – Memorandum to Corporate Growth Committee re "MORI Note Sale to TIAA Closed" (MAR-008870), produced by Plaintiffs

Exhibit 4 – Background Information Note to Rev. Rul. 95-26 (011000-03), produced by Defendant

Exhibit 5 – Internal Revenue Service Meeting Notes (010810-11), produced by Defendant

3. Further attached hereto as Exhibit 6 are deposition transcript excerpts from the deposition of M. Lester Pulse, Jr. taken in these actions on December 11, 2002.

4. Further attached hereto as Exhibit 7 are deposition transcript excerpts from the deposition of Michael E. Dearing, taken in these actions on December 12, 2002.

5. Further attached hereto as Exhibit 8 is the Declaration of Dr. Owen Lamont, one of Plaintiffs' designated expert witnesses, along with his appended expert witness report previously produced to Defendant.

6. Further attached hereto as Exhibit 9 is an excerpt from Defendant-Appellee's Brief, filed July 2007, in Kornman & Assoc. Inc. v. United States, No. 06-11422 (5th Cir.).

7. I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 25, 2008, at Washington, D.C.

Harold J. Heltzer

5118808

# Plaintiffs' Exhibit 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, TAX MATTERS PARTNER** | |
| **Plaintiff,** | **Nos. 01-256T and 01-257T** |
| **v.** | **Judge Marion Blank Horn** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

**PLAINTIFF'S RESPONSES TO**
**DEFENDANT'S FIRST SET OF INTERROGATORIES**

In accordance with Rules 26 and 33 of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff hereby responds to defendant's first set of interrogatories as follows:

**GENERAL OBJECTIONS**

The following objections apply to, and are hereby incorporated within, each of plaintiff's responses to defendant's first set of interrogatories:

1. Plaintiff objects to defendant's interrogatories to the extent they seek information protected by the attorney-client privilege, the work product doctrine, RCFC 26(a)(4)(B), or any other applicable privilege.

2. Plaintiff objects to defendant's "Instructions" and "Definitions" to the extent that they purport to impose obligations beyond those set forth in RCFC 26 and 33.

3. Plaintiff objects to defendant's definitions of "Time-Share Note Sale Transaction," "Short-Sale Transaction" and "Partnership Transaction," in that these definitions incorrectly seek to define the events and circumstances underlying this suit as separate and distinct transactions.

## RESPONSES

INTERROGATORY NO. 1:

Describe each and every reason (*e.g.*, business, financial, accounting, economic, or tax) for which plaintiff entered into the "Short-Sale Transaction," including each and every reason (*e.g.*, business, financial, accounting, economic, or tax) for entering into the "Short-Sale Transaction" as a whole, as well as each and every reason (*e.g.*, business, financial, accounting, economic, or tax) for (a) plaintiff's short sales of Treasury securities, (b) plaintiff's investments of proceeds from short sales into repurchase obligations, (c) plaintiff's formation and capitalization of the MIR partnerships, (d) plaintiff's contributions of Treasury securities to the MIR partnerships, (e) plaintiff's transfers of short sale obligations to MIR partnerships, (f) plaintiff's transfers of repurchase obligations to the MIR partnerships, and (g) plaintiff's transfers of any partnership interests in MIR.

RESPONSE:

See plaintiff's General Objections. Plaintiff also objects to the use of the term "each and every" as overly broad and unduly burdensome. See, e.g., Steil v. Humana Kansas City, Inc., 197 F.R.D. 445 (D. Kan. 2000); IBP, Inc. v. Mercantile Bank of Topeka, 179 F.R.D. 316 (D. Kan. 1998). Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

Plaintiff entered into the "Short-Sale Transaction" as a whole in order to hedge its exposure to the interest rate risks associated with holding the Mortgages[1] until their sale to Teachers Insurance and Annuity Association of America ("TIAA") in November of 1994. Specifically, the transactions, including the short sales of the Treasury securities described in the Complaints in these actions, were intended to protect Marriott against the risk that interest rates would rise during the period prior to the sale of the Mortgages to TIAA, which would cause the value of the fixed-rate Mortgages to decline, possibly substantially. The cash proceeds from the Treasury security short sales were invested in Repos[2] during this holding period in order to earn a return on those proceeds while the hedges involving the Treasury securities short sales were in place. The investment of the proceeds in Repos completed the hedge by replacing a fixed-rate asset with a variable-rate asset. MIR was an essential element of these transactions because the securitization of the Mortgages (which was necessary to sell the Mortgages to TIAA) effectively required the use of a bankruptcy remote special purpose entity.[3] The use of a bankruptcy remote special purpose entity resulted in a higher credit rating by the rating

---

1 As used in these responses, the term "Mortgages" refers to the mortgages that were securitized and then sold to TIAA in 1994 in the form of a certificate in a grantor trust, as described in the Complaints in these actions.

2 As used in these responses, "Repos" refers to the repurchase obligations described in paragraphs 13 and 14 of the Complaints in these actions.

3 See generally Financial Accounting Standard 125 (MAR-009251 - MAR-009308). While the Standard was formally issued in 1996, it reflects the pre-existing commercial practice in this area.

agencies, which ensured that plaintiff would receive the highest possible price for the 1994 Mortgages. Moreover, as a practical matter, the use of a bankruptcy remote special purpose entity was necessary in order to be able to accomplish the sale of the Mortgages to TIAA. As set forth in the Complaints in these actions, MORI in 1994 transferred the Mortgages, as well as the associated Repos and short sale obligations, to MIR.[4] The transfer of the Mortgages to MIR was necessary, as noted, to ensure that TIAA would be purchasing the Mortgages from a bankruptcy remote special purpose entity. The concurrent transfer of the associated Repos and short sale obligations to MIR was appropriate in that the Repos and short sale obligations were being used to hedge the interest rate risk associated with the transferred Mortgages; that is, the same entity (MIR) would hold both the assets being hedged (the Mortgages), as well as the proceeds of the hedge (the Repos) and the obligation to close the hedge. With respect to MORI's transfer of its partnership interest in MIR to MICC, that transfer was consistent with MICC's function as the Marriott subsidiary primarily responsible for providing financing, credit, lending, and related financial services for Marriott properties and for holding debt and

---

4 The interrogatory appears to indicate that the Treasury securities were also transferred by MORI to MIR. In fact, no Treasury securities were ever transferred to MIR. As set forth in the Complaints in these actions, the Treasury securities were sold in the course of the short sale transactions, and the proceeds from those sales were then invested in Repos. Accordingly, there were no Treasury securities to transfer.

equity investments that Marriott made to owners and developers of Marriott properties. Plaintiff recognized that certain aspects of the "Short-Sale Transaction," such as the use of a limited partnership form for MIR, would receive advantageous tax treatment under the Internal Revenue Code, and, as a matter of prudent tax planning, engaged in the transactions in a manner that resulted in the realization of those advantages. However, as the above indicates, the overall purpose of these transactions was to accomplish the securitization and sale of the Mortgages to TIAA on the most favorable terms Marriott could achieve, while at the same time protecting Marriott from the possible adverse consequences of interest rate increases before the sale of the Mortgages was consummated.

INTERROGATORY NO. 2:

State the reasons (*e.g.*, business, financial, accounting, economic, or tax) for the incorporation or creation, as well as the business activities, of (a) Marriott International Resorts, L.P. ("MIR"), (b) Marriott International JBS Corporation ("JBS"), (c) Marriott International Capital Corporation ("MICC"), (d) the second MIR partnership, and (e) any corporate successor of any of these entities.

RESPONSE:

See plaintiff's General Objections. Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

See plaintiff's response to Interrogatory No. 1. As noted in plaintiff's response to the previous interrogatory, MIR was created to serve as the bankruptcy remote special purpose entity necessary to obtain the highest available credit rating for the securitized Mortgages and to accomplish the sale of the Mortgages to TIAA. JBS was organized for the specific purpose of serving as the general partner of MIR

(JBS also is MIR's tax matters partner). MICC was incorporated in December of 1993 specifically to provide credit, lending, and related financial services for Marriott properties, and to hold debt and equity investments that Marriott made to owners and developers of Marriott properties. In addition to its role as a partner in MIR, MICC also engages in other investment and financing activities such as providing mortgage loans and credit support to developers of Marriott properties. As set forth in the Complaints in these actions, the "second MIR partnership" was a result of the technical termination of the partnership pursuant to Internal Revenue Code section 708(b)(1)(B) caused by the transfer of MORI's interest in MIR to MICC. This termination resulted in the deemed liquidation of the original MIR partnership for Federal income tax purposes and the deemed distribution of its assets to the partners, followed by the deemed creation of the "second MIR partnership" for Federal income tax purposes and the deemed contribution of the assets to the partnership.[5] With respect to the transfer of MORI's interest in MIR to MICC, as it relates to MICC's function in Marriott, see plaintiff's response to Interrogatory No. 1.

INTERROGATORY NO. 3:

Identify each and every person who provided to plaintiff or received from plaintiff any information and/or advice regarding the tax implications of the "Short-Sale Transaction" and the "Time-Share Note Sale Transaction" during calendar years 1993, 1994, and/or 1995.

---

5 None of these entities have a "corporate successor," at least so far as plaintiff understands the import of Interrogatory no. 2.

RESPONSE:

See plaintiff's General Objections. Plaintiff also objects to the use of the term "each and every" as overly broad and unduly burdensome. See, e.g., Steil v. Humana Kansas City, Inc., 197 F.R.D. 445 (D. Kan. 2000); IBP, Inc. v. Mercantile Bank of Topeka, 179 F.R.D. 316 (D. Kan. 1998). Plaintiff further objects to the term "any information" as vague and ambiguous. Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

The referenced transactions were disclosed to Arthur Andersen LLP ("Andersen") in its capacity as Marriott's outside independent auditor. However, Andersen did not provide Marriott with any Federal income tax planning or advice related to the transactions. See generally September 10, 2002 Affidavit of M. Lester Pulse, Jr. submitted in support of the Memorandum of Law of Andersen and the Memorandum of Law of Plaintiff in opposition to defendant's motion to compel subpoena duces tecum. Per the representations of Andersen's counsel (White & Case LLP), defendant has already obtained from Andersen all responsive documents in Andersen's tax files related to its review of the transactions.

In early 1994, CS First Boston ("CSFB") provided Marriott with a description and analysis of a proposed transaction which would have resulted in certain tax benefits. While Marriott did not implement that proposed transaction, some aspects of CSFB's analysis were considered in planning the transactions at issue in these cases. The key individuals at CSFB who were involved in these discussions in early 1994 were Phil Hamon, Roy Hahn and Charles Edelstein.

Several law firms provided Marriott with legal advice related to various Federal and/or state tax issues involving the securitization and sale of the Mortgages to TIAA. These firms are all identified in the 1994 Closing Binder (MAR-000001 - MAR-001682) previously produced to defendant as part of plaintiff's initial disclosure. See also MAR-009075 and MAR-009140 - 41 (law firms on 1994 MORI Working Group List), previously produced to defendant as part of plaintiff's initial disclosure.

INTERROGATORY NO. 4:

Explain how MIR treated the contributions of the (1) short positions in the Treasury Notes, (2) the proceeds from the short positions in the Treasury Notes, (3) the repurchase obligations (*i.e.*, "repos"), and (4) the liabilities to replace the shorted Treasury Notes for financial reporting and/or accounting purposes during the calendar years 1993, 1994, and 1995.

RESPONSE:

See plaintiff's General Objections. Plaintiff also objects to the interrogatory on the grounds that it is vague and confusing in several respects. Specifically, plaintiff objects to: (1) the distinction in the interrogatory between "financial reporting" and "accounting" purposes, which is a distinction plaintiff does not understand; (2) the apparent distinction in the interrogatory between the "proceeds from the short positions" and the "repurchase obligations," since the proceeds were invested in the repurchase obligations (the Repos); (3) the use in the interrogatory of the term "liabilities," since that is not the correct term for plaintiff's obligation to close the short positions; and (4) the references in the interrogatory to 1993 and

1995, since the transactions took place in 1994. Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

For accounting purposes, MIR treated the contribution of the Repos and the assumption of the obligation to close the short sales by including in its own accounts the income from the Repos, the expense of paying interest to the short-sale lender, and the gain from closing the short sales. Documents reflecting this treatment are attached hereto (MAR-013159 - 62). MIR did not issue separate financial reports but was consolidated in the Marriott International, Inc. group for financial reporting purposes.

INTERROGATORY NO. 5:

Explain plaintiff's calculation of the basis of the time-share mortgages that were contributed to MIR (and state the total amount of all time-share mortgages) during the calendar year 1994.

RESPONSE:

See plaintiff's General Objections. Plaintiff also objects to the interrogatory on the grounds that it is vague and confusing. Specifically, plaintiff does not understand what defendant means by its reference to "the total amount of all time-share mortgages." If defendant is referring to the aggregate face amount of all the Mortgages sold to TIAA in 1994, that aggregate face amount is set forth in the Complaints in these actions, as well as in the 1994 Closing Binder previously produced to defendant, and those documents provide the requested information (see RCFC 33(d)). If defendant means something else by its reference to "the total amount of all time-share mortgages," plaintiff does not understand the

interrogatory. Notwithstanding and without waiving any of plaintiff's objections, plaintiff responds as follows.

With respect to the calculation of the basis of the time-share mortgages contributed to MIR during 1994, that calculation is set forth in MAR-009193, previously produced to defendant as part of plaintiff's initial disclosure.[6] See RCFC 33(d).

Respectfully submitted,

Dated: October 8, 2002

Harold J. Heltzer
(Counsel of Record)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2565
(202) 628-5116 (facsimile)

Attorney for Plaintiff

Of Counsel:

Howard M. Weinman
Robert L. Willmore
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 2004-2595

---

6 As defendant is aware, there was an error in the original calculation, which was subsequently corrected by plaintiff and disclosed to the IRS Examination team on audit. Both calculations are reflected on the referenced document.

## VERIFICATION

I hereby verify that I have reviewed the foregoing Plaintiff's Responses to Defendant's First Set of Interrogatories, and that the responses contained therein are true and correct to the best of my knowledge, information and belief.

[signature]
M. Lester Pulse, Jr.
Senior Vice President - Taxes
Marriott International, Inc.

SUBSCRIBED AND SWORN BEFORE ME

on this 7th day of October, 2002

Paula Niswander
Notary Public

PAULA NISWANDER
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires February 2, 2003

CA0520 R-3 PD 13 FY 94 PERIOD BEGIN 12/03/94 END 12/30/94 MARRIOTT CORPORATION CORPORATION LEDGER BY ACCOUNT RUN: 01/13/95 PAGE 2117 H04

| ACCOUNT NAME | CORP | UNIT | ACCOUNT | PERIOD AMOUNT | YEAR TO DATE AMOUNT | 2971109313897097 |
|---|---|---|---|---|---|---|
| MORI-CASH DEPOSITORY | 297 | 38 97097 | 1109.31 | .00 | 81,269.97 | |
| | | ACCT TOTAL | 1109 | .00 * | 81,269.97 * | |
| | | CLASS TOTAL | 11 | .00 * | 81,269.97 * | |
| MORI - SUN FEES REC-91A | 297 | 38 97097 | 1960.01 | 56,786.59- | 56,786.59- | |
| MORI SUN FEES REC - 94A | 297 | 38 97097 | 1960.16 | .00 | 2,311,868.93 | |
| | | ACCT TOTAL | 1960 | 56,786.59-* | 2,255,082.34 * | |
| MORI SUN- COLLECTION 94A | 297 | 38 97097 | 1962.05 | 7,185.83 | 10,786.65 | |
| | | ACCT TOTAL | 1962 | 7,185.83 * | 10,786.65 * | |
| MORI - ESCROW PRIMARY | 297 | 38 97097 | 1963.30 | 600.06- | 52,163.13 | |
| | | ACCT TOTAL | 1963 | 600.06-* | 52,163.13 * | |
| | | CLASS TOTAL | 19 | 50,200.82-* | 2,318,032.12 * | |
| | | GROUP TOTAL | 1 | 50,200.82-* | 2,399,302.09 * | |
| CORP CASH CLEARING | 297 | 85 800 | 2010.01 | 243,962.78 | 84,354,000.40 | |
| | | ACCT TOTAL | 2010 | 243,962.78 * | 84,354,000.40 * | |
| CORP CASH CLEARING | 297 | 85 800 | 2012.21 | .00 | 24,369.00- | |
| | | ACCT TOTAL | 2012 | .00 * | 24,369.00-* | |
| CORP CASH CLEARING | 297 | 85 800 | 2014.71 | 57,386.65 | 83,236,359.45 | |
| | | ACCT TOTAL | 2014 | 57,386.65 * | 83,236,359.45 * | |
| I/C ACCTS PAY SYSTEM | 297 | 85 800 | 2070.05 | 4,405.22 | 00 | |
| I/C FEEDER SYSTEMS NET | 297 | 85 800 | 2070.13 | 128,682.15- | 128,682.15- | |
| | | ACCT TOTAL | 2070 | 124,276.93-* | 128,682.15-* | |
| | | CLASS TOTAL | 20 | 177,072.50 * | 964,589.80 * | |
| MORI - ACCR LIABILITIES | 297 | 38 97097 | 2198.18 | 124,766.43 | 246,459.35- | |
| | | ACCT TOTAL | 2198 | 124,766.43 * | 246,459.35-* | |
| | | CLASS TOTAL | 21 | 124,766.43 * | 246,459.35 * | |
| | | GROUP TOTAL | 2 | 301,838.93 * | 718,130.45 * | |
| INT INCOME-1994A | 297 | 38 97097 | 3812.57 | 7,185.83- | 2,872,980.26 | |

CA0520 R-3 PD 13 FY 94 MARRIOTT CORPORATION RUN: 01/13/95 PAGE 2118 104
PERIOD BEGIN 12/03/94 END 12/30/94 CORPORATION LEDGER BY ACCOUNT

| ACCOUNT NAME | CORP UNIT | ACCOUNT | PERIOD AMOUNT | YEAR TO DATE AMOUNT | 2973812573897097 |
|---|---|---|---|---|---|
| | ACCT TOTAL | 3812 | 7,185.83-* | 2,872,980.26-* | |
| | CLASS TOTAL | 38 | 7,185.83-* | 2,872,980.26-* | |
| | GROUP TOTAL | 3 | 7,185.83-* | 2,872,980.26-* | |
| MORI TRUST EXPENSE 1994A | 297 38 97097 | 6932.29 | 489.50- | 489.50- | |
| | ACCT TOTAL | 6932 | 489.50-* | 489.50-* | |
| | CLASS TOTAL | 69 | 489.50-* | 489.50-* | |
| | GROUP TOTAL | 6 | 489.50-* | 489.50-* | |
| GAIN/LOSS ON MARKET | 297 85 82201 | 8001.31 | 819,532.00- | 819,532.00- | |
| | ACCT TOTAL | 8001 | 819,532.00-* | 819,532.00-* | |
| INTEREST INCOME - TNOTES | 297 85 82201 | 8006.10 | 1,157,454.00- | 1,157,454.00- | |
| INTERSET EXPENSE- TNOTES | 297 85 82201 | 8006.20 | 1,507,483.00 | 1,507,483.00 | |
| | ACCT TOTAL | 8006 | 350,029.00 * | 350,029.00 * | |
| | CLASS TOTAL | 80 | 469,503.00-* | 469,503.00-* | |
| OTHER MISC. EXPENSE | 297 85 800 | 83[illegible]0.47 | 225,540.22 | 225,540.22 | |
| | ACCT TOTAL | 8320 | 225,540.22 * | 225,540.22 * | |
| | CLASS TOTAL | 83 | 225,540.22 * | 225,540.22 * | |
| | GROUP TOTAL | 8 | 243,962.78-* | 243,962.78-* | |
| CORP 297 | TOTAL | | .00 * | .00 * | |

MAR-013160

1st 5th

C.C. 5 1

*DIVISION NUMBER IS REQUIRED.

Marriott

# DISTRIBUTION TICKET

VENDOR NO.

| WK | PD | YR |
|---|---|---|
| 5 | 13 | 94 |

| UNIT (DIV* UNIT DEPT) | CORP. | ACCOUNT (PRIM SEC) | A.E. COST CODE | INVOICE DATE | INVOICE NUMBER | AMOUNT |
|---|---|---|---|---|---|---|
| 8582201 | 001 | 8006110 | | | Int Inc | 1157454.00 |
| 8582201 | 001 | 8006210 | | | Int Exp. | (1507483.00) |
| 8582201 | 001 | 8001311 | | | mk to mkt | 819532.00 |
| ↓ | 297 | 800610 | | | Int Inc | (1157454.00) |
| ↓ | 297 | 800620 | | | Int Exp | 1507483.00 |
| ↓ | 297 | 800131 | | | mk to mkt | (819532.00) |

To move treasury short sale P&L activity to appropriate Corp - MORI Corp.

CC: Mercedes Infante @ MORI
Nancy Berg

JOURNAL DESCRIPTION:

PREPARED BY

APPROVED BY

CA-099

REV 11/87

THIS FORM MAY NOT BE USED FOR AE. ENTRIES.
Double lines across the page should be drawn to separate individual entries.
"Continued" should be written at the bottom of the ticket when an entry is continued on the next page.

UNIT NO 85 82201 DISTRICT 001
LOCATION NAME INT & FINANCE

MARRIOTT CORPORATION
WEEKLY DISTRIBUTION SUMMARY

1ST COPY S. WARNER 2ND COPY D. SISK
WK 5 PD 12 YR 94 PAGE 16708
WEEK ENDING 12/02/94

| ACCOUNT MAJR SB | CORP | VENDOR NUMBER | NAME | INVOICE NUMBER | DATE | BATCH | W K | CURRENT WEEK | % | PERIOD TO DATE % | YEAR TO DATE | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8001 10 | | | INT INC MISC | | | | A | | | 17,364.43- | 386,271.99- | |
| 8001 11 | | | N/R INT INCOME | | | | A | | | 207,750.50- | 828,298.93- | |
| 8001 17 | | | HH LOC | | | | A | | | 1,179,166.90- | 12,773,688.32- | |
| 8001 18 | | | HH LOC FEES | | | | A | | | 363,378.05- | 4,322,290.77- | |
| 8001 19 | | | PHIL CC MORT | | | | A | | | 525,905.81- | 4,447,684.74- | |
| 8001 20 | 001 | 999120 | JOURNAL ENTRY LATE FEE | PD6-10 | | A999T | 5 | 3,717.00- | | | | |
| 8001 20 | 001 | 999120 | JOURNAL ENTRY REV PD6-9 | | | A999T | 5 | 4,346.00 | | | | |
| 8001 20 | 523 | 999120 | JOURNAL ENTRY RECLASS | | | H474T | 5 | 137,654.04 | | | | |
| 8001 20 | | | INT INC-MKT SEC | | | | A | 138,283.04 * | | 87,190.17- | 270,622.51- | |
| 8001 22 | | | CASH RESERVE INC | | | | A | | | 230,448.00- | 1,522,952.45- | |
| 8001 31 | | | GAIN/LOSS ON MARKET | | | | A | | | | 819,532.00- | |
| 8001 | | | INTEREST INC TAX | | | | A | 138,283.04 ** | | 2,611,203.86- | 23,371,341.71- | |
| | | | | | | | B | | | 2,079,000- | 23,020,000- | |
| | | | | | | | LY | | | 1,926,690- | 14,224,248- | |
| 8006 10 | | | INTEREST INCOME - TNOTES | | | | A | | | | 1,157,454.00- | |
| 8006 20 | | | INTERSET EXPENSE- TNOTES | | | | A | | | | 1,507,483.00 | |
| 8006 | | | INT I/E FORN SUB | | | | A | | | | 350,029.00 | |
| | | | | | | | LY | | | | 11,473,456- | |
| 8007 | | | INCOME I/E FN SB | | | | LY | | | | 11,473,456 | |
| 8010 01 | | | INTEREST EXPENSE | | | | A | | | | 3,502,729.17 | |
| 8010 | | | INTEREST EXPENSE | | | | A | | | | 3,502,729.17 | |
| | | | | | | | B | | | 170,000 | 1,853,000 | |
| 8014 | | | INT EXP SEC EQUP | | | | B | | | 63,000 | 796,000 | |
| 8015 | | | INT EXP SEC RLES | | | | A | | | 65,011.77 | 804,292.38 | |
| | | | | | | | LY | | | 77,396 | 27,486,399 | |
| 8016 01 | | | SENIOR NOTES FIXED | | | | A | | | 778,846.15 | 9,346,153.80 | |
| 8016 | | | SENIOR NOTES-1977 | | | | A | | | 778,846.15 | 9,346,153.80 | |
| | | | | | | | B | | | 779,000 | 9,346,000 | |
| | | | | | | | LY | | | | 110,907,473 | |
| 8017 | | | INT EXP UNSC DEB | | | | B | | | 15,000 | 173,000 | |
| | | | | | | | LY | | | | 26,892 | |
| 8018 01 | 001 | 999120 | JOURNAL ENTRY | 0000 | 0 | B200T | 5 | 71,917.81- | | | | |
| 8018 01 | | | INT EXP UNSC GEN | | | | A | 71,917.81- * | | 292.94- | 17,284.62 | |
| 8018 03 | | | UNSEC L.T.-FLOATING | | | | A | | | | 174,400.56 | |
| 8018 05 | | | SPECIAL RAR ACCRU | | | | A | | | 233,547.68 | 2,041,229.80 | |
| 8018 10 | 001 | 999120 | JOURNAL ENTRY | | | B200T | 5 | 71,917.81 | | | | |
| 8018 10 | | | COMMITMENT FEES | | | | A | 71,917.81 * | | 71,917.81 | 1,551,059.09 | |
| 8018 11 | | | UNSECURED LT-FIXED | | | | A | | | 14,526.06 | 174,312.72 | |
| 8018 18 | | | REVOLVER INTEREST | | | | A | | | | 1,629,545.24 | |
| 8018 24 | | | COMMERCIAL PAPER | | | | A | | | 996,543.92 | 7,632,014.48 | |
| 8018 25 | | | BEDFORD SLS BONDS | | | | A | | | 6,824.68 | 70,926.69 | |
| 8018 | | | INT EXP UNSC GEN | | | | A | | | 1,323,066.81 | 13,290,773.00 | |
| | | | | | | | B | | | 926,000 | 10,685,000 | |
| | | | | | | | LY | | | 2,221,492 | 32,561,855 | |
| 8019 01 | 001 | 999120 | JOURNAL ENTRY PHLP-BANK | | | B200T | 5 | 175,992.60 | | | | |
| 8019 01 | 864 | 999120 | JOURNAL ENTRY PHLP | | | B200T | 5 | 4,253.08 | | | | |
| 8019 01 | | | INT CAP LEASE OBL | | | | A | 180,245.68 * | | 200,739.98 | 2,312,175.56 | |
| 8019 | | | INT EXP LEASE OBL | | | | A | 180,245.68 ** | | 200,739.98 | 2,312,175.56 | |
| | | | | | | | B | | | 201,000 | 2,407,000 | |
| | | | | | | | LY | | | 406,421 | 2,894,440 | |
| 8031 01 | 001 | 999120 | JOURNAL ENTRY KAUAI HTLS | | | F330T | 5 | 37,360.00- | | | | |
| 8031 01 | 471 | 999120 | JOURNAL ENTRY MORI EST12 | | | F330T | 5 | 73,535.00- | | | | |
| 8031 01 | 471 | 999120 | JOURNAL ENTRY MORI ADJ11 | | | F330T | 5 | 680.00- | | | | |
| 8031 01 | 471 | 999120 | JOURNAL ENTRY KAUAI MORI | | | F330T | 5 | 253,672.00- | | | | |
| 8031 01 | 706 | 999120 | JOURNAL ENTRY SLS | | | F330T | 5 | 25,202.00- | | | | |
| 8031 01 | 706 | 000000 | CAP INTRST | | 120894 | F370 | 5 | 48,351.83- | | | | |
| 8031 01 | 706 | 000000 | CAP INTRST | | 120894 | F370 | 5 | 37,580.71- | | | | |

MAR-013162

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Plaintiff's Responses to Defendant's First Set of Interrogatories was served on counsel for Defendant this 8th day of October, 2002, by mailing a true copy of same via first-class U.S. mail, postage-prepaid, upon:

Charles M. Ruchelman, Esq.
U.S. Department of Justice
Tax Division
P.O. Box 26
Ben Franklin Station
Washington, DC 20044

Robert L. Willmore

1940489

# Plaintiffs' Exhibit 2

**M E M O R A N D U M**

| | | | |
|---|---|---|---|
| **TO:** | **Growth Committee** | | |
| **FROM:** | **Michael A. Stein**<br>**Lester Pulse** | **Raymond G. Murphy**<br>**Michael E. Dearing** | |
| **DATE:** | **April 22, 1994** | | |

**SUBJECT: Hedging MORI Note Exposure**

Per the terms of an existing purchase agreement, Marriott International ("MI") will sell to Teachers Insurance and Annuity Association ("TIAA") MORI mortgages with a face value of approximately $91,000,000 in December 1994. The purpose of this memo is to request Growth Committee approval to enter into a transaction to hedge the interest rate exposure related to the anticipated sale. The proposed transaction provides Marriott International a cost-effective means to prudently manage a significant interest rate exposure in a particularly volatile environment.

**TIAA Purchase Agreement**

In November 1993, MI entered into an agreement with TIAA whereby MI agreed to sell and TIAA agreed to buy up to $105,000,000 of MORI mortgages in 1994. The yield to be received by TIAA on the purchased mortgage portfolio will be set at a 2.4% spread over the four-year Treasury yield <u>at the time of the sale</u>. The difference between (1) the average mortgage yield (set when the original mortgages were written) and (2) the above-described yield to be paid to TIAA is retained by MI (the "Excess Amount"). Thus, for example, if the average yield on the mortgage portfolio were 11.2% (as it is today) and the four-year Treasury were 6.2% (today's level), the yield to TIAA would be 8.6% (2.4% spread plus 6.2% Treasury) and the Excess Amount for MI would be 2.6% (11.2% average mortgage yield less 8.6% yield to TIAA).

We originally anticipated executing a series of quarterly transactions so that our MORI mortgage inventory would never be held in significant amounts for long periods. Recently, however, in view of (1) the extent of MI investment capacity and (2) the significant profit contributed by the MORI mortgages, we elected to consolidate the 1994 sales into a single larger sale (approximately $91,000,000) near year-end.

**Interest Rate Exposure**

Each MORI mortgage bears a fixed rate of interest set at the time of issuance at a spread (5.0% to 5.5%) over the then-current matched-maturity Treasury yield. Thus, our portfolio yields a fixed rate of interest. On the liability side, we are financing this growing fixed-rate portfolio with floating rate borrowings under our revolving credit facility.

In the case of MORI mortgages, we are in essentially the same position as any mortgage banker: we have a relatively short holding period (say, eight months) and we are financing relatively long-term fixed-rate assets with short-term floating-rate debt. Like mortgage bankers, we have two kinds of interest rate exposure: (1) value of the fixed-rate asset, and (2) spread between the fixed and floating rates during the holding period.

<u>1. Value of the Fixed Rate Asset</u>
Since the yield to be received by TIAA on the purchased mortgage portfolio is set at the time of sale, any changes in the four-year Treasury yield between mortgage origination and sale impact MI via changes in the Excess Amount. This is a direct economic exposure for MI since the value of the Excess Amount depends on the level of interest rates on the sale date.

<u>2. Spread Between the Fixed and Floating Rates</u>
During the holding period (approximately eight months), MI earns the spread between the mortgage yield (approximately 11.2% today) and the cost of borrowing under the revolving credit facility (approximately 4.2% today). If short-term interest rates change over the holding period, then the spread earned by MI changes by the same amount: if floating rates rise 1.0% then our spread declines by 1.0% and vice versa. This interest rate exposure impacts both cash flow and earnings during the holding period.

**Planned Hedging Program**

The proposed transaction will offset both types of exposure described above. Immediately subsequent to your approval, we plan to enter into a short sale of approximately $65,000,000 (the amount of our current MORI mortgage portfolio) of 4.5 year Treasury notes and to invest the proceeds in floating-rate money market instruments. As we accumulate additional MORI mortgages between today and December 1994, we will increase our short position commensurately. This is ~~exactly~~ the sort ~~of~~ "rate-lock" hedge transaction typically undertaken by mortgage bankers facing this kind of interest rate exposure.

Note that the $65,000,000 initial short sale is intended to cover our current exposure only. As we accumulate additional mortgages, our interest rate exposure will increase until we do another short sale (probably in the third quarter). At no time will the short position exceed our actual MORI mortgage exposure.

During the holding period, any fluctuations in our borrowing costs are hedged by our floating rate investments. Thus, if short-term rates rise by 1%, for example, the increase in our borrowing costs is exactly offset by increased interest earnings on our short-term investments. The net effect is to lock in the current interest rate spread (approximately 7.0% today).

At the sale date, any gain or loss in the value of the Excess Amount due to interest rate changes during the holding period will be offset by an equal but opposite gain or loss on the closing of our short Treasury position:

| Yield Curve | Value Impact on Excess Amount | Gain on Close of Short Position | Net Impact |
|---|---|---|---|
| up 1% | ($3,567,000) | $3,580,000 | ($13,000) |
| no change | 0 | 0 | 0 |
| down 1% | 3,567,000 | ( 3,580,000) | 13,000 |

**Financial Reporting**

The accounting literature requires that the value of our short position be "marked to market." Thus, as interest rates rise (fall), we will record gains (losses) equal to the corresponding change in the value of our short position. Any gain or loss in the value of the MORI mortgage portfolio (due to interest rate fluctuations) will be deferred until the sale is actually completed (in the fourth quarter).

The net effect is that, while the proposed hedging plan protects the value of our MORI mortgage portfolio, we will be exposed to potential book gains and losses during the second and third quarters. Any such gains and losses would be offset in the fourth quarter when we complete the sale to TIAA. For example, if interest rates were to fall 1.0% between the time we do the initial $65,000,000 short sale (second quarter) and the final Teachers sale (fourth quarter), we would record quarterly pre-tax charges against earnings totalling $3,580,000 while the gain on sale in the fourth quarter would be greater by the same $3,580,000. On an annual basis, there would be no P&L impact.

Note that it is declines in interest rates that trigger book losses. Our intention in setting up the hedge has been to protect against what we believe to be the more likely rising interest rate scenario.

**Next Steps**

Upon Growth Committee approval, we will proceed with the proposed hedging program. We anticipate closing our short position coincident with the pricing of the TIAA sale transaction in fourth quarter.

# Plaintiffs' Exhibit 3

# MEMORANDUM

**TO:** Corporate Growth Committee

**FROM:** Michael E. Dearing

**DATE:** December 7, 1994

**SUBJECT: MORI Note Sale to TIAA Closed**

In accordance with the Purchase Agreement signed in November 1993, Marriott International sold $83,277,308 of MORI mortgages to Teachers Insurance and Annuity Association on November 14 at an "all-in" pre-tax gain of $2.7M. The purpose of this memo is to summarize the results of the sale and the associated interest rate hedge transaction.

The terms of the TIAA Purchase Agreement called for the yield to TIAA to be set immediately prior to sale based on then-current market interest rates. In view of this interest rate exposure, we sought and received Corporate Growth Committee approval at the April 22 meeting to hedge our position via a short sale of approximately $75,000,000 of Treasury notes.

In fact, by the time the TIAA yield was set in early October, the Treasury yield had risen 0.8% resulting in a pre-tax gain of approximately $820,000 on the hedge (i.e., the Treasury short sale) which offset the interest-rate-driven decline in the gain on the sale of the MORI mortgages.

In summary, our hedging objective was met; the sum of (a) the actual pre-tax gain on sale ($1.9M) and (b) the pre-tax gain on the hedge ($0.8M) approximately equals the pre-tax gain on sale MI would have realized had interest rates not risen between April and October.

# Plaintiffs' Exhibit 4

BACKGROUND INFORMATION NOTE
(PAGE 1)

Case Name: Short Sales

Control Number: TR-33-000105-93 Branch Symbols: CC:DOM:P&SI:1

RECORD OF CLEARANCE

Initiator: Mary A. Berman Phone: 622-3050

Branch Reviewer: David R. Haglund Phone: 622-3050

| DOMESTIC COORDINATION | | OTHER COORDINATION | |
|---|---|---|---|
| ACC(FS) Reviewer | Date: | Name (Symbols) | Date: |
| Curtis Wilson | 06/23/93 | Regina Oldak CC:EBEO | 02/07/94 |
| Other Reviewer (Symbols) | Date: | Name (Symbols) | Date: |
| Alan Munro CC:DOM:FI&P | 02/04/94 | | / / |

ASSISTANT CHIEF COUNSEL

Date Submitted: 10/28/94 Date Cleared: 11/03/94

Other Contact Person (Phone): ( - )

ASSOCIATE CHIEF COUNSEL

Date Submitted: 11/10/94 Date Cleared: 11/17/94

CHIEF COUNSEL

Date Submitted: / / Date Cleared: / /

COMMISSIONER

Date Submitted: / / Date Cleared: / /

TREASURY

Date Submitted: / / Date Cleared: / /

Macro Form Revised 02/94

011600

Background Information Note

**HOLDING:** The proposed revenue ruling holds that short sales of securities as described in the ruling create partnership liabilities under § 752.

**BACKGROUND:** Rev. Rul. 88-77, 1988-2 C.B. 129, defines a liability for purposes of § 752. On December 30, 1988, the Service published temporary regulations under § 752. The temporary regulations incorporated the definition of a liability contained in Rev. Rul. 88-77. On December 20, 1991, the Service published final regulations under § 752. The final regulations do not include a definition of a liability. The definition of a liability was dropped from the regulation for purposes of simplicity and brevity. It was not dropped with an intent to change the definition. It was believed that the regulations did not need a separate definition of a liability because it would only duplicate the definition contained in Rev. Rul. 88-77.

**SOURCE:** This project was established at the request of Treasury.

**REASON FOR PUBLICATION:** Publication is needed because some taxpayers are engaging in short sales through partnerships with the hope of avoiding a basis increase in their partnership interests. This would enable taxpayers to create gains that can be offset by losses that would otherwise expire. These transactions are inconsistent with the Service's position that partnership liabilities are created and therefore the partners' bases are increased.

A short sale is a contractual arrangement under which the seller is obligated to make delivery of a specified amount of specified property at some date in the future. The usual form of a short sale transaction is the seller borrowing property that is immediately sold on the open market.

The potential for abuse can be illustrated as follows: A, an individual, with losses about to expire, forms a 50/50 partnership with B, an investment bank. A and B each contribute $100. The partnership borrows securities from its securities broker-dealer and sells them short for $500. The $500 is deposited with the securities broker-dealer and listed as an asset on the partnership's books. Before the short sale closes, B sells B's 50% interest, causing a § 708(b)(1)(B) termination. By taking the position that a partnership liability is not created, A's basis is not increased beyond A's initial contribution of $100. Therefore, on the deemed distribution under § 708(b)(1)(B), A has a gain of $250 (distribution of $350 minus a basis of $100). This gain allows A to use the losses.

The Service position is that the obligation creates a partnership liability and, therefore, each partner's share is included in its adjusted basis. As a result, A's basis prior to the termination includes A's share of the partnership liability resulting in a total basis of $350, and no gain is realized on the termination.

**PENDING REGULATIONS:** There are no proposed, temporary, or draft regulations that cover the issue in this revenue ruling.

The proposed subchapter K anti-abuse regulation under § 701 could provide an alternative basis to challenge a taxpayer's position in a case like the one described above. However, we believe that the technical position asserted in the proposed ruling is convincing. To include a discussion of the anti-abuse regulation in the proposed ruling could suggest otherwise. Furthermore, the issue of whether a short sale creates a liability under § 752 can arise where the short sale is not engaged in with an improper view, and the ruling is drafted so as to raise only the technical issue.

**CONTRA ARGUMENTS:** There are two contra arguments to the publication of the proposed revenue ruling. First, the definition of a liability as stated in Rev. Rul. 88-77 may not generally be considered as including short sales. Rev. Rul. 88-77 provides that the term "liability" includes an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings). The classic example of this type of partnership liability is a mortgage on real property. The borrowing leg of a short sale of securities does not meet the definition in Rev. Rul. 88-77 because the mere borrowing of stock does not increase the basis of a partnership asset. However, in the other leg of the transaction, the borrower converts the borrowed stock into cash, which has basis, without the recognition of income. Therefore, we believe that the transaction creates the type of obligation intended in the definition of a liability set forth in Rev. Rul. 88-77. Also see, e.g., Deputy v. du Pont, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118 (a short sale creates an obligation although not an indebtedness). The term "liability" is broader than the term "indebtedness." Accordingly, the holding in Deputy v. du Pont supports the holding in this ruling.

A second contra argument is that, if the Service considers these transactions to be partnership liabilities, taxpayers can structure transactions using short sales that provide basis for partners whenever needed. However, even without the proposed revenue ruling, alternatives such as loans exist to provide partnerships with additional basis. Because short sales fall within the definition of a partnership liability set forth in Rev. Rul. 88-77, it is appropriate that a partner include in basis the partner's share of the liability.

**COORDINATION:** CC:EBEO published a companion revenue ruling, Rev. Rul. 95-8, 1995-4 I.R.B. 29, addressing whether short sale transactions give rise to unrelated business taxable income (UBTI) under § 512. We have coordinated with CC:EBEO and their counterparts at XLC. They have concluded that their position is not affected by our proposed ruling.

**RESEARCH STATEMENT:** The attached proposed revenue ruling has been researched by the originator through February 28, 1995.

for [signature]
Chief, Branch 1 (CC:DOM:P&SI)

3/1/95
Date

Attachments:
Rev. Rul. 88-77
Rev. Rul. 95-8

# Plaintiffs' Exhibit 5

Questions I might be asked.

That RR 88-77.

Significance of partnership case Helmer (probably find significance below).

Similarity to deep-in-the-money options.

P&SI says there is no relevant case under § 357, but mentions Bongiovanni.

Maybe to do.

RR 80-199, 1980-2 C.B. 122: announces IRS will follow Focht, not Bongiovanni.

Says its interpretation of "liability" applies only in § 351 regime, not elsewhere.

Conference with Crouch 1/9/95.

RR 95-8 just issued by EBEO: income from a short sale is not UBTI [I reviewed it; it cites a S. Ct. case under § 163 that the obligation to replace stock borrowed in a short sale is not "indebtedness", and the UBTI rules require indebtedness, so there is no UBTI.]

Brown etc. have asked Corporate how short sales would be treated under the liability rules of §§ 351, 357.

Conference with Jackal, FI&P, P&SI, Treasury, Crouch 1/9/95.

[These are very loose notes; I was not sure who represented who and heard a lot of vaguely reminiscent partnership tax law.]

RR 95-8 says a short sale does not create indebtedness, so income from short sale not UBTI.

So Brown is reluctant to say a short sale generates a liability.

Can it be an obligation without being indebtedness?

Brown suggested writing a regulation to cover all these questions.

Brown mentioned uncovered options. How would one be handled? Would the problem ever arise without a deep-in-the-money option? A '75 ('78?) case: people formed a partnership. The partnership got $1t for writing an option to sell its land. Option was fixed price. We tried say § 731 gain because partnership distributed the cash to partners. Partners said no, should be a § 752 liability there. But court said no, no obligation to repay. Certainly if the option were exercised, the partnership must transfer the land. [Case apparently called Helmer, discussed in McKee.]

If did it without a partnership, no gain.

Options and short sales have lot in common. In both cases bet (he seems, Treasury guy, say) same, though maybe different magnitude and cost.

Should we say short sale creates liability when an option does not? Worried about adverse selection: if want basis and gain, rely on Helmer using short sale, if not use option.

FI&P might say all options obligations [liabilities?]?

Mentions 446-5 [a regulation?] [get feeling quite important here]. FI&P apparently says every option, whether deep-in-money or not, is a § 752 obligation [liability?]. Others apparently disagree. (That is apparently at odds with Helmer; hence they are talking about maybe doing this as a regulation (overruling a case) rather than just a RR (or something).)

But P&SI has problems with that FI&P view.

P&SI wants keep "liabilities" narrow, not blow § 752 wide open.

Treasury does not like giving taxpayers selectivity [so we have FI&P, P&SI, Treasury positions: but does Treasury want handle it by going in same direction as FI&P?].

P&SI says there is no relevant case under § 357 (but mentions something like Bongiovanni). Jackal mentions a recent S corporation basis case (maybe Hitchins): S corporation did not formally substitute its note for shareholder's (?) debt, but essentially . . . : court talked about varying meanings of "liability".

They are trying to figure out what Brown's feeling was at last meeting.

What did he say: if options and short sales are the same, he does not want us handling them differently. Did he say that? Apparently Brown's worried this proposed ruling and RR 95-8 seem run in opposite directions. Re Helmer, etc., if we had to choose one poison or another, he tended agree with Helmer (a position IRS perhaps needs, lesser of two evils).

Jackal: different answers at partner and partnership levels: Jackal does not like, thinks Helmer bad idea, thinks contrary to direction in which we are going.
Brown said Helmer's bad if just do § 705 only [believe McKee discusses this], so our ruling should say basis increase under § 752, not just § 705 [apparently McKee makes same point].
FI&P willing put out short sale ruling and say nothing about options. FI&P had argued against the EBEO ruling [95-8] as inconsistent with this proposed ruling, same thing worrying Brown. [Apparently a question whether to delete deep-in-money option language from RR. Jackal: we cannot mention them and leave them at that.]
Treasury [apparently] opposes leaving it open with possibly one rule for short sales but latitude for taxpayers re options (and does not think can do same for options in a RR, need regulation to overrule Helmer).
Whole issue is mismatch between inside and outside basis. Good [?] basis inside because agreed to do this in future [or because partnership has the cash?]: Treasury wants reach right result re outside basis too: a basis kick-up there too, no matter how get to that result, and only way there is § 752: using it to cram through result: understands it is not an entirely clean way of doing it.
P&SI does not want to broaden § 752, v. Treasury wants consistency if done inside or outside partnership.
Talked about meeting again next week [to try reach a consensus?].

Conference with Crouch 1/9/95.

Make sure there are no cases on point under § 351, 357.
Then decide whether Corporate wants the result to go one way or the other.
Consider § 357(b) too.

Review of P&SI's briefing memo for 3/7/95 meeting with Brown.

Executive summary.

Issue: does short sale by partnership create partnership liability under § 752?
RR 88-77: § 752 liabilities include an obligation to extent incurring it creates or increases basis of any partnership assets (including cash attributable to borrowings).
The cash received in the short sale increases the partnership's asset basis.
Hence short sale creates a liability.
Recommendation: issue the RR.

Attachment to Chief Counsel Meeting Request Form.

Issue.

Original draft RR addressed both short sales and deep-in-money puts; held both created § 752 liabilities.
EBEO RR ruled short sales create obligations but not debt-financed property re § 514.
Chief Counsel asked that further consideration be given to (1) draft RR position on treatment of other arrangements such as options and deep-in-money puts, (2) possibility of addressing short sales under § 705(b) rather than § 752.

Treatment of other arrangements.

Options.

"Existing authority is contrary to a position that options create liabilities". Helmer held that no partnership liability is created upon receipt of option payments by a partnership; payments received were without restrictions except that upon exercise of the options the amounts would be applied against the purchase price.
"While we agree that existing authority prevents treating options as creating liabilities in the proposed RR, further consideration of the appropriateness of expanding the definition of liability is recommended. We recommend, in view of connection between liability definition under §§ 752

# Plaintiffs' Exhibit 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - -x

ORIGINAL

MARRIOTT INTERNATIONAL RESORTS, :
LP; MARRIOTT INTERNATIONAL JBS :
CORPORATION, TAX MATTERS PARTNER, : Nos. 01-256 T
Plaintiffs, : and 01-257 T
vs. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - -x

DEPOSITION OF LESTER PULSE

Washington, DC
Wednesday, December 11, 2002

REPORTED BY:
VICKY J. STALLSWORTH

Deposition of LESTER PULSE, called for examination pursuant to notice of deposition, on Wednesday, December 11, 2002, in Washington, DC, at the offices of Crowell & Moring, 1001 Pennsylvania Avenue NW, at 9:21 a.m., before VICKY J. STALLSWORTH, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

ROBERT L. WILLMORE, ESQ.
HAROLD J. HELTZER, ESQ.
Crowell & Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595
202-624-2915
On behalf of Plaintiffs

--continued--

APPEARANCES (CONTINUED):

CHARLES M. RUCHELMAN, ESQ.
ROZELLA OLIVER, ESQ.
ROBERT NOAH, ESQ.
CRYSTAL MILLER, ESQ.
U.S. Department of Justice
555 4th Street NW, Room 8112
Washington, DC 20001
202-616-3423
On behalf of Defendant

P R O C E E D I N G S

Whereupon,

LESTER PULSE

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. RUCHELMAN:

Q Good morning, Mr. Pulse.

A Good morning.

Q My name is Charles Ruchelman. I'm an attorney with the Department of Justice tax division. And this is your deposition in the case of Marriott International Resorts Limited Partnership, which is docketed in the United States Court of Federal Claims, Docket Number 01-256 T and 01-257 T.

What we're going to do today is I'm going to ask you a few questions about what you know about the facts and the allegations in this case.

Have you ever been deposed before? Have you ever given testimony at a deposition before?

A Yes.

mortgage pool sale?
A Other than ultimately becoming a partner in the partnership, I don't have any other recollection of MICC.
Q Okay. Was MICC involved in any other of the mortgage pool sales, the 1995-A transaction, the 1993-A transaction, the 1992-A transaction? Any of those?
A I don't believe so.
Q Let's talk about the term "hedging" for a moment. Do you understand what that term means?
A Well, I understood what it meant in the context of this transaction.
Q Okay. What is that? "This" meaning 1994-A mortgage pool transaction.
A The 1994 time-share note transaction.
Q Okay.
A We were concerned with interest rates rising and affecting the value of the asset. And we decided to put a hedge on it. So that's how I would -- that's all I can give you on the definition of "hedging."

A I have a recollection in '95. But I'm not -- I can't give you the details since I wasn't involved with the transaction. But it seemed like it may well have been hedging activity going on in '95.

Q Okay. Are you familiar with the term "bankruptcy remote entity"?

A I've heard those words before.

Q Okay. Are you familiar with those words in the context of this case, of this transaction, the 1994-A transaction?

A I've heard those words used in this transaction, yes.

Q Are you aware or were you aware in 1994 that a bankruptcy remote entity was used in the 1994-A transaction?

A I think in '94, my best recollection was there was an attempt to use the entity we could use to best allow us to get the highest price we could get on the mortgages.

I heard the term "bankruptcy remote" used in '94 and to the present. I've heard that term

used quite a bit both inside Marriott and outside Marriott. But my best recollection of what was happening in '94 was we were trying to do the right thing in terms of value.

Q Uh-huh.

A And whether that the partnership we used was bankruptcy remote, so forth and so on, only went to the point of view where we were trying to extract the highest value on the mortgages. That's my recollection of how that term came to me.

Q Right. Right. How would use of the bankruptcy remote entity provide the highest value in the transaction?

A Given my limited expertise on that, I can tell you what I thought in '94 was happening, and I think today happened, was it gave the buyer the highest security we could give the buyer in terms of the mortgages and hence allowed us to receive the highest price.

Q Okay. And you said it was a partnership used for that purpose.

A Yes.

included First Boston and probably did. I started with Marriott in '85.

Q Right.

A And my best guess is I've had some relationship with First Boston and other firms throughout my career at Marriott.

Q Okay. Let's just back up a little bit. You've referred to the spin-off a lot. Can you tell me what that means? What was the spin-off?

A Well, in '93, in essence, Marriott International was created essentially as a manager of the Marriott properties. And that entity was spun off, distributed to our shareholders I believe in October of '93.

Q Okay.

A The entity that transferred Marriott International is now known as Host Marriott, and they're essentially in material terms the owner of a number of Marriott properties.

Q Okay. What was the initial entity called? It was called Marriott Corporation.

A Yes.

A As we did the transaction --
Q Okay.
A -- that I see.
Q From your perspective, was this a tax planning presentation or a business planning presentation?
A My general sense in looking at it now is that it is attempting to do both.
Q Okay.
A But it does it in a very abstract unidentifiable to me way since it has no interrelationship with our business, our real interest rate risk or anything associated with Marriott.
Q Okay.
A Any company who looks at this document, one can argue all companies have interest rate risks. You can make a loose argument as they tried to do that this might make sense in terms of short reinvesting, so on.
Q I see.
A I'm certain then and I'm quite certain now

looking at this that this is not the transaction we did.

Q Okay. After reviewing this document, did you conclude that Marriott could achieve significant tax savings by structuring a transaction this way, as set out in Exhibit 164?

MR. WILLMORE: Objection.

THE WITNESS: No. The only thing I concluded, as I recall looking at this document, I was quite intrigued by the idea of a short obligation not being a liability for tax purposes. That's the main thing that as I went through this document I looked at and thought about, "is that true or not under the tax law?"

BY MR. RUCHELMAN:

Q Okay.

A And I believe from that I did do some checking in terms of that, that generalized concept.

Q I see.

A That before then I don't have any recollection that I -- I may have been familiar with this concept; I may not. But when I saw this, I

A -- is given the date of this and the date of this spin-off we were doing, it's entirely clear to me now why I was not paying a lot of attention to MTMG.

Q Okay.

A I will tell you, looking at A, B, C and D --

Q Right.

A -- and using some forward evidence I had with the company and what we have done with time-share notes since '94 --

Q Right.

A -- we typically sell time-share notes on a quarterly basis.

Q Okay.

A As a rule, today, at least for the last couple of three years.

Q I see.

A I believe what was happening in '94, and my recollection goes to the growth committee submission that we made on the '94 transaction, I believe that submission indicates or was discussed

at the meeting, how did we end up with this volume of notes.

Q Okay.

A What was -- why do we have this big a note pile sitting on our balance sheet.

I believe the fundamental reason, as I recall, is, and I keep coming back to the spin-off, not to obfuscate anything, but ~~to~~ the spin off changed the entire financial structure in creating Marriott International, wherein we had very little debt. And there was, I'm certain, the growth committee -- it's either in the document or we discussed it, the discussion was very simple. Why don't we hold these notes and earn the high interest? Why are we selling them off and keeping just the residual? Why not keep the entire spread?

And I believe at that time, in '94, the year went along, the notes piled up. I think at the time the growth committee made the decision, no, we want to recycle the capital. We want to sell the notes.

Q Okay.

A So my best recollection is we didn't have these tranches in '94.

Q Right.

A We had one transaction near the end of the year.

Q And --

A And I believe that's why.

Q Okay. And you said there was some growth committee discussion or in the memo --

A That's my recollection.

Q Right. As to why Marriott was holding the notes. Do you recall when in time that was, what month in 1994? Was it earlier in the year or was it towards the end in November when the sale to Teachers was done?

A I have no recollection as to the fundamental decisions as to who was in charge of how many notes was being produced and how that volume was growing.

Q Okay.

A I do have a distinct recollection though in '94, and I believe it was at the growth committee

meeting, with respect to this transaction, there was a long discussion about should we sell or not.

Q Okay.

A And it went to the spreads form and it went to the fact that our balance sheet, prior to the spin-off, we were very highly levered at a lot of debt. It was easy to sell time-share notes at that point. Post-spin-off, we had very little debt. So there was less of a need to recycling capital than before.

Q Okay.

A So there's a sequence going on here of a new Marriott International, people grappling with these issues --

Q Right.

A -- and so forth.

Q So if the sales were made on a quarterly basis, the '94-A note sale would have been around April 1st, and the '94-B would have been around June 1st. Is that how it would work?

A It would generally, hypothetically --

Q Okay.

years '93, '94 and '95."

And part of the response is on the bottom of page 7, which says "in early 1994, CS First Boston provided Marriott with a description and analysis of a proposed transaction which would have resulted in certain tax benefits. While Marriott did not implement that proposed transaction, some aspects of CSFB's analysis were considered in planning the transactions at issue in these cases."

And the question I have about this is how can you say in this response -- how can Marriott say that Marriott did not implement that proposed transaction?

A This answer drives off of a January '94 document that Phil Hamon sent --

Q Okay.

A -- to somebody in the company. I guess it came to me as I recall. It is my view that, in the ~~looks~~ loose sense, if you want to call that a proposed transaction, small T, I suppose you can. But, again, the only element of that document that I saw that piqued my interest at all was the ability to

hedge through short sale.

So it is my view that the transaction, little T, in that document we did not execute.

Q But CS First Boston executed the trades for you.

A They executed the trades, right.

Q How was that different? They proposed a plan for corporate structures. They proposed trades, Treasury notes, and Marriott basically did those items.

MR. WILLMORE: I'm going to object. That mischaracterizes both the testimony and the record.

BY MR. RUCHELMAN:

Q That's my question.

A Let me describe to you what they didn't propose.

Q Okay.

A Was a bona fide and necessary need to hedge time-share notes. They didn't propose that we had developed a large volume in these notes that needed hedging, because in my view, the volume was developed because we had the capacity to hold the

notes. They knew nothing about that, didn't develop that. They didn't develop the fact that MIR sold the notes to teachers, remains in existence today with the residual interest. They didn't develop any of that.

So in the wild substance of the transaction as I describe the transaction, the ultimate -- the entire transaction, it didn't describe that transaction at all.

Q So who developed it, then? How did it come to --

A The business was ongoing. The business was not created. The time-share notes were not created.

Q Right.

A This was not created for a tax planning strategy. The simple fact of the matter is that this hedge, which was executed in the form of a short sale --

Q Right.

A -- was embedded in a bona fide business activity, and was needed to protect ourselves from a

diminution in value of these notes, and the tax consequences resulted from that. And First Boston never described that type of transaction at all in my mind in the January '94 document.

Q But someone wedded the facts, Marriott's financial position, Marriott being in the mortgage note business, Marriott looking to sell the -- pooling and selling the mortgage notes -- somebody wedded those facts to the tax benefits of creating a partnership, contributing the mortgage notes to the partnership and the short sale and the obligation to close the short sale to the partnership, and the transfer from MORI to MICC -- someone wedded those facts to those structures to create a multimillion dollar tax loss.

Who was that?

A Well, I've told you that in substance Mike Dearing and I --

Q Okay.

A -- did the transaction.

Q Okay.

A -- in a material sense.

Q And Mr. Dearing from the finance side and Mr. Pulse from the tax side.

A Yes.

Q Now, why does Marriott care whether CS First Boston gets any credit for this transaction?

A You're --

MR. WILLMORE: Objection. What do you mean by credit?

BY MR. RUCHELMAN:

Q Well, why not say Marriott implemented the transaction that CS First Boston proposed?

A Because that would be false.

Q And it's false because?

A When you say proposed --

Q Right.

A -- I take that to mean you're talking about the January '94 document --

Q Okay.

A -- that came in early '94.

Q Right.

A In my view, to argue that that transaction was executed is false. That transaction was not

executed. What was executed is what we did. And what we did in a material sense is associated with a business activity and had economic substance, and would have been done with or without a tax planning strategy.

Q A tax what?

A Tax planning strategy.

Q So you view that January document as a tax planning strategy?

MR. WILLMORE: Objection. Mischaracterization of testimony.

THE WITNESS: I view that document, again, what piqued my interest in the document was the expression that hedging in the form of a short sale could have tax ramifications that we needed to study, assuming that there was an existing and overwhelming business purpose to execute the hedge.

BY MR. RUCHELMAN:

Q Okay. Let's take a look at Exhibit 288. Are you familiar with this document?

A No, I'm not.

Q Let's take a look at Exhibit 406. Have

tranches or series of mortgage pool transactions, the '93A, '94A, '94B, C, D.

Do you recall that discussion?

A Yes.

Q And you indicated that Marriott decided to hold the mortgages rather than sell them in the quarterly basis because Marriott had the capital to do it.

MR. WILLMORE: Objection. Mischaracterizes the testimony.

THE WITNESS: I think what I indicated is given the newness of the company and what I perceived at the time really to be an evolving process, not only with respect to time-share notes but with respect to the financial policies of how we were going to operate Marriott International, the volume of these time-share notes because the activity of the business was picking up ended up to be what it was.

BY MR. RUCHELMAN:

Q Okay.

A But it was not at this point in time,

thinking about the present case, it was not as critical to us for a couple of reasons.

One, we were able to carry those notes and the corresponding debt without it getting anywhere near losing our investment grade status on the ~~bottom~~ bond market. And the spreads were attractive, ~~Bar/was paying 4~~ paying 400 or 500 basis points more than the Treasury bill. That number was a heck of a lot more than our bar. So for some reason, it made some sense to keep those notes until we decided what the financial policies of Marriott International were going to be.

Q And that's when Marriott changed its corporate mind and decided to sell the '94A pool in November of '94, once it had determined what the financial policy of Marriott was going to be?

A I'm not sure it was finally determined at that point ~~of view~~ in time. But certainly at that point in time, we decided to sell that mortgage portfolio.

Q And if you felt that the spread was positive for Marriott -- it was attractive for Marriott, the spread that you discussed, why enter

into a hedge with the short sale transaction as you did with CS First Boston?

MR. WILLMORE: Objection.

THE WITNESS: Again, my understanding of the hedge was to protect the value of the asset we had. We clearly had a view. If you go back to the '93 TIAA agreement, there must have been a view that there was a possibility we could be doing more transactions. And it seemed prudent at the time, given the sizes of this loan portfolio, and we were going forward in '94, whether we actually executed a transaction with teachers or not, certainly it was on the radar, there's a possibility we could sell these mortgages.

And it made no sense to let that fixed-rate asset sit out there in an environment where I believe at that time the company thought the bias of interest rates was to go up, which is what happened, not because we can foresee the future.

Q Right.

A But my recollection is we actually thought at that point in time the environment indicated to

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

x M Zester Puler Jr

Subscribed and sworn to before me this 29 day of January, 2003.

x Paula Niswander
Notary Public

My commission expires: PAULA NISWANDER
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires February 2, 2003

# ERRATA SHEET

DEPOSITION OF: Lester Pulse

DATE OF DEPOSITION: 11 December 2002 PAGE 1 of 3 Pages

| PAGE | LINE | CORRECTION (Type or print) |
|---|---|---|
| 16 | 2 | Add "amounts" after "de minimis" |
| 16 | 2 | "minimum" changed to "minimums" |
| 16 | 6 | Strike "is" |
| 21 | 7 | "that" changed to "the" |
| 21 | 7 | "papers" changed to "paper" |
| 22 | 6 | Strike extra "is" |
| 25 | 1 | "finances" changed to "financing" |
| 35 | 20 | "mortgage" changed to "mortgages" |
| 37 | 14 | Strike "in all its sense" |
| 44 | 2 | "settlement" changed to "transaction" |
| 45 | 8 | "partner" changed to "partnership" |
| 46 | 12 | "standing" changed to "planning" |
| 65 | 2 | "wherefrom" changed to "from which" |
| 66 | 7 | Add "of the" after "disposition" |
| 67 | 7 | Add "Resorts, Inc." after "Ownership" |
| 68 | 22 | "subsidiaries" changed to "some purpose" |
| 70 | 2 | "management" changed to "matters partner" |
| 77 | 16 | Strike "end" |
| 94 | 21 | "fax" changed to "facts" |
| 96 | 16 | "no idea" changed to "know" |
| 116 | 8 | "to" changed to "the" |
| 119 | 14 | "marks" changed to "is March" |
| 135 | 15 | Add "interest" after "partnership" |

ERRATA SHEET

DEPOSITION OF: Lester Pulse

DATE OF DEPOSITION: 11 December 2002 PAGE 2 of 3 Pages

| PAGE | LINE | CORRECTION (Type or print) |
|---|---|---|
| 148 | 3 | "merit" changed to "Marriott" |
| 153 | 10 | "market" changed to "mark" |
| 154 | 3 | "market" changed to "mark" |
| 163 | 7 | Strike the 1st "was" |
| 165 | 11 | "Barters" changed to "Partners" |
| 169 | 9 | "or" changed to "for" |
| 180 | 2 | "speaker national" changed to "International" |
| 196 | 11 | "ability" changed to "taxability" |
| 206 | 7 | "partner" changed to "department" |
| 207 | 12 | "Grif" changed to "Griff" |
| 207 | 13 | "Don" changed to "Dawn" |
| 214 | 1 | Add "purpose" after "business" |
| 226 | 1 | "Grif" changed to "Griff" |
| 236 | 19 | "looks" changed to "loose" |
| 242 | 19 | "Grif" changed to "Griff" |
| 242 | 19 | "Don" changed to "Dawn" |
| 243 | 1 | "Grif" changed to "Griff" |
| 243 | 1 | "Don" changed to "Dawn" |
| 243 | 10 | "Grif" changed to "Griff" |
| 243 | 10 | "down" changed to "Dawn" |
| 243 | 14 | 2nd "Mr." changed to "Ms." |
| 250 | 14 | "really" changed to "rarely" |
| 260 | 3 | "gap" changed to "GAAP" |

# ERRATA SHEET

DEPOSITION OF: Lester Pulse

DATE OF DEPOSITION: 11 December 2002

PAGE 3 of 3 Pages

| PAGE | LINE | CORRECTION (Type or print) |
|---|---|---|
| 264 | 2 | "Owner" changed to "Owned" |
| 264 | 4 | "Owner" changed to "Owned" |
| 266 | 17 | "year" changed to "air" |
| 273 | 8 | "insurance" changed to "inside" |
| 273 | 8 | "object" changed to "in the" |
| 280 | 6 | "bottom" changed to "bond" |
| 280 | 6 | "." changed to "," |
| 280 | 7 | "Bar was paying 4" changed to "paying 400" |
| 280 | 18 | "of view" changed to "in time" |
| 283 | 11 | "Buudoin" changed to "Baudoin" |
| 283 | 13 | "Buudoin" changed to "Baudoin" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Plaintiffs' Exhibit 7

COURT OF FEDERAL CLAIMS



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

- - - - - - - - - - - - - -x

MARRIOTT INTERNATIONAL :
RESORTS, et al., :
Plaintiffs, : Numbers 01-256 T
vs. : and 01-257 T
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - x

DEPOSITION OF MICHAEL E. DEARING

Washington D.C.
Thursday, December 12, 2002

REPORTED BY:
BRENDA SMONSKEY

Deposition of MICHAEL E. DEARING, called for examination pursuant to notice of deposition, on Thursday, December 12, 2002, in Washington, D.C., at the offices of Crowell & Moring, 1001 Pennsylvania Avenue, Northwest, at 9:35 a.m., before BRENDA SMONSKEY, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

ROBERT L. WILLMORE, ESQ.
HAROLD J. HELTZER, ESQ.
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
On behalf of Plaintiffs

-- continued --

APPEARANCES (CONTINUED):

ROZELLA A. OLIVER, ESQ.
CHARLES M. RUCHELMAN, ESQ.
ROBERT NOAH, ESQ.
United States Department of Justice
P.O. Box 26
Ben Franklin Station
Washington, D.C. 20044
On behalf of Defendant

ALSO PRESENT: Crystal Miller

P R O C E E D I N G S

Whereupon,

MICHAEL E. DEARING

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. OLIVER:

Q Good morning, Mr. Dearing. My name is Rozella Oliver. I'm an attorney with the Justice Department Tax Division. Along with my co-counsel Charles Ruchelman, I'm representing the United States in this action brought in the Court of Federal Claims in the cases of Marriott International Resorts, LP versus United States, Federal Claim Number 01-256 T and 01-257 T. This deposition is being taken pursuant to the rules of the Court of Federal Claims.

I'm going to ask you questions today to find out what you know about the facts and allegations in this lawsuit.

Have you ever been deposed before?

A Yes.

MORI note sale program was being analyzed.

Q When you say "spin-off," can you explain what you mean by that, the spin-off of Marriott International?

A In I believe it was October of 1993, Marriott Corporation spun off Marriott International.

Q What is Marriott International or how is it different from the old Marriott Corporation?

A Prior to October '94, Marriott Corporation --

Q October --

A October of '93. Excuse me. Marriott Corporation owned a significant amount of hotel real estate, and it was also a hotel management company.

The effect of the spin-off was that Marriott International, the spun-off company, was the management company, the hotel management company, while Marriott Corporation, later renamed Host Marriott, was primarily a hotel real estate ownership company.

Q Do you know as a result of the spin-off

the number of note sales?

A As I said, I don't specifically recall discussions with Barry Johnson about the number or timing of note sales in 1994.

Q Just to back up a little, can you tell me who Barry Johnson is?

A Barry Johnson was the business person at Teachers who had primary responsibility for the time-share note sales between Marriott and Teachers.

Q Was he your primary contact at Teachers?

A Yes.

Q From Marriott's perspective, what would have been the benefits of doing one note sale in 1994 as opposed to multiple?

A Well, the longer we held the notes, the more income, more interest income we would have received, since during the period of the hold we got the interest income. So one factor that was a favorable factor in terms of holding would be the interest income coming from the notes.

There would be lower transaction costs associated with doing fewer as opposed to more

time-share notes. But, again, I have to say that any such decision wouldn't have been unilateral on the part of Marriott. It would have been made in dialogue with Teachers.

Q But your testimony today is that you cannot recall any such dialogues with Barry Johnson at Teachers?

A That is correct.

Q And you don't recall any documents that memorialize such discussions?

A That too is correct.

Q And you don't know of any documents that memorialize the decision to do one note sale as opposed to multiple sales in 1994?

A I would like to clarify that I'm sure there are documents that talk about the note sale. But if you mean documents that specifically discuss the decision as to whether there should be one or two or three or four within '94, I don't specifically recall documents dealing with that point.

Q In the 1991 note sale to Teachers, was

set up and whether the partnership was a necessary component. The part that I was focused on from a business standpoint was making sure the interest rate exposure on the portfolio was protected.

Q Could you have done the hedge without setting up a partnership?

A I really don't recall the exploration of alternative structures. Understand, the way this happened was there was an intent to protect the interest rate exposure we had on the time-share note portfolio.

Based on taking into account all the advice from the accountants and First Boston and our counsel, we set up up in the way that made the most sense. As to that particular component, I don't recall the advice.

Q Do you know if the decision to have a partnership was driven by TIAA or Teachers' needs in the note sale in 1994?

A I don't recall particularly. I do recall that they had a persistent desire to make sure that there was a bankruptcy-remote unit involved so that

they would be protected from the time-share mortgage pool being dragged back into a bankruptcy estate on the part of the seller or seller's affiliates.

Q In the prior sales to TIAA, what was the grantor that was used to effectuate the sale to TIAA?

A As I recall, MTMG was the grantor in some of those deals. I'm not sure whether it was in all of them.

Q MTMG, was that a partnership or a corporation?

A I think it was a corporation. Again, the decision as to the exact form of these units, whether they were corporations or LLCs or partnerships, wasn't something that I was primarily focused on.

The way in which those organizational units were incorporated or structured and the various forms that they took, we took the advice of our counsel and our accountants and our financial advisors on what was the most logical way to set it up. My focus was the business objective.

invest in other assets.

Q So had that capacity increased or decreased?

A What this reference is is that our current estimate for the amount of investment capacity as well as what the other uses of it are, what this is saying is that the best current use or one of the better current uses for our investment capacity would be to stay invested in the MORI time-share mortgages for the course of the year.

Q So to hold on to them longer rather than execute quarterly sales?

A Right.

Q The second reason given in this paragraph is "the significant profit contributed by the MORI mortgages." What does that mean?

A That's the interest spread, the difference between the interest income on the mortgage portfolio and the cost of carrying those mortgages, the interest expense related to the related debt.

Q Now, it says that recently one and two occurred or were occurring. Was that something that

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

x Michael E. Dewey

Subscribed and sworn to before me this 31st day of January, 20 03.

x [signature]
Notary Public

My commission expires: 1/19/05.

LAURA L. PEARCE
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
MY COMMISSION EXPIRES JAN. 19, 2005

# ERRATA SHEET

DEPOSITION OF: Michael E. Dearing

DATE OF DEPOSITION: 12 December 2002

PAGE 1 of 1 Pages

| PAGE | LINE | CORRECTION (Type or print) |
|---|---|---|
| 89 | 13 | "partner" changed to "part" |
| 99 | 8 | "Don" changed to "Dawn" |
| 99 | 15 | "Don" changed to "Dawn" |
| 100 | 7 | "Don" changed to "Dawn" |
| 108 | 20 | "NED" changed to "MED" |
| 113 | 13 | "LPPs" changed to "LPs" |
| 134 | 3 | "stretch" changed to "structure" |
| 160 | 20 | "lot" changed to "lock" |
| 161 | 9 | "Don" changed to "Dawn" |
| 161 | 10 | "Don" changed to "Dawn" |
| 197 | 20 | "Principals" changed to "Principles" |
| 198 | 15 | Add "a" after "with" |
| 198 | 16 | "Aircraft" changed to "aircraft" |
| 202 | 9 | "Don" changed to "Dawn" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Plaintiffs' Exhibit 8

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner, | |
| Plaintiffs, | Nos. 01-256T and 01-257T<br>Judge Charles F. Lettow |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

## DECLARATION OF OWEN A. LAMONT

I, Owen A. Lamont, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am submitting this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Plaintiffs' Cross-Motion for Partial Summary Judgment in these cases. I have personal knowledge regarding the matters set forth in this Declaration.

2. I have a B.A. in Economics and Government (with honors) from Oberlin College (1988), a Ph.D. in Economics from the Massachusetts Institute of Technology (1994), and have taught at the Princeton University Department of Economics, the University of Chicago Graduate School of Business, and the Yale School of Management. My CV is attached as part of Exhibit A.

3. Over the years, I have done substantial work related to short selling, including the publication of articles and papers regarding short selling, research with respect to short selling, and testimony before the National Association of Securities Dealers (NASD) and the U.S. House of Representatives regarding issues relating to short selling.

4. I was retained in 2003 by Plaintiffs as a testifying expert witness with respect to these cases. Pursuant to that retention, I was asked to prepare an expert witness report (1) explaining the mechanics of short selling generally, and (2) offering any opinions regarding the nature of the obligation that is created when one borrows a security in order to short it.

5. My expert witness report regarding these two matters was submitted in these cases in October of 2003. I was subsequently deposed by counsel for Defendant on January 29, 2004, regarding the matters covered in my expert report.

6. A copy of my expert witness report in these cases is attached as Exhibit A. It accurately reflects my conclusions and opinions regarding the matters addressed in the report. My expert report also sets forth my qualifications.

7. In Part III of my expert report ("Mechanics of Short Selling"), I explain the basic mechanics of short selling, as well as the motives for short selling.

8. In Part IV of my expert report ("Contingent Nature of Short Selling"), I explain the risks and contingencies associated with short selling. My opinions in this regard are accurately summarized in the "Summary of My Opinions" on page 2 of my expert report, which states as follows:

Borrowing a security and selling it short creates a contingent obligation. The value of the obligation, the timing of the obligation, and how the obligation is fulfilled are uncertain. The value of the loan fluctuates with the price of the borrowed security. The timing of the obligation is also unknown, and is not completely under the control of the short seller. The lender may demand the return of the borrowed security at any time. External events, such as squeezes or adverse price movements that decrease the collateral of the short seller, can force the short seller to close his position. The short seller is obliged to return the security to the lender, but in some cases this may not be necessary. The securities loan can be stretched out indefinitely. If the issuing company goes bankrupt, the loan might be terminated without actually returning the borrowed security.

9. I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19, 2008, at Chestnut Hill, Massachusetts.

Owen A. Lamont

# Exhibit A to
# Declaration of Owen A. Lamont

In the Matter of

Marriott International Resorts, L.P.,
Marriott International JBS Corporation

v.

The United States

United States Court of Federal Claims
Nos. 01-256T and 01-257T

Expert Witness Report of
Dr. Owen A. Lamont

October 2003

Owen A. Lamont
October 23, 2003

## I QUALIFICATIONS

My name is Owen A. Lamont. For the academic year 2003-2004, I am Visiting Professor of Finance at Yale School of Management. For the academic year 2004-2005, I will be Professor of Finance at the Yale School of Management. I am also a Research Associate at the National Bureau of Economic Research. Previously, I have been Associate Professor of Finance at the University of Chicago Graduate School of Business, Assistant Professor of Economics at Princeton University, and Associate Economist at the Boston Company Economic Advisors. I obtained a B.A. in Economics and Government (with honors) from Oberlin College in 1988, and a Ph.D. in Economics from the Massachusetts Institute of Technology in 1994.

My research is in empirical finance. I have published 16 papers in academic journals on topics such as stock returns, bond returns, closed-end funds, and corporate diversification. Most recently my work has focused on short selling. I have published two articles on short sale constraints (with Charles M. Jones, Short Sale Constraints and Stock Returns, *Journal of Financial Economics*, November 2002, and with Richard H. Thaler, Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs, *Journal of Political Economy*, April 2003), and have a third working paper on the subject (Go Down Fighting: Short sellers vs. Firms, November 2002).

I have received numerous prizes and awards for research, including fellowships from the National Science Foundation and the Alfred P. Sloan Foundation. I have presented my research at many universities, practitioner groups, and government institutions around the world. On the topic of short selling, I have addressed the NASD and have given testimony to the U.S. House of Representatives. I attach my CV as Appendix A, which lists all my publications and testimony.

Counsel for Marriott International has asked me to prepare this statement in order (1) to explain the mechanics of short selling generally and (2) to offer my opinions regarding the nature of the obligation that is created when one borrows a security in order to short it. I am being paid my customary rate, $800/hour, for work on this case.

## II SUMMARY OF MY OPINIONS

Borrowing a security and selling it short creates a contingent obligation. The value of the obligation, the timing of the obligation, and how the obligation is fulfilled are uncertain. The value of the loan fluctuates with the price of the borrowed security. The timing of the obligation is also unknown, and is not completely under the control of the short seller. The lender may demand the return of the borrowed security at any time. External events, such as squeezes or adverse price movements that decrease the collateral of the short seller, can force the short seller to close his position. The short seller is obliged to return the security to the lender, but in some cases this may not be necessary. The securities loan can be stretched out indefinitely. If the issuing company goes bankrupt, the loan might be terminated without actually returning the borrowed security.

The rest of this statement discusses my opinions in more detail. A list of the documents considered in preparing this statement is included in Appendix B.

## III MECHANICS OF SHORT SELLING

Short selling occurs when an investor sells a security that he does not currently own.[1] This transaction is accomplished by borrowing the security from a current owner, and selling it to a new buyer. Later, when the short seller wishes to end his short position, he will buy the security back, and return the security to the original lender. The short seller doesn't need to return precisely the same security that he borrowed, but can return an

---

1 It some cases, an investor may sell short a security that he currently owns. For example, the investor would own shares in stock XYZ, but would nevertheless borrow shares of stock XYZ from another current owner, and sell them. Thus, the investor would simultaneously have both a long and short position in stock XYZ. In the past this transaction, known as "shorting against the box," was sometimes done for tax reasons.

identical security instead. When the short seller buys the security back and returns it to the lender, he is said to "cover" the short sale, thus closing his short position.

One motive for short selling is that the short seller believes the security will fall in price, and wishes to speculate on the price movement. Suppose the price of the security is $100 and the short seller thinks that it may fall. The short seller will borrow the security from an existing owner and sell the borrowed security to a new owner for $100. If the price of the security falls to $90 the following day, the short seller can then buy the security back, and return the security to the original lender. Since the short seller sold at $100 but bought at $90, he makes a $10 profit, not counting the expenses incurred. Like an investor who buys a security hoping to sell it after it has risen in price, the short seller is following a "buy low, sell high" strategy. The main difference is that the short seller reverses the chronological order of the transactions, selling it first, and buying it back later. Like all taxable investors, short sellers pay taxes on the profits they realize under current tax rules.

In addition to speculation, another motive for short selling is hedging. If an investor owns one security but wishes to hedge some of the price risk, he can short a similar security to reduce risk. There are also more technical motives for shorting, having to do with the need to deliver securities that one does not currently have in inventory.

Before selling short, the short seller must borrow the security from an existing owner. The first step is to find a willing lender. For some securities, such as small stocks that are not widely held by institutions or securities that are in great demand for borrowing, it can be difficult to find a lender. Various financial intermediaries attempt to match borrowers and lenders. Once the short seller has found a lender, the short seller (the borrower) and the existing owner (the lender) negotiate an agreement as to the terms of this loan. This agreement specifies the (1) duration of the loan, (2) the collateral provided by the borrower to the lender, and (3) any payments made by either side.

A typical agreement in the equity market would be as follows. Suppose A lends shares to B and B sells short the stock. (1) The duration of the loan is one day, though the loan can be renewed in subsequent days. (2) When the sale is made, the cash generated by the short sale does not go to B but rather to A, to serve as collateral for the loan. In addition to providing the short sale proceeds to A, B also must provide additional collateral, typically 2%, so that A gets 102% of the value of the security as collateral. Sometimes a lender will require even more collateral. This collateral is typically in the form of cash. As the price of the security rises, B will be required to provide additional collateral to A. When the loan is closed, A repays cash to B and B returns the shares to A. (3) In a typical loan, B receives some interest payment on the cash deposited with A. The rate paid is called the rebate rate, because A rebates the interest earned on the cash to B. For typical equity loans, the rebate rate is slightly below the riskless overnight rate. The difference between the rebate and the overnight rate serves as a fee that A gets in return for lending his shares. This difference is a cost for B, a holding cost that is paid periodically.

In this transaction, A is no longer the legal owner of the security, and so he does not receive any distributions (such as dividends or interest payments) generated by the security. Thus B is responsible for compensating A for this lost payment. If the stock pays a dividend of $1, then B must pay $1 to A (ignoring tax complications). These payments are another cost that B must pay to maintain his position.

## IV CONTINGENT NATURE OF SHORT SELLING

Short selling can be risky. For those who are shorting for speculative reasons, the most obvious risk is that instead of falling in price the security rises in price. If one sells short at $100, and then the security rises in price to $150, one has lost $50.

Although short selling can in general reduce risk when used for hedging, a variety of features of the securities lending market create uncertainty about the short position. Short

sellers never know exactly at what price they will cover, when they will cover, or what events might force them to cover.

A short seller may cover the next day, or he may not cover for months or even years. This time uncertainty creates another source of financial risk, because the short seller faces holding costs. As mentioned previously, one holding cost is the difference between the rebate rate and the riskless interest rate. Suppose this cost comes to $10 a year, and suppose the short seller sells at $100 and covers at $90. If the price falls immediately, then the short seller makes $10 (since he does not have to pay the yearly holding cost). If the price falls over the course of a year, the short seller breaks even (since he has paid one year's worth of cost). If the price falls in two years, the short seller loses $10. So even if the short seller believed the price would fall for certain by $10, uncertainty about the speed at which it falls creates financial risk.

Two events can force the short seller to involuntarily close the short position. First, if the lender demands that the short seller return the borrowed securities, the short seller will be forced to cover unless he is able to find a new lender. This event, called recall risk or buy-in risk, can occur because lending agreements are not indefinite but rather have end points. In the U.S., the term of a standard equity loan is one day, though the loans are usually renewed for subsequent days. That means on any day, either the lender (the owner of the security) or the borrower (the short seller) can decide to end the lending relationship. The lender of the stock has the right to demand the return of his shares at any time. If the stock lender decides to sell his shares (or for some other reason calls in his loan) after the shares have risen in price, the short sellers may be forced to close their position at a loss if they are unable to find other shares to borrow. This risk has long been recognized as a major problem for short sellers.

Even if the short-seller is able to find a new lender, the terms of the loan could change drastically. Securities that many short sellers wish to borrow are called "hot" or "special." Hot securities will be very expensive to borrow (assuming that one can even find a lender). In some cases, if a security becomes very expensive to borrow, a short seller may want to close his position because it is too expensive to maintain.

Second, a short seller may be forced to close his position because his net worth falls. Short sellers are required to post additional collateral as the value of the borrowed security rises. If the short seller cannot provide the additional collateral, he must close his position. Thus dramatic rises in the price of the shorted security can ruin a short seller. If the price rises, he may run out of money and be forced to cover his position. Thus if the short seller sells the security at $100, and it rises to $150, he may be forced to close his position. If the security later falls back to $90, the short seller does not benefit because he was not able to maintain his position.

Either of these two events can cause a "short squeeze," which I define as a situation when short sellers are forced to cover their positions at the same time, either due to inability to borrow the security or inability to maintain adequate collateral. A different, broader definition is that a short squeeze occurs whenever the price of a security rises and short sellers cover for whatever reason. Either because of lower wealth, increased risk aversion, or fear of further price rises, the short seller covers his position, increasing the demand for the security and driving the price further up.

Sometimes market manipulation can cause a short squeeze. An extreme form of buy-in risk is the "corner". Suppose B borrows bonds from A and sells them short. Now A acquires all available bonds and demands that B returns the borrowed bonds. In this case the only way B can return the bonds is to buy them (at an inflated price) from A.

Short squeezes and corners can occur in both the stock and bond market. Cornering is illegal and probably rare. Corners probably occurred in U.S. equity markets more frequently in the late 19th and early 20th century, a prominent late case being the Stutz

Motor corner of 1920 (Meeker, 1932). Two recent cases in the U.S. occurred in the late 1980's. The president of Southland Communications was tried and convicted for driving the stock price up in 1989 by cornering the firm's stock through secret trades (Lansner, 1998). In another case, the SEC determined that two individuals had orchestrated a corner in Chase Medical in 1988, and that they controlled 108% of the public float (Norris, 1989). In the Treasury market, a short squeeze apparently occurred in 1991 when Salomon Brothers nearly cornered the supply of a certain two-year note. Salomon admitted controlling 94% of the supply of this note, in violation of Treasury regulations. This squeeze caused prices to be significantly higher than normal (see Jegadeesh, 1993).

Short squeezes do not necessarily reflect market manipulation, they can also occur naturally. In the Treasury market, short squeezes come about when a particular government security is hard to borrow. This might occur if many investors wish to hedge out interest rate risk by shorting a particular benchmark Treasury issue, but for some reason there are not enough of this issue available for borrowing. In rare instances, governments intervene to relieve disruptive short squeezes in the fixed income market, a recent example being the U.S. Treasury market in October 2001 (see Ip and Zuckerman, 2001). The U.S. Treasury resolved the squeeze in a particular Treasury bond by issuing more of it, thus allowing short sellers the ability to borrow the now cheap and plentiful bond.

Short squeezes are about forcing the short seller to prematurely close his short position and return the borrowed security. On the opposite end of the spectrum, under some circumstances the short seller may never need to return the borrowed security. This could occur for two reasons.

First, if the borrowed security ceases to have value, the lender and the borrower may agree to terminate the securities loan without return of the borrowed security. In the equity market, a "terminal short" is when short sellers hold their positions until the price has fallen all the way down to zero. If the issuer goes bankrupt, the borrowed security usually ceases to have any value. In this case, the short seller and the securities lender

usually agree that the value of the security is zero, and thus it is not necessary for the borrowed security to be returned. This event, sometimes called a "deemed buy-in," is the same as if the borrower had repurchased the security for a price of zero and returned it to the lender. For tax purposes, the IRS currently requires that when the security is "substantially worthless" a taxable event occurs, and the short seller pays taxes as if he had returned the security at a price of zero.[2] Alternatively, the borrower and lender might agree on some small positive price to close the short position. In any case, actually repurchasing the security and returning it is not necessary (and indeed, may be impractical if the security no longer trades). Thus, some short positions never close.

Second, in principle, each day the lender and borrower can agree to renew the loan, stretching out the short position indefinitely. Thus in principle the security need never be returned. The short seller and lender just maintain the loan (and therefore the short position) indefinitely. Although it is not common, because eventually the lender wants to sell his securities and thus demands return of his securities, in some cases the short position can stretch on for years. Opdyke (2003) mentions Boston Chicken as an example of this phenomenon. Boston Chicken went bankrupt in 1998, but apparently some short sellers still have not closed their positions, and some lenders have not demanded return of their shares. Maintaining the loan would be in the interest of the short seller because by avoiding covering his position, he avoids paying capital gains tax.[3] Maintaining the loan might be in the interest of a (tax-exempt) lender because he may still receive income from the securities loan, income the borrower is willing to pay since it is more than offset by the reduced taxes.

---

[2] This requirement was imposed recently. In prior years, in cases where the security became worthless and was never delivered back to the lender, the short seller paid no taxes on his profits. Gelband (1991) and Pollard (1987).

[3] Since Opdyke (2003) reports that Boston Chicken is quoted at 10 cents a share, apparently it is not "substantially worthless" and the IRS rule does not apply.

A

**Appendix A**

Owen A. Lamont
Yale School of Management
135 Prospect Street
PO Box 208200
New Haven CT 06520-8200

(203) 432 3069, (203) 432 6970 fax
owen.lamont@yale.edu
http://mba.yale.edu/faculty/others/lamont.htm

**EMPLOYMENT**

Yale School of Management: Visiting Professor of Finance, 2003-present

**PREVIOUS POSITIONS**

The Boston Company Economic Advisors: Research Associate, 1988-89;
Associate Economist, 1989-90
Princeton University: Assistant Professor of Economics, 1994-95
University of Chicago Graduate School of Business: Assistant Professor of Finance, 1995-98; Associate Professor of Finance, 1998-2003

**EDUCATION**

B.A., Oberlin College, (with Honors) in Economics and Government, May 1988
Ph.D. in Economics, Massachusetts Institute of Technology, May 1994
Dissertation: Corporate Finance and Macroeconomics
Advisors: Olivier Jean Blanchard and Jeremy Stein

**RESEARCH INTERESTS**

Imperfect capital markets. Short selling. Security prices, expected returns, and reaction to news. Diversified firms and internal capital markets. Macroeconomic fluctuations and investment.

**TEACHING**

Princeton University, Department of Economics,
1994-95, Ph.D. Course in Macroeconomics
1994-95, Ph.D. Course in Finance
University of Chicago, Graduate School of Business,
1995-99, MBA Course in Corporate Finance
1998-2003, MBA Course in Portfolio Management (created new course)
Yale School of Management
2003-present, MBA Course in Behavioral Finance (created new course)

## HONORS AND FELLOWSHIPS

Philips Fellow in Economics, Oberlin College, 1987-88
Phi Beta Kappa, Oberlin College, 1987
National Science Foundation Graduate Fellowship, 1990-93
Alfred P. Sloan Foundation Dissertation Fellowship, 1993-94
MIT World Economics Laboratory Grant, 1994
Research Associate, National Bureau of Economic Research, 2003-present; Faculty Research Fellow, 1995-2003 (in Monetary Economics starting 1995, in Asset Pricing starting 1998, in Corporate Finance starting 1998, in Economic Fluctuations and Growth starting 2001).
FMC Scholar, University of Chicago Graduate School of Business, 1996-97
National Science Foundation CAREER grant ($213,472), "Expectations, the Stock Market, and Investment," 1998-2002
Alfred P. Sloan Research Fellow, 2000-02
Institute for Quantitative Research in Finance ("Q Group") Research Grant, 2001

## PAPER PRIZES

Academic Competition of the Chicago Quantitative Alliance: First Prize, 1996, "Macroeconomic News and Bond Market Volatility"; Second Prize, 1997, "Financial Constraints and Stock Returns"; Second Prize, 1998, "Economic Tracking Portfolios"

Smith Breeden Prize, *Journal of Finance*: Distinguished Paper Prize, 1997, "Cash Flow and Investment: Evidence from Internal Capital Markets"

Michael J. Borrelli, CFA Research Grant Award, co-sponsored by the Investment Analysts Society of Chicago and Association of Investment Management and Research, 2001, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs"

Jensen Prize for Corporate Finance and Organizations, *Journal of Financial Economics*: First Prize, 2002, "Does Diversification Destroy Value? Evidence from Industry Shocks"

## PROFESSIONAL ACTIVITIES

Associate Editor, The Journal of Investing, 2001-present
Co-organizer, NBER Asset Pricing Meeting, Summer 2001
Session Organizer, American Economic Association Annual Meeting, 2001
Nominating Committee, American Finance Association, 2002
Program Committee, Western Finance Association, 2001-2002
Program Committee and Session Chair, American Finance Association Annual Meeting, 2003
Testimony on short selling and hedge funds before U.S. House of Representatives, Committee on Financial Services, May 22, 2003

**Appendix A**

**PUBLICATIONS IN REFERRED JOURNALS**

1. Credit Conditions and the Cyclical Behavior of Inventories (with Anil K. Kashyap and Jeremy C. Stein), *Quarterly Journal of Economics*, August 1994

2. Corporate Debt Overhang and Macroeconomic Expectations, *American Economic Review*, December 1995

3. Relative Price Variability and Inflation: Evidence fromU.S.Cities (with Guy Debelle), *Journal of Political Economy*, February 1997

4. Cash Flow and Investment: Evidence from Internal Capital Markets, *Journal of Finance*, March 1997 [reprinted in *Empirical Corporate Finance*, 2001, edited by Michael J. Brennan]

5. Macroeconomic News and Bond Market Volatility (with Charles M. Jones and Robin Lumsdaine), *Journal of Financial Economics*, March 1998

6. Investor Reaction to Salient News In Closed-End Country Funds (with Peter Klibanoff and Thierry Wizman), *Journal of Finance*, April 1998 [reprinted in *Behavioral Finance*, 2001, edited by Hersh Shefrin]

7. Earnings and Expected Returns, *Journal of Finance*, October 1998

8. Leverage and House-Price Dynamics in U.S. Cities (with Jeremy C. Stein), *Rand Journal of Economics*, Autumn 1999

9. Investment Plans and Stock Returns, *Journal of Finance*, December 2000

10. Financial Constraints and Stock Returns (with Christopher Polk and Jesus Saa-Requejo), *Review of Financial Studies*, Summer 2001

11. The Diversification Discount: Cash Flows vs. Returns (with Christopher Polk), *Journal of Finance*, October 2001

12. Economic Tracking Portfolios, *Journal of Econometrics*, November 2001

13. Does Diversification Destroy Value? Evidence from Industry Shocks (with Christopher Polk), *Journal of Financial Economics*, January 2002

14. Macroeconomic Forecasts and Microeconomic Forecasters, *Journal of Economic Behavior and Organization*, July 2002

15. Short Sale Constraints and Stock Returns (with Charles M. Jones), *Journal of Financial Economics*, November 2002

**PUBLICATIONS IN REFERRED JOURNALS, CONTINUED**

16. Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs (with Richard H. Thaler), *Journal of* Political *Economy*, April 2003.

**WORKING PAPERS**

1. Evaluating value weighting: Corporate events and market timing, February 2002

2. Go down fighting: Short sellers vs. firms, November 2002

**OTHER WORK**

1. Do '*Shortages*' Cause Inflation? in *Reducing Inflation: Motivation and Strategy*, edited by Christina D. Romer and David H. Romer, University of Chicago Press, 1997

2. Comment on "e-*Capital*: The Link between the Stock Market and the Labor Market in the 1990s" by Robert E. Hall, *Brookings Papers on Economic Activity*, 2:2000

3. Palm and 3Com: A pricing conundrum, *Financial Times* June 18, 2001, *Mastering investment supplement*. [reprinted in *Mastering investment*, 2002, edited by James Pickford, and in *Introducing Investments: a personal finance approach*, forthcoming, by Keith Redhead]

4. Discussion of "*Perspectives* on Behavioral Finance: Does Irrationality Disappear with Wealth? Evidence from Expectations and Actions" by Annette Vissing-Jorgensen, *NBER Macroeconomics Annual 2003*, edited by Mark Gertler and Kenneth Rogoff

5. Anomalies: The law of one *price* in financial markets, (with Richard H. Thaler), *Journal of Economic Perspectives*, forthcoming

October 23, 2003

B

**Appendix B**

## MATERIALS CONSIDERED

http://www.sec.gov/rules/concept/34-42037.htm

Asensio, Manuel P., 2001, *Sold Short: Uncovering Deception in the Markets*

D'Avolio, Gene, 2002, The Market for Borrowing Stock, *Journal of Financial Economics*, November 2002.

Drave, Ed, 1993, "The Long (and Short) of Short Selling. (Short Selling of Stock as an Investment Strategy)," 14 September 1993, FW, p. 58.

Duffie, D., 1996. Special Repo Rates. *Journal of Finance* 51, 493-526.

Duffie, Darrell, Garleanu, Nicolae, Pedersen, Lasse Heje, Securities Lending, Shorting, and Pricing, *Journal of Financial Economics*, November 2002.

Fabozzi, Frank, 1997, ed., Securities Lending and Repurchase Agreements, Frank J. Fabozzi Associates, New Hope, Pennsylvania

Geczy, Christopher C., David K. Musto, and Adam V. Reed, 2002, Stocks are Special Too: An Analysis of the Equity Lending Market, *Journal of Financial Economics*, November 2002.

Gelband, Joseph F., 1991, "Worthless, but When? – The Key to Tax Breaks on No-Value Shares," 3 June 1991, Barron's, p. 33

H.R. 2014, P.L. 105-34; H.R. Conf. Rep. No. 105-220, 105th Cong., 1st Sess. 217 (1997)

Internal Revenue Code section 1233 (2003)

Ip, Greg and Gregory Zuckerman, 2001, "Treasury Sale Averts a Crisis in `Repo' Market --- Unscheduled Auction of $6 Billion in Notes Is a Department First," The Wall Street Journal, 5 October 2001, p. C1.

Jegadeesh, Narasimhan, 1993, Treasury Auction Bids and the Salomon Squeeze, *Journal of Finance* 48, 1403-1419.

Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in 1997 (JCS-23-97), December 17, 1997.

Joint Committee on Taxation, Summary of Revenue Provisions of H.R. 2014 ("Taxpayer Relief Act of 1997") (JCX-40-97), August 1, 1997.

Jones, Charles M., and Owen A. Lamont, Short Sale Constraints and Stock Returns, *Journal of Financial Economics*, November 2002

**Appendix B**

Lamont, Owen A., 2002, Go Down Fighting: Short Sellers vs. Firms, working paper.

Lamont, Owen A., and Richard H. Thaler, 2003. Can the Market Add and Subtract? Mispricing in Tech Stock Carve-outs, forthcoming *Journal of Political Economy*

Lansner, Jonathan, 1998, "Bull Market a Bear for Short Sellers," Austin American-Statesman, 03/28/1998

Meeker, J., 1932. Short Selling. Harper & Brothers Publishers, New York.

Merrick, John J. Jr., Narayan Y. Naik, and Pradeep K. Yadav, 2002, Strategic Trading Behavior, Price Distortion and Market Depth in a Manipulated Market: Anatomy of a Squeeze, working paper.

Norris, Floyd, 1989, Market Place; Cost for the Shorts in Chase Medical, The New York Times, September 8, 1989, Section D; Page 6

Opdyke, Jeff. D., 2003, "At WorldCom, Shares May Die, But They Might Not Fade Away," 15 April 2003, The Wall Street Journal, p. C3

Pollard, John K. Jr., 1987, "Sell High, Buy Low – A Short Course in the Art of Sell Short," 27, July 1987, Barron's.

Report of Special Study of Securities Markets of the Securities and Exchange Commission (Part 2), H.R. Rep. No. 88-95, 88th Cong., 1st Sess. (1963).

Short-Selling Activity In the Stock Market: Market Effects and the Need for Regulation (Part 1), H.R. Rep. No. 102-414, 102d Cong., 1st Sess. (1991).

# Plaintiffs' Exhibit 9

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 06-11422

KORNMAN & ASSOCIATES INC., as tax matters partner for Valiant Investments 99-100, LP, a TEFRA Partnership;
Plaintiff-Appellant
v.
UNITED STATES OF AMERICA,
Defendant-Appellee

---

COLM PRODUCER INC., as tax matters partner for GMK-GMK II, LP, a TEFRA Partnership;
Plaintiff-Appellant
v.
UNITED STATES OF AMERICA,
Defendant-Appellee

---

ETTMAN FAMILY TRUST I, a 5-percent group of Valiant Investments 99-100, LP, a TEFRA Partnership;
Plaintiff-Appellant
v.
UNITED STATES OF AMERICA,
Defendant-Appellee

---

ETTMAN FAMILY TRUST I, a partner for GMK-GMK II, LP, a TEFRA Partnership;
Plaintiff-Appellant
v.
UNITED STATES OF AMERICA,
Defendant-Appellee

---

ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS

---

BRIEF FOR THE APPELLEE

---

## JURISDICTIONAL STATEMENT

On September 25, 2003, the Internal Revenue Service mailed notices of final partnership administrative adjustment ("FPAA") to

realized. Treas. Reg. § 1.752-1(h). *See also* Treas. Reg. § 1.1001-2(a)(1), Example (3).

As indicated above, appellants maintain that Czerwinski's assumption of GMK's obligation to replace the borrowed T-Notes with a face value of $100 million to DLJ as part of his purchase of GMK's interest in Valiant is not treated under § 752(d) as an additional amount realized by GMK on the sale because the obligation was a contingent one and, as such, outside the scope of § 752. Appellants further contend in this regard that whether an obligation acquired by a partnership pursuant to a contribution by a partner of encumbered property to the partnership is contingent or fixed must be determined at the time of such contribution and that the District Court here erred in determining, *sua sponte*, that the relevant date in this case was the date that GMK sold its interest in Valiant to Czerwinski.

We agree with appellants that the District Court erred in using, *sua sponte*, the date of sale of a partnership interest to determine whether a partnership obligation is fixed or contingent. The proper time for determining whether an obligation is fixed is the date the obligation becomes a partnership obligation. In this case, the obligation to replace the borrowed property became a partnership obligation on December 27, 1999, when the Trust transferred the brokerage account (containing approximately $104,000,000 in cash but

subject to the obligation to replace the borrowed T-Notes) to Valiant. As we shall demonstrate, however, the obligation to replace the borrowed T-Notes was a fixed obligation at all times. It was a fixed obligation when the short sale occurred, when the Trust transferred the brokerage account to Valiant, and at all times thereafter. Thus, the District Court was correct in its holding that the obligation to close the short sale was a "liability" within the meaning of § 752.

**B. An obligation to close a short sale is a fixed liability because one who borrows securities in a short sale has a legal obligation to replace the borrowed property with equivalent property**

It is axiomatic that "[t]he task of resolving [a] dispute over the meaning of . . . [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). Section 752, however, does not define the term "liability."[8] Thus, the District Court correctly relied

---

[8] Section 752, as well as the other partnership provisions of Subchapter K of the Internal Revenue Code, was enacted as part of the Internal Revenue Code of 1954. *See* Act of August 16, 1954, Pub. L. No. 591, 68A Stat. 3, 251. The legislative history does not elucidate the meaning of "liability." It merely explains that § 752 was intended to deal with the effect on a partner of his assumption of partnership liabilities and the partnership's assumption of his liabilities. *See* S. Rep. No. 83-1622 at 405 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4621, 5047 (emphasis added). *Accord* H.R. Rep. No. 83-1337 at A236-237 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017, 4376-4377 (1954).

*Capital Holdings v. United States*, 330 F. Supp. 2d 122, 171 (D. Conn. 2004), *aff'd on other grounds by unpublished op.*, 96 A.F.T.R.2d (RIA) 6344 (2d Cir. 2005). For this reason alone, the District Court's judgment should be affirmed.

## CONCLUSION

For the reasons stated, the District Court judgment should be affirmed. If this Court should reverse the grant of summary judgment to the Government, the case should be remanded for trial of the Government's contentions that the transactions giving rise to the claimed artificial loss were devoid of economic substance and that the IRS properly recast these transactions under Treas. Reg. § 1.701-2.

Respectfully submitted,

RICHARD T. MORRISON
*Acting Assistant Attorney General*

GILBERT S. ROTHENBERG
*Acting Deputy Assistant Attorney General*

Joan I. Oppenheimer

RICHARD FARBER (202) 514-2959
JOAN I. OPPENHEIMER (202) 514-2954
*Attorneys*
*Tax Division*
*Department of Justice*
*Post Office Box 502*
*Washington, D.C. 20044*

*Of Counsel:*

RICHARD ROPER, III
*United States Attorney*

JULY 2007