**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner,** | |
| **Plaintiffs,** | **Nos. 01-256T and 01-257T** |
| | **Judge Charles F. Lettow** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

In accordance with Rule 56(h)(2) of the Rules of the United States Court of Federal Claims, Plaintiffs hereby submit their Response to Defendant's Proposed Findings of Uncontroverted Facts. Plaintiffs' responses are set forth in italics following each proposed finding of uncontroverted fact.

1. Marriott International Resorts, LP ("MIR" or the "Partnership") is a Delaware limited partnership with its principal place of business located in Montgomery County, Maryland. (Compl. ¶¶ 1, 4.)

   *Agrees.*

2. For the tax period ending October 28, 1994, Marriott International JBS Corporation ("JBS") and Marriott Ownership Resorts, Inc. ("MORI") were MIR's general partner and limited partner, respectively. (Compl. ¶¶ 1, 15.)

   *Agrees.*

3. For the tax period ending December 30, 1994, JBS and another Marriott subsidiary, Marriott International Capital Corporation ("MICC"), were MIR's general partner and limited partner, respectively.

*Agrees.*

4. JBS, MORI, MIR, and MICC, were at all times relevant to this case subsidiaries of Marriott International, Inc. (Compl. ¶¶ 15, 24.)

*Disagrees to the extent that the term "subsidiaries" could be construed to encompass only corporations; agrees that JBS, MORI, and MICC were at all times relevant to this case subsidiaries of Marriott International, Inc., and that MIR was wholly owned initially by MORI and JBS and subsequently by MICC and JBS.*

5. During the periods in issue, MORI engaged in the business of selling timeshare interests in resort properties. (Compl. ¶ 9.)

*Agrees.*

6. As part of this business, MORI offered buyers the opportunity to finance their purchases by having the buyer execute a promissory note, secured by a mortgage on the timeshare unit ("Mortgage Notes"). (Compl. ¶ 9.)

*Agrees.*

7. On November 22, 1993, MORI, and another Marriott entity, MTMG Corporation, entered into an agreement with Teachers Insurance and Annuity Association of America ("TIAA") in which the Marriott entities

agreed to sell to TIAA up to $175,000,000 of Mortgage Notes. (Def. Exs. 1, 2.)

*Agrees.*

8. On January 3, 1994, Philip Hamon of the investment banking firm CS First Boston, faxed to Lester Pulse, the Tax Director of Marriott International an "Executive Summary" which set forth a blueprint for a series of transaction that were designed to enable Marriott to create a loss for Federal income tax purposes based on the premise that a short-sale obligation is not considered a liability for partnership tax basis purposes. (Def. Ex. 3.)

*Disagrees as to the following points: (i) Lester Pulse's title was Senior Vice President; (ii) the "Executive Summary" constituted only a portion of the faxed document; (iii) disagrees with the use of the term "blueprint"; (iv) disagrees with the use of the term "create." Proposes the following revision: "On January 3, 1994, Philip Hamon of the investment banking firm CS First Boston, faxed to Lester Pulse, Senior Vice President of Marriott International, a document which described a series of transactions that would enable Marriott to recognize a loss for Federal income tax purposes based on the premise that a short-sale obligation is not considered a liability for partnership tax basis purposes. (Def. Ex. 3.)"*

9. The transactions described in the CS First Boston tax loss blueprint consisted of the following steps (Def. Ex. 3, see also Def. Exs. 4, 5.):

*Disagrees with use of the term "blueprint"; proposes replacing "tax loss blueprint" with "document."*

- Marriott International (MI) sells short 2-year Treasuries and invests the proceeds in intermediate-term Treasuries.

  *Disagrees to the extent that the "intermediate-term Treasuries" were subsequently more definitely described in the document as 5-year Treasuries (MAR-008664); proposes replacing "intermediate-term Treasuries" with "5-year Treasuries."*

- MI, as a limited partner, and another Marriott entity, as the general partner, form a partnership.

  *Disagrees that "another Marriott entity" would be the general partner; the description (MAR-008664) stated that "a third party will own 5 percent"; propose replacing "another Marriott entity" with "a third party."*

- MI contributes the intermediate-term Treasuries and short-sale obligations to the partnership and the general partner contributes some cash.

  *Disagrees with use of "intermediate-term Treasuries"; proposes replacing "intermediate-term Treasuries" with "5-year Treasuries"; disagrees with stating that the obligations were "contributed"; proposes the following revision: "MI contributes the 5-year Treasuries, subject to the short-sale obligations, to the partnership and the general partner contributes some cash."*

- The partnership obtains additional assets and subsequently sells the intermediate term Treasuries and closes the short sale obligation on the 2-year Treasuries.

  *Disagrees with use of "intermediate-term Treasuries"; proposes replacing "intermediate-term Treasuries" with "5-year Treasuries."*

- MI transfers its partnership interest to another Marriott subsidiary on which no gain or loss is recognized.
  *Agrees.*

- The partnership interest transfer results in a technical termination of the partnership which causes a deemed distribution of the assets to each partner and a re-contribution of the assets to a new partnership.

  *Agrees.*

- The tax basis of the assets takes on the high outside tax basis of MI's interest based on the value of the intermediate term Treasuries which is not reduced by the short-sale obligation.

  *Disagrees with the phrase "based on the value of the intermediate term Treasuries," in that this statement is not included in the cited document, and proposes its deletion; otherwise agrees.*

- The assets later are sold at a loss as a result of the high tax basis and through its subsidiary MI recognizes the tax benefit of the loss.

  *Disagrees to the extent that the description (MAR-008663) stated that Marriott could also benefit through depreciation of the assets; proposes replacing this statement with: "The assets later are depreciated or sold at a loss as a result of the high tax basis and through its subsidiary MI recognizes the tax benefit of the high basis."*

10. On or about on April 25, 1994, MORI established a short position in five-year Treasury securities with a face amount of $65,000,000 ("First Short Sale"). (Compl. ¶ 13.)

*Agrees.*

11. The First Short Sale was executed through CS First Boston. (Def. Ex. 6.)

*Agrees.*

12. MORI received cash proceeds in the amount of $63,703,816 that were invest in repurchase obligations ("Repos") yielding a fixed return.[4] (Compl. ¶ 13.)

*Agrees, but "invest" should be "invested."*

[4] The Repos were repurchase transactions in 30-day Eurodollar equivalent investments adjusted to the prevailing 30-day LIBOR rate. (Def. Ex. 4.)

*Agrees.*

13. On May 9, 1994, JBS was incorporated in the State of Delaware. (Def. Ex. 7.)

*Agrees.*

14. On May 6, 1994, MORI and JBS formed the MIR partnership. (Compl. ¶ 15; Def. Ex. 8.)

*Agrees.*

15. JBS was the general partner of MIR holding a 1% interest, and MORI was a limited partner of MIR holding a 99% interest. (Compl. ¶ 22.)

*Agrees.*

16. On or about on May 6, 1994, MORI contributed to MIR (1) the Repos, (2) the Mortgage Notes, and (3) the obligations to close the First Short Sale. (Compl. ¶ 16, 17; Def. Ex. 8.)

*Disagrees to the extent that the statement simply refers to "the Mortgage Notes," since that term is defined in ¶ 6 without reference to dollar amount; disagrees with stating that obligations were "contributed"; proposes the following: "On or about on May 6, 1994, (1) MORI contributed to MIR (i) the Repos and (ii) Mortgage Notes with a face amount of approximately $65,200,000, and (2) MIR assumed the obligations to close the First Short Sale. (Compl. ¶ 16, 17; Def. Ex. 8.)"*

17. On or about on May 6, 1994, JBS contributed $1,000,000 to MIR. (Compl. ¶ 18.)

*Agrees.*

18. On or about on August 15, 1994, MORI established a short position in five-year Treasury securities with a face amount of $10,000,000 (the Second Short Sale). (Compl. ¶ 14.)

*Agrees.*

19. The Second Short Sale was also executed through CS First Boston. (Def. Ex. 6.)

*Agrees, but reference should be to Def. Ex. 10.*

20. MORI received cash proceeds in the amount of $9,463,451 that were invested in repurchase obligations yielding a fixed return (Repos). (Compl. ¶ 14.)

*Agrees.*

21. On August 16, 1994, MORI contributed to MIR: (1) the Repos, (2) Mortgage Notes with a face amount of approximately $11,900,000, and (3) the obligation to close the Second Short Sale. (Compl. ¶ 19, 20.)

*Disagrees with stating that obligation was "contributed"; proposes the following: "On August 16, 1994, (1) MORI contributed to MIR (i) the Repos and (ii) Mortgage Notes with a face amount of approximately $11,900,000, and (2) MIR assumed the obligation to close the Second Short Sale. (Compl. ¶ 19, 20.)"*

22. On October 1, 1994, MORI contributed to MIR Mortgage Notes with a face amount of approximately $6,200,000. (Compl. ¶ 21.)

*Agrees.*

23. On September 29, 1994, MIR closed the First Short Sale with CS First Boston by purchasing replacement Treasuries (with the funds invested in the Repos) with a face amount of $65,000,000 at a cost of $62,667,034. (Def. Ex. 9.) On October 17, 1994, MIR closed the Second Short Sale with CS First Boston by purchasing replacement Treasuries (with the funds invested in the Repos) with a face amount of $10,000,000 at a cost of $9,279,811. (Compl. ¶ 23, Def. Ex. 10.) On its partnership return (Form

1065) for the period ended October 28, 1994, MIR reported a trading gain of $819,532 on the Treasuries short sales. (Def. Ex. 11.)

*Agrees.*

24. In connection with the Treasuries short sales and Repos transactions, Marriott paid CS First Boston a "structuring fee" of $200,000 and expenses of $22,540.22, and paid a bid-ask spread of $50,000 on the trades, for a total transaction cost of $272,540.22. (Def. Exs. 6, 9, 11.)

*Disagrees, in that there is no evidence that the $50,000 bid-ask spread was a separately charged fee that was not simply incorporated in the trading price; proposes the following: "In connection with the Treasuries short sales and Repos transactions, Marriott paid CS First Boston a 'structuring fee' of $200,000 and expenses of $22,540.22, for a total transaction cost of $222,540.22. In addition, the trading price of the transactions included a bid-ask spread of $50,000."*

25. On October 28, 1994, MORI transferred its entire partnership interest in MIR to MICC. (Compl. ¶ 24.)

*Agrees.*

26. The transfer of MORI's interest in MIR to MICC triggered a technical termination of MIR under § 708(b)(1)(B). (Compl. ¶ 25.)

*Agrees.*

27. Under § 708(b)(1)(B), the termination resulted in a deemed distribution of MIR's assets to its partners (JBS and MICC) followed by the creation of a

new partnership by JBS and MICC, and contribution of the MIR assets to the new partnership-which also was named MIR. (Compl. ¶ 26.) The actual assets held by MIR prior to, and after, the termination were the Mortgage Notes, $1 million cash, and a receivable with a face amount of $3,303,164. (Compl. ¶ 27.)

*Agrees, but second reference should be to Compl. ¶ 28.*

28. Prior to the termination, MICC had a purported basis of $159,444,635 in its interest in MIR (i.e., not reduced by the obligation to close the shorts sales by purchasing replacement Treasuries), which consisted of the bases of the Mortgage Notes, the Repos, and minor adjustments due to MIR's operations (i.e., interest and investment income). (Compl. ¶ 27.)

*Agrees, but "shorts" should be "short."*

29. After the termination, JBS's and MICC's partnership bases were allocated to the new MIR's assets (the Mortgage Notes, cash, and the receivable). Thus, the new MIR was assigned a purported basis in the Mortgage Notes of $155,141,472. (Compl. ¶ 29.)

*Agrees.*

30. On or about on November 14, 1994, MIR conveyed the Mortgage Notes to a grantor trust and the received a Certificate in the Trust representing all of the interest in the Trust other than the Residual interest in the Trust. (Compl. ¶ 30, 31.)

*Agrees, but "and the received" should be "and received."*

31. On the same date, MIR sold to TIAA the certificate for $81,974,204 less transaction fees of $522,092, for a net amount of $81,452,111. (Compl. ¶ 31.) The fair market value of the interest sold to TIAA was $81,974,204; thus the cash loss on the sale was $522,093. (Compl. ¶ 32.)

*Disagrees with "thus the cash loss on the sale was $522,093" in that this statement is ambiguous and not included in the cited document; otherwise agrees.*

32. The purported basis of the Mortgage Notes interest sold to TIAA was $150,894,679 (i.e., not reduced by the obligation to close the shorts sales by purchasing replacement Treasuries). (Compl. ¶ 32.)

*Agrees, but "shorts" should be "short."*

33. On its partnership return (Form 1065) for the period ended December 30, 1994, MIR reported a loss on the of the Mortgage Notes of $71,189,461. (Def. Ex. 12.)[1]

*Agrees, but "on the of the" should be "on the sale of the".*

34. On February 2, 2001, the IRS issued a Notice of Final Partnership Administrative Adjustment ("FPAA") with respect to MIR's taxable year ended October 28, 1994. (Compl. ¶ 35, Compl. Ex. A.)

*Agrees.*

---

1 Defendant correctly notes in a footnote that this reported loss is different from the loss alleged in the Complaint. It is Plaintiffs' position that the loss alleged in the Complaint is correct. Plaintiffs agree that the difference is immaterial to the resolution of the motions.

35. In the FPAA for MIR's October 28, 1994, taxable year, the IRS reduced the partnership basis by $75,000,000 to reflect the obligation to return the Treasuries sold short to CS First Boston. (Compl. Ex. A.)

*Agrees.*

36. On February 2, 2001, the IRS issued a Notice of Final Partnership Administrative Adjustment ("FPAA") with respect to MIR's taxable year ended December 30, 1994. (Compl. No. 01-257 T ¶ 35, Compl. No. 01-257 T Ex. A.)

*Agrees.*

37. In the FPAA for MIR's December 30, 1994, taxable year, the IRS determined that MIR realized a gain on the sale of the Mortgage Notes of $1,757,378, instead of the loss reported on the MIR Form 1065 of $71,189,461. This determination was based on the reduction in the partnership basis of $75,000,000 which reflected the obligation to return the Treasuries sold short to CS First Boston. (Compl. No. 01-257 T Ex. A.)

*Agrees.*

Respectfully submitted,

March 27, 2008

s/Harold J. Heltzer
Harold J. Heltzer (Attorney of Record)
Robert L. Willmore
Alex E. Sadler
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2915
Fax: (202) 628-5116
Counsel for Plaintiffs