**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Nos. 01-256 T and 01-257 T**
**(Judge Charles Lettow)**

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant.**

**DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Defendant, the United States, in accordance with Rule 56(h) of the Rules of the Court of Federal Claims, hereby responds to Plaintiff's Proposed Findings of Uncontroverted Facts.[1]

1. The mortgages issued by Marriott Ownership Resorts Inc. ("MORI") to the purchasers of its time-share units bore interest at a fixed interest rate. (Pl.Ex. 1, at 3; Pl. Ex. 2, at

[1] Only for purposes of this motion for summary judgment, defendant accepts as true and accurate the facts contained in the parties' proposed findings of uncontroverted fact, except to the extent that defendant objects herein to plaintiff's proposed findings of uncontroverted fact. If this case proceeds to trial, however, defendant reserves the right to challenge the truth, accuracy, and/or credibility of all such alleged facts. Moreover, defendant reserves the right to challenge the transactions engineered by Marriott on the grounds that they were factual shams and/or they lack economic substance. See *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1347 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 1261 (2007); *Jade Trading, LLC v. United States*, No. 03-2164 T, WL 4553043 (Fed.Cl., December 21, 2007).

MAR-008867.)

**Defendant's response:** Agrees.

2. MORI's sale of the Mortgage Notes to Teachers Insurance and AnnuityAssociation ("TIAN') in 1994 was priced to provide TIAA with a yield of 240 basis points (a 2.4% spread) above average yields on U.S. Treasury securities adjusted to a constant maturity of four years. (Pl. Ex. 2, at MAR-008866; Def. Ex. 1, at MAR-008673.)

**Defendant's response:** Agrees.

3. Because the interest rate on the Mortgage Notes was fixed, and the yield TIAA received at the time of its purchase of the Mortgage Notes changed with the prevailing interest rate, MORI would receive less from the sale of the Mortgage Notes to TIAA if interest rates increased between the time the Mortgage Notes were issued and the time of the sale of those Mortgage Notes to TIAA. (Pl. Ex. 1, at 2-5; Pl. Ex. 2, at MAR-008866-67.)

**Defendant's response:** Agrees.

4. The Mortgage Notes were sold by MORI to TIAA in the form of interests in securitized portfolios, referred to as "pass-through certificates." (Def. Ex. 1.)

**Defendant's response:** Agrees.

5. The securitization of the Mortgage Notes involved the use of a bankruptcy remote special-purpose entity. The use of such an entity allowed the securitized Mortgage Notes to receive a higher credit rating, meaning that they could be sold at a higher price. (Pl. Ex. 1, at 3-5; Pl. Ex. 6, at 35-36; Pl. Ex. 7, at 101-02.)

**Defendant's response:** Agrees.

6. With respect to the 1994 sale of the portfolio of securitized Mortgage Notes to TIAA,

Marriott International Resorts, LP ("MIR") served as the required bankruptcy remote special-purpose entity. (Pl. Ex. 1, at 3-5.)

**Defendant's response:** Agrees.

7. In October of 1993, Marriott International, Inc. ("Marriott") was spun off from its former parent, Marriott Corporation. (Pl. Ex. 6, at 87; Pl. Ex. 7, at 24.)

**Defendant's response:** Agrees.

8. Because of the profit associated with the interest being received from the Mortgage Notes, Marriott in 1994 elected to hold the Mortgage Notes for a single larger sale later in the year rather than sell them on a more frequent, quarterly basis. (Pl. Ex. 2, at MAR-008866; Pl. Ex. 6, at 115-18, 279-81; Pl. Ex. 7, at 54-55, 145.)

**Defendant's response:** Agrees.

9. Marriott was concerned, however, that, should interest rates increase while it was holding the Mortgage Notes, it could receive substantially less in its sale of the Mortgage Notes later in the year to TIAA. (Pl. Ex. 1, at 3; Pl. Ex. 2, at MAR-008867-68.)

**Defendant's response:** Agrees.

10. On April 22, 1994, Marriott's Corporate Growth Committee approved the implementation of an interest rate hedge using a Treasury note short sale with respect to the Mortgage Notes being held for sale later in the year to TIAA. (PI. Ex. 2; Pl. Ex. 3.)

**Defendant's response:** Agrees.

11. The planned initial short sale hedge of $65 million was intended to cover the amount of the then accumulated Mortgage Notes. While later short sales were planned as additional mortgage notes were accumulated, it was contemplated that the short sales would at no

time exceed MORI's actual mortgage exposure. (Pl. Ex. 2, at MAR-008867-68.)

**Defendant's response:** Agrees.

12. After approval of the short sale hedge by Marriott's Corporate Growth Committee at its April 22, 1994, meeting, a Treasury note short sale hedge was established with respect to the then accumulated Mortgage Notes. (Pl. Ex. 3.)

**Defendant's response:** Agrees.

13. As Marriott had anticipated, interest rates increased in 1994, resulting in an increase in Treasury yields. (Pl. Ex. 3; Pl. Ex. 6, at 33, 279-81.)

**Defendant's response:** Agrees.

14. The Treasury note short sale hedge accomplished its hedging purpose; that is, it resulted in a gain which offset the reduction in the sales price of the Mortgage Notes caused by the increase in interest rates. (Pl. Ex. 3.)

**Defendant's response:** Agrees.

15. As a result of a meeting in early 1994 with representatives of CS First Boston regarding a transaction proposed by CS First Boston, Marriott was aware that a Treasury security short sale could be used to hedge interest rate risks and could also provide significant tax benefits. (Pl. Ex. 1, at 7; Pl. Ex. 6, at 97-98, 236-41.)

**Defendant's response:** Agrees.

16. Marriott did not, however, engage in the transaction that had been proposed by the CS First Boston representatives at the early 1994 meeting. (Pl. Ex. 1, at 7; Pl. Ex. 6, at 97-98, 236-41.)

**Defendant's response:** Objects. The cited documents do not establish that Marriott did

not engage in transactions equivalent to those described in the January 1994 CSFB proposal. (Def. Ex. 3.) On the contrary, the facts establish that Marriott generally followed the CSFB tax-loss script. (Compare Def. PPF 9 and Pl. PPF 10-33.)

Respectfully submitted,

*s/G. Robson Stewart*
G. ROBSON STEWART
U.S. Department of Justice - Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, DC 20044
tel: (202) 307-6493
fax: (202) 514-9440

JOHN A. DICICCO
Deputy Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
MARY M. ABATE
Assistant Chief, Court of Federal Claims Section

*s/Mary M. Abate*
Of Counsel

Dated: April 18, 2008