**Nos. 01-256 T and 01-257 T**
**(Judge Charles Lettow)**

---

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**.

---

**REPLY OF THE UNITED STATES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

JOHN A. DICICCO
Deputy Assistant Attorney General
DAVID GUSTAFSON
MARY M. ABATE
G. ROBSON STEWART
Attorneys
Department of Justice, Tax Division
Court of Federal Claims Trial Section
P.O. Box 26
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6493

## Table of Contents

Page(s)

**Reply of the United States in Support of its Motion for Summary Judgment and in Opposition To Plaintiff's Cross-motion for Partial Summary Judgment . . . . . . . 1**

**Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1**

**A. The Tax Court cases cited by Marriott involved transactions that are not analogous to the scheme that used Treasury short sale obligations to artificially increase MIR's partnership basis . . . . . . . . . . . . . . . . . . . . . . . . . 3**

**B. The transaction involved in other tax shelter cases cited by Marriott are not analogous to the binding, secured short sale obligations here . . . . . . . . . 7**

**C. Two cases have specifically held that Treasury short sales obligations are liabilities under § 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10**

**D. Marriott's contention that the tax treatment of short sales as open transactions means that the liability is contingent is wrong . . . . . . . . . . . . . 11**

**E. Revenue Rulings 88-77 and 95-26, which contain the IRS's interpretation of the term "liability," are entitled to *Chevron* deference . . . . . . . . . . . . . . . 13**

**F. Marriott complaint that its scheme is not a Son of Boss tax shelter rings hollow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18**

**Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20**

## TABLE OF AUTHORITIES

**Cases:**

***Ammex, Inc. v. United States*, 367 F.3d 530 (6th Cir. 2004), *cert. denied*, 544 U.S. 948 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14**

***Atlantic Mut. Ins. Co. v. Commissioner*, 523 U.S. 382 (1998) . . . . . . . . . . . . . . . . . . . . 13**

***Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 7**

***Bissell v. Merrill Lynch*, 937 F. Supp. 237 (S.D. N.Y. 1996) *aff'd*, 157 F.3d 138 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17**

**Cases (Continuation):**

**Page(s)**

***Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982) *cert. denied* 462 U.S. 1106 (1983) . . . . . . . . . . 7**

***Carroll v. Leboeuf, Lamb, Greene & Macrae, LLP*, 374 F. Supp. 2d 375 (S.D. N.Y. 2005) . . . . . . . . . . 19**

***Cemco Investors, LLC v. United States*, 515 F.3d 749 (2008) . . . . . . . . . . 4, 7, 8**

***Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) . . . . . . . . . . 13, 14**

***Colm Producer, Inc. v. United States*, 460 F. Supp. 2d 713 (N.D. Tex. 2006) *appeal pending, Kornman & Associate v. United States*, No. 06-11422 (5th Cir. 2007) . . . . . . . . . . 10**

***Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 1261 (2007) . . . . . . . . . . 19**

***D'Avanzo v. United States*, 67 Fed. Cl. 39 (2005) . . . . . . . . . . 10**

***Dixon v. United States*, 381 U.S. 68 (1965) . . . . . . . . . . 15**

***Dzuris v. United States*, 44 Fed. Cl. 452 (1999) . . . . . . . . . . 10**

***Foil v. Commissioner*, 920 F.2d 1196 (5th Cir. 1990) . . . . . . . . . . 14**

***Fox v. Commissioner*, 80 T.C. 972 (1983), *aff'd sub nom. Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984) . . . . . . . . . . 7**

***Gibson Prods. Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981) . . . . . . . . . . 7**

***Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975) . . . . . . . . . . 3-5, 7,8,10, 15**

***Hendricks v. Commissioner*, 423 F.2d 485 (4th Cir. 1970) . . . . . . . . . . 11**

***Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (2007) . . . . . . . . . . 7, 8, 19**

***Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp. 608 (E.D. Tex 2006) . . . . . . . . . . 7-9**

**Cases (Continuation):**

**Page(s)**

***Klamath Strategic Investment Fund, LLC v. United States*, 472 F. Supp. 2d 885 (E.D. Tex. 2007) . . . . . . . . 9**

***Kornman & Assoc. v. United States*, No. 06-11422 (5th Cir. 2007) . . . . . . . . 10**

***La Rue v. Commisioner*, 90 T.C. 465 (1988) . . . . . . . . 5-8, 15**

***Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339 (2007) . . . . . . . . 15-17**

***Long v. Commissioner*, 71 T.C. 1 (1978) . . . . . . . . 5,8, 15**

***McGann v. United States*, 76 Fed. Cl. 745 (2007) . . . . . . . . 10**

***Omohundro v. United States*, 300 F.3d 1065 (9th Cir. 2002) . . . . . . . . 14**

***Salina Partnership, LP v. Commissioner*, T.C. Memo 2000-352, 80 T.C.M. (CCH) 686 (2000) . . . . . . . . 10, 11, 17**

***Stobie Creek Investments LLC v. United States*, No. 05-748T, 2008 WL 902960 (Fed. Cl. Apr. 1, 2008) . . . . . . . . 11**

***United States v. Mead Corp.*, 533 U.S. 218 (2001) . . . . . . . . 13, 14**

***United States v. Russo*, 74 F.3d 1383 *cert. denied*, 519 U.S. 927 (1996) . . . . . . . . 17**

**Statutes:**

**Fair Labor Standards Act (FLSA) (26 U.S.C.), § 213(a)(15) . . . . . . . . 16**

**Internal Revenue Code of 1986 (26 U.S.C.):**

**§ 705 . . . . . . . . 4, 11-12**

**§ 722 . . . . . . . . 12, 18**

**§ 731 . . . . . . . . 4, 12**

**§ 733 . . . . . . . . 12**

**§ 742 . . . . . . . . 12**

**Statutes (Continuation):**

**Page(s)**

**§ 752** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ***Passim***

**§ 1233** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

**§ 7805** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

**Miscellaneous:**

**Banks and Banking(12 C.F.R.):**

**§ 220.1** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**§ 220.4** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**§ 220.18** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**§ 220.19** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

**IRS Notice 2000-44, 2002-2 C.B. 255** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

**New York Stock Exchange, Rule 431** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**Rev. Rul 88-77, 1988-2 C.B. 129** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13, 15, 17**

**Rev. Rul. 95-26, 1995-1 C.B. 703** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13-17**

**Rev. Rul. 95-45, 1995-1 C.B. 53** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**Treas. Directive 27-10, 55 Fed. Reg. 42532-02 (1990)** . . . . . . . . . . . . . . . . . . . . . . . . **14**

**Treas. Order 111-2, 1981-1 C.B. 698** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

**Treas. Reg. § 601.601 (26 C.F.R.)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Nos. 01-256 T and 01-257 T**
**(Judge Charles Lettow)**

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**.

**REPLY OF THE UNITED STATES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant filed a motion for summary judgment on the question whether an obligation to close a short sale constitutes a liability for partnership basis purposes pursuant to § 752.[1] Plaintiff filed an opposition to defendant's motion for summary judgment and a cross-motion for partial summary judgment. This is defendant's reply to plaintiff's opposition and defendant's opposition to plaintiff's cross-motion for partial summary judgment.

**Introduction**

In its motion for summary judgment, the United States established that under the relevant statute, § 752, Marriott International Resorts, L.P., (MIR) must include in its partnership basis

[1] Except as otherwise noted, all sections cited herein refer to the Internal Revenue Code of 1986, 26 U.S.C. in effect during the periods in issue.

the U.S. Treasury short sale obligations it assumed from Marriott Ownership Resorts, Inc. (MORI) because the short sale obligations are binding, secured, legal liabilities, and the proceeds from the short sales were contributed to MIR as part of the transaction. The fixed nature of MIR's short sale obligations for partnership basis purposes is underscored by two crucial elements. First, short sale obligations are binding, secured liabilities because the short sale proceeds are "frozen" as collateral until the short sales are closed. Second, the short sale obligations are fixed and determinable for partnership basis purposes on the date the obligations become partnership obligations, and the amount of the obligations equals the amount of the proceeds from the short sales that were contributed to MIR. Rev. Rul. 95-45, 1995-1 C.B. 53.

The Credit Suisse First Boston (CSFB) confirmations of MORI's short sales establish both elements.[2] The confirmations evidence that the short sales are secured liabilities by specifying the amount of the collateral securing each short sale–*i.e.*, the amount of the proceeds from the short sale plus any additional margin requirement.[3] The confirmations also show that the short sale liabilities are fixed and determinable because the confirmations quantify the amount of the liability of each short sale–*i.e.*, the proceeds received by MORI that were then contributed to MIR. Accordingly, under §752, the short sale obligations constitute liabilities that must be included in MIR's partnership basis.

---

[2] Examples of the CSFB MORI short sale confirmations are included in Defendant's Supplemental Proposed Findings of Fact filed herewith.

[3] While Marriott claims that the short sale proceeds and corresponding short sale obligations are severable, the Federal Reserve Board and CSFB do not share that view. *See* discussion at pp. 17-18, *infra*.

In its opposition, Marriott argues that the short sale liabilities should not be included in MIR's partnership basis for four general reasons. First, Marriott asserts that the IRS's litigating posture in several Tax Court cases is inconsistent with its position here. Second, Marriott argues that several recent decisions involving other tax shelters support the notion that short sale obligations are not liabilities under § 752. Third, Marriott claims that because a short sale is an open transaction, *i.e.*, the gain or loss on the bet is not known until the short sale is closed, it cannot be included in MIR's basis. Finally, Marriott argues that the IRS improperly "crammed through" a revenue ruling to address the types of abusive transactions at issue here and accordingly, the revenue ruling is not entitled to any deference. None of Marriott's arguments, however, changes the outcome dictated by the *statute*--that the short sale liabilities must be included in MIR's partnership basis.

**A. The Tax Court cases cited by Marriott involved transactions that are not analogous to the scheme that used Treasury short sale obligations to artificially increase MIR's partnership basis**

Marriott cites several Tax Court cases in an effort to refute the conclusion that § 752 requires that the Treasury short sale liabilities be included in the partnership basis calculation of MIR. Marriott asserts that in those cases, the IRS argued that certain contingent transactions do not constitute liabilities for purposes of § 752, and that the IRS is now taking an inconsistent position. None of the Tax Court cases, however, provides the succor plaintiff seeks.

Marriott's description of *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), as a "seminal" case is misleading because *Helmer* is inapposite to the application of § 752 to the facts of this case.[4] In *Helmer*, the partnership granted a purchase option on property owned by it.

[4] As the Court of Appeals for the Seventh Circuit noted, *Helmer* is not binding on this, or

Under the terms of the purchase option, the partnership received an initial option payment and subsequent annual option payments. The partnership did not have to repay the option payments if the option agreement terminated. The partnership received the option payments with no restrictions except that if the purchase option were exercised, the option payments would be applied against the purchase price.

The partners in *Helmer* argued that the option payments created a partnership liability equal to the amount of the option payments. Increasing the partnership liabilities would increase the partners' bases under § 752 and thus, distributions of the option payments would constitute tax-free returns of basis. See § 731(a)(1) The issue whether the option payments were taxable arose only because the partners took immediate distributions of the option payments while the partnership deferred the income from the option payments–a tactic that resulted in no off-setting increase in the partners' bases. See § 705(a)(1)(A). The Tax Court found that the option payments did not create a partnership liability because the "option agreement. . . created no liability on the part of the partnership to repay funds nor to perform any services in the future," and held that no liability arose under § 752. *Id.* at 730. Thus, at most, *Helmer* demonstrates, by negative inference, that if an obligation is one that imposes a binding, secured, legal obligation to undertake some action, it would be a § 752 liability.

MIR's short sale transaction did create such a partnership liability because the short sale proceeds received by MIR were encumbered by the binding, legal obligation to replace the borrowed Treasuries. That is, as long as the short sale was open, the short sales proceeds (plus

---

any other court (nor are other Tax Court and Tax Court Memorandum decisions). *Cemco Investors, LLC v. United States*, 515 F.3d 749, 751 (2008).

margin) were required to remain as collateral for the short sale obligation. Therefore, Marriott's inclusion of the (encumbered) short sale proceeds in the partnership basis calculation requires that the corresponding short sale obligations also be taken into account.

Similarly, the claims involved in *Long v. Commissioner,* 71 T.C. 1 (1978), are not analogous to the short sale obligation here. The claims in *Long* had arisen from the partnership's construction business–one of its projects developed structural defects and another experienced problems with the general contractor. The Tax Court stated: "The liabilities for those claims had not been established and was in fact contested. Moreover, the amounts of the damages sought were by no means definite or fixed." *Id*. at 8. In fact, the claims were so nebulous that the Tax Court observed that "the claimaints [against the decedent-partner] sought several million dollars in damages and eventually settled for only a total of $300,000." Until the claims were fully contested (through litigation), there was no ground to determine whether a bona fide liability existed, so it is appropriate that such claims not be counted until they are established. Moreover, the claims involved in *Long* did not create or increase the basis of the partnership's assets. Accordingly, *Long* simply does not stand for the proposition that a short sale obligation is contingent. And, as noted above, *Long* is inapposite in any event, because in this case the obligation to return the borrowed Treasuries was not contested, nor could it be, and the amount of the liability was fixed at the time it became a partnership obligation as measured by the amount of the contributed short sale proceeds.

As in *Long* and *Helmer*, the claims at issue in *La Rue v. Commisioner,* 90 T.C. 465 (1988), are demonstrably different from MIR's unconditional, secured obligation to replace the borrowed Treasuries. In *La Rue,* a large partnership brokerage firm, Goodbody, became

insolvent due to due to serious "back-office" operations in handling its customers' securities transactions. *Id.* at 469. To avoid an outright failure of Goodbody, which was feared would cause a domino-type failure of other firms, Merrill Lynch agreed to assimilate Goodbody. *Id.* at 470. As part of that transaction, Merrill Lynch had Goodbody's books audited. The audit resulted in additions to Goodbody's book reserves for the back-office transactions losses. *Id.* at 474.

Goodbody's back-office transactions losses consisted of unresolved securities differences, unconfirmed securities held by transfer agents, customer accounts in deficit, and unconfirmed debit balance and short security positions in dividend and suspense accounts. The reserves represented the maximum possible amount of the errors, discounted to reflect the projection that some customers would either not discover or not claim the errors. *Id.* at 475. Most of the transactions represented by the reserves were closed out within one to two years, although some were unresolved for as long as five years. The partnership attempted to deduct the estimated reserves as expenses from operations, but this treatment was disallowed by the IRS and the partnership conceded the issue. *Id.* at 477. The partnership then attempted to claim the reserves as liabilities includible in the partners' bases. *Id.* at 478. The Tax Court, however, rejected the effort to include the reserves as liabilities because the "additional reserves reflected potential liabilities of the partnership, valued by reference to listed stock prices but before actual sale or purchase and, accordingly, represented estimates." *Id.* at 479.

Because the reserves in *La Rue* represented *potential* claims that were estimated, they are completely different from MIR's short sale transaction in which the short sale proceeds were known with certainty and the corresponding obligation to replace the borrowed Treasuries was

immutable. Moreover, Goodbody's reserves for the potential, projected claims arose from the partnership's brokerage business operations–*i.e.*, back office transactions executed for the accounts of its brokerage customers. None of the back-office transactions increased the basis in any partnership asset. In this case, however, Marriott seeks to include a transaction--the short sale proceeds (collateral to the short sale)--to increase partnership basis, without taking into account the corresponding short sale obligation which generated the proceeds. *La Rue* thus does not support Marriott's effort to manipulate partnership basis to obtain an enormous artificial tax loss.[5]

**B. <u>The transactions involved in other tax shelter cases cited by Marriott are not analogous to the binding, secured short sale obligations here</u>**

Marriott cites three recent tax shelter decisions in an attempt to escape the operation of § 752 with respect to MIR's binding secured obligation to replace the borrowed Treasuries: *Jade Trading, LLC v. United States,* 80 Fed. Cl. 11 (2007)**;** *Cemco Investors, LLC v. United States,* 515 F.3d 749 (2008); and *Klamath Strategic Investment Fund, LLC v. United States*, 440 F.Supp. 608 (E.D. Tex 2006) (*Klamath I*). *Jade Trading* and *Cemco* both involved foreign currency options which the taxpayers claimed were equivalent to the contingent property purchase option in *Helmer*. *Jade Trading*, 80 Fed. Cl. at 13; *Cemco,* 515 F.3d at 750. We already have shown that *Helmer* is distinguishable from this case. Ironically, *Helmer* is also distinguishable from

[5] Marriott cites three other cases in an effort to show that the IRS is taking a litigation position here which is different from its posture in earlier cases: *Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982), *cert. denied* 462 U.S. 1106 (1983); *Gibson Prods. Co. v. United States,* 637 F.2d 1041 (5th Cir. 1981); and *Fox v. Commissioner*, 80 T.C. 972 (1983), *aff'd sub nom. Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984). The claims involved in those cases were spectacularly speculative and were not part of a scheme to manipulate an artificial increase to partnership basis. Accordingly, they merit little attention.

*Jade Trading*, *Cemco,* and *Klamath I* (which makes these tax shelter cases twice removed from any relevance to this case).

The property option contract in *Helmer,* which the buyer might or might not ever exercise, is not even remotely comparable to the kind of abusive pre-arranged, offsetting transactions utilized by the taxpayers in *Jade Trading* and *Cemco*.[6] This is, in part, because an option contract of the kind described in *Helmer* has real economic consequences--*i.e.*, it did not seek to generate phony losses arising from artificially-inflated partnership bases. By stark contrast, the purportedly contingent liabilities in the offsetting foreign currency option transactions in *Jade Trading* and *Cemco* were designed and implemented for the sole purpose of generating purely fictitious losses. *Jade Trading*, 80 Fed. Cl. at 13-16; *Cemco,* 515 F.3d at 750-51. There is simply no comparability in the two types of option transactions, so the taxpayers in *Jade Trading* and *Cemco* could in no way have relied reasonably on *Helmer* (or *Long* and *LaRue*) to justify the noneconomic losses they claimed.

*Klamath I* involved "loan premiums" that were contributed to partnerships in connection with their assumption of the corresponding "loans" (the proceeds of which were also contributed to the partnerships). *Klamath I,* 440 F.Supp. at 611-14. The "loan premiums" purportedly compensated the borrowers for agreeing to pay an above-market interest rate on the purported

---

[6] The transactions used in *Jade Trading* and *Cemco* are described in Notice 2000-44, 2000-2 C.B. 255, which disallowed the treatment of the abusive option transactions. In these option transactions, the taxpayer purports to purchase a long digital option on foreign currency and, simultaneously, purports to sell a short digital option on the same foreign currency with virtually the same strike price and for virtually the same cost. The counterparty never receives the purported price of the long option (the supposed contingent liability), but only the difference in price between the long and the short options. Therefore, the taxpayer economically has in reality a single long position, not a long and a short position.

loan amounts. *Id.* at 611. If the partnerships prepaid the "loans," they were subject to a penalty that essentially mirrored the unamortized "premium." *Id.* at 612. The court found that, taking the documents at their face, there were no circumstances under which the partnerships were required to repay the loan premium. *Id.* at 617. The court, in its grant of summary judgment, also found that the obligation to pay the prepayment penalty was (1) contingent on prepayment of the "loan" and (2) contingent in amount because, again taking the documents at their face, the calculation of the penalty was dependent on future interest rates. *Ibid.* Accordingly, the court held that neither the "premium" nor the prepayment penalty was a partnership liability under § 752. *Id.* at 617-19.

*Klamath I* is inapposite for at least two reasons. First, the court's analysis assumes the validity of the loan transactions. In fact, in a subsequent opinion after trial, the court held that the loans were shams that must be disregarded for tax purposes. *Klamath Strategic Investment Fund, LLC v. United States*, 472 F. Supp. 2d 885 (E.D. Tex. 2007) (*Klamath II*).[7] Thus, the continuing viability of *Klamath I* is dubious at best. Moreover, even if one accepts the court's factual and legal analysis in *Klamath I*,[8] the secured legal obligation of MIR to replace the borrowed Treasuries in no way resembles the obligations that the court found to be contingent in *Klamath I*.

[7] For that very reason, the Government moved the court to vacate its judgment in *Klamath I*, which the court declined to do.

[8] On appeal (5th Cir. No. 07-40861), the Government has argued that, even if one assumes that the loan transactions were not shams, the obligations to repay the loan "premiums" were liabilities for purposes of § 752 (i.e., were not contingent).

**C. <u>Two cases have specifically held that Treasury short sales obligations are liabilities under § 752</u>**

Marriott gamely attempts to disparage two cases that are on all fours with the facts here, *Salina Partnership, LP v. Commissioner*, T.C. Memo. 2000-352, 80 T.C.M. (CCH) 686 (2000); and *Colm Producer, Inc. v. United States*, 460 F.Supp.2d 713 (N.D. Tex. 2006 ) *appeal pending sub nom. Kornman & Assoc. v. United States*, No. 06-11422 (5th Cir. July 31, 2007)). While Marriott characterizes *Salina's* analysis as "superficial," the Tax Court followed the same course in that case that this Court will–*i.e.,* it applied the statute, § 752, to the facts. As the Tax Court held, the widely-accepted definition of liability must encompass a short sale that represents a legal obligation, secured by collateral, to replace borrowed securities.[9] Contrary to Marriott's assertion, such a definition of liability would not change the outcome in any of the cases it cites. Those cases involved transactions that the respective courts found to be contingent in nature and therefore could not be analogous to the secured legal obligation created by a short sale.

The only criticism that Marriott can muster against *Colm Producer* is that the court used the wrong date for determining when an obligation to close a short sale becomes fixed. Because the proper time to determine whether a short sale obligation is fixed is when the short sale obligation becomes a partnership obligation, Marriott presumably agrees that the short sale

[9] Marriott also insinuates that this Court should not give much value to *Salina* by noting (Br. 33 n.19) that Tax Court memorandum opinions have no precedential value. That memorandum opinions are not precedent in the Tax Court merely means that one Tax Court judge is not bound by another judge's memorandum opinion, just as one circuit court of appeals is not bound by the decision of another circuit court of appeals. But that hardly means that memorandum opinions do not have *persuasive* value. Indeed, this Court has frequently found them helpful. *See, e.g., D'Avanzo v. United States*, 67 Fed. Cl. 39 (2005); *McGann v. United States*, 76 Fed. Cl. 745 (2007); *Dzuris v. United States*, 44 Fed. Cl. 452 (1999). (Inconsistently with its professed opinion of the insignificance of Tax Court memorandum opinions, Marriott has urged this Court to be guided by the inapposite Tax Court memorandum opinion in *Helmer*.)

obligations here were determinable and fixed when MORI contributed to MIR the short sale proceeds, subject to the corresponding short sale obligations. Once the short sale obligations became MIR's obligations, MIR had a binding legal secured obligation to replace the borrowed Treasuries, and that obligation was measured by the amount of the corresponding contributed short sale proceeds.

### D. <u>Marriott's contention that the tax treatment of short sales as open transactions means that the liability is contingent is wrong</u>

Marriott's contention (Br. 17-21) that the tax treatment of short sales as open transactions until the sales are closed (see § 1233) somehow renders the liability of the borrower to replace the property a contingent liability is not relevant to the question whether short sale transactions are liabilities under § 752. Moreover, Marriott does not cite any authority to support its argument that the rules governing the timing of the recognition of the gains or losses from short sales dictate their treatment for purposes of §752.[10] Furthermore, the Tax Court in *Salina* rejected the argument. The court reasoned that §§ 752 and 1233 have disparate policies that warrant different treatment (*id*. at 698):

> Petitioner's argument overlooks the disparate policies that sections 1233 and 752 are intended to promote. Section 1233 . . . defers recognition of gain or loss until the short sale is closed, to clarify and simplify the tax treatment of a transaction that is something of hybrid. *See Hendricks v. Commissioner*, 423 F.2d 485, 486-487 (4th Cir. 1970). . . . In contrast, the basis adjustment provisions in subchapter K, including sections 705 and 752, are intended to avoid distortions in the tax reporting of partnership items by

---

[10] Marriott cites only to the report of one of its experts, Owen A. Lamont. To the extent that Marriott is attempting to use Mr. Lamont's report to support a legal conclusion that a short sale is not an obligation for purposes of § 752, it is improper. *Stobie Creek Investments LLC v. United States*, No. 05-748T, 2008 WL 902960 (Fed. Cl. Apr. 1, 2008).

> promoting parity between a partnership's aggregate inside basis in its assets and its partners' outside bases in their partnership interests.

The question whether a transaction is open or closed for purposes of determining when gain or loss on the transaction should be recognized has nothing to do with whether an obligation to replace borrowed property with equivalent property is a contingent or fixed obligation. Further, the application of open transaction principles to determination of bases would undermine the comprehensive statutory scheme in the Code that governs matters of basis. Basis is a dynamic concept; a taxpayer's basis in property is adjusted upon the occurrence of various tax events. The statutory provisions pertaining to partnership interests illustrate this concept.

Section 705(a) provides the starting point for determining a partner's outside basis and identifies some of the events that cause the adjustment of this basis. A partner's initial outside basis is "the basis of such interest determined under § 722 (relating to contributions to a partnership) or § 742 (relating to transfers of partnership interests)." § 705(a). A partner's basis is subsequently increased, *inter alia*, by his distributive share of the partnership's taxable and tax-exempt income. § 705(a)(1)(A) & (B). His basis is decreased, *inter alia*, by partnership distributions as provided in § 733 and by his distributive share of partnership losses. § 705(a)(2). Similarly, a partner's outside basis is increased by any increase in his share of partnership liabilities and by any increase in his individual liabilities resulting from his assumption of partnership liabilities. §§ 722, 752(a). A partner's outside basis is decreased by any decrease in his share of the partnership liabilities and by any decrease in his individual liabilities by reason of the partnership's assumption of them. §§ 731, 752(b).

In short, neither the open transaction doctrine nor the provisions of § 1233 (relating to the recognition of gain or loss realized on short sales) has any relevance with whether a binding, secured obligation to replace borrowed Treasuries is a liability under § 752.

**E. <u>Revenue Rulings 88-77 and 95-26, which contain the IRS's interpretation of the term "liability," are entitled to *Chevron* deference</u>**

Marriott asserts that Rev. Rul. 95-26 is flawed and is not entitled to any deference. On the contrary, Rev. Rul. 95-26 is a reasonable interpretation of § 752 and the Court should accord considerable deference to its holding. As a general matter, revenue rulings should be entitled to the higher level of deference set out in *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Chevron* requires a court to follow an agency's interpretation of a statute unless that interpretation is arbitrary, capricious, or manifestly contrary to the statute. 467 U.S. at 844. In *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Court, refining its *Chevron* analysis, determined that *Chevron* deference was available to any administrative implementation of a statutory provision "when it appears that Congress delegated authority to the agency generally to make such rules carrying the force of law," and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id*. at 226-227. It is well settled that Treasury Regulations (both general and specific authority regulations) are entitled to *Chevron* deference. *Atlantic Mut. Ins. Co. v. Commissioner*, 523 U.S. 382, 387-89 (1998). Revenue rulings--like treasury regulations--satisfy the standard for *Chevron* deference set out in *Mead*.

Revenue rulings and IRS interpretive regulations should be accorded the same level of deference. Both forms of agency interpretation are issued pursuant to the same congressional mandate. See § 7805(a) (providing that the "Secretary shall prescribe all needful rules and

regulations for the enforcement of this title"). Both are ultimately authorized at the same level of the IRS and the Department of Treasury. See Treas. Order 111-2, 1981-1 C.B. 698, 699 (delegating responsibility for "final determination of the Treasury Department's position" on Treasury Regulations and published revenue rulings from the Secretary to the Assistant Secretary (Tax Policy)); Treas. Directive 27-10, 55 Fed. Reg. 42532-02 (1990) (Assistant Secretary (Tax Policy) develops and reviews regulations and rulings; Office of Tax Legislative Counsel assists in the development of regulations and rulings). Both are published. Treas. Reg. § 601.601(d)(2)(i)(a). And both are designed to provide precedent, binding on the IRS, for all taxpayers. Treas. Reg. § 601.601(d)(2)(v)(d).

The only material distinction between the Commissioner's interpretive regulations and his revenue rulings is that the latter are not issued pursuant to notice-and-comment procedures. The Supreme Court made clear in *Mead*, however, that, while notice-and-comment rulemaking and formal adjudication almost always assure *Chevron* deference, the absence of such formalities in the rulemaking process does not preclude such deference, so long as it appears (as it does with revenue rulings) that Congress intended to grant the agency the power to make binding rules. 533 U.S. at 230-231.

But even if this Court were to conclude that revenue rulings are not entitled to *Chevron* deference, they are certainly highly persuasive precedent that should be followed unless they are unreasonable. See *Foil v. Commissioner*, 920 F.2d 1196, 1202-1203 (5th Cir. 1990); *Omohundro v. United States*, 300 F.3d 1065, 1067-1069 (9th Cir. 2002); *Ammex, Inc. v. United States*, 367 F.3d 530, 535 (6th Cir. 2004), *cert. denied*, 544 U.S. 948 (2005).

Fully consistent with § 752, Rev. Ruls. 88-77, 1988-2 C.B. 129, and 95-26 contain a more-than-reasonable interpretation of the term "liability." It makes perfect sense to require a partner who has included an asset in his outside basis to reduce his basis by the obligation that created this asset, because the legally--enforceable obligation diminishes the value of his partnership interest. Just as a corporation that borrows money to buy real estate must, on its balance sheet, treat the real estate as an asset and the mortgage as a liability, so too should a partner take into account both the asset and the liability in computing his outside basis. It is unremarkable that Rev. Rul. 95-26 does not discuss *Helmer*, *Long,* and *La Rue*, because, as we have established, those cases have no relevance to the question of whether a *short sale* obligation is a liability for the purposes of § 752.

Even assuming, *arguendo*, that plaintiff is right that Rev. Rul. 95-26 represents a change from the position the IRS took in litigating *Long, Helmer,* and *La Rue*, that circumstance would have no effect on the Court's analysis here. (Because the facts of *Long*, *Helmer,* and *La Rue* are distinguishable from the facts in Rev. Rul. 95-26, the ruling does not represent a change in position. But even if it were, this Court still must determine how the statute, § 752, applies to the facts of this case.) Whether or not the IRS changed its interpretation of a statute has no bearing on the Court's analysis. It is well-established that the IRS may correct mistakes of law in the application of the tax laws to particular transactions, even retroactively. *Dixon v. United States*, 381 U.S. 68, 72 (1965). The IRS may do so even where a taxpayer has relied to his detriment on the IRS's mistaken position. *Id.* at 73, *see also Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339 (2007).

In *Long Island Care*, the Supreme Court unanimously upheld an agency's change in its interpretation of the meaning of the term "domestic service" employment. That case presented the question whether a domestic worker who provided "companionship services" to the elderly and infirm as an employee of a third-party agency was entitled to minimum wages and overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 213(a)(15). This Act exempted "any employee employed in domestic service employment to provide companionship services" for the elderly and infirm from minimum wages and maximum hour rules.

The Department of Labor had two conflicting regulations. One regulation defined exempt "domestic service" employment as services performed in and about a private home of the employer. Under the second regulation, at issue in Long Island Care, companionship workers for a third party, *i.e.*, an employer other than the household using their services, were exempt from minimum wages and maximum hours. The Court upheld the validity and applicability of the second regulation. 127 S. Ct. at 2348. Noting that, in the FLSA, Congress had explicitly left gaps in the scope and definition of "domestic service employment" and "companionship services" for the agency to fill, the Court explained that "[w]hen an agency fills such a 'gap' reasonably, and in accordance with other applicable (e.g., procedural) requirements, the courts accept the result as legally binding." *Id*. at 2345-2346.

The Court further held that "as long as interpretive changes create no unfair surprise . . . the change in interpretation alone present[ed] no separate ground for disregarding the Department's present interpretation." 127 S. Ct. at 2349. Indeed, the Court gave the Department of Labor's most recent interpretation legal effect even though this interpretation was set forth in the form of internal guidance and was in response to litigation. The Court reasoned that the

"agency's course of action indicates that the interpretation . . . reflects its considered views. . . ." *Id*.

In this case, the IRS's position -- that the obligation to close a short sale is a liability under § 752 -- represents its "considered views." The IRS took this position in Rev. Rul. 95-26 and *Salina*. This interpretation should have created no "unfair surprise." Six years before the transactions in issue, the IRS, in Rev. Rul. 88-77, defined "liability" under § 752 to "include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets. . . ." 1988-2 C.B. at 129. Before Marriott filed the tax returns for the periods involved in the transactions at issue, the IRS issued Rev. Rul. 95-26, applying Rev. Rul. 88-77 to short sales and ruling that short sales of securities by partnerships create partnership liabilities for purposes of § 752. Accordingly, if any change in interpreting § 752 occurred, "the change in interpretation alone presents no separate ground for disregarding the [IRS's] present interpretation." *Long Island Care*, 127 S. Ct. at 2349.

Marriott also finds fault with Rev. Rul 95-26 because it ties the short sale proceeds to the short sale obligation. Rev. Rul 95-26, however, is not the only source for this requirement. As the court highlighted in *United States v. Russo*, 74 F.3d 1383, 1388, *cert. denied*, 519 U.S. 927 (1996):

> Short sales are closely regulated, and, according to the Federal Reserve Board margin rules, a seller is presently required to put up margin equal to at least 50% of the value of the stock it sells short. 12 C.F.R. § 220.19(a) (1995). In addition, any proceeds from the sale are frozen under the rules until the seller covers the short sale.

The court in *Bissell v. Merrill Lynch*, 937 F.Supp. 237, 240 (S.D. N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998), provides further guidance:

> Regulation T of the Federal Reserve Board requires that all short sales be made in a margin account because a short sale, whether a regular short sale or a short sale against the box, involves the collateralized loan of securities on which the broker may charge interest. *See* Regulation T, 12 C.F.R. § 220.4(a). For regular short sales of nonexempt securities, Regulation T requires that customers meet an initial margin requirement of 150 percent of the market value of the security being sold. *See* 12 C.F.R. § 220.18(c). The New York Stock Exchange ("NYSE") imposes separate maintenance margin requirements for short sales. *See* NYSE Rule 431(c); *see also* Regulation T, 12 C.F.R. § 220.1(b)(2) (permitting exchanges to impose margin requirements above those set by the Federal Reserve Board).

Thus, the obligation to cover the short sales was a binding, secured legal obligation to replace the borrowed Treasuries. Because MIR increased its tax basis by the amount of the short sale proceeds, the corresponding short sale obligation is similar to a conventional purchase-money financing that would be included in partnership liabilities under § 752. The short sale proceeds that were used to increase MORI's outside basis under § 722 were acquired only because of the obligations Marriott now seeks to ignore. Unlike short sales, a liability that is truly contingent does not immediately create or increase the borrower's tax basis in any property precisely because the obligation is contingent. Thus, Marriott's claim that the obligation to close the short sales may be disregarded for partnership tax basis is groundless.

### F. <u>Marriott's complaint that its scheme is not a "Son of Boss" tax shelter rings hollow</u>

Finally, Marriott complains that defendant has unfairly characterized the transactions here as a specific type of tax shelter known as "Son of Boss." The semantics of tax shelter classification, however, make no difference in the analysis of the issue here--whether the short sale obligations are liabilities under § 752. There is ample evidence that Marriott was aware that the transactions it used to manipulate partnership basis were part of a tax shelter scheme. For

instance, it is apparent from the CSFB transaction proposal that the ultimate aim of the scheme was to generate artificial tax losses. In addition, in attendance at several meetings between Marriott and CSFB was Roy Hahn, a self-described "engineer [of] smart, cutting edge financial programs that . . . deliver powerful tax advantages." (Def. Supp. PPF 39 .) Mr. Hahn has had other experience developing tax shelters. *See Carroll v. Leboeuf, Lamb, Greene & Macrae, LLP*, 374 F.Supp.2d 375 (S.D. NY 2005).

In any event, tax shelters typically cloak themselves in the guise of transactions that have superficial business or investment purpose and are crafted to meet the letter of the law. As other courts have found, however, such apparent business or investment purpose withers under the glare of skeptical scrutiny. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 1261 (2007); *Jade Trading*, 80 Fed. Cl. 11. While Marriott makes self-serving assertions that it had good reasons to try to hedge its interest rate exposure and to package the mortgage notes in a bankruptcy-remote entity, one step in the scheme served no useful business or investment purpose other than to generate an artificial enormous tax loss: the failure to treat the short sale obligations as liabilities in calculating MIR's partnership basis. This facet of the scheme had no business or investment purpose and tags Marriott's transactions as a tax shelter–whether it is called Son of Boss or not is immaterial.

## CONCLUSION

Because the statute, the applicable administrative rulings, and the case law support the Government's interpretation and application of § 752, defendant respectfully requests that its motion for summary judgment be granted.

Respectfully submitted,

*s/G. Robson Stewart*
G. ROBSON STEWART
U.S. Department of Justice - Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, DC 20044
tel: (202) 307-6493
fax: (202) 514-9440

JOHN A. DICICCO
Deputy Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
MARY M. ABATE
Assistant Chief, Court of Federal Claims Section

*s/Mary M. Abate*
Of Counsel

Dated: April 18, 2008