**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**Nos. 01-256 T and 01-257 T**
**(Judge Lettow)**

**MARRIOTT INTERNATIONAL RESORTS, L.P.,**
**MARRIOTT INTERNATIONAL JBS CORPORATION,**
**TAX MATTERS PARTNER,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

**SECOND DECLARATION OF G. ROBSON STEWART**

---

I, G. Robson Stewart, being of legal age and pursuant to 28 U.S.C., Section 1746, declare as follows:

1. I am the Department of Justice trial attorney assigned to defend the above-captioned case and I have in my possession relevant Department of Justice files.

2. Attached hereto are true and accurate copies of the following documents:

Exhibit 13 - Credit Suisse First Boston confirmation statements for three short sales of U.S. Treasury Notes by Marriott Ownership Resorts, Inc.

Exhibit 14 - Deposition transcript excerpts from the deposition of Roy Hahn, taken in these action on February 13, 2003.

I declare under penalty of perjury, that the foregoing is true and correct. Executed in Washington, D.C., on April 18, 2008.

G. ROBSON STEWART
Trial Attorney, Tax Division
U.S. Department of Justice

GOVERNMENT EXHIBIT 13

CUSTOMER COPY

FIRST BOSTON

THE FIRST BOSTON CORPORATION
PARK AVENUE PLAZA, NEW YORK, N.Y. 10055

OPERATIONS
Five World Trade Center
New York, N Y 10048
Telephone (212) 909-2000

Atlanta, Boston, Chicago, Dallas, Houston
Los Angeles, Philadelphia, San Francisco, San Juan
London, Geneva, Melbourne, Tokyo

**CONFIRMATION AND STATEMENT**

| | TRADE NO. | A/C | TRANS CODE | TRADE DATE | SETTLEMENT DATE | CUST. NO. | TYPE | REP. | | SECURITY CODES | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| YOU SOLD | 61171 | 21 | 15 | 08/30/1994 | 09/30/1994 | 2D86H 0 | 1 | 28R | * | 120772 | 912827K68 |

MARRIOT OWNERSHIP RESORTS INC
ATT MICHAEL DEARING VP CORPORATE FINACE
MARRIOTT DRIVE
DEPT 924-11
WASHINGTON DC 20058

DUPLICATE FOR ACCOUNT BELOW 21 AC
MARRIOTT OWNERSHIP RESORTS INC
ATT MICHAEL DEARING
1200 U S HIGHWAY 98 SOUTH SUITE 19
LAKELAND FL 33801

MELLON BANK PITTS/TRUST
ABA 043000261
A/C 199-8036 MARRIOTT INTL

IRS NO.521 32 0904

WE CONFIRM ACCORDING TO TRANSACTION CODE BELOW AND THE TERMS STATED HEREON AND ON THE REVERSE HEREOF

| NUMBER OF DAYS ACCRUED INTEREST | SECURITY | | | | RATE | MATURITY |
|---|---|---|---|---|---|---|
| | U S TREASURY NOTES | | | 04/30/1993 | 5.1250 | 04/30/1998 |
| | FACE OR SHARES | PRICE | PRINCIPAL | | INT.–DIV.–DISC. | PROCEEDS |
| 123 | 15,000,000 | 96.7500 | 14,512,500.00 | | 256,946.33 | 14,769,446.33 |

INTEREST AT 04.125 PCT FOR 30 DYS
PROCEEDS PAYABLE IN FEDERAL FUNDS

| | |
|---|---|
| PLUS MARGIN | 125,964.81 |
| | -------------- |
| VALUE OF COLLATRL | 14,895,411.14 |
| REPO INTEREST | 51,202.98 |

IF THIS CONFIRMATION IS NOT IN ALL RESPECTS IN ACCORDANCE WITH YOUR UNDERSTANDING, PLEASE NOTIFY US IMMEDIATELY.

*** OUR NEW NAME IS CS FIRST BOSTON CORPORATION ***

AMOUNT DUE YOU 14,946,614.12

TRANSACTION CODE

11 - AS YOUR AGENT WE HAVE SOLD FOR YOUR ACCOUNT AND RISK.
12 - AS AGENT FOR PURCHASER WE HAVE BOUGHT FROM YOU.
13 - AS AGENT FOR PURCHASER WE HAVE BOUGHT THROUGH YOU.
14 - YOU HAVE BOUGHT FOR OUR ACCOUNT AND RISK.
15 - AS PRINCIPAL AND FOR OUR OWN ACCOUNT WE HAVE BOUGHT FROM YOU.
16 - AS REPRESENTATIVE OF ONE OR MORE OF THE SEVERAL PURCHASERS, WE HAVE BOUGHT FROM YOU.
17 - WE HEREBY RECEIVE FROM YOU.

21 - AS YOUR AGENT WE HAVE BOUGHT FOR YOUR ACCOUNT AND RISK.
22 - AS AGENT FOR SELLER WE HAVE SOLD TO YOU.
23 - AS AGENT FOR SELLER WE HAVE SOLD THROUGH YOU.
24 - YOU HAVE SOLD FOR OUR ACCOUNT AND RISK.
25 - AS PRINCIPAL AND FOR OUR OWN ACCOUNT WE HAVE SOLD TO YOU.
26 - AS REPRESENTATIVE OF ONE OR MORE OF THE SEVERAL SELLERS, WE HAVE SOLD TO YOU.
27 - WE HEREBY DELIVER TO YOU.

## TERMS OF AGREEMENT

T IS AGREED BY CUSTOMER AND THE FIRST BOSTON CORPORATION FBC) THAT THIS TRANSACTION AS DESCRIBED ON THE FACE HEREOF S SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS

This confirmation hereby incorporates and all transactions hereunder are ubject to (a) the provisions of any Customer Agreement and any other written greement between Customer and FBC, (b) the Uniform Practices for the Clear nce and Settlement of Mortgage-Backed Securities, and (c) the constitution, y laws, rules, regulations, interpretations, and usages of the exchange or market and its clearing house if any) where executed and of the National Association of ecurities Dealers, Inc (NASD), the Securities and Exchange Commission (SEC) nd the Board of Governors of The Federal Reserve System. In all cases where pplicable Provisions contained in and remedies provided by this confirmation which are additional to or more or less expansive than any provision contained in r remedies provided by any agreement with Customer (including, without limita ion, provisions or remedies that cover the same subject matter) shall not be leemed to be in conflict with each other, and all such provisions and remedies hall be applicable and available

If our capacity in this transaction was as "agent," we acted as your broker (or, if ndicated, as broker both for yourself and the party(s) on the other side) and not or our own account If our capacity was as "principal," we bought from or sold to ou as dealer for our own account (or, if indicated, for our joint account with nother firm or for the account of an underwriting syndicate of which we are a nember) Your capacity was for your own account unless you expressly specified therwise to us in writing and gave us sufficient information (including, without mitation, all financial information requested by us) in writing prior to the trans ction for us to identify and rely upon the credit of another party or your credit in nother capacity Time of execution will be furnished upon request

If we acted as your agent in this transaction, the amount of any commission or ther remuneration to be paid to us by you is stated on the face hereof If we also cted as agent for another person, upon request we will furnish the name of that erson, any remuneration received from that person, and such further informa ion as may be required by the rules and regulations of the SEC and any other ody having jurisdiction over the transaction Commission rates are subject to egotiation, and any commission charged Customer in this transaction may be nore or less than the commission charged to or by others in similar transactions

Until paid for in full by you, securities sold to you or bought for you may be ypothecated under circumstances which will permit the commingling thereof with securities carried for the account of other customers We may pledge or epledge on such terms as we deem appropriate in our sole discretion any ecurities pledged to us by you

If this transaction is a purchase by you and sufficient funds are not already in our account with us, it is agreed that you will make the payment for the securities lescribed on the face hereof promptly in accordance with the terms of this onfirmation, that we shall not be deemed to have transferred or be required to ransfer such securities to you until we have received such full payment therefor, nd that you shall not sell such securities prior to making such payment All onfirmations and book entries purporting to evidence or effect such transfer to ou of such securities shall be deemed to be provisional and without effect until uch full payment therefor has been received If this transaction is a sale by you nd the securities described on the face hereof are not already held in your ccount with us and it is not marked short, we are acting upon your representation hat you or your principal own such securities, and it is agreed that you will romptly deliver such securities to us If full payment for securities sold to or ought for you in this transaction is not received by us on or before the settlement late, or if securities bought from or sold (except short sales) for you in this ransaction are not delivered to us promptly and in proper form, you shall be leemed to be in default in respect of this transaction

This transaction and all other transactions with us and our affiliates have been ntered into in consideration of each other If Customer or any of its affiliates collectively, the "Customer Parties") shall default in respect of this or any other ransaction with FBC or any of its affiliates (collectively, the "FBC Parties"), state hat any Customer Party will not perform any obligation to any FBC Party, apply or, consent to or be the subject of any application or petition for the appointment f or the taking of possession by, a receiver, custodian, trustee, liquidator or imilar person of itself or of all or a substantial part of its property, admit in writing s inability, or become generally unable, to pay its debts as such debts become ue make a general assignment for the benefit of its creditors, file or be the ubject of the filing or entry of a petition or order for relief under Title 11 of the U S Code or any similar law of any jurisdiction regarding reorganization, liquidation issolution, insolvency, or relief of debtors or of an application for a protective ecree under Section 5 of the Securities Investor Protection Act of 1970, or if any BC Party believes that it may not be able to apply without delay property that it or ny other FBC Party is holding or expects to receive from any Customer Party gainst any obligations to such first FBC Party, each FBC Party may (a) cancel or therwise liquidate this and any other transaction between it and you without rior notice to you, (b) set off any obligation owing by it to you against any of your obligations or any of your subsidiaries obligations owed [illegible] any other FBC Party and (c) realize upon any property securing any obligations [illegible] or any other FBC Party Any grace or notice period required by agreement or custom prior to exercise of such remedies may be shortened or eliminated by any FBC Party if in its discretion, it is reasonable to do so under the circumstances Customer shall be liable to each FBC Party for all costs and expenses, including attorney's fees and expenses, incurred in connection with the enforcement or collection by such FBC Party of its rights or claims hereunder against any Customer Party

7 Customer hereby grants to each FBC Party a security interest in all securities, moneys or other property and all proceeds of any of the foregoing, now or hereafter held or carried by any FBC Party in Customer's account(s) with any FBC Party or otherwise as collateral security for the payment of any and all obligations and liabilities of Customer and its subsidiaries to any FBC Party now existing or arising hereafter Customer hereby irrevocably constitutes and appoints each FBC Party its true and lawful agent and attorney in fact, with full power to act in the name of Customer and on its behalf, with respect to the execution of all instru ments and the taking of all action necessary or desirable to effectuate the rights and remedies provided hereunder and by applicable law to any FBC Party

8 At the time this transaction was executed or subsequent thereto, we (or others acting for our account) may have effected transactions which stabilize or main tain the market price of the securities described on the face hereof (or other securities of the same issuer) at a level above that which might otherwise prevail in the open market Such transactions may have been effected on any market where these securities are traded Such stabilization if commenced may be discontinued at any time FBC may have made and may continue to make pur chases and sales of securities of the same issue involved in this transaction (or other securities of the same issuer) for its own account or for the accounts of others, and such transactions, if made may be discontinued at any time There may not have been and there may not be in the future any market in such securities other than that made by FBC

9 We (or others acting for our account) reserve the right to offer for sale and/or to sell from time to time as principal or agent an amount of the securities described on the face hereof in excess of the amount owned by us (or the Seller for whom we act as agent) at the time such offers and/or sales are made Such offers or sales (sometimes known as "short sales" or "overallotments") may or may not be made in conjunction with stabilizing transactions described above

10 Customer agrees that, within 24 hours after FBC's request, Customer will deliver to FBC a sufficient amount of the securities subject to this agreement, or otherwise provide collateral of a type and in form acceptable to FBC, so that the then current market value of the securities and other collateral then held by FBC with respect to this transaction (a) in the case of a reverse repurchase agreement, resale or other transaction with respect to which Customer was required to provide FBC collateral at the outset of the transaction, bears the same ratio to the then outstanding amount of Customer's obligations under such transaction (tak ing into account accrued interest on the collateral and on the transaction) as the market value of such required collateral on the date of this confirmation bears to the outstanding amount of Customer's obligations under this transaction on the date hereof, and (b) in all other cases, equals at least the amount by which the price Customer is to pay for securities as set forth on the face of this confirmation exceeds the then current market value of such securities or by which the then current market value of securities that Customer is to sell exceeds the amount Customer is to be paid therefor as set forth on the face hereof as the case may be

11 If this transaction relates to a debt security call features may exist which could affect the yield thereof Further information pertaining to the yield on debt securi ties is available upon request

12 If this transaction is described on the face hereof as a "When Issued" or "When Distributed" contract, then this contract shall be subject to the special requirements for such contracts, if any, of the market where executed This contract shall be settled and payment therefor made only at such time and place in such manner, and by delivery of such securities and/or other property received by us as such market may require or shall be cancelled if the proposal pursuant to which the securities were to be issued or distributed has been abandoned or materially changed or if the securities which are the subject of the contract have been materially changed

13 If a security underlying any transaction hereunder is or becomes subject to a notice of adverse claim received by the issuer of such security (or its agent) from or on behalf of the registered holder of such security, then upon the request of the transferee and simultaneously with the transfer by the transferee to the transferor of such a disputed security (or any right to receive such a disputed security from the issuer or its agent if such disputed security is in the possession of the issuer or its agent), the transferor shall pay to the transferee an amount equal to the amount theretofore paid by the transferee to the transferor for such disputed security All transfers and payments pursuant to this Section 13 shall be effected in the same manner as the transfer and payment in the transaction in which such disputed security was transferred by the transferor to the transferee

14 This Agreement shall inure to the benefit of FBC, its affiliates, and its and their successors The parties acknowledge that this transaction is a "securities contract" within the meaning of 11 U S C Section 741(7)

15 This confirmation shall be deemed to have been accepted and signed by Customer if not objected to in writing by Customer to FBC within 10 days of receipt hereof The Terms of Agreement set forth on the first confirmation of this form delivered to Customer shall be deemed to have been accepted and signed by Customer with respect to each and every transaction in respect of which this form of confirmation is delivered, unless Customer shall have objected in writing to FBC within 10 days of receipt of such first confirmation

16 In the event any one or more provisions contained in this confirmation shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this confirmation shall be construed as if such invalid, illegal, or unenforce able provision had never been contained herein

17. In connection with any claim arising out of or relating to this transaction or any other transaction between Customer and any FBC Party or between FBC and any affiliate of Customer, Customer and FBC each irrevocably (a) submits (i) at the option of FBC or Customer, to binding arbitration in accordance with the rules then obtaining of either the National Association of Securities Dealers, Inc., or the Board of Arbitration of the New York Stock Exchange, and (ii) to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, (b) waives any objection to the laying of venue in such court, (c) waives any claim that any suit, action or proceeding in such court has been brought in an inconvenient forum, (d) waives the right to object that such court does not have jurisdiction over Customer or FBC, as the case may be, (e) waives the right to trial by jury in any suit, action or proceeding brought in respect of any such transaction, and (f) designates the Secretary of State of the State of New York as its agent for the service of process (provided that Customer and FBC may by written notice to the other change its designation of agent to a specified person located in the Borough of Manhattan). This confirmation and all transactions hereunder shall be governed by and construed in accordance with the laws of the State of New York (excluding choice or conflict of law doctrine) and all applicable federal laws and regulations. Any arbitration hereunder shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.

THE FIRST BOSTON CORPORATION

### EXPLANATION OF SYMBOLS

| SYMBOL | |
|---|---|
| 'A' | We acted as agent for both buyer and seller charging you a commis sion, as shown on the face hereof Other remuneration will be received by us in this transaction Source and amount will be fur nished upon request |
| 'B' | An odd-lot differential or equivalent fee has been charged in this trans action the amount of which will be furnished upon request |
| 'C' | We acted as principal in this transaction without risk The amount of our markup or markdown is set forth on the face hereof |
| 'D' | Other remuneration will be received by us in this transaction Source and amount are set forth on the face hereof |
| 'E' | No periodic payments callable below maturity value without notice by mail to holder unless registered |
| 'F' | Actual yield may vary depending upon prepayment experience |
| 'G' | Interest payments may be deferred and added to principal |
| 'H' | Interest accretions to principal payable at market price |

OPERATIONS:
Five World Trade Center
New York, N.Y. 10048
Telephone (212) 909-2000

| | | | | |
|---|---|---|---|---|
| Atlanta | Boston | Chicago | Dallas | Houston |
| Los Angeles | Philadelphia | San Francisco | San Juan | |
| London | Geneva | Melbourne | Tokyo | |

CUSTOMER COPY

**FIRST BOSTON**

THE FIRST BOSTON CORPORATION
**PARK AVENUE PLAZA, NEW YORK, N.Y. 10055**

CONFIRMATION AND STATEMENT

| | | A/C | | TRADE DATE | SETTLEMENT DATE | CUST. NO. | TYPE | REP. | | SECURITY CODES |
|---|---|---|---|---|---|---|---|---|---|---|
| YOU SOLD | 61170 | 21 | 15 | 08/30/1994 | 09/30/1994 | 2D86H | 0 | 1 | 28R | * 120772 623 |

21 AC CUSIP-912827K68 JD-94242

MARRIOTT OWNERSHIP RESORTS INC
ATT MICHAEL DEARING
1200 U S HIGHWAY 98 SOUTH SUITE 19
LAKELAND FL 33801

MELLON BANK PITTS/TRUST
ABA 043000261
A/C 199-8036 MARRIOTT INTL

IRS NO.521 32 0904

WE CONFIRM ACCORDING TO TRANSACTION CODE BELOW AND THE TERMS STATED HEREON AND ON THE REVERSE HEREOF

| NUMBER OF DAYS ACCRUED INTEREST | SECURITY | | | RATE | MATURITY |
|---|---|---|---|---|---|
| | U S TREASURY NOTES | | 04/30/1993 | 5.1250 | 04/30/1998 |
| | FACE OR SHARES | PRICE | PRINCIPAL | INT.–DIV.–DISC. | PROCEEDS |
| 123 | 50,000,000 | 96.7500 | 48,375,000.00 | 856,487.77 | 49,231,487.77 |

INTEREST AT 04.125 PCT FOR 30 DYS
PROCEEDS PAYABLE IN FEDERAL FUNDS

PLUS MARGIN 419,882.69
--------------
VALUE OF COLLATRL 49,651,370.46
REPO INTEREST 170,676.59

IF THIS CONFIRMATION IS NOT IN ALL RESPECTS IN ACCORDANCE WITH YOUR UNDERSTANDING, PLEASE NOTIFY US IMMEDIATELY.

*** OUR NEW NAME IS CS FIRST BOSTON CORPORATION ***

AMOUNT DUE
YOU 49,822,047.05

**TRANSACTION CODE**

11 - AS YOUR AGENT WE HAVE SOLD FOR YOUR ACCOUNT AND RISK.
12 - AS AGENT FOR PURCHASER WE HAVE BOUGHT FROM YOU.
13 - AS AGENT FOR PURCHASER WE HAVE BOUGHT THROUGH YOU.
14 - YOU HAVE BOUGHT FOR OUR ACCOUNT AND RISK.
15 - AS PRINCIPAL AND FOR OUR OWN ACCOUNT WE HAVE BOUGHT FROM YOU.
16 - AS REPRESENTATIVE OF ONE OR MORE OF THE SEVERAL PURCHASERS, WE HAVE BOUGHT FROM YOU.
17 - WE HEREBY RECEIVE FROM YOU

21 - AS YOUR AGENT WE HAVE BOUGHT FOR YOUR ACCOUNT AND RISK.
22 - AS AGENT FOR SELLER WE HAVE SOLD TO YOU
23 - AS AGENT FOR SELLER WE HAVE SOLD THROUGH YOU
24 - YOU HAVE SOLD FOR OUR ACCOUNT AND RISK
25 - AS PRINCIPAL AND FOR OUR OWN ACCOUNT WE HAVE SOLD TO YOU.
26 - AS REPRESENTATIVE OF ONE OR MORE OF THE SEVERAL PURCHASERS, WE HAVE SOLD TO YOU.
27 - WE HEREBY DELIVER TO YOU

MAR - 008517

## TERMS OF AGREEMENT

[illegible] AND THE FIRST BOSTON CORPORATION [illegible] TRANSACTION DESCRIBED ON THE FACE [illegible] WITH TERMS AND CONDITIONS

[illegible] by incorporates and all transactions hereunder are subject to [illegible] of any Customer Agreement and any other written agreement between Customer and FBC, (b) the Uniform Practices for the Clear[illegible] of Mortgage-Backed Securities and (c) the constitution, [illegible] interpretations and usages of the exchange or market [illegible] (if any) where executed and of the National Association of Securities Dealers, Inc. (NASD), the Securities and Exchange Commission (SEC) and the Board of Governors of The Federal Reserve System in all cases where [illegible] Provisions contained in and remedies provided by this confirmation [illegible] more or less expansive than any provision contained in [illegible] by any agreement with Customer (including without limita[illegible] remedies that cover the same subject matter) shall not be [illegible] with each other and all such provisions and remedies [illegible] applicable and available.

[illegible] the transaction was as agent we acted as your broker (or if [illegible] broker both for yourself and the party(s) on the other side) and not [illegible] our account. If our capacity was as principal we bought from or sold to [illegible] for our own account (or if indicated for our joint account with [illegible] the account of an underwriting syndicate of which we are a [illegible] capacity was for your own account unless you expressly specified [illegible] in writing and gave us sufficient information (including without [illegible] requested by us) [illegible] prior to the trans[illegible] identify and rely upon the credit of another party or your credit in [illegible] capacity. Time of execution will be furnished upon request.

[illegible] we acted as your agent in this transaction, the amount of any commission or other remuneration to be paid to us by you is stated on the face hereof. If we also acted as agent for another person, upon request we will furnish the name of that person, any remuneration received from that person, and such further information as may be required by the rules and regulations of the SEC and any other body having jurisdiction over the transaction. Commission rates are subject to negotiation and any commission charged Customer in this transaction may be more or less than the commission charged to or by others in similar transactions.

[illegible] Until paid for in full by you, securities sold to you or bought for you may be hypothecated under circumstances which will permit the commingling thereof with securities carried for the account of other customers. We may pledge or repledge on such terms as we deem appropriate in our sole discretion any securities pledged to us by you.

[illegible] If this transaction is a purchase by you and sufficient funds are not already in your account with us, it is agreed that you will make the payment for the securities described on the face hereof promptly in accordance with the terms of this confirmation, that we shall not be deemed to have transferred or be required to transfer such securities to you until we have received such full payment therefor and that you shall not sell such securities prior to making such payment. All confirmations and book entries purporting to evidence or effect such transfer to you of such securities shall be deemed to be provisional and without effect until such full payment therefor has been received. If this transaction is a sale by you and the securities described on the face hereof are not already held in your account with us and are not marked short, we are acting upon your representation that you or your principal own such securities, and it is agreed that you will promptly deliver such securities to us. If full payment for securities sold to or bought for you in this transaction is not received by us on or before the settlement date, or if securities bought from or sold (except short sales) for you in this transaction are not delivered to us promptly and in proper form, you shall be deemed to be in default in respect of this transaction.

5. The transaction and all other transactions with us and our affiliates have been entered into in consideration of each other. If Customer or any of its affiliates (collectively, the Customer Parties) shall default in respect of this or any other transaction with FBC or any of its affiliates (collectively, the FBC Parties), state that any Customer Party will not perform any obligation to any FBC Party, apply for, consent to or be the subject of any application or petition for the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar person of itself or of all or a substantial part of its property, admit in writing its inability, or become generally unable, to pay its debts as such debts become due, make a general assignment for the benefit of its creditors, file or be the subject of the filing or entry of a petition or order for relief under Title 11 of the U.S. Code or any similar law of any jurisdiction regarding reorganization, liquidation, dissolution, insolvency or relief of debtors or of an application for a protective decree under Section 5 of the Securities Investor Protection Act of 1970, or if any FBC Party believes that it may not be able to apply without delay property that it or any other FBC Party is holding or expects to receive from any Customer Party against any obligations to such first FBC Party, each FBC Party may (a) cancel or otherwise liquidate this and any other transaction between it and you without prior notice to you, (b) set off any obligation owing by it to you against any of your obligations or any of your subsidiaries' obligations owing to it or any other FBC Party, and (c) exercise any remedy on any property securing any obligations to it or any other FBC Party. Any prior notice period required by agreement or otherwise prior to exercise of such remedies may be shortened or eliminated by any FBC Party if in its discretion it is reasonable to do so under the circumstances. Customer shall be liable to each FBC Party for all costs and expenses, including attorney's fees and expenses, incurred in connection with the enforcement or collection by such FBC Party of its rights or claims hereunder against any Customer Party.

7. Customer hereby grants to each FBC Party a security interest in all securities, moneys or other property, and all proceeds of any of the foregoing, now or hereafter held or carried by any FBC Party in Customer's account(s) with any FBC Party or otherwise as collateral security for the payment of any and all obligations and liabilities of Customer and its subsidiaries to any FBC Party, now existing or arising hereafter. Customer hereby irrevocably constitutes and appoints each FBC Party its true and lawful agent and attorney-in-fact, with full power to act in the name of Customer and on its behalf, with respect to the execution of all instruments and the taking of all action necessary or desirable to effectuate the rights and remedies provided hereunder and by applicable law to any FBC Party.

8. At the time this transaction was executed or subsequent thereto, we (or others acting for our account) may have effected transactions which stabilize or maintain the market price of the securities described on the face hereof (or other securities of the same issuer), at a level above that which might otherwise prevail in the open market. Such transactions may have been affected on any market where these securities are traded. Such stabilization, if commenced, may be discontinued at any time. FBC may have made and may continue to make purchases and sales of securities of the same issue involved in this transaction (or other securities of the same issuer) for its own account or for the accounts of others, and such transactions, if made, may be discontinued at any time. There may not have been and there may not be in the future any market in such securities other than that made by FBC.

9. We (or others acting for our account) reserve the right to offer for sale and/or to sell from time to time as principal or agent an amount of the securities described on the face hereof in excess of the amount owned by us (or the Seller for whom we act as agent) at the time such offers and/or sales are made. Such offers or sales (sometimes known as "short sales" or "overallotments") may or may not be made in conjunction with stabilizing transactions described above.

10. Customer agrees that, within 24 hours after FBC's request, Customer will deliver to FBC a sufficient amount of the securities subject to this agreement, or otherwise provide collateral of a type and in form acceptable to FBC, so that the then current market value of the securities and other collateral then held by FBC with respect to this transaction (a) in the case of a reverse repurchase agreement, resale or other transaction with respect to which Customer was required to provide FBC collateral at the outset of the transaction, bears the same ratio to the then outstanding amount of Customer's obligations under such transaction (taking into account accrued interest on the collateral and on the transaction) as the market value of such required collateral on the date of this confirmation bears to the outstanding amount of Customer's obligations under this transaction on the date hereof, and (b) in all other cases, equals at least the amount by which the price Customer is to pay for securities as set forth on the face of this confirmation exceeds the then current market value of such securities or by which the then current market value of securities that Customer is to sell exceeds the amount Customer is to be paid therefor as set forth on the face hereof, as the case may be.

11. If this transaction relates to a debt security, call features may exist which could affect the yield thereof. Further information pertaining to the yield on debt securities is available upon request.

12. If this transaction is described on the face hereof as a "When-Issued" or "When Distributed" contract, then this contract shall be subject to the special requirements for such contracts, if any, of the market where executed. This contract shall be settled and payment therefor made only at such time and place, in such manner, and by delivery of such securities and/or other property received by us as such market may require or shall be cancelled if the proposal pursuant to which the securities were to be issued or distributed has been abandoned or materially changed or if the securities which are the subject to the contract have been materially changed.

13. If a security underlying any transaction hereunder is or becomes subject to a notice of adverse claim received by the issuer of such security (or its agent) from or on behalf of the registered holder of such security, then upon the request of the transferee and simultaneously with the transfer by the transferee to the transferor of such a disputed security (or any right to receive such a disputed security from the issuer or its agent if such disputed security is in the possession of the issuer or its agent), the transferor shall pay to the transferee an amount equal to the amount theretofore paid by the transferee to the transferor for such disputed security. All transfers and payments pursuant to this Section 13 shall be effected in the same manner as the transfer and payment in the transaction in which such disputed security was transferred by the transferor to the transferee.

14. This Agreement shall inure to the benefit of FBC, its affiliates, and its and their successors. The parties acknowledge that this transaction is a "securities contract" within the meaning of 11 U.S.C. Section 741(7).

15. This confirmation shall be deemed to have been accepted and signed by Customer if not objected to in writing by Customer to FBC within 10 days of receipt hereof. The Terms of Agreement set forth on the first confirmation of this form delivered to Customer shall be deemed to have been accepted and signed by Customer with respect to each and every transaction in respect of which this form of confirmation is delivered, unless Customer shall have objected in writing to FBC within 10 days of receipt of such first confirmation.

16. In the event any one or more provisions contained in this confirmation shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this confirmation shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**17. In connection with any claim arising out of or relating to this transaction or any other transaction between Customer and any FBC Party or between FBC and any affiliate of Customer, Customer and FBC each irrevocably (a) submits (i) at the option of FBC or Customer, to binding arbitration in accordance with the rules then obtaining of either the National Association of Securities Dealers, Inc., or the Board of Directors of the New York Stock Exchange and (ii) to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, (b) waives any objection to the laying of venue in such court, (c) waives any claim that any suit, action or proceeding in such court has been brought in an inconvenient forum, (d) waives the right to object that such court does not have jurisdiction over Customer or FBC, as the case may be, (e) waives the right to trial by jury in any suit, action or proceeding brought in respect of any such transaction, and (f) designates the Secretary of State of the State of New York as its agent for the service of process (provided that Customer and FBC may by written notice to the other change its designation of agent to a specified person located in the Borough of Manhattan). This confirmation and all transactions hereunder shall be governed by and construed in accordance with the laws of the State of New York (excluding choice or conflict of law doctrine) and all applicable federal laws and regulations. Any arbitration hereunder shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.**

THE FIRST BOSTON CORPORATION

### EXPLANATION OF SYMBOLS

| SYMBOL | |
|---|---|
| 'A' | We acted as agent for both buyer and seller charging you a commission, as shown on the face hereof. Other remuneration will be received by us in this transaction. Source and amount will be furnished upon request |
| 'B' | An odd-lot differential or equivalent fee has been charged in this transaction, the amount of which will be furnished upon request |
| 'C' | We acted as principal in this transaction without risk. The amount of our markup or markdown is set forth on the face hereof |
| 'D' | Other remuneration will be received by us in this transaction. Source and amount are set forth on the face hereof |
| 'E' | No periodic payments-callable below maturity value without notice by mail to holder unless registered |
| 'F' | Actual yield may vary depending upon prepayment experience |
| 'G' | Interest payments may be deferred and added to principal |
| 'H' | Interest accretions to principal payable at market price |

CUSTOMER COPY

**FIRST BOSTON**

THE FIRST BOSTON CORPORATION
**PARK AVENUE PLAZA, NEW YORK, N.Y. 10055**

OPERATIONS
Five World Trade Center
New York N Y 10048
Telephone (212) 909-2000

Atlanta Boston Chicago Dallas Houston
Los Angeles Philadelphia San Francisco San Juan
London Geneva Melbourne Tokyo

**CONFIRMATION AND STATEMENT**

| | TRADE NO. | A/C | TRANS CODE | TRADE DATE | SETTLEMENT DATE | CUST. NO. | TYPE | REP. | | SECURITY CODES | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| YOU SOLD | 60028 | 21 | 15 | 08/16/1994 | 08/31/1994 | 2D86H 0 | 1 | 28R | * | 120797 | 268 |

21 AC CUSIP-912827M25 JD-94228

MARRIOTT OWNERSHIP RESORTS INC
ATT MICHAEL DEARING
1200 U S HIGHWAY 98 SOUTH SUITE 19
LAKELAND FL 33801

MELLON BANK PITTS/TRUST
ABA 043000261
A/C 199-8036 MARRIOTT INTL

IRS NO.521 32 0904

WE CONFIRM ACCORDING TO TRANSACTION CODE BELOW AND THE TERMS STATED HEREON AND ON THE REVERSE HEREOF

| NUMBER OF DAYS ACCRUED INTEREST | SECURITY | | | | RATE | MATURITY |
|---|---|---|---|---|---|---|
| | U S TREASURY NOTES | | | 08/31/1993 | 4.7500 | 08/31/1998 |
| | FACE OR SHARES | PRICE | | PRINCIPAL | INT.-DIV.-DISC. | PROCEEDS |
| 169 | 10,000,000 | 94.6341 | | 9,463,410.00 | 218,138.59 | 9,681,548.59 |

INTEREST AT 04.125 PCT FOR 15 DYS — LESS MARGIN 218,138.59
CORRECT 09/23/94 FOR DATE CHNG MATURITY.
--------------
NT= 94266-61197 — VALUE OF COLLATRL 9,463,410.00
PROCEEDS PAYABLE IN FEDERAL FUNDS — REPO INTEREST 16,265.24

IF THIS CONFIRMATION IS NOT IN ALL RESPECTS IN ACCORDANCE WITH YOUR UNDERSTANDING, PLEASE NOTIFY US IMMEDIATELY.

*** OUR NEW NAME IS CS FIRST BOSTON CORPORATION ***

AMOUNT DUE YOU 9,479,675.24

**TRANSACTION CODE**

11 - AS YOUR AGENT WE HAVE SOLD FOR YOUR ACCOUNT AND RISK
12 - AS AGENT FOR PURCHASER WE HAVE BOUGHT FROM YOU
13 - AS AGENT FOR PURCHASER WE HAVE BOUGHT THROUGH YOU
14 - YOU HAVE BOUGHT FOR OUR ACCOUNT AND RISK
15 - **AS PRINCIPAL AND FOR OUR OWN ACCOUNT WE HAVE BOUGHT FROM YOU.**
16 - AS REPRESENTATIVE OF ONE OR MORE OF THE SEVERAL PURCHASERS, WE HAVE BOUGHT FROM YOU
17 - WE HEREBY RECEIVE FROM YOU
21 - AS YOUR AGENT WE HAVE BOUGHT FOR YOUR ACCOUNT AND RISK.
22 - AS AGENT FOR SELLER WE HAVE SOLD TO YOU
23 - AS AGENT FOR SELLER WE HAVE SOLD THROUGH YOU
24 - YOU HAVE SOLD FOR OUR ACCOUNT AND RISK.
25 - **AS PRINCIPAL AND FOR OUR OWN ACCOUNT WE HAVE SOLD TO YOU.**
26 - AS REPRESENTATIVE OF ONE OR MORE OF THE SEVERAL PURCHASERS, WE HAVE SOLD TO YOU
27 - WE HEREBY DELIVER TO YOU

MAR - 008545

## TERMS OF AGREEMENT

IT IS AGREED BY CUSTOMER AND THE FIRST BOSTON CORPORATION (FBC) THAT THIS TRANSACTION, AS DESCRIBED ON THE FACE HEREOF, IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

1 This confirmation hereby incorporates and all transactions hereunder are subject to (a) the provisions of any Customer Agreement and any other written agreement between Customer and FBC, (b) the Uniform Practices for the Clearance and Settlement of Mortgage-Backed Securities, and (c) the constitution, by-laws, rules, regulations, interpretations, and usages of the exchange or market (and its clearing house, if any) where executed and of the National Association of Securities Dealers, Inc. (NASD), the Securities and Exchange Commission (SEC) and the Board of Governors of The Federal Reserve System, in all cases where applicable. Provisions contained in and remedies provided by this confirmation which are additional to or more or less expansive than any provision contained in or remedies provided by any agreement with Customer (including without limitation, provisions or remedies that cover the same subject matter) shall not be deemed to [illegible] conflict with each other, and all such provisions and remedies shall be ap[illegible]able and available

2 If our capacity in this transaction was as "agent," we acted as your broker (or, if indicated, as broker both for yourself and the party(s) on the other side) and not for our own account. If our capacity was as "principal," we bought from or sold to you as dealer for our own account (or, if indicated, for our joint account with another firm or for the account of an underwriting syndicate of which we are a member). Your capacity was for your own account unless you expressly specified otherwise to us in writing and gave us sufficient information (including, without limitation, all financial information requested by us) in writing prior to the transaction for us to identify and rely upon the credit of another party or your credit in another capacity. Time of execution will be furnished upon request

3 If we acted as your agent in this transaction, the amount of any commission or other remuneration to be paid to us by you is stated on the face hereof. If we also acted as agent for another person, upon request we will furnish the name of that person, any remuneration received from that person, and such further information as may be required by the rules and regulations of the SEC and any other body having jurisdiction over the transaction. Commission rates are subject to negotiation, and any commission charged Customer in this transaction may be more or less than the commission charged to or by others in similar transactions

4 Until paid for in full by you, securities sold to you or bought for you may be hypothecated under circumstances which will permit the commingling thereof with securities carried for the account of other customers. We may pledge or repledge on such terms as we deem appropriate in our sole discretion any securities pledged to us by you

5 If this transaction is a purchase by you and sufficient funds are not already in your account with us, it is agreed that you will make the payment for the securities described on the face hereof promptly in accordance with the terms of this confirmation, that we shall not be deemed to have transferred or be required to transfer such securities to you until we have received such full payment therefor, and that you shall not sell such securities prior to making such payment. All confirmations and book entries purporting to evidence or effect such transfer to you of such securities shall be deemed to be provisional and without effect until such full payment therefor has been received. If this transaction is a sale by you and the securities described on the face hereof are not already held in your account with us and it is not marked short, we are acting upon your representation that you or your principal own such securities, and it is agreed that you will promptly deliver such securities to us. If full payment for securities sold to or bought for you in this transaction is not received by us on or before the settlement date, or if securities bought from or sold (except short sales) for you in this transaction are not delivered to us promptly, and in proper form, you shall be deemed to be in default in respect of this transaction

6 This transaction and all other transactions with us and our affiliates have been entered into in consideration of each other. If Customer or any of its affiliates (collectively, the "Customer Parties") shall default in respect of this or any other transaction with FBC or any of its affiliates (collectively, the "FBC Parties"), state that any Customer Party will not perform any obligation to any FBC Party, apply for, consent to or be the subject of any application or petition for the appointment of or the taking of possession by, a receiver, custodian, trustee, liquidator or similar person of itself or of all or a substantial part of its property, admit in writing its inability, or become generally unable, to pay its debts as such debts become due, make a general assignment for the benefit of its creditors, file or be the subject of the filing or entry of a petition or order for relief under Title 11 of the U.S. Code or any similar law of any jurisdiction regarding reorganization, liquidation, dissolution, insolvency, or relief of debtors or of an application for a protective decree under Section 5 of the Securities Investor Protection Act of 1970, or if any FBC Party believes that it may not be able to apply without delay property that it or any other FBC Party is holding or expects to receive from any Customer Party against any obligations to such first FBC Party, each FBC Party may (a) cancel or otherwise liquidate this and any other transaction between it and you without prior notice to you, (b) set off any obligation owing by it to you against any of your obligations or any of your subsidiaries obligations owing to it or any other FBC Party, and (c) realize upon any property securing any obligations to it or any other FBC Party. Any grace or notice period required by agreement or custom prior to exercise of such remedies may be shortened or eliminated by any FBC Party if in its discretion, it is reasonable to do so under the circumstances. Customer shall be liable to each FBC Party for all costs and expenses, including attorney's fees and expenses, incurred in connection with the enforcement or collection by such FBC Party of its rights or claims hereunder against any Customer Party

7 Customer hereby grants to each FBC Party a security interest in all securities, moneys or other property, and all proceeds of any of the foregoing, now or hereafter held or carried by any FBC Party in Customer's account(s) with any FBC Party or otherwise as collateral security for the payment of any and all obligations and liabilities of Customer and its subsidiaries to any FBC Party now existing or arising hereafter. Customer hereby irrevocably constitutes and appoints each FBC Party its true and lawful agent and attorney in fact with full power to act in the name of Customer and on its behalf, with respect to the exercise of all instruments and the taking of all action necessary or desirable to effectuate the rights and remedies provided hereunder and by applicable law to any FBC Party

8 At the time this transaction was executed or subsequent thereto, we (or others acting for our account) may have effected transactions which stabilize or maintain the market price of the securities described on the face hereof (or other securities of the same issuer), at a level above that which might otherwise prevail in the open market. Such transactions may have been effected on any market where these securities are traded. Such stabilization, if commenced, may be discontinued at any time. FBC may have made and may continue to make purchases and sales of securities of the same issue involved in this transaction (or other securities of the same issuer) for its own account or for the accounts of others, and such transactions, if made, may be discontinued at any time. There may not have been and there may not be in the future any market in such securities other than that made by FBC

9 We (or others acting for our account) reserve the right to offer for sale and/or to sell from time to time as principal or agent an amount of the securities described on the face hereof in excess of the amount owned by us (or the Seller for whom we act as agent) at the time such offers and/or sales are made. Such offers or sales (sometimes known as "short sales" or "overallotments") may or may not be made in conjunction with stabilizing transactions described above

10 Customer agrees that, within 24 hours after FBC's request, Customer will deliver to FBC a sufficient amount of the securities subject to this agreement, or otherwise provide collateral of a type and in form acceptable to FBC, so that the then current market value of the securities and other collateral then held by FBC with respect to this transaction (and the case of a reverse repurchase agreement, resale or other transaction with respect to which Customer was required to provide FBC collateral at the outset of the transaction, bears the same ratio to the then outstanding amount of Customer's obligations under such transaction (taking into account accrued interest on the collateral and on the transaction) as the market value of such required collateral on the date of the confirmation bears to the outstanding amount of Customer's obligations under this transaction on the date hereof, and (b) in all other cases, equals at least the amount by which the price Customer is to pay for securities as set forth on the face of this confirmation exceeds the then current market value of such securities or by which the then current market value of securities that Customer is to sell exceeds the amount Customer is to be paid therefor as set forth on the face hereof, as the case may be

11 If this transaction relates to a debt security, call features may exist which could affect the yield thereof. Further information pertaining to the yield on debt securities is available upon request

12 If this transaction is described on the face hereof as a "When Issued" or "When Distributed" contract, then this contract shall be subject to the special requirements for such contracts, if any, of the market where executed. This contract shall be settled and payment therefor made only at such time and place, in such manner, and by delivery of such securities and/or other property received by us as such market may require or shall be cancelled if the proposal pursuant to which the securities were to be issued or distributed has been abandoned or materially changed or if the securities which are the subject to the contract have been materially changed

13 If a security underlying any transaction hereunder is or becomes subject to a notice of adverse claim received by the issuer of such security (or its agent) from or on behalf of the registered holder of such security, then upon the request of the transferee and simultaneously with the transfer by the transferee to the transferor of such a disputed security (or any right to receive such a disputed security from the issuer or its agent if such disputed security is in the possession of the issuer or its agent), the transferor shall pay to the transferee an amount equal to the amount theretofore paid by the transferee to the transferor for such disputed security. All transfers and payments pursuant to this Section 13 shall be effected in the same manner as the transfer and payment in the transaction in which such disputed security was transferred by the transferor to the transferee

14 This Agreement [illegible] and its and their successors. The parties [illegible] securities contract" within the meaning of 11 U.S.C. Section 741(7)

15 This confirmation shall be deemed to have been accepted and signed by Customer if not objected to in writing by Customer to FBC within 10 days of receipt hereof. The Terms of Agreement set forth on the first confirmation of this form delivered to Customer shall be deemed to have been accepted and signed by Customer with respect to each and every transaction in respect of which this form of confirmation is delivered, unless Customer shall have objected in writing to FBC within 10 days of receipt of such first confirmation

16 In the event any one or more provisions [illegible] in this confirmation shall for any reason be held to be [illegible] in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this confirmation shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein

17 In connection with any claim arising out of or relating to this transaction or any other transaction between Customer and any FBC Party or between FBC and any affiliate of Customer, Customer and FBC each irrevocably (a) submits (i) at the option of FBC or Customer, to binding arbitration in accordance with the rules then obtaining of either the National Association of Securities Dealers, Inc., or the Board of Arbitration of the New York Stock Exchange, and (ii) to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, (b) waives any objection to the laying of venue in such court, (c) waives any claim that any suit, action or proceeding in such court has been brought in an inconvenient forum, (d) waives the right to object that such court does not have jurisdiction over Customer or FBC, as the case may be, (e) waives the right to trial by jury in any suit, action or proceeding brought in respect of any such transaction, and (f) designates the Secretary of State of the State of New York as its agent for the service of process (provided that Customer and FBC may by written notice to the other change its designation of agent to a specified person located in the Borough of Manhattan). This confirmation and all transactions hereunder shall be governed by and construed in accordance with the laws of the State of New York (excluding choice or conflict of law doctrine) and all applicable federal laws and regulations. Any arbitration hereunder shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.

THE FIRST BOSTON CORPORATION

### EXPLANATION OF SYMBOLS

| SYMBOL | |
|---|---|
| 'A' | We acted as agent for both buyer and seller charging you a commission, as shown on the face hereof. Other remuneration will be received by us in this transaction. Source and amount will be furnished upon request |
| 'B' | An odd-lot differential or equivalent fee has been charged in this transaction, the amount of which will be furnished upon request |
| 'C' | We acted as principal in this transaction without risk. The amount of our markup or markdown is set forth on the face hereof |
| 'D' | Other remuneration will be received by us in this transaction. Source and amount are set forth on the face hereof |
| 'E' | No periodic payments callable below maturity value without notice by mail to holder unless registered |
| 'F' | Actual yield may vary depending upon prepayment experience |
| 'G' | Interest payments may be [illegible] and added to principal |
| 'H' | Interest accretions [illegible] market price |

MAR - 008546

UNITED STATES COURT OF FEDERAL CLAIMS

---oOo---

MARRIOTT INTERNATIONAL
RESORTS, INC., et al.,

Plaintiffs,

vs.

No. 01-256T
No. 01-257T

THE UNITED STATES,

Defendant.
____________________________/

ORIGINAL

**DEPOSITION OF ROY HAHN**

THURSDAY, FEBRUARY 13, 2003

Reported by:
KELLIE A. ZOLLARS, CSR, RPR, CRR
CSR License No. 5735

UCCELLI & ASSOCIATES
Certified Shorthand Reporters
1243 Mission Road
South San Francisco, California 94080
Tel: (650) 952-0774

GOVERNMENT EXHIBIT
14

I N D E X


| EXAMINATION BY | Page |
|---|---|
| MR. RUCHELMAN | 4 |


E X H I B I T S


| EXHIBIT | Page |
|---|---|


(No exhibits were marked.)

BE IT REMEMBERED THAT, pursuant to SUBPOENA DUCES TECUM, and on THURSDAY, FEBRUARY 13, 2003, commencing at the hour of 9:45 a.m. thereof, at the offices of McDERMOTT, WILL & EMERY, 3150 Porter Drive, Palo Alto, California, before me, KELLIE A. ZOLLARS, CSR No. 5735, a Certified Shorthand Reporter in the State of California, personally appeared

**ROY HAHN**

called as a witness by the Defendant; who, having been by me first duly sworn, was thereupon examined and interrogated as hereinafter set forth.

---oOo---

Appearing as counsel on behalf of Defendant:

CHARLES M. RUCHELMAN, ATTORNEY AT LAW
U.S. DEPARTMENT OF JUSTICE, TAX DIVISION
COURT OF FEDERAL CLAIMS SECTION
555 Fourth Street, N.W., Room 8112
Washington, D.C. 20001
Telephone: (202) 616-3423

Appearing as counsel on behalf of Plaintiffs:

ALEX E. SADLER, ATTORNEY AT LAW
Law Offices of CROWELL MORING
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone: (202) 624-2704

Appearing as counsel on behalf of Roy Hahn:

CHRISTOPHER KLIEFOTH, ATTORNEY AT LAW
Law Offices of McDERMOTT, WILL & EMERY
600 13th Street, N.W.
Washington, D.C. 20005-3096

---oOo---

**EXAMINATION BY MR. RUCHELMAN**

MR. RUCHELMAN: Q. Good morning, Mr. Hahn. My name is Charles Ruchelman, I'm an attorney with the United States Department of Justice in the Tax Division. And this is your deposition in the case of Marriott International Resorts Limited Partnership, et al., versus United States, which is docketed in the United States Court of Federal Claims; and we're going to hold this deposition, which is being taken in accordance with the rules of the United States Court of Federal Claims. I'm going to ask you a few questions about what you know about the facts and allegations pertaining to this lawsuit.

Just a few simple ground rules in terms of taking a deposition. If I've asked you a question and you do not understand it, please let me know; and I'll try and rephrase the question so that you can understand it.

A. Many of the investment banking clients that we have are interested in minimizing their taxes. And so the advice we give includes trying to help them minimize the taxes that they would pay.
Q. And are you involved in that service?
A. Yes.
Q. The tax strategies?
A. Yes, I am.
Q. Now, back to page 8 again. Where it says "Tax and Accounting." And it says "Tax and Accounting: Leader of Chenery's West Coast operations, Roy Hahn specializes in understanding the complexity of today's tax codes while anticipating the changes of tomorrow. With years of experience working for the world's top accounting firms, Roy is able to engineer smart, cutting-edge financial programs that leverage current economic climates and deliver powerful tax advantages." Can you tell me what "engineer smart, cutting-edge financial programs" means?
I guess focusing on the word "engineer."
A. Well, the -- many of our clients are

international companies that have the need to harmonize both accounting and tax regimes in varying countries. So I think the word "engineer" was an attempt to capture the need to achieve that harmonization in dealing in varying jurisdictions.

Q. Okay. So does "engineer" mean to develop? Is that -- or design?

A. Yes.

Q. Okay.

A. Yes.

Q. And, then, what does "leverage current economic climates" mean? What is that referring to?

A. I believe it would mean that in trying to come up with advice to clients, being abreast of economic -- economic situations around the world are a part of engineering an effective strategy.

Q. Okay. And last question on this document. If you turn to the next page, which is page 9. There at the top paragraph it says, "Let's face it - when it comes to taxes, no one likes to fool around. There's a lot of risk." What does that mean? What kind of

risk are you talking about there?
A. I think -- I think risk in the sense that all cross-border or even domestic strategies have allocations of risk between the parties. So I think I used the word risk as meant to encompass just a broad category of risk that would be inherent in any of the strategies.
Q. Are you referring to financial risk?
A. It would include financial risk.
Q. Would it include market risk?
A. Yes, it would include market risk.
Q. Does that include risk of government oversight from the Internal Revenue Service?
A. Certainly.
Q. It's a great website.
A. Thank you.
Q. Let's talk now, go back in history a little bit. And go back to 1994, calendar year 1994, when you were a consultant. What type of services were you providing in calendar year 1994?
A. My time was spent significantly being a consultant to CSFB. I was asked to primarily provide internal U.S. federal tax support for structuring suggestions that the firm was

either implementing or considering.
Q. Okay. How did you get hooked up with CSFB? How did you form a relationship with them?
A. One of my former partners at Coopers and Lybrand had recently left the firm to work for CSFB. And he asked if I would be willing to consult with CSFB in the income tax area.
Q. What was that person's name?
A. Ed Wallace.
Q. Did you work for -- provide consulting services for other entities as well?
A. Yes.
Q. Who were they?
A. I did small matters of work for Merrill Lynch. I spoke briefly with the people at Arthur Andersen. There may have been others, but those are the names I recall.
Q. Sure.
Who at Merrill Lynch did you work with?
A. I don't recall.
Q. How about Goldman Sachs? Did you work with them at all in 1994?
A. I wasn't paid anything by Goldman Sachs in 1994, but I may well have met and spoke with

them.
Q. Okay. Did you work with an individual named David Ackart, A-c-k-a-r-t, at Goldman?
A. Yes. I was introduced to David. I don't believe we ever closed a transaction. In which I was a consultant and David was at Goldman. But, yes, I remember David.
Q. And in 1994 where was your office located?
A. I was working out of my home.
Q. And that was in San Francisco?
A. On Chenery Street.
Q. Can you tell me a little bit about the arrangement that you had with CS First Boston? Were you paid a consulting fee per transaction? Was there a retainer? Or was there, you know, a monthly salary?
MR. SADLER: Objection. Compound.
THE WITNESS: I was paid for the time I spent working at CSFB. I recall there was an hourly billing rate. I was required to send CSFB a statement every month, which included hours worked and any expenses for which I was claiming reimbursements.
MR. RUCHELMAN: Q. Did you bring clients to CSFB?

A. No.
Q. They had the clients and you worked for their clients?
A. Yes.
Q. In 1994 with whom at CS First Boston did you work?
A. My main point of contact at CSFB was Phil Hamon.
Q. Okay. Did you report to Mr. Hamon?
A. Yes, I did.
Q. How did you meet Mr. Hamon?
A. I met Mr. Hamon while he was an employee at Mitsubishi Credit sometime in the 1980s.
Q. You mentioned Ed Wallace, you worked with Ed Wallace. Did you work with Mr. Eckelstein?
A. I don't recall that name.
Q. What about Don Kendall?
A. Yes.
Q. What do you remember about Don Kendall?
A. My recollection is that Don was the relationship manager at CSFB for some of the clients. Don was a very outgoing, demonstrative individual. Those are my current recollections.
Q. Okay. What about an individual named

Mr. Odebayo? O-d-e-b-a-y-o. Sometimes called Bayo, I think. B-a-y-o.

A. Yes, I recall Bayo as well.

Q. And was there a certain department that you worked in, or worked for, as a consultant for CSFB?

A. There likely was, but I don't know what it was.

Q. Okay. Do you presently have a working relationship with CSFB?

A. No.

Q. When did the arrangement end?

MR. SADLER: Objection. Vague.

MR. RUCHELMAN: Q. When did the arrangement with CSFB end?

A. I don't remember.

Q. Do you remember -- okay. Strike that last question. Or that last phrase.

Could you explain to me the history of your professional relationship with Marriott International.

MR. SADLER: Objection. Assumes fact not testified to already.

MR. RUCHELMAN: Well, it's backup. Did you have a working relationship with Marriott

International at any time?
A. No.
Q. Did you work on any transactions with or for Marriott International?
A. Other than the one we are discussing?
Q. Including the one we're discussing?
A. Yes.
Q. And what transaction was that? Or transactions. Was this the only transaction you worked on for Marriott International?
A. Yes.
Q. Okay. And what services did you provide for Marriott International?
A. I didn't provide any services to Marriott.
Q. Well, you said you worked on a transaction with them or a deal. What were you doing for them?
A. Well, in my capacity as a consultant to CSFB, I was asked to be a part of an explanation to the Marriott team. And I think that was the extent of my involvement.
Q. Okay. An explanation of the transaction that is at issue in this lawsuit?
A. Yes.
Q. Okay. In 1994 were you aware that Marriott

was in the timeshare business?
A. Yes.
Q. Okay. And how did you become aware of that?
A. I remember that during our discussions some of the Marriott team members talked about the notes receivable held by Marriott relating to the sale of interests in the Marriott properties, the so-called timeshares.
Q. What Marriott team members? Do you recall individual's names?
A. Lester Pulse and Griff Lindsey.
Q. Do you recall the name Dawn Morton. D-a-w-n, M-o-r-t-o-n?
A. No.
Q. What about Michael Dearing? From Marriott. Do you recall speaking with him?
A. No.
Q. Were you aware in 1994 that Marriott held mortgages on the timeshare units that it sold?
A. Yes.
Q. Were you aware that they were fixed rate mortgages?
A. I remember that the rates of interest were either fixed or floating.

A. Yes.
Q. And do you recall what the name of that department was?
A. I do not.
Q. Is that the department that you were working with as a consultant?
A. I believe it was.
Q. Okay. Do you know where that department was located?
A. Well, Phil Hamon's office and the offices for Bayo --
Q. Okay.
A. -- were in Midtown New York.
Q. Okay. And in 1994 did CSFB have a department that was involved in designing tax advantaged products for corporations?
MR. SADLER: Objection. Ambiguous.
MR. RUCHELMAN: Q. I used the word "designing" similar to the way you used the word "engineering" earlier.
A. Yes. I think it was the group about which I just spoke.
Q. Okay. Now, just to spend a few more moments on this one page here, and then we'll move on. Does the term under "Transaction Type,"

"Leasehold Interest," have meaning to you?
A. Yes. Yes.
Q. What is that?
A. It's a transaction that viewed -- viewed presently would relate to a rent stripping transaction.
Q. Okay. And what about advantage lease? What does that mean to you?
A. Advantage lease was a synthetic lease, primarily a financial accounting strategy.
Q. And moving down a little bit further, tax lease, what does that mean?
A. I'm not sure. There is no special meaning that I recall.
Q. Okay. And what about at the bottom there, Section 956? What does that mean to you?
A. Section 956 refers to a Internal Revenue Code section; and I don't recall the strategy.
Q. Okay. Now, except for Section 956 and tax lease, which you said you weren't presently familiar with, or you can't recall what the strategy was, were you involved in marketing the other products identified on 1061? And I just state what they are: Leasehold interest, short sale, and advantage lease.

MR. SADLER: Objection. Ambiguous as to the term "marketing."

THE WITNESS: As to the advantage lease, I had no involvement.

MR. RUCHELMAN: Okay.

THE WITNESS: I may have responded to questions on the leasehold interest program, but don't recall any specifics. The short sale transaction, uhm, I recall discussing it with the Marriott team.

MR. RUCHELMAN: Q. Okay. Do you recall discussing the short sale transaction with any other corporations?

A. Yes.

Q. And who were they?

A. I don't remember whether they were corporations or other entities. And all I remember is they were generally clients of CSFB.

Q. Okay.

A. But don't remember -- I don't remember names or whether there were any transactions concluded.

Q. Okay. Do you recall talking to people at Safeway about the short sale transaction?

A. No.
Q. How about any biotechnology companies?
A. I don't.
Q. How about pharmaceutical companies?
A. There was a pharmaceutical company with whom I spoke while at CSFB. I don't remember whether a particular product was discussed.
Q. Okay. So you don't recall if you discussed short sale with that company? Is that what you're saying?
A. That's correct, I do not recall whether I discussed short sale with them.
Q. Okay. The short sale transaction -- I'm still on Exhibit 164 -- do you know how this transaction came to your attention?
A. I didn't hear the complete question.
Q. Do you know how this transaction came to your attention?
A. The short sale transaction?
Q. Yes, sir.
A. Yes.
Q. And how was that?
A. In the early 1990s a law firm in San Francisco engaged Coopers and Lybrand to review the short sale strategy and offer our comments on

the tax efficacy of the strategy.
Q. Okay. What law firm was that?
A. Jackson, Tufts, Cole & Black.
Q. How do you spell Tufts?
A. T-u-f-t-s.
Q. And Black?
A. B-l-a-c-k.
Q. All right.
Were there any particular individuals at the law firm that you spoke with about it?
A. Yes.
Q. And who were they?
A. The partner was Emil, E-m-i-l; Peseri, P-e-s-e-r-i.
Q. Is that it? Just the individual?
A. Yes.
Q. Do you know how Mr. Peseri became familiar with the transaction --
MR. SADLER: Objection.
MR. RUCHELMAN: Q. Did he tell you?
MR. SADLER: Objection. Calls for speculation.
THE WITNESS: No, I don't.
MR. RUCHELMAN: Q. Do you know if

third and fourth pages of the document.

A. Yes, I am.

Q. Okay. Do you know who was involved in the creation of this document?

MR. SADLER: Objection. Calls for speculation.

THE WITNESS: I don't know.

MR. RUCHELMAN: Q. Okay. You said you were familiar with documents that at least were similar to this type of document. How did you become familiar with the documents that you're referring to?

A. As a general matter?

Q. Yes.

A. In a transaction such as the one we're discussing, CSFB team members would draft a presentation which they referred to as "the pitch book."

Q. Okay.

A. And the pitch book was circulated among CSFB people that had relationship responsibility with Marriott. It would also have been circulated, at least in the design stage, to Mr. Peseri for his comments. And it was often the case that copies would be sent to me for

my comments as well.
Q. And did you provide comments on the short sale transaction in the pitch book?
A. From time to time I did. I don't remember about this one.
Q. Now, it references Lester Pulse there on the first page. Do you know what prompted CSFB to send this presentation to Marriott?
MR. SADLER: Objection. Calls for speculation.
THE WITNESS: No, I don't.
MR. RUCHELMAN: Q. Do you know who introduced Mr. Hamon to Mr. Pulse?
A. I don't know.
Q. Were you aware that Marriott ultimately engaged CSFB to work on a transaction that was similar to this presentation?
A. I was not aware of that. Until our conversation some months ago.
Q. Okay. Let's take a look at the third page of the document. Now, the first paragraph, the first bullet there says, "Marriott International desires to hedge its exposure in interest sensitive assets presently owned and/or to be acquired. After an evaluation of

its financial risks, Marriott International enters into a series of security transactions to be managed by CS First Boston as part of an overall plan to manage financial risks inherent in its business. One strategy will involve selling short 2-year Treasuries and investing the proceeds in intermediate term Treasuries as a hedge against future increases in interest rates. The short obligation is not considered to be a 'liability' for tax purposes. An alternative might include the same strategy using foreign currencies against the U.S. dollar. Any strategy will involve some risks and be designed to earn a profit."

The first paragraph, was this a presentation that was sent out to all prospective corporations? Or is this tailored to Marriott's specific needs?

MR. SADLER: Objection. Vague.

MR. KLIEFOTH: Do you mean is that specific language, other than changing the name "Marriott International," this --

MR. RUCHELMAN: Right. Exactly.

MR. KLIEFOTH: -- this line was sent out to any prospective client who may be

interested in dealing with First Boston?

MR. RUCHELMAN: Right. Well, in this transaction.

THE WITNESS: No. This was -- this was tailored to Marriott's interest rate issue.

MR. RUCHELMAN: Q. Okay. In order to be interested in the short sale transaction, does a corporation have to have an interest rate issue?

A. No.

Q. "No."

Under what circumstances would they -- could they still engage in the transaction without having a interest rate issue?

MR. KLIEFOTH: Objection. Overbroad. Calls for speculation.

THE WITNESS: There were clients of CSFB that had foreign currency exposures. There were also clients that had exposure to specific companies or the credit of specific companies in which the short sale transaction was discussed.

MR. RUCHELMAN: Q. Can you say that again? Credit?

A. The -- yes. In some cases there were companies that did not have an interest rate risk --

Q. Okay.

A. -- but the company had a short position with respect to a third-party company. And so, on occasion, the short sale might be thought about as a way to hedge that risk.

Q. Okay. Is that what is -- well, let's get into the foreign currency exposure. Is that what's being discussed there in the second to the last sentence of the first paragraph where it says, "an alternative might include the same strategy using foreign currencies against the U.S. dollar"?

A. Yes.

Q. What terms were used to identify this transaction?

MR. SADLER: Objection. Vague.

MR. RUCHELMAN: Q. Were there in-house terms or industry terms like "short sale" -- maybe I'll give you a few, see if it may ring a bell. Was this transaction called capital loss transaction?

A. No.

Q. Was it ever referred to as a basis pump transaction?
A. No.
I only recalled it being referred to as the short sale transaction.
Q. Okay. Let's go on to the -- sticking with that first paragraph there, "One strategy will involve selling short 2-year Treasuries and investing the proceeds in intermediate term Treasuries as a hedge against future increases in interest rates." What is that referring to?
A. Are you asking about the mechanics?
Q. Yeah.
A. Well, it would assume that Marriott International would be selling short or taking a short position on 24-month treasuries, taking the cash proceeds and acquiring treasuries with a different maturity. I don't remember or know what the tenor would be for an intermediate treasury, that doesn't have a particular meaning to me other than it's not 2-year treasuries.
Q. Okay. Is it longer than 2-year treasuries?
A. I don't remember.

Q. Okay. Now, the second bullet point says, "Marriott International enters into the trade discussed above. Subsequently, a partnership is formed with Marriott International as a limited partner to reflect any investments and obligations on a net basis on the company's financial statements." What's the purpose of forming the partnership?

MR. SADLER: Objection. Lack of showing personal knowledge as to this point. Or as to this specific document.

THE WITNESS: One of the concerns that was expressed by the Marriott team was the financial accounting for the short sale strategy. CSFB believed that the use of a partnership in which Marriott was a limited partner would result in off-balance-sheet treatment for Marriott with respect to the short sale strategy.

MR. RUCHELMAN: Q. Okay. Were there any other benefits for partnership from this transaction?

MR. SADLER: Objection. Vague.

THE WITNESS: Well, there were -- several come to mind.

MR. RUCHELMAN: Okay.

THE WITNESS: One is that, certainly, the tax benefits and the strategy assumed the use of a partnership.

Secondly, the members of the Marriott team were questioning the financial risk of the transaction, and I believe the partnership was one way to help manage that risk.

MR. RUCHELMAN: Q. Okay. What type of tax benefits were derived from using a partnership in the transaction?

A. Well, the --

MR. KLIEFOTH: Just let me make clear when you say "this transaction," I think there is a transaction that was actually done which is reflected in the complaint.

MR. RUCHELMAN: Right.

MR. KLIEFOTH: Right. And we don't know whether that transaction -- there's been no testimony here today, nor do I think there will be any testimony here today, that that transaction is as this description states.

THE WITNESS: Right.

MR. KLIEFOTH: So when you say in the

transaction, I think it maybe could confuse the record a little bit when, say, Mr. Hahn testified there may be some tax benefits or some of the tax benefits assume the use of a partnership. I think he's talking about this document here (indicating).

MR. RUCHELMAN: Absolutely. Yeah. Thank you.

MR. KLIEFOTH: I want to make sure you're talking about this document (indicating).

MR. RUCHELMAN: Yeah, I apologize for that. I'm talking about the transaction that is expressed in this document, Exhibit 164.

THE WITNESS: Could you repeat your question?

MR. RUCHELMAN: Yeah.

Q. What are tax benefits when using a partnership in the transaction described in Exhibit 164?

A. The partnership permitted -- the partnership permitted proceeds from the short sale to be measured for federal income tax purposes. By not treating the short sale obligation as a tax liability. The partnership permitted those sale proceeds and their tax basis through a technical termination of the

partnership to mechanically be transferred
other assets.
Q. From your discussions with the Marriott team,
were you aware that they were interested in
that tax result?
MR. SADLER: Objection. Calls for
speculation.
THE WITNESS: Well, from my discussions
with them, I think they were broadly
interested in tax planning strategies.
MR. RUCHELMAN: Okay.
THE WITNESS: I had no understanding
about this particular result.
MR. RUCHELMAN: Q. Okay. Let's take a
look at the next exhibit. Which is 155. Put
some time references on the documents we're
going to look through now. This first
document, Exhibit 164 -- or the last document
we looked at, 164, was that fax from Phil
Hamon to Lester Pulse and it was dated
January 3rd, 1994. And going to the next
document, which is Exhibit 155, it is a
handwritten memo dated March 3rd, 1994, that
Marriott produced in this litigation.
And it's referencing either a

meeting or a phone conversation with First Boston, Phil Hamon, and someone named Roy Cohn. We think that might be a misspelling of your name there, but maybe you can help us out. Do you recall having a conversation in March with Marriott people?

A. I don't recall.

Q. Okay. Do you recall having face-to-face meetings with Marriott people about the short sale transaction?

A. I do.

Q. Did you go down to them, or did they come up -- or go out west to you? Do you recall where the discussions were?

A. The meeting I recall was at Marriott's offices in Bethesda, Maryland.

Q. Okay. And do you recall who else was there?

Who from the Marriott team was there?

A. The day of my meeting there were actually two meetings that I recall. There was a initial meeting with several CSFB people present, of which Phil Hamon was one.

Q. Okay.

A. And from Marriott's team, Pulse and Lindsey

were present.

There may have been other people in that meeting, but those are the names I recall.

Q. And that first meeting was in Bethesda, Maryland?

A. Yes.

Q. And do you recall what was discussed at that first meeting?

A. We talked about the presentation that you've just showed me. I don't remember whether it was a written presentation, but there were questions and specifics that the Marriott team had of primarily the CSFB people. So at that meeting the income tax issues were not taking up significant time, it was mainly having to do with financial statement presentation and determination of the interest rate exposure. What dates it would be present, how long it would last, and then a -- and a preparation for a larger meeting later that day with more members of the Marriott team.

Q. What was your role at that first meeting?

A. I was there as a resource to CSFB to respond to tax questions that might arise.

Q. And were there any tax questions at that meeting?
A. None that I recall.
Q. And then there was a second meeting later that same day?
A. Yes.
Q. Okay. And who was at that meeting?
A. I don't remember any of the people that were there. There were approximately a dozen people in the meeting. They were more senior members of the Marriott team.
Q. Do you recall the name Michael Dearing?
MR. SADLER: Objection. Asked and answered.
THE WITNESS: I do not.
MR. RUCHELMAN: Q. Michael Stein?
A. No.
Q. Ray Murphy?
A. No.
Q. Carolyn Handlon?
A. No.
Q. Who from CSFB were at that second meeting?
A. My recollection is that Phil Hamon was present, I believe Ed Wallace was present at that meeting. And the relationship manager at

Marriott, that is the CSFB employee who had relationship management responsibility for Marriott. I don't remember who that is. You asked me about Don Kendall.

Q. Okay.

A. That name rings a bell, but I don't remember if Don was there.

Q. What about was Brit Bartter from CSFB there?

A. I don't recognize that name.

Q. Okay. Irene Sinrich? Was she present?

A. I don't remember.

Q. And who took the lead at the second meeting from CSFB's side?

MR. SADLER: Objection. Vague.

THE WITNESS: I don't remember.

MR. RUCHELMAN: Q. Was it you or Ed Wallace or Phil Hamon?

A. It was not me.

And I don't recall who at CSFB was the primary spokesperson.

Q. Okay. And what was discussed at that second meeting?

A. There were three broad areas of discussion and the topics interrelated; but they were the financial accounting treatment of the short

sale, the tax treatment of the short sale, and the correlation of the short sale strategy to the interest rate risk.

Q. What do you mean by that last item, the correlation of the strategy to...

A. In the meetings I was at, there was an ongoing evaluation of the precise amount of risk that Marriott had with respect to the MORI notes, how long the risk was present, and the magnitude of the risk.

Both Lester Pulse and Griff Lindsey had told me in the meetings that they were working with others inside of Marriott to properly understand the interest rate risk. Again, how long the risk would be present and the amount of the risk.

Q. Who took the lead -- who was the lead spokesperson on the Marriott side at this second meeting?

A. There was a so-called chair of the meeting on Marriott's part whose name I don't recall. But the chair's opening comments lasted 30 seconds, after which Mr. Pulse was invited to address the group and discuss the state of the transaction.

Q. And Mr. Pulse was their -- was Marriott's tax person?
A. Yes.
Q. And the short sale -- the short sale transaction was discussed at this meeting?
A. Yes.
Q. Okay. And the short sale transaction is a tax advantaged product?
MR. SADLER: Objection. Mischaracterizes prior testimony.
THE WITNESS: Yes.
MR. RUCHELMAN: Q. Okay. Now, from your perspective, was Marriott -- did Marriott become aware -- did Marriott become interested in the short sale transaction for the tax advantages, and then they sought to fit a transaction for a business reason for entering into the transaction after they had become interested in the tax advantages of the transaction?
MR. SADLER: Objection. Calls for speculation.
MR. KLIEFOTH: Lack of foundation.
THE WITNESS: I don't know.
MR. RUCHELMAN: Q. Let's take a look at