IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner,** | |
| **Plaintiffs,** | **Nos. 01-256T and 01-257T** |
| | **Judge Charles F. Lettow** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

# PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Harold J. Heltzer
Robert L. Willmore
Alex E. Sadler
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2915
Fax: (202) 628-5116

May 9, 2008

## TABLE OF CONTENTS

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT .........................1

A. Defendant's Attempt To Distinguish The Section 752 Case Law Prior To Rev. Rul. 95-26 Misrepresents The Holdings And Rationale Of The Cases And Ignores The "All-Events" Test. ..................................................................1

B. Defendant's Argument That The Obligation To Close A Short Sale Should Be Considered A "Fixed" Obligation Because The Short Sale Proceeds Are Used As Collateral For The Short Sale Is A "Red Herring" That Is Completely Irrelevant To Whether An Obligation Is A "Liability" For Purposes Of Section 752. .........................................................................5

C. Defendant's Attempt To Distinguish Judge Williams' Decision In *Jade Trading*, And The District Court Decisions In *Klamath* And *Cemco Investors*, Is Unpersuasive. Defendant Is Merely Arguing A Position Which Each Of Those Courts Rejected...........................................................7

D. Defendant Does Not Deny That The Court In *COLM Producer* Based Its Ruling On An Erroneous Understanding Of The Relevant Time When The Obligation Had To be "Fixed" In Order To Be Considered A Liability Under Section 752.......................................................................9

E. Defendant's Response Regarding the *Salina* Decision Simply Assumes Away The Issue Through Circular Reasoning. ..............................................10

F. There Is No Legal Basis For Defendant's Argument That This Court Should Accord *Chevron* Deference To Rev. Rul. 95-26. In Fact, Rev. Rul. 95-26 Should Not Even Be Accorded *Skidmore* Deference Given That It Does Not Evidence Thoroughness Of Consideration, Employs Flawed And Invalid Reasoning, And Is Inconsistent With A Long Line Of Cases Which The Revenue Ruling Does Not Even Acknowledge, Much Less Explain..........................................................................12

G. Defendant Now Argues That Marriott Engaged In A "Tax Shelter Scheme" Because It Interpreted Section 752 In A Manner Consistent With The Interpretation Of That Provision In 1994 By Both The U.S. Tax Court And The IRS. .........................................................................18

CONCLUSION..........................................................................................20

APPENDIX B

Investopedia® Article ............................................................................ B-1

APPENDIX C

April 22, 2008, Slip Opinion in *Sala v. United States*,
Dkt. No. 05-cv-00636 (D.C. Colo.) .................................................................. C-1

ATTACHMENT

Declaration of Robert L. Willmore with Plaintiffs' Exhibit 10

## TABLE OF AUTHORITIES

### CASES

*America Online, Inc. v. United States*, 64 Fed. Cl. 571 (2005) ........................ 12

*Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982) ................................ 12

*Cemco Investors, LLC v. United States*, 2007-1 USTC ¶ 50,385 (N.D. Ill. 2007), *aff'd*, 515 F.3d 749 (7th Cir. 2008) ............................*passim*

*COLM Producer, Inc. v. United States*, 460 F. Supp. 2d 713 (N.D. Tex. 2006), *appeal pending*, *Kornman & Associate Inc. v. United States*, No. 06-11422 (5th Cir.) .................................................................... 9-10

*Federal Nat'l Mtg. Ass'n v. United States*, 379 F.3d 1303 (Fed. Cir. 2004) ........................................................................................... 13

*Fox v. Commissioner*, 80 T.C. 972 (1983*), aff'd sub nom. Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984) ............................................. 12

*Gibson Prods. Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981) ................ 12

*Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975) ...........................*passim*

*Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (2007) .....................*passim*

*Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006)...........................................................*passim*

*La Rue v. Commissioner*, 90 T.C. 465 (1988) ...........................................*passim*

*Long v. Commissioner*, 71 T.C. 1 (1978), *aff'd in part and rev'd in part on other issues*, 660 F.2d 416 (10th Cir. 1981) ........................*passim*

*Long Island Care at Home, Ltd. v. Coke*, 127 S.Ct. 2339 (2007)................ 14-18

*Officemax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005)....................... 12

*Sala v. United States*, Dkt. No. 05-cv-00636 (D.C. Colo. April 22, 2008) ........................................................................... 16-18

*Salina Partnership L.P. v. Commissioner*, 80 T.C.M. (CCH) 686 (2000) .......... 10-11

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001) .......... 17-18

*USA Choice Internet Serv., LLC v. United States*, 73 Fed. Cl. 780 (2006) .......... 12-13

**STATUTES, REGULATIONS AND OTHER MATERIALS**

26 U.S.C. § 752 .......... *passim*

Treas. Reg. § 1.1233-1(a)(1) .......... 4

29 C.F.R. § 552.109 .......... 15

Rev. Rul. 95-26, 1995-1 C.B. 131 .......... *passim*

Rev. Rul. 88-77, 1988-2 C.B. 128 .......... 12, 16

Fed. R. Evid. 704 .......... 7

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner,** | |
| **Plaintiffs,** | **Nos. 01-256T and 01-257T** |
| | **Judge Charles F. Lettow** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Marriott International Resorts, L.P., Marriott International JBS Corp., Tax Matters Partner ("Marriott"), respectfully submit this Reply to Defendant's Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment ("Def. Opp."). For the reasons set forth below and in Marriott's opening memorandum, Plaintiffs respectfully request that Plaintiffs' Cross-Motion for Partial Summary Judgment be granted.

**A. Defendant's Attempt To Distinguish The Section 752 Case Law Prior To Rev. Rul. 95-26 Misrepresents The Holdings And Rationale Of The Cases And Ignores The "All-Events" Test.**

Defendant argues that the cases cited by Marriott for the principle that it was well established prior to Rev. Rul. 95-26 that contingent obligations are not "liabilities" under Section 752 are distinguishable on the ground that they only involve obligations where the fact of liability was still contingent. But this reading

of the case law is plainly wrong, as shown below. Moreover, because Defendant's revisionist interpretation of the case law cannot be reconciled with the "all-events" test, Defendant simply ignores that test in its discussion of the case law.

The fact that the Section 752 "liability" holdings in question were not limited to situations where the fact of liability was contingent is clear from both Long v. Commissioner, 71 T.C. 1 (1978), aff'd in part and rev'd in part on other issues, 660 F.2d 416 (10th Cir. 1981), and La Rue v. Commissioner, 90 T.C. 465 (1988).

In Long**,** the Tax Court held that the obligation in question was not a liability both because the fact of liability "had not been established," and because "the amounts of damages sought were by no means definite or fixed." 71 T.C. at 8. Significantly, the Tenth Circuit, in affirming this holding, specifically observed that the liability was contingent as to amount. 660 F.2d at 419 ("[The Tax Court] held that because the lawsuit claims against the partnership were indefinite and contingent liabilities, they should not be recognized for basis adjustment purposes until the exact amounts of the liabilities were established. . . . We agree with this approach and holding.") (emphasis added).

La Rue is even more clear in this regard. There, the partnership's contractual obligation to correct the "back office" trading failures had already been established and was not in question. 90 T.C. at 479. The key contingency in La Rue was not the fact of liability, but the amount of liability (that is, what it would ultimately cost to correct the "back office" failures). This point could not be more clear from the Tax Court's opinion:

> Once the "back office" failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the NYSE rules. . . . All of petitioners' witnesses testified that these were transactions for which the partnership was liable. <u>There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.</u>
>
> Petitioners have not shown that these amounts were determinable with reasonable accuracy. . . . <u>A loss is not determinable until the securities are actually purchased or sold and the transaction closed.</u> We accordingly hold that because the reserves were not a fixed obligation of the partnership <u>sufficiently determinable in amount</u> in 1970, they cannot be included in the partners' basis in that year.

<u>La Rue</u>, 90 T.C. 479-80 (emphasis added) (footnote omitted).

It also is worth noting <u>La Rue</u>'s discussion of <u>Long</u>, which completely undercuts Defendant's argument that <u>Long</u> was only concerned with whether the obligation in question was contingent as to the fact of liability. The Tax Court in <u>La Rue</u> had a very different understanding of its prior decision:

> The test used in *Long* focused on the fact of liability <u>and whether the amount of the liability was definite or fixed.</u> This test is similar, if not identical, to the "all-events" test for deduction of accrued expenses. . . . [W]e think that test may be properly used to determine when the corresponding liability is includable in basis.

<u>La Rue</u>, 90 T.C. 478 (emphasis added). <u>See also</u> <u>Klamath Strategic Investment Fund, LLC v. United States</u>, 440 F. Supp. 2d 608, 616 (E.D. Tex. 2006) ("*Long* held there were two reasons that the claims were not liabilities under Section 752: the obligations were contingent and they were indefinite in amount.")

The <u>Klamath</u> court's analysis of <u>La Rue</u> also is inconsistent with Defendant's argument:

> In *La Rue v. Comm'r*, 90 T.C. 465 . . . (1988), the Service again argued, and the Court agreed, that obligations that are fixed in the sense that it is known that some amount will be paid, but that remain contingent in amount, do not constitute "liabilities" for purposes of Section 752. The *La Rue* Court held that even though a contractual obligation is fixed, that obligation does not represent a liability under Section 752 until the cost of that obligation becomes fixed in amount. *Id.* at 479 . . . ; *see also Long*, 71 T.C. at 8.

Id. at 616 (emphasis added). See also Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 44-45 (2007) (citing La Rue and Long for proposition that non-fixed obligations are not liabilities for purposes of Section 752).

Even though the Tax Court in La Rue indicated that its holding was based on the "all-events" test,[1] there is absolutely no discussion in Defendant's brief of that test or the Tax Court's use of that test in applying Section 752. This was not a mere oversight by Defendant. The reason Defendant does not discuss the "all-events" test is because that test – which provides that a fixed liability cannot exist until the fact of liability has been established and the amount of that liability is determinable with reasonable accuracy – is fundamentally irreconcilable with Defendant's present argument.[2]

---

1 The syllabus to La Rue summarizes the pertinent holding as follows: "*Held*, liabilities attributable to an accrual basis partnership's deductible expenses must meet the 'all events' test before they may be included in the bases of Ps' partnership interests." 90 T.C. at 466.

2 Defendant argues (Def. Opp., at 11-12) that Code section 1233 – which provides that recognition of taxable gain or loss from a short sale transaction is determined at the time the short sale is closed – is irrelevant to the issue before the Court. It is noteworthy, however, that Code section 1233 (as well as the relevant Treasury Regulation, Treas. Reg. § 1.1233-1(a)(1)) is consistent with the "all-events" test.

Accordingly, Defendant's argument that the cases that have held that a contingent obligation is not a "liability" for purposes of Section 752 are limited to those situations where the fact of liability is contingent is not only unsupported by the case law but is incompatible with the reasoning of those decisions.

**B. Defendant's Argument That The Obligation To Close A Short Sale Should Be Considered A "Fixed" Obligation Because The Short Sale Proceeds Are Used As Collateral For The Short Sale Is A "Red Herring" That Is Completely Irrelevant To Whether An Obligation Is A "Liability" For Purposes Of Section 752.**

Defendant argues that, because the proceeds of a short sale (that is, the money the short seller obtains when he sells the borrowed securities) are typically held as collateral by the lender of the shorted securities, the obligation to close the short sale by returning the borrowed securities should be considered a "fixed" obligation and therefore a "liability" under Section 752.

It is not altogether clear what point Defendant is trying to make with its argument. If Defendant is arguing that there is a contractual obligation to return the borrowed securities, which is, in turn, secured by collateral, that is not a point that is or ever has been controverted in this case. Marriott has never argued that there was not a contractual obligation to return the shorted Treasury Notes, and, in fact, the Treasury Notes were returned when the short sale was closed.

In this regard, it should be noted that the role of collateral in a short sale transaction was described in Dr. Lamont's expert report[3] (at page 4) and covered in

[3] Dr. Lamont's expert report is attached as Exhibit 8 to the Declaration of Harold J. Heltzer dated March 25, 2008.

his deposition.[4] As Dr. Lamont noted in his report, and as he explained in his deposition, the proceeds from the sale of the shorted securities are typically used as part of the collateral provided to the lender of the securities, and the amount of the required collateral can increase or decrease as the value of the shorted securities increases or decreases. See Plaintiffs' Exhibit 8, at 4; Plaintiffs' Exhibit 10, at 28-32, 44-50.[5]

The existence of collateral, however, does not change the fundamental reality that the ultimate cost of closing the short sale simply cannot be determined until the replacement securities have been purchased by the short seller. Defendant's argument that the existence of collateral somehow makes that obligation "fixed" in amount is illogical. The three CSFB confirmation statements that Defendant submits with its Opposition (see Defendant's Exhibit 13) do not suggest otherwise or demonstrate anything of significance to the legal issues before this Court.[6]

It also should be noted that Defendant's "collateral" argument was made to and expressly rejected by the District Court in Klamath:

> The government's proposed distinctions are not borne out by the cases. In *La Rue*, for example, the Tax Court specifically found that the taxpayer was obligated to make payment. *See La Rue v. Comm'r*,

---

[4] Relevant pages from Dr. Lamont's deposition are attached as Exhibit 10 to the Declaration of Robert L. Willmore dated May 9, 2008, filed concurrently.

[5] For illustration purposes only, attached to this brief as Appendix B is an article from Investopedia® showing how the amount of collateral can change with the change in the value of the shorted securities.

[6] Moreover, to the extent the CSFB confirmation statements show the amount of collateral securing the short sales, they would only show the amount of collateral at the time of the confirmation statements.

> 90 T.C. 465, 479 . . . (1988). Moreover, the taxpayer had established reserves to pay this obligation, and such reserves are the functional equivalent of the collateral account here. Nevertheless, the Tax Court found the existing obligation was not a liability under Section 752 because it was still "contingent in amount." *Id.* at 479 . . . .

Klamath, 440 F. Supp. 2d at 618 (emphasis added).

Finally, it bears emphasis that Defendant does not contest any of the points made by Marriott in its opening memorandum (at pages 17-21) explaining why the obligation to close a short sale is by its very nature a contingent obligation.[7]

### C. Defendant's Attempt To Distinguish Judge Williams' Decision In *Jade Trading*, And The District Court Decisions In *Klamath* And *Cemco Investors*, Is Unpersuasive. Defendant Is Merely Arguing A Position Which Each Of Those Courts Rejected.

Defendant argues that this Court should not treat Judge Williams' decision in Jade Trading, or the District Court decisions in Klamath and Cemco Investors,[8] as persuasive authority in this case, even though each of those decisions – citing the Tax Court opinions discussed above – held that contingent obligations are not "liabilities" for purposes of Section 752.

---

[7] In a footnote (Def. Opp., at 11 n.10), Defendant states that Dr. Lamont's report is improper if it is being used to support a legal conclusion. This statement is a nonsequitur. As the Court can readily ascertain from reviewing his report, Dr. Lamont does not claim to be offering any legal opinions of any kind. Rather, he explains the mechanics of a short sale transaction and describes the various contingencies that can arise in the course of a short sale transaction. Moreover, even though Dr. Lamont's report shows that a short sale transaction is by its nature a contingent obligation, expert opinion testimony embracing an ultimate issue in a case is entirely appropriate. See Fed. R. Evid. 704 (a). In sum, there is absolutely nothing improper about Dr. Lamont's report.

[8] Cemco Investors, LLC v. United States, 2007-1 USTC ¶ 50,385 (N.D. Ill. 2007), aff'd, 515 F.3d 749 (7th Cir. 2008).

The precise reason why these holdings should be rejected by this Court is not altogether clear from Defendant's Opposition, but it appears that Defendant is taking the position that, because each Court ultimately concluded that the underlying transaction lacked economic substance, each Court also should have ruled that there was no contingent obligation for purposes of Section 752.

One obvious problem with Defendant's argument is that none of the three courts saw it Defendant's way. Certainly, Judge Williams of this Court did not, given that her opinion in Jade Trading rejected the Government's Section 752 argument on the ground that a contingent obligation is not a Section 752 "liability," see 80 Fed. Cl. at 44-45, but nonetheless held in favor of the Government with respect to the economic substance of the underlying transaction. Id. at 45-52. Klamath and Cemco Investors came to similar conclusions. Interestingly, Defendant even complains that the court in Klamath denied the Government's motion to vacate its Section 752 summary judgment ruling based on the court's subsequent decision rejecting the economic substance of the transaction. See Def. Opp., at 9 n.7.

A more basic problem with Defendant's argument is that the economic substance of the Marriott short-sale transactions is not at issue in these cross-motions for summary judgment and relevant summary judgment evidence as to that question is not before this Court. If Defendant had seriously wanted to pursue this theory, it should have moved for summary judgment on the economic substance doctrine (although it seems clear that there would be numerous disputed issues of

material fact). But Defendant chose not to do so. It is entirely inappropriate for Defendant now to argue that this Court should nevertheless attempt to view the Section 752 "liability" issue through the prism of the economic substance doctrine.

### D. Defendant Does Not Deny That The Court In *COLM Producer* Based Its Ruling On An Erroneous Understanding Of The Relevant Time When The Obligation Had To be "Fixed" In Order To Be Considered A Liability Under Section 752.

Defendant accuses Marriott of "gamely attempt[ing] to disparage" the decision in COLM Producer[9] by pointing out that the court in that case based its ruling on an error regarding the relevant time at which the obligation had to be "fixed" in order to be considered a "liability" under Section 752. See Def. Opp., at 10. Respectfully, Marriott would simply note that Defendant's own appellate counsel conceded to the Fifth Circuit that the District Court had erred in this regard. See Plaintiffs' Opening Mem., at 32.

As explained in Marriott's opening memorandum, the court in COLM Producer believed that the relevant time for determining when the obligation to close the short sale was "fixed" was at the time the partnership was sold to a third party. As the court noted, at that time, the entity that sold the partnership to the third party would not be subject to any further interest rate fluctuations. See Plaintiffs' Opening Mem., at 31-32. In fact, the correct time for determining whether or not the obligation was "fixed" was when the obligation was transferred

[9] COLM Producer, Inc. v. United States, 460 F. Supp. 2d 713 (N.D. Tex. 2006), appeal pending, Kornman & Assoc. Inc. v. United States, No. 06-11422 (5th Cir.)

to the partnership. Presumably, at that earlier point in time, the entity that eventually sold the partnership would still have been subject to further interest rate fluctuations. Marriott can only speculate how this error affected the court's ultimate ruling in COLM Producer. But, applying the court's analytical framework without this error suggests that, at the time the obligation to close the short sale was transferred to the partnership, the obligation was still contingent and therefore not a "liability" within the meaning of Section 752. See COLM Producer, at 716 ("The cases on which COLM relies stand for the proposition that liabilities that are contingent as to the obligation itself or as to the amount of the obligation do not qualify as 'liabilities' for purposes of section 752.") (emphasis added).[10]

### E. Defendant's Response Regarding the *Salina* Decision Simply Assumes Away The Issue Through Circular Reasoning.

In its opening memorandum, Marriott noted that the Salina Tax Court Memorandum[11] upon which Defendant relies for its position here did not go through the same careful analysis as the Federal court decisions that reviewed and applied the Helmer,[12] Long and La Rue line of cases, but instead based its ruling on a broad

---

10 Defendant claims that "Marriott presumably agrees that the short sale obligations were determinable and fixed when MORI contributed to MIR the short sale proceeds . . . ." Def. Opp., at 10-11. Marriott does not agree with that statement. Since the profit or loss on the short sale could not be determined until the short sale was closed at a later point in time, the obligation obviously was not "fixed" at the time it was transferred to the partnership and therefore not a "liability" under Section 752. That is the teaching of the Tax Court's opinion in La Rue.

11 Salina Partnership L.P. v. Commissioner, 80 T.C.M. (CCH) 686 (2000).

12 Helmer v. Commissioner, 34 T.C.M. (CCH) 727 (1975).

definition of "liability" found in Black's Law Dictionary. Marriott observed that, if the term "liability" in Section 752 really were to be defined using this broad definition, then virtually all the cited cases applying Section 752 – both from the Tax Court and the various refund forums – would have been incorrectly decided given the breadth of that definition. Defendant contends that this is not so because "[t]hose cases involved transactions that the respective courts found to be contingent in nature . . . ." Def. Opp., at 10. But this response simply assumes away the issue though circular reasoning.

For purposes of Section 752, either an obligation is a "liability" or is not a "liability." Helmer, Long, and La Rue all analyzed the issue by determining whether the obligation in question was or was not contingent in nature.[13] Salina, however, applied an entirely different (and highly superficial) analytical approach, and in the process ignored two binding Tax Court Opinions (La Rue and Long). If the correct analytical approach – as Defendant appears to concede in its Opposition – is to determine whether the obligation is or is not contingent in nature, than Salina must be considered to have been wrongly decided since that is not what the Salina court did. If, on the other hand, the correct analytical approach is to ignore the question of whether the obligation is contingent in nature, and instead only consider whether the obligation fits within the broad definition of "liability" found in Black's Law Dictionary, then presumably the Salina court was right. In that

---

13 As discussed above, his approach was followed by Judge Williams in Jade Trading and the District Courts in Klamath and Cemco Investors.

event, however, Helmer, Long, La Rue, Brountas, Gibson, Fox, Jade Trading, Cemco Investors and Klamath would all have been wrongly decided.

### F. There Is No Legal Basis For Defendant's Argument That This Court Should Accord *Chevron* Deference To Rev. Rul. 95-26. In Fact, Rev. Rul. 95-26 Should Not Even Be Accorded *Skidmore* Deference Given That It Does Not Evidence Thoroughness Of Consideration, Employs Flawed And Invalid Reasoning, And Is Inconsistent With A Long Line Of Cases Which The Revenue Ruling Does Not Even Acknowledge, Much Less Explain.

Defendant argues that this Court should accord Chevron deference to Rev. Rul. 95-26, 1995-1 C.B. 131. In making this argument, Defendant ignores this Court's analysis in two recent decisions regarding the appropriate degree of deference to be accorded IRS revenue rulings. See America Online, Inc. v. United States, 64 Fed. Cl. 571, 580 (2005); USA Choice Internet Serv., LLC v. United States, 73 Fed. Cl. 780, 792-93 (2006); see also Officemax, Inc. v. United States, 428 F.3d 583, 595 (6th Cir. 2005). As noted in Marriott's opening memorandum (at 35-36), there is no legal basis for Defendant's position that this Court should accord Chevron deference to Rev. Rul. 95-26.[14]

The more significant question is whether any deference should be accorded Rev. Rul. 95-26, such as Skidmore deference. In its decisions in America Online and

---

[14] Defendant also argues that Chevron deference should be accorded to Rev. Rul. 88-77, 1988-2 C.B. 128. But as discussed in Marriott's opening memorandum (at 23-26), Defendant's argument regarding Rev. Rul. 88-77 completely misconstrues the purpose and meaning of that revenue ruling, which had nothing to do with whether the obligation to close a short sale is a contingent obligation. Defendant simply ignores Marriott's argument, but nonetheless asks the Court to accord Chevron deference to its misapplication of Rev. Rul. 88-77.

USA Choice, this Court discussed the factors that bear on that question. See also Federal Nat'l Mtg. Ass'n v. United States, 379 F.3d 1303, 1307-09 (Fed. Cir. 2004) (analyzing deference due an IRS revenue procedure). In its opening memorandum, Marriott reviewed each of those factors and demonstrated why, applying those factors, Skidmore deference is not appropriate. Defendant essentially ignores these factors and, instead, argues that this Court must defer to any Internal Revenue Code interpretation by the Service set forth in a revenue ruling as long as that interpretation is not unreasonable. See Def. Opp., at 14-15.

Marriott will not reiterate here all of its arguments from its opening memorandum (at 35-41) why this Court should not defer to Rev. Rul. 95-26. But one key consideration in this regard is the revenue ruling's complete failure to even acknowledge, much less explain, its departure from the Helmer, Long and La Rue line cases regarding what type of obligation will be considered a "liability" for purposes of Section 752. This should be juxtaposed against the preamble to the 2003 proposed Treasury Regulations which candidly conceded that "[t]he definition of liability contained in these proposed regulations does *not* follow *Helmer v. Commissioner*." See Plaintiffs' Opening Mem., at 29. Marriott respectfully submits that judicial deference of the kind Defendant requests here is particularly inappropriate when an agency does not even acknowledge that it is using an informal procedure to change established law, much less explain why.

Defendant argues in response that "[i]t is unremarkable that Rev. Rul. 95-26 doe not discuss Helmer, Long and La Rue, because . . . those cases have no

relevance to the question of whether a *short sale* obligation is a liability for purposes of § 752." Def. Opp., at 15. But this contention obviously is not correct given the above-noted concession in the preamble to the 2003 proposed Treasury regulations which recognized the relevance of Helmer and its progeny, as well as the decisions in Jade Trading, Klamath and Cemco Investors regarding the holdings of those Tax Court decisions.

Moreover, it is difficult to accept Defendant's argument that Rev. Rul. 95-26 did not represent an effort to change established law when the contemporaneous internal IRS notes produced by Defendant in this case show the obvious discomfort of the Service's own attorneys with the approach being urged by the Treasury Department to achieve its desired policy outcome. See Plaintiffs' Opening Mem., at 21-23 (noting that Treasury wants to use § 752 to "cram through [that] result" even though it "understands it is not an entirely clean way of doing it"); Plaintiffs' Exhibit 5.[15]

With respect to its deference argument, Defendant relies heavily on the Supreme Court's recent opinion in Long Island Care at Home, Ltd. v. Coke, 127 S.Ct. 2339 (2007). But Long Island Care does not support Defendant's general argument; in fact, it undermines Defendant's argument. It was important in Long Island Care, and the Court repeatedly noted, that the rule in question had been

[15] As other portions of those internal IRS notes reflect, the Service was well aware of the inconsistency between Treasury's proposal and Helmer. See Jade Trading, 80 Fed. Cl. at 44-45 n.65.

formally promulgated subject to notice and comment procedures.[16] One of the issues in Long Island Care was whether the rule was an "interpretive regulation," which the Court noted "may 'persuade' a reviewing court, . . . but will not necessarily 'bind' a reviewing court." Id. at 2349-50 (citations omitted). In holding that the regulation was not an interpretive regulation, the Court emphasized that the agency had used "full public notice-and-comment procedures." Id. at 2350.

Defendant appears to suggest in its Opposition that the Court in Long Island Care was upholding a guidance issued by the agency. See Def. Opp., at 16. But this so-called guidance was an "'Advisory Memorandum' issued only to internal Department personnel" which explained and defended the regulation in question. 127 S.Ct. at 2345 & 2349. Although the courts considered the internal "Advisory Memorandum," the issue before the Supreme Court was not the validity of (or any deference to be accorded) the "Advisory Memorandum," but the validity of the regulation being challenged (29 C.F.R. § 552.109(a)). If Long Island Care stands for anything relevant to these cross-motions, it strongly suggests that a revenue ruling should not be accorded Chevron deference given the lack of public notice-and-comment procedures.

Defendant even cites Long Island Care for the proposition that an agency should be permitted to change its interpretation of a statute as long as the changed

---

16 See, e.g., 127 S.Ct. at 2346 ("The Department focused fully upon the matter in question. It gave notice, it proposed regulations, it received public comment, and it issued final regulations in light of that comment.")

interpretation creates "no unfair surprise." See Def. Opp., at 16.[17] Defendant contends that Rev. Rul. 95-26 did not create an "unfair surprise" because of Rev. Rul. 88-77. But as discussed in Marriott's opening brief (at 23-26), Rev. Rul. 88-77 did not deal with the proper treatment of contingent obligations, but dealt with an entirely different issue; that being, restricting the scope of the term "liability" when a cash basis taxpayer transfers its accounts payable to a related entity. In no sense would Rev. Rul. 88-77 have alerted anyone prior to 1995 that the IRS intended to abandon – at least with respect to short sales – a principle it had successfully established in the Tax Court over several decades.[18]

This Court may also wish to consider the U.S. District Court's recent opinion in Sala v. United States, Dkt. No. 05-cv-00636 (D.C. Colo. April 22, 2008) (slip opinion attached hereto at Appendix C). In that opinion, entered after trial, the court ruled that the Government could not retroactively apply its 2003 regulations defining the term "liability" under Section 752 to a transaction which had occurred

---

17 In support of this proposition, Defendant quotes a passage from Long Island Care. But it should be noted that, in the quoted passage, Defendant deleted through ellipsis the portion of the Court's discussion observing that it was "the Department's recourse to notice-and-comment rulemaking in an attempt to codify its new interpretation . . . [that] makes any such surprise unlikely here." Long Island Care, 127 S.Ct. at 2349.

18 Defendant also contends in its Opposition that there was no "unfair surprise" because Marriott filed its 1994 Federal tax return after Rev. Rul. 95-26 had been issued. See Def. Opp., at 17. But Defendant simply disregards the fact that all the relevant transactions had been entered into and completed by the end of 1994, prior to the issuance of Rev. Rul. 95-26 and while Marriott had no reason to believe that the governing law was anything other than that articulated by the Tax Court in Helmer, Long and La Rue.

in 2000. Slip op. at 51-57. The court noted that retroactive application of a regulation may be considered an abuse of discretion if "the retroactive regulation alters settled prior law or policy upon which the taxpayer justifiably relied and if the change causes the taxpayer to suffer inordinate harm." Id. at 53 (quoting CWT Farms, Inc. v. Comm'r of Internal Revenue, 755 F.2d 790, 802 (11th Cir. 1985)). As the Court noted in Sala:

> Treasury Regulation § 1.752-6 not only alters settled prior law – as the Treasury acknowledged, *see* Fed. Reg. 37434, 37437 (June 24, 2003) ("The definition of a liability contained in these proposed regulations does not follow *Helmer v. Commissioner*, T.C. Memo 1975-160.") – it directly contradicts the underlying statutes – 26 U.S.C. §§ 358 and 752 – the abuse of which it supposedly prevents. As such, the regulation does not "protect" the statute from abuse, but rather amends the statute to reach an outcome different from – and contrary to – that the statute would require.

Slip op. at 53.

It is ironic that Defendant here asks this Court to apply a revenue ruling retroactively to invalidate a transaction through a new definition of "liability" when the court in Sala would not even allow the Government to accomplish that purpose through the retroactive application of a 2003 Treasury regulation defining the term "liability" for purposes of Section 752.

Finally, it is noteworthy that neither of Defendant's briefs even mentions the Supreme Court's opinion in United States v. Cleveland Indians Baseball Co., 532 U.S. 200 (2001), in which the Court addressed but did not resolve the issue of the appropriate deference to be accorded a revenue ruling. In that case, the Court concluded that it would defer to the IRS's longstanding and steady interpretation of

its regulations. Id. at 220 ("We do not resist according such deference in reviewing an agency's steady interpretation of its own 61-year-old regulation implementing a 62-year-old statute.") Here, of course, this Court is faced with precisely the contrary situation; that is, a revenue ruling that seeks to alter (without even acknowledging such) a longstanding and steady interpretation of a statute.

Essentially, this point also was made by the District Court in Sala in its rejection of the Government's deference argument. Citing and distinguishing Long Island Care, the court in Sala noted that: "This is not a case like the one in *Long Island Care* where a regulation was intended to settle a question the agency had 'struggled' with for years. To the contrary, the regulation sought to reverse a policy the Treasury had relied upon – whenever such reliance inured to its benefit – since 1975." Sala, slip op. at 55. The very same is true here.

**G. Defendant Now Argues That Marriott Engaged In A "Tax Shelter Scheme" Because It Interpreted Section 752 In A Manner Consistent With The Interpretation Of That Provision In 1994 By Both The U.S. Tax Court And The IRS.**

In its opening memorandum, Defendant referred to the Marriott short sale transactions as "Son of Boss" transactions. Marriott pointed out that this characterization of the transactions was incorrect and unfair, and that Defendant was merely attempting to cast the short sale transactions in a negative light.

In its Opposition (at 18-19), Defendant abandons the "Son of Boss" label, but instead argues that the Marriott short sale transactions should nonetheless be considered a "tax shelter scheme" because of Marriott's "failure to treat the short sale obligations as liabilities in calculating MIR's partnership basis." Def. Opp., at

18-19. What Defendant fails to mention, however, is that Marriott's treatment of the short sale obligations in this manner in 1994 was not only consistent with a well established line of Tax Court cases regarding what type of obligations constitute "liabilities" under Section 752, but also was consistent with the IRS's own understanding at the time of what constituted a Section 752 "liability."[19] As noted in Marriott's opening memorandum, the Service understood that Rev. Rul. 95-26 – issued the year following the Marriott short sale transactions – was "not an entirely clean way" of achieving Treasury's policy goal, but decided to proceed anyway because, for Treasury, it was "no matter how [to] get to that result." See Plaintiffs' Opening Mem., at 21-23; Plaintiffs' Exhibit 5.

It is odd, indeed – particularly in light of the circumstances surrounding the genesis of Rev. Rul 95-26 – that Marriott now stands accused of having engaged in a "tax shelter scheme" because it interpreted a provision of the Internal Revenue Code in a manner consistent with the interpretation of that provision by both the U.S. Tax Court and the IRS.[20]

---

19 See also Jade Trading, supra, at 44-45 (contingent obligations are not considered Section 752 "liabilities"); Klamath, supra, at 625-26 (same).

20 Defendant also proffers two supplemental proposed findings of uncontroverted facts related to Mr. Roy Hahn, which Defendant implies support its "tax shelter scheme" accusation. But, as the Court can see from Plaintiffs' response to the proposed findings, Mr. Hahn had no personal knowledge of the actual Marriott short sale transactions and apparently did even know (prior to being informed by Defendant's counsel) that Marriott had entered into those transactions. See Plaintiffs' Response to Defendant's Supplemental Proposed Findings of Uncontroverted Facts, at 2-3.

**CONCLUSION**

For the reasons stated above and in Plaintiffs' opening memorandum, Plaintiffs respectfully request that Plaintiffs' Cross-Motion for Partial Summary Judgment be granted.

Respectfully submitted,

May 9, 2008

s/Harold J. Heltzer
Harold J. Heltzer (Attorney of Record)
Robert L. Willmore
Alex E. Sadler
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2915
Fax: (202) 628-5116

Counsel for Plaintiffs

5564394

Home | Dictionary | Articles | Tutorials | Exam Prep | Ask Us | Stock Simulator | Stock Community | Stock Ideas | Free

INVESTOPEDIA®
A Forbes Media Company

Sign In | Register | FREE Investing Newsletters

Search

TOP SEARCHES
1. Stock Picking
2. FOREX
3. Options Trading
4. Mutual Funds

Dictionary
Articles
Investing Basics
Stocks
Mutual Funds
FOREX
ETFs
Active Trading
Bonds
Economics
Financial Careers
Financial Theory
Fundamental Analysis
Options & Futures
Personal Finance
Professional Education
Real Estate & Mortgages
Retirement
Taxes
Young Investors
FAQs
Exam Prep
Tutorials
Ask Us
Stock Simulator
Stock Community
Calculators
Free Reports
FREE Newsletters
FREE Tools

## INVESTMENT QUESTION

**What are the minimum margin requirements for a short sale account?**

In a short sale transaction, the investor borrows shares and sells them on the market in the hope that the share price will decrease and he or she will be able to buy them back at a lower price. The proceeds of the sale are then deposited into the short seller's margin account. Because short selling is essentially the selling of stocks that are not owned, there are strict margin requirements. This margin is important, as it is used for collateral on the short sale to better insure that the borrowed shares will be returned to the lender in the future.

While the initial margin requirement is the amount of money that needs to be held in the account at the time of the trade, the maintenance margin is the amount that must be in the account at any point after the initial trade.

Under Regulation T, the Federal Reserve Board requires all short sale accounts to have 150% of the value of the short sale at the time the sale is initiated. The 150% consists of the full value of the short sale proceeds (100%), plus an additional margin requirement of 50% of the value of the short sale. For example, if an investor initiates a short sale for 1,000 shares at $10, the value of the short sale is $10,000. The initial margin requirement is the proceeds $10,000 (100%), along with an additional $5,000 (50%), for a total of $15,000.

Maintenance margin requirement rules for short sales add a protective measure that further improves the likelihood that the borrowed shares will be returned. In the context of the NYSE and NASD, the maintenance requirements for short sales are 100% of the current market value of the short sale, along with at least 25% of the total market value of the securities in the margin account. Keep in mind that this level is a minimum, and it can be adjusted upward by the brokerage firm. Many brokerages have higher maintenance requirements of 30-40%. (In this example, we are assuming a maintenance margin requirement of 30%.)

| At Time of Short Sale | Shares | Share Price | Short Sale Value | Initial Margin Requirement | Total Margin Requirement |
|---|---|---|---|---|---|
| | 1000 | $50 | $50,000 | $25,000 | $75,000 |

| As Stock Price Increase | Shares | Share Price | Short Sale Value | Maintenance Margin Requirement | Total Margin Requirement | Margin Call |
|---|---|---|---|---|---|---|
| | 1000 | $55 | $55,000 | $16,500 | $71,500 | $0 |
| | 1000 | $60 | $60,000 | $18,000 | $78,000 | $3,000 |
| | 1000 | $75 | $75,000 | $22,500 | $97,500 | $22,500 |

Figure 1

In the first table of Figure 1, a short sale is initiated for 1,000 shares at a price of $50. The proceeds of the short sale are $50,000, and this amount is deposited into the short sale margin account. Along with the proceeds of the sale, an additional 50% margin amount of $25,000 must be deposited in the account, bringing the total margin requirement to $75,000. At this time, the proceeds of the short sale must remain in the account; they cannot be removed or used to purchase other securities.

The second table of Figure 1 shows what happens to the short seller if the stock price increases and the trade moves against him or her. The short seller is required to deposit additional margin in the account when the total margin requirement exceeds the original total margin requirement of $75,000. So, if the stock price increases to $60, then the market value of the short sale is $60,000 ($60 x 1000 shares). The maintenance margin is then calculated based on the market value of the short, and it is $18,000 (30% x $60,000). Added together, the two margin requirements equal $78,000, which is $3,000 more than the initial total margin that was in the account, so a $3,000 margin call is issued and deposited into the account.

| At Time of Short Sale | Shares | Share Price | Short Sale Value | Initial Margin Requirement | Total Margin Requirement |
|---|---|---|---|---|---|
| | 1000 | $50 | $50,000 | $25,000 | $75,000 |

| As Stock Price Decreases | Shares | Share Price | Short Sale Value | Additional Margin Requirement | Total Margin Requirement | Margin Released |
|---|---|---|---|---|---|---|
| | 1000 | $45 | $45,000 | $22,500 | $67,500 | $7,500 |
| | 1000 | $40 | $40,000 | $20,000 | $60,000 | $15,000 |
| | 1000 | $35 | $35,000 | $17,500 | $52,500 | $22,500 |

Figure 2

Figure 2 shows what happens when the stock price decreases and the short sale moves in the short seller's favor: the value of the short sale decreases (which is good for the short seller), the margin requirements also change, and this change means the investor will start to receive money out of the account. As the stock heads lower and lower, more and more of the margin in the account - the $75,000 - is released to the investor. If the price of the stock falls to $40 a share, the short sale value will be $40,000, down from $50,000. Whenever the price falls, investors are still required to have an additional 50% in the account - so the additional margin required in this case will be $20,000, down from $25,000. The difference between the initial margin requirement total and the margin requirement total as the price falls is released to the short seller. In this example, the amount released when the price falls to $40 is $15,000, which consists of the $10,000 drop in the short sale value and the $5,000 drop in the additional margin requirement. The short seller could then use this money to purchase other investments.

To learn more, see our *Short Selling Tutorial* and our *Margin Trading Tutorial*.

**Get A FREE Options Investing Kit**

**Ask Us A Question!**


Copyright © 2008 Investopedia ULC. All Rights Reserved | Terms of Use | Privacy Policy | Advertise on Investopedia
**Investopedia Partners:** AOL Money & Finance

Technical Analysis CHART ADVISOR | Follow Warren Buffett Coattail Investor | Business News Forbes | Forbes Magazine Forbes | Forbes Traveler Forbes TRAVELER | Fc

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**LEWIS T. BABCOCK, JUDGE**

Civil Case No. 05-cv-00636-LTB

CARLOS E. SALA, and
TINA ZANOLINI-SALA,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

---

Babcock, J.

This action concerns a claim by Plaintiffs Carlos E. Sala and Tina Zanolini Sala (referred to herein as "Sala," since Tina Zanolini-Sala is a named plaintiff only because the Salas filed a joint tax return) for a refund on Sala's 2000 federal taxes. Sala timely filed his 2000 federal tax return on or before April 15, 2001. Although Sala had income in 2000 of more than $60 million, he claimed a tax loss that essentially nullified his tax burden. Sala achieved the alleged loss through his involvement in a foreign currency options investment transaction known as Deerhurst. Sala filed an amended return on November 18, 2003, eliminating the loss claimed on his original 2000 return and paying over $26 million in taxes, plus penalties and interest. Sala later filed another amended return reclaiming the tax loss and seeking a refund of the taxes, interest, and penalties. The Government contends Sala is not entitled to claim the tax loss because Deerhurst

was an improper tax shelter. Sala disagrees, and brought suit against the Government to obtain a refund of the taxes, interest, and penalties he paid to the Government.

An eight day trial to the Court in this matter was held commencing March 10, 2008, and concluding March 19, 2008. The two claims at issue were Sala's entitlement to a refund of the taxes, penalties, and interest he paid on his 2000 income and—to the extent any refund was due Sala on putatively "excess" interest—the Government's entitlement to an accuracy-related penalty owed, but not assessed. After a review of all the evidence presented both at trial and by deposition, I find in favor of Carlos Sala and Tina Zanolini-Sala and against the Government on all claims and counterclaims.

## I. BACKGROUND FACTS

The following facts are not disputed. In 1997, Sala became employed as CFO, Secretary, and Treasurer of Abacus Direct, Inc. Sala's compensation included cash and stock options. In June 1999, Abacus was acquired by DoubleClick, Inc. In connection with the acquisition, Sala received DoubleClick stock options. Sala sold his DoubleClick options in February or March of 2000. Largely as a result of the sale of these options, Sala realized more than $60 million in income in 2000.

Sala invested most of this income into municipal bonds and other fixed income financial products. Approximately $9 million, however, was invested in a foreign currency investment program, which is collectively referred to herein as the "Deerhurst Program." As part of the Deerhurst Program, Sala deposited $500,000 on October 23, 2000, into a personal account at Refco Capital Markets ("Refco") that was managed by Deerhurst Management Company, Inc.

Case 1:01-cv-03026-FB-ALM Document 96 Filed 09/22/2008 Page 3 of 55

("Deerhurst Management"). Deerhurst Management was principally owned and managed by Andrew Krieger, a renowned foreign currency trader.

On November 21, 2000, Sala deposited an additional $8,425,000 into his personal account at Refco. Between November 20 and November 27, 2000, Deerhurst Management acquired 24 foreign currency options on Sala's behalf. The options consisted of both long and short options in various foreign currencies with a net cost to Sala of approximately $728,297.85.

On November 8, 2000, Sala formed Solid Currencies, Inc. ("Solid" or "Solid Currencies")—a Delaware S Corporation in which he was the sole shareholder. On November 28, 2000, Sala transferred the 24 options, plus approximately $8 million in cash, to Solid and then from Solid to Deerhurst Investors, GP, ("Deerhurst GP") in exchange for a partnership interest. Deerhurst GP was liquidated prior to December 31, 2000. Upon liquidation of Deerhurst GP, Solid received a share of the proceeds. Solid transferred its share of the Deerhurst GP proceeds to Deerhurst Trading LLC. Krieger continued to manage these funds on behalf of Sala in various entities through 2004.

On or before April 15, 2001, Sala filed a corporate income tax return for Solid for the 2000 tax year. The return was prepared and signed by David Schwartz, the brother of Michael Schwartz—the person who introduced Sala to the Deerhurst Program. The return reported an ordinary loss from a trade or business of $60,449,984.

The approximately $60 million loss claimed was allegedly achieved by a series of predetermined steps, orchestrated under a then-existing tax rule that disregarded short options as liabilities for purposes of establishing partnership basis. Under this rule, established in *Helmer v. Commissioner of Internal Revenue*, T.C. Memo. 1975-160 (1975), liabilities created by short

options were considered too contingent to affect a partner's basis in the partnership. Upon transfer of the 24 foreign currency options from Sala to Solid and then to Deerhurst GP, Solid's basis in Deerhurst GP was increased by the value of the long options, $60,987,866.79, but was not offset by the $60,259,568.94 cost of the short options. Accordingly, Solid's claimed basis in Deerhurst GP was approximately $69 million—the value of the cash plus the long options.

Upon liquidation of Deerhurst GP, Solid received a portion of Deerhurst GP's liquidated assets equal to the proportionate size of Solid's basis. Solid claimed to have received approximately $8 million in cash and two foreign currency contracts. Under the Tax Code, the foreign currency contracts were considered to be "property" at transfer. The value of the foreign exchange contracts distributed to Solid, therefore, was claimed to be approximately $61 million—$69 million (Solid's original basis in Deerhurst GP) less the $8 million in cash. When Solid sold the foreign currency contracts, its loss was equal to the $61 million dollar value of the contracts, offset by any profit received from their sale. According to Solid's 2000 tax return, the combined loss on the foreign currency contracts was approximately $60,250,065.94. When combined with Solid's other expenses and losses, Solid's 2000 loss was reported as $60,449,984.

On or before April 15, 2001, Sala filed a personal federal income tax return for the 2000 year ("2000 return"). The 2000 return reported wages of $51,748,681; taxable interest income of $1,837,561; dividend income of $410,300; taxable refunds, credits, or offsets of state and local income taxes of $7,846; a capital gain of $6,472,000; and other income of ($23). The 2000 return reported on line 17 (rental real estate, royalties, partnerships, S corporations, trusts, etc.) the $60,449,984 loss attributed to a non-passive loss from Solid Currencies. The 2000 return reported adjusted gross income of $26,381. Sala reported owing no federal taxes.

Case 1:01-cv-03625-FB Document 96 Filed 05/09/2008 Page 32 of 85

In November 2003, Sala filed a form 1040X amending his 2000 return. The amended return reported the same income amounts as the original return, but did not report the $60,449,984 loss previously attributed to Solid Currencies. Sala paid the resulting approximately $26 million in taxes, interest, and penalties. On or about June 18, 2004, the IRS issued a Notice of Deficiency to Sala, asserting he owed additional taxes in the amount of $22,204 due to the disallowance of $56,071 of losses Sala reported as attributable to Solid Currencies. The Notice of Deficiency also asserted an accuracy-related penalty in the amount of $4,400.80 for tax year 2000.

In September 2004, Sala filed another form 1040X for the 2000 tax year reclaiming the loss attributable to Solid Currencies and claiming a refund due of $23,727,630.

In the Amended Pretrial Order [Docket # 195], the parties stipulated to the following additional relevant facts. In late 1999, Sala was introduced to KPMG partner Tracie Henderson through Sala's friend Tim Gillis—also a KPMG partner. KPMG prepared Sala's federal and state tax returns for the years 2000, 2001, 2002, and 2003. Prior to 2000, Sala's tax returns were prepared by PricewaterhouseCoopers.

On August 13, 2000, IRS Notice 2000-44 was released electronically; on September 18, 2000, it was published.

On or about April 15, 2001, Sala paid R. J. Ruble $75,000 for a tax opinion letter involving the tax benefits of the Deerhurst Program.

## II. ISSUES PRESENTED AT TRIAL

Five distinct issues were presented at trial: (1) whether the transactions creating Sala's 2000 tax loss constituted sham transactions; (2) whether Sala entered into the transactions

creating his 2000 tax loss for profit; (3) whether the transactions creating Sala's 2000 tax loss, as executed, allowed the tax loss; (4) whether any allowable tax loss was rendered retroactively disallowed by 26 C.F.R. § 1.752-6; and (5) whether the Government is entitled to an offset of any excess interest payments made by Sala with an accuracy-related penalty. The second issue is an issue of fact. *See Hildebrand v. Comm'r of Internal Revenue*, 28 F.3d 1024, 1026 (10th Cir. 1994). The fourth issue is a question of law. The remaining issues are mixed questions of law and fact.

Before addressing these issues, however, it is necessary to define the appropriate burden of proof in this case and define the scope of the loss-generating transaction.

## III. BURDEN OF PROOF

The allocation of burdens as to each specific factual issue will be addressed where appropriate throughout this order. I therefore lay out only the general framework here.

Under 26 U.S.C. § 7491, when a taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability, the Government has the burden of proof with respect to such factual issue so long as (1) the taxpayer has complied with the requirements of the Tax Code to substantiate any item, and (2) the taxpayer has maintained all records required and has cooperated with reasonable requests for witnesses, documents, meetings, and interviews.

It cannot genuinely be disputed that Sala has complied with the requirements of the Tax Code to substantiate each of his factual claims and that Sala has maintained all records required and has cooperated with reasonable requests for witnesses, documents, meetings, and interviews. Sala has provided the Government with thousands of pages of records, including written

explanations and other supporting information substantiating his factual claims. Moreover, Sala consented to extending the period in which the IRS could assess an additional tax deficiency for the 2000 tax year. Sala's cooperation with the IRS was clearly sufficient to meet the requirements under § 7491. Accordingly, the Government has the burden of proof as to each issue of fact so long as Sala supports his factual account with credible evidence. For the purposes of § 7491, "credible evidence . . . is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Griffin v. Comm'r of Internal Revenue*, 315 F.3d 1017, 1021 (8th Cir. 2003).

When considering penalties, however, the burden of production is on the Government to make a *prima facie* case that penalties should apply. If the Government meets this burden, the burden then shifts to Sala to show his underpayment was not the result of negligence and that he did what a reasonably prudent person would have done under the circumstances. *Sparkman v. Comm'r of Internal Revenue*, 509 F.3d 1149, 1161 (9th Cir. 2007); *Van Scoten v. Comm'r of Internal Revenue*, 439 F.3d 1243, 1258 (10th Cir. 2006). The determination of whether a taxpayer meets his burden of proving due care is a factual one. *Mortensen v. Comm'r of Internal Revenue*, 440 F.3d 375, 385 (6th Cir. 2006).

## IV. SCOPE OF THE LOSS-GENERATING TRANSACTION

Before analyzing whether Sala was entitled to the loss allegedly generated by the Deerhurst Program, it is necessary to define the scope of the "transaction" that caused the loss. I must look beyond the form of the Deerhurst Program to determine whether the portion of the program that created the loss is bona fide. *See Rogers v. United States*, 281 F.3d 1108, 1114–17

(10th Cir. 2002). I examine Sala's involvement in the Deerhurst Program as a whole, considering each step, to determine if the substance of the transaction is consistent with its form. *ACM P'ship v. Comm'r of Internal Revenue,* 157 F.3d 231, 246–48 (3d Cir. 1998). The "transaction" to be analyzed is the transaction that gave rise to the particular tax benefit, not collateral transactions which do not produce the tax benefits. *See James v. Comm'r of Internal Revenue*, 899 F.2d 905, 910 (10th Cir. 1990). So long as the transaction that creates the tax benefit is bona fide, any tax benefit achieved will be presumed legitimate. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1356–57 (Fed. Cir. 2006) (discussing cases).

The threshold issue, therefore, is whether (a) the "transaction" includes only the portions of the Deerhurst Program occurring in 2000—that is, Sala's purchase of the 24 foreign currency option contracts and the subsequent transfers from Sala to Solid Currencies and from Solid Currencies to Deerhurst GP, the subsequent sale of the contracts, and the return to Solid of a reported $8 million in cash and two foreign currency contracts—or (b) whether the "transaction" also includes the reinvestment of the Deerhurst GP liquidation proceeds into Deerhurst LLC and the trading occurring from 2001 onward. For the reasons stated below, I find and conclude that—for purpose of determining whether the loss-generating transaction was bona fide—both the Deerhurst GP portion of the Deerhurst Program and the Deerhurst LLC portion of the Deerhurst Program must be considered together as a single transaction.

A. Findings of fact

The subjective intent of the parties to a loss-generating transaction is a significant factor when determining whether the transaction was bona fide. *See, e.g., Klamath Strategic Inv. Fund, LLC v. United States*, 472 F. Supp. 2d 885, 896–98 (E.D. Tex. 2007). Sala testified at trial that

his participation in the Deerhurst Program was undertaken in accordance with a five year plan. Under the plan, potential Deerhurst investors were required to place a minimum of $500,000 into a Refco account, to be traded on each individual's behalf by Krieger through Deerhurst. Investors were free to withdraw their funds without penalty at any time during this initial test period. If investors desired to continue investing in Deerhurst, they were required to deposit additional funds—which combined were to equal at least 15% of their expected tax loss—into a Deerhurst GP account. This second round of investment was to remain under Deerhurst management through 2000. If the Deerhurst GP account was profitable after liquidation in late 2000, investors were required to reinvest their liquidation proceeds in Deerhurst LLC for a minimum of five years, or face a significant early-withdrawal penalty. Sala's testimony—which was not contradicted by any Government evidence—was both credible and well-supported by documentary evidence and the deposition testimony of Michael Schwartz, Martin White—a friend of Sala who also was a significant Deerhurst investor—and Andrew Krieger. I accept Sala's testimony in this regard as fact.

Sala testified that he viewed his investment in the Deerhurst Program to be part of one continuous transaction lasting five years. This testimony was uncontradicted. Accordingly, I conclude Sala subjectively viewed his participation in the Deerhurst Program to be a single transaction.

The behavior of the other Deerhurst Program investors also supports the conclusion that the Deerhurst GP program and the Deerhurst LLC program were understood by the investors to comprise one transaction. Martin White testified by deposition that "at a certain point, you needed to be either in or out. And if you were in, you were in for, I think it was four years. And

that was it. You were in, you were locked in . . . your investment was sort of illiquid at that point." Although one investor, Joe Umback, withdrew from the initial test phase of the Deerhurst Program—without ever investing in the Deerhurst GP portion of the program—every investor who participated in Deerhurst GP also invested in Deerhurst LLC despite the fact that the Deerhurst LLC portion had no tax benefits. This demonstrates that the investors in the Deerhurst understood their obligation—once they had profitably invested in the Deerhurst GP portion of the Deerhurst Program—to invest in the five-year combined program.

B. Case law analysis

The Government argues that the focus of my inquiry must be upon the Deerhurst GP portion of the Deerhurst Program alone, as the Deerhurst GP portion achieved the 2000 tax loss. I am unconvinced.

The cases cited by the Government do not concern the question presented here—whether a loss generated in the first year of an ongoing multi-year investment relationship between two parties must be analyzed on its own. For example, in *James* the Tenth Circuit addressed whether lease transactions between certain joint ventures—which reported a tax loss—and an entity engaged in the purchase and lease of computer equipment could be found to lack economic substance when the purchases and lease transactions themselves were legitimate. *See James, supra*, 899 F.2d 905. The court relied on the fact that the legitimate transactions were undertaken by entities independent from those claiming the tax loss. Rejecting the argument that the loss-generating arrangements and the purchase and lease arrangements were one "unitary deal," the court noted "there were many individual actors and many individual transactions." *Id*. at 910. The court held that the purchase-and-lease entity "never actually purchased equipment 'on behalf

of' the joint ventures, but instead executed separate purchase agreements with them." *Id*. at 909. Thus, the legitimate purchase and lease contracts were independent of the loss-generating arrangements between the purchase-and-lease entity and the joint ventures and the latter were not "legitimized merely because they were on the periphery of some legitimate transactions." *Id*.

Likewise, in *Nicole Rose Corp. v. Comm'r of Internal Revenue*, 320 F.3d 282 (2d Cir. 2003), the court addressed whether an otherwise sham loss-generating transaction could be found to have economic substance because it offset profits from other associated transactions. The taxpayer claimed a loss of $22 million achieved from the transfer of certain leases of European computer equipment to a European bank. *Id*. at 283. Contemporaneous with the lease transfers, the taxpayer bought and sold a third corporation, realizing a profit of $11 million. *Id*. at 284. Rejecting the taxpayer's argument that the two transactions should be considered together for purposes of determining economic substance, the Second Circuit held that income generated from the purchase and sale of the third corporation was irrelevant to the inquiry whether the lease transfer had economic substance. *Id*. *Nicole Rose* did not concern whether the loss-generating portion of an ongoing investment relationship between two parties must be analyzed on its own for economic substance.

The remaining cases cited by the Government are similarly distinct from Sala's. *See, e.g.*, *Klamath*, *supra*, 472 F. Supp. 2d 885 (holding that although the loss-generating transaction was described as part of a seven-year plan on paper, the "seven-year plan" was actually intended to be—and in fact was—concluded in its entirety by the end of the tax year in which the loss was generated); *see also Coltec*, *supra*, 454 F.3d 1340 (holding that although the loss-generating transfer of contingent asbestos litigation liabilities to Garrison—a Coltec subsidiary—in exchange

Case 1:01-cv-00625-BB-LCS Document 246 Filed 04/28/2008 Page 12 of 35

for a $375 million note was done in conjunction with a legitimate business purpose transfer of management of asbestos claims, the transfer of management was "separate and distinct from the fact that Garrison took a managerial role in the asbestos liabilities, as demonstrated by the fact that Garrison managed another entity's asbestos liabilities . . . without actually assuming [its] liabilities" and therefore was not sufficiently linked with the transfer of liabilities for purposes of considering the transfer of management and liability as one transaction).

Unlike the phony seven-year plan in *Klamath*, the evidence here shows that not only the investors, but also the promoters and managers of the Deerhurst Program, intended the program to be long term. Andrew Krieger created a special entity—Beckenham Trading Company ("BTC")—that executed the trades on behalf of the Deerhurst Program. BTC had its own employees and its own independent infrastructure. The promoters of the Deerhurst Program, including Michael Schwartz and John Raby, were largely paid for their efforts out of the fees BTC generated from making trades. Likewise, Andrew Krieger received a large portion of his fees from BTC's profits. In 2000—the year in which Sala realized the tax loss—BTC generated no income. If the Deerhurst Program had been a quick in-and-out program, neither Krieger, Schwartz, nor Raby would have realized a significant return from the Deerhurst Program. As all three parties expressed their expectation of being paid for their work, it follows that all three expected and intended the Deerhurst Program to be ongoing. Accordingly, I find this case unlike those cited by the Government in support of its argument that the Deerhurst GP portion of the Deerhurst Program should be considered separately from the Deerhurst LLC portion of the Deerhurst Program for purposes of determining whether the loss-generating transaction was bona fide.

Instead, I find the facts here akin to those in *Salina Partnership LP v. Commissioner of Internal Revenue*, T.C. Memo. 2000-352 (2000). In *Salina Partnership*—a case addressing a question nearly identical to that presented in this section—the taxpayer invested in a long-term investment program that consisted of two distinct steps, one occurring at the end of 1992, and the other occurring from 1993 forward. Like this case, the 1992 portion lasted only a few days but yielded significant tax benefits. *See id*. at *9–11. While conceding the economic substance of the 1993-forward portion of the program, the Government claimed the 1992 portion was structured solely for the purpose of achieving tax benefits and therefore should have been considered a distinct transaction. *See id*. at *11. The Government argued the taxpayer never had any intent to achieve profits from the 1992 portion of the program, but always intended the invested funds to be immediately reinvested in the 1993 forward program. *See id*. Disagreeing with the Government's position, the Tax Court "decline[d] to analyze the economic substance of the disputed transaction by focusing solely on events occurring during the period December 28 through 31, 1992. Segregating FPL's investment in Salina into two parts, as respondent suggests, would violate the principle that the economic substance of a transaction turns on a review of the entire transaction." *Id*. at *13. The court was persuaded by the fact that the taxpayer—like Sala here, *see* Part VII, *infra*—conducted significant due diligence on the 1993 forward program before investing in the 1992 program and that a condition of investment in the 1992 program—like the investment in Deerhurst GP here—was the requirement that the liquidated 1992 funds be reinvested in the 1993 program. *See Salina P'ship*, T.C. Memo. 2000-352 at *13.

Accordingly, I find and conclude that—for purposes of determining whether the loss-generating portion of Sala's participation in Deerhurst was part of a bona fide transaction—the Deerhurst Program must be considered in its entirety from 2000 onward.

## V. STEP TRANSACTION ANALYSIS

The Government argues that—for purposes of determining whether Sala suffered a deductible loss in 2000—the Deerhurst GP transactions should be collapsed into one transaction under the "step transaction doctrine." Under the Government's view, the steps Sala took in 2000 should be conceptually merged together so that Sala's purchase of the initial 24 options would—for purposes of calculating tax consequences—be converted to the $9 million dollar proceeds without the intervening loss-generating steps involving Solid Currencies. The issues involved in the application of the step transaction doctrine, especially with regard to taxpayer's intent, "are undeniably questions of fact." *See True v. United States*, 190 F.3d 1165, 1176 n.10 (10th Cir. 1999).

"Deciding 'whether to accord the separate steps of a complex transaction independent significance, or to treat them as related steps in a unified transaction, is a recurring problem in the field of tax law.' In search of an answer to this problem, courts utilize a variety of approaches, including a particular incarnation of the basic substance over form principle known as the step transaction doctrine. Simply stated, the step transaction doctrine provides that 'interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction.'" *See True*, *supra*, 190 F.3d at 1174 (quoting *Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 738 (1989); *King Enters., Inc. v. United States*, 418 F.2d 511, 516 (Ct. Cl. 1969)).

Case 1:01-cv-03025-RDB Document 246 Filed 09/24/2008 Page 15 of 35

"Courts have developed three tests for determining when the step transaction doctrine should operate to collapse the individual steps of a complex transaction into a single integrated transaction for tax purposes: (1) end result, (2) interdependence, and (3) binding commitment. More than one test might be appropriate under any given set of circumstances; however, the circumstances need only satisfy one of the tests in order for the step transaction doctrine to operate." *True*, *supra*, 190 F.3d at 1174 (citing *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1522 (10th Cir. 1991)). While the Government tries to separate the Deerhurst GP transactions from the Deerhurst LLC transactions for purposes of the step transaction analysis, such a separation would run afoul of the rationale behind the step transaction doctrine in the first place: combining related steps into a single integrated transaction for tax purposes. Thus, as held above, the "complex transaction" examined in this section must necessarily include the entire Deerhurst Program from 2000 and beyond.

The end result test "amalgamates into a single transaction separate events which appear to be component parts of something undertaken to reach a particular result." *Kornfeld v. Comm'r of Internal Revenue*, 137 F.3d 1231, 1235 (10th Cir. 1998). Under this test, if the particular steps in a transaction are "merely the means to reach a particular result," I do not separate those steps, "but instead treat them as a single transaction." *See True*, *supra,* 190 F.3d at 1175. The taxpayer's subjective intent when entering into each step is especially important under this test. *See id*. Whether the taxpayer intended to avoid taxes, however, is not the relevant inquiry. *See id*. Instead, my focus is on whether—at the time each individual step was taken—each individual step had a purpose other than the achievement of the end result. *See id*. at 1175–77. Courts invoking the "end result" test generally find it applicable when the complex steps actually

Case 1:01-cv-03025-TC Document 96 Filed 04/2008 Page 16 of 35

employed had little or no benefit over a more direct course of action. *See id.* at 1177; *Crenshaw v. United States*, 450 F.2d 472, 475 (5th Cir. 1971). If I apply the end result test, Sala's participation in the Deerhurst Program will be collapsed such that his initial investment in Deerhurst GP in 2000 will be considered for tax purposes as a direct investment in Deerhurst LLC in 2001.

Looking at the fact of this case, it is clear that the "end result" test should not apply. The intended end result of Sala's participation in the Deerhurst Program—aside from the tax benefits which are irrelevant to the "end result" inquiry—was to achieve significant returns from his Deerhurst LLC investments. The evidence presented at trial overwhelmingly shows that Sala was an extremely cautious investor who invested a great deal of time and energy carefully researching and choosing his investments. Sala's participation in the Deerhurst GP test period falls well within the realm of behavior one would expect from such an investor. Had the Deerhurst Program lost money during the Deerhurst GP test period comparable to the money lost in the Deerhurst LLC period—a phenomena not uncommon among hedge funds, according to Sala's credible testimony—Sala would have invested his money elsewhere. Accordingly, Sala's investment in Deerhurst GP was not a circuitous sojourn on the path to his investment in Deerhurst LLC, but was instead a checkpoint that protected him—albeit only to a small degree—from plunging headfirst into an uncertain five-year strategy. In that sense, the Deerhurst GP steps were not "taken for the purpose of reaching the ultimate result" of investing in Deerhurst LLC, but were steps taken for the purpose of protecting Sala from having to "reach the ultimate result"—investing in Deerhurst LLC—at all. *See Associated Wholesale Grocers*, *supra*, 927 F.2d at 1523 (citations omitted).

The “interdependence test” requires an inquiry into “whether under a reasonably objective view the steps were so interdependent that the legal relations created by one of the transactions seem fruitless without completion of the series.” *Kornfeld*, *supra*, 137 F.3d at 1235. “Disregarding the tax effects of individual steps under this test is, therefore, ‘especially proper where . . . it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts.’” *Associated Wholesale Grocers*, *supra*, 927 F.2d at 1523 (quoting *Kuper v. Comm’r of Internal Revenue*, 533 F.2d 152, 156 (5th Cir. 1976) (ellipsis in original)). If each individual step would not have been taken had the others not followed, therefore, the interdependence test requires those steps to be considered as one. *True*, *supra*, 190 F.3d at 1179.

Under the interdependence test, I “examine [the] tandem of transactional totalities to determine whether each step has a reasoned economic justification standing alone.” *Sec. Indus. Ins. Co. v. United States*, 702 F.2d 1234, 1247 (5th Cir. 1983); *see also True*, *supra*, 190 F.3d at 1178. The fact that there was a business purpose for each individual step is one indication that its formation was not interdependent with the subsequent steps. *See Associated Wholesale Grocers*, *supra*, 927 F.2d at 1527 n.15. As held in Part VI, *infra*, each individual step in the Deerhurst Program had a valid non-tax business purpose.

More important, the evidence presented at trial showed Sala invested in the Deerhurst Program for profit, *see* Part VII, *infra*, and each step of the transaction helped assure that goal. Sala could have achieved the tax loss without the use of Solid Currencies. Sala also could have achieved the tax loss without reinvesting in Deerhurst LLC. Each step Sala took leading to his eventual investment in Deerhurst LLC amounted to “the type of business activity one would expect to see in a bona fide, arm’s length business deal between unrelated parties” and each makes

Case 1:05-cv-00636-LTB-KLM Document 96 Filed 04/22/2008 Page 18 of 35

objective sense standing alone without contemplation of the subsequent steps in the transaction. *See True*, *supra*, 190 F.3d at 1179. Most telling, the initial phases of the Deerhurst Program were structured such that Sala—as one investor did—could exit the program early before committing his full $9 million. Thus, as a matter of fact, each step did not lead "inexorably to the next." *See id*. Accordingly, it can hardly be said that each step of Sala's investment in the Deerhurst Program would be "fruitless" without the others and the interdependence test does not require the multiple steps in Sala's Deerhurst investment to be considered as one.

The "binding commitment" test collapses a series of steps into a single transaction where there was a binding commitment at the time the first step was entered into to also undertake a later step or series of steps. *See generally Comm'r of Internal Revenue v. Gordon*, 391 U.S. 83 (1968). The "binding commitment" test is seldom applied outside of the context of *Gordon*—wherein a corporate distribution was broken into a span of several years—and has generally been rejected in other contexts. *See Associated Wholesale Grocers, supra*, 927 F.2d at 1522 n.6. As this case does not concern the statutory language considered in *Gordon* concerning divisive reorganizations, I need not apply the test here. *See Security Indus*., *supra*, 702 F.2d at 1245; *King Enters*., *supra*, 418 F.2d at 517–18.

Accordingly, I find and conclude the step transaction doctrine does not apply here to merge Sala's purchase of the initial 24 options into his eventual investment in Deerhurst LLC without the intervening loss-generating steps involving Solid Currencies.

## VI. WHETHER THE DEERHURST PROGRAM WAS A SHAM TRANSACTION

While the legal right of a taxpayer to decrease the amount of what otherwise would be his taxes—or altogether avoid them by means which the law permits—cannot be doubted, *Boulware*

*v. United States*, 128 S. Ct. 1168, 1175 n.7 (2008), "sham transactions" are not recognized for tax purposes. *Keeler v. Comm'r of Internal Revenue*, 243 F.3d 1212, 1215 (10th Cir. 2001). "Sham transactions" generally fall into one of two categories. *James*, *supra*, 899 F.2d at 908 n.4. A "sham in fact" is a transaction that occurs on paper, but which never took place in reality. *Id*. The Government does not contend that the loss-generating investments at issue in this case were "shams in fact."

A "sham in substance" occurs when there is nothing of substance to be realized from a transaction apart from income tax savings. *James*, *supra*, 899 F.2d at 908. A transaction will be accorded tax recognition only if it has economic substance which is compelled or encouraged by business realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached. *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–85 (1978). The analysis, therefore, requires both an objective inquiry into whether the transaction had economic substance—that is, a reasonable possibility of profits beyond the tax benefits—and a subjective inquiry into whether the taxpayer had a business purpose for engaging in the transaction other than tax avoidance. *See Jackson v. Comm'r of Internal Revenue*, 966 F.2d 598, 601 (10th Cir. 1992) (citing *Casebeer v. Comm'r of Internal Revenue*, 909 F.2d 1360, 1363 (9th Cir. 1990)); *Bohrer v. Comm'r of Internal Revenue*, 945 F.2d 344, 348 n.5 (10th Cir. 1991). It is not necessary for the Government to prove both inquiries. *James*, *supra*, 899 F.2d at 908–09. A finding that either a loss-generating transaction lacked objective economic substance or was not motivated by a non-tax business purpose is sufficient to find a transaction to be a sham. *See Keeler*, *supra*, 243 F.3d at 1220.

A review of the relevant case law makes clear that the line between the economic substance and business purpose inquiries is not a bright one, and that both inquiries have subjective and objective elements. *See Nickeson v. Comm'r of Internal Revenue*, 962 F.2d 973, 976 (10th Cir. 1992). Accordingly, I consider the economic substance of the Deerhurst Program and Sala's business purpose motivation together to determine whether the transaction had any practical economic effects other than the creation of income tax losses. *See Jackson*, *supra*, 966 F.2d at 601. I view the transaction as a whole, and each step—from commencement to consummation—is relevant. *See ACM P'Ship*, *supra*, 157 F.3d at 247.

A. Whether the Deerhurst Program had economic substance

Whether a claimed loss is deductible turns on "the objective realities of a transaction rather than the particular form the parties employed." *Boulware*, *supra*, 128 S. Ct. at 1175. It cannot seriously be doubted that the Deerhurst Program had the objective potential to be hugely profitable. Looking at the 24 basis-generating options—trades that Government expert Dr. DeRosa repeatedly referred to as "un-Kriegerlike" for their *low* potential to earn profits—the experts agreed that the contracts had the potential to earn profits of approximately $550,000—excluding a directional British pound-Japanese yen play—on an investment of approximate $728,000.

Accounting for the directional play, the profit potential was much higher. As Sala's expert Dr. Kolb and Dr. DeRosa both concluded, including the pound-yen play in the profitability calculation—due to its highly speculative nature—was inappropriate and I do not include it in my analysis here. I note, however, that the pound-yen directional play—the type of "occasional core

position" Sala, Krieger, and White testified was typical of Krieger's trading technique—in fact returned over 500% of its cost in less than one month.

Dr. Kolb testified—and I agree—that the appropriate measure of comparison for determining profit from an investment is the cost of the investment, not the value of the undergirding account. Comparing the $550,000 profit, then, to the $728,000 cost, the 24 trades had a profit potential of approximately 75% in one year. Subtracting Krieger's 30% "incentive fee," 4% "management fee"—assuming the account was traded at a 4-to-1 notional value—and "mark-up fees" of 1.5 pips ($150) per million dollars in equity controlled, the profit potential of the 24 basis trades was approximately 45% per year as follows: $728,000 plus $550,000 yields approximately $1,278,000. $1,278,000 reduced by a 30% "incentive fee" on the $550,000 in profit yields $1,113,000. $1,113,000 reduced by a 4% "management fee" yields $1,068,480—a profit of over 46%. The inclusion a "mark-up fee" of 1.5 pips per million dollars roundturn has only a minor impact. Although no "mark-up fee" was actually charged on the 24 basis trades, a review of the Refco statements reveals that the $728,000 controlled $60 million in cash, leading to a "mark-up fee"—if it had been charged—of $9,000. This corresponds to a "mark-up fee" of approximately 1.2% of the $728,000. Subtracting the "mark-up fee" from the $1,068,480 yields $1,059,480—a profit, net of fees, of over 45%.

Had Krieger invested all of Sala's $9 million in similar "low profit potential" trades and reinvested the after-fee proceeds in similar trades, Sala's $9 million had the potential to exceed—albeit by a slender margin—the $60,449,984 claimed loss within the five years and two months dedicated to the combined Deerhurst Program. Although the possibility of achieving such maximum profits was small—based on Dr. DeRosa's estimate that the trades had, at most, a 50

percent likelihood of reaching maximum profitability in one year—the potential is still significant. If—as Dr. DeRosa repeatedly argued he should have—Krieger invested in higher profit potential trades, the likelihood of exceeding the $60 million tax loss could only increase.

Although Dr. DeRosa testified "it would be impossible to ever obtain" even a ten percent return using the investment strategy employed by Krieger in 2000, the actual results show DeRosa's testimony to be inaccurate in this regard. In fact, the results are even more impressive when calculated using the actual profits achieved from the basis trades. In 24 days, Sala's $728,000 investment yielded a profit of between $90,000 and $110,000—depending on which expert's opinion is believed—corresponding to a monthly return well over ten percent by either accounting. Annualized over the course of a 365-day year, this rate of return amounts to between approximately 550 and 780 percent. In light of the potential and actual profits arising from the Deerhurst Program, I find and conclude the program offered a reasonable opportunity for profits exclusive of the tax benefits and therefore possessed economic substance.

B. Whether Sala had a business purpose for structuring his investment in the Deerhurst Program other than tax avoidance

A taxpayer has a legal right to conduct his business so as to decrease—or altogether avoid—the amount of what otherwise would be his taxes. *Gregory v. Helvering*, 293 U.S. 465, 499 (1935). Accordingly, a tax-avoidance motive is not inherently fatal to a transaction. *See True*, *supra*, 190 F.3d at 1173 n.6. If a taxpayer chooses to conduct his business in a form that results in tax avoidance, however, he must choose a business structure that comprises a viable business entity that has a substantial business purpose or actually engages in substantive business

activity. *See N. Ind. Pub. Serv. Co. v. Comm'r of Internal Revenue*, 115 F.3d 506, 511 (7th Cir. 1997).

The business purpose prong of the sham transaction inquiry is similar to the "primarily for profit" standard of 26 U.S.C. § 165, discussed at Part VII, *infra*. *See Friedman v. Comm'r of Internal Revenue*, 869 F.2d 785, 792 (4th Cir. 1989). Thus, the business purpose inquiry concerns the subjective motivations of the taxpayer when entering into the transaction. *See id.* Unlike the 26 U.S.C. § 165 inquiry, however, the business purpose inquiry is met by the taxpayer if he can show *any* business purpose for structuring his transactions other than tax avoidance. *See Frank Lyon Co., supra*, 435 U.S. at 584; *Friedman*, 869 F.2d at 792; *see also Keeler, supra*, 243 F.3d at 1217. Whether the taxpayer had a business purpose other than tax avoidance can be determined by evidence demonstrating the taxpayer's subjective motivations or by an objective examination of the transaction. *See Friedman*, 869 F.2d at 792; *see also Keeler*, 243 F.3d at 1217.

As the business purpose inquiry is a factual question, the initial burden of production is on Sala to produce evidence sufficient to allow for judgment in his favor if not contradicted. *See* 26 U.S.C. § 7491. Sala met his burden of production at trial. While admitting the Deerhurst Program was structured in a way that provided significant tax benefits, Sala testified credibly at trial that each step of the program was structured to provide non-tax business benefits as well. Sala's testimony was supported by Michael Schwartz, Andrew Krieger, Martin White, Dr. Kolb, and documentary evidence. Accordingly, the burden is on the Government to show by a preponderance of the evidence that there was no business purpose to Sala's actions other than tax avoidance. The Government does not meet its burden.

*1. Solid Currencies had a legitimate business purpose*

Sala testified he believed contributing the loss-generating options contracts to an S corporation protected him from personal liability. Although Sala's attorney, Mr. Nemirow, expressed concerns that Solid Currencies was undercapitalized, he was satisfied by the opinion letter of Rosenman & Colin LLP concerning the liability issue—a letter Mr. Nemirow testified provided a "strong" and "unqualified" opinion regarding Sala's liability exposure under New York law.

The Government argues that the use of an S Corporation was intended to distinguish Sala's transaction from those listed in I.R.S. Notice 2000-44. The evidence presented at trial, however, showed that the use of an S Corporation was envisioned by the Deerhurst Program's promoters before Notice 2000-44 was issued. Moreover, Sala could have achieved the same tax benefits without the use of an S corporation by contributing the 24 options contracts directly to Deerhurst GP. This lends additional credibility to Sala's testimony regarding the business purpose of Solid Currencies. Accordingly, I find and conclude Sala's contribution of the loss-generating options contracts to Solid Currencies had a legitimate business purpose other than the creation of tax losses.

*2. Deerhurst GP had a legitimate business purpose*

A partnership will not be recognized for tax purposes if the partnership "is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions." *DeMartino v. Comm'r of Internal Revenue*, 862 F.2d 400, 406 (2d Cir. 1988). In such cases, the basic inquiry is whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance. *Comm'r of Internal Revenue v.*

Case 1:01-cv-00326-5-EC-LM Document 246 Filed 05/04/2008 Page 25 of 55

*Culbertson*, 337 U.S. 733, 741 (1949); *ASA Investerings P'ship v. Comm'r of Internal Revenue*, 201 F.3d 505, 513 (D.C. Cir. 2000). The parties' "intention in this respect is a question of fact, to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.'" *Culbertson*, 337 U.S. at 742 (citing *Drennen v. London Assurance Co.*, 113 U.S. 51, 56 (1885)).

Although there is no doubt the partners, including Sala, entered Deerhurst GP with an eye on tax benefits, there is likewise no doubt that they also entered Deerhurst GP with a good faith intent to join together for the purpose of investing in currency options and sharing in the profits, losses, and expenses. Further, there is no doubt that Deerhurst GP actually engaged in substantial business activity. Deerhurst GP bought and sold hundreds of options contracts—controlling billions of dollars in currency according to Dr. DeRosa—in its one month existence, and achieved substantial profits. These profits—as well as their related expenses—were divided among the partners based upon their partnership share.

As Sala and Krieger testified, contributing Solid Currencies' options to Deerhurst GP allowed for economies of scale, reduced transaction costs that could be spread among the various partners, reduced likelihood of human error, and better allocation of risk and exposure. Krieger testified that having a pool of funds in Deerhurst GP was preferable to numerous individual accounts in the test period because banks were generally not interested in trades amounting to less than $5 million. Although Sala's account—as well as Martin White's—was valued over $5 million, no other investor had an account approaching a similar value. Krieger and Sala both testified that larger trades were more attractive to banks and therefore afforded better liquidity and lower costs. Sala and Krieger testified as well that the larger pool of funds in Deerhurst

GP—as compared to the individual accounts—allowed for trading at a higher leveraged basis. As leverage increased, so did the potential for profit—or loss. This testimony was supported by the testimony of Sala's expert, Dr. Kolb, and I find it reasonable and credible.

Sala and Martin White both testified that the Deerhurst GP test period allowed investors to get comfortable with Krieger's operation and, as Sala put it, "make sure he didn't run off with my money." During the Deerhurst GP test period, Sala became acquainted with Krieger's back office operations and reporting, as well as Krieger's trading style and type of investments. Sala developed a working relationship with Krieger that culminated in Deerhurst adopting Sala's preferred reporting methods as its own—at least for the reports provided to Sala and Martin White.

Sala, Krieger, and Michael Schwartz testified that liquidating Deerhurst GP at the end of 2000 allowed for easier accounting and redistribution of the partnership assets. This testimony was confirmed by Dr. Kolb and I find it to be reasonable and credible. Sala and Krieger also testified that liquidation helped protect the parties against year-end volatility in the market.

The Government relied on the testimony of its expert Dr. DeRosa to show a lack of legitimate business purpose. Dr. DeRosa testified that Krieger's investment strategy was largely volatility-based, and therefore more profitable under volatile market conditions. While Dr. DeRosa's testimony was credible, it does not overwhelm the other valid business purposes for liquidating at the end of 2000, particularly in light of the fact that—as Dr. DeRosa noted in his expert report—the portfolio was profitable at the end of 2000, and actual profits could only be realized by selling the underlying contracts. In light of Krieger's understandable desire to start slowly in order to acclimate his clients to the novel world of foreign currency options trading,

“cashing in” while the options were significantly profitable clearly served a reasonable and legitimate business end. Accordingly, I find the liquidation of the Deerhurst GP at the end of 2000 had a legitimate business purpose other than the creation of tax losses.

Viewing the Deerhurst GP transactions in their individual steps and in their entirety, therefore, I find and conclude Deerhurst GP was a bona fide partnership. Each transaction entered into by Sala with regard to the partnership—including Solid Currencies’ contribution of the loss-generating options contracts to Deerhurst GP—and by the partnership with regard to Sala—including liquidating the options contracts at year’s end—had a substantial business purpose other than the creation of tax losses.

*3. The Deerhurst Program test period had a legitimate business purpose*

The Government argues that the fact that Sala was committed to the Deerhurst Program if the Deerhurst GP made even a penny of profit conclusively shows Sala was only interested in a tax loss. I am unconvinced. As Krieger testified, the Deerhurst Program required a long term commitment in order to execute the foreign currency options trades profitably. Krieger had experienced difficulties with a prior client—Ross Capital—that chose to withdraw and then reinvest in the Deerhurst Program several times in 1998 and 1999. Accommodating short-term investors was excessively burdensome due to the large amount of currency controlled by the options. Krieger’s testimony regarding his strong preference for long term investors was therefore credible. Whether or not a test period even occurred, it would not be unreasonable for Krieger to require a long term investment. The test period helped ensure any investors would remain invested. Also, as Krieger testified, allowing investors to start of with a smaller amount

helped promote the program to those investors who would be uncomfortable jumping into the unfamiliar area of foreign currency options trading with a large up-front investment.

The Government also argues the test period could not have served as a model whereby Sala could become acquainted with Krieger's trading style because only $728,000 was actually invested, and the profit on the test account was—although the exact dollar amount is not clear—only about one percent of the $9 million. The Government's argument ignores the historic realities of the Deerhurst Program. As Sala, Krieger, White, and both experts testified, and as the documentary evidence clearly established, Krieger's trading style consisted mostly of lower risk, lower return investments coupled with occasional core positions betting on the direction of a particular currency's valuation. This is exactly what the 24 basis trades consisted of: five volatility-based sets of four options that had fixed risk/reward potential and two pairs of options with a directional basis. Moreover, the one percent return was comparable to the great plurality of monthly returns in the history of Deerhurst before 2000. Approximately fifty of the 107 months in which Deerhurst had been operational from 1991 to 2000 showed gains or losses of less than two percent. Thirty-six months—approximately one third of all months reported—showed gains or losses of less than one percent. Thus, contrary to the Government's position, Krieger traded in 2000 just as he had traded prior to 2000. No matter how "un-Kriegerlike" Dr. DeRosa believed the trades to be, the historical record of Krieger's actual trading patterns closely mimics that of the test period. Accordingly, I find and conclude the use of a test period had a legitimate business purpose other than the creation of tax losses.

Case 1:01-cv-00025-TBC Document 96 Filed 04/2008 Page 29 of 35

*4. The use of four-option sets had a legitimate business purpose*

The Government presented expert testimony that Sala could have purchased essentially identical-risk options sets using "digital options"—options that are set at a specific price and either expire worthless or pay out a fixed amount. Dr. DeRosa's report notes that each of the four-option sets could be replaced with a cluster of 33 digital options—a total of 165 options achieving the same outcome as the 20 actually used—for a similar price. Using digital options, Sala would have had the same profit/loss potential, but controlled significantly less currency than the $60 million controlled by the 24 basis trades. Thus, using digital options, Sala would not have been able to achieve the $60 million tax loss. While this may be true, the law does not require Sala to have structured his affairs so as to maximize his tax burden. *See Helvering, supra*, 293 U.S. at 469. The Government presented no evidence that the option strategy actually employed by Krieger lacked a business purpose or was in any way unusual or suspect. Sala's expert, on the other hand, testified that digital options had significant disadvantages in that they were considered "exotic" options that were traded less frequently and therefore had less liquidity and higher transaction costs. I find this testimony to be credible. Accordingly, whether Sala could have achieved the same investment goal using digital options does not impact whether the purchase of the 24 basis options had a valid business purpose.

*5. The Deerhurst Program, when viewed in its entirety, had a legitimate business purpose*

Having determined that each step of Deerhurst Program in 2000 was structured in a way that had a valid business purpose above and beyond the creation of tax losses, I next look at whether—when viewed collectively—the Deerhurst Program had a valid business purpose. *See True, supra*, 190 F.3d at 1174. I apply the substance over form principle to prevent the true

Case 1:05-cv-00636-LTB-KLM Document 96 Filed 04/14/2008 Page 30 of 35

nature of the Deerhurst Program from being disguised by mere formalities. *See id*. In light of the Deerhurst Program's potential for significant profits and Sala's good faith and reasonable belief in and expectation of the program's profitability above and beyond the tax benefits, *see* Part VII, *infra*, I find and conclude the Deerhurst Program "considered as a whole" had a business purpose other than the creation of tax losses. *See id*. at 1177.

Accordingly, I hold Sala's investment in the Deerhurst Program was not a sham transaction.

## VII. WHETHER SALA ENTERED INTO THE DEERHURST PROGRAM FOR PROFIT

Although the Deerhurst Program was not a sham transaction, Sala's losses are deductible from his ordinary income only if Sala satisfies the express statutory requirement of 26 U.S.C. § 165(c)(2) that the ordinary income deduction arises from a transaction entered into "for profit." *See Yosha v. Comm'r of Internal Revenue*, 861 F.2d 494, 499 (7th Cir. 1988); *Miller v. Comm'r of Internal Revenue*, 836 F.2d 1274, 1279 (10th Cir. 1988). The test of whether a taxpayer entered into a loss-generating transaction for profit requires a factual determination of the taxpayer's intentions when entering into the loss-creating venture. *See Miller*, 836 F.2d at 1279. If the taxpayer has a good faith belief that the venture will create a benefit in excess of the anticipated tax loss, the Government "allows the loss, because had the transaction been profitable as intended by the taxpayer, the government would have benefitted through increased taxable income." *Id*. at 1278–79. Even though the actual prospects of a profitable operation are minuscule, that is not conclusive in determining the taxpayer's purpose. *King v. United States*, 545 F.2d 700, 708 (10th Cir. 1976). Likewise, even if the venture is unprofitable in fact, the loss

may still be deducted so long as it was reasonably expected to be profitable by the taxpayer. *See Miller, supra*, 836 F.2d at 1279. "What need be shown is that the taxpayer entered into the venture in good faith, for the purpose of making a profit." *King*, 545 F.2d at 708.

Under 26 U.S.C. § 7491, the initial burden of production is on Sala to produce evidence sufficient to allow for judgment in his favor if not contradicted. Sala met his burden of production at trial. Sala testified that he considered other investment programs, including BLIPS and OPIS, but determined these programs—unlike the Deerhurst Program—had little potential for long term profit. Sala testified he chose not to invest in these programs—but instead to invest in Deerhurst—based on his good faith belief—in light of the well-documented trading history of Krieger and Deerhurst—that the Deerhurst Program would be significantly profitable over its anticipated lifespan. Martin White testified similarly. I find this testimony to be credible. Both Sala and White also testified that profitability above and beyond the tax losses was more important than the tax losses themselves because the tax losses were speculative and somewhat dependent on the whims of the I.R.S. With this caveat in mind, Sala sought out an investment program that had what he calculated to be more than a 50% chance of being profitable over and above the tax losses. I find this testimony to be likewise credible. If no contrary evidence were submitted, Sala's credible testimony and supporting exhibits would—without regard to the judicial presumption of IRS correctness—be sufficient grounds to make a finding of fact that Sala entered into the Deerhurst Program with the ultimate objective of producing profits in excess of the tax losses. *Griffin, supra*, 315 F.3d at 1021. Accordingly, the burden of proof is on the Government under 26 U.S.C. § 7491 to show Sala did not enter into the Deerhurst Program with a primary profit objective. The Government fails to meet this burden.

In support of his assertion that he had a good faith belief the Deerhurst Program would be profitable, Sala testified extensively about his investigation of Andrew Krieger and the prior Deerhurst trading results. Sala's investigation revealed Krieger had a consistent record of profitability extending back to 1991, when the Deerhurst Program began. Krieger also had a reputation of being an aggressive foreign currency trader who was well known in financial circles for realizing a $228 million foreign currency exchange profit at Banker's Trust in 1987 at the age of 31. Krieger then went on to work for George Soros, another well-known foreign currency investor, where he achieved additional and significant profits. Sala contacted prior investors with whom Andrew Krieger had been associated—including Lehman Brothers and the Ross Perot Family Fund. These prior investors gave Krieger "glowing recommendations" and confirmed Krieger's reputation as a skilled and reputable investment manager with a history of making consistent and significant profits for his investors.

Before investing in the Deerhurst Program, Sala also reviewed Deerhurst's prior trading results from 1991 through 2000. Over this time period, Sala determined Deerhurst had an average annual return of between 16 and 18 percent net of fees on an unleveraged basis. An independent accounting firm, Julius D. Farber and Company, confirmed Deerhurst had an average annual return of 20.7 percent, net of fees, from 1995 through 1999. Sala applied these calculations and determined that Deerhurst had a significant potential for profit that reached as high as 89% per year net of fees if the performance was consistent with prior years—excluding 1991, 1999, and 2000—and the account was traded at a 4-to-1 leveraged basis.

Sala testified he calculated that if Deerhurst produced returns at the low end of its historic performance range—and Sala's account was unleveraged—Sala's investment net of fees would

double in five years. Sala's 4-to-1 leveraged investment of $9 million would produce taxable income net of fees of approximately $58 million, yielding $26 million in taxes. If Deerhurst produced returns at the high end of its historic performance range, Sala's 4-to-1 leveraged investment would produce taxable income of over $100 million net of fees, yielding $46 million in taxes. Sala's testimony in this regard was corroborated by documentary evidence as well as by the testimony of Martin White and both Sala's and the Government's experts.

The Government argues that the fee structure imposed by Krieger and BTC was so high that it would have been impossible for Deerhurst LLC to ever have been profitable. Indeed, the fees in 2001 alone were as much as one quarter of the amount deposited. Determining Sala's profit motive by examining the outcome in hindsight, however, is inappropriate given the Tenth Circuit's instruction that profit motive be determined at the time the taxpayer enters into the transaction. *See King*, *supra*, 545 F.2d at 709 ("[T]hese transactions should not be viewed in hindsight. Rather, the proper focal point is at the time that King purchased the NOPIs.").

Sala testified extensively at trial that Krieger represented—and Sala reasonably believed—that BTC would actually reduce transaction costs. I find this testimony to be credible. Sala also credibly testified that he continued to receive reassurances from Krieger regarding the BTC fees throughout the life of the Deerhurst Program. The ostensibly cost-reducing effects of BTC were included in the Deerhurst promotional materials. Moreover, Sala's expert, Dr. Kolb, credibly opined that the BTC fees were not unreasonable, provided the returns net of fees were comparable to Deerhurst's historical performance. The Government cannot recast Sala's intent in light of what we all now know regarding Deerhurst's trading performance, but it must be determined at the time Sala entered into the Deerhurst transaction. The evidence makes clear that

Sala had ample reason to believe—and, in fact, did believe—the Deerhurst Program would be profitable, despite the fact that BTC would charge fees for executing the trades.

The Government also argues Sala's negotiation of a separate fee arrangement for himself and Martin White suggests Sala did not enter into the Deerhurst Program for profit. The standard fee agreement for investors in the Deerhurst program included (in addition to BTC's fees) a two percent annual management fee—calculated against the notional, *i.e.*, leveraged, value of the investment—plus an incentive fee of twenty percent of the profits. Sala sought a lower management fee of one percent. Krieger agreed to a lower management fee provided Sala would agree to an incentive fee of thirty percent. Sala admitted at trial that the arrangement he negotiated would result in less profits, but felt a decrease of the management fee accompanied by an increase of the profit share would both incentivise Krieger to ensure Deerhurst's profitability and help ease the pain should Deerhurst return lower than expected results. Both these considerations are reasonable and do not impact whether Sala had a good faith belief Deerhurst would be profitable above and beyond the tax losses. Such belief need not be absolute, as the Government's argument suggests.

In light of Krieger's and Deerhurst's past performance, Sala's testimony that he expected his investment in Deerhurst to be profitable above and beyond the expected tax loss was both reasonable and credible. Sala's extensive investigation and authentication—including first hand recommendations from prior investors—of Krieger's and Deerhurst's past performance, supports his testimony that he was seeking an investment that could achieve consistent and substantial profits. Sala's testimony that he considered other tax-advantaged investments before deciding on Deerhurst—but chose not to participate in these investments because of the low potential for

significant profit—was also reasonable and credible. Sala's testimony was further supported by the testimony of Martin White and the documentary evidence presented at trial. Accordingly, I find and conclude Sala entered into the Deerhurst Program with a good faith belief that the venture would create a benefit in excess of the anticipated tax loss. *See Miller*, *supra*, 836 F.2d at 1279. Even though the Deerhurst Program was unprofitable in fact over the long term, the loss can still be deductible "because had the transaction been profitable as intended by the taxpayer, the government would have benefitted through increased taxable income." *Id*. at 1278–79.

## VIII. WHETHER THE DEERHURST PROGRAM, AS EXECUTED, ALLOWED THE TAX LOSS

The Government argues that—even if the Deerhurst Program was not a sham transaction and was entered into primarily for profit—the Deerhurst Program was not executed in a manner that allowed the tax loss. Four issues are raised in this regard: (A) whether Sala's basis in Solid Currencies was properly calculated to include the $60 million value of the long options; (B) whether the $60 million loss appropriately reflected Sala's investment; (C) whether the long and short options could be considered separate instruments; and (D) whether Solid Currencies received property upon the liquidation of Deerhurst GP. I address each issue in turn.

### A. Whether Sala's basis in Solid Currencies included the $60 million value of the long options under 26 U.S.C. §§ 351 and 358

When a taxpayer transfers property to a corporation in exchange for stock in the corporation, the taxpayer's basis in the stock received is generally equal to his basis in the property that was transferred to the corporation. *See* 26 U.S.C. § 358. Accordingly, no gain or loss is realized in such an exchange. *See* 26 U.S.C. § 351. If the taxpayer also receives money or

property in addition to the stock, however, gain is recognized in amount equal to the amount of money and property received. *See* 26 U.S.C. § 351. If the transfer would result in a loss—such as when the taxpayer assumes a liability of the corporation—the loss is not passed to the taxpayer. *See* 26 U.S.C. § 351.

When a taxpayer transfers property in exchange for stock in a corporation and money or other property, the taxpayer's basis in the corporation is generally equal to the value of the property exchanged (a) decreased by the amount of money received by the taxpayer, the fair market value of any other property received by the taxpayer, and the amount of any loss to the taxpayer; and (b) increased by the amount which was treated as a dividend, and the amount of non-dividend gain to the taxpayer. *See* 26 U.S.C. § 358(a). Where the corporation assumes a liability of the taxpayer on the exchange, such assumption is treated as money received, *see* 26 U.S.C. § 358(d), unless the liability assumed is one that would give rise to a tax deduction when paid, *see* 26 U.S.C. § 357(c)(3), or unless the trade, business, or substantially all the assets with which the liability is associated are transferred to the party assuming the liability as part of the exchange, *see* 26 U.S.C. §§ 358(h)(2)(A) & (B); H.R. CONF. REP. 106-1033 at 1019 (2000).

In this case, Solid assumed all of the contingent obligations represented by the short positions held in Sala's personal account when Solid was formed. At the same time, Sala also transferred all of the long positions to Solid. As the evidence at trial showed, all assets held by Sala in his personal Refco account were transferred to Solid together. Accordingly, "substantially all of the assets" which were associated with the contingent obligations were transferred as part of the incorporation transaction. Under 26 U.S.C. § 358(h)(2)(B), therefore, Sala's basis in Solid was not reduced by the contingent liability value of the short options.

B. Whether Sala's $60 million loss from Solid Currencies was allowable under 26 U.S.C. §§ 465 and 1366

26 U.S.C. § 465 limits a taxpayer's deductions for losses from investment activities to the amount of money the taxpayer has at risk. Under § 465(b)(1)(A), a taxpayer's amount at risk includes "the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity." 26 U.S.C. § 465(b)(4), however, provides that "a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Case law from other circuits holds that offsetting options positions are not within the § 465(b)(4) exception. *See, e.g., Laureys v. Comm'r of Internal Revenue,* 92 T.C. 101, 131–32 (U.S. Tax Ct. 1989). I agree. Accordingly, Sala's amount "at risk" under § 465(b)(1)(A) included the $60 million in adjusted basis and the approximately $9 million in cash.

26 U.S.C. § 1366(d) limits the aggregate amount of losses a shareholder in an S corporation may deduct in a year to the adjusted basis of the shareholder's stock in the S corporation less the adjusted basis of any indebtedness to the S corporation. The Government argues the losses are limited to the amount of "investment" in the S corporation, and that such "investment" would be limited to the cost of the 24 options plus the $9 million in cash. In support, the Government cites cases holding that when a shareholder's basis in an S corporation is created using loans that did not have to be repaid or otherwise did not constitute an actual economic outlay on behalf of the shareholders, the shareholder's basis is not increased by the amount of the loans. *See, e.g., Estate of Leavitt v. Comm'r of Internal Revenue*, 875 F.2d 420 (4th Cir. 1989); *Pike v. Comm'r of Internal Revenue*, 78 T.C. 822 (U.S. Tax Ct. 1982).

To the extent these cases hold a phony loan does not constitute an "actual economic outlay," they are easily distinguished from this case. This case does not involve a phony loan. Each option was a real investment that had actual economic consequences associated with it. The options could be purchased, sold, and traded on the open market. They controlled the disposition of approximately $60 million in currency. Although Sala did not address this argument in his briefing or at trial, I hold the Government's claim—that the "actual economic outlay" requirement should alter the longstanding meaning of "adjusted basis" such that the rule regarding certain contingent liabilities, including short options, be disregarded—is unsupported and I reject it here. Sala's basis in Solid Currencies was properly determined under the rule that short options are not taken into account when calculating basis in acquired stock. Accordingly, Sala's basis—and potential for loss—in Solid Currencies was approximately $69 million.

C. Whether the long and short options can be considered separate instruments

In determining the tax consequences of the transfer of the long and short options, it must be determined whether the options should be treated as separate instruments or whether they consisted of integrated groups of offsetting options. If the options cannot be treated as separate instruments, they would be considered together and the value of the long options would be offset by the value of the short options for purposes of calculating basis. Thus, Solid Currencies' basis in Deerhurst GP would only amount to approximately $9 million—the offset value of the long and short options plus the cash contributed.

As a general rule, long and short options are considered separate instruments, even when purchased in offsetting pairs. *See Smith v. Comm'r of Internal Revenue*, 78 T.C. 350, 376 (U.S. Tax Ct. 1982). As Dr. Kolb testified, each of the 24 option positions was purchased as a separate

contract, each was independently priced, and each could be transferred or assigned independently. Although Dr. DeRosa testified that executing the options contracts would be impractical due to the high cash outlay necessary, he conceded that—with $60 million in funding—the options could indeed be traded as separate instruments. Accordingly, I see no reason to depart from the longstanding rule and find that each of the 24 options contracts was a separate instrument.

D. Whether Solid Currencies received property upon the liquidation of Deerhurst GP

When a partnership makes a liquidating distribution, the basis of the distributed property in the hands of the partner is equal to the adjusted basis of the partner's interest in the partnership, less any money distributed. 26 U.S.C. § 732. Under 26 U.S.C. § 731, foreign currency is not considered "money" when distributed from an "investment partnership"—such as Deerhurst GP—that does not engage in a trade or business and whose assets consist substantially of marketable securities, including foreign currency and options contracts. 26 U.S.C. § 731(c)(3). Thus, any distribution of foreign currency or options from Deerhurst GP to Solid Currencies would be considered "property" to which Solid's adjusted basis—less the approximately $8 million in cash transferred—would attach. The parties dispute whether Deerhurst GP transferred any foreign currency or options to Solid Currencies at liquidation.

As a question of fact under 26 U.S.C. § 7491, the initial burden of production is on Sala to produce evidence sufficient to allow for judgment in his favor if not contradicted. Sala met his burden of production at trial. Sala testified that Solid Currencies received a cash transfer of $8 million as well as a put option and a spot option. This testimony was supported by documentary evidence and by the credible testimony of Dr. Kolb. If no contrary evidence were submitted, Sala's and Dr. Kolb's credible testimony and supporting exhibits would—without regard to the

judicial presumption of IRS correctness—be sufficient grounds to make a finding of fact that Solid Currencies received both cash and property upon the liquidation of Deerhurst GP. Accordingly, the burden of proof is on the Government under 26 U.S.C. § 7491 to show Sala did not receive property upon liquidation of Deerhurst GP. The Government fails to meet this burden. Even if the burden were on Sala, however, the great weight of the credible evidence shows Solid Currencies received property upon liquidation of Deerhurst GP.

According to Dr. DeRosa, the Refco settlement statements show the disputed put option and spot trade were acquired by Deerhurst GP on December 20, 2000. Both were transferred to Solid Currencies on December 22, 2000, and paid for by the Solid Currencies Refco account. The Government claims this shows Solid Currencies received only cash, as the put option and spot trade were paid for by Solid Currencies and therefore not distributed as proceeds from Deerhurst GP's liquidation.

To the extent Dr. DeRosa relied on the Refco statements when formulating his position, his conclusions are suspect. Both parties presented evidence calling into doubt the accuracy of Refco's reports. Andrew Krieger testified extensively that Refco statements were notoriously unreliable and that Peter Molyneaux—who ran the back-office operations of Deerhurst—frequently found errors. This testimony is borne out somewhat by a review of the documents obtained from Molyneaux showing corrections. More important, Dr. DeRosa testified that Refco had known accounting problems that "very well may call into question Refco's customer statements." As the burden is on the Government as to this question of fact, I find the Refco statements were not entirely reliable.

Excluding the suspect Refco statements—which were certainly not conclusive on this point in any regard—the preponderance of the evidence shows that Solid Currencies did in fact receive the disputed put option and spot trade upon liquidation of Deerhurst GP. Documents prepared by Peter Molyneaux show both contracts were transferred on December 22, 2000. Sala and Krieger both testified this was their understanding of the events as well. Even Dr. DeRosa—the only witness testifying there was no transfer of property—stated in his expert report: "December 22, 2000. Deerhurst Investors GP transferred the Step 1 put option on the euro (EUR 26,004,030) to Solid Currencies. . . . Deerhurst Investors GP transferred the Step 1 spot trade to buy euros against dollars (EUR 10,401,612 against USD 9,423,860.47) to Solid Currencies." In light of this evidence, I find that Deerhurst GP transferred both the put option and spot trade to Solid Currencies on December 22, 2000.

This does not end the inquiry, however. Drs. Kolb and DeRosa disagreed whether the transfer of the put option and spot trade amounted to a transfer of "property" to which Solid Currencies basis in Deerhurst GP could attach. While the question whether what was transferred was "property" is ultimately a question beyond either's expertise—which Dr. Kolb was freely willing to admit, but Dr. DeRosa seemed reluctant to do—both experts testified that, at a minimum, what was transferred from Deerhurst GP to Solid Currencies was a reservation of the trades.

Dr. Kolb testified: "[I]n the context of the way financial markets work, when one engages in a trade and even gives a verbal utterance, one becomes obligated. And I say one is obligated . . . in that the other side very much expects the party to carry through with what they said they would do, and that if they don't carry through and actually consummate the transaction with cash

flow, there will be very hard feelings and ultimately potentially serious consequences. And that's true, I think, in all financial markets." Dr. Kolb compared the options trading process to the commodities market depicted in movies and television by great numbers of traders waving their hands and giving signals to one another. At the end of each day, the "trades" agreed to in this frenetic flurry of hand waving are actually consummated and paid for. If a trader later disputes the terms of the trade, this can lead to arbitration or other legal consequences. Further, if a trader gains a reputation as one who does not follow through on his promises to buy or sell at a certain amount, he may be shunned by other traders and no longer be able to have his "reservations" accepted. Dr. Kolb testified that if the "reservations" agreed to by Deerhurst GP were not ultimately paid for—by Solid Currencies or otherwise—"then that is a serious breach of faith."

Dr. DeRosa testified initially that a reservation of a trade was no more like property than a reservation at a restaurant was like an actual meal. Thus, Deerhurst GP would not have a property interest in the put option and spot trade that could be transferred to Solid Currencies any more than a person who makes a reservation at a restaurant would have an obligation to pay for a meal eaten by someone who dines in the reserving person's stead. When pressed further, however, Dr. DeRosa admitted that—unlike a reservation at a restaurant—had the reserved trades not been paid for, Deerhurst GP would have liability exposure based on the value of the trades to the issuing bank. In light of both experts' agreement that a "reservation" includes a commitment to pay for the reservation, I find that—even if all that was transferred was a "reservation" and not an actual trade—the reservation constitutes "property" for purposes of §§ 731 and 732.

## IX. WHETHER ANY ALLOWABLE TAX LOSS WAS RENDERED RETROACTIVELY DISALLOWED BY 26 C.F.R. § 1.752-6

Under 26 U.S.C. § 752, a partner's adjusted basis in a partnership is determined by a partner's contribution to the partnership. Under § 752(b), a partner must decrease his basis in the partnership to the extent that the partnership assumes the partner's individual liabilities. In 1975, the Government successfully argued before the United States Tax Court that obligations created by selling an option were too contingent to constitute liabilities under § 752 because no actual obligation on the part of the partnership existed unless and until the option was exercised. *See Helmer v. Comm'r of Internal Revenue*, T.C. Memo 1975-160 (1975). The taxpayer was therefore not allowed to increase his basis in the partnership and, as a result, owed additional taxes when the partnership made a distribution. The I.R.S. continued to successfully apply the rule of *Helmer* to increase partner taxation as late as 2000. *See Salina P'ship*, *supra*, T.C. Memo. 2000-352.

On June 24, 2003, the Treasury Department revised the regulations that govern the definition of "liability" for purposes of 26 U.S.C. § 752. *See* 26 C.F.R. §§ 1.752-1 through 1.752-7. For authority, the Treasury relied on Section 309 of the Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 at 2763A-638 (codified in 26 U.S.C. §§ 357 & 358) ("Section 309"). The new regulations—mimicking the definition of "liability" in Section 309—expanded the definition of "liability" under 26 U.S.C. § 752 to include "any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code." 26 C.F.R. §§ 1.752-1. Under

the new regulations, a partner's basis in the partnership would generally be reduced by the value of the contingent liability. 26 C.F.R. § 1.752-6.

Where Section 309, however, carved out two exceptions—essentially maintaining the current state of the law as established in *Helmer*—when the trade or business or substantially all the assets with which the contingent liability is associated are transferred to the person assuming the liability as part of the exchange—*see* 26 U.S.C. § 358(h)(2)—26 C.F.R. § 1.752-6, added an "exception to the exception" for those cases where the exchange in question was a transaction described in I.R.S. Notice 2000-44. Notice 2000-44 describes a situation—similar to that at issue here—where a taxpayer purchases and writes options and contributes the options to a partnership, thereby creating basis in the partnership equivalent to the long options, but not offset by the short options. Under 26 C.F.R. § 1.752-6, if the transaction was one described in Notice 2000-44, contingent liabilities reduced the partner's basis in the partnership even if substantially all the assets with which the contingent liabilities were associated were also transferred simultaneously to the partnership. The Treasury made 26 C.F.R. § 1.752-6 retroactive, applying it to all assumptions of contingent liabilities occurring between October 18, 1999, and June 24, 2003. Sala claims the Treasury exceeded its authority in so doing. I agree.

A. Standard of review

The Tax Code—as amended in 1996—generally prohibits retroactive regulations. *See Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 620 (E.D. Tex. 2006); 26 U.S.C. § 7805. Under the amended version of § 7805, a regulation may be applied retroactively only in very specific enumerated circumstances. As applied to this case, a regulation may only be applied retroactively to the extent it was issued either to prevent abuse or pursuant to

a legislative grant from Congress authorizing retroactive legislation. *See* 26 U.S.C. §§ 7805(b)(3) & (6). When making 26 C.F.R. § 1.752-6 retroactive, the Treasury claimed both that—under 26 U.S.C. § 7805(b)(6)—26 C.F.R. § 1.752-6's retroactivity was expressly authorized by Section 309(c) and that—under 26 U.S.C. § 7805(b)(3)—26 C.F.R. § 1.752-6 would prevent "the same types of abuses that section 358(h) was designed to deter." *See* 70 Fed. Reg 30335, 30337.

The standard of deference given to the Treasury's claim it is entitled to enact a retroactive regulation depends on whether the authorization to make the regulation retroactive is considered legislative or interpretive. If Congress has explicitly or implicitly delegated authority to an agency to issue a certain regulation, the regulation is considered a legislative regulation and is given controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute. *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 844 (1984). "Review under the 'arbitrary and capricious standard' requires the court to decide whether the agency acted within the scope of its authority, whether the actual choice made was based on a consideration of the relevant factors, whether there has been a clear error of judgment, and whether the agency's action followed the necessary procedural requirements." *Webb v. Hodel*, 878 F.2d 1252, 1255 (10th Cir. 1989).

If a regulation is not "promulgated pursuant to authority Congress has delegated," it is considered an interpretive regulation and "the interpretation is 'entitled to respect' only to the extent it has the 'power to persuade.'" *Gonzales v. Oregon*, 546 U.S. 243, 256, 258 (2006) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "Because Congress has delegated to the Commissioner the power to promulgate 'all needful rules and regulations for the enforcement of the Internal Revenue Code,' 26 U.S.C. § 7805(a), [I] must defer to his regulatory

Case 1:01-cv-00625-TC-KLM  Document 246  Filed 04/02/2008  Page 46 of 58

interpretations of the Code so long as they are reasonable." *Cottage Sav. Ass'n v. Comm'r of Internal Revenue*, 499 U.S. 554, 560–61 (1991). Regulations are entitled to no deference, however, if they are inconsistent with congressional intent or if there are compelling indications that the regulations are wrong. *Webb, supra*, 878 F.2d at 1255. If I find the Treasury acted beyond its statutory authority by issuing a regulation that is "not in accordance with the law," or is "fundamentally at odds with the manifest congressional design," I therefore have the power to declare the regulation unlawful and set it aside. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29. 41 (1983); *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26 (1982).

B. Whether 26 C.F.R. § 1.752-6 is a legislative regulation

Section 309(d) explicitly provides for the retroactive application of rules issued under Section 309(c). Accordingly, if 26 C.F.R. § 1.752-6 was properly issued under Section 309(c), it is a legislative regulation and its retroactive application cannot be in dispute. To determine whether 26 C.F.R. § 1.752-6 "carries out the congressional mandate in a proper manner, [I] look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." *Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 477 (1979).

The first question is whether Congress has directly spoken to the precise question at issue. *Chevron*, *supra*, 467 U.S. at 842. If the answer to the first question is yes, that is the end of the matter "for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." *Id*. at 842–43. If the statute is silent or ambiguous, however, I defer to the Treasury's interpretation so long as it is based upon a "permissible construction of the statute." *Id*. at 843.

The statute upon which the Treasury ostensibly relied in issuing 26 C.F.R. § 1.752-6 is Section 309. Section 309 changed the law regarding contingent liabilities in the corporate context and required that, in most circumstances, contingent liabilities be taken into account to reduce shareholder basis in corporate stock. *See* 26 U.S.C. § 358(h)(3). In passing Section 309, Congress "was concerned about a type of transaction in which taxpayers seek to accelerate, and potentially duplicate, deductions involving certain liabilities." *See General Explanation of Tax Legislation Enacted in the 106th Congress*, JCS-2-01 at 154 (Joint Committee on Taxation, April 19, 2001). Congress was concerned that a taxpayer could transfer assets to a corporation, and the corporation could assume a contingent liability that would give rise to a deduction in a future taxable period. The shareholder could claim a basis in the stock equal to the basis of the assets he transferred to the corporation, unreduced by the contingent liability. Then, the shareholder could sell his stock in the corporation for a price that reflected the contingent liability. This would allow the shareholder to immediately "accelerate" a deduction that would otherwise be taken over time as the contingent liabilities were satisfied. Additionally, the corporation that assumed the contingent liability could take a deduction when it satisfied the liabilities, thus "duplicating" the deduction. In order to prevent such abusive acceleration and duplication of losses, Congress passed Section 309 in an attempt to "eliminate any loss on the sale of stock attributable to such liabilities." *Id*. The amendment was estimated to increase Federal fiscal year 2001 budget receipts by $13 million.

Section 309(c), codified in the notes to 26 U.S.C. § 358, authorized the Secretary of the Treasury to prescribe "comparable rules" which "provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or

duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code . . . in transactions involving partnerships." Any regulations prescribed under 309(c) could be made retroactive to October 18, 1999.

The Government claims Section 309(c) authorizes the retroactivity of 26 C.F.R. § 1.752-6. Sala argues that the retroactivity of § 1.752-6 is not authorized by Section 309(c) because: (a) the rules set out for partnerships in § 1.752-6 are not "comparable" to the rules for corporations described in § 358(h) as required by § 309(c); (b) the rules do not address the "acceleration or duplication" of losses; and (c) the regulation does not apply to "liabilities described in section 358(h)(3)" of the Tax Code. I agree with Sala on each point.

*1. Whether the rules set out for partnerships in § 1.752-6 are "comparable" to the rules for corporations described in § 358(h)*

Section 309(c) authorizes the Treasury to issue "comparable rules" to be applied to transactions involving partnerships. Even a cursory look at the authorizing statute demonstrates § 1.752-6 is not a "comparable" rule. Applying 26 U.S.C. § 358(h) to the transaction at hand, the value of the options contributed by Sala to Solid Currencies must be disregarded when determining Sala's basis. While the contingent value of the short options contributed to Solid Currencies would generally be considered a liability under § 358(h)(3)—thereby reducing Sala's basis in Solid Currencies under § 358(h)(1)—§ 358(h)(2)(B) makes an exception where, as here, the associated short and long options are transferred together. Applying § 1.752-6, however, effectively eviscerates the outcome dictated by § 358(h)(2)(b). It does so by creating an "exception to the exception" provided by § 358(h)(2)(B) for transactions described in Notice 2000-44. When comparing Solid Currencies' basis in Deerhurst GP without the "exception to the

exception"—*i.e.*, as dictated by the text of 26 U.S.C. § 358(h) if applied to partnerships—to the basis if the "exception to the exception" is applied, the former results in a basis of $69 million, while the latter results in a basis of $9 million. The results could hardly be less comparable.

*2. Whether the rules in § 1.752-6 address the "acceleration or duplication" of losses*

Congress authorized the Treasury to issue retroactive regulations "to prevent the acceleration or duplication of losses" through the assumption of contingent liabilities "in transactions involving partnerships." *See* Section 309(c). As stated in the committee report, a loss is "accelerated" when the taxpayer sells the stock in the transferee entity for a reduced price that reflects the losses that would otherwise be realized by satisfying the contingent liability in the normal course of business. *See General Explanation of Tax Legislation Enacted in the 106th Congress*, *supra*. A loss is "duplicated" when the transferee entity takes a deduction in addition to the deduction realized when the taxpayer sells his stock in the transferee entity at a loss. *See id.*

The transactions described in Notice 2000-44 do not involve accelerated or duplicated losses. The I.R.S. makes no reference to duplication or acceleration of losses in the notice, nor do the factual scenarios discussed therein lend themselves to duplicated or accelerated losses. The transactions described in Notice 2000-44 result in a single loss that occurs at a specific time: liquidation of the inflated-basis assets. Accordingly, to the extent the Treasury created an "exception to the exception" for Notice 2000-44 transactions, it exceeded the statutory grant of authority to "prescribe rules . . . to prevent the acceleration or duplication of losses . . . in transactions involving partnerships." *See* Section 309(c)(1); *see also Klamath*, *supra*, 440 F. Supp. 2d at 622.

*3. Whether § 1.752-6 addresses "liabilities described in 26 U.S.C. § 358(h)(3)"*

Section 309(c) authorizes the Treasury to prescribe regulations under subchapter K of the Tax Code—the subchapter on partnerships—addressing "the assumption of liabilities described in section 358(h)(3) . . . in transactions involving partnerships." Section 358(h)(3) provides that "for purposes of this subsection," the term "liability" includes contingent liabilities. The specific "subsection" referenced by § 358(h)(3) is § 358(h). Even if "subsection" is construed to mean all of § 358, § 358(h)(3) applies only to liabilities assumed in "an exchange or series or exchanges" to which "section 351, 354, 355, 356 or 361 applies"—all sections involving corporate exchanges. Thus, the language authorizing Treasury to issue regulations relating to "the assumption of liabilities described in section 358(h)(3)" can only be interpreted to relate to contingent liabilities assumed in a corporate exchange.

Because § 358(h)(3) applies only to liabilities that are assumed in an exchange or series of exchanges between a corporation and its shareholders, the language in § 309(c)(1) authorizing Treasury to issue regulations relating to "the assumption of liabilities described in section 358(h)(3) . . . in transactions involving partnerships" only authorized the Treasury to issue regulations involving transactions between a corporation and a partnership. The Treasury, in fact, did issue such a regulation addressing transfers by partners and partnerships to corporations in which the partners or partnerships are shareholders. *See* 26 C.F.R. 1.358-7. The regulation at issue here, however, applies to any transaction where a partner contributes property to a partnership in exchange for an interest in that partnership and where the partnership assumes a contingent liability of the partner—even if no corporation is involved.

Case 1:01-cv-00326-SJ-K Document 246 Filed 09/12/2008 Page 51 of 58

By attempting to legislate rules for partner-partnership exchanges, § 1.752-6 is overly broad and exceeds the authority granted by § 309(c)(1). The overbreadth of § 1.752-6 is especially evident in light of the fact that § 358(h) is a corporate provision. *See Klamath*, *supra*, 440 F. Supp. 2d at 622. Had Congress intended to make a sea change in the law with respect to transactions between partners and their partnerships, it would have done so directly. It certainly would not have authorized Treasury to do so by regulation in a statute that fails to even mention § 752. Nothing in the Act or its legislative history suggest this was Congress's intent.

C. 26 C.F.R. § 1.752-6 cannot be applied retroactively to the Deerhurst Program

As 26 C.F.R. § 1.752-6 was not promulgated under an express grant of authority from Congress, it's retroactivity is not authorized by 26 U.S.C. § 7805(b)(6). This does not necessarily invalidate the regulation or its retroactivity, however. *See Klamath*, 440 F. Supp. 2d at 622. The regulation was ostensibly also issued pursuant to the Treasury's general grant of authority to issue retroactive regulations to prevent abuse, and its validity in serving this end—and therefore its accompanying retroactivity—may be analyzed under the antiabuse provision found in 26 U.S.C. § 7805(b)(3). Regulations issued under § 7805(b)(3) are necessarily interpretive. *See Klamath*, 440 F. Supp. 2d at 621.

The fair measure of deference to the Treasury's interpretive regulations administering the Tax Code is "understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). Accordingly, the weight accorded an interpretive regulation depends on "all those factors which give it power to persuade, if lacking power to control." *Skidmore*, *supra*, 323 U.S. at 140.

The question of what constitutes "abuse" is not clarified by the statute. *See* Edward A. Morse, *Reflections on the Rule of Law and "Clear Reflection of Income": What Constrains Discretion?*, 8 CORNELL J.L. & PUB. POL'Y 445, 488 (1999) ("The scope of this exception is unclear, and it remains to be seen whether it will be exercised independently of Congress' power to authorize retroactive regulations."). The Joint Committee Report adds little other than stating the "abuse" envisioned is "abuse of the statute." *Background and Information Relating to the Taxpayer Bill of Rights*, JCX-15-95 at 22 (Joint Committee on Taxation, March 21,1995). Unfortunately, no court appears to have ruled on the scope of the § 7805(b)(3) exception.

As has been noted, "[i]t seems contrary to the purpose of the statute to allow the Secretary to promulgate retroactive regulations whenever it determines that something is 'abusive to the statute' without some check on the Secretary's ability to declare something abusive." *See* James Whitmire & Bruce Lemons, *The New Partnership Liability Regulations—Placing a Premium on Validity*, 606 PLI/TAX 229, 233 (2004). I need not decide this question here, however, because the regulation specifies the type of abuse it seeks to prevent: "the same types of abuses that [26 U.S.C.] section 358(h) was designed to deter." *See* 70 Fed. Reg 30335.

As the regulation is in fact contrary to 26 U.S.C. § 358(h), the Treasury's position is unpersuasive in the first instance. *See Mead Corp.*, *supra*, 533 U.S. at 228. A Treasury regulation that conflicts with the underlying statute is invalid, even if cast as an anti-abuse regulation. *See Microsoft Corp. v. Comm'r of Internal Revenue*, 311 F.3d 1178, 1189 (9th Cir. 2002); *see also Rasquin v. Humphreys*, 308 U.S. 54, 56 (1939) ("Whatever validity the . . . regulation . . . may have in its prospective operation, we think it so plainly in conflict with the statute as to preclude its application retroactively"). Even under the retroactivity-friendly Tax

Case 1:01-cv-00635-TC-KLM Document 246 Filed 04/2008 Page 80 of 85

Code prior to the 1996 amendments—*see, e.g.*, *Sec. Benefit Life Ins. Co. v. United States*, 517 F. Supp. 740, 756 (D. Kan. 1980) ("[T]he I.R.S. has broad power to promulgate rules and regulations with retroactive application. A presumption of retroactivity arises from 26 U.S.C. § 7805(b).")—the Treasury's retroactive application of a regulation could be considered an abuse of discretion if "the retroactive regulation alters settled prior law or policy upon which the taxpayer justifiedly relied and if the change causes the taxpayer to suffer inordinate harm." *CWT Farms, Inc., v. Comm'r of Internal Revenue*, 755 F.2d 790, 802 (11th Cir. 1985).

Treasury Regulation § 1.752-6 not only alters settled prior law—as the Treasury acknowledged, *see* 68 Fed. Reg. 37434, 37437 (June 24, 2003) ("The definition of a liability contained in these proposed regulations does not follow *Helmer v. Commissioner*, T.C. Memo 1975-160.")—it directly contradicts the underlying statutes—26 U.S.C. §§ 358 and 752—the abuse of which it supposedly prevents. As such, the regulation does not "protect" the statute from abuse, but rather amends the statute to reach an outcome different from—and contrary to—that the statute would require. Congress clearly intended to provide tax-protected status to the transactions described in 26 U.S.C. § 358(h)(2). By creating an "exception to the exception" for Notice 2000-44 transactions, the regulation overrides the statutory directive, rather that protects it.

The Government maintains that the anti-abuse provisions of § 7805(b)(3) should nonetheless apply, however, because "abuse is patent in Son of Boss tax shelters, which are designed to generate paper tax losses where no comparable economic losses have occurred." *Cf. Cemco Investors, LLC v. United States*, 515 F.3d 749, 751 (7th Cir. 2008) ("The Commissioner has a statutory power to disregard transactions that lack economic substance."). Although

Congress has delegated to the Treasury the general authority to make rules carrying the force of law, *see Mead*, *supra*, 533 U.S. at 226–27, the authority to make such rules retroactive is limited. The Treasury is only entitled to make regulations retroactive to prevent “abuse of the statute,” which this regulation clearly does not do. Moreover, the facts show Sala’s participation in the Deerhurst Program was a genuine investment transaction that possessed economic substance and was entered into for the purposes of realizing profits above and beyond the tax losses. Because Sala’s investment in the Deerhurst Program was not abusive, it is immaterial whether other transactions of the general type he entered into were abusive.

*Cemco* does not counsel a contrary conclusion. Initially, I note an opinion of the Seventh Circuit is not controlling on this Court. Further (in an opinion curiously lacking substantive analysis) the *Cemco* court did not analyze whether the Treasury exceeded its statutory authority in promulgating 26 C.F.R. § 1.752-6. The *Cemco* court based its conclusion regarding the regulation’s retroactivity solely on the fact that the retroactive date—October 18, 1999—was the same as the date authorized by Section 309. *Cemco*, 515 F.3d at 752. If the question presented in this case was whether the retroactive date in the regulation was a valid one, *Cemco*’s holding in this regard would have some persuasive relevance. As to the validity of the regulation’s retroactivity at all, however, it has none.

In light of my conclusion that 26 C.F.R. § 1.752-6 is contrary to the statutes it supposedly protects from abuse, I accord no deference to the Treasury’s claim that 26 C.F.R. § 1.756-2 was properly issued under Section 309—and properly made retroactive under 26 U.S.C. § 7805. Instead of protecting the statutes from abuse, Treasury’s attempt to legislate an exception to the statutory exception to be applied only in Notice 2000-44 transactions was an obvious effort to

bootstrap the government's litigating position with respect to so-called "Son of Boss" cases. Indeed, the day following the promulgation of the regulations, Treasury told its attorneys to use the newly enacted regulations as a principal ground to challenge taxpayers' claimed losses. *See* Chief Counsel Notice CC-2003-020, released June 25, 2003. Such a procedure is generally improper, and such make-weight regulations are frequently disregarded by the courts—*see, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir. 1971) ("[T]he Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense.")—if they do not reflect a "fair and considered judgment on the matter in question." *See Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2349 (2007). This is not a case like the one in *Long Island Care* where a regulation was intended to settle a question the agency had "struggled" with for years. To the contrary, the regulation sought to reverse a policy the Treasury had relied upon—whenever such reliance inured to its benefit—since 1975.

Accordingly, I hold 26 C.F.R. § 1.752-6 to be unlawful and set it aside. Even if 26 C.F.R. § 1.752-6 was properly issued—that is, even if the regulation was not contrary to the underlying statutes—the Treasury would still lack the authority to make the regulation retroactive under the anti-abuse provision of 26 U.S.C. § 7805(b)(3). Without retroactive application, 26 C.F.R. § 1.752-6—being issued many years after Sala entered into the Deerhurst Program—has no bearing on this case.

Case 1:05-cv-00636-LTB-KLM Document 246 Filed 05/09/2008 Page 83 of 58

## X. WHETHER THE GOVERNMENT IS ENTITLED TO OFFSET ANY EXCESS INTEREST PAYMENTS WITH AN ACCURACY-RELATED PENALTY

This Court has previously ruled Sala was entitled to summary judgment on his entitlement to a refund of a portion of the interest he paid on his 2000 taxes [Docket # 154]. The Government seeks to offset this refund with an accuracy related penalty owed but not assessed by the I.R.S. pursuant to 26 U.S.C. § 6662.

The I.R.S. may only apply such a penalty if there is an "underpayment" of taxes. *See* 26 U.S.C. § 6662. Having determined that Sala was entitled to the approximately $60 million loss claimed in 2000—and in the absence of any evidence of "underpayment" of some other variety—I conclude the Government is not entitled to an offset.

Even if Sala did underpay his 2000 taxes, however, the Government is not entitled to a penalty if Sala filed a "qualified amended return." 26 C.F.R. § 1.6664-2(c)(2). An amended return is not a qualified amended return if it was filed after the commencement of an investigation of "any person described in section 6700(a) . . . concerning an examination of an activity described in section § 6700(a) with respect to which the taxpayer claimed any tax benefit on the return directly or indirectly." 26 C.F.R. § 1.6664-2(c)(3)(ii) (2003) (this rule was amended in 2005; I cite here to the rule in effect in 2002 and 2003). Section 6700(a) imposes penalties on anyone who "organizes (or assists in the organization of)" an abusive tax shelter.

The Government argues Sala's amended return was not qualified because KPMG—an alleged "promoter" of Deerhurst, and a red herring in this case—was under investigation prior to Sala's filing of his amended return. As I previously held in my July 3, 2007, Order, KPMG was indeed under investigation for promoting abusive tax shelters prior to when Sala filed his amended

return on November 18, 2003. While the Government admits this investigation did not include Deerhurst *per se*, it claims the investigation of KPMG involved tax shelter activities related to Deerhurst.

The relevant inquiry, however, is not whether KPMG was contacted regarding transactions similar to Deerhurst, but whether KPMG was contacted regarding Deerhurst itself. Under 26 C.F.R. § 1.6664-2(c)(3)(ii), an amended return is not "qualified" if filed after a "person" described in 26 U.S.C. § 6700 is contacted regarding a transaction described in § 6700 "with respect to which the taxpayer claimed any tax benefit." The only transaction with respect to which Sala "claimed any tax benefit" in 2000 was the Deerhurst Program. No evidence was presented at trial showing KPMG was contacted regarding Deerhurst prior to November 18, 2003. Accordingly, the Government fails to make a *prima facie* case that penalties should apply.

## XI. CONCLUSION

In summary, I find and conclude: (1) Sala's participation in the Deerhurst Program possessed a reasonable possibility of profits beyond the tax benefits, was entered into for a business purpose other than tax avoidance, and was motivated by a desire for profits above and beyond the tax benefits sought; (2) Sala's basis in Solid Currencies was approximately $69 million—the value of the long options contributed plus the cash contributed—and Solid Currencies' basis in Deerhurst GP was an identical amount; (3) the 24 options contracts contributed by Sala to Solid Currencies and by Solid Currencies to Deerhurst GP were separate financial instruments; (4) Solid Currencies received property upon the liquidation of Deerhurst GP; (5) the Treasury exceeded its authority when issuing 26 C.F.R. § 1.752-6(b)(2); (6) the Treasury exceeded its authority when making 26 C.F.R. § 1.752-6 retroactive; (7) Sala filed a

Case 1:05-cv-00636-LTB-KLM Document 96 Filed 05/04/2008 Page 85 of 85

qualified amended return on November 18, 2003; and (8) the Government is not entitled to offset any excess interest payments made by Sala with an accuracy-related penalty.

Accordingly, IT IS ORDERED that judgment shall enter in favor of Carlos Sala and Tina Zanolini-Sala and against the Government on all claims and counterclaims. As agreed to by the parties in the Amended Pretrial Order, the parties shall submit a joint stipulation as to computation of Sala's refund, plus applicable interest and costs, within 30 days of the issuance of this Order.

Dated: April __22__, 2008.

BY THE COURT:

s/Lewis T. Babcock
Lewis T. Babcock, Judge

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner, Plaintiffs, v. THE UNITED STATES, Defendant. | Nos. 01-256T and 01-257T<br>Judge Charles F. Lettow |

**DECLARATION OF ROBERT L. WILLMORE**

I, Robert L. Willmore, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am counsel for Plaintiffs in these actions, and am submitting this Declaration in support of Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment.

2. Attached hereto as Exhibit 10 are deposition transcript excerpts from the deposition of Owen Lamont taken in these actions on January 29, 2004.

3. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 9, 2008, at Washington, D.C.

Robert L. Willmore

5564663

# Plaintiffs' Exhibit 10

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

* * * * * * * * * * * * * * *
MARRIOTT INTERNATIONAL *
RESORTS, L.P., MARRIOTT *
INTERNATIONAL JBS *
CORPORATION, Tax *
Matters Partner, *
vs. * Case No. 01-256 T
THE UNITED STATES * No. 01-257 T
* * * * * * * * * * * * * * *

DEPOSITION OF OWEN LAMONT

Deposition at the office of PriceWaterhouseCoopers, One Post Office Square, Boston, Massachusetts on Thursday, January 29, 2004, commencing at 9:44 a.m.

Court Reporter: Lynda C. Vetter, CSR
New Hampshire CSR No. 112 (RSA 331-B)

Certified Copy

APPEARANCES:

Representing the Plaintiff:
CROWELL & MORING
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
By: Robert L. Willmore, Esq.
Alex E. Sadler, Esq.

Representing the Defendant:
US DEPARTMENT OF JUSTICE
Tax Division
555 4th Street, NW, Suite 8814
Washington, DC 20004
By: G. Robson Stewart, Esq.

I N D E X

WITNESS: OWEN LAMONT

EXAMINATION: Page
By Mr. Stewart 4

EXHIBITS FOR IDENTIFICATION:
Number Page

NOTE: NO EXHIBITS WERE MARKED

OWEN LAMONT
having been duly sworn by the reporter,
was deposed and testified as follows:

EXAMINATION

BY MR. STEWART:

Q. Mr. Witness, could you identify yourself, please.

A. Owen A. Lamont.

MR. STEWART: Why don't we have an introduction around the table.

MR. WILLMORE: My name is Robert Willmore with Crowell & Moring, representing the plaintiff.

MR. SADLER: Alex Sadler.

MR. PLOTKIN: Irv Plotkin from PriceWaterhouseCoopers.

MR. STEWART: My name is Rob Stewart and I represent the Department of Justice.

Q. (By Mr. Stewart) Have you had your deposition taken before?

A. No.

Q. Do you understand the procedure that we will be undergoing here?

A. Yes.

Q. Generally?

Q. You mentioned the parallel between the bond and the equity markets. You gave us one example. Can you give me a more detailed description of what those parallels are between the two?

A. Sure. So the ways one shorts a stock is one identifies someone who currently owns the stock. One borrows a share or shares from that person. Then one sells the stock on the market. And the lender of the stock gets collateral from the person who wants to borrow the stock and that collateral generates income. And some of that income is kept by the lender. Some of it is given back to the borrower. So the part that is given back is called the rebate rate. Essentially the lender is rebating some of the income back to the borrower so that's the lending market in the stock market.

In the bond market, the exact same process. It's just that there is a different terminology to describe. It is slightly different institutions that support this. So in the bond market if I want to short a bond, I borrow the bond from someone currently owning it. And I give that person collateral. And the amount of money --

instead of getting rebated back the income on the collateral, it's called the repo rate or repurchase REPO. So the repo rate is the benefit or the difference between the short-term interest rate and the repo rate is the cost of shorting.

So for example, if the short-term interest rate is 5 percent and the repo rate is 4 percent; whenever I borrow, whenever I short a bond, I would be paying a cost of one percent for the right to short or the ability to short it. That's something the lender -- it's the benefit the lender is getting, the repo rate. So that's in the bond market.

Same thing in the stock market. When you lend stock to someone, you get a little benefit of lending a stock is the difference between the short-term interest rate and the rebate rate.

Q. And the rates are calculated on what?

A. I'm not following your question.

Q. Well, what's the corpus that that interest rate is calculated? I mean: How do you know -- you have a rate. But what are you calculating that rate against to determine what?

A. Are you talking about amount of money in terms of dollars or the reference yield that

is --

Q. Well, yeah, the amount of money. What money are you talking about?

A. So suppose I short a stock. I want to short a stock that has a price of $100. I borrow the stock from somebody. I sell it to a third person. That generates $100. I give that $100 plus some additional monies, say $102. I give that $102. That $102 becomes collateral for the loan. Usually it gets placed in an account somewhere, so that 102 dollars is what the rebate rate is calculated on.

Q. Those rates, the repo rate and the rebate rate, are calculated on the amount of collateral deposited in an account?

A. That's correct. If I understand your use of the word calculated correctly, that's multiplied by?

Q. Right. And is the collateral handled the same way in the equity market and the bond market?

A. Even -- there are disparate ways of handling it even within the stock market. So I should say that I am not the world's greatest expert in the bond market. I know more about the

stock market. But even within the stock market, that collateral can be handled in different ways. For example, for some stocks that are particularly hard to short, the lender will demand more than negotiate more than 102 percent collateral. He might want 110 percent collateral. That is essentially a private contract written between the lender and borrower. To the best of my knowledge, the standard practice -- one of the things they negotiate about is this amount of collateral.

The standard number is 102 percent in the stock market, although people can negotiate different numbers. The primary one variable is the rate, is the rebate rate or repo rate.

In the bond market, I do not know the precise number in terms of the collateral, whether it's 100 or 102 or 99 percent. But I think in both markets its claimed variable that equilibrates. Supply and demand is this great. I would have to say that when this collateral gets placed into an account, I cannot give you precise information about who controls that account, whether who has -- certainly the collateral legally backs the loans so that the lender has recourse to that collateral in the case the security is not returned. But I don't

know precisely legally who operates the account or who is the custodian of that.

Q. Would that be something that's subject to an agreement between the lender and the borrower?

A. I believe that all aspects of this transaction are negotiable.

Q. Are there any federal or state regulations which would apply to govern the terms of a short-sale transaction?

A. There is unfortunately a large amount of regulation, both federal having to do with the particular exchange; for example, coming from the New York Stock Exchange and having to do with the type of the -- the nature of the lender. For example, it may be that different legal entities are different abilities to lend. So I would not be able to give you the details. But it's my understanding that some entities don't lend for legal reasons because there are -- there are certain -- they have the entities have a certain status regarding the tax status or it's a pension or IRISA entity. Different entities have different abilities to lend.

I would imagine there is a variety of

securities?
A. Right, um-hmm.
Q. Going down to the last sentence of that paragraph on page two: The summary of your opinions, you state: "If the issuing company goes bankrupt the loan might be terminated without actually returning the borrowed security." I just -- this is mainly for clarification so that I understand what you're saying here. You say the issuing company. What do you mean by that?
A. That's the stock XYZ or company XYZ. So it's the firms whose assets underlie the security.
Q. That's not the lender of the stock?
A. No.
Q. Okay. Going down to your section 3 there, Mechanics of the Short Selling, you have explained a lot of this so I don't want to ask you to repeat it. But one thing I don't think you did talk about in your second sentence, you say, "this transaction," which refers to the short-selling transaction. Where does this transaction take place? Does it take place on a market of some sort?
MR. WILLMORE: Objection, vague.

A. There is a series. Once one sells something short, there is a series of transactions that occurs. The first transaction is the lending or the borrowing of the security. And that is a -- does not take place usually in a market or it does not take place in a centralized market. It takes place when you find a lender and a borrower. So that's the first -- when one wants to sell a security short, the first component of that is to do the borrowing transaction. So that's the first.

Then you have to sell the security. In the case of a stock or the case of a bond, that will take place in a centralized market. Then you have to buy the security back in the centralized mortgage once the short sale is terminated. Then you have to return it.

So in the stock market at least, the borrowing market is not a -- the borrowing system is not a centralized market. And it was in the 1920s but it is not now.

Q. Would it be fair to characterize that as a private transaction, then?

A. Yes. This is the lending transaction you are referring to?

Q. Right.

A. Yes.
Q. Then the -- the initial sale of the security, that would take place, you said, on a centralized market. Can you tell me. What do you mean by that?
A. So if I want to short IBM, first I have to borrow it, and that's a private transaction. Then I would go to the floor of the New York Stock Exchange and sell a share to somebody. That's what I mean by centralized market.
Q. Can you tell me what the centralized markets are that would apply in the case of a Treasury security?
A. In a Treasury security, there is not a physical marketplace such as the floor of the New York stock Exchange. It's more like NASDEQ where it's an over-the-counter market but centralized in the sense that there is a well-defined electronic system for trading securities. So at least in the stock market, there is not well-defined -- the difference I'm making between the bond market selling and the lending market is there is a well-defined system of electronic buying and selling where you can sell a security. There is

not a similar system in the stock market for borrowing a security.

Q. Then you stated the third step of the transaction, buying back a security?

A. When you are ready to close your transaction.

Q. You said that occurs on, typically occurs on a centralized market as well?

A. Right.

Q. You are talking the same kind of centralized market as step 2?

A. Right, just the reverse.

Q. What was the fourth step again?

A. Was returning the borrowed security to the owner.

Q. Where would that take place?

A. Again in the stock market that's the private transaction. So I'm not sure where but it would take place privately.

Q. In a typical short sell, can you give me a description of the cash flow in the transaction.

A. Sure. So I want a short share of IBM. Its price is $100. I initially go to a lender. I borrow one share of IBM. I then go out

and sell it to someone who wants to buy it. So the first thing that happens is the original owner of IBM gives a piece of paper -- say I am the short seller, gives a piece of paper to me. I sell that piece of paper to some third party.

Now, there is no physical piece of paper going on but for convenience there is -- say there is. So there is a piece of paper that says one share of IBM. That gets given from the original owner to me, the short seller. I sell it to some third person. That third person gives me $100 so that's the initial cash flow. That gets from the new buyer to the short seller.

That $100 gets placed into an account perhaps with additional collateral from me, so 102 dollars gets placed in an account. That's the second flow of cash. The short seller takes the collateral and puts it somewhere. You can think about collateral if you want to as physically going to the original owner. He gets to keep the 102 dollars, gets into the account but benefits him. That's the initial set of cash flows.

Then that 102 dollars generates interest and generally that interest is just kept in that same account. So whatever the short-term

interest rate is, say it's 10 percent every day some interest gets accrued and that account gets increased.

So that's the first day. If in the future the price of the security greatly varies, say a security priced from 100 dollars to $200, then the short seller will be asked to contribute additional collateral into that account. So perhaps put in another 50 or $100. So there may be additions to that account. If additional cash flows going from the short seller to the lender if the price of a security changes sufficiently.

Then when and if the short seller is ready to cover his short position, he will go out into the world. He will buy back a share of IBM. So some cash going from him to the new -- to the buyer. I'm sorry, from the short seller to the seller. So there will be some cash going away from the short seller, a piece of paper says IBM on it to the short seller.

The short seller then gives that piece the paper back to the original lender. So it has his piece of paper back that says IBM on it. Now that collateral that's in that account goes back to the short seller.

In the interim, between the original lending of the security and the return of the security, that account has generated money. That account has generated interest. And when the short seller covers his position, that collateral plus interest is returned to him, minus anything that might be kept by the lender. So, for example, if the rebate rate is 5 percent or 4 percent and the interest rate is 5 percent, the short seller when he closes the position will get back his original 102 dollars plus the interest based on 4 percent. The other interest based on the difference between 4 and 5 percent, that 1 percent gets kept by the lender. So that's the series of cash flows.

Q. Are there any other transaction costs or any transaction costs involved other than the -- other than the difference between the interest rates that you mentioned?

A. Well, the short seller would have to pay brokerage fees when he buys and sells. He may have to pay the bid-asked spread which is viewed as a transactions cost by economists. But that's the price at which he sells and the price at which he buys.

I imagine there could be some minor

transactional fees as well. But I wouldn't be able to specify them.

Q. Would you consider a short sale a complicated transaction?

MR. WILLMORE: Let me object. That's a vague question.

A. I would say that most people in America would describe it as that. From the standpoint of a financial economist, it's a simple transaction.

Q. Going down to your footnote on page two, footnote one. The last sentence you state: -- feel free to read the whole footnote. "In the past this transaction known as shorting against the box was sometimes done for tax reasons." Can you tell me what you mean by that, explain it.

A. I'm going -- I'm unable to be extremely precise about answering this question. But as I understand it in the past, if I bought IBM and it had greatly appreciated, I could avoid paying the -- I could avoid or perhaps defer paying the capital gains tax by instead of selling the IBM that I bought, I would sell short IBM. So I can't be terribly precise about the timing of this. But as I understand it, that is no longer possible to avoid or defer taxes by doing this transaction by

shorting against the box.

Q. Okay. Going back to your earlier discussion with respect to when a security becomes worthless, keeping in mind the explanation you just gave of cash flows --

A. Yes.

Q. -- tell me how that works. When a security does become worthless, what happens to the short sale transaction to the cash --

A. Well --

Q. -- flow.

A. This is assuming that the transaction is closed?

Q. Well --

A. The short position is covered?

Q. No, no. I'm sorry. When a short seller goes short on a security and while he is holding, while he was in the short position, the underlying security becomes worthless.

A. Well, one thing that could happen -- and I could not state with precision. I believe this may be governed by individual negotiations one thing that can happen is that the amount of collateral will change. Because if I have originally shorted IBM at $100 and now it's worth

10 dollars, it is conceivable the short seller could withdraw some of his collateral from his account. I don't know for sure. It may be that he doesn't get that back until the position is closed.

I do know that if the price of IBM goes up, he will be asked to add additional collateral. I don't know if the price of IBM goes down, he will get his collateral back. But I would expect that to be the case.

I guess I'm not fully understanding your question. But I guess one thing that can happen is that the amount of collateral could go down.

Q. I guess that was the basis of my question. How would the short seller realize any -- because you talked about a situation where the short seller doesn't close his position --

A. Right.

Q. -- when the security goes, becomes worthless?

A. Right.

Q. I'm just wondering how -- where -- how does he --

A. You don't get his gains, so to speak. And you don't have to do a transaction to get a

CERTIFICATE OF WITNESS

I, Owen Lamont, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony

Owen Lamont

Sworn and subscribed to before me this 19 day of February, 2004.

Judith Ratte
Notary Public
My Commission Expires: 9/30/06

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: February 5, 2004
Case Name: Marriott International Resorts vs. United States
Case Number:
Dep. Date: January 29, 2004
Deponent: Owen Lamont
Place: Boston MA
Ref. No.: 6254-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 8 | 14 | IF ALL OF | IF NOT ALL OF | TRANSCRIPT ERROR |
| 9 | 2 | LEXIS | ALEXIS | " |
| 10 | 8 | WEBB | WEB | SPELLING |
| 11 | 2 | WEBB | WEB | " |
| 14 | 15 | ARE | WERE | TRANSCRIPT ERROR |
| 17 | 8 | IS ONE. SINCE | IS ONE ~~CHANGE~~ CHANGE. SINCE | " |
| 17 | 22 | I | YOU | " |
| 18 | 15 | AT CHICAGO AT | AT | " |
| 19 | 23 | ESPECIALLY | SPECIFICALLY | " |
| 24 | 25 | TEXT | TECH | " |
| 26 | 19 | ACTIONS. PERHAPS | ACTIONS, PERHAPS | " |
| 27 | 9 | WHAT'S KNOWN AS | ECONOMICALLY EQUIVALENT TO | IMPRECISE WORDING |
| 29 | 1 | INSTEAD OF GETTING | GETTING | GRAMMER |
| 29 | 1 | BACK THE | BACK, THE | TRANSCRIPT ERROR |

[signature]
Signature of Deponent

2/18/04
Date of Signature

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: February 5, 2004
Case Name: Marriott International Resorts vs. United States
Case Number:
Dep. Date: January 29, 2004
Deponent: Owen Lamont
Place: Boston MA
Ref. No.: 6254-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 29 | 2 | IT'S CALLED | IS ECONOMICALLY EQUIVALENT TO | IMPRECISE WORDING |
| 29 | 3 | REPO. SO | RATE. SO | TRANSCRIPT ERROR |
| 29 | 3 | THE REPO RATE IS THE BENEFIT OR THE | THE | GRAMMER |
| 29 | 12 | GETTING, THE REPO RATE. | GETTING. | GRAMMER |
| | | | | |
| 31 | 13 | PRIMARY ONE | ONE | GRAMMER |
| 31 | 18-19 | ITS CLAIMED VARIABLE THAT EQUILIBRATES. SUPPLY AND DEMAND IS THIS GREAT. | THE SAME VARIABLE THAT EQUILIBRATES SUPPLY AND DEMAND IS THIS RATE. | TRANSCRIPT ERROR |
| 32 | 12 | FEDERAL | FEDERAL AND | " |
| 32 | 17 | ARE | HAVE | " |
| 32 | ~~27~~ 23 | IRISA | ERISA | SP. |
| 37 | 4 | AND THE | THE | TRANSCRIPT ERROR |
| 37 | 6 | THAT | OF | " |
| 37 | 6 | TO THE | THE | " |

[signature]
Signature of Deponent

2/18/04
Date of Signature

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: February 5, 2004
Case Name: Marriott International Resorts vs. United States
Case Number:
Dep. Date: January 29, 2004
Deponent: Owen Lamont
Place: Boston MA
Ref. No.: 6254-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 37 | 18 | THOUGH | THE | TRANSCRIPT ERROR |
| 43 | 17 | NASDEQ | NASDAQ | SPELLING |
| 46 | 22 | IT | HE | TRANSCRIPT ERROR |
| 53 | 2 | 200 | 100 | " |
| 56 | 10 | PARODY | PARITY | SP. |
| 56 | 12 | IS | ARE | TRANSCRIPT ERROR |
| 57 | 4 | ON | AND | " |
| 61 | 15 | BETRAY | CONVEY | " |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[signature]
Signature of Deponent

2/18/04
Date of Signature