**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner,** | ) | |
| **Plaintiffs,** | ) | **Nos. 01-256T and 01-257T** |
| **v.** | ) | **Judge Charles F. Lettow** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DECLARATION OF ROBERT L. WILLMORE**

I, Robert L. Willmore, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am counsel for Plaintiffs in these actions, and am submitting this Declaration in support of Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment.

2. Attached hereto as Exhibit 10 are deposition transcript excerpts from the deposition of Owen Lamont taken in these actions on January 29, 2004.

3. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 9, 2008, at Washington, D.C.

Robert L. Willmore

5564663

# Plaintiffs' Exhibit 10

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

* * * * * * * * * * * * * * *
MARRIOTT INTERNATIONAL *
RESORTS, L.P., MARRIOTT *
INTERNATIONAL JBS *
CORPORATION, Tax *
Matters Partner, *
vs. * Case No. 01-256 T
THE UNITED STATES * No. 01-257 T
* * * * * * * * * * * * * * *

DEPOSITION OF OWEN LAMONT

Deposition at the office of PriceWaterhouseCoopers, One Post Office Square, Boston, Massachusetts on Thursday, January 29, 2004, commencing at 9:44 a.m.

Court Reporter: Lynda C. Vetter, CSR
New Hampshire CSR No. 112 (RSA 331-B)

Certified Copy

APPEARANCES:

Representing the Plaintiff:
CROWELL & MORING
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
By: Robert L. Willmore, Esq.
Alex E. Sadler, Esq.

Representing the Defendant:
US DEPARTMENT OF JUSTICE
Tax Division
555 4th Street, NW, Suite 8814
Washington, DC 20004
By: G. Robson Stewart, Esq.

I N D E X

WITNESS: OWEN LAMONT

EXAMINATION: Page
By Mr. Stewart 4

EXHIBITS FOR IDENTIFICATION:
Number Page

NOTE: NO EXHIBITS WERE MARKED

OWEN LAMONT
having been duly sworn by the reporter,
was deposed and testified as follows:
EXAMINATION
BY MR. STEWART:
Q. Mr. Witness, could you identify yourself, please.
A. Owen A. Lamont.
MR. STEWART: Why don't we have an introduction around the table.
MR. WILLMORE: My name is Robert Willmore with Crowell & Moring, representing the plaintiff.
MR. SADLER: Alex Sadler.
MR. PLOTKIN: Irv Plotkin from PriceWaterhouseCoopers.
MR. STEWART: My name is Rob Stewart and I represent the Department of Justice.
Q. (By Mr. Stewart) Have you had your deposition taken before?
A. No.
Q. Do you understand the procedure that we will be undergoing here?
A. Yes.
Q. Generally?

Q. You mentioned the parallel between the bond and the equity markets. You gave us one example. Can you give me a more detailed description of what those parallels are between the two?

A. Sure. So the ways one shorts a stock is one identifies someone who currently owns the stock. One borrows a share or shares from that person. Then one sells the stock on the market. And the lender of the stock gets collateral from the person who wants to borrow the stock and that collateral generates income. And some of that income is kept by the lender. Some of it is given back to the borrower. So the part that is given back is called the rebate rate. Essentially the lender is rebating some of the income back to the borrower so that's the lending market in the stock market.

In the bond market, the exact same process. It's just that there is a different terminology to describe. It is slightly different institutions that support this. So in the bond market if I want to short a bond, I borrow the bond from someone currently owning it. And I give that person collateral. And the amount of money --

instead of getting rebated back the income on the collateral, it's called the repo rate or repurchase REPO. So the repo rate is the benefit or the difference between the short-term interest rate and the repo rate is the cost of shorting.

So for example, if the short-term interest rate is 5 percent and the repo rate is 4 percent; whenever I borrow, whenever I short a bond, I would be paying a cost of one percent for the right to short or the ability to short it. That's something the lender -- it's the benefit the lender is getting, the repo rate. So that's in the bond market.

Same thing in the stock market. When you lend stock to someone, you get a little benefit of lending a stock is the difference between the short-term interest rate and the rebate rate.

Q. And the rates are calculated on what?

A. I'm not following your question.

Q. Well, what's the corpus that that interest rate is calculated? I mean: How do you know -- you have a rate. But what are you calculating that rate against to determine what?

A. Are you talking about amount of money in terms of dollars or the reference yield that

is --

Q. Well, yeah, the amount of money. What money are you talking about?

A. So suppose I short a stock. I want to short a stock that has a price of $100. I borrow the stock from somebody. I sell it to a third person. That generates $100. I give that $100 plus some additional monies, say $102. I give that $102. That $102 becomes collateral for the loan. Usually it gets placed in an account somewhere, so that 102 dollars is what the rebate rate is calculated on.

Q. Those rates, the repo rate and the rebate rate, are calculated on the amount of collateral deposited in an account?

A. That's correct. If I understand your use of the word calculated correctly, that's multiplied by?

Q. Right. And is the collateral handled the same way in the equity market and the bond market?

A. Even -- there are disparate ways of handling it even within the stock market. So I should say that I am not the world's greatest expert in the bond market. I know more about the

stock market. But even within the stock market, that collateral can be handled in different ways. For example, for some stocks that are particularly hard to short, the lender will demand more than negotiate more than 102 percent collateral. He might want 110 percent collateral. That is essentially a private contract written between the lender and borrower. To the best of my knowledge, the standard practice -- one of the things they negotiate about is this amount of collateral.

The standard number is 102 percent in the stock market, although people can negotiate different numbers. The primary one variable is the rate, is the rebate rate or repo rate.

In the bond market, I do not know the precise number in terms of the collateral, whether it's 100 or 102 or 99 percent. But I think in both markets its claimed variable that equilibrates. Supply and demand is this great. I would have to say that when this collateral gets placed into an account, I cannot give you precise information about who controls that account, whether who has -- certainly the collateral legally backs the loans so that the lender has recourse to that collateral in the case the security is not returned. But I don't

know precisely legally who operates the account or who is the custodian of that.

Q. Would that be something that's subject to an agreement between the lender and the borrower?

A. I believe that all aspects of this transaction are negotiable.

Q. Are there any federal or state regulations which would apply to govern the terms of a short-sale transaction?

A. There is unfortunately a large amount of regulation, both federal having to do with the particular exchange; for example, coming from the New York Stock Exchange and having to do with the type of the -- the nature of the lender. For example, it may be that different legal entities are different abilities to lend. So I would not be able to give you the details. But it's my understanding that some entities don't lend for legal reasons because there are -- there are certain -- they have the entities have a certain status regarding the tax status or it's a pension or IRISA entity. Different entities have different abilities to lend.

I would imagine there is a variety of

securities?

A. Right, um-hmm.

Q. Going down to the last sentence of that paragraph on page two: The summary of your opinions, you state: "If the issuing company goes bankrupt the loan might be terminated without actually returning the borrowed security." I just -- this is mainly for clarification so that I understand what you're saying here. You say the issuing company. What do you mean by that?

A. That's the stock XYZ or company XYZ. So it's the firms whose assets underlie the security.

Q. That's not the lender of the stock?

A. No.

Q. Okay. Going down to your section 3 there, Mechanics of the Short Selling, you have explained a lot of this so I don't want to ask you to repeat it. But one thing I don't think you did talk about in your second sentence, you say, "this transaction," which refers to the short-selling transaction. Where does this transaction take place? Does it take place on a market of some sort?

MR. WILLMORE: Objection, vague.

A. There is a series. Once one sells something short, there is a series of transactions that occurs. The first transaction is the lending or the borrowing of the security. And that is a -- does not take place usually in a market or it does not take place in a centralized market. It takes place when you find a lender and a borrower. So that's the first -- when one wants to sell a security short, the first component of that is to do the borrowing transaction. So that's the first.

Then you have to sell the security. In the case of a stock or the case of a bond, that will take place in a centralized market. Then you have to buy the security back in the centralized mortgage once the short sale is terminated. Then you have to return it.

So in the stock market at least, the borrowing market is not a -- the borrowing system is not a centralized market. And it was in the 1920s but it is not now.

Q. Would it be fair to characterize that as a private transaction, then?

A. Yes. This is the lending transaction you are referring to?

Q. Right.

A. Yes.
Q. Then the -- the initial sale of the security, that would take place, you said, on a centralized market. Can you tell me. What do you mean by that?
A. So if I want to short IBM, first I have to borrow it, and that's a private transaction. Then I would go to the floor of the New York Stock Exchange and sell a share to somebody. That's what I mean by centralized market.
Q. Can you tell me what the centralized markets are that would apply in the case of a Treasury security?
A. In a Treasury security, there is not a physical marketplace such as the floor of the New York stock Exchange. It's more like NASDEQ where it's an over-the-counter market but centralized in the sense that there is a well-defined electronic system for trading securities. So at least in the stock market, there is not well-defined -- the difference I'm making between the bond market selling and the lending market is there is a well-defined system of electronic buying and selling where you can sell a security. There is

not a similar system in the stock market for borrowing a security.

Q. Then you stated the third step of the transaction, buying back a security?

A. When you are ready to close your transaction.

Q. You said that occurs on, typically occurs on a centralized market as well?

A. Right.

Q. You are talking the same kind of centralized market as step 2?

A. Right, just the reverse.

Q. What was the fourth step again?

A. Was returning the borrowed security to the owner.

Q. Where would that take place?

A. Again in the stock market that's the private transaction. So I'm not sure where but it would take place privately.

Q. In a typical short sell, can you give me a description of the cash flow in the transaction.

A. Sure. So I want a short share of IBM. Its price is $100. I initially go to a lender. I borrow one share of IBM. I then go out

and sell it to someone who wants to buy it. So the first thing that happens is the original owner of IBM gives a piece of paper -- say I am the short seller, gives a piece of paper to me. I sell that piece of paper to some third party.

Now, there is no physical piece of paper going on but for convenience there is -- say there is. So there is a piece of paper that says one share of IBM. That gets given from the original owner to me, the short seller. I sell it to some third person. That third person gives me $100 so that's the initial cash flow. That gets from the new buyer to the short seller.

That $100 gets placed into an account perhaps with additional collateral from me, so 102 dollars gets placed in an account. That's the second flow of cash. The short seller takes the collateral and puts it somewhere. You can think about collateral if you want to as physically going to the original owner. He gets to keep the 102 dollars, gets into the account but benefits him. That's the initial set of cash flows.

Then that 102 dollars generates interest and generally that interest is just kept in that same account. So whatever the short-term

interest rate is, say it's 10 percent every day some interest gets accrued and that account gets increased.

So that's the first day. If in the future the price of the security greatly varies, say a security priced from 100 dollars to $200, then the short seller will be asked to contribute additional collateral into that account. So perhaps put in another 50 or $100. So there may be additions to that account. If additional cash flows going from the short seller to the lender if the price of a security changes sufficiently.

Then when and if the short seller is ready to cover his short position, he will go out into the world. He will buy back a share of IBM. So some cash going from him to the new -- to the buyer. I'm sorry, from the short seller to the seller. So there will be some cash going away from the short seller, a piece of paper says IBM on it to the short seller.

The short seller then gives that piece the paper back to the original lender. So it has his piece of paper back that says IBM on it. Now that collateral that's in that account goes back to the short seller.

In the interim, between the original lending of the security and the return of the security, that account has generated money. That account has generated interest. And when the short seller covers his position, that collateral plus interest is returned to him, minus anything that might be kept by the lender. So, for example, if the rebate rate is 5 percent or 4 percent and the interest rate is 5 percent, the short seller when he closes the position will get back his original 102 dollars plus the interest based on 4 percent. The other interest based on the difference between 4 and 5 percent, that 1 percent gets kept by the lender. So that's the series of cash flows.

Q. Are there any other transaction costs or any transaction costs involved other than the -- other than the difference between the interest rates that you mentioned?

A. Well, the short seller would have to pay brokerage fees when he buys and sells. He may have to pay the bid-asked spread which is viewed as a transactions cost by economists. But that's the price at which he sells and the price at which he buys.

I imagine there could be some minor

transactional fees as well. But I wouldn't be able to specify them.

Q. Would you consider a short sale a complicated transaction?

MR. WILLMORE: Let me object. That's a vague question.

A. I would say that most people in America would describe it as that. From the standpoint of a financial economist, it's a simple transaction.

Q. Going down to your footnote on page two, footnote one. The last sentence you state: -- feel free to read the whole footnote. "In the past this transaction known as shorting against the box was sometimes done for tax reasons." Can you tell me what you mean by that, explain it.

A. I'm going -- I'm unable to be extremely precise about answering this question. But as I understand it in the past, if I bought IBM and it had greatly appreciated, I could avoid paying the -- I could avoid or perhaps defer paying the capital gains tax by instead of selling the IBM that I bought, I would sell short IBM. So I can't be terribly precise about the timing of this. But as I understand it, that is no longer possible to avoid or defer taxes by doing this transaction by

shorting against the box.

Q. Okay. Going back to your earlier discussion with respect to when a security becomes worthless, keeping in mind the explanation you just gave of cash flows --

A. Yes.

Q. -- tell me how that works. When a security does become worthless, what happens to the short sale transaction to the cash --

A. Well --

Q. -- flow.

A. This is assuming that the transaction is closed?

Q. Well --

A. The short position is covered?

Q. No, no. I'm sorry. When a short seller goes short on a security and while he is holding, while he was in the short position, the underlying security becomes worthless.

A. Well, one thing that could happen -- and I could not state with precision. I believe this may be governed by individual negotiations one thing that can happen is that the amount of collateral will change. Because if I have originally shorted IBM at $100 and now it's worth

10 dollars, it is conceivable the short seller could withdraw some of his collateral from his account. I don't know for sure. It may be that he doesn't get that back until the position is closed.

I do know that if the price of IBM goes up, he will be asked to add additional collateral. I don't know if the price of IBM goes down, he will get his collateral back. But I would expect that to be the case.

I guess I'm not fully understanding your question. But I guess one thing that can happen is that the amount of collateral could go down.

Q. I guess that was the basis of my question. How would the short seller realize any -- because you talked about a situation where the short seller doesn't close his position --

A. Right.

Q. -- when the security goes, becomes worthless?

A. Right.

Q. I'm just wondering how -- where -- how does he --

A. You don't get his gains, so to speak. And you don't have to do a transaction to get a

CERTIFICATE OF WITNESS

I, Owen Lamont, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony

[signature]
Owen Lamont

Sworn and subscribed to before me this 19 day of February, 2004.

[signature]
Notary Public

My Commission Expires: 9/30/06

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: February 5, 2004
Case Name: Marriott International Resorts vs. United States
Case Number:
Dep. Date: January 29, 2004
Deponent: Owen Lamont
Place: Boston MA
Ref. No.: 6254-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 8 | 14 | IF ALL OF | IF NOT ALL OF | TRANSCRIPT ERROR |
| 9 | 2 | LEXIS | ALEXIS | " |
| 10 | 8 | WEBB | WEB | SPELLING |
| 11 | 2 | WEBB | WEB | " |
| 14 | 15 | ARE | WERE | TRANSCRIPT ERROR |
| 17 | 8 | IS ONE. SINCE | IS ONE ~~CHANGE~~ CHANGE. SINCE | " |
| 17 | 22 | I | YOU | " |
| 18 | 15 | AT CHICAGO AT | AT | " |
| 19 | 23 | ESPECIALLY | SPECIFICALLY | " |
| 24 | 25 | TEXT | TECH | " |
| 26 | 19 | ACTIONS. PERHAPS | ACTIONS, PERHAPS | " |
| 27 | 9 | WHAT'S KNOWN AS | ECONOMICALLY EQUIVALENT TO | IMPRECISE WORDING |
| 29 | 1 | INSTEAD OF GETTING | GETTING | GRAMMER |
| 29 | 1 | BACK THE | BACK, THE | TRANSCRIPT ERROR |

[signature]
Signature of Deponent

2/18/04
Date of Signature

# ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: February 5, 2004
Case Name: Marriott International Resorts vs. United States
Case Number:
Dep. Date: January 29, 2004
Deponent: Owen Lamont
Place: Boston MA
Ref. No.: 6254-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 29 | 2 | IT'S CALLED | IS ECONOMICALLY EQUIVALENT TO | IMPRECISE WORDING |
| 29 | 3 | REPO. SO | RATE. SO | TRANSCRIPT ERROR |
| 29 | 3 | THE REPO RATE IS THE BENEFIT OR THE | THE | GRAMMER |
| 29 | 12 | GETTING, THE REPO RATE. | GETTING. | GRAMMER |
| | | | | |
| 31 | 13 | PRIMARY ONE | ONE | GRAMMER |
| 31 | 18-19 | ITS CLAIMED VARIABLE THAT EQUILIBRATES. SUPPLY AND DEMAND IS THIS GREAT. | THE SAME VARIABLE THAT EQUILIBRATES SUPPLY AND DEMAND IS THIS RATE. | TRANSCRIPT ERROR |
| 32 | 12 | FEDERAL | FEDERAL AND | " |
| 32 | 17 | ARE | HAVE | " |
| 32 | ~~17~~ 23 | IRISA | ERISA | SP. |
| 37 | 4 | AND THE | THE | TRANSCRIPT ERROR |
| 37 | 6 | THAT | OF | " |
| 37 | 6 | TO THE | THE | " |

[signature]
Signature of Deponent

2/18/04
Date of Signature

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: February 5, 2004
Case Name: Marriott International Resorts vs. United States
Case Number:
Dep. Date: January 29, 2004
Deponent: Owen Lamont
Place: Boston MA
Ref. No.: 6254-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 37 | 18 | THOUGH | THE | TRANSCRIPT ERROR |
| 43 | 17 | NASDEQ | NASDAQ | SPELLING |
| 46 | 22 | IT | HE | TRANSCRIPT ERROR |
| 53 | 2 | 200 | 100 | " |
| 56 | 10 | PARODY | PARITY | SP. |
| 56 | 12 | IS | ARE | TRANSCRIPT ERROR |
| 57 | 4 | ON | AND | " |
| 61 | 15 | BETRAY | CONVEY | " |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[signature]
Signature of Deponent

2/18/04
Date of Signature