UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARRIOTT INTERNATIONAL RESORTS LIMITED PARTNERSHIP, | ) | |
| AND | ) | |
| MARRIOTT INTERNATIONAL JBS CORPORATION, | ) | Docket Nos.: 01-256T 01-257T (Consolidated) |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 1 through 93

Place: Washington, D.C.

Date: May 19, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARRIOTT INTERNATIONAL RESORTS LIMITED PARTNERSHIP, | |
| AND | |
| MARRIOTT INTERNATIONAL JBS CORPORATION, | Docket Nos.: 01-256T<br>01-257T<br>(Consolidated) |
| Plaintiffs, | |
| v. | |
| UNITED STATES, | |
| Defendant. | |

Courtroom 7
National Courts Building
717 Madison Place NW
Washington, D.C.

Monday,
May 19, 2008

The parties met, pursuant to the notice of the Court, at 9:59 a.m.

BEFORE: HONORABLE CHARLES F. LETTOW
Judge

APPEARANCES:

For the Plaintiff:

HAROLD J. HELTZER, Esquire
ROBERT L. WILLMORE, Esquire
HOWARD M. WEINMAN, Esquire
Crowell Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2565 / 624-2915 / 624-2725

APPEARANCES: (Cont'd)

For the Defendant:

G. ROBSON STEWART, Esquire
THOMAS J. SAWYER, Esquire
U.S. Department of Justice
Tax Division
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
(202) 307-6493 / 514-8129

P R O C E E D I N G S

(9:59 a.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Charles F. Lettow presiding.

THE COURT: Please be seated. I apologize for being a minute early. The case before the Court this morning is Marriott International Resorts Limited Partnership and Marriott International JBS Corporation v. The United States, Nos. 01-256T and 01-257T.

Mr. Heltzer, will you introduce yourself and your colleagues, please?

MR. HELTZER: Your Honor, I'm Harold Heltzer, Crowell & Moring, representing the Plaintiffs, and we have on my right, Robert Willmore, Crowell & Moring, and Howard Weinman.

THE COURT: Welcome.

MR. HELTZER: Mr. Willmore will be making the argument.

THE COURT: All right, thank you.

MR. STEWART: Good morning, Your Honor.

THE COURT: Good morning.

MR. STEWART: Rob Stewart for the United States.

THE COURT: Welcome, Mr. Stewart. We have

the interesting situation of cross-motions. It has taken awhile to get this case to this point, but we're there. The first motion by the parties' agreement some time ago under the schedule we had adopted for submission of cross-motions was and is the government's. Accordingly, I would propose that the government begin first with its argument and then, Mr. Willmore, if you would respond. The Could would also propose to give each of you brief time to reply.

Now we don't have a time limit. But on the other hand, the Court has in hand the documents, and especially has, I call it, the charts that describe the transaction, as well as the statements of uncontested fact. Mr. Stewart, if you would proceed.

MR. STEWART: Certainly, Your Honor -- good morning, and may it please the Court, at issue in this summary judgment proceeding is the application of the Subchapter K partnership basis provisions of the Internal Revenue Code.

Specifically, the discreet legal issue here is whether a short sale obligation incurred by an American controlled entity was a liability for the purposes of partnership basis calculations under Section 752 of the Code.

This issue arises because Marriott used a

short sale of Treasury notes and a pre-arranged series of partnership transactions to create an enormous artificial tax loss of $71 million, with only a minor meaning corresponding economic loss.

THE COURT: Let's sort through the fact that these were Treasury notes rather than, for example, Treasury bills. What was the term of the Treasury notes?

MR. STEWART: I believe it was five years, Your Honor. According to the Department of Treasury reps, that constitutes a Treasury note.

THE COURT: Right, anything over a year and less than the term of a bond -- so I understand the distinction. That's what I'm trying to sort out.

MR. STEWART: Sure.

THE COURT: Go ahead.

MR. STEWART: I was just going to say, I don't think the term of the Treasury note makes any difference in this case, that I'm aware of.

THE COURT: It might to the Court.

MR. STEWART: Okay, very well.

THE COURT: Let me ask a set of questions related to that. Because to the Court's eye, a short term Treasury bill -- let's say, a three month bill -- is almost like cash.

There is an interest rate uncertainty associated with it. But it's only for a relatively short period of time. So it's virtual cash. That's why I was interested in the term of the notes. In your eye, does it make any difference?

MR. STEWART: I don't think in this particular part of the proceeding for the 752 issue that it does.

THE COURT: So you think a short sale of even a six month bill would raise the same legal issues?

MR. STEWART: Yes, yes -- while the facts of this case may seem complex, the ultimate facts necessary to resolve the 752 issue are relatively straight forward. In a nutshell, the facts are that a Marriott subsidiary entered into two short sales of the Treasury notes, for them to receive cash and incur the obligation to return the borrowed Treasury notes that were used to generate the short sale proceeds.

That subsidiary then formed another partnership with another Marriott-controlled entity, and contributed the short sale proceeds, some other assets, timeshare mortgages notes, to that partnership, and the partnership assumed the obligation to return the borrowed Treasury notes to

the broker.

THE COURT: Let's stop right there. In parts of the government's moving papers, there is a suggestion that there was not a business purpose to this set of transactions; only a suggestion. I take it, you are not actually making the claim that these were entirely tax motivated transactions without a business purpose.

MR. STEWART: In this 752 proceeding, we're not asserting the lack of business purpose at this point. That's wrapped up in the issues of economic self-sensitive transactions, that would require factual findings after a trial.

THE COURT: But do you make the claim in this case at all?

MR. STEWART: Well, yes, I mean, the basis of one of the adjustments in the FPA was a lack of business purpose for parts of this transaction.

THE COURT: But you have the situation where Marriott was ostensibly hedging its interest rate risk on the mortgages or whatever they were, securing the sale of the timeshares. What do you do with that? Is it proper to hedge a transaction like that?

MR. STEWART: At this point, for the purposes of this motion, we're assuming that the

business purpose of hedging the mortgage notes was a valid business purpose at this point.

THE COURT: Still, do you think in the case, depending on the outcome of this motion -- let's say the motions are denied and we go to trial in due course.

MR. STEWART: Right.

THE COURT: Do you think that would be an open issue, that we'd have to retried?

MR. STEWART: Well, it's a complicated issue. I don't think the government disputes that Marriott had the intent to somehow hedge its interest rate risk on holding the mortgage notes. Our dispute is the manner in which it was done.

What we find lax business purpose is the short sale itself, if it works out to be a hedge this time, MORI, which is Marriott Ownership Resorts International, that held the mortgage notes during that time period, wanted to purportedly hedge their interest rate risk, entering in the short sale may have been one valid way of doing that.

THE COURT: Well, it's the usual way of doing that.

MR. STEWART: It's one way of doing that, right. To hedge those interest rate risks, it didn't

require contributing the short sale proceeds to a partnership.

THE COURT: That's true. You could have held the proceeds from the short sale, and the mortgage notes or whatever they were.

MR. STEWART: And it's that fact that we claim lacks the business purpose. That was something that wasn't necessarily to the purpose of hedging interest rate risk. I think the Jade Trading case had a good quote about that.

THE COURT: I understand that part. But I'm sorry, I interrupted you in mid-flow on a very complicated transaction. You were about to say that the obligation to close the short sale and some assets were transferred to a partnership.

MR. STEWART: Right. The partnership, Marriott International Resorts I think is the full name of the corporation. We've been referring to it as MIR I think in the papers. But anyway, I thought the Court was actually going to ask another question about the assumption of the liabilities.

THE COURT: I'm about to get there.

MR. STEWART: Okay, that's fine; I won't anticipate. But anyway, going on from there, I'll just finish summing up my short factual summary.

In calculating its basis, MORI calculated its basis and the contribution to MIR, took into account the value of the mortgage notes that were contributed to the partnership and the short sale proceeds; but it did not account for the obligation to close the short sales.

THE COURT: All right, now we have the distinction between inside and outside basis arising, and that's what you were anticipating in a sense.

MR. STEWART: Well, to some extent -- now I thought the Court's question was going to whether there was a valid assumption by the partnership of the obligation to close. Again, for our purposes here, we're assuming that it was done.

THE COURT: That's right. Is there a question about that?

MR. STEWART: Well, yes, I think there's a factual question. If we get to a trial of this case, one can still point to some of the economic substance transaction doctrines.

Some of the paperwork that we submitted in briefing seemed to indicate that MORI was obligated to close the short sales; or actually did close the short sales; not MIR.

THE COURT: I missed that; I will have to

tell you.

MR. STEWART: If you looked at the trading confirmation statements that we submitted, they still list MORI as the plight for the trades.

THE COURT: Well, that's probably because the account had been opened in MORI's name, and it never shifted. I don't know.

MR. STEWART: I mean, that would be a question that --

THE COURT: Who is legally obliged to do it might be another issue.

MR. STEWART: Right, right -- but anyway, I can provide more facts. I was prepared to go more detailed into the facts if the Court would like.

THE COURT: Well, let's just sort through what happened. Let's assume the obligation was actually transferred. The obligation to close the short sale was transferred.

Let's also assume that the assets were transferred, and there is a valuation added to them. What do you think happened to the basis, inside and outside, at that point?

MR. STEWART: Well, the government's position is that the basis should have been adjusted to include the obligation to close the short sales,

which is valued based on the proceeds; that generally, the short sale, was at the time they were contributed to the partnership.

So MORI took its basis based on the fair market value of the mortgage notes, and then added the short sale proceeds, which were approximately $63 million at that point, the first short sale. Again, later on, they executed another short sale, and received about another $8 million.

THE COURT: Yes, but these are basically short sales that, in a sense, matched the mortgage notes.

MR. STEWART: I think eventually they sort of did.

THE COURT: It's just they took a couple of steps. Can we ignore, as far as the government's purposes are concerned, the fact that there were two rather than just one; or does it make a difference?

MR. STEWART: Well, no, I think we can just consider them as one transaction. It's the same effect, because they did the same thing in calculating the basis, by leaving out the obligations in calculating the basis.

THE COURT: All right, just now review the bidding. From what you just said, this occurred in, I

always forget, 1994, right?

MR. STEWART: Right.

THE COURT: Or these steps occurred in 1994. At that point, you would say, MORI had a basis based on the assets contributed. This is an outside basis.

MR. STEWART: Right.

THE COURT: Assets contributed to the partnership. But it actually had a reduction in its basis because it contributed also to the short sale obligation. That is a liability.

MR. STEWART: Correct.

THE COURT: So you know, whatever the meaning was, was its outside basis. That's what you said.

MR. STEWART: Right.

THE COURT: The inside basis in the partnership was the same netting. At that point, the inside basis and the outside basis were the same. Is that right?

MR. STEWART: Right, well, not quite, because there was another partner involved in the case.

THE COURT: Oh, that's right.

MR. STEWART: JBS had one percent. So I think we've sort of been assuming, because MORI owned

99 percent that the amounts basically net out. You know, there would be a slight difference, because any interest partnership, the partnership interest differed.

Because MORI would actually only be liable for the 99 percent of its share of the obligation assumed by the partnership. So there is a slight difference.

THE COURT: Right.

MR. STEWART: For our purposes, essentially, it's a netted transaction here.

I had prepared a little sort of cheat sheet that has some of the dates and transactions, if the Court would like. I have copies here.

THE COURT: Thank you, that's the one thing that's missing from the materials that were filed in 2006. But they're in the other papers.

MR. STEWART: Well, I realize that the charts we did, they were helpful. But it took several pages to get through them.

THE COURT: Well, it's just steps.

MR. STEWART: Right, anyway, as we've talked about here, the main partnership provisions at issue here are 722 and 752. As we've discussed, 722 is the provision that accounts for the basis on the

contribution to a partnership by partner, and 752 accounts for any liabilities that are either contributed to a partnership or assumed by a partner with respect to the partnership.

The definition of liability is not provided in Section 752. That's part of the problem here. Because we are confronted with an issue of whether these short sale obligations are liabilities for purposes of 752.

There are several other authorities which give guidance on the question of what constitutes a liability for 752. In 1984, Congress enacted a rule with respect to the treatment of liabilities and a corporate assumption of why those, in Section 357(c)(3)(b).

In that section, it talked about obligations constitute liabilities when they create or increases basis in property. Therefore, they are treated as liabilities for the purposes of that section and the corporate section.

THE COURT: The Court has learned, if it didn't know before, that the Tax Code is very precise, specifying different entities to which given sections apply; sometimes partnerships, sometimes individuals, sometimes special purpose entities, Subchapter S, and

so on and so forth. This appears to apply only to corporations.

MR. STEWART: That's true, Your Honor. That provision does apply though. But it gives a groundwork for getting to a definition of liability for 752 purposes. Clearly, it doesn't control. Partnership is a hybrid. So are the entities, because they're not taxed individually. The tax flows through to the partners.

Another relevant authority that helps define the liability under Section 752 is the rule in 8878. It echoes the same definition of liability as something that creates or increases basis in property. That Revenue Ruling, which was promulgated in 1988, dealt specifically with partnerships.

So the concept of a liability being something that creates or increases basis in property for partnership purposes was established or clarified many years before the transactions that took place here. Then we have Revenue Ruling 9526.

THE COURT: At some point, you're going to talk about precedence having to do with contingencies. You haven't used the word contingencies really yet.

MR. STEWART: No, that's true, Your Honor. Well, the most recent precedent on that is the Kornman

decision out of the Fifth Circuit.

THE COURT: Well, let's go to your progression. You were about to get to 95. It's just you'd skipped over a couple.

MR. STEWART: Okay, well, 9526 deals specifically with the short sale situation, and reaches the conclusion that's consistent with 8877 and 357(3)(b), that an obligation is considered a liability when it creates or increases basis in property.

I think some of the cases you are referring to are hallmarks for the Tax Court decision of Helmer, LaRue, and Long, that concerned contingent liabilities. It's certainly true that those cases held that if a liability or an obligation is contingent, then it wouldn't be constituted a liability for Section 752.

Those cases are distinguishable from the facts here. The Fifth Circuit in Kornman examined those cases, and also the Tax Court in Salina examined those cases and found that they weren't comparable to a short sale obligation here.

Helmer, for example involved options. They sold options for purchase of some property, received the payments on those options. Those payments were

unrestricted. They had no obligation to make any repayment of those auction payments, and they weren't used to increase any basis in the partnership. So they were found not to constitute liabilities for 752.

THE COURT: Let me ask a question about Helmer.

MR. STEWART: Sure.

THE COURT: On the facts of Helmer, let's say the same facts arise today. In light of the regulations and 752, what would be the result in Helmer?

MR. STEWART: The result in Helmer today would be different.

THE COURT: Explain how and why; how would it be different and why would it be different.

MR. STEWART: The IRS issued regulations -- I think it was in 2003 -- that changed the definition or included contingent liabilities such as the ones in Helmer, as obligations under Section 752. That regulation is not controlling for our purposes. We're dealing with a different type of obligation.

THE COURT: Well, I understand that. But you're saying basically that raises the perspective of any retroactivity questions, if the Court recalls correctly, that Klamath addressed.

MR. STEWART: Right, and I think Plaintiff was in a different posture. Because 7805 concerns the retroactivity of regulations and rulings was changed in July of 1996. Before that date, revenue rulings and regulations were presumed to be retroactive, unless the IRS specifically said that they would not have retroactive effect.

That changed in 1996. So we're really talking about two different situations with respect to anything after 1996.

THE COURT: After 1995, what was the change, specifically?

MR. STEWART: With respect to the question of liabilities?

THE COURT: Retroactivity.

MR. STEWART: That was in 7805(b). It was changed after 1996. The regulation had to be specifically --

THE COURT: It was prospective unless it was specifically retroactive.

MR. STEWART: Right.

THE COURT: And you had to explain why it would be retroactive, rather than the opposite.

MR. STEWART: Right, so it was the mere opposite.

THE COURT: That's right, and that was the situation that was addressed in Klamath. Is that correct?

MR. STEWART: Correct.

THE COURT: All right, you're saying now, if Helmer arose, under the regulations under 752 that were adopted whenever it was, 2003 --

MR. STEWART: Right.

THE COURT: -- that option arrangement would give rise to a recognized liability for purposes of basis.

MR. STEWART: Yes, and I think the regulation specifically states it's changing the result under Helmer.

THE COURT: Okay, this is just wonderful. We have different elements of contingency. Well, in Helmer, you had the contingency, whether or not the option would be exercised at all.

There were a whole set of circumstances in which you could imagine that the option would not be exercised. One party just bought the option, and it had some value at the time it was purchased. But at a given point, it would disappear.

You're saying, okay, that result still requires a recognition, both of the liability in terms

of the inside and outside basis aspects of the thing, right?

MR. STEWART: Under the regulation.

THE COURT: That's right.

MR. STEWART: Right, yes. Not at the time we're talking about.

THE COURT: Just to cut through all this, you're saying that the contingency aspect of this thing, which arose well before the regulations and a year before the Revenue Ruling, 95-26, the contingency here was really just an interest rate contingency. Because they were, after all, Treasury security notes.

MR. STEWART: Right.

THE COURT: And the interest rate contingency was not enough to lead to non-recognition under the prior precedence for 752. I'm trying to just encapsulate this thing.

MR. STEWART: Well, there's a little bit more to it than that. Unlike Helmer, with the short sale, there is a binding secured legal obligation to return the borrowed treasurers.

THE COURT: That's what I say, it's just an interest rate risk.

MR. STEWART: For the value.

THE COURT: That's right.

MR. STEWART: You're talking about the value.

THE COURT: That's all there is.

MR. STEWART: Right, and in this case also, the proceeds from the short sale were used to increase the basis in the partnership, whereas, in Helmer, that had occurred.

THE COURT: Why would that make a difference?

MR. STEWART: Well, because that's how a partnership basis can be manipulated improperly. Because if something is used to increase partnership basis that constitutes a liability, it's as if --

THE COURT: I understand that part in terms of the tax effect of the transaction. I'm just looking at the contingency aspect of recognition going on and why would that make that fact, that is, the proceeds from the sale, short sale, make a difference?

MR. STEWART: Not with respect to the contingency aspect.

THE COURT: Yes.

MR. STEWART: I misunderstood then what you were asking. But yes, contingency is a sliding scale. I mean, as the Salina Court mentioned, there's a general proposition that contingent propositions are

liabilities. But there's no hard and fast white line rule.

THE COURT: Well, at least there was before your regulation.

MR. STEWART: Well, I don't think so. I mean, because our position here is that this isn't affected by the regulation.

THE COURT: That's right. I'm just saying, after the regulation, contingency doesn't care.

MR. STEWART: Right, right.

THE COURT: Okay, all right, I think we understand each other.

MR. STEWART: Okay, so yes, there is a sliding scale.

THE COURT: You're saying there is this scale; and you have to get to kind of a tipping point on the scale for recognition or non-recognition.

MR. STEWART: Right.

THE COURT: How do you tell where you are on the scale?

MR. STEWART: Well, it requires an examination of each of the types of obligations involved. Here, this type of obligation, where you have a binding either obligation to return the board securities is sufficient to put it on the tipping

point to make it a liability, if not a contingent obligation.

THE COURT: All right, you're saying because the short sale -- or, in fact, regulatory requirements respecting a short sale required that it be closed at some point, and indeed in this point.

You say there are five year notes. We don't know when the term of the five year notes these transactions arose. But at least it was a little bracket -- it was not a little, but a medium term bracket of time in which the short sale had to be closed.

MR. STEWART: Correct.

THE COURT: It wasn't indefinite.

MR. STEWART: Correct.

THE COURT: It was definite by the definition of the securities that were sold in the short sale.

MR. STEWART: Right.

THE COURT: That makes a difference, you're saying, to Helmer, because there the option could never be exercised.

MR. STEWART: Right. There was no repayment obligation on those option payments.

THE COURT: That's not repaid, okay.

MR. STEWART: They were seen free and clear, and I think that's the difference. Here you had the obligation to return. The Board of Treasuries would never be extinguished until it was extinguished.

THE COURT: What in the prior precedence -- that is, before 1995 -- indicated that there was this sliding scale, and you could have some contingencies but not others; and if you got to a given point, you had to recognize for basis purposes a contingent obligation?

MR. STEWART: In many cases, it dealt with different types of liabilities, of debts, what constitutes a debt. Particularly, some taxpayers were trying to structure debt obligations that really weren't bona fide debt and things like that.

THE COURT: Well, that's a little different, isn't it? Because you're saying those basically were not effective transactions. They were shams, basically.

MR. STEWART: Well, but there were cases where whether the liability was contingent or not had to be determined. This wasn't a unique situation with respect to whether option payments were contingent. I mean, there were a lot of different types of transactions where this question arose.

Specifically here though, since we're dealing with a short sale that has some similarity to auction type transactions, I think that's why the Plaintiffs have focused on those particular tax cases.

THE COURT: Well, it's been a little bit since the Court has looked at Revenue Ruling 9526. There doesn't appear to be anything in Revenue Ruling 9526 that goes into the kind of analysis that you've described today.

MR. STEWART: No, not with respect to the contingency aspect of the transaction.

THE COURT: Right.

MR. STEWART: It focuses more on the aspect that deals with whether an obligation gets lodged in an increase, a creation of basis in property. I think that's where the ruling hangs its hat, so to speak, based on where the Rule 8877, which made that clear; and also Section 357, which had also dealt with the same issue.

So you're right, there are two problems: the contingency aspect and the basis creation aspect. But distinguishing Helmer and the rule in Long involves both of those aspects. Because in those other cases, the obligations hadn't been used to increase partnership basis.

So the general principle of equalizing inside and outside basis, well, it would have been violated if those obligations had been considered.

THE COURT: In fact, Marriott argues that it was the government, prior to the revenue sharing, that had sought a difference in inside and outside basis for its own tax purposes.

MR. STEWART: Well, no, in Helmer, there would have been a list match, because the options weren't taken into basis calculations at the time.

I think Long was the same way. They were deferred and the income from them, and LaRue was the same thing. There was an initial basis increase, based on those obligations. So there was no call for liability to offset that.

THE COURT: Yes, and that's one of the reasons the Court asked you about what the result in Helmer would be today, because if you take a look at those, it really is a deferral. Because I take it, at some point, based on the facts of those prior cases, there would be a recognition; either when the option expired or was exercised, right?

MR. STEWART: The deferral of the income --

THE COURT: That's right.

MR. STEWART: -- well, in some of the cases

it was provided for by statute; but, yes.

THE COURT: Say it wasn't.

MR. STEWART: Right.

THE COURT: When you say right, are you agreeing with me that it, in effect, was a deferral situation; when the contingency was removed, then you had a recognition situation?

MR. STEWART: For the payments, right, in Helmer.

THE COURT: That's right. So the income would have been, one way or another, offset against the obligation; either that it had expired or exercised.

MR. STEWART: Well, the obligation in Helmer was for the eventual sale of the property.

THE COURT: Right.

MR. STEWART: So if the property had never been sold, the options would expire.

THE COURT: That's right. But at that point, I guess what I'm asking you is whether the income would have been recognized at that point. You'd recognize that as income.

MR. STEWART: Right.

THE COURT: Otherwise, it would have been offset against, I take it. I don't know. I don't

remember the details of the transaction. It would have been offset against the purchase price of the property or not? I don't know.

MR. STEWART: Well, that's what was called for in the contract; that if the option was exercised, then the payments that had been made would be given credit to them.

THE COURT: I'm asking you about the recognition situation before or pre-1995. Would have happened?

MR. STEWART: Well, the income would have been recognized at the time that the payments were made. I can't remember specifically. I remember in Helmer -- I think I may be confusing it with Long. Long used a completed contract method of accounting, and that allowed them to defer the income.

THE COURT: Right, that's what I'm thinking. Maybe I'm confused. That's what I'm thinking.

MR. STEWART: Right, yes, Helmer, at the time, it received them. But Long is the case where they received the deferred payments under the completed contract method. I think that may be what you're talking about.

So under that method of counting, they were allowed to defer the income until the contract was

completed. Now that's a specific statutory provision that allows them to account for a contract completion in that manner. So that's a separate question from what we're talking about here.

THE COURT: Well, I have a few questions about that, and we'll come to them in due course.

MR. STEWART: Sure, I think maybe if the Court is alluding to Section 1233 in the open transaction doctrine with respect to the short sales, the income from the short sales wouldn't be recognized until the short sale was ultimately closed.

But that concept is answered or the question of when the basis has to be calculated for partnership basis purposes is 722. Because that specifies that the partnership basis has to be calculated at the time of the contribution of the asset to the partnership.

As the Tax Court in Salina said, 752 and 1233 just have no interaction. One, 1233 is used for calculating income amounts and 752 is partnership basis. So there's just no overlap there between them. It would be the same as if a partners contributed stock to a partnership.

THE COURT: That goes back to your first question, that there was really no need for MORI to set up the partnership or MORI and JBS to set up the

partnership. If MORI had simply held the timeshare mortgage -- if they were mortgages or whatever they were -- secured notes and held the short sale obligation, then the recognition under 1233 would have come at the time. The recognition of any gain or loss on the hedge, as a hedge, would have been recognized at the time the thing closed.

MR. STEWART: Correct, right.

THE COURT: Nobody disagrees with that.

MR. STEWART: I don't think so, no. If MORI held the short sale and then eventually closed it out when it did, it would have just recognized the gain or income at that time. It was only because they went through the partnership transactions that creates this question at all. So that's why we have the difference between the partnership basis.

THE COURT: Well, let me cut through all this and say, let me look at your sheet, because at some point, MIR disappears and you go to new MIR. I am trying to get this square in my mind as to dates. But by that time -- well, I'm trying to get the fact that the first short sale closed, you say on your sheet, September 29, 1994. The second short sale closed October 17, 1994. That appears to be before Mori transferred its partnership obligation to

Marriott International Capital Corporation.

MR. STEWART: Yes.

THE COURT: When the short sale closed -- let's say two, let's just talk them as one. When the short sale obligation closed, why wasn't there a recognition event on the liability side, at least at that point?

MR. STEWART: Well, there could well have been. I mean, that's the -- the date of lost was determined with that time. But, the partnership basis was determined back in May 6th of 1994.

THE COURT: When the assets were and liabilities were contributed?

MR. STEWART: Were contributed.

THE COURT: There isn't any rule that says, okay, it might have been sufficiently contingent under the old rules that we're not going to account in a basis step for the liability that was transferred, but the contingency could be removed at a given point and at that point, you have to recognize the liability? It's not a rule like that?

MR. STEWART: Not that I'm aware of.

THE COURT: So, we have a disappearing outside basis. It just goes away.

MR. STEWART: With respect to the short sale

proceeds? You mean --

THE COURT: No.

MR. STEWART: -- the actual asset?

THE COURT: To the liability. If you don't recognize it at the time the liability -- let's just talk about the liability side rather than the asset side. If you don't recognize it at the time it's contributed and subsequently the contingency is removed, but let's just pass over the question whether the obligation to close the short sale was actual or not and say it was, there isn't a later step that says, okay, when the contingency is removed, then at least the contribution of the liability will be recognized for outside basis purposes?

MR. STEWART: Not that I'm aware of. Under 722, it specifies that the basis calculation is made at the time the property is contributed to the partnership.

THE COURT: But, this is not property. It's a liability. So, it falls under 752.

MR. STEWART: Well, but those things are determined at the time of the contribution. The proceeds were contributed at that time and --

THE COURT: Pardon me, but that's a nutty rule.

MR. STEWART: Well, the partnership basis provisions are completely --

THE COURT: To the point where that rule --

MR. STEWART: I mean, the Court has a good point, because the short sales weren't closed within the same taxable year.

THE COURT: Yeah, they were.

MR. STEWART: Presumably --

THE COURT: I just don't understand it.

MR. STEWART: It would make it much easier for us here if that was the case and all of what would happen is that the basis would be adjusted to recognize what the actual trade transaction was.

THE COURT: If there was an interest rate risk contingency. But, it was removed during the period we're talking about.

MR. STEWART: Right. Then, basically, you get a symmetrical accounting. You would have the proceeds and then the offsetting loss or sale and that eliminates the liability and then you would be left with either a gain or loss of the trade, which --

THE COURT: Which is the effect that 1233 otherwise would provide.

MR. STEWART: Right. But, under that -- once it's contributed to the partnership, it becomes

the income to the partnership. So, it's accounted for in the partnership as its income. There is a basis adjustment to the partners, as a result of that fact, but it would just be based on the gain or loss of the sale. It would just be the same as any partnership operation, if they were selling timeshares directly. Whatever they made on their timeshare sales as profit would be adjusted -- make a basis adjustment.

THE COURT: That's part of what I don't understand, because the inside basis to the partnership was reflected in the assets, but then you have this contingency rule, why don't you take that into account and then it's a pass through, if you see what I'm driving at. So, why don't you -- because the short sale was closed before all of this wrapped up, I just -- it's a mystery to me how the liability just disappeared.

MR. STEWART: Well, it would be much easier in this case if we could do that.

THE COURT: You say you can't.

MR. STEWART: Under 722, it's at the time of the contribution. So, the short sale was contributed back in May of 1994 and that's when you make the basis calculation. That's when Mori's partnership interest came into being. So, it would certainly make life a

lot easier if we could make those adjustments within the year. But, it would just be as if Mori contributed a long position stock and then the partnership may have sold it in the same year. Whatever the gain or loss to the partnership is -- wouldn't directly effect the initial basis in the partnership. It would have some effect based on the operations.

THE COURT: That's the one thing about this I have never understood. I understand what you say the timing is, but I just -- you know, why? There has to be a reason.

MR. STEWART: Well, I think because partnerships are hybrid entities.

THE COURT: Well, it's a pass through.

MR. STEWART: Right.

THE COURT: It's like a Chapter S corporation.

MR. STEWART: Right. And the basis rules are meant to try to equalize some treatment. Sometimes, it doesn't always work out that way. I mean, it's not a hard and fast rule, that inside and outside basis always have to match, because they don't always. But, in this situation where we have such a huge basis increase based on a purported asset, which

were proceeds from an insurance sale, we're saying that you have to take that liability into recognition at that time, as opposed to waiting until the transaction closes.

THE COURT: So, you really have two grounds for your position. One is that you have the proceeds from a short sale and the second is that you have this sliding scale on contingency; is that right? Those are the two grounds for your position?

MR. STEWART: Yes. I mean, I don't know if I want to characterize it as "sliding scale." I mean, at some point, some things are contingent and some things aren't. So, we're only here to draw the line with respect to one.

THE COURT: I'm sorry?

MR. STEWART: I said, we're only here to draw the line with respect to this particular one.

THE COURT: I understand that. But, I asked you before what would happen if the proceeds from the short sale were not contributed.

MR. STEWART: To the partnership? Then, there would be no increase in Mori's basis in the partnership, any adjustment to -- it's only basis would be the value of the mortgage notes that it contributed and those are the assets that were

ultimately sold --

THE COURT: Right.

MR. STEWART: -- which gave it a gain. So, the other way to look at it is if you don't increase the basis by the short sale proceeds, then the problem goes away, too.

THE COURT: But, the short sale occurred obviously before the partnership was formed and the assets and the obligation to close the short sale were contributed. You didn't have to contribute the proceeds from the short sale to the partnership.

MR. STEWART: Right, that's true.

THE COURT: And I'm trying to figure out why that makes a difference in this, if you see what I'm driving at.

MR. STEWART: Yes.

THE COURT: There didn't have to be a match here.

MR. STEWART: There wouldn't be a mismatch if they hadn't contributed the short sale proceeds to the partnership.

THE COURT: Right. I understand that aspect of it.

MR. STEWART: By the very fact that they did is what creates the issue. It's sort of a basic

accounting issue. You've got the asset offsetting the liability. They're trying to sever the two and we're just adding up. The asymmetrical treatment isn't possible under the basis partnership rules, because you get this humongous distortion that creates a tax loss. And I think that's what Revenue rule 9526 is a recognition of those kinds of manipulations. The fact that it wasn't a longstanding Revenue rule is -- really is a non-factor, because it was promulgated in response to these kinds of operations that were being used. And for the same reason the lack of notice and comment of the Revenue rule, it was -- the IRS was trying to issue something quickly to make sure that these kinds of transactions were stopped.

And, again, Revenue rulings don't create law or change law. They interpret existing law. So, when you talk about retroactive effect of Revenue rules is somewhat of a misnomer. The predicate for Revenue ruling 9526 was already established in 8877 for the transactions here and also 357-3(b). So, to that extent, we believe that 9526 is entitled to substantial deference in the Court's consideration of the issue here.

THE COURT: Well, this is kind of a peculiar case, because you could have a short sale obligation

of IBM stock, a short sale and an obligation to close the short sale respecting IBM stock. It didn't have to be a Treasury bill or, in this case, a Treasury note, which was near catch. That's where we started this exercise. And I'm trying to figure out whether, in your eyes, that makes a difference.

MR. STEWART: You know, I think each individual asset would and the type of transaction would need to be looked at individually. We thought about that kind of a situation, if you're talking about a stock, as opposed to a Treasury note. But, that would make a difference with respect to the contingent nature of the obligation. I really don't think it will, because with the unique aspect of the short sale is that obligation to return the property exists until the short sale is done.

THE COURT: You could have it respecting any traded security basically --

MR. STEWART: Correct.

THE COURT: -- under the short sale rules. That's what I'm driving at.

MR. STEWART: Sure. And under regulation T and exchange rules and brokerage rules, those proceeds aren't anything but free and clear as the amounts were in Calibar that were received by the taxpayer there.

I mean, Marriott couldn't have withdrawn them and invested them outside of the company.

THE COURT: But it could have kept them in Mori.

MR. STEWART: Oh, certainly. Sure. I mean, Mori was the original --

THE COURT: Which goes back to your question about whether or your point about whether there was an actual transfer, the aggregation to MIR.

MR. STEWART: Well, that's a question we don't have to address here, resolve here.

THE COURT: Okay.

MR. STEWART: So, I think at this point, Your Honor, that's all I have.

THE COURT: A wonderful case. Thank you, very much, Mr. Stewart. Sorry to besiege you with all sorts of questions. That helped. Mr. Willmore?

MR. WILLMORE: Thank you, Your Honor. I'd like to address one issue of fact before the liability issue, which is the partnership. And I wasn't sure if the government said the mortgages never needed to be -- did not need to be transferred to the partnership. They had to be transferred to the partnership, because the way in which these mortgages were sold was through a securitization and there had to be a bankruptcy

remote entity and that's what the partnership here was. MIR was a bankruptcy remote special corpus entity and that permitted the securitization to take place. And so, the mortgages did have to be transferred to the partnership and they were what was being hedged. And so the hedging vehicle, which was the short sale, the obligation to close the short sale was also transferred -- well, it was actually acquired by MIR.

THE COURT: You would --

MR. WILLMORE: It was a business purpose.

THE COURT: You would accept the fact that the obligation to close the short sale actually was transferred from Mori to MRI.

MR. WILLMORE: MIR.

THE COURT: In fact, you would assert that it did.

MR. WILLMORE: Yes. MIR assumed the obligation. MIR received the mortgages, it received the proceeds from the short sale, and it assumed the obligation to close the short sale.

THE COURT: But, let me ask what -- where we finished with Mr. Stewart. Mori did not have to transfer to MIR the proceeds from the short sale. It did not have to create the basis under 722.

MR. WILLMORE: Your Honor, I think it was economically very logical for Mori when it transferred the mortgages, which were being hedged, to transfer what was hedging -- the other part of the hedge, in other words. You had a hedge in place. The mortgages were one part of the hedge. The short sale was the other part of the hedge. They were hedging each other. And when Mori transferred the mortgages down, it transferred the other part of the hedge down, too.

THE COURT: Well, it didn't have to do that, because the – if you're really just protecting yourself against interest rate risk, you had the asset in terms of the mortgage and you had the short sale obligation. You didn't -- and you essentially could have kept the proceeds in Mori, essentially monetized -- I hate to use that kind of -- but monetized the mortgages from Mori's standpoint.

MR. WILLMORE: I'm not sure from an accounting standpoint, however, it worked, Your Honor, because you would have one part of the hedge and the other part of the hedge in another entity. So, you would have the hedge --

THE COURT: As I say, you would have essentially monetized the mortgages. Well, anyway -- all right.

MR. WILLMORE: But, I just want to be clear, the partnership had very clear business purposes, not just the hedge, itself, but the partnership had to exist.

THE COURT: I understand the hedging aspect of it.

MR. WILLMORE: With respect to -- and I'm addressing both our opposition and our cross-motion at this point, I assume, Your Honor. With respect to the question before the Court, which is, is the obligation to close a short sale a liability within the meaning of Section 752 of the Code, I think what we would suggest is that the Court would have to put itself in the position of Marriott in 1994 asking itself that question. If I have an obligation to close a short sale, is that or is that not a liability within the meaning of Section 752. And I think any objective reasonable taxpayer asking itself that question in 1994 would have looked primarily at what the Tax Court had already articulated in accepting the IRS's position that a contingent obligation is not a liability within the meaning of Section 752. And it would have looked -- any taxpayer would have looked at the three central cases, Helmer, Long, and LaRue.

There was a lot of discussion of Helmer, but

the case that's really closest on point is actually the last of these cases, the LaRue case, which is a 1988 decision. And it's the closest case on point, because economically, what was at issue was very similar to a short sale. In LaRue, the brokerage had made a number of back office errors. They had to correct those errors. The liability was clear. The court made that point repeatedly in the decision. Nobody was disputing the liability to correct those back office errors. But, the court nevertheless held that it was not a liability in LaRue, because the cost of correcting those errors, purchasing the securities to correct those errors, could not be determined until the securities were actually purchased.

THE COURT: That comes very close to the question I asked Mr. Stewart about the difference between IBM stock, it could be any stock, any listed security, as contrasted to Treasury notes, would it, because --

MR. WILLMORE: It don't think it matters, Your Honor. I really don't think it matters, because what we're dealing with here -- Your Honor mentioned interest rate risk. But, what we're really dealing with is the balance --

THE COURT: That's because it's a hedging

transaction. I'm sorry.

MR. WILLMORE: But what we're dealing with is the value of the security and in a short sale, as Your Honor knows, you borrow the security, you sell it, you hold it for a certain amount of time, it can be days, months, years, then you purchase the replacement securities, whether it's IBM stock or Treasury notes, and you deliver them back to the lender securities. And from an economic standpoint, I don't think it matters.

Now, there's a reason Treasury notes were used here, because of hedging. But from the standpoint --

THE COURT: Well, you wanted interest rate risk rather than --

MR. WILLMORE: Speculation.

THE COURT: That's right -- well, speculation. You didn't want business risk tacked on necessarily. So, the Court understands that part.

MR. WILLMORE: One of the other reasons that LaRue is really the case that's closest on point is because LaRue not only deals clearly with the situation where there is a -- where the contingency is contingency, an amount, and because the government in one of its -- I think it may have been its opening

brief, maybe it was its reply brief, I can't remember, argued that these Tax Court cases were distinguishable as some of the later cases, because they really dealt with the fact of liability, not whether there was contingency as to the amount of liability, but the fact of liability. And LaRue is very clear that the issue is the amount of liability. And I believe it was Judge Gerber, I believe, in LaRue, who, as I indicated, said the fact of liability is established. The amount of liability is not established. And interestingly enough, he goes back to Long and looks at Long and says in Long, it was both the fact of liability and the amount of liability that was at issue -- that was contingent, I should say.

If you were a taxpayer in 1994, asking yourself, is the obligation to close a short sale a liability, you would look at these Tax Court decisions where the Tax Court ruled in favor of the government. It accepted the government's arguments that contingent obligations are not liabilities. LaRue was also important in the sense that the court there created a conceptual framework for this holding and they said this is like the all events test. And, in fact, when one looks at the holding, itself, that's in the syllabus to LaRue, it's phrased in terms of the all

events test.

THE COURT: Well, that comes very close to what I think of now as the second ground for Mr. Stewart's position, that is the sliding scale on contingency. You're just going to have to tell me I'm wrong, but I have two points here: one, that the proceeds for the two things that he says make this obligation a liability recognizable under 752 are the fact that the proceeds from the short sale were contributed; and the second thing is this sort of sliding scale on contingency. And you're saying, well, LaRue affects the second position.

MR. WILLMORE: I think -- I'm not sure I see the sliding scale, Your Honor. What I see is the all events test –

THE COURT: Well, did I mishear Mr. Steward?

MR. WILLMORE: Oh, I mean, I'm not speaking on behalf of Justice. Plaintiff doesn't see the sliding scale. What I see is the all events test. The all events test is a pretty clear test. It's one that's very well understood.

THE COURT: Well, but that suggests --

MR. WILLMORE: Okay.

THE COURT: I'm not a tax lawyer, but the all events test to me is a recognition test.

MR. WILLMORE: It basically tells the taxpayer when he can -- when the taxpayer can recognize a certain liability or a certain deduction.

THE COURT: Not only can, must.

MR. WILLMORE: Must, yes, Your Honor. And what the all events test basically says is that when the fact of liability is fixed and the amount of liability is fixed, you can recognize the event.

THE COURT: But, that's like 1233.

MR. WILLMORE: 1233 is very consistent with the all events test. In fact, that's why it's so interesting that in the government's brief, the government never talks about the all events test. But, it is the holding of LaRue. And a taxpayer in 1994 would have looked at these three decisions and would have looked at LaRue and that's the understanding any taxpayer would have had in 1994. And the reason I don't think the government can talk about the all events test is because it can't reconcile the all events test with the position that it is now advocating.

Now, the government argues -- the government's argument apparently has changed a little bit and maybe has been refined.

THE COURT: Well, I think it's not the

argument that necessarily would have been made in 1994.

MR. WILLMORE: The government's argument now is more focused on whether or not a basis was created by the obligation. And that focuses back on Revenue ruling 8877 and, of course, they're also citing the Kornman case, which was decided last week. Now, one of the things I just want to say, because I'm not entirely clear what the government's position is, in light of Kornman, I think there is an issue about whether or not in Helmer there was creation of basis, because in Helmer, as the Court will recollect, there were premiums paid to the partnership, which were these premiums, paid to the partnership, which were then distributed to the partners. And there must have been basis associated with those cash premium options payments that were then distributed to the partners. So when the government says there was no basis in the partnership, I'm just not sure that's accurate.

THE COURT: Well, the partners, themselves, had a basis, obviously, in the asset respecting which the option was issued.

MR. WILLMORE: The partners had -

THE COURT: Yeah. I'm talking about an outside basis rather than an inside basis.

MR. WILLMORE: But what the partners wanted to do is when they received the premium payments, they wanted to treat that as a liability. And the government said, no, you can't and the Tax Court agreed with the government's position.

THE COURT: I understand that part. But, that led us to the discussion of recognition and 1233. Let's say there was that -- well, I'm still not exactly clear what ultimately happened to the receipt in Helmer by the partners of the distribution from the partnership.

MR. WILLMORE: It was cash, so presumably it was treated as a distribution and as a distribution, it would have decreased their basis. And I think what they were trying to do was to get the -- get a liability recognized, which would then increase their basis. And that's what the Tax Court wouldn't do in Helmer. But, I do believe the cash payment would have been treated as a distribution and, therefore, a decrease in their basis.

THE COURT: That's right. But, a decrease in their basis, not actual income in the year that the distribution was made.

MR. WILLMORE: That, I don't know, Your Honor.

THE COURT: Well, that's what I don't know either.

MR. WILLMORE: Okay.

THE COURT: That's why I was hesitating. Anyway, that's where you get the inside, outside basis distinction.

MR. WILLMORE: Now, at least at one point, the government's argument, as I indicated, was that these Tax Court cases only dealt with contingencies of fact, rather than contingencies of amount. That's clearly not the case in LaRue. And that argument, I would simply say, Your Honor, was made to the court Klamath and specifically rejected by the court of Klamath, which said the case law does not support that position. So, I'm not entirely sure if that is still the government's position here.

THE COURT: Well, I think that's why Mr. Stewart put forward this sliding scale, which is a little unspecific.

MR. WILLMORE: Yeah, I don't know where to draw the line in the sliding scale and I don't know of any case law that supports the sliding scale. The case law that is out there, the three Tax Court cases we've discussed, and then the subsequent cases, the Jade Trading case, the Klamath case, the Cemco

Investors case, they all talk about is it a contingent obligation in the sense, can you determine the amount of the obligation. And that's clearly the issue in Klamath. That's clearly the issue in LaRue. In LaRue, LaRue --

THE COURT: That's particularly trading, because -- I mean, let's say we get over the summary judgment ground here, we end up then with the issue in Jade Trading, economic substance.

MR. WILLMORE: Economic substance. That is the government's argument.

THE COURT: And it's sort of backwards to Jade Trading.

MR. WILLMORE: We obviously disagree with the government.

THE COURT: I understand that. I understand that.

MR. WILLMORE: Yes, but that is correct, Your Honor. We will get to that issue.

THE COURT: And so Jade went off on the second ground in this case rather than the first ground, basically.

MR. WILLMORE: But, Judge Williams did address this issue.

THE COURT: I know she did.

MR. WILLMORE: Yes.

THE COURT: Well, just --

MR. WILLMORE: Yes. And she actually addressed it twice. The second time was quite important, because she addressed it in the context of the penalties that were under consideration in Jade and there's a long discussion -- not a long discussion, an extensive quote from Cemco Investors, which Judge Williams notes in sort of the latter part of her decision.

This, then, leads to the question, is the obligation to close a short sale a -- is it a contingent obligation or is it a fixed investment obligation. Because if it's a contingent obligation, then at least in 1994, if you're looking at what the cases tell you, it's not a liability. And our position, and I think it's a position that's very consistent with particularly the LaRue case, is that if you cannot determine the amount of the liability, it has to be a contingent obligation. And when you are dealing with a short sale, you cannot determine the amount until the short sale is actually closed.

THE COURT: All right. Now, let's go the question where Mr. Stewart and the Court sorted through what happens when the actual amount is

uncertain at the time the liability is transferred, but it becomes certain at a point relatively close in time -- I mean, relatively, in this case, it was I don't know how many months later, but the short sale obligation was closed in the same tax year, I assume, 1994. And he says, okay, now, you look at everything as of the date the asset or liability was contributed. You don't look at subsequent events to figure out whether the contingency was removed. So, you kind of have this situation that doesn't match 1233 or the all events test.

MR. WILLMORE: I think the way it would work, Your Honor, if that were the rule, and I don't -- obviously, it's not the rule. But, if it were the rule and the contingent obligation became a liability at the time that you obtained the securities to close the short sale, I think at that point, under 752(a), if I understand it correctly, that liability increases the partners basis by the share of that partner's interest in the partnership. I think that's what 752(a) does. So, if, for example, there was not a liability and then it became a liability, the partner's basis under 752 would increase by his interest in the partnership -- subject to his interest in the partnership. And then when the liability is

distinguished, when the short sale is closed, his basis would be increased again, because that liability would be distinguished. So, I think that the net effect would be zero. I believe that's how it would work, Your Honor, if that were the rule.

THE COURT: I have to think about that one.

MR. WILLMORE: Well, I thought about it while Mr. Stewart was talking, so that's what I think was the rule, but I haven't really had a chance to think it through, other than --

THE COURT: I would have to confess to you, I think of this case as the case of the disappearing basis. That's probably a misnomer.

MR. WILLMORE: The government also makes the argument, they didn't make it today, so again, I don't know whether it is an argument that the government continues to make, but in their reply brief, the government makes the argument that somehow the existence of collateral suggests that this is not a contingent obligation or that it should be treated as a liability.

We addressed that. As we indicate, collateral is really a nonissue. In fact, as we point out, even the collateral isn't fixed. The collateral goes up and down with the value of the security, but

the collateral --

THE COURT: Well, all right, collateral. The assets are of two kinds in this case. We are just focusing on this case. One is the mortgage.

MR. WILLMORE: The mortgages.

THE COURT: Let's just call them that for kind of a short-hand. And the other is the proceeds from the short sale.

MR. WILLMORE: Of course.

THE COURT: And that, I mean, the cash doesn't fluctuate; the mortgages fluctuate.

MR. WILLMORE: The mortgages fluctuate. The cash is actually invested in repos, but I think for our discussion now I would just simply refer to it as cash.

THE COURT: Repos have a lot of similarities to a short sale, but in any event, that's a separate issue.

MR. WILLMORE: That's all right. But the mortgages will fluctuate with the interest rate, and that's what the hedge is designed to address, and as we point out in our papers, the belief was in 1994 that interest rates were going to go up. That was the assumption, and the concern was they were holding these mortgages because the mortgage was throwing off

a very attractive rate of interest for Marriott, but they knew eventually they would have to sell the mortgages to free up the capital, because they needed the money to continue in their business, and so they held the mortgages.

They held them for approximately a half a year, and they were concerned that in that half a year, interest rates might increase, might even increase very substantially, and they did increase, and the short sale was the way to hedge that risk, to protect themselves from losing a very significant amount of money if interest rates increased, particularly if interest rates increased very substantially.

So yes, what was sent down to MIR, the partnership, were the mortgages, the proceeds and the obligation, all of which hedged each other, all of which operated as the hedge. On the collateral issue, if I may just point out, Your Honor, that same argument was made to the Court in Klamath, and I don't fully understand every aspect of the transaction in Klamath, but there was collateral there as well, and the Court rejected that, and the Court even went back in Klamath and discussed LaRue and the reserve account that was established in LaRue and said, that's just

like collateral, and that didn't affect the Court's decision in LaRue.

Now we not only have the three Tax Court cases. We also have three later cases, one of which is from Judge Williams in the Jade Trading case. There's also the Klamath decision. There's also the Cemco Investors decision. They all, all six of these cases come to the same conclusion: a contingent obligation is not a liability for purposes of Section 752. And the latter cases, including Judge Williams's decision in Jade Investors, looked to those three Tax Court cases.

THE COURT: Well, the Court looks at Jade, as we described to you earlier, as kind of a, you can say, a "cart before the horse" kind of situation, but the basis for a decision was not 752.

MR. WILLMORE: I'm sorry?

THE COURT: The basis for decision was not 752.

MR. WILLMORE: Right, because in Jade Trading, there --

THE COURT: It was in Klamath, but that was a retroactivity case, in a sense.

MR. WILLMORE: Well, Your Honor, it's not the basis for decision, but Judge Williams did address

the liability issue.

THE COURT: I understand that.

MR. WILLMORE: Okay. And I guess, Your Honor, I'm not sure I -- you mean the ultimate basis for the decision?

THE COURT: Right.

MR. WILLMORE: Okay. I guess the question that arises is the government now argues, and I think in part because of the Kornman case, that those three Tax Court decisions are all distinguishable because, in those three cases, the obligation did not create basis or did not increase basis. That's the government's argument, and that's essentially what the Fifth Circuit said in Helmer.

The problem with that argument is, first of all, I'm not entirely sure what it means in the context of Helmer, because there were these premiums, and they must have had some impact on basis, but another problem with that argument, and this goes to both the government's argument and the Fifth Circuit's logic, is, that's not discussed in those three cases. If that was an important point to the three cases, you would think the court, the Tax Court, would have said something along those lines, or at least would have noted it, but it's not there.

So it appears to be an after-the-fact attempt to distinguish three cases, which the government has a very hard time doing. Another problem with that argument is that if you accept that logic, then I submit, Your Honor, you also have to conclude that Jade Trading, Klamath and Cemco Investors were all decided incorrectly on the 752 issue, because in those three cases, there was an increase in basis related to the obligation, and certainly those three judges didn't see it that way, and they didn't see that argument or that distinction that the government has put --

THE COURT: Well, going back to the two points the government raises, proceeds from the short sale were contributed and the sliding scale on contingency, I'm not exactly sure the government -- in fact, I'm fairly confident the government would not take the position it is in this case if the proceeds from the short sale hadn't been contributed. What the government is objecting to is the mismatch.

MR. WILLMORE: Right, and we do address that in our brief. They argue that there is a problem with the mismatch between the outside and inside basis, and what we point out in our brief is that the government doesn't object to that when it benefits the

government.

THE COURT: That's true.

MR. WILLMORE: And the Court in Klamath really discussed that at some length.

THE COURT: Yes.

MR. WILLMORE: And so, if they object to it when it benefits the taxpayer, they don't object to it when it benefits the government --

THE COURT: I'm just saying, right now, the government's -- it's sort of not one or the other, it's one and the other. You get one and two, then you say okay, and that's what they are arguing in this case.

MR. WILLMORE: There are two other things I would like to point out, though, with regard to the argument that if the obligation has an impact on basis, that it then needs to be treated as a liability. That's sort of the Kornman discussion, and the Fifth Circuit's position, that in those three Tax Court cases, there was no change, there was no increase in the basis, and therefore they were distinguishable.

Two other arguments that I would point out, and this really goes to the heart of Kornman, is that if that is in fact a way to distinguish those Tax

Court cases and implicitly Jade and Cemco and Klamath, one question you have to ask yourself is, why did the IRS issue its regulations in 2003, what was the meaning for those regulations in 2003, and indeed, the very fact that the IRS issued those regulations in 2003 suggests that that distinction didn't exist in the eyes of the IRS in 2003 --

THE COURT: Well, that's why the government -- we went through the exercise with Mr. Stewart about the result in Helmer, whether that result would be changed under the regulations, and he said yes.

MR. WILLMORE: I think Mr. Stewart is right about that, but that does lead to one other point about the --

THE COURT: This is sort of -- well, okay, go ahead.

MR. WILLMORE: That leads to one other point about the 2003 regulations that's very interesting, and you need to juxtapose what those regulations say about Helmer and what Kornman and now the government is saying about Helmer, because in 2003, the IRS when it issued the regulations said, this is inconsistent with Helmer. We know that.

Now, Kornman said, oh, Helmer is distinguishable. But those two positions are

inconsistent with each other. The IRS knew that the position that it was issuing in 2003 and said in its preamble was inconsistent with Helmer, and in fact, it was overruling Helmer.

THE COURT: That's what Mr. Stewart says today.

MR. WILLMORE: Well, not the Fifth Circuit in Kornman. Kornman --

THE COURT: I understand that, but it's not --

MR. WILLMORE: Okay, and to some extent, I am also talking about Kornman, Your Honor, because obviously, we've had a week to look at the decision and think about it, and one of the odd things about Kornman is the way it deals with Helmer when you compare it to the way the IRS dealt with Helmer in 2003. And interestingly, the Court in Klamath talks about what the 2003 regulations mean, and what that statement by the IRS meant when they said, we recognize this is inconsistent with Helmer.

The ultimate issue, I guess, particularly in light of Kornman, is, to what extent is the Court going to defer to Revenue Ruling 9526? And the government in its brief, and I'm not sure if the government is going to push this, argued initially for

Chevron deference, and I think that's pretty much --

THE COURT: I am just shaking my head.

MR. WILLMORE: Okay, well --

THE COURT: You don't have to argue that point.

MR. WILLMORE: Okay, I won't argue it. So really the question is, I think, ultimately Skidmore deference.

THE COURT: Well, that might be so, but Mr. Stewart said today that Revenue Ruling 9526 doesn't deal with the contingency aspect that's described and argued today.

MR. WILLMORE: It doesn't. That's true, and that's one of the reasons the Court shouldn't defer to --

THE COURT: Well, it doesn't necessarily bear on this argument.

MR. WILLMORE: Well, I think it does bear, Your Honor, because the question the IRS is dealing with in 1995, which was a year after the transactions here, and that turns out to be important because one of the things that really struck me when I read Kornman is, three times the Court in Kornman says, these transactions, the ones in Kornman that occurred I think mostly in 1999, occurred years after these

Revenue Rulings, and the first they say "importantly, it occurred years..." and then they repeat it two more times.

The transactions here occurred before 9526. So the IRS was being asked by the Treasury Department in 1995 to issue a Revenue Ruling to deal with short sales, and they issue a Revenue Ruling that says, a short sale will not be treated as a contingent obligation; it will be treated as a liability for purposes of Section 752. Now, you would think that any ruling issued by the IRS, if it was a careful, systematic analysis, would at least talk about the fact that this is a change, that this is a change to the law, and that there are these Tax Court decisions, which the Tax Court issued at the government's urging -- these were the government's positions that the Tax Court adopted, that any taxpayer would have assumed, prior to Revenue Ruling 9526, led to the result of a short sale is not a liability under 726, but 9526 doesn't say anything.

They cite Deputy v. du Pont, which is really -- or an issue that's really not in dispute, that is the fact that in the short sale, there is an obligation to return the securities. No one would dispute that. They cite Revenue Ruling 8877, which I

should discuss very quickly, and that's kind of the extent of the analysis, and it's not much of an analysis.

It's basically, the whole analysis is contained in one paragraph, and it doesn't even talk about the issue, and what's interesting, and this is why we talk about these IRS notes, the attorney notes, what's interesting is looking at the attorney notes of the IRS attorneys working on 9526, they understood that what they were doing was a significant change, and they talked about the fact that the Treasury Department wanted to fix this problem no matter how they were going to do it, and they were going to cram it through and they were going to use 752.

So they understood they were changing the law, and in Jade Trading there is even a discussion about Helmer that Judge Williams notes in a footnote in the relevant portion. They understood what they were doing, but there is not a word of it in 9526. So when the Court is thinking about whether to defer to 9526, we would submit that one issue the Court should think about it, when the Revenue Ruling doesn't even acknowledge that it's changing law, much less explain why that change is necessary and what that means that it is changing law, that is a significant problem as

far as deferring to that Revenue Ruling, and I think that goes directly to the Skidmore question.

Now, the government says, well, 9526 is just an application of Revenue Ruling 8877, obviously from 1988, so what's the big deal? Well, it isn't quite. It isn't quite, because if you go back and look at Revenue Ruling 8877, and this is discussed both in our brief, it's actually in the Salina case itself, when you go back and look at 8877, 8877 was dealing with a very discrete problem.

It was a problem associated with cash-basis partnerships, and what the IRS was doing in 8877 was basically fixing a problem that Congress had told it to fix in 1984, and that Congress had already previously fixed with regard to controlled corporations, and what the IRS was dealing with in 8877 was a situation where a partner contributes, a cash-basis partner contributes accounts receivables and accounts payables for cash-basis partnership, and what happens in that situation, it's a very harsh and unfair result prior to 8877, is the accounts receivables don't increase the partner's basis because their accounts receivables are not cash.

If you contributed cash, you'd be given the increase in basis, but he's only contributing accounts

receivables, so they don't increase his basis, but prior to 8877, his accounts payables would be treated as a liability, and then he would have to recognize that as a distribution even though we didn't get the increase from contributing the accounts receivables, and Congress had already corrected that in the controlled corporation context, and then in '84, they said to the IRS, make the same change in the partnership situation, which is what 8877 did.

Now, the important thing to understand is that 8877 is not dealing with the issue that we are dealing with here, which is, when is an obligation a liability? I mean, you can think of it as a Venn diagram. There is this universe of obligations and then there is a subuniverse of liability. 8877 is dealing with the subuniverse. These were recognized liabilities.

Because of the harshness of the result for taxpayers, all the IRS was doing in 8877 was saying, we're going to carve out part of this, and even though they are liabilities, we are not going to treat them as liabilities for Section 752 because the result is too harsh, and if you look at the issue section -- Revenue Rulings have, just like court decisions, they do issue, the analysis, the facts, the holdings.

If you look at the issue section, if you look at the holdings section, it talks about cash-basis partnerships. No taxpayer in 1994 would have connected those dots. It just wouldn't have occurred to anybody in 1994, so what happened in 9526? What happened in 9526, Revenue Ruling 9526, was the IRS knew they were changing the law, the IRS attorneys were not very comfortable with what was going on, they were looking for something they could cite to sort of hang their hat, and they found this concept in 8877 which they took out of the context, the factual context of 8877, and they transplanted it to the factual context of 9526.

So that's an important part of the issue of deferring, Skidmore deference or whatever, to 8877. What are you really deferring to, when the Fifth Circuit in Kornman says, I think they are applying Skidmore deference to 8877. It's a little unclear. It's clear on 9526. It's a little unclear on 8877, but what are they really deferring to? They are not deferring to 8877 as it existed in ‘88, because that didn't deal with this.

They are deferring to the transplanted 8877 as it is integrated into 9526, and this all goes to the question of, what would a taxpayer have thought in

1994? And I do want to address this retroactivity issue that Mr. Stewart addressed, because I think there is some case law out there on this issue that the Court should be aware of, at least a statement of the rule, and the case that I would cite to the Court is Honeywell v. Commissioner. It's citation -- this is a Tax Court case, 87 Tax Ct. 624.

I believe the quote in question is on page 635. It's a 1986 decision, and they were, the Court in Honeywell was dealing with this very issue of the retroactive application of a Revenue Ruling, and I'm just quoting here, it says, "Even if the Revenue Ruling did have effect for years after it was issued, it would be an abuse of discretion to apply it retroactively to the years in question since it is a change of position."

And so that's part of the question of retroactivity. Another case I would cite, interestingly, a Fifth Circuit case, and I don't believe it's cited in Kornman, but the 1977 decision by the Fifth Circuit, Anderson, Clayton and Company v. United States, the citation was 562 F.2d 972, and then the discussion is at 981, a 1977 decision, and there, the Fifth Circuit was not dealing with Revenue Rulings, but it was dealing with the retroactive

application of regulation, IRS regulations, Treasury regulations, and it is setting out various things that the court should consider in whether or not it would apply IRS regulations retroactively, and here again is a quote, or at least one basis that they gave for declining to give -- where they said it could lead to declining to give application to a regulation is, quote, "whether and to what extent the taxpayer justifiably relied on settled prior law or policy and whether and to what extent the punitively retroactive regulation alters that law."

And I think that's exactly what we're dealing with. The law was settled in 1994 at least as to what was a liability from the standpoint of contingent obligations. They changed it in Revenue Ruling 9526. And even if the Court decides that it will defer to 9526, and we don't think the Court should defer to 9526, but even if the Court decides that it will defer in the sense of things that happened after 1995, we think it would be an abuse and it would be unfair to apply it to a change in position which is not even acknowledged in the Revenue Ruling.

I have covered most everything I wanted to discuss. The one thing I did want to mention because it has come up and it is in the government's papers is

this economic substance argument. I agree with the government, it's not here. It's not in the motion. It shouldn't even be in the government's briefs, but the government did put it in its briefs and did make various statements and did call these short sales Son of Boss transactions, which is completely inaccurate, and I just want to make it clear to the Court our position that these transactions had very clear economic substance.

THE COURT: Mr. Willmore, I tried to clarify that fairly early on in the government's argument.

MR. WILLMORE: Okay. Thank you, Your Honor.

THE COURT: And just eliminate that from the case.

MR. WILLMORE: Yes, sir, and we would agree with that, and those, I believe, are the primary points I wanted to raise. Thank you, Your Honor.

THE COURT: Thank you very much. We'll give a chance for a reply after Mr. Stewart gets a few minutes to address the points that you made.

Mr. Stewart?

MR. STEWART: Your Honor, the first point I'd like to address is with respect to the predicate of 9526. He neglected to mention that 8877 wasn't the only authority that set out the same proposition as

8877. In the same year that 8877 was promulgated, there was also a temporary regulation which was attached to 752 that specifically set out a consistent definition of liability that we're talking about here where the liability is used to increase or create basis in a partnership.

When the regulation was ultimately made permanent, for some reason, we're not sure why, but that definition of liability was not included, but I don't think that's any indication of the IRS was not happy with that definition. I think it was more of an indication that it wasn't something that was necessary in that setting. So the predicate for 9526 was well-established long before 1998, in 1994 here.

1998 was this concept of the creation of increase in basis was out there in a public --

THE COURT: That's actually important. If the Court recalls correctly, the regulation omitting, or the permanent regulation omitting the definition of liability came in ‘91 or so?

MR. STEWART: Right, the temporary regulations have a three-year life, so to speak.

THE COURT: Oh, they do? I didn't realize that.

MR. STEWART: Yes, I think if --

THE COURT: I thought a temporary regulation sat there unless and until you had something happen to it.

MR. STEWART: Well, I may be confused, but I think they do have a specified life of their effectiveness, and I thought it was three years. I may be confused about that, though. That was my understanding and that's why -- but in any case, it's no longer valid as the temporary regulation. The permanent regulation is valid, so at least as the answer to Mr. Willmore's point that no taxpayer would have any --

THE COURT: I just dealt with a tax case that was on a temporary regulation. That's why I am a little confused.

MR. STEWART: I may be wrong on that.

THE COURT: In this case, the provision was repealed, and so the temporary regulation kind of sits there for the period of time -- well, anyway. That's neither here nor there. We don't need to go into, reargue that case.

MR. STEWART: Right. The other point is, too, with respect to that, that the Tax Court in Salina had no qualms about applying the Revenue Ruling 9526 to transactions that had occurred in 1992. This

Revenue Ruling dealt with short sales. There was no case decision or ruling prior to it that dealt with short sales in this to count out --

THE COURT: Well, short sales specifically subject to regulation T or whatever it is?

MR. STEWART: Right. The Federal Reserve Board regulations.

THE COURT: That's it.

MR. STEWART: Right. And there have been no decided cases on short sales and whether they constitute a liability for partnership basis purposes, so to characterize it as a change of law is just inaccurate because there wasn't anything, any authority contrary to that position before that.

Mr. Willmore also mentioned something about that he was confused by why the government was making the argument with respect to the Regulation T and the collateral requirements, and I think to me it's pretty obvious the reason for that, but -- to prove, to provide evidence that these kinds of, the short sale obligation was not comparable to the kind of contingent obligation or the options in Helmer where the amounts were received free and clear, and in fact, in Helmer, the payments were not recognized when they were received.

It's not clear from the opinion why the IRS apparently conceded that the taxpayers there could defer recognition --

THE COURT: That's the discussion -- I'm glad you clarified that point, because that's the discussion we had before.

MR. STEWART: Right. It's similar to Long where there there was a clear statutory provision. In Helmer, they just said that the respondent, the IRS conceded that point with no other explanation as to why. So there was no basis increase from those payments at the time they were received when the partners were trying to take the distributions that represented the amounts of those. So there was no increase in the basis, and they were trying to pump up basis to offset the amount so they wouldn't have to recognize income individually.

THE COURT: All right. Let's go back to a point we talked about and indeed discussed also with Willmore before, and that is the proceeds from the short sale, and I mean, they pump up basis in a sense, which is the point you just made, but let's go back to Reg T. Was it necessary for the purposes of Reg T for the Marriott entities to transfer the proceeds from the short sale to the partnership to make effective

the transfer of the obligation to close the short sale?

I know that's kind of a mouthful, but I think if you parse all the clauses, you'll get what I'm talking about.

MR. STEWART: The fact that, well, I am not sure if Regulation T, from what I recall, addresses the assignment of --

THE COURT: The proceeds?

MR. STEWART: -- the proceeds.

THE COURT: Actually, we'll have to research this, but it requires essentially that the short sale obligation be covered, covered plus.

MR. STEWART: Right, right.

THE COURT: I guess you could do it any way you want to. You wouldn't need to transfer the proceeds for that.

MR. STEWART: Right. I think you can substitute collateral if you had some stock. I think that's my understanding of the operation of those, of the collateral requirements, but Regulation T certainly provides that it's the two sides of the transaction, so to speak, go hand in hand, that if the proceeds are transferred, then whomever is taking those proceeds also becomes liable for the obligation

to close the proceeds, and I'm sure there are probably exchange rules and brokerage rules.

One thing to remember, that all these transactions were Marriott-controlled entities. We are not dealing with third parties. And we're also dealing with a facilitating broker who provided the borrowed treasuries, executed the short sales, handled the proceeds, so that's always subject to extra scrutiny, but that goes to the economic substance and those kinds of questions, but the Regulation T certainly contemplates that those are non-severable transactions, and as opposed to the Plaintiff here is trying to sever the proceeds and the obligations into two separate things for partnership basis purposes, and obviously, we're saying that's not allowed.

The Plaintiff also --

THE COURT: That's right. That goes to whether or not Reg T governs 752, and that's an interesting question.

MR. STEWART: I don't think it governs 752, but it certainly governs what happens to the short sale, or governs the handling of the short sale, which is different from -- again, that's why, when we are talking about these other earlier cases that didn't deal with short sales, short sales are a unique

transaction, and --

THE COURT: Well, they are a specific type of transaction.

MR. STEWART: Right.

THE COURT: I have to think about that. Okay.

MR. STEWART: Anyway, the Plaintiff also mentioned the LaRue case. I think the Kornman case, Salina, had distinguished LaRue on the basis of the fact that there, there was no increase in partnership basis based on these somewhat loose reserves that were taken. The reserves arose out of partnership operations. They didn't constitute an asset that has been contributed to increase partnership basis, and the way we've distinguished LaRue is on that basis, and there was -- Plaintiff characterized LaRue reserves as anything but contingent, but there are strong indications in the decision that there were some contingencies on those obligations, because there was some statement about some of the customers might never have challenged the failure to deliver, and really, the reserve -- the Court made a big point in saying that the reserves were merely estimates.

THE COURT: Well, but that had a lot to do with when the replacement occurred, or when --

replacement is not exactly the word, but when the accounts were credited with securities that hadn't been transferred.

MR. STEWART: Right. But the major point of distinction in LaRue is it just wasn't used as something to pump up the basis. You didn't have that mismatch that we are getting here from the short sales proceeds being used. I think that's all I have, Your Honor. Thank you.

THE COURT: Thank you, Mr. Stewart.

Mr. Willmore?

MR. WILLMORE: Thank you, Your Honor. I'll keep my comments short and just address the points that Mr. Stewart addressed.

On the temporary regulation, it's very hard to know what to make of the temporary regulation because, as Mr. Stewart indicated, that definition of liability was withdrawn without any explanation.

It may have been that all they were trying to do was cover the 887 situation. And you would think that if the temporary regulations were meant to make a major change in what a liability was, there would have been some statement about that, that there would have been some explanation.

They would have said something, or changing

the law, they want to do this, but there was nothing like that.

THE COURT: You have to be careful on that score, Mr. Willmore. One time the Court made an argument to the Supreme Court on a statute and said X happened. There was a fairly dramatic jurisdictional change, Congress didn't say a word about. They couldn't have meant that. That's not exactly the way the Supreme Court decided the case, but these things happen.

MR. WILLMORE: Okay. But the bottom line --

THE COURT: And they cited Arthur Conan Doyle's --

MR. WILLMORE: Parable.

THE COURT: That's right, because if it didn't bark in the night. But, anyway, you have to be careful.

MR. WILLMORE: Yes, okay, Your Honor.

But the bottom line is that the dog disappeared.

THE COURT: All right.

MR. WILLMORE: So, in 1991, that definition disappeared. I think it was 1991. I don't know whether a taxpayer could -- or would it have been 1994.

But what does that all mean?

The government says: Well, there is no case that is required to render a ruling under 526 that specifically dealt with a short sale. I don't think there is a case that specifically deals with a short sale, but, from an economic perspective, LaRue is very close.

Now, it isn't a short sale. It doesn't work the same way that a short sale works. But, economically, it's very similar. And, certainly, there were cases that dealt with contingent obligations.

Any taxpayer in 1994, and I believe even today, would believe that a short sale is a contingent obligation, and that you don't know what the value for the short sale is until it is in fact closed.

THE COURT: Let me ask you the same question that was asked of Mr. Stewart: Does Reg-T have a bearing?

MR. WILLMORE: You know, Your Honor, I don't have an answer to that. I've never looked at it from that standpoint. I don't want to hazard an answer when I really don't know whether Reg-T has any bearing on that.

I apologize, but that is not an issue that

I've looked into.

THE COURT: Well, it's what's come out of this discussion. That's why I'm a little concerned. The Court really doesn't like surprises and doesn't think the parties do either.

MR. WILLMORE: It's not an issue that has come up in the briefing.

THE COURT: It has now.

MR. WILLMORE: Yes, it has now. I understand, Your Honor. If Your Honor wants us to address that, we would be glad to do that.

THE COURT: I honestly think that, given the way this case has evolved, that might have a bearing on the outcome.

MR. WILLMORE: Okay. Well, Your Honor --

THE COURT: I'm not saying it will. I'm just saying that there is a possibility, so we ought not to ignore that possibility.

MR. WILLMORE: If Your Honor would like to give us a date or something by which to submit some briefs, or have us submit a date to the Court, that is certainly something that we could do.

THE COURT: In all fairness, I think we ought to do something, but I didn't even bring my calendar. Does somebody have a calendar?

Well, let's see, what is ten days from today? Today is the 19th.

MR. WILLMORE: It's the 19th, that would be I guess the 29th.

THE COURT: That ought to be a Thursday.

MR. WILLMORE: Yes, it is a Thursday, Your Honor.

THE COURT: Could each side submit a brief, if you want, you don't have to, on Reg-T and the implications?

MR. STEWART: Would it be possible if we had a little more time. With the long weekend coming up, I'm going to be out of town, in addition to the long weekend.

THE COURT: Mr. Stewart and Mr. Willmore, why don't you propose a date.

MR. STEWART: Fine.

THE COURT: Let's just sort this out right now because I don't want to leave this uncertain. If you'll help each other out, please.

MR. WILLMORE: How about like the 6th?

MR. STEWART: June 6th?

MR. WILLMORE: Yes, June 6th.

THE COURT: You really want it on June 6th? We're going to have D-Day here. All right, D-Day it

is.

ALL: Okay.

THE COURT: Okay.

MR. STEWART: Then just to clarify: What exactly does the Court want us to address in regard to the application of Reg-T to a short sale?

THE COURT: Whether Reg-T, as it presumably stood in 1994, and I don't know what the situation is, has implications for the application of 752?

Do I need to issue an order to that effect?

MR. WILLMORE: Not for us, Your Honor.

MR. STEWART: No, I think that's fine.

THE COURT: Thank you.

MR. STEWART: So on the government's argument -- I think their argument that in 95-26 there was no change in the law, or it did not reflect a change in the law.

I do think that that is ultimately inconsistent with the IRS notes that I've referred to, and also the case law from the Tax Court. But there is no other way to understand those IRS notes, and the IRS attorneys trying to figure out, or responding to what their being asked to do.

It is very clear that they are being asked to make a change in the law, at least that's their

perspective, and that's certainly our perspective.

We believe there was a change a law. It was basically taking short sales and saying: Okay, even though a short sale is a contingent obligation, we're going to treat it is as a liability.

That was a change in the law, and that's what 95-26 did.

THE COURT: Will you refresh my memory: Does 95-26 actually refer to Reg-T?

MR. WILLMORE: No.

MR. STEWART: No, I don't think so, Your Honor.

THE COURT: When Revenue ruling 95-26 -- and it's here somewhere in the pile of papers. I don't have it separately identified. Does it refer to short sales of securities that would give rise to the applicability of Reg-T?

MR. WILLMORE: I don't believe so, Your Honor. I have it here. I can look, but I'm pretty sure it doesn't.

THE COURT: Why don't you address that in these supplemental briefs.

MR. WILLMORE: Maybe I don't remember Salina correctly, but I think the government suggested that the court in Salina distinguished LaRue, this is the

tax court; and Salina, of course, is a tax court, which means that it doesn't have precedable authority.

It can persuade, but it doesn't have precedable authority. LaRue is a tax court opinion.

THE COURT: Well, that's true. It doesn't have, necessarily, a review by other judges on the tax court.

MR. WILLMORE: Right.

THE COURT: It stands for the view of one judge on the tax court.

MR. WILLMORE: Right.

THE COURT: As far as the Court is concerned, it is rather like a Revenue ruling. If it's persuasive, fine; if it's not, well --

MR. WILLMORE: But one thing it can't do is: It can't overrule a tax court opinion.

THE COURT: That's true, and it can't bind the other judges on the tax court either.

MR. WILLMORE: Right. And I don't remember. I know there's a citation for LaRue at one point in Salina. But I don't remember any discussion of LaRue, which is perplexing when one considers that LaRue was not even discussed in Salina.

So, I'm not sure LaRue is distinguished. I don't think LaRue was even discussed in Salina. What

the court ended up using in Salina was *Black's Law Dictionary*, which is odd given that it had all this case law to look at, and then ended up using a portion of *Black's Law Dictionary* for the basis of its holding, which even the Fifth Circuit in Kornman didn't accept as the proper way to look at this issue.

The last point I would make is the collateral point. This is a bit of a repetition, but there was no collateral that I recollect in Jade Trading, but there was in Klamath. And again, I don't understand all the details of the Klamath transaction, but the collateral issue, the government must have made the same collateral argument to the court in Klamath because it discusses it specifically and not only rejects the collateral argument as being significant to this issue but then goes back and talks about LaRue and says: the reserve in LaRue is just like collateral, and it didn't change the outcome of LaRue.

So I think the collateral argument has at least been rejected once very clearly in Klamath, or perhaps less clearly, but also in LaRue.

THE COURT: Now, where does Klamath stand? I'd just ask that question.

MR. WILLMORE: Yes, Klamath is before the

fifth circuit. I don't think it has briefed, or maybe one brief has been filed. I think it's in the processes of being briefed. The government probably knows much better than I do what the status is.

But I believe Klamath is still in the process of being briefed, or it's just starting to be briefed.

THE COURT: Do you give permission for me to ask Mr. Stewart?

MR. WILLMORE: Yes, Your Honor.

THE COURT: Mr. Stewart?

MR. STEWART: Yes, I think my understanding is the one brief has been filed.

MR. SAWYER: Two.

MR. STEWART: Two?

MR. SAWYER: The government's reply brief is going to be filed today, and then I believe Klamath has one more reply brief, so three out of the four briefs are in.

THE COURT: That case was decided in 2006. It's been sitting for little bit and I don't quite understand why, but, all right.

MR. WILLMORE: I don't know the answer to that either.

But Klamath is a case -- and the relevant

decision is a summary judgment decision.

THE COURT: Right.

MR. WILLMORE: Klamath is a case that discusses many of these issues in considerable detail. It goes into quite an analysis of the very same issues that we've been talking about today.

Thank you, Your Honor.

THE COURT: Thank you. The Court is actually aware of that, and appreciates that. This is just a curious case.

But the Court appreciates your care and your briefing, and thinks it understands at least what the issues are, and will know more once you've file the supplemental briefs. And we're not likely to forget the due date.

I suspect that what we could do is, nonetheless, issue just a little order. But it's not for your purposes, it's just to alert the Clerk's office. When they get the supplemental briefs, not to kick them back to take in place, and that we're asked that they be submitted.

So if you'll allow us just to do that housekeeping step, I think it will make all of our lives a little easier. I'm reluctant to ask you to put more time and effort into this case, but it would

actually be helpful to the Court.

ALL: Yes, Your Honor.

THE COURT: All right. Thank you very much for your preparation, and for your detailed arguments today. Pending the receipt of the supplemental briefs, we'll treat the case as submitted. Thank you.

ALL: Thank you.

THE CLERK: All rise.

(Whereupon, at 12:00 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NOS.: 01-256T, 01-257T

CASE TITLE: Marriott International v U.S

HEARING DATE: May 19, 2008

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: May 19, 2008

Barbara Berney
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018