IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner, Plaintiffs, v. THE UNITED STATES, Defendant. | Nos. 01-256T and 01-257T<br>Judge Charles F. Lettow |

**PLAINTIFFS' SUPPLEMENTAL BRIEF**
**REGARDING IMPLICATIONS OF REGULATION T**

Harold J. Heltzer
Robert L. Willmore
Alex E. Sadler
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2915
Fax: (202) 628-5116

June 6, 2008

# TABLE OF CONTENTS

PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING IMPLICATIONS OF REGULATION T....1

A. Defendant Argues That Regulation T Is Relevant To Whether The Obligation To Close A Short Sale Is A "Liability" Within The Meaning Of Section 752 Because Regulation T Requires That Collateral Be Maintained With The Broker-Dealer. For The Reasons Set Forth In Marriott's Reply, The Existence Of Collateral Has No Bearing On Whether The Obligation To Close A Short Sale Constitutes A "Liability" Under Section 752....2

B. Regulation T Also Does Not Have Any Such Implications With Respect To The Existence Of A Section 752 "Liability" At The Time Of The Transfer Of The Obligation To The Partnership....4

APPENDIX D

12 C.F.R. Part 220 (1994) (Regulation T)....D-1

# TABLE OF AUTHORITIES

## CASES

*Kornman & Assocs., Inc. v. United States*, No. 06-11422, *slip op.* (5th Cir. May 12, 2008) ........ 5

*Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006) ........ 3-4

*Klamath Strategic Investment Fund, LLC v. United States,* 472 F. Supp. 885 (E.D. Tex. 2007), *appeal pending*, Nos. 07-40861 & 07-40915 (5th Cir.) ........ 4

*La Rue v. Commissioner*, 90 T.C. 465 (1988) ........ 4

## STATUTES, REGULATIONS AND OTHER MATERIALS

15 U.S.C. § 78c ........ 2

26 U.S.C. § 752 ........ *passim*

26 U.S.C. § 1233 ........ 5-6

Treas. Reg. § 1.1233-1(a)(1) ........ 4

12 C.F.R. Part 220 (Regulation T) ........ *passim*

Rev. Rul. 95-26, 1995-1 C.B. 131 ........ 5

Rev. Rul. 95-45, 1995-1 C.B. 53 ........ 5-6, 8

New York Stock Exchange Rule 431 ........ 3

Charles F. Rechlin, *Securities Credit Regulation* (2d ed. 2007) (vol. 22 of *West's Securities Law Series*) ........ 2-3

Steven Lofchie, *Lofchie's Guide to Broker-Dealer Regulation* (2005) ........ 3

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **MARRIOTT INTERNATIONAL RESORTS, L.P., MARRIOTT INTERNATIONAL JBS CORPORATION, Tax Matters Partner,** | |
| **Plaintiffs,** | **Nos. 01-256T and 01-257T** |
| | **Judge Charles F. Lettow** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF**
**REGARDING IMPLICATIONS OF REGULATION T**

Pursuant to this Court's Order of May 19, 2008, Plaintiffs Marriott International Resorts, L.P., Marriott International JBS Corp., Tax Matters Partner ("Marriott"), respectfully submit this supplemental brief regarding the implications of Regulation T (12 C.F.R. Part 220 (1994)).[1] Specifically, the Court asked the parties to address the question of "whether Regulation T as it stood in 1994 has implications for the applicability of Section 752 to the transfer of the obligation to close the short sales pertinent to these cases." For the reasons set forth below, Marriott does not believe that Regulation T has any such implications.

[1] In accordance with the Court's Order, all references to Regulation T are to the 1994 version of Regulation T, as published in the 1994 Code of Federal Regulations (1-1-94 Edition). For the Court's convenience, a copy of that version of Regulation T is attached at Appendix D.

**A. Defendant Argues That Regulation T Is Relevant To Whether The Obligation To Close A Short Sale Is A "Liability" Within The Meaning Of Section 752 Because Regulation T Requires That Collateral Be Maintained With The Broker-Dealer. For The Reasons Set Forth In Marriott's Reply, The Existence Of Collateral Has No Bearing On Whether The Obligation To Close A Short Sale Constitutes A "Liability" Under Section 752.**

Defendant argued in its reply brief that Regulation T is relevant to the issue before the Court on the ground that Regulation T requires that collateral be maintained with the broker-dealer while the short sale is outstanding. See Defendant's Reply, at 2, 4-5 & 17-18. Typically, this initial collateral includes the proceeds from the sale of the shorted securities plus an additional margin amount (the entire amount of the required collateral is referred to as the "margin requirement").[2] With respect to short sales of nonexempted securities, the margin requirement is 150 percent of the current value of the security. 12 C.F.R. § 220.18(c). With respect to short sales of exempted securities – which includes securities issued by the Federal government (such as Treasury notes)[3] – the margin requirement is 100 percent of the current value of the security plus an additional margin required by the broker-dealer in good faith. 12 C.F.R. § 220.18(d).

---

[2] See generally Appendix B attached to Plaintiffs' Reply (Investopedia® article, "What are the minimum margin requirements for a short sale account?").

[3] Regulation T (at 12 C.F.R. § 220.2(r)) refers back to the definition of "exempted security" found in section 3(a)(12) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(12)). That definition includes "government securities," as defined in section 3(a)(42), which includes securities that are direct obligations of the United States. See generally Charles F. Rechlin, Securities Credit Regulation §§ 3:2 & 3:3 (2d ed. 2007) (vol. 22 of West's Securities Law Series).

As discussed in Marriott's Reply (at 5-7), the margin requirement is not "fixed" (contrary to Defendant's contention), but fluctuates with the value of the shorted security subject to a "maintenance margin." This maintenance margin is not specifically addressed in Regulation T, but is established by the applicable Exchange rule, typically New York Stock Exchange Rule 431 ("NYSE Rule 431"). See generally Rechlin, Securities Credit Regulation §§ 3:32 & 3:33; Steven Lofchie, Lofchie's Guide to Broker-Dealer Regulation 564-65, 569, 589, 596 (2005).[4]

Accordingly, Defendant's contention that the amount of collateral that the broker-dealer holds pursuant to Regulation T is "fixed" is wrong. But even if Defendant were correct in this regard, the existence of collateral – in whatever amount – is ultimately irrelevant to whether the amount of the obligation is contingent. The amount of the pertinent obligation – that is, what it actually costs the short seller to fulfill the obligation to return the borrowed securities – simply cannot be determined until the short seller purchases the securities he must deliver to the broker-dealer in order to close the short sale. Until that event happens, the cost of closing the short sale by definition is contingent and undetermined, and the obligation thus cannot constitute a "liability" for purposes of Section 752.

As also noted in Marriott's Reply, this is not the first time the Government has made this "collateral" argument in the context of what constitutes a "liability" under Section 752. The Government made a similar argument in Klamath

---

4 The actual operation of the maintenance margin can be complex. For illustrative examples, see Rechlin, Securities Credit Regulation § 3:38.

Strategic Investment Fund, LLC v. United States, 440 F. Supp. 2d 608 (E.D. Tex. 2006), which the District Court there expressly rejected.[5] Id. at 618 (noting that the reserve account in La Rue v. Commissioner, 90 T.C. 465 (1988), was the "functional equivalent" of collateral, and that the Tax Court nonetheless held that the obligation to correct the "back office" trading failures was too contingent to constitute a Section 752 liability).

Accordingly, to the extent Defendant is arguing that Regulation T is relevant to the legal issue before the Court because the Regulation establishes a requirement that the broker-dealer maintain collateral while the short sale is outstanding, that requirement has no implications regarding whether or not the short seller's contractual obligation to close the short sale constitutes a "liability" for purposes of Section 752.

## B. Regulation T Also Does Not Have Any Such Implications With Respect To The Existence Of A Section 752 "Liability" At The Time Of The Transfer Of The Obligation To The Partnership.

In its May 19, 2008, Order, the Court asks the parties to address whether Regulation T has any "implications for the applicability of Section 752 to the transfer of the obligation to close the short sales." As Marriott understands the question being posed, the Court is asking whether the requirement of Regulation T that the broker-dealer maintain collateral while the short sale is outstanding has

---

[5] A description of the collateral in Klamath can be found in the District Court's 2007 Memorandum Opinion and Order after the trial of the economic substance issues. See Klamath Strategic Investment Fund, LLC v. United States, 472 F. Supp. 2d 885, 896-98 (E.D. Tex. 2007), appeal pending, Nos. 07-40861 & 07-40915 (5th Cir.).

implications for the nature of the obligation to close the short sale at the time of the transfer of that obligation by the partner, Marriott Ownership Resorts, Inc. ("MORI"), to the partnership, Marriott International Resorts, L.P. ("MIR").[6] Marriott does not believe that Regulation T has any implications with respect to Section 752 in that regard.

As the Court is aware, since 1995, the Internal Revenue Service ("IRS") has taken the position in its revenue rulings that, not only is the obligation to close a short sale a "liability" within the meaning of Section 752, but that the amount of that "liability" is determined at the time of the short sale of the borrowed securities; that is, the Section 752 "liability" equals the amount of proceeds obtained by the short seller from selling the borrowed securities. While this latter position is implicit in Rev. Rul. 95-26,[7] the IRS expressly stated this position in Rev. Rul. 95-45. See Rev. Rul. 95-45, 1995-1 C.B. 53 (dealing with short sale obligation assumed by a corporation); Kornman & Assocs., Inc. v. United States, No. 06-11422, slip op. at 23-24 & 26 n.17 (5th Cir. May 12, 2008) (applying holding of Rev. Rul. 95-45 to determine amount of short sale "liability" assumed by partnership).[8] Thus, for

---

6 Technically, this transfer occurred in the form of an assumption of the obligation by MIR.

7 As noted at the May 19, 2008, hearing, there is no reference to Regulation T in Rev. Rul. 95-26, 1995-1 C.B. 131.

8 However, in order to comply with Code section 1233 and Treas. Reg. § 1.1233-1(a)(1), which provide that recognition of gain or loss from a short sale transaction is determined at the time the short sale is closed, some basis adjustment is then presumably made at the time the short sale is closed under which the amount of the Section 752 "liability" established under Rev.

(continued…)

purposes of determining the amount of the purported Section 752 "liability," Defendant looks to the time of the short sale of the borrowed securities rather than to the time of any subsequent transfer of the obligation to close that short sale.

With respect to the time of MORI's transfer to MIR of the obligation to close the Treasury Note short sales, Regulation T does not have any implications for the Section 752 analysis that are pertinent to this case. Regulation T merely requires that the broker-dealer (here CS First Boston) maintain adequate collateral in a margin account to protect itself in the event of a default by the investor. For that purpose, the broker-dealer receives a security interest in the collateral being maintained in the margin account.[9] There is no indication whatsoever that this security interest was affected by MORI's contribution of the short sales proceeds to

---

(continued)

Rul. 95-45 apparently becomes irrelevant. This adjustment, however, is not explained by the IRS and directly contravenes Section 1233, which provides that recognition of gain or loss from a short sale transaction is determined at the time the short sale is closed.

9 This security interest is described in the "Terms of Agreement" on the backs of the CS First Boston trading confirmation statements. For example, see page MAR-008546 in Defendant's Exhibit 13 appended to the Second Declaration of G. Robson Stewart, dated April 18, 2008. Paragraph 7 of the "Terms of Agreement" provides in pertinent part:

> Customer hereby grants to each FBC party a security interest in all securities, moneys or other property, and all proceeds of any of the foregoing, now or hereafter held or carried by any FBC Party in Customer's account(s) with any FBC Party or otherwise as collateral security for the payment of any and all obligations and liabilities of Customer and its subsidiaries to any FBC Party now existing or arising hereafter.

"FBC" refers to The First Boston Corporation, which was subsequently renamed CS First Boston Corporation.

MIR or by MIR's assumption of the obligation to close the short sales. To the contrary, during this entire time period (both before and after the contribution and assumption), CS First Boston continued to reinvest those proceeds in 30-day Repos. See Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts, at 6 (no. 12), dated March 27, 2008. These Repos were ultimately used to purchase the replacement Treasury Notes that were returned to CS First Boston to close the short sales. See id. at 8-9 (no. 23).

In addition, CS First Boston clearly was aware of and approved MORI's transfer of the obligation to close the short sales to MIR. See Defendant's Exhibit 5 appended to Declaration of G. Robson Stewart, dated February 1, 2008.[10]

At the May 19, 2008, hearing, the Court raised the issue of whether Regulation T required the short sales proceeds to be transferred by MORI to MIR when MIR assumed the obligation to close the short sales. While Marriott believes that it was entirely logical to transfer the short sales proceeds to MIR in conjunction with MIR's assumption of the obligation to close the short sales,[11] there does not

---

10 Defendant's Exhibit 5 is a countersigned June 24, 1994, letter agreement between CS First Boston and Marriott. The first paragraph of the letter agreement states in pertinent part as follows: "The Company [MORI] has hedged approximately $65 million of MORI Notes in 1994 (the 'Transaction'). We [CS First Boston] understand that subsequent to entering into the hedge the Company assigned its interest in the Transaction to an affiliated partnership (the 'Partnership')." The referenced partnership is MIR.

11 As noted by Marriott's counsel at the hearing, the proceeds were part of the interest rate hedge. That is, by transferring the proceeds to MIR (along with the mortgages and the obligation to close the short sales), the entire hedge as a unit was transferred from MORI to MIR. As an economic matter, Marriott

(continued…)

appear to be anything in Regulation T that specifically requires that result.[12] As long as the collateral remains in the margin account (which it did), and the broker-dealer is protected through its security interest in the collateral (which it was), the requirements of Regulation T are satisfied.[13]

In sum, while Regulation T required CS First Boston to maintain collateral with respect to the Marriott short sale transactions, that requirement had no implications with respect to the Court's analysis of whether the obligation to return the borrowed Treasury Notes to CS First Boston was a "liability" within the meaning of Section 752. For the reasons set forth in Marriott's opening and reply briefs, because that obligation was contingent in amount, it could not be considered a "liability" under that provision.

---

(continued)

believes that it made a great deal of sense, and was certainly reasonable, to transfer the hedge in its entirety rather than keep part of the hedge in one entity and the rest of the hedge in another entity.

12 The IRS appears to have a similar view, based on Rev. Rul. 95-45. In that ruling, the IRS dealt with the transfer of short sale proceeds (from a short sale of "XYZ securities") and the obligation to close the short sale by a parent corporation ("P") to a wholly owned subsidiary corporation ("S"). Although P had deposited additional cash as further collateral with the broker-dealer (presumably in compliance with the 150 percent margin requirement in Regulation T), it did <u>not</u> transfer this additional cash to S when it transferred the short sale proceeds and the obligation to close the short sale to S. While the collateral thus was split between P and S, the IRS did not see this as presenting an issue in Rev. Rul. 95-45.

13 In that regard, Marriott assumes that CS First Boston, as a large and sophisticated broker-dealer, fully understood its margin obligations under Regulation T and complied with those obligations.

Respectfully submitted,

June 6, 2008

s/Harold J. Heltzer
Harold J. Heltzer (Attorney of Record)
Robert L. Willmore
Alex E. Sadler
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2915
Fax: (202) 628-5116

Counsel for Plaintiffs

5866667

# SUBCHAPTER A—BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

## PART 220—CREDIT BY BROKERS AND DEALERS (REGULATION T)

Sec.
220.1 Authority, purpose, and scope.
220.2 Definitions.
220.3 General provisions.
220.4 Margin account.
220.5 Margin account exceptions and special provisions.
220.6 Special memorandum account.
220.7 Arbitrage account.
220.8 Cash account.
220.9 Nonsecurities credit and employee stock ownership account.
220.10 Omnibus account.
220.11 Broker-dealer credit account.
220.12 Market functions account.
220.13 Arranging for loans by others.
220.14 Clearance of securities, options, and futures.
220.15 Borrowing by creditors.
220.16 Borrowing and lending securities.
220.17 Requirements for the list of marginable OTC stocks and the list of foreign margin stocks.
220.18 Supplement: Margin requirements.

INTERPRETATIONS

220.101 Transactions of customers who are brokers or dealers.
220.102 [Reserved]
220.103 Borrowing of securities.
220.104 [Reserved]
220.105 Ninety-day rule in special cash account.
220.106 Designation of New York Stock Exchange for purposes of specialists transactions.
220.107 Transactions in undermargined accounts.
220.108 International Bank Securities.
220.109 Arrangement for credit by brokers or dealers.
220.110 Assistance by Federal credit union to its members.
220.111 Arranging for extensions of credit to be made by a bank.
220.112 Arranging loan to purchase open-end investment company shares.
220.113 Necessity for prompt payment and delivery in special cash accounts.
220.114 Transactions in restricted accounts under amended withdrawal rules.
220.115 Short sales made prior to recent amendments, but covered subsequent thereto.
220.116 Simultaneous long and short positions in same margin account where short position is taken first.
220.117 Exception to 90-day rule in special cash account.
220.118 Time of payment for mutual fund shares purchased in a special cash account.
220.119 Applicability of margin requirements to credit extended to corporation in connection with retirement of stock.
220.120 Loan value of securities used to make required deposit.
220.121 Applicability of margin requirements to joint account between two creditors.
220.122 "Deep in the money put and call options" as extensions of credit.
220.123 Partial delayed issue contracts covering nonconvertible bonds.
220.124 Installment sale of tax-shelter programs as "arranging" for credit.
220.125 Extending, maintaining or arranging credit on mutual fund shares having portfolio of exempted securities.
220.126 Put and call options.
220.127 Independent broker/dealers arranging credit in connection with the sale of insurance premium funding programs.
220.128 Treatment of simultaneous long and short positions in the same margin account when put or call options or combinations thereof on such stock are also outstanding in the account.
220.129 Applicability of same-day substitution rule to accounts subject to section 220.8(g).
220.130 Escrow receipts for option transactions.
220.131 Application of the arranging section to broker-dealer activities under SEC Rule 144A.

AUTHORITY: Secs. 3, 7, 8, 17 and 23 of the Securities Exchange Act of 1934, as amended (15 U.S.C. 78c, 78g, 78h, 78q and 78w).

SOURCE: Regulation T, §§220.1 through 220.18 appear at 48 FR 23165, May 24, 1983, unless otherwise noted.

EDITORIAL NOTES: (1) A copy of each form referred to in this part is filed as a part of the original document. Copies are available upon request to the Board of Governors of the Federal Reserve System or any Federal Reserve Bank.

(2) See the List of CFR Sections Affected in the Finding Aids section of this volume for FR citations to part 220 OTC Margin Stocks changes.

### § 220.1 Authority, purpose, and scope.

(a) *Authority and purpose.* Regulation T (this part) is issued by the Board of

Governors of the Federal Reserve System (the Board) pursuant to the Securities Exchange Act of 1934 (the Act) (15 U.S.C. 78a *et seq*.). Its principal purpose is to regulate extensions of credit by and to brokers and dealers; it also covers related transactions within the Board's authority under the Act. It imposes, among other obligations, initial margin requirements and payment rules on securities transactions.

(b) *Scope*. (1) This part provides a margin account and seven special purpose accounts in which to record all financial relations between a customer and a creditor. Any transaction not specifically permitted in a special account shall be recorded in a margin account.

(2) This part does not preclude any exchange, national securities association, or creditor from imposing additional requirements or taking action for its own protection.

### § 220.2 Definitions.

The terms used in this part have the meanings given them in section 3(a) of the Act or as defined in this section.

(a) *Credit balance* means the cash amount due the customer in a margin account after debiting amounts transferred to the special memorandum account.

(b) *Creditor* means any broker or dealer (as defined in sections 3(a)(4) and 3(a)(5) of the Act), any member of a national securities exchange, or any person associated with a broker or dealer (as defined in section 3(a)(18) of the Act), except for business entities controlling or under common control with the creditor.

(c) *Customer* includes: (1) Any person or persons acting jointly: (i) To or for whom a creditor extends, arranges, or maintains any credit; or (ii) who would be considered a customer of the creditor according to the ordinary usage of the trade;

(2) Any partner in a firm who would be considered a customer of the firm absent the partnership relationship; and

(3) Any joint venture in which a creditor participates and which would be considered a customer of the creditor if the creditor were not a participant.

(d) *Debit balance* means the cash amount owed to the creditor in a margin account after debiting amounts transferred to the special memorandum account.

(e) *Delivery against payment*, *Payment against delivery*, or a *C.O.D. transaction* refers to an arrangement under which a creditor and a customer agree that the creditor will deliver to, or accept from, the customer, or the customer's agent, a security against full payment of the purchase price.

(f) *Equity* means the total current market value of security positions held in the margin account plus any credit balance less the debit balance in the margin account.

(g) *Escrow agreement* means any agreement issued in connection with a call or put option under which a bank, holding the underlying security, foreign currency, certificate of deposit, or required cash, is obligated to deliver to the creditor (in the case of a call option) or accept from the creditor (in the case of a put option) the underlying security, foreign currency, or certificate of deposit against payment of the exercise price upon exercise of the call or put.

(h) *Examining authority* means: (1) The national securities exchange or other self-regulatory organization of which a creditor is a member; or

(2) If not a member of any such self-regulatory organization, the Regional Office of the Securities and Exchange Commission (SEC) where the creditor has its principal place of business; or

(3) If a member of more than one self-regulatory organization, the organization designated by the SEC as the examining authority for the creditor.

(i) *Foreign margin stock* means: (1) A foreign security that is an equity security and that appears on the Board's periodically published List of Foreign Margin Stocks based on information submitted by a self-regulatory organization under procedures approved by the Board; or

(2) A foreign security that is a debt security convertible into a margin security.

(j) *Foreign security* means a security issued in a jurisdiction other than the United States.

(k) *Good faith margin* means the amount of margin which a creditor, exercising sound credit judgment, would customarily require for a specified security position and which is established without regard to the customer's other assets or securities positions held in connection with unrelated transactions.

(l) *In or at the money* means the current market price of the underlying security is not more than one standard exercise interval below (with respect to a call option) or above (with respect to a put option) the exercise price of the option.

(m) *In the money* means the current market price of the underlying security is not below (with respect to a call option) or above (with respect to a put option) the exercise price of the option.

(n) *Margin call* means a demand by a creditor to a customer for a deposit of additional cash or securities to eliminate or reduce a margin deficiency as required under this part.

(o) *Margin deficiency* means the amount by which the required margin exceeds the equity in the margin account.

(p) *Margin excess* means the amount by which the equity in the margin account exceeds the required margin. When the margin excess is represented by securities, the current value of the securities is subject to the percentages set forth in § 220.18 (the Supplement).

(q) *Margin security* means:

(1) Any registered security;

(2) Any OTC margin stock;

(3) Any OTC margin bond;

(4) Any OTC security designated as qualified for trading in the National Market System under a designation plan approved by the Securities and Exchange Commission (NMS security);

(5) Any security issued by either an open-end investment company or unit investment trust which is registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a–8)

(6) Any foreign margin stock.

(r) *Nonexempted security* means any security other than an exempted security (as defined in section 3(a)(12) of the Act).

(s) *Nonmember bank* means a bank that is not a member of the Federal Reserve System.

(t) *OTC margin bond* means: (1) A debt security not traded on a national securities exchange which meets all of the following requirements:

(i) At the time of the original issue, a principal amount of not less than $25,000,000 of the issue was outstanding;

(ii) The issue was registered under section 5 of the Securities Act of 1933 (15 U.S.C. 77e) and the issuer either files periodic reports pursuant to section 13(a) or 15(d) of the Act or is an insurance company which meets all of the conditions specified in section 12(g)(2)(G) of the Act; and

(iii) At the time of the extension of credit, the creditor has a reasonable basis for believing that the issuer is not in default on interest or principal payments; or

(2) A private mortgage pass-through security (not guaranteed by an agency of the U.S. government) meeting all of the following requirements:

(i) An aggregate principal amount of not less than $25,000,000 (which may be issued in series) was issued pursuant to a registration statement filed with the SEC under section 5 of the Securities Act of 1933;

(ii) Current reports relating to the issue have been filed with the SEC; and

(iii) At the time of the credit extension, the creditor has a reasonable basis for believing that mortgage interest, principal payments and other distributions are being passed through as required and that the servicing agent is meeting its material obligations under the terms of the offering; or

(3) A *mortgage related security* as defined in section 3(a)(41) of the Act; or

(4) A debt security issued or guaranteed as a general obligation by the government of a foreign country, its provinces, states, or cities, or a supranational entity, if at the time of the extension of credit one of the following is rated in one of the two highest rating categories by a nationally recognized statistical rating organization:

(i) The issue,

(ii) The issuer or guarantor (implicitly), or

(iii) Other outstanding unsecured long-term debt securities issued or guaranteed by the government or entity; or

(5) A foreign security that is a nonconvertible debt security that meets all of the following requirements:

(i) At the time of original issue, a principal amount of at least $100,000,000 was outstanding;

(ii) At the time of the extension of credit, the creditor has a reasonable basis for believing that the issuer is not in default on interest or principal payments; and

(iii) At the time of the extension of credit, the issue is rated in one of the two highest rating categories by a nationally recognized statistical rating organization, except that an issue that has not been rated as of the effective date of this provision shall be considered an *OTC margin bond* if a subsequent unsecured issue of at least $100,000,000 of the same issuer is rated in one of the two highest rating categories by a nationally recognized statistical rating organization.

(u) *OTC margin stock* means any equity security not traded on a national securities exchange that the Board has determined has the degree of national investor interest, the depth and breadth of market, the availability of information respecting the security and its issuer, and the character and permanence of the issuer to warrant being treated like an equity security traded on a national securities exchange. An OTC stock is not considered to be an *OTC margin stock* unless it appears on the Board's periodically published list of OTC margin stocks.

(v) *Overlying option* means: (1) A put option purchased or a call option written against a long position in an underlying security in the specialist record in §220.12(b); or

(2) A call option purchased or a put option written against a short position in an underlying security in the specialist record in §220.12(b).

(w) *Purpose credit* means credit for the purpose of: (1) Buying, carrying, or trading in securities; or

(2) Buying or carrying any part of an investment contract security which shall be deemed credit for the purpose of buying or carrying the entire security.

(x) *Registered security* means any security that: (1) Is registered on a national securities exchange; or

(2) Has unlisted trading privileges on a national securities exchange.

(y) *Short call or short put* means a call option or a put option that is issued, endorsed, or guaranteed in or for an account.

(1) A short call obligates the customer to sell the underlying security, foreign currency, or certificate of deposit at the exercise price upon receipt of an exercise notice at any time prior to the expiration date of the option.

(2) A short put obligates the customer to purchase the underlying security, foreign currency, or certificate of deposit at the exercise price upon receipt of an exercise notice at any time prior to the expiration date of the option.

(3) A short call or a short put on stock index options obligates the customer to pay the holder of an *in the money* long put or call who has exercised the option the cash difference between the exercise price and the current assigned value of the index as established by the option contract.

(z) *Specialist joint account* means an account which, by written agreement, provides for the commingling of the security positions of the participants and a sharing of profits and losses from the account on some predetermined ratio.

(aa) *Underlying security* means the security that will be delivered upon exercise of an option.

[48 FR 23165, May 24, 1983; 48 FR 34945, Aug. 2, 1983, as amended at 49 FR 35758, Sept. 12, 1984; 52 FR 32292, Aug. 27, 1987; 53 FR 30831, Aug. 16, 1988; 55 FR 11159, Mar. 27, 1990]

### §220.3 General provisions.

(a) *Records*. The creditor shall maintain a record for each account showing the full details of all transactions.

(b) *Separation of accounts*. Except as provided for in the margin account and the special memorandum account, the requirements of an account may not be met by considering items in any other account. If withdrawals of cash or securities are permitted under the regulation, written entries shall be made when cash or securities are used for purposes of meeting requirements in another account.

(c) *Maintenance of credit.* Except as prohibited by this part, any credit initially extended in compliance with this part may be maintained regardless of:

(1) Reductions in the customer's equity resulting from changes in market prices;

(2) Any security in an account ceasing to be margin or exempted; or

(3) Any change in the margin requirements prescribed under this part.

(d) *Guarantee of accounts.* No guarantee of a customer's account shall be given any effect for purposes of this part.

(e) *Receipt of funds or securities.* (1) A creditor, acting in good faith, may accept as immediate payment:

(i) Cash or any check, draft, or order payable on presentation; or

(ii) Any security with sight draft attached.

(2) A creditor may treat a security, check or draft as received upon written notification from another creditor that the specified security, check, or draft has been sent.

(3) Upon notification that a check, draft, or order has been dishonored or when securities have not been received within a reasonable time, the creditor shall take the action required by this part when payment or securities are not received on time.

(4) A creditor may accept, in lieu of securities, a properly executed exercise notice for a stock option issued by the customer's employer and instructions to the issuer to deliver the resulting stock to the creditor. Prior to acceptance, the creditor must verify that the issuer will deliver the securities promptly and the customer must designate the account into which the securities are to be deposited.

(f) *Exchange of securities.* (1) To enable a customer to participate in an offer to exchange securities which is made to all holders of an issue of securities, a creditor may submit for exchange any securities held in a margin account, without regard to the other provisions of this part, provided the consideration received is deposited into the account.

(2) If a nonmargin, nonexempted security is acquired in exchange for a margin security, its retention, withdrawal, or sale within 60 days following its acquisition shall be treated as if the security is a margin security.

(g) *Valuing securities.* The current market value of a security shall be determined as follows:

(1) Throughout the day of the purchase or sale of a security, the creditor shall use the security's total cost of purchase or the net proceeds of its sale including any commissions charged.

(2) At any other time, the creditor shall use the closing sale price of the security on the preceding business day, as shown by any regularly published reporting or quotation service. If there is no closing price, the creditor may use any reasonable estimate of the market value of the security as of the close of business on the preceding business day.

(h) *Innocent mistakes.* If any failure to comply with this part results from a mistake made in good faith in executing a transaction or calculating the amount of margin, the creditor shall not be deemed in violation of this part if, promptly after the discovery of the mistake, the creditor takes appropriate corrective action.

(i) *Variable annuity contracts issued by insurance companies.* Any insurance company that issues or sells variable annuity contracts or engages in a general securities business as a broker or dealer shall be subject to this part only for transactions in connection with those activities. Extensions of credit associated with conventional lending practices of insurance companies are subject to part 207 of this chapter.

[48 FR 23165, May 24, 1983, as amended at 52 FR 48805, Dec. 28, 1987]

### § 220.4 Margin account.

(a) *Margin transactions.* (1) All transactions not specifically authorized for inclusion in another account shall be recorded in the margin account.

(2) A creditor may establish separate margin accounts for the same person to:

(i) Clear transactions for other creditors where the transactions are introduced to the clearing creditor by separate creditors; or

(ii) Clear transactions through other creditors if the transactions are effected by separate creditors; or

(iii) Provided one or more accounts over which the creditor or a third party investment adviser has investment discretion.

(b) *Required margin.* The required margin for each position in securities is set forth in §220.18 (the Supplement) and is subject to the exceptions and special provisions contained in §220.5 (Margin Account Exceptions and Special Provisions).

(c) *When additional margin is required*—(1) *Computing deficiency.* All transactions on the same day shall be combined to determine whether additional margin is required by the creditor. For the purpose of computing equity in an account, security positions are established or eliminated and a credit or debit created on the trade date of a security transaction. Additional margin is required on any day when the day's transactions create or increase a margin deficiency in the account and shall be for the amount of the margin deficiency so created or increased. To the extent that debits in a margin account are denominated in foreign currency secured by specifically identified foreign margin securities as provided in §220.5(g), each foreign currency debit position shall be considered separately for purposes of computing a deficiency and no credit shall be given to such specifically identified foreign margin securities for purposes of computing equity in the margin account either in United States dollars or in any other specific foreign currency.

(2) *Satisfaction of deficiency.* The additional required margin may be satisfied by a transfer from the special memorandum account or by a deposit of cash, margin securities, exempted securities, or any combination thereof.

(3) *Time limits.* (i) A margin call shall be satisfied within 7 business days after the margin deficiency was created or increased.

(ii) The 7 day period may be extended for one or more limited periods upon application by the creditor to a self-regulatory organization or national securities association unless the organization or association believes that the creditor is not acting in good faith or that the creditor has not sufficiently determined that exceptional circumstances warrant such action. Applications shall be filed and acted upon prior to the end of the 7 day period or the expiration of any subsequent extension. However, applications filed by firms having no direct electronic access to the organization or association may be accepted as timely filed if postmarked by midnight of the last day of the 7 day period or any subsequent extension.

(4) *Satisfaction restriction.* Any transaction, position, or deposit that is used to satisfy one requirement under this part shall be unavailable to satisfy any other requirement.

(d) *Liquidation in lieu of deposit.* If any margin call is not met in full within the required time, the creditor shall liquidate securities sufficient to meet the margin call or to eliminate any margin deficiency existing on the day such liquidation is required, whichever is less. If the margin deficiency created or increased is $500 or less, no action need be taken by the creditor.

(e) *Withdrawals of cash or securities.* (1) Cash or securities may be withdrawn from an account, except if:

(i) Additional cash or securities are required to be deposited into the account for a transaction on the same or a previous day; or

(ii) The withdrawal, together with other transactions, deposits, and withdrawals on the same day, would create or increase a margin deficiency.

(2) Margin excess may be withdrawn or may be transferred to the special memorandum account (§220.6) by making a single entry to that account which will represent a debit to the margin account and a credit to the special memorandum account.

(3) If a creditor does not receive a distribution of cash or securities which is payable with respect to any security in a margin account on the day it is payable and withdrawal would not be permitted under this paragraph, a withdrawal transaction shall be deemed to have occurred on the day the distribution is payable.

(f) *Interest, service charges, etc.* (1) Without regard to the other provisions of this section, the creditor, in its usual practice, may debit the following items to a margin account if they are

considered in calculating the balance of such account:

(i) Interest charged on credit maintained in the margin account;

(ii) Premiums on securities borrowed in connection with short sales or to effect delivery;

(iii) Dividends, interest, or other distributions due on borrowed securities;

(iv) Communication or shipping charges with respect to transactions in the margin account; and

(v) Any other service charges which the creditor may impose.

(2) A creditor may permit interest, dividends, or other distributions credited to a margin account to be withdrawn from the account if:

(i) The withdrawal does not create or increase a margin deficiency in the account; or

(ii) The current market value of any securities withdrawn does not exceed 10 percent of the current market value of the security with respect to which they were distributed.

[48 FR 23165, May 24, 1983, as amended at 55 FR 11159, Mar. 27, 1990]

### § 220.5 Margin account exceptions and special provisions.

(a) *Unissued securities.* (1) The required margin on a net long or net short commitment in an unissued security is the margin that would be required if the security were an issued margin security, plus any unrealized loss on the commitment or less any unrealized gain.

(2) Margin is not required on a net short commitment in unissued securities when the account contains the related issued securities, nor for any net short or net long position in unissued exempted securities.

(b) *Short sales*—(1) The required margin for the short sale of a security shall be the amount set forth in § 220.18 (the Supplement).

(2) A short sale "against the box" shall be treated as a long sale for the purpose of computing the equity and the required margin.

(c) *Options*—(1) *Margin or cover for options on exempted debt securities, certificates of deposit, stock indices, or securities exchange traded options on foreign currencies.* The required margin for each transaction involving any short put or short call on an exempted debt security, certificate of deposit, stock index, or foreign currency (if the option is traded on a securities exchange), shall be the amount or positions in lieu of margin set forth in § 220.18 (the Supplement).

(2) *Margin for options on equity securities.* The required margin for each transaction involving any short put or short call on an equity security shall be the amount set forth in § 220.18 (the Supplement).

(3) *Cover or positions in lieu of margin.* No margin is required for an option written on an equity security position when the account holds any of the following:

(i) The underlying security in the case of a short call, or a short position in the underlying security in the case of a short put;

(ii) Securities immediately convertible into or exchangeable for the underlying security without the payment of money in the case of a short call, if the right to convert or exchange does not expire on or before the expiration date of the short call;

(iii) An escrow agreement for the underlying security or foreign exhange (in the case of a short call) or cash (in the case of a short put);

(iv) A long call on the same number of shares of the same underlying security if the long call does not expire before the expiration date of the short call, and if the amount (if any), by which the exercise price of the long call exceeds the exercise price of the short call is deposited in the account;

(v) A long put on the same number of shares of the same underlying security if the long put does not expire before the expiration date of the short put, and if the amount (if any), by which the exercise price of the short put exceeds the exercise price of the long put is deposited in the account;

(vi) A warrant to purchase the underlying security, in the case of a short call, if the warrant does not expire on or before the expiration date of the short call, and if the amount (if any), by which the exercise price of the warrant exceeds the exercise price of the short call is deposited in the account. A warrant used in lieu of the required

margin under this provision shall contribute no equity to the account.

(4) *Adjustments*. (i) When a short position held in the account serves in lieu of the required margin for a short put, the amount prescribed by paragraph (c)(2) of this section as the amount to be added to the required margin in respect of short sales shall be increased by any unrealized loss on the position.

(ii) When a security held in the account serves in lieu of the required margin for a short call, the security shall be valued at no greater than the exercise prices of the short call.

(5) *Straddles*. When both a short put and a short call are in a margin account on the same number of shares of the same underlying security, the required margin shall be the margin on either the short put or the short call, whichever is greater, plus any unrealized loss on the other option.

(6) *Exclusive designation*. The customer may designate at the time the option order is entered which security position held in the account is to serve in lieu of the required margin, if such service is offered by the creditor; or the customer may have a standing agreement with the creditor as to the method to be used for determining on any given day which security position will be used in lieu of the margin to support an option transaction. Only security held in the account which serves in lieu of the required margin for a short put or a short call shall be unavailable to support any other option transaction in the account.

(d) *Accounts of partners*. If a partner of the creditor has a margin account with the creditor, the creditor shall disregard the partner's financial relations with the firm (as shown in the partner's capital and ordinary drawing accounts) in calculating the margin or equity of the partner's margin account.

(e) *Contribution to joint venture*. If a margin account is the account of a joint venture in which the creditor participates, any interest of the creditor in the joint account in excess of the interest which the creditor would have on the basis of its right to share in the profits shall be treated as an extension of credit to the joint account and shall be margined as such.

(f) *Transfer of accounts*. (1) A margin account that is transferred from one creditor to another may be treated as if it had been maintained by the transferee from the date of its origin, if the transferee accepts, in good faith, a signed statement of the transferor (or, if that is not practicable, of the customer), that any margin call issued under this part has been satisfied.

(2) A margin account that is transferred from one customer to another as part of a transaction, not undertaken to avoid the requirements of this part, may be treated as if it had been maintained for the transferee from the date of its origin, if the creditor accepts in good faith and keeps with the transferee account a signed statement of the transferor describing the circumstances for the transfer.

(g) *Credit denominated in foreign currency*. A creditor may extend credit denominated in a foreign currency secured by foreign margin securities denominated or traded in the same foreign currency and specifically identified on the creditor's books and records as securing the foreign currency debit.

[48 FR 23165, May 24, 1983, as amended at 50 FR 26355, June 26, 1985; 55 FR 11159, Mar. 27, 1990]

### § 220.6 Special memorandum account.

(a) A special memorandum account (SMA) may be maintained in conjunction with a margin account. A single entry amount may be used to represent both a credit to the SMA and a debit to the margin account. A transfer between the two accounts may be effected by an increase or reduction in the entry. When computing the equity in a margin account, the single entry amount shall be considered as a debit in the margin account. A payment to the customer or on the customer's behalf or a transfer to any of the customer's other accounts from the SMA reduces the single entry amount.

(b) The SMA may contain the following entries:

(1) Dividend and interest payments;

(2) Cash not required by this part, including cash deposited to meet a maintenance margin call or to meet any requirement of a self-regulatory organization that is not imposed by this part;

(3) Proceeds of a sale of securities or cash no longer required on any expired or liquidated security position that may be withdrawn under § 220.4(e) of this part; and

(4) Margin excess transferred from the margin account under § 220.4(e)(2) of this part.

**§ 220.7 Arbitrage account.**

In an arbitrage account a creditor may effect and finance for any customer *bona fide* arbitrage transactions. For the purpose of this section, the term "*bona fide* arbitrage" means:

(a) A purchase or sale of a security in one market together with an offsetting sale or purchase of the same security in a different market at as nearly the same time as practicable for the purpose of taking advantage of a difference in prices in the two markets, or

(b) A purchase of a security which is, without restriction other then the payment of money, exchangeable or convertible within 90 calendar days of the purchase into a second security together with an offsetting sale of the second security at or about the same time, for the purpose of taking advantage of a concurrent disparity in the prices of the two securities.

**§ 220.8 Cash account.**

(a) *Permissible transactions*. In a cash account, a creditor, may:

(1) Buy for or sell to any customer any security if: (i) There are sufficient funds in the accounts; or (ii) the creditor accepts in good faith the customer's agreement that the customer will promptly make full cash payment for the security before selling it and does not contemplate selling it prior to making such payment;

(2) Buy from or sell for any customer any security if: (i) The security is held in the account; or (ii) the creditor accepts in good faith the customer's statement that the security is owned by the customer or the customer's principal, and that it will be promptly deposited in the account;

(3) Issue, endorse, or guarantee an option for any customer if:

(i) In the case of a call option, the underlying security (or a security immediately convertible into the underlying security, without the payment of money) is held in or purchased for the account on the same day, and the option premium is held in the account until cash payment for the underlying or convertible security is received; or

(ii) In the case of a put option, the creditor obtains cash in an amount equal to the exercise price or holds in the account any of the following instruments with a current market value at least equal to the exercise price and with one year or less to maturity: securities issued or guaranteed by the United States or its agencies, negotiable bank certificates of deposit, or bankers acceptances issued by banking institutions in the United States and payable in the United States.

(4) Use an escrow agreement in lieu of the cash or underlying security position if:

(i) In the case of a call or a put, the creditor is advised by the customer that the required securities or cash are held by a bank and the creditor independently verifies that an appropriate escrow agreement will be delivered by the bank promptly; or

(ii) In the case of a call issued, endorsed, or guaranteed on the same day the underlying security is purchased in the account and the underlying security is to be delivered to a bank, the creditor verifies that an appropriate escrow agreement will be delivered by the bank promptly.

(b) *Time periods for payment; cancellation or liquidation*—(1) *Full cash payment*. A creditor shall obtain full cash payment for customer purchases—

(i) Within seven business days of the date:

(A) Any nonexempted security was purchased;

(B) Any unissued security was made available by the issuer for delivery to purchasers;

(C) Any "when distributed" security was distributed under a published plan;

(D) A security owned by the customer has matured or has been redeemed and a new refunding security of the same issuer has been purchased by the customer, provided:

(*1*) The customer purchased the new security no more than 35 calendar days prior to the date of maturity or redemption of the old security;

(*2*) The customer is entitled to the proceeds of the redemption; and

(*3*) The delayed payment does not exceed 103 percent of the proceeds of the old security.

(ii) In the case of the purchase of a foreign security, within seven business days of the trade date or the date on which settlement is required to occur by the rules of the foreign securities market, provided this period does not exceed the maximum time permitted by this part for delivery against payment transactions.

(2) *Delivery against payment.* If a creditor purchases for or sells to a customer a security in a delivery against payment transaction, the creditor shall have up to 35 calendar days to obtain payment if delivery of the security is delayed due to the mechanics of the transaction and is not related to the customer's willingness or ability to pay.

(3) *Shipment of securities, extension.* If any shipment of securities is incidental to consummation of a transaction, a creditor may extend the 7 business day period by the number of days required for shipment, but not by more than 7 business days.

(4) *Cancellation; liquidation; minimum amount.* A creditor shall promptly cancel or otherwise liquidate a transaction or any part of a transaction for which the customer has not made full cash payment within the required time. A creditor may, at its option, disregard any sum due from the customer not exceeding $500.

(c) *90 day freeze.* (1) If a nonexempted security in the account is sold or delivered to another broker or dealer without having been previously paid for in full by the customer, the privilege of delaying payment beyond the trade date shall be withdrawn for 90 calendar days following the date of sale of the security. Cancellation of the transaction other than to correct an error shall constitute a sale.

(2) The 90 day freeze shall not apply if: (i) Within 7 business days of the trade date, full payment is received or any check or draft in payment has cleared and the proceeds from the sale are not withdrawn prior to such payment or check clearance; or (ii) the purchased security was delivered to another broker or dealer for deposit in a cash account which holds sufficient funds to pay for the security. The creditor may rely on a written statement accepted in good faith from the other broker or dealer that sufficient funds are held in the other cash account.

(d) *Extension of time periods; transfers.* (1) Unless a self-regulatory organization or association believes that the creditor is not acting in good faith or that the creditor has not sufficiently determined that exceptional circumstances warrant such action, it may, upon application by the creditor:

(i) Extend any period specified in paragraph (b) of this section;

(ii) Authorize transfer to another account of any transaction involving the purchase of a margin or exempted security; or

(iii) Grant a waiver from the 90 day freeze.

(2) Applications shall be filed and acted upon prior to the end of the 7 day period or the expiration of any subsequent extension. However, an application filed from firms having no direct electronic access to the exchange or association may be accepted as timely filed if it is postmarked no later than midnight of the last day of the 7 day period or any subsequent extension.

[48 FR 23165, May 24, 1983, as amended at 55 FR 11159, Mar. 27, 1990]

### § 220.9 Nonsecurities credit and employee stock ownership account.

(a) In a nonsecurities credit account a creditor may:

(1) Effect and carry transactions in commodities;

(2) Effect and carry transactions in foreign exchange;

(3) Extend and maintain secured or unsecured nonpurpose credit, subject to the requirements of paragraph (b) of this section.

(4) Extend and maintain credit to employee stock ownership plans without regard to the other sections of this part.

(b) Every extension of credit, except as provided in paragraphs (a) (1) and (2) of this section, shall be deemed to be purpose credit unless, prior to extending the credit, the creditor accepts in good faith from the customer a written statement that it is not purpose credit.

The statement shall conform to the requirements established by the Board. To accept the customer's statement in good faith, the creditor shall be aware of the circumstances surrounding the extension of credit and shall be satisfied that the statement is truthful.

[48 FR 23165, May 24, 1983, as amended at 50 FR 26356, June 26, 1985]

### §220.10 Omnibus account.

(a) In an omnibus account, a creditor may effect and finance transactions for a broker or dealer who is registered with the SEC under section 15 of the Act and who gives the creditor written notice that:

(1) All securities will be for the account of customers of the broker or dealer; and

(2) Any short sales effected will be short sales made on behalf of the customers of the broker or dealer other than partners.

(b) The written notice required by paragraph (a) shall conform to any SEC rule on the hypothecation of customers' securities by brokers or dealers.

### §220.11 Broker-dealer credit account.

(a) *Permissible transactions.* In a broker-dealer credit account, a creditor may:

(1) Purchase any security from or sell any security to another creditor under a good faith agreement to promptly deliver the security against full payment of the purchase price.

(2) Effect or finance transactions of any of its owners if the creditor is a clearing and servicing broker or dealer owned jointly or individually by other creditors.

(3) Extend and maintain credit to any partner or stockholder of the creditor for the purpose of making a capital contribution to, or purchasing stock of, the creditor, affiliated corporation or another creditor.

(4) Extend and maintain, with the approval of the appropriate examining authority:

(i) Credit to meet the emergency needs of any creditor; or

(ii) Subordinated credit to another creditor for capital purposes, if the other creditor:

(A) Is an affiliated corporation; or

(B) Will not use the proceeds of the loan to increase the amount of dealing in securities for the account of the creditor, its firm or corporation or an affiliated corporation.

(b) For purposes of paragraphs (a) (3) and (4) of this section *affiliated corporation* means a corporation all the common stock of which is owned directly or indirectly by the firm or general partners and employees of the firm, or by the corporation or holders of the controlling stock and employees of the corporation and the affiliation has been approved by the creditor's examining authority.

### §220.12 Market functions account.

(a) *Requirements.* In a market functions account, a creditor may effect or finance the transactions of market participants in accordance with the following provisions. A separate record shall be kept for the transactions specified for each category described in paragraphs (b) through (e) of this section. Any position in a separate record shall not be used to meet the requirements of any other category.

(b) *Specialists*—(1) *Applicability.* A creditor may clear or finance specialist transactions for any specialist, or any specialist joint account, in which all participants, or all participants other than the creditor, are registered as specialists on a national securities exchange that requires regular reports on the use of specialist credit from the registered specialists.

(2) *Permitted offset positions.* A specialist in options may establish, on a share-for-share basis, a long or short position in the securities underlying the options in which the specialist makes a market, and a specialist in securities other than options may purchase or write options overlying the securities in which the specialist makes a market, if the account holds the following permitted offset positions:

(i) A short option position which is "in or at the money" and is not offset by a long or short option position for an equal or greater number of shares of the same underlying security which is "in the money";

(ii) A long option position which is "in or at the money" and is not offset by a long or short option position for

an equal or greater number of shares of the same underlying security which is "in the money";

(iii) A short option position against which an exercise notice was tendered;

(iv) A long option position which was exercised;

(v) A net long position in a security (other than an option) in which the specialist makes a market; or

(vi) A net short position in a security (other than an option) in which the specialist makes a market.

(3) *Required margin.* The required margin for a specialist's transactions shall be:

(i) Good faith margin for any long or short position in a security in which the specialist makes a market;

(ii) Good faith margin for any wholly-owned margin security or exempted security;

(iii) The margin prescribed by § 220.18 (the Supplement) when a security purchased or sold short in the account does not qualify as a specialist or permitted offset position.

(4) *Additional margin; restriction on "free-riding."* (i) Except as required by paragraph (b)(5) of this section, the creditor shall issue a margin call on any day when additional margin is required as a result of specialist transactions. The creditor may allow the specialist a maximum of 7 business days to satisfy a margin call.

(ii) If a specialist fails to satisfy a margin call within the period specified in this paragraph (and the creditor is required to liquidate securities to satisfy the call), the creditor shall be prohibited for a 15 calendar day period from extending any further credit to the specialist to finance transactions in nonspecialty securities.

(iii) The restriction on "free-riding" shall not apply to:

(A) Any specialist on a national securities exchange that has an SEC-approved rule on "free-riding" by specialists; or (B) the acquisition or liquidation of a permitted offset position.

(5) *Deficit status.* On any day when a specialist's separate record would liquidate to a deficit, the creditor shall not extend any further specialist credit in the account and shall issue a margin call at least as large as the deficit. If the call is not met by noon of the following business day, the creditor shall liquidate positions in the specialist's account.

(6) *Withdrawals.* Withdrawals may be permitted to the extent that the equity exceeds the margin requirements specified in paragraph (b)(3) of this section.

(c) *Underwritings and distributions.* A creditor may effect or finance for any dealer or group of dealers transactions for the purpose of facilitating the underwriting or distribution of all or a part of an issue of securities with a good faith margin.

(d) *OTC Marketmakers and Third Marketmakers.* (1) A creditor may clear or finance with a good faith margin, marketmaking transactions for an OTC marketmaker or a third marketmaker who:

(i) Is in compliance with any applicable SEC rule, including minimum net capital rules;

(ii) Regularly submits *bona fide* competitive bid and offer quotations to a recognized inter-dealer quotation system;

(iii) Is ready, willing, and able to effect transactions in reasonable amounts with other brokers and dealers at the quoted prices; and

(iv) Has a reasonable average rate of inventory turnover.

(2) If the credit extended to a marketmaker ceases to be for the purpose of marketmaking, or the dealer ceases to be a marketmaker for an issue of securities for which credit was extended, the credit shall be subject to the margin specified in § 220.18 (the Supplement).

(e) *Odd-lot dealers.* A creditor may clear and finance odd-lot transactions for any creditor who is registered as an odd-lot dealer on a national securities exchange with a good faith margin.

[48 FR 23165, May 24, 1983; 48 FR 26590, June 9, 1983]

### § 220.13 Arranging for loans by others.

A creditor may not arrange for the extension or maintenance of credit to or for any customer by any person upon terms and conditions other than those upon which the creditor may itself extend or maintain credit under the provisions of this part, except that this limitation shall not apply to credit arranged for a customer which does

not violate parts 207 and 221 of this chapter and results solely from:

(a) Investment banking services, provided by the creditor to the customer, including, but not limited to, underwritings, private placements, and advice and other services in connection with exchange offers, mergers, or acquisitions, except for underwritings that involve the public distribution of an equity security with installment or other deferred payment provisions;

(b) The sales of nonmargin securities (including securities with installment or other deferred payment provisions) if the sale is exempted from the registration requirements of the Securities Act of 1933 under section 4(2) of section 4(6) of the Act;

(c) A subsequent loan or advance on a face-amount certificate as permitted under 15 U.S.C. 80a–28(d); or

(d) Credit extended by a foreign person to purchase foreign securities.

[50 FR 10934, Mar. 19, 1985, as amended at 55 FR 11160, Mar. 27, 1990]

**§220.14 Clearance of securities, options, and futures.**

(a) *Credit for clearance of securities.* The provisions of this part shall not apply to the extension or maintenance of any credit that is not for more than one day if it is incidental to the clearance of transactions in securities directly between members of a national securities exchange or association or through any clearing agency registered with the SEC.

(b) *Deposit of securities with a clearing agency.* The provisions of this part shall not apply to the deposit of securities with an options or futures clearing agency for the purpose of meeting the deposit requirements of the agency if:

(1) The clearing agency:

(i) Issues, guarantees performance on, or clears transactions in, any security (including options on any security, certificate of deposit, securities index or foreign currency); or

(ii) Guarantees performance of contracts for the purchase or sale of a commodity for future delivery or options on such contracts;

(2) The clearing agency is registered with the Securities and Exchange Commission or is the clearing agency for a contract market regulated by the Commodity Futures Trading Commission; and

(3) The deposit consists of any margin security and complies with the rules of the clearing agency that have been approved by the Securities and Exchange Commission or the Commodity Futures Trading Commission.

[48 FR 23165, May 24, 1983, as amended at 56 FR 46110, Sept. 10, 1991]

**§220.15 Borrowing by creditors.**

(a) *Restrictions on borrowing.* A creditor may not borrow in the ordinary course of business as a broker or dealer using as collateral any registered nonexempted security, except:

(1) From or through a member bank of the Federal Reserve System; or

(2) From any nonmember bank that has filed with the Board an agreement as prescribed in paragraph (b) of this section, which agreement is still in effect; or

(3) From another creditor if the loan is permissible under this part.

(b) *Agreements of nonmember banks.* (1) A nonmember bank shall file an agreement that conforms to the requirements of section 8(a) of the Act (See Form F.R. T–2) if:

(i) Its principal place of business is in a territory or insular possession of the United States; or

(ii) It has an office or agency in the United States and its principal place of business is outside the United States.

(2) Any other nonmember bank shall file an agreement that conforms to the requirements of section 8(a) of the Act (See Form F.R. T–1).

(3) Any nonmember bank may terminate its agreement if it obtains the written consent of the Board.

**§220.16 Borrowing and lending securities.**

Without regard to the other provisions of this part, a creditor may borrow or lend securities for the purpose of making delivery of the securities in the case of short sales, failure to receive securities required to be delivered, or other similar situations. Each borrowing shall be secured by a deposit of one or more of the following: cash, securities issued or guaranteed by the United States or its agencies, negotiable bank certificates of deposit and

bankers acceptances issued by banking institutions in the United States and payable in the United States, or irrevocable letters of credit issued by a bank insured by the Federal Deposit Insurance Corporation or a foreign bank that has filed an agreement with the Board on Form F.R. T-2. Such deposit made with the lender of the securities shall have at all times a value at least equal to 100 percent of the market value of the securities borrowed, computed as of the close of the preceding business day.

**§ 220.17 Requirements for the list of marginable OTC stocks and the list of foreign margin stocks.**

(a) *Requirements for inclusion on the list of marginable OTC stocks.* Except as provided in paragraph (f) of this section, OTC margin stock shall meet the following requirements:

(1) Four or more dealers stand willing to, and do in fact, make a market in such stock and regularly submit bona fide bids and offers to an automated quotations system for their own accounts;

(2) The minimum average bid price of such stock, as determined by the Board, is at least $5 per share.

(3) The stock is registered under section 12 of the Act, is issued by an insurance company subject to section 12(g)(2)(G) of the Act, is issued by a closed-end investment management company subject to registration pursuant to section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), is an American Depository Receipt (ADR) of a foreign issuer whose securities are registered under section 12 of the Act, or is a stock of an issuer required to file reports under section 15(d) of the Act;

(4) Daily quotations for both bid and asked prices for the stock are continuously available to the general public;

(5) The stock has been publicly traded for at least six months;

(6) The issuer has at least $4 million of capital, surplus, and undivided profits;

(7) There are 400,000 or more shares of such stock outstanding in addition to shares held beneficially by officers, directors or beneficial owners of more than 10 percent of the stock;

(8) There are 1,200 or more holders of record, as defined in SEC Rule 12g5-1 (17 CFR 240.12g5-1), of the stock who are not officers, directors or beneficial owners of 10 percent or more of the stock, or the average daily trading volume of such stock as determined by the Board, is at least 500 shares; and

(9) The issuer or a predecessor in interest has been in existence for at least three years.

(b) *Requirements for continued inclusion on the list of marginable OTC stocks.* Except as provided in paragraph (f) of this section, OTC margin stock shall meet the following requirements:

(1) Three or more dealers stand willing to, and do in fact, make a market in such stock and regularly submit bona fide bids and offers to an automated quotations system for their own accounts;

(2) The minimum average bid price of such stocks, as determined by the Board, is at least $2 per share;

(3) The stock is registered as specified in paragraph (a)(3) of this section;

(4) Daily quotations for both bid and asked prices for the stock are continuously available to the general public;

(5) The issuer has at least $1 million of capital, surplus, and undivided profits;

(6) There are 300,000 or more shares of such stock outstanding in addition to shares held beneficially by officers, directors, or beneficial owners of more than 10 percent of the stock; and

(7) There continue to be 800 or more holders of record, as defined in SEC Rule 12g5-1 (17 CFR 240.12g5-1), of the stock who are not officers, directors, or beneficial owners of 10 percent or more of the stock, or the average daily trading volume of such stock, as determined by the Board, is at least 300 shares.

(c) *Requirements for inclusion on the list of foreign margin stocks.* Except as provided in paragraph (f) of this section, a foreign margin stock shall meet the following requirements:

(1) The security is listed for trading on or through the facilities of a foreign securities exchange or a recognized foreign securities market and has been trading on such exchange or market for at least six months;

(2) Daily quotations for both bid and asked or last sale prices for the security provided by the foreign securities exchange or foreign securities market on which the security is traded are continuously available to creditors in the United States pursuant to an electronic quotation system;

(3) The aggregate market value of shares, the ownership of which is unrestricted, is not less than $1 billion;

(4) The average weekly trading volume of such security during the preceding six months is either at least 200,000 shares or $1 million; and

(5) The issuer or a predecessor in interest has been in existence for at least five years.

(d) *Requirements for continued inclusion on the list of foreign margin stocks.* Except as provided in paragraph (f) of this section, a foreign margin stock shall meet the following requirements:

(1) The security continues to meet the requirements specified in paragraphs (c) (1) and (2) of this section;

(2) The aggregate market value of shares, the ownership of which is unrestricted, is not less than $500 million; and

(3) The average weekly trading volume of such security during the preceding six months is either at least 100,000 shares or $500,000.

(e) *Removal from the lists.* The Board shall periodically remove from the lists any stock that:

(1) Ceases to exist or of which the issuer ceases to exist, or

(2) No longer substantially meets the provisions of paragraphs (b) or (d) of this section or § 220.2(u).

(f) *Discretionary authority of Board.* Without regard to other paragraphs of this section, the Board may add to, or omit or remove from the list of marginable OTC stocks and the list of foreign margin stocks and equity security, if in the judgment of the Board, such action is necessary or appropriate in the public interest.

(g) *Unlawful representations.* It shall be unlawful for any creditor to make, or cause to be made, any representation to the effect that the inclusion of a security on the list of marginable OTC stocks or the list of foreign margin stocks is evidence that the Board or the SEC has in any way passed upon the merits of, or given approval to, such security or any transactions therein. Any statement in an advertisement or other similar communication containing a reference to the Board in connection with the lists or stocks on those lists shall be an unlawful representation.

[48 FR 23165, May 24, 1983; 48 FR 34945, Aug. 2, 1983, as amended at 55 FR 11160, Mar. 27, 1990]

**§ 220.18 Supplement: Margin Requirements.**

The required margin for each security position held in a margin account shall be as follows:

(a) Margin equity security, except for an exempted security or a long position in an option: 50 percent of the current market value of the security or the percentage set by the regulatory authority where the trade occurs, whichever is greater.

(b) Exempted security, registered nonconvertible debt security or OTC margin bond: The margin required by the creditor in good faith or the percentage set by the regulatory authority where the trade occurs, whichever is greater.

(c) Short sale of nonexempted security: 150 percent of the current market value of the security, or 100 percent of the current market value if a security exchangeable or convertible within 90 calendar days without restriction other than the payment of money into the security sold short is held in the account.

(d) Short sale of an exempted security: 100 percent of the current market value of the security plus the margin required by the creditor in good faith.

(e) Nonmargin, nonexempted security or a long position in any option: 100 percent of the current market value.

(f) Short put or short call on a security, certificate of deposit, securities index or foreign currency:

(1) In the case of puts and calls issued by a registered clearing corporation and listed or traded on a registered national securities exchange or a registered securities association, the amount, or other position (except in the case of an option on an equity security), specified by the rules of the registered national securities exchange or

the registered securities association authorized to trade the option, provided that all such rules have been approved or amended by the SEC; or

(2) In the case of all other puts and calls, the amount, or other position (except in the case of an option on an equity security), specified by the maintenance rules of the creditor's self-regulatory organization.

[50 FR 26356, June 26, 1985, as amended at 55 FR 11160, Mar. 27, 1990]

INTERPRETATIONS

**§ 220.101 Transactions of customers who are brokers or dealers.**

The Board has recently considered certain questions regarding transactions of customers who are brokers or dealers.

(a) The first question was whether delivery and payment under § 220.4(f)(3) must be exactly simultaneous (such as in sight draft shipments), or whether it is sufficient if the broker-dealer customer, "as promptly as practicable in accordance with the ordinary usage of the trade," mails or otherwise delivers to the creditor a check in settlement of the transaction, the check being accompanied by instructions for transfer or delivery of the security. The Board ruled that the latter method of setting the transaction is permissible.

(b) The second question was, in effect, whether the limitations of § 220.4(c)(8) apply to the account of a customer who is himself a broker or dealer. The answer is that the provision applies to any "special cash account," regardless of the type of customer.

(c) The third question was, in effect, whether a purchase and a sale of an unissued security under § 220.4(f)(3) may be offset against each other, or whether each must be settled separately by what would amount to delivery of the security to settle one transaction and its redelivery to settle the other. The answer is that it is permissible to offset the transactions against each other without physical delivery and redelivery of the security.

[11 FR 14155, Dec. 7, 1946]

**§ 220.102 [Reserved]**

**§ 220.103 Borrowing of securities.**

(a) The Board of Governors has been asked for a ruling as to whether § 220.6(h), which deals with borrowing and lending of securities, applies to a borrower of securities if the lender is a private individual, as contrasted with a member of a national securities exchange or a broker or dealer.

(b) Section 220.6(h) does not require that the lender of the securities in such a case be a member of a national securities exchange or a broker or dealer. Therefore, a borrowing of securities may be able to qualify under the provision even though the lender is a private individual, and this is true whether the security is registered on a national securities exchange or is unregistered. In borrowing securities from a private individual under § 220.6(h), however, it becomes especially important to bear in mind two limitations that are contained in the section.

(c) The first limitation is that the section applies only if the broker borrows the securities for the purpose specified in the provision, that is, "for the purpose of making delivery of such securities in the case of short sales, failure to receive securities he is required to deliver, or other similar cases". The present language of the provision does not require that the delivery for which the securities are borrowed must be on a transaction which the borrower has himself made, either as agent or as principal; he may borrow under the provision in order to relend to someone else for the latter person to make such a delivery. However, the borrowing must be related to an actual delivery of the type specified—a delivery in connection with a specific transaction that has already occurred or is in immediate prospect. The provision does not authorize a broker to borrow securities (or make the related deposit) merely in order that he or some other broker may have the securities "on hand" or may anticipate some need that may or may not arise in the future.

(d) The ruling in the 1940 Federal Reserve Bulletin, at page 647, is an example of a borrowing which, on the facts as given, did not meet the requirement.

There, the broker wished to borrow stocks with the understanding that he "would offer to lend this stock in the 'loan crowd' on a national securities exchange." There was no assurance that the stocks would be used for the purpose specified in §220.6(h); they might be, or they might merely be held idle while the person lending the stocks had the use of the funds deposited against them. The ruling held in effect that since the borrowing could not qualify under §220.6(h) it must comply with other applicable provisions of the regulation.

(e) The second requirement is that the deposit of cash against the borrowed securities must be "bona fide." This requirement naturally cannot be spelled out in detail, but it requires at least that the purpose of the broker in making the deposit should be to obtain the securities for the specified purpose, and that he should not use the arrangement as a means of accommodating a customer who is seeking to obtain more funds than he could get in a general account.

(f) The Board recognizes that even with these requirements there is still some possibility that the provision may be misapplied. The Board is reluctant to impose additional burdens on legitimate transactions by tightening the provision. If there should be evidence of abuses developing under the provision, however, it would become necessary to consider making it more restricted.

[12 FR 5278, Aug. 2, 1947]

### §220.104 [Reserved]

### §220.105 Ninety-day rule in special cash account.

(a) Section 220.4(c)(8) places a limitation on a special cash account if a security other than an exempted security has been purchased in the account and "without having been previously paid for in full by the customer * * * has been * * * delivered out to any broker or dealer." The limitation is that during the succeeding 90 days the customer may not purchase a security in the account other than an exempted security unless funds sufficient for the purpose are held in the account. In other words, the privilege of delayed payment in such an account is withdrawn during the 90-day period.

(b) The Board recently considered a question as to whether the following situation makes an account subject to the 90-day disqualification: A customer purchases registered security ABC in a special cash account. The broker executes the order in good faith as a bona fide cash transaction, expecting to obtain full cash payment promptly. The next day, the customer sells registered security XYZ in the account, promising to deposit it promptly in the account. The proceeds of the sale are equal to or greater than the cost of security ABC. After both sale and purchase have been made, the customer requests the broker to deliver security ABC to a different broker, to receive security XYZ from that broker at about the same time, and to settle with the other broker—such settlement to be made either by paying the cost of security XYZ to the other broker and receiving from him the cost of security ABC, or by merely settling any difference between these amounts.

(c) The Board expressed the view that the account becomes subject to the 90-day disqualification in §220.4(c)(8). In the instant case, unlike that described at 1940 Federal Reserve Bulletin 772, the security sold is not held in the account and is not to be deposited in it unconditionally. It is to be obtained only against the delivery to the other broker of the security which had been purchased. Hence payment can not be said to have been made prior to such delivery; the purchased security has been delivered out to a broker without previously having been paid for in full, and the account becomes subject to the 90-day disqualification.

[13 FR 2368, May 1, 1948]

### §220.106 Designation of New York Stock Exchange for purposes of specialists transactions.

As amended effective July 29, 1949, §220.4(g) removes the margin requirements applicable to credit for financing the functions of "specialists" on an exchange designated by the Board of Governors of the Federal Reserve System.

Effective July 20, 1949, the Board of Governors of the Federal Reserve Sys-

tem has designated the New York Stock Exchange pursuant to § 220.4(g), as amended, this designation to be effective until further notice.

[14 FR 4665, July 27, 1949]

**§ 220.107 Transactions in undermargined accounts.**

(a) In an interpretation published at § 220.104 (13 FR 1791), the Board considered two questions in connection with the rules applicable at that time to withdrawals of cash or securities from an undermargined general account under this part.

(b) One question related to the purchase of an unregistered nonexempted security in the account. The other concerned a case in which a security held in the account was sold, delivery was delayed by borrowing a security rather than delivering the security held in the account, and the security held in the account was used later to settle the short position.

(c) The conclusions on both points were based on the provisions of this part in effect at the time regarding withdrawals from such accounts. Those withdrawal provisions were changed by an amendment, effective May 1, 1949 (§ 220.4(c)(7) and (8)), and the Board has been asked regarding the application of the new withdrawal rules to such situations. It has expressed the following views:

NOTE: Without reference to the preceding language or to paragraph (d) of this section, the amendment of Regulation T at 24 FR 4697 superseded the following subparagraphs (1) and (2):

(1) Unregistered securities cannot be carried on margin and accordingly a deposit equal to the full cost of any unregistered securities purchased in the account must, of course, be obtained. However, a purchase of unregistered securities in the general account may now be treated as a transaction other than a withdrawal, and accordingly the deposit equal to such cost may be obtained within the three-day period specified in § 220.3(b) and (e).

(2) With respect to the case in which a customer wishes to sell a security that is held in the account and to delay delivery by borrowing a security rather than delivering the one held in the account, the present withdrawal rules permit the sale to be treated as a short sale against which margin is not required and permit the transaction to be treated as completed when the security held in the account is delivered later to close out the short position. Accordingly, it is now permissible for an offsetting transaction to take place on the date when the delivery is so made.

(d) This supersedes the ruling referred to above at § 220.104. (That ruling also pointed out that the "good faith loan value" specified for an exempted security means the amount which the broker would customarily lend on the security, and that the figure can not be arbitrarily reduced merely for the purpose of permitting a later substitution of registered securities for exempted securities. That principle is still correct, but is of limited application in view of the provisions now contained in this part for withdrawals and substitutions of securities.)

[14 FR 4857, Aug. 5, 1949]

**§ 220.108 International Bank Securities.**

(a) Section 2 of the Act of June 29, 1949 (Pub. L. 142—81st Congress), amended the Bretton Woods Agreements Act by adding a new section numbered 15 providing, in part, that—

Any securities issued by International Bank for Reconstruction and Development (including any guaranty by the bank, whether or not limited in scope), and any securities guaranteed by the bank as to both principal and interest, shall be deemed to be exempted securities within the meaning of * * * paragraph (a)(12) of section 3 of the [Securities Exchange] Act of June 6, 1934, as amended (15 U.S.C. 78c). * * *.

(b) In response to inquiries with respect to the applicability of the margin requirements of this part to securities issued or guaranteed by the International Bank for Reconstruction and Development, the Board has replied that, as a result of this enactment, securities issued by the Bank are now classified as exempted securities under § 220.2(e). Such securities are now in the same category under this part as are United States Government, State and municipal bonds. Accordingly, the specific percentage limitations prescribed by this part with respect to maximum loan value and margin requirements are no longer applicable thereto.

[14 FR 5505, Sept. 7, 1949]

**§220.109 Arrangement for credit by brokers or dealers.**

(a) The Securities Exchange Act of 1934, and this part issued thereunder, provide in substance that any broker or dealer who is subject to this part shall not extend or maintain any credit on unregistered securities (i.e., securities not registered on a national securities exchange). The act (section 7(c)) and §220.7(a) also provides in substance that any such broker or dealer shall not arrange for any extension or maintenance of credit on unregistered securities. There are certain exceptions to these prohibitions, but they are not relevant to the present question.

(b) The Board has been asked whether there would be a violation of the above-mentioned prohibition against arranging credit on unregistered securities if a broker or dealer who is subject to this part 220 participated in a certain financing plan which a national bank has under consideration. The proposed plan would finance the purchase of shares which are issued by so-called open-end investment trusts and which are not registered on any national securities exchange.

(c) The shares are on continuous sale and can be acquired by periodic cash purchases without the need for any bank financing. However, the bank proposes to make loans to prospective purchasers for the purpose of financing the purchase of larger amounts of the investment trust shares. The shares would be pledged to secure the loan, and the borrower would undertake to pay the principal and interest on the loan in monthly installments.

(d) The bank would furnish forms of a credit application and note to security dealers and their salesmen, who would then make them available to the customers to whom they are selling or contemplate selling the investment trust shares. When the forms had been completed and executed, the dealers would return them to the bank.

(e) The bank would have complete discretion as to whether or not to approve any such application. The bank would not pay any fees or commissions to the security dealers, although the dealers would, of course, get the benefit of increased security sales that might result from operation of the plan.

(f) Upon consideration of the various aspects of the proposed plan, the Board of Governors is of the opinion that if any broker or dealer who is subject to this part participated in the plan in the manner contemplated, there would be an arranging for the extension or maintenance of credit on unregistered securities in violation of section 7(c) of the Securities Exchange Act of 1934 and §220.7(a).

[17 FR 9584, Oct. 22, 1952]

**§220.110 Assistance by Federal credit union to its members.**

(a) An inquiry was presented recently concerning the application of this part or part 221 of this subchapter, to a plan proposed by a Federal credit union to aid its members in purchasing stock of a corporation whose subsidiary apparently was the employer of all the credit union's members.

(b) From the information submitted, the plan appeared to contemplate that the Federal credit union would accept orders from its members for registered common stock of the parent corporation in multiples of 5 shares; that whenever orders had been so received for a total of 100 shares, the credit union, as agent for such members, would execute the orders through a brokerage firm with membership on a national securities exchange; that the brokerage firm would deliver certificates for the stock, registered in the names of the individual purchasers, to the credit union against payment by the credit union; that the credit union would prorate the total amount so paid, including the brokerage fee, among the individual purchasers according to the number of shares purchased by them; and that a savings in brokerage fee resulting from the 100-lot purchases would be passed on by the credit union to the individual purchasers of the stock. However, amounts of the stock less than 100 shares would be purchased by the credit union through the brokerage firm for any members willing to forego such savings.

(c) It appeared further that the Federal credit union members for whom stock was so purchased would reim-

burse the credit union (1) by cash payment, (2) by the proceeds of withdrawn shares of the credit union, (3) by the proceeds of an installment loan from the credit union collateraled by the stock purchased, or by (4) by a combination of two or more of the above methods. To assist the collection of any such loan, the employer of the credit union members would provide payroll deductions. Apparently, sales by the credit union of any of the stock purchased by one of its members would occur only in satisfaction of a delinquent loan balance. In no case did it appear that the credit union would make a charge for arranging the execution of transactions in the stock for its members.

(d) The Board was of the view that, from the facts as presented, it did not appear that the Federal credit union should be regarded as the type of institution to which part 221 of this subchapter, in its present form, applied.

(e) With respect to this part, the question was whether the activities of the Federal credit union under the proposal, or otherwise, might be such as to bring it within the meaning of the terms "broker" or "dealer" as used in the part and the Securities Exchange Act of 1934. The Board observed that this, of course, was a question of fact that necessarily depended upon the circumstances of the particular case, including the manner in which the arrangement in question might be carried out in practice.

(f) On the basis of the information submitted, however, it did not appear to the Board that the Federal credit union should be regarded as being subject to this part as a "broker or dealer who transacts a business in securities through the medium of" a member firm solely because of its activities as contemplated by the proposal in question. The Board stated that the part rather clearly would not apply if there appeared to be nothing other than loans by the credit union to its members to finance purchases made directly by them of stock of the parent corporation of the employer of the member-borrowers. The additional fact that the credit union, as agent, would purchase such stock for its members (even though all such purchases might not be financed by credit union loans) was not viewed by the Board as sufficient to make the regulation applicable where, as from the facts presented, it did not appear that the credit union in any case was to make any charge or receive any compensation for assisting in such purchases or that the credit union otherwise was engaged in securities activities. However, the Board stated that matters of this kind must be examined closely for any variations that might suggest the inapplicability of the foregoing.

[18 FR 4592, Aug. 5, 1953]

### § 220.111 Arranging for extensions of credit to be made by a bank.

(a) The Board has recently had occasion to express opinions regarding the requirements which apply when a person subject to this part (for convenience, called here simply a broker) arranges for a bank to extend credit.

(b) The matter is treated generally in § 220.7(a) and is also subject to the general rule of law that any person who aids or abets a violation of law by another is himself guilty of a violation. It may be stated as a general principle that any person who arranges for credit to be extended by someone else has a responsibility so to conduct his activities as not to be a participant in a violation of this part, which applies to brokers, or part 221 of this subchapter, which applies to banks.

(c) More specifically, in arranging an extension of credit that may be subject to part 221 of this subchapter, a broker must act in good faith and, therefore, must question the accuracy of any non-purpose statement (i.e., a statement that the loan is not for the purpose of purchasing or carrying registered stocks) given in connection with the loan where the circumstances are such that the broker from any source knows or has reason to know that the statement is incomplete or otherwise inaccurate as to the true purpose of the credit. The requirement of "good faith" is of vital importance. While the application of the requirement will necessarily vary with the facts of the particular case, the broker, like the bank for whom the loan is arranged to be made, must be alert to the circumstances surrounding the loan.

Thus, for example, if a broker or dealer is to deliver registered stocks to secure the loan or is to receive the proceeds of the loan, the broker arranging the loan and the bank making it would be put on notice that the loan would probably be subject to part 221 of this subchapter. In any such circumstances they could not in good faith accept or rely upon a statement to the contrary without obtaining a reliable and satisfactory explanation of the situation. The foregoing, of course, applies the principles contained in §221.101 of this subchapter.

(d) In addition, when a broker is approached by another broker to arrange extensions of credit for customers of the approaching broker, the broker approached has a responsibility not to arrange any extension of credit which the approaching broker could not himself arrange. Accordingly, in such cases the statutes and regulations forbid the approached broker to arrange extensions of credit on unregistered securities for the purpose of purchasing or carrying either registered or unregistered securities. The approaching broker would also be violating the applicable requirements if he initiated or otherwise participated in any such forbidden transactions.

(e) The expression of views, set forth in this section, to the effect that certain specific transactions are forbidden, of course, should not in any way be understood to indicate approval of any other transactions which are not mentioned.

[18 FR 5505, Sept. 15, 1953]

### §220.112 Arranging loan to purchase open-end investment company shares.

(a) The Board was recently asked whether a creditor subject to this part may arrange for a customer a loan from a bank subject to part 221 on unregistered, redeemable shares of an open-end investment company for the purpose of purchasing such shares.

(b) This matter was the subject of the Board's interpretation contained in §220.109 which stated, in substance, that a creditor subject to this part may not arrange for the extension or maintenance of credit on unregistered, redeemable shares of an open-end investment company in view of the provisions of section 7(c) of the Securities Exchange Act of 1934 and §220.7(a). The shares of most open-end investment companies, of course, are not registered on any national securities exchange.

(c) It was suggested, however, that the interpretation just referred to might now be inapplicable because of amendment to §221.3(b) and (c) of this subchapter, effective August 1, 1953. Under that amendment, loans by banks for the purpose of purchasing or carrying redeemable shares of open-end investment companies, whose assets customarily include registered securities, shall be deemed to be loans for the purpose of purchasing or carrying registered stocks. Therefore, any such loan, if secured directly or indirectly by any stock, is subject to part 221 of this subchapter although the shares of the company are not themselves registered shares.

(d) In announcing the amendment mentioned in paragraph (c) of this section, the Board in 18 FR 3409 stated, among other things, that such amendment "does not affect part 220." In addition, the Board's interpretation contained in §220.111 stated that a creditor subject to this part may not arrange extensions of credit on unregistered securities for the purpose of purchasing or carrying either registered or unregistered securities.

(e) Accordingly, the Board stated that its interpretation contained in §220.109, referred to in this section, is still effective, and that a creditor subject to this part may not arrange for a customer a bank loan on unregistered, redeemable shares of an open-end investment company for the purpose of purchasing or carrying such shares.

[20 FR 1642, Mar. 18, 1955]

### §220.113 Necessity for prompt payment and delivery in special cash accounts.

(a) The Board of Governors recently received an inquiry concerning whether purchases of securities by certain municipal employees' retirement or pension systems on the basis of arrangements for delayed delivery and payment, might properly be effected by a



150-041 O—94——2

creditor subject to this part in a special cash account under §220.4(c).

(b) It appears that in a typical case the supervisors of the retirement system meet only once or twice each month, at which times decisions are made to purchase any securities wished to be acquired for the system. Although the securities are available for prompt delivery by the broker-dealer firm selected to effect the system's purchase, it is arranged in advance with the firm that the system will not accept delivery and pay for the securities before some date more than seven business days after the date on which the securities are purchased. Apparently, such an arrangement is occasioned by the monthly or semimonthly meetings of the system's supervisors. It was indicated that a retirement system of this kind may be supervised by officials who administer it as an incidental part of their regular duties, and that meetings requiring joint action by two or more supervisors may be necessary under the system's rules and procedures to authorize issuance of checks in payment for the securities purchased. It was indicated also that the purchases do not involve exempted securities, securities of the kind covered by §220.4(c)(3), or any shipment of securities as described in §220.4(c).

(c) This part provides that a creditor subject thereto may not effect for a customer a purchase in a special cash account under §220.4(c) unless the use of the account meets the limitations of §220.4(a) and the purchase constitutes a "bona fide cash transaction" which complies with the eligibility requirements of §220.4(c)(1)(i). One such requirement is that the purchase be made "in reliance upon an agreement accepted by the creditor (broker-dealer) in good faith" that the customer will "promptly make full cash payment for the security, if funds sufficient for the purpose are not already in the account; and, subject to certain exceptions, §220.4(c)(2) provides that the creditor shall promptly cancel or liquidate the transaction if payment is not made by the customer within seven business days after the date of purchase. As indicated in the Board's interpretation at 1940 Federal Reserve Bulletin 1172, a necessary part of the customer's undertaking pursuant to §220.4(c)(1)(i) is that he "should have the necessary means of payment readily available when he purchases a security in the special cash account. He should expect to pay for it immediately or in any event within the period (of not more than a very few days) that is as long as is usually required to carry through the ordinary securities transaction."

(d) The arrangements for delayed delivery and payment in the case presented to the Board and outlined above clearly would be inconsistent with the requirement of §220.4(c)(1)(i) that the purchase be made in reliance upon an agreement accepted by the creditor in good faith that the customer will "promptly" make full cash payment for the security. Accordingly, the Board said that transactions of the kind in question would not qualify as a "bona fide cash transaction" and, therefore, could not properly be effected in a special cash account, unless a contrary conclusion would be justified by the exception in §220.4(c)(5).

(e) Section 220.4(c)(5) provides that if the creditor, "acting in good faith in accordance with" §220.4(c)(1), purchases a security for a customer "with the understanding that he is to deliver the security promptly to the customer, and the full cash payment is to be made promptly by the customer is to be made against such delivery", the creditor may at his option treat the transaction as one to which the period applicable under §220.4(c)(2) is not the seven days therein specified but 35 days after the date of such purchase. It will be observed that the application of §220.4 (c)(5) is specifically conditioned on the creditor acting in good faith in accordance with §220.4(c)(1). As noted above, the existence of the arrangements for delayed delivery and payment in the case presented would prevent this condition from being met, since the customer could not be regarded as having agreed to make full cash payment "promptly". Furthermore, such arrangements clearly would be inconsistent with the requirement of §220.4(c)(5) that the creditor "deliver the security promptly to the customer".

(f) Section 220.4(c)(5) was discussed in the Board's published interpretation, referred to above, which states that "it is not the purpose of (§220.4 (c)(5)) to allow additional time to customers for making payment. The 'prompt delivery' described in (§220.4 (c)(5)) is delivery which is to be made as soon as the broker or dealer can reasonably make it in view of the mechanics of the securities business and the bona fide usages of the trade. The provision merely recognizes the fact that in certain circumstances it is an established bona fide practice in the trade to obtain payment against delivery of the security to the customer, and the further fact that the mechanics of the trade, unrelated to the customer's readiness to pay, may sometimes delay such delivery to the customer".

(g) In the case presented, it appears that the only reason for the delay is related solely to the customer's readiness to pay and is in no way attributable to the mechanics of the securities business. Accordingly, it is the Board's view that the exception in §220.4(c)(5) should not be regarded as permitting the transactions in question to be effected in a special cash account.

[22 FR 5954, July 27, 1957]

**§220.114 Transactions in restricted accounts under amended withdrawal rules.**

(a) Amendments to part 220, effective June 15, 1959 (24 FR 3866), deal with withdrawals of collateral from a "restricted account", i.e., a general account in which the adjusted debit balance exceeds the maximum loan value of the securities. In that connection, an inquiry has been received regarding the application of the amended part to a purchase of unregistered nonexempted securities in such a "restricted account".

(b) Unregistered nonexempted securities have no loan value under the part, are not subject to the restrictions of the withdrawal rules, and are not referred to in those rules. Purchase of an unregistered security without a deposit of a sum equal to the cost would amount to a withdrawal of the cost of the security.

(c) This supersedes paragraph (c)(1) of §220.107 dealing with a similar question.

(d) Section 220.107 also dealt with two other points. One was the treatment of certain transactions as short sales. Paragraph (c)(2) of §220.107 was superseded by the June 15, 1959 amendment to paragraph (g) of §220.3. The other point was that the "good faith loan value" specified for an exempted security means the amount which the broker would customarily lend on the security, and that the figure cannot be arbitrarily reduced merely for the purpose of permitting a later substitution of registered securities for exempted securities. That principle continues to apply and is of increased significance under the amendments.

[24 FR 4697, June 10, 1959]

**§220.115 Short sales made prior to recent amendments, but covered subsequent thereto.**

(a) The Board of Governors of the Federal Reserve System has been requested to consider the following situation relative to §220.3(g) as amended June 15, 1959.

(b) Certain securities have been held "long" in a margin account, at least since early 1958. Subsequently, at various times in 1958 and on January 13, 1959, short sales of this same stock were executed in the account. The total shares involved in the short sales did not exceed the shares held in the "long" position. It is now desired to close out the short position by covering purchases.

(c) The applicable provision of §220.3(g) reads as follows:

For the purposes of this part (Regulation T), if a security has maximum loan value in the account under paragraph (c)(1) of this section, a sale of the same security (even though not the same certificate) in the account shall be deemed to be a long sale and shall not be deemed to be or treated as a short sale.

Under this provision, a short sale at the present time against a "long" position in the same security must be treated as a "long" sale. The subsequent covering transaction would therefore be treated as any other regular purchase and could not be executed as a covering purchase requiring no

further margin. However, where the short sale against the "long" position was executed prior to June 15, 1959, the effective date of the above noted amendment to § 220.3(g), the sale would not lose its character as a "short" sale. The covering transactions, even if effected after June 15, 1959, could be treated as such, and under the provisions of this part, could be completed without obtaining further margin.

(d) This interpretation is expressly limited to the facts here presented. Any variation or addition to the circumstances might well alter the result expressed herein.

(e) Attention is further directed to § 220.7(e) which provides that nothing in this part shall prevent an exchange or a creditor from "further restricting" or requiring "additional security" in the extension or maintenance of any credit.

[24 FR 7496, Sept. 17, 1959]

**§ 220.116 Simultaneous long and short positions in same margin account where short position is taken first.**

(a) The Board has been asked whether the last sentence of § 220.3(g) applies when a customer first sells a registered security short in an undermargined account, then subsequently purchases the same security, instructing the broker to maintain long and short positions in that security.

(b) The last sentence of § 220.3(g) prohibits the concurrent carrying of long and short positions in the same registered security for the purposes of this part, regardless of which position is taken first. This result follows because the word "sale" is equivalent where the sense of the regulation requires it, to "sale position". Accordingly, where a security is purchased "long" in a margin account, and there is an existing short position in the same security in the account, the two positions must be "netted out" for purposes of the regulation.

[26 FR 794, Jan. 26, 1961]

**§ 220.117 Exception to 90-day rule in special cash account.**

(a) The Board of Governors has recently interpreted certain of the provisions of § 220.4(c)(8), with respect to the withdrawal of proceeds of a sale of stock in a "special cash account" when the stock has been sold out of the account prior to payment for its purchase.

(b) The specific factual situation presented may be summarized as follows:

Customer purchased stock in a special cash account with a member firm on Day 1. On Day 3 customer sold the same stock at a profit. On Day 8 customer delivered his check for the cost of the purchase to the creditor (member firm). On Day 9 the creditor mailed to the customer a check for the proceeds of the sale.

(c) Section 220.4(c)(8) prohibits a creditor, as a general rule, from effecting a purchase of a security in a customer's special cash account if any security has been purchased in that account during the preceding 90 days and has then been sold in the account or delivered out to any broker or dealer without having been previously paid for in full by the customer. One exception to this general rule reads as follows:

* * * The creditor may disregard for the purposes of this subparagraph (§ 220.4(c) (8)) a sale without prior payment provided full cash payment is received within the period described by subparagraph (2) of this paragraph (seven days after the date of purchase) and the customer has not withdrawn the proceeds of sale on or before the day on which such payment (and also final payment of any check received in that connection) is received. * * *

(d) Final payment of customer's check: (1) The first question is: When is the creditor to be regarded as having received "final payment of any check received" in connection with the purchase?

(2) The clear purpose of § 220.4(c) (8) is to prevent the use of the proceeds of sale of a stock by a customer to pay for its purchase—i.e., to prevent him from trading on the creditor's funds by being able to deposit the sale proceeds prior to presentment of his own check to the drawee bank. Thus, when a customer undertakes to pay for a purchase by check, that check does not constitute payment for the purchase, within the language and intent of the above-quoted exception in § 220.4(c)(8), until it has been honored by the drawee bank,

indicating the sufficiency of his account to pay the check.

(3) The phrase "final payment of any check" is interpreted as above notwithstanding §220.6(f), which provides that:

> For the purposes of this part (Regulation T), a creditor may, at his option (1) treat the receipt in good faith of any check or draft drawn on a bank which in the ordinary course of business is payable on presentation, * * * as receipt of payment of the amount of such check, draft or order; * * *

This is a general provision substantially the same as language found in section 4(f) of Regulation T as originally promulgated in 1934. The language of the subject exception to the 90-day rule of §220.4(c)(8), i.e., the exception based expressly on final "payment of any check," was added to the regulation in 1949 by an amendment directed at a specific type of situation. Because the exception is a special, more recent provision, and because §220.6(f), if controlling, would permit the exception to undermine, to some extent, the effectiveness of the 90-day rule, sound principles of construction require that the phrase "final payment of any check" be given its literal and intended effect.

(4) There is no fixed period of time from the moment of receipt by the payee, or of deposit, within which it is certain that any check will be paid by the drawee bank. Therefore, in the rare case where the operation of the subject exception to §220.4(c)(8) is necessary to avoid application of the 90-day rule, a creditor should ascertain (from his bank of deposit or otherwise) the fact of payment of a customer's check given for the purchase. Having so determined the day of final payment, the creditor can permit withdrawal on any subsequent day.

(e) Mailing as "withdrawal": (1) Also presented is the question whether the mailing to the customer of the creditor's check for the sale proceeds constitutes a withdrawal of such proceeds by the customer at the time of mailing so that, if the check for the sale proceeds is mailed on or before the day on which the customer's check for the purchase is finally paid, the 90-day rule applies. It may be that a check mailed one day will not ordinarily be received by the customer until the next. The Board is of the view, however, that when the check for sale proceeds is issued and released into the mails, the proceeds are to be regarded as withdrawn by the customer; a more liberal interpretation would open a way for circumvention. Accordingly, the creditor's check should not be mailed nor the sale proceeds otherwise released to the customer "on or before the day" on which payment for the purchase, including final payment of any check given for such payment, is received by the creditor, as determined in accordance with the principles stated herein.

(2) Applying the above principles to the schedule of transactions described in the second paragraph of this interpretation, the mailing of the creditor's check on "Day 9" would be consistent with the subject exception to §220.4(c)(8), as interpreted herein, only if the customer's check was paid by the drawee bank on "Day 8".

[27 FR 3511, Apr. 12, 1962]

## §220.118 Time of payment for mutual fund shares purchased in a special cash account.

(a) The Board has recently considered the question whether, in connection with the purchase of mutual fund shares in a "special cash account" under the provisions of this part 220, the 7-day period with respect to liquidation for nonpayment is that described in §220.4(c)(2) or that described in §220.4(c)(3).

(b) Section 220.4(c)(2) provides as follows:

> In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security within 7 days after the date on which the security is so purchased, the creditor shall, except as provided in subparagraphs (3)–(7) of this paragraph, promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof.

Section 220.4(c)(3), one of the exceptions referred to, provides in relevant part as follows:

> If the security when so purchased is an unissued security, the period applicable to the transaction under subparagraph (2) of this paragraph shall be 7 days after the date on which the security is made available by the issuer for delivery to purchasers.

(c) In the case presented, the shares of the mutual fund (open-end investment company) are technically not issued at the time they are sold by the underwriter and distributor. Several days may elapse from the date of sale before a certificate can be delivered by the transfer agent. The specific inquiry to the Board was, in effect, whether the 7-day period after which a purchase transaction must be liquidated or cancelled for nonpayment should run, in the case of mutual fund shares, from the time when a certificate for the purchased shares is available for delivery to the purchaser, instead of from the date of the purchase.

(d) Under the general rule of §220.4 (c)(2) that is applicable to purchases of outstanding securities, the 7-day period runs from the date of purchase without regard to the time required for the mechanical acts of transfer of ownership and delivery of a certificate. This rule is based on the principles governing the use of special cash accounts in accordance with which, in the absence of special circumstances, payment is to be made promptly upon the purchase of securities.

(e) The purpose of §220.4(c)(3) is to recognize the fact that, when an issue of securities is to be issued at some fixed future date, a security that is a part of such issue can be purchased on a "when-issued" basis and that payment may reasonably be delayed until after such date of issue, subject to other basic conditions for transactions in a special cash account. Thus, unissued securities should be regarded as "made available for delivery to purchasers" on the date when they are substantially as available as outstanding securities are available upon purchase, and this would ordinarily be the designated date of issuance or, in the case of a stock dividend, the "payment date". In any case, the time required for the mechanics of transfer and delivery of a certificate is not material under §220.4(c)(3) any more than it is under §220.4(c)(2).

(f) Mutual fund shares are essentially available upon purchase to the same extent as outstanding securities. The mechanics of their issuance and of the delivery of certificates are not significantly different from the mechanics of transfer and delivery of certificates for shares of outstanding securities, and the issuance of mutual fund shares is not a future event in a sense that would warrant the extension of the time for payment beyond that afforded in the case of outstanding securities. Consequently, the Board has concluded that a purchase of mutual fund shares is not a purchase of an "unissued security" to which §220.4(c)(3) applies, but is a transaction to which §220.4(c)(2) applies.

[27 FR 10885, Nov. 8, 1962]

### §220.119 Applicability of margin requirements to credit extended to corporation in connection with retirement of stock.

(a) The Board of Governors has been asked whether part 220 was violated when a dealer in securities transferred to a corporation 4,161 shares of the stock of such corporation for a consideration of $33,288, of which only 10 percent was paid in cash.

(b) If the transaction was of a kind that must be included in the corporation's "general account" with the dealer (§220.3), it would involve an excessive extension of credit in violation of §220.3 (b)(1). However, the transaction would be permissible if the transaction came within the scope of §220.4(f)(8), which permits a "creditor" (such as the dealer) to "Extend and maintain credit to or for any customer without collateral or on any collateral whatever for any purpose other than purchasing or carrying or trading in securities." Accordingly, the crucial question is whether the corporation, in this transaction, was "purchasing" the 4,161 shares of its stock, within the meaning of that term as used in this part.

(c) Upon first examination, it might seem apparent that the transaction was a purchase by the corporation. From the viewpoint of the dealer the transaction was a sale, and ordinarily, at least a sale by one party connotes a purchase by the other. Furthermore, other indicia of a sale/purchase transaction were present, such as a transfer of property for a pecuniary consideration. However, when the underlying objectives of the margin regulations are considered, it appears that they do not encompass a transaction of this na-

ture, where securities are transferred on credit to the issuer thereof for the purpose of retirement.

(d) Section 7(a) of the Securities Exchange Act of 1934 requires the Board of Governors to prescribe margin regulations "For the purpose of preventing the excessive use of credit for the purchase or carrying of securities." Accordingly, the provisions of this part are not intended to prevent the use of credit where the transaction will not have the effect of increasing the volume of credit in the securities markets.

(e) It appears that the instant transaction would have no such effect. When the transaction was completed, the equity interest of the dealer was transmuted into a dollar-obligation interest; in lieu of its status as a stockholder of the corporation, the dealer became a creditor of that corporation. The corporation did not become the owner of any securities acquired through the use of credit; its outstanding stock was simply reduced by 4,161 shares.

(f) The meaning of "sale" and "purchase" in the Securities Exchange Act has been considered by the Federal courts in a series of decisions dealing with corporate "insiders" profits under section 16(b) of that Act. Although the statutory purpose sought to be effectuated in those cases is quite different from the purpose of the margin regulations, the decisions in question support the propriety of not regarding a transaction as a "purchase" where this accords with the probable legislative intent, even though, literally, the statutory definition seems to include the particular transaction. See Roberts v. Eaton (CA 2 1954) 212 F. 2d 82, and cases and other authorities there cited. The governing principle, of course, is to effectuate the purpose embodied in the statutory or regulatory provision being interpreted, even where that purpose may conflict with the literal words. U.S. v. Amer. Trucking Ass'ns, 310 U.S. 534, 543 (1940); 2 Sutherland, Statutory Construction (3d ed. 1943) ch. 45.

(g) There can be little doubt that an extension of credit to a corporation to enable it to retire debt securities would not be for the purpose of "purchasing * * * securities" and therefore would come within §220.4(f)(8), regardless of whether the retirement was obligatory (e.g., at maturity) or was a voluntary "call" by the issuer. This is true, it is difficult to see any valid distinction, for this purpose, between (1) voluntary retirement of an indebtedness security and (2) voluntary retirement of an equity security.

(h) For the reasons indicated above, it is the opinion of the Board of Governors that the extension of credit here involved is not of the kind which the margin requirements are intended to regulate and that the transaction described does not involve an unlawful extension of credit as far as this part is concerned.

(i) The foregoing interpretation relates, of course, only to cases of the type described. It should not be regarded as governing any other situations; for example, the interpretation does not deal with cases where securities are being transferred to someone other than the issuer, or to the issuer for a purpose other than immediate retirement. Whether the margin requirements are inapplicable to any such situations would depend upon the relevant facts of actual cases presented.

[27 FR 12346, Dec. 13, 1962]

### §220.120 Loan value of securities used to make required deposit.

(a) The Board of Governors of the Federal Reserve System has received a number of inquiries resulting from the upward change in the level of margin requirements that became effective November 6, 1963, as to what loan value applies to securities used to make the deposit required by paragraph (b)(1) of §220.3 with respect to transactions in general accounts which occur before an increase in margin requirements, if such deposit is made after the higher margin requirements become effective.

(b) In the case of such deposits, the loan value (on the occasion of that deposit only) is that which was in effect when the transaction in question was executed on the floor of the exchange. Thus, where the customer's order was executed before the recent increase from 50 percent of 70 percent margin became effective, he would still make his deposit at the lower margin, even though the securities used to satisfy

the deposit requirement were not delivered to his broker until after the new margin requirements came into force.

[28 FR 12311, Nov. 21, 1963]

**§ 220.121 Applicability of margin requirements to joint account between two creditors.**

(a) The Board has recently been asked whether extensions of credit in a joint account between two brokerage firms, a member of a national securities exchange ("Firm X") and a member of the National Association of Securities Dealers ("Firm Y") are subject to the margin requirements of this part (Regulation T). It is understood that similar joint accounts are not uncommon, and it appears that the margin requirements of the regulation are not consistently applied to extensions of credit in the accounts.

(b) When the account in question was opened, Firm Y deposited $5,000 with Firm X and has made no further deposit in the account, except for the monthly settlement described below. Both firms have the privilege of buying and selling specified securities in the account, but it appears that Firm X initiates most of the transactions therein. Trading volume may run from half a million to a million dollars a month. Firm X carries the "official" ledger of the account and sends Firm Y a monthly statement with a complete record of all transactions effected during the month. Settlement is then made in accordance with the agreement between the two firms, which provides that profits and losses shall be shared equally on a fifty-fifty basis. However, all transactions are confirmed and reconfirmed between the two on a daily basis.

(c) Section 220.3(a) provides that

> All financial relations between a creditor and a customer, whether recorded in one record or in more than one record, shall be included in and be deemed to be part of the customer's general account with the creditor, * * *.

and § 220.2(c) defines the term "customer" to include

> * * * any person, or any group of persons acting jointly, * * * to or for whom a creditor is extending or maintaining any credit * * *

In the course of a normal month's operations, both Firm X and Firm Y are at one time or another extending credit to the joint account, since both make purchases for the account that are not "settled" until the month's end. Consequently, the account would be a "customer" within the above definition.

(d) Section 220.6(b) provides, with respect to the account of a joint adventure in which a creditor participates, that

> * * * the adjusted debit balance of the account shall include, in addition to the items specified in § 220.3(d), any amount by which the creditor's contribution to the joint adventure exceeds the contribution which he would have made if he had contributed merely in proportion to his right to share in the profits of the joint adventure.

In addition, the final paragraph of § 220.2(c) states that the definition of "customer"

> * * * includes any joint adventure in which a creditor participates and which would be considered a customer of the creditor if the creditor were not a participant.

(e) The above provisions clearly evince the Board's intent that the regulation shall cover trading accounts in which a creditor participates. If additional confirmation were needed, it is supplied by the fact that the Board found it needful specifically to exempt from ordinary margin requirements credit extended to certain joint accounts in which a creditor participates. These include the account in which transactions of odd-lot dealers may be financed under § 220.4(f) (4), and the specialist's account under § 220.4(g). Accordingly, the Board concluded that the joint account between Firm X and Firm Y is a "customer" within the meaning of the regulation, and that extensions of credit in the account are subject to margin requirements.

[31 FR 7169, May 17, 1966]

**§ 220.122 "Deep in the money put and call options" as extensions of credit.**

(a) The Board of Governors has been asked to determine whether the business of selling instruments described as "deep in the money put and call options" would involve an extension of credit for the purposes of the Board's

regulations governing margin requirements for securities transactions. Most of such options would be of the "call" type, such as the following proposal that was presented to the Board for its consideration:

> If X stock is selling at $100 per share, the customer would pay about $3,250 for a contract to purchase 100 shares of X at $70 per share within a 30-day period. The contract would be guaranteed by an exchange member, as are standard "puts" and "calls". When the contract is made with the customer, the seller, who will also be the writer of the contract, will immediately purchase 100 shares of X at $100 per share through the guarantor member firm in a margin account. If the customer exercises the option, the shares will be delivered to him; if the option is not exercised, the writer will sell the shares in the margin account to close out the transaction. As a practical matter, it is anticipated that the customer will exercise the option in almost every case.

(b) An ordinary "put" is an option given to a person to sell to the writer of the put a specified amount of securities at a stated price within a certain time. A "call" is an option given to a person to buy from the writer a specified amount of securities at a stated price within a certain time. To be freely saleable, options must be indorsed, or guaranteed, by a member firm of the exchange on which the security is registered. The guarantor charges a fee for this service.

(c) The option embodied in the normal put or call is exercisable either at the market price of the security at the time the option is written, or some "points away" from the market. The price of a normal option is modest by comparison with the margin required to take a position. Writers of normal options are persons who are satisfied with the current price of a security, and are prepared to purchase or sell at that price, with the small profit provided by the fee. Moreover, since a large proportion of all options are never exercised, a person who customarily writes normal options can anticipate that the fee would be clear profit in many cases, and he will not be obligated to buy or sell the stock in question.

(d) The stock exchanges require that the writer of an option deposit and maintain in his margin account with the indorser 30 percent of the current market price in the case of a call (unless he has a long position in the stock) and 25 percent in the case of a put (unless he has a short position in the stock). Many indorsing firms in fact require larger deposits. Under § 220.3(a) of Regulation T, all financial relations between a broker and his customer must be included in the customer's general account, unless specifically eligible for one of the special accounts authorized by § 220.4. Accordingly, the writer, as a customer of the member firm, must make a deposit, which is included in his general account.

(e) In order to prevent the deposit from being available against other margin purchases, and in effect counted twice, § 220.3(d)(5) requires that in computing the customer's adjusted debit balance, there shall be included "the amount of any margin customarily required by the creditor in connection with his endorsement or guarantee of any put, call, or other option". No other margin deposit is required in connection with a normal put or call option under Regulation T.

(f) Turning to the "deep in the money" proposed option contract described above, the price paid by the buyer can be divided into (1) a deposit of 30 percent of the current market value of the stock, and (2) an additional fixed charge, or fee. To the extent that the price of the stock rose during the 30 ensuing days the proposed instrument would produce results similar to those in the case of an ordinary profitable call, and the contract right would be exercised. But even if the price fell, unlike the situation with a normal option, the buyer would still be virtually certain to exercise his right to purchase before it expired, in order to minimize his loss. The result would be that the buyer would not have a genuine choice whether or not to buy. Rather, the instrument would have made it possible for him, in effect, to purchase stock as of the time the contract was written by depositing 30 percent of the stock's current market price.

(g) It was suggested that the proposed contract is not unusual, since there are examples of ordinary options selling at up to 28 percent of current

market value. However, such examples are of options running for 12 months, and reflect expectations of changes in the price of the stock over that period. The 30-day contracts discussed above are not comparable to such 12-month options, because instances of true expectations of price changes of this magnitude over a 30-day period would be exceedingly rare. And a contract that does not reflect such true expectations of price change, plus a reasonable fee for the services of the writer, is not an option in the accepted meaning of the term.

(h) Because of the virtual certainty that the contract right would be exercised under the proposal described above, the writer would buy the stock in a margin account with an indorsing firm immediately on writing the contract. The indorsing firm would extend credit in the amount of 20 percent of the current market price of the stock, the maximum permitted by the current § 220.8 (supplement to Regulation T). The writer would deposit the 30 percent supplied by the buyer, and furnish the remaining 50 percent out of his own working capital. His account with the indorsing firm would thus be appropriately margined.

(i) As to the buyer, however, the writer would function as a broker. In effect, he would purchase the stock for the account, or use, of the buyer, on what might be described as a deferred payment arrangement. Like an ordinary broker, the writer of the contract described above would put up funds to pay for the difference between the price of securities the customer wished to purchase and the customer's own contribution. His only risk would be that the price of the securities would decline in excess of the customer's contribution. True, he would be locked in, and could not liquidate the customer's collateral for 30 days even if the market price should fall in excess of 30 percent, but the risk of such a decline is extremely slight.

(j) Like any other broker who extends credit in a margin account, the writer who was in the business of writing and selling such a contract would be satisfied with a fixed predetermined amount of return on his venture, since he would realize only the fee charged. Unlike a writer of ordinary puts and calls, he would not receive a substantial part of his income from fees on unexercised contract rights. The similarity of his activities to those of a broker, and the dissimilarity to a writer of ordinary options, would be underscored by the fact that his fee would be a fixed predetermined amount of return similar to an interest charge, rather than a fee arrived at individually for each transaction according to the volatility of the stock and other individual considerations.

(k) The buyer's general account with the writer would in effect reflect a debit for the purchase price of the stock and, on the credit side, a deposit of cash in the amount of 30 percent of that price, plus an extension of credit for the remaining 70 percent, rather than the maximum permissible 20 percent.

(l) For the reasons stated above, the Board concluded that the proposed contracts would involve extensions of credit by the writer as broker in an amount exceeding that permitted by the current supplement to Regulation T. Accordingly, the writing of such contracts by a brokerage firm is presently prohibited by such regulation, and any brokerage firm that endorses such a contract would be arranging for credit in an amount greater than the firm itself could extend, a practice that is prohibited by § 220.7(a).

[35 FR 3280, Feb. 21, 1970]

### § 220.123 Partial delayed issue contracts covering nonconvertible bonds.

(a) During recent years, it has become customary for portions of new issues of nonconvertible bonds and preferred stocks to be sold subject to partial delayed issue contracts, which have customarily been referred to in the industry as "delayed delivery" contracts, and the Board of Governors has been asked for its views as to whether such transactions involve any violations of the Board's margin regulations.

(b) The practice of issuing a portion of a debt (or equivalent) security issue at a date subsequent to the main underwriting has arisen where market conditions made it difficult or impos-

sible, in a number of instances, to place an entire issue simultaneously. In instances of this kind, institutional investors (e.g., insurance companies or pension funds) whose cash flow is such that they expect to have funds available some months in the future, have been willing to subscribe to a portion, to be issued to them at a future date. The issuer has been willing to agree to issue the securities in two or more stages because it did not immediately need the proceeds to be realized from the deferred portion, because it could not raise funds on better terms, or because it preferred to have a certain portion of the issue taken down by an investor of this type.

(c) In the case of such a delayed issue contract, the underwriter is authorized to solicit from institutional customers offers to purchase from the issuer, pursuant to contracts of the kind described above, and the agreement becomes binding at the underwriters' closing, subject to specified conditions. When securities are issued pursuant to the agreement, the purchase price includes accrued interest or dividends, and until they are issued to it, the purchaser does not, in the case of bonds, have rights under the trust indenture, or, in the case of preferred stocks, voting rights.

(d) Securities sold pursuant to such arrangements are high quality debt issues (or their equivalent). The purchasers buy with a view to investment and do not resell or otherwise dispose of the contract prior to its completion. Delayed issue arrangements are not acceptable to issuers unless a substantial portion of an issue, not less than 10 percent, is involved.

(e) Sections 3(a) (13) and (14) of the Securities Exchange Act of 1934 provide that an agreement to purchase is equivalent to a purchase, and an agreement to sell to a sale. The Board has hitherto expressed the view that credit is extended at the time when there is a firm agreement to extend such credit (1968 Federal Reserve Bulletin 328; 12 CFR 207.101; ¶ 6800 Published Interpretations of the Board of Governors). Accordingly, in instances of the kind described above, the issuer may be regarded as extending credit to the institutional purchaser at the time of the underwriters' closing, when the obligations of both become fixed.

(f) Section 220.7(a) of the Board's Regulation T (12 CFR 220.7(a)), with an exception not applicable here, forbids a creditor subject to that regulation to arrange for credit on terms on which the creditor could not itself extend the credit. Sections 220.4(c) (1) and (2) (12 CFR 220.4(c) (1) and (2)) provide that a creditor may not sell securities to a customer except in good faith reliance upon an agreement that the customer will promptly, and in no event in more than 7 full business days, make full cash payment for the securities. Since the underwriters in question are creditors subject to the regulation, unless some specific exception applies, they are forbidden to arrange for the credit described above. This result follows because payment is not made until more than 7 full business days have passed from the time the credit is extended.

(g) However, §220.4(c)(3) provides that:

> If the security when so purchased is an unissued security, the period applicable to the transaction under subparagraph (2) of this paragraph shall be 7 days after the date on which the security is made available by the issuer for delivery to purchasers.

(h) In interpreting §220.4(c)(3), the Board has stated that the purpose of the provision:

> * * * is to recognize the fact that, when an issue of securities is to be issued at some future fixed date, a security that is part of such issue can be purchased on a "when-issued" basis and that payment may reasonably be delayed until after such date of issue, subject to other basic conditions for transactions in a special cash account. (1962 Federal Reserve Bulletin 1427; 12 CFR 220.118; ¶5996, Published Interpretations of the Board of Governors.)

In that situation, the Board distinguished the case of mutual fund shares, which technically are not issued until the certificate can be delivered by the transfer agent. The Board held that mutual fund shares must be regarded as issued at the time of purchase because they are:

> * * * essentially available upon purchase to the same extent as outstanding securities. The mechanics of their issuance and of the delivery of certificates are not significantly different from the mechanics of transfer and

delivery of certificates for shares of outstanding securities, and the issuance of mutual fund shares is not a future event in the sense that would warrant the extension of the time for payment beyond that afforded in the case of outstanding securities. (ibid.)

The issuance of debt securities subject to delayed issue contracts, by contrast with that of mutual fund shares, which are in a status of continual underwriting, is a specific single event taking place at a future date fixed by the issuer with a view to its need for funds and the availability of those funds under current market conditions.

(i) For the reasons stated above the Board concluded that the nonconvertible debt and preferred stock subject to delayed issue contracts of the kind described above should not be regarded as having been issued until delivered, pursuant to the agreement, to the institutional purchaser. This interpretation does not apply, of course, to fact situations different from that described in this section.

[36 FR 2777, Feb. 10, 1971]

### § 220.124 Installment sale of tax-shelter programs as "arranging" for credit.

(a) The Board has been asked whether the sale by brokers and dealers of tax-shelter programs containing a provision that payment for the program may be made in installments would constitute "arranging" for credit in violation of this part 220. For the purposes of this interpretation, the term "tax-shelter program" means a program which is required to be registered pursuant to section 5 of the Securities Act of 1933 (15 U.S.C. section 77e), in which tax benefits, such as the ability to deduct substantial amounts of depreciation or oil exploration expenses, are made available to a person investing in the program. The programs may take various legal forms and can relate to a variety of industries including, but not limited to, oil and gas exploration programs, real estate syndications (except real estate investment trusts), citrus grove developments and cattle programs.

(b) The most common type of tax-shelter program takes the form of a limited partnership. In the case of the programs under consideration, the investor would commit himself to purchase and the partnership would commit itself to sell the interests. The investor would be entitled to the benefits, and become subject to the risks of ownership at the time the contract is made, although the full purchase price is not then required to be paid. The balance of the purchase price after the downpayment usually is payable in installments which range from 1 to 10 years depending on the program. Thus, the partnership would be extending credit to the purchaser until the time when the latter's contractual obligation has been fulfilled and the final payment made.

(c) With an exception not applicable here, § 220.7(a) of Regulation T provides that:

> A creditor [broker or dealer] may arrange for the extension or maintenance of credit to or for any customer of such creditor by any person upon the same terms and conditions as those upon which the creditor, under the provisions of this part, may himself extend or maintain such credit to such customer, but only such terms and conditions * * *

(d) In the case of credit for the purpose of purchasing or carrying securities (purpose credit), § 220.8 of the regulation (the Supplement to Regulation T) does not permit any loan value to be given securities that are not registered on a national securities exchange, included on the Board's OTC Margin List, or exempted by statute from the regulation.

(e) The courts have consistently held investment programs such as those described above to be "securities" for purpose of both the Securities Act of 1933 and the Securities Exchange Act of 1934. The courts have also held that the two statutes are to be construed together. Tax-shelter programs, accordingly, are securities for purposes of Regulation T. They also are not registered on a national securities exchange, included on the Board's OTC Margin List, or exempted by statute from the regulation.

(f) Accordingly, the Board concludes that the sale by a broker/dealer of tax-shelter programs containing a provision that payment for the program may be made in installments would constitute "arranging" for the exten-

sion of credit to purchase or carry securities in violation of the prohibitions of §§ 220.7(a) and 220.8 of Regulation T.

[37 FR 6568, Mar. 31, 1972]

### § 220.125 Extending, maintaining or arranging credit on mutual fund shares having portfolio of exempted securities.

(a) The Board of Governors has been asked whether a broker or dealer may extend, maintain, or arrange for credit in a special bond account subject to § 220.4 (i) on collateral consisting of shares of registered open-end investment companies whose portfolios are made up entirely or in part of exempted securities.

(b) The term "exempted securities" is defined in section 3(a)(12) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(12)) and generally includes federal, state, and municipal securities. Such securities are eligible as collateral for extensions of credit in § 220.4(i) and are entitled to good faith loan value in an account carried pursuant to that section, under § 220.8(b).

(c) This Part 220 (Regulation T) provides that brokers and dealers may not extend, maintain, or arrange for credit to purchase any securities unless the collateral for such credit consists of exempted securities or securities that are registered on a national securities exchange or appear on the Board's OTC Margin List. Shares in registered open-end investment companies are not "exempted" securities, irrespective of the composition of the portfolio of the company, nor are they registered on national securities exchanges, or included on the OTC Margin List. Accordingly, such shares do not have loan value for purposes of this part 220, nor may brokers or dealers extend credit against such shares to purchase or carry any securities under § 220.4(i).

(d) The above-stated opinion is in conformity with the Board's views expressed previously in its interpretations announced in 1952 Bulletin 1105 (§ 220.109) and 1955 Bulletin 267 (§ 220.112) to the effect that brokers or dealers are prohibited from arranging credit to purchase unlisted shares issued by open-end investment companies.

[37 FR 6831, Apr. 5, 1972]

### § 220.126 Put and call options.

(a) The Board has been asked several questions about the treatment of put and call options and combinations thereof (puts and calls) under Regulation T (Part 220). These questions involve § 220.3(d) Adjusted debit balance, § 220.3(h) Unissued securities, § 220.4(c) Special cash account and § 220.4(d) Special arbitrage account.

(b) The special cash account under § 220.4(c) may be used only for those bona fide transactions in securities in which the creditor accepts in good faith the customer's agreement, if he is a purchaser, that (if he does not already have sufficient funds in the account) he will promptly make full cash payment for the security and does not contemplate selling it prior to making such payment, and if he is a seller, that he or his principal owns the security and (if it is not already held in the account) it will be promptly deposited therein. It is the Board's view that subject to these requirements, a creditor may effect in a special cash account—

(1) The purchase or sale for cash of a put or call;

(2) The exercise of a call, provided that full cash payment for the purchased stock is deposited in the account promptly and in any event prior to the release of the proceeds of any resale of such security; and

(3) The endorsement, guarantee or issuance of a put or call if (in the case of a put) sufficient funds to purchase the underlying stock or (in the case of a call) the underlying stock itself are held in the account.

(c) Generally a put or call option refers to an agreement to sell a security or to purchase a security, at some future time. Although the agreement may itself be deemed to be a security, it cannot be an "unissued" security, under § 220.3(h) or § 220.4(c)(3), for the reasons set forth by the Board in discussing a similar question in regard to mutual fund shares (1962 Bulletin 1427; 12 CFR 220.118). Accordingly, in respect of a transaction involving puts or calls, payment is required within the period of time provided by § 220.3(b)(1) if the transaction occurs in the general account (or if the transaction occurs in a special cash account, by § 220.4(c)(2)) without regard to whether there has

been a delay in obtaining the endorsement, or for any other reason the option has not yet technically been issued.

(d) A question has been asked whether puts and calls may be considered to be securities which are exchangeable or convertible into other securities within 90 calendar days, without restriction other than the payment of money. If held in a general account, such exchangeable or convertible securities are acceptable in lieu of the margin required in respect of a short sale under § 220.3(d)(3). If held in a special arbitrage account under § 220.4 (d), exchangeable or convertible securities will support the sale, for purposes of bona fide arbitrage, of the security into which they are so exchangeable or convertible. The Board concludes that puts and calls may not be considered, for either purpose, as securities that are exchangeable or convertible into other securities. The Board's view stems from the policies underlying the sections in question.

(e) The margin restrictions in respect of short sales were imposed in order that:

> * * * traders on the short side of the market should not be in a position, with a given amount of funds, to exert a greater influence on the market than they could with the same amount of funds if they were trading on the long side. (Annual Report, Board of Governors, 1937, p. 208.)

Permitting call options to be used in lieu of the margin required in respect of a short sale would be inconsistent with that general policy (parallel considerations would apply in the case of puts).

(f) The use of the special arbitrage account under § 220.4(d) is limited to the simultaneous purchase and sale of the same or equivalent securities for the purpose of taking advantage of a difference in price. Arbitrage is permitted to be carried on without additional deposit of margin because it tends to equalize prices between markets and between equivalent securities. Because the relatively high initial cost of a put or call option must be deducted from the potential profit due to the disparity in price between the two securities, it is not likely that true arbitrage would take place between an option and an underlying security. Such options would be used, rather, for purposes of "hedging," that is to say, to protect an investor against loss while he holds a security in the hope of profiting by changes in its price. Such market strategies may be beneficial to individual investors. However, they do not perform a comparable market function.

(g) Section 221.2 of this chapter provides that "a bank may extend and may maintain any credit for the purpose specified in § 221.1, without regard to the limitations prescribed therein, or in § 221.3(t), if the credit comes within any of the following descriptions." Paragraph (j) contains the following description: "Any credit extended to a member of a national securities exchange for the purpose of financing his or his customers' bona fide arbitrage transactions in securities." The Board has concluded that a purchase of a put or call is not embraced within the term in § 220.4(d) "a purchase of a security which is, without restriction other than the payment of money exchangeable or convertible * * * into a second security" so as to qualify such purchase, when effected together with an offsetting sale of the second security, as a bona fide arbitrage transaction, and the Board's conclusion is also applicable to paragraph (j) of § 221.2.

[38 FR 5237, Feb. 27, 1973]

**§ 220.127 Independent broker/dealers arranging credit in connection with the sale of insurance premium funding programs.**

(a) The Board's September 5, 1972, clarifying amendment to § 220.4(k) set forth that creditors who arrange credit for the acquisition of mutual fund shares and insurance are also permitted to sell mutual fund shares without insurance under the provisions of the special cash account. It should be understood, of course, that such account provides a relatively short credit period of up to 7 business days even with so-called cash transactions. This amendment was in accordance with the Board's understanding in 1969, when the insurance premium funding provisions were adopted in § 220.4(k), that firms engaged in a general securities business would not also be engaged in

the sale and arranging of credit in connection with such insurance premium funding programs.

(b) The 1972 amendment eliminated from §220.4(k) the requirement that, to be eligible for the provisions of the section, a creditor had to be the issuer, or a subsidiary or affiliate of the issuer, of programs which combine the acquisition of both mutual fund shares and insurance. Thus the amendment permits an independent broker/dealer to sell such a program and to arrange for financing in that connection. In reaching such decision, the Board again relied upon the earlier understanding that independent broker/dealers who would sell such programs would not be engaged in transacting a general securities business.

(c) In response to a specific view recently expressed, the Board agrees that under Regulation T:

> * * * a broker/dealer dealing in special insurance premium funding products can only extend credit in connection with such products or in connection with the sale of shares of registered investment companies under the cash accounts * * * (and) cannot engage in the general securities business or sell any securities other than shares * * * (in) registered investment companies through a cash account or any other manner involving the extension of credit.

(d) There is a way, of course, as has been indicated, that an independent broker/dealer might be able to sell other than shares of registered investment companies without creating any conflict with the regulation. Such sales could be executed on a "funds on hand" basis and in the case of payment by check, would have to include the collection of such check. It is understood from industry sources, however, that few if any independent broker/dealers engage solely in a "fund on hand" type of operation.

[38 FR 11066, May 4, 1973]

**§220.128 Treatment of simultaneous long and short positions in the same margin account when put or call options or combinations thereof on such stock are also outstanding in the account.**

(a) The Board was recently asked whether under Regulation T, "Credit by Brokers and Dealers" (12 CFR part 220), if there are simultaneous long and short positions in the same security in the same margin account (often referred to as a short sale "against the box"), such positions may be used to supply the place of the deposit of margin ordinarily required in connection with the guarantee by a creditor of a put or call option or combination thereof on such stock.

(b) The applicable provisions of regulation T are §220.3(d)(3) and (5) and §220.3(g)(4) and (5) which provide as follows:

> (d) * * * the adjusted debit balance of a general account * * * shall be calculated by taking the sum of the following items:
>
> * * * * *
>
> (3) The current market value of any securities (other than unissued securities) sold short in the general account plus, for each security (other than an exempted security), such amount as the board shall prescribe from time to time in §220.8(d) (the supplement to regulation T) as the margin required for such short sales, except that such amount so prescribed in such §220.8(d) need not be included when there are held in the general account * * * the same securities or securities exchangeable or convertible within 90 calendar days, without restriction other than the payment of money, into such securities sold short;
>
> * * * * *
>
> (5) The amount of any margin customarily required by the creditor in connection with his endorsement or guarantee of any put, call, or other option;
>
> * * * * *
>
> (g) * * * (4) Any transaction which serves to meet the requirements of paragraph (e) of this section or otherwise serves to permit any offsetting transaction in an account shall, to that extent, be unavailable to permit any other transaction in such account.
>
> (5) For the purposes of this part (regulation T), if a security has maximum loan value under paragraph (c)(1) of this section in a general account, or under §220.4(j) in a special convertible debt security account, a sale of the same security (even though not the same certificate) in such account shall be deemed to be a long sale and shall not be deemed to be or treated as a short sale.

(c) Rule 431 of the New York Stock Exchange requires that a creditor obtain a minimum deposit of 25 percent

of the current market value of the optioned stock in connection with his issuance or guarantee of a put, and at least 30 percent in the case of a call (and that such position be "marked to the market"), but permits a short position in the stock to serve in lieu of the required deposit in the case of a put and a long position to serve in the case of a call. Thus, where the appropriate position is held in an account, that position may serve as the margin required by § 220.3(d)(5).

(d) In a short sale "against the box," however, the customer is both long and short the same security. He may have established either position, properly margined, prior to taking the other, or he may have deposited fully paid securities in his margin account on the same day he makes a short sale of such securities. In either case, he will have directed his broker to borrow securities elsewhere in order to make delivery on the short sale rather than using his long position for this purpose (see also 17 CFR 240.3b–3).

(e) Generally speaking, a customer makes a short sale "against the box" for tax reasons. Regulation T, however, provides in § 220.3(g) that the two positions must be "netted out" for the purposes of the calculations required by the regulation. Thus, the board concludes that neither position would be available to serve as the deposit of margin required in connection with the endorsement by the creditor of an option.

(f) A similar conclusion obtains under § 220.3(d)(3). That section provides, in essence, that the margin otherwise required in connection with a short sale need not be included in the account if the customer has in the account a long position in the same security. In § 220.3(g) (4), however, it is provided that "[A]ny transaction which * * * serves to permit any offsetting transaction in an account shall, to that extent, be unavailable to permit any other transaction in such account." Thus, if a customer has, for example, a long position in a security and that long position has been used to supply the margin required in connection with a short sale of the same security, then the long position is unavailable to serve as the margin required in connection with the creditor's endorsement o a call option on such security.

(g) A situation was also described i which a customer has purported to es tablish simultaneous offsetting lon and short positions by executing "cross" or wash sale of the security o the same day. In this situation, n change in the beneficial ownership o stock has taken place. Since there i no actual "*contra*" party to eithe transaction, and no stock has been bor rowed or delivered to accomplish th short sale, such fictitious position would have no value for purposes of th Board's margin regulations. Indeed, th adoption of such a scheme in connec tion with an overall strategy involvin the issuance, endorsement, or guaran tee of put or call options or combina tions thereof appears to be manipula tive and may have been employed fo the purpose of circumventing the re quirements of the regulations.

[38 FR 12098, May 9, 1973]

**§ 220.129 Applicability of same-day substitution rule to accounts subject to section 220.8(g).**

(a) The Board has been asked numerous questions regarding the use of the same-day substitution privilege i § 220.3(b) of Regulation T in connectio with accounts subject to § 220.8(g), generally, accounts having less than 4 percent equity. Prior to the Board' amendments, effective September 18 1972 (37 FR 13972, 13973, 13974, July 15 1972), a customer whose account wa undermargined to any extent was allowed to substitute one security for another on the same day, usually through a sale and purchase for like amounts, without being required to improve his equity in the account. The 1972 amendments limit this privilege to accounts with an equity of 40 percent or more; as presently set by the Board. Accordingly, if a customer's equity is below 40 percent, he is not eligible for the same-day substitution privilege, but is required to put up margin on any new commitment, and retention requirements are applied to any liquidation, even though the transactions are effected on the same day.

(b) The questions raised with the Board touch upon other provisions of Regulation T as well that are affected

by the September 1972 amendment to the same-day substitution rule and the impact of the amendment on these provisions is also reflected in the examples stated below. In making computations in similar situations it should be borne in mind that the examples are based on a current loan value of 35 percent for margin securities (margin requirements of 65 percent), and 50 percent loan value for exchange-listed convertible bonds, while the retention requirement for all accounts is 70 percent (release 30 percent).

QUESTIONS AND ANSWERS ON THE SAME-DAY SUBSTITUTION RULE IN CONNECTION WITH ACCOUNTS SUBJECT TO §220.8(g)

Based on margin requirements as of November 24, 1972 of 65 percent (35 percent loan value) in the general account and 50 percent (50 percent loan value) in the special convertible debt security account, and retention requirements with respect to withdrawals in each account of 70 percent (30 percent release).

June 1973

1. Q. Customer is long $10,000 margin securities in his general account, which has an adjusted debit balance of $7,000. Customer has an $8,000 balance in his special miscellaneous account. The general account is subject to section 8(g). The customer wishes to purchase margin securities worth $1,000 and sell securities worth $1,000 on the same day. What is the Regulation T margin call if any?

A. $350, the margin required on the purchase ($650) minus the margin released on the sale ($300) (net $350). The call may be met by a debit to the customer's special miscellaneous account.

2. Q. Customer is long $10,000 margin securities in his general account which has an adjusted debit balance of $9,000. Customer has an $8,000 balance in his special miscellaneous account. The general account is subject to section 8(g). May the creditor reduce the special miscellaneous account balance to a level at which time the general account would no longer be subject to section 8(g)?

A. Yes; before such a debit to the special miscellaneous account is made, however, the creditor may wish to obtain the written consent of the customer. The customer should be fully aware of the procedure to be followed by the creditor and that such an amount could not be transferred back from the general account to the special miscellaneous account at a later date, unless an excess over 65 percent margin in the general account would permit another transfer.

3. Q. Customer's account has a Regulation T margin call which was outstanding (and not overdue) as of the close of business on the preceding business day. In computing the account to determine if it is subject to section 8(g), may the creditor consider the outstanding Regulation T margin call as collected?

A. Yes, for the purpose of computing an account to determine whether it is subject to section 8(g), the creditor may give credit to such an outstanding Regulation T margin call which would reduce the adjusted debit balance.

4. Q. Customer is long $10,000 margin securities in his general account which has an adjusted debit balance of $6,075. The account is subject to section 8(g) by an amount less than $100. He wishes to purchase margin securities valued at $1,000 and sell securities valued at $1,000 in the account on the same day. What Regulation T margin call if any should be issued?

A. $350. Once the determination has been made that an account is subject to section 8(g), purchases in the general account are charged the margin required, currently 65 percent, and sales currently release 30 percent. The $100 rule in §220.3(g)(3) does not apply to the 8(g) computation.

5. Q. Customer's account has an outstanding maintenance margin call. In computing the account to determine if it is subject to section 8(g), may the creditor consider the outstanding maintenance margin call as collected?

A. No; maintenance margin calls are generally credited to the customer's special miscellaneous account, and accordingly, the collection of the maintenance margin call would not change the adjusted debit balance.

6. Q. Customer is long $10,000 margin securities in his general account which is subject to section 8(g) by $100 and is in a so-called regular restricted status by $2,600. He wishes to sell securities worth $9,000 and buy margin securities worth $9,000 on the same day. The purchase would require margin of $5,850 and the sale would release $2,700 (net $3,150). In what amount should the creditor issue a Regulation T margin call?

A. $2,600. The customer would not be required to deposit more than is needed to eliminate the so-called regular restriction.

7. Q. Does a debit to the general account and a credit to the special miscellaneous account (SMA) increase the customer's adjusted debit balance?

A. Yes; the reference to "net debit balance" in §220.3(d)(1) of Regulation T, in connection with the adjusted debit balance computation, includes any amounts debited to the general account and credited to the SMA. It is quite possible for an account to be subject to section 8(g) as a result of such entries. For regulatory purposes, the balances of the two accounts should be separately

stated, whether the creditor maintains the SMA by journal or memorandum entry methods.

Section 220.4(a) provides that a creditor may establish an SMA, the purpose of which is defined in paragraph (f)(6), provided it is recorded separately, and confined to its intended purpose, with an adequate record maintained. Paragraph (a)(3) further provides that:

> * * * If a customer has with a creditor both a general account and one or more such special accounts, the creditor shall treat each such special account as if the customer had with the creditor no general account * * *

The agreement between the creditor and the customer should clearly show that two accounts will be maintained and that when transfers of amounts such as dividends, maintenance margin calls, and excess are made, the general account and the SMA are debited or credited as the case may be. Funds cannot be freely transferred back and forth. Generally, while funds can always be transferred from the SMA to the general account, transfers from the general account to the SMA can only be made when certain specific events occur and conditions are met.

8. Q. Customer is long $80,000 convertible debt securities in a special convertible debt security account which has an adjusted debit balance of $50,000. The account is subject to section 8(g). The customer wishes to purchase $60,000 convertible debt securities (which are marginable) and sell $60,000 convertible debt securities on the same day. What is the Regulation T margin call if any?

A. $10,000. The margin currently required on the purchase is $30,000 and the margin currently released on the sale is $18,000. However, the customer would not be required to deposit more than is needed to eliminate the so-called regular restriction of $10,000 in the account.

9. Q. Does the 8(g) rule apply to the special bond account?

A. No; in a special bond account, the maximum loan value of collateral held in the account is determined by the creditor in good faith, and the retention requirement which applies to withdrawal of such collateral is equal to the good faith loan value applied by the creditor.

10. Q. Customer has an account subject to 8(g) and wishes to know how much he can buy or sell without incurring a Regulation T margin call.

A. (1) Under the current 65 percent margin requirement (in the general account),

(a) To determine how much a customer can buy with the proceeds of a sale in that account, apply this formula:

30% (margin released on sale)/65% (margin required on purchase)=46.1% (round off 46%)

Thus, a sale of $10,000 would permit a purchase of $4,600.

Proof:

| | |
|---|---|
| Margin released on sale of $10,000 | $3,000 |
| Margin required on purchase of $4,600 | 2,990 |

(b) To determine how much a customer would have to sell to meet the margin requirement on a purchase, apply this formula:

65% (margin required on purchase)/30% (margin released on sale)=216⅔% (round off 217%)

Thus, a purchase of $10,000 would require a sale of $21,667.

Proof:

| | |
|---|---|
| Margin required on purchase of $10,000 | $6,500 |
| Margin released on sale of $21,667 | 6,500 |

(2) Under the current 50 percent margin requirement (in the special convertible debt security account),

(a) To determine how much a customer can buy with the proceeds of a sale in that account, apply this formula:

30% (margin released on sale)/50% (margin required on purchase)=60%

Thus, a sale of $10,000 would permit a purchase of $6,000.

Proof:

| | |
|---|---|
| Margin released on sale of $10,000 | $3,000 |
| Margin required on purchase of $6,000 | 3,000 |

(b) To determine how much a customer would have to sell to meet the margin requirement on a purchase, apply this formula:

50% (margin required on purchase)/30% (margin released on sale)=166⅔% (round off 167%)

Thus, a purchase of $10,000 would require a sale of $16,700.

Proof:

| | |
|---|---|
| Margin required on purchase of $10,000 | $5,000 |
| Margin released on sale of $16,700 | 5,010 |

11. Q. A Regulation T margin call is issued as a result of a same-day substitution occurring in an account that is subject to section 8(g). What computation is required?

A. The amount may be determined by applying this formula:

Less:
Margin required on commitment
Margin released on liquidation
Equals: Regulation T margin call

ILLUSTRATIONS

1. In a general account:

| | |
|---|---|
| a. Purchase $10,000×65% margin required | $6,500 |
| Sell $9,000×30% margin released | 2,700 |
| Regulation T margin call | 3,800 |
| b. Purchase $8,000×65% margin required | 5,200 |
| Sell $11,000×30% margin released | 3,300 |

ILLUSTRATIONS—Continued

| | |
|---|---|
| Regulation T margin call | 1,900 |
| 2. In a special convertible debt security account: | |
| a. Purchase $6,000×50% margin required | 3,000 |
| Sell $5,000×30% margin released | 1,500 |
| Regulation T margin call | 1,500 |
| b. Purchase $7,000×50% margin required | 3,500 |
| Sell $9,000×30% margin released | 2,700 |
| Regulation T margin call | 800 |

12. Q. Customer's general account which is subject to section 8(g) includes a short position in stock A of 100 shares at 100 (market value $10,000). Customer buys 200 shares of the same stock and maintains his short position, which results in a long position of 200 shares of which 100 shares is considered the long side of the short sale "against the box." Does this transaction result in the issuance of a Regulation T margin call and for how much?

A. Yes; the customer would incur a Regulation T margin call of $6,500, the margin required on the new net commitment of 100 shares long. Because the customer's account is subject to section 8(g), the retention requirement provision in the regulation (which does not provide for any release on the covering of a short position) would apply.

13. Q. Customer's general account is subject to section 8(g) and he wishes to buy and sell the same stock on the same day (day trade). May he do so without furnishing additional margin under Regulation T? (This question assumes that the customer could effect such a day trade in conformance with exchange requirements.)

A. No; Regulation T in providing for transactions on a given day in §220.3(g) does not distinguish between same or different securities. Therefore, the amount of deposit required would be computed on the basis of the margin required on the purchase less the amount released on the sale of the same stock.

14. Q. May the amount deposited to meet a Regulation T margin call in an account subject to section 8(g) be credited to the customer's special miscellaneous account?

A. No; any Regulation T margin call must be credited directly to the account with respect to which the call was issued and may not be transferred to the customer's special miscellaneous account.

15. Q. Customer's general account is subject to section 8(g). He effects a same-day substitution by liquidating securities worth $21,334, thereby releasing 30 percent ($6,400), and purchasing margin securities worth $10,000, thereby requiring margin of 65 percent ($6,500). Must the customer deposit the $100 difference?

A. No; the creditor may waive a Regulation T margin call of $100 or less.

16. Q. Customer's special convertible debt security account is subject to section 8(g). His general account is in a so-called restricted status but not subject to section 8(g). May he effect a same-day substitution of securities in like amounts in his general account without incurring a Regulation T margin call?

A. Yes. Each account is computed separately, either one of which may or may not be subject to section 8(g).

17. Q. Customer's general account is subject to section 8(g) and he has a $200 balance in his special miscellaneous account. May he withdraw the $200?

A. Yes; Regulation T would not prevent such a withdrawal. However, exchange and creditor requirements should be considered.

18. Q. A customer's general account is priced as of the previous night's close of business and is subject to section 8(g) by $300. On the current day, may the customer deposit $300 directly into his general account and subsequently effect a same-day substitution of margin securities without incurring a Regulation T margin call?

A. No; when an account is subject to section 8(g), a deposit on the current day of the amount by which the account is subject to section 8(g) would not eliminate the section 8(g) restriction. Accordingly, a Regulation T margin call should be issued in the appropriate amount if there is effected in the account a same-day substitution of margin securities.

19. Q. Customer is long a profitable call option on 100 shares of margin stock A at 50 in his general account which is subject to section 8(g). He wishes to exercise the option and hold the stock which is currently at 55. What is the Regulation T margin call if any?

A. $3,250, the margin required on the purchase of $5,000. In pricing the account subsequent to the purchase, loan value would be applied to the stock's current market value of $5,500.

20. Q. Customer is long a profitable call option on 100 shares of margin stock B at 50 in his general account which is subject to section 8(g). He wishes to exercise the option by buying stock B at 50 and selling stock B at 55 on the same day. What is the Regulation T margin call if any?

A. $1,600, the margin required on the purchase ($3,250) minus the margin released on the sale ($1,650).

21. Q. Is it possible under Regulation T for a customer who is long a profitable option in his general account which is subject to section 8(g) to terminate his position in the option and have immediate access to the funds representing the profit?

A. Yes; he may give instructions to his broker to transfer the option from his general account to his special cash account where he could sell the option itself either back to the broker or to others.

22. Q. A customer's general account is subject to section 8(g). May he transfer a profitable call option from his general account to his special cash account where he would exercise it?

A. Yes; provided that full cash payment for the purchased stock is available in the special cash account or is deposited promptly. Such payment must be deposited in the special cash account prior to the release of the proceeds of the resale of the security, if the customer wishes to liquidate the position in the security acquired upon exercise.

23. Q. Customer is short an uncovered call option on 100 shares of stock C with a striking price of 50 in his general account which is subject to section 8(g). His net debit balance was reduced by $1,500 (30 percent margin requirement) when the short option position was taken (made up by receipt of $500 premium and additional deposit of $1,000, both credited to the general account). Presently, the market value of stock C is up to 60 and customer's adjusted debit balance now includes $2,800 ($6,000x30 percent=$1,800 plus the mark to the market loss of $1,000). The call is exercised against him at 60 and customer purchases the stock and delivers it the same day. What is the Regulation T margin call, if any?

A. $2,400, the margin required on the purchase of stock C ($3,900) minus the margin released on the sale of stock C ($1,500). When an account is subject to section 8(g), the retention requirement provisions in the regulation do not provide for any release of any portion of the amount included in the adjusted debit balance computation in connection with the option prior to its exercise. The account, of course, may subsequently be refigured for any Regulation T excess.

24. Q. Customer's account is the same as in question 23. However, when the call is exercised against him at 60, customer borrows the stock for delivery (without buying in), thereby establishing a short position in stock C. What is the Regulation T margin call if any?

A. $3,250, the margin required on the newly established short position in stock C. Here, too, because the account is subject to section 8(g), the regulation would not permit the broker to offset the Regulation T margin call by any portion of the amount previously included in the adjusted debit balance computation in connection with the outstanding option prior to its exercise. It should be further noted that subsequent to the exercise and during the time the customer maintains the short position in stock C, the adjusted debit balance computation for the short position would be based on the current market value of the security.

25. Q. Customer's account is the same as in question 23. However, when the call is exercised, the customer assumes a short position of 100 shares in stock C. Later in the day the customer covers his short position by purchasing on the open market 100 shares of stock C at 60. What is the Regulation T margin call, if any?

A. $2,400, the margin required on the purchase of stock C ($3,900) minus the margin released on the sale of stock C ($1,500).

26. Q. Customer is short an uncovered call option on 100 shares of stock D with a striking price of 50 in his general account which is subject to section 8(g). His net debit balance was reduced by $1,500 (30 percent margin requirement) when the short option position was taken. Presently, the market value of stock D is down to 40 and customer's adjusted debit balance now includes $200 ($4,000x30 percent=$1,200 minus the mark to the market gain of $1,000). The holder of the option allows it to expire. May the customer who is short the option withdraw any portion of the amount included as margin in the adjusted debit balance computation in connection with the option or use the amount against another transaction?

A. No. When an account is subject to section 8(g), the retention requirement provisions in the Regulation do not provide for any release of any portion of the amount included as margin in the adjusted debit balance computation in connection with the option.

[38 FR 16652, June 25, 1973]

## § 220.130 Escrow receipts for option transactions.

(a) The Board has been asked whether or not it is permissible under the provisions of § 220.4(c) of Regulation T (12 CFR 220.4(3)) relating to the special cash account, to allow customers to write put and call securities options which are "covered" by the escrow receipt of a bank when the escrow receipt, because of the mechanics of the trade, cannot be delivered to the broker on the day the option is written. When exchange-traded securities options were first introduced in 1973 the Board expressed the view that certain option transactions were permitted in the cash account (1973 Bulletin 525; 12 CFR 220.126) under circumstances which indicated their nature as bona fide cash transactions. Basically, that interpretation indicates that the special cash account can be used if the underlying securities, or the funds necessary to pay for the securities, are held in the account on the day the option is written. (This is commonly referred to as a "covered" transaction.) The use of "escrow receipts"

for option transactions to be effected in a special cash account was not considered by the Board at the time of the 1973 interpretation.

(b) An escrow receipt is an agreement under which a bank represents and warrants that it holds for the account of a customer the securities which are the subject of a call, or the cash to purchase the securities which are the subject of a put, and will continue to hold the same until the option is either exercised or expires. If the option is exercised, the bank will deliver or accept delivery of the appropriate securities against payment, as the circumstances require.

(c) It has been represented to the Board that customers who wish to write covered options in a cash account using escrow receipts are hampered because of procedural delays in transmitting the escrow receipt from the bank to the broker. Up to three business days may elapse before the receipt can be in the physical possession of the broker because, for example, some banks will not issue the receipt until the premium for writing the option is delivered.

(d) The Board is of the view that a broker may effect an option transaction in a special cash account where the customer represents that the required securities or cash are then held for that customer at a bank and the broker independently verifies that the appropriate escrow receipt will be delivered to the broker by the bank as soon as possible but, in no event, later than three business days after the option is written. (The term "bank" as defined in section 3(a)(6) of the Securities Exchange Act of 1934 includes banks, trust companies and those branches of foreign banks which are located in the United States and are supervised and examined by State banking authorities.) Any delay in delivery of the escrow receipt resulting from factors within the customer's control would, of course, cast doubt on the eligibility of the transaction as a *bona fide* cash transaction.

[41 FR 34938, Aug. 18, 1976]

**§ 220.131 Application of the arranging section to broker-dealer activities under SEC Rule 144A.**

(a) The Board has been asked whether the purchase by a broker-dealer of debt securities for resale in reliance on Rule 144A of the Securities and Exchange Commission (17 CFR 230.144A)[1] may be considered an arranging of credit permitted as an "investment banking service" under § 220.13(a) of Regulation T.

(b) SEC Rule 144A provides a safe harbor exemption from the registration requirements of the Securities Act of 1933 for resales of restricted securities to *qualified institutional buyers*, as defined in the rule. In general, a *qualified institutional buyer* is an institutional investor that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the buyer. Registered broker-dealers need only own and invest on a discretionary basis at least $10 million of securities in order to purchase as principal under the rule. Section 4(2) of the Securities Act of 1933 provides an exemption from the registration requirements for "transactions by an issuer not involving any public offering." Securities acquired in a transaction under section 4(2) cannot be resold without registration under the Act or an exemption therefrom. Rule 144A provides a safe harbor exemption for resales of such securities. Accordingly, broker-dealers that previously acted only as agents in intermediating between issuers and purchasers of privately-placed securities, due to the lack of such a safe harbor, now may purchase privately-placed securities from issuers as principal and resell such securities to "qualified institutional buyers" under Rule 144A.

(c) The Board has consistently treated the purchase of a privately-placed debt security as an extension of credit subject to the margin regulations. If the issuer uses the proceeds to buy securities, the purchase of the privately-placed debt security by a creditor represents an extension of "purpose cred-

[1] Rule 144A, 17 CFR 230.144A, was originally published in the FEDERAL REGISTER at 55 FR 17933, April 30, 1990.

it" to the issuer. Section 7(c) of the Securities Exchange Act of 1934 prohibits the extension of purpose credit by a creditor if the credit is unsecured, secured by collateral other than securities, or secured by any security (other than an exempted security) in contravention of Federal Reserve regulations. If a debt security sold pursuant to Rule 144A represents purpose credit and is not properly collateralized by securities, the statute and Regulation T can be viewed as preventing the broker-dealer from taking the security into inventory in spite of the fact that the broker-dealer intends to immediately resell the debt security.

(d) Under § 220.13 of Regulation T, a creditor may arrange credit it cannot itself extend if the arrangement is an "investment banking service" and the credit does not violate Regulations G and U. Investment banking services are defined to include, but not be limited to, "underwritings, private placements, and advice and other services in connection with exchange offers, mergers, or acquisitions, except for underwritings that involve the public distribution of an equity security with installment or other deferred-payment provisions." To comply with Regulations G and U where the proceeds of debt securities sold under Rule 144A may be used to purchase or carry margin stock and the debt securities are secured in whole or in part, directly or indirectly by margin stock (see 12 CFR 207.2(f), 207.112, and 221.2(g)), the margin requirements of the regulations must be met.

(e) The SEC's objective in adopting Rule 144A is to achieve "a more liquid and efficient institutional resale market for unregistered securities." To further this objective, the Board believes it is appropriate for Regulation T purposes to characterize the participation of broker-dealers in this unique and limited market as an "investment banking service." The Board is therefore of the view that the purchase by a creditor of debt securities for resale pursuant to SEC Rule 144A may be considered an investment banking service under the arranging section of Regulation T. The market-making activities of broker-dealers who hold themselves out to other institutions as willing to buy and sell Rule 144A securities on a regular and continuous basis may also be considered an arranging of credit permissible under § 220.13(a) of Regulation T.

[Reg. T, 55 FR 29566, July 20, 1990]

# PART 221—CREDIT BY BANKS FOR THE PURPOSE OF PURCHASING OR CARRYING MARGIN STOCK (REGULATION U)

Sec.

221.1 Authority, purpose, and scope.
221.2 Definitions.
221.3 General requirements.
221.4 Agreements of nonmember banks.
221.5 Special purpose loans to brokers and dealers.
221.6 Exempted transactions.
221.7 Requirements for the List of OTC margin stocks.
221.8 Supplement, maximum loan value of margin stock and other collateral.

INTERPRETATIONS

221.101 Determination and effect of purpose of loan.
221.102 Designation of New York Stock Exchange for purposes of specialists transactions.
221.103 Loans to brokers or dealers.
221.104 Federal credit unions.
221.105 Arranging for extensions of credit to be made by a bank.
221.106 Reliance in "good faith" on statement of purpose of loan.
221.107 Arranging loan to purchase open-end investment company shares.
221.108 Effect of registration of stock subsequent to making of loan.
221.109 Loan to open-end investment company.
221.110 Questions arising under Regulation U.
221.111 Purchase-and-sale substitution on same day.
221.112 Loans by bank in capacity as trustee.
221.113 Loan which is secured indirectly by stock.
221.114 Bank loans to purchase stock of American Telephone and Telegraph Company under Employees' Stock Plan.
221.115 Accepting a purpose statement through the mail without benefit of face-to-face interview.
221.116 Bank loans to replenish working capital used to purchase mutual fund shares.
221.117 When bank in "good faith" has not relied on stock as collateral.
221.118 Bank arranging for extension of credit by corporation.