# In the United States Court of Federal Claims

Nos. 01-256T & 01-257T (consolidated)

(Filed: August 28, 2008)

******************************

| | |
|---|---|
| MARRIOTT INTERNATIONAL RESORTS, L.P., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Cross-motions for summary judgment in a tax case; recognition of basis upon contribution of assets and liabilities to a partnership; 26 U.S.C. §§ 722, 752; contingent liabilities; short sales; Federal Reserve Board's Regulation T |

******************************

Harold J. Heltzer, Crowell & Moring LLP, Washington, D.C., for plaintiff. With him on the briefs were Robert L. Willmore and Alex E. Sadler, Crowell & Moring LLP, Washington, D.C.

G. Robson Stewart, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for defendant. With him on the brief were Nathan J. Hochman, Assistant Attorney General, John A. Dicicco, Deputy Assistant Attorney General, David Gustafson, Chief, and Mary M. Abate, Assistant Chief, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

Pending before the court are cross-motions for summary judgment, filed by the parties in this partnership-taxation case.[1] At issue is a claimed tax loss of $71,189,461 on the sale of Mortgage Notes, as manifested on a partnership tax return. This loss was the planned result of a series of transactions entered into by Marriott-affiliated entities with the intention of recognizing a tax loss based upon the premise that the obligation to close a short sale[2] is not considered a liability for partnership-tax-basis purposes.[3] The Internal Revenue Service ("IRS" or "the Service") took issue with this premise and disallowed the claimed loss. Following extensive prior proceedings related to discovery and privilege,[4] the motions now at issue were filed and have been fully briefed. A hearing on the cross-motions was held on May 19, 2008, and supplemental briefs were filed on June 6, 2008. The competing motions accordingly are ready for disposition.

---

[1]This case arises under the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 648-671 ("TEFRA") (codified in scattered sections of the Internal Revenue Code ("I.R.C."), including especially 26 U.S.C. ("I.R.C.") §§ 6221-6234). A TEFRA partnership proceeding provides a means to determine the appropriateness of the partnership's reporting of "partnership items" on its annual information return. *See McGann v. United States*, 81 Fed. Cl. 642, 643-44 (2008). Partnerships are pass-through entities for tax purposes, I.R.C. §§ 701, 702, and when the IRS disagrees with a partnership's reporting of any partnership item, it must issue a Final Partnership Administrative Adjustment ("FPAA") before making any assessments against the partners attributable to such an item. *See* I.R.C. §§ 6223(a)(2), (d)(2), 6225(a). The timely mailing of the FPAA suspends the running of the limitations period for assessing any income taxes that are attributable to any partnership item or affected item. I.R.C. § 6229(d).

[2]A short sale has been defined as "consisting of two transactions: (1) the taxpayer's sale of property (typically, securities) borrowed from another person (typically, a broker), and (2) the subsequent closing out of the short position by the taxpayer's delivery of securities to the person who loaned the securities that were sold." *Salina P'ship v. Commissioner*, 80 T.C.M. (CCH) 686, 690 n.5 (2000) (citing 2 Boris Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 54.3.1, at 54-21 (2d ed. 1990)).

[3]Generally, "basis" is a concept that is fundamental to the reporting of gain or loss on a transaction for tax purposes. Gain or loss is typically calculated by subtracting "basis" from the "amount realized." I.R.C. § 1001(a). The "basis" of property is usually the cost of the property or the value when received, although there are a number of specific exceptions to this general rule. *See* I.R.C. §§ 1011-1016.

[4]*See Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1308 (Fed. Cir. 2006) (holding that the Commissioner of the IRS by formal explicit action could delegate authority to invoke the deliberative process privilege on the Service's behalf to an Assistant Chief Counsel). After this decision, the government submitted for the court's inspection *in camera* over 4,000 pages of agency records as to which the deliberative-process privilege was claimed.

## FACTS[5]

The parties provided the court with charts that set out the competing federal income tax consequences of Marriott's transactions. *See* Joint Status Report (Oct. 16, 2006), Ex. A ("Joint Submission"). Subsequently, the government provided a summary setting out specific dates and dollar amounts for aspects of the transactions. *See* Exhibit submitted in conjunction with the hearing held on May 19, 2008 ("Gov't's Summary"). These submissions, together with the parties' proposed findings of uncontroverted facts and responses, supply a baseline of agreed facts underpinning the cross-motions for summary judgment.

### A. The Transactions

Plaintiff, Marriott International Resorts ("Marriott Resorts") is a Delaware limited partnership with its principal place of business located in Montgomery County, Maryland. Compl. ¶¶ 1, 4.[6] For a tax period ending October 28, 1994, Marriott International JBS Corporation ("JBS") and Marriott Ownership Resorts, Inc. ("MORI") were Marriott Resorts' general partner and limited partner, respectively. Compl. ¶¶ 1, 15. For a tax period ending December 30, 1994, JBS and Marriott International Capital Corporation ("MICC") were Marriott Resorts' general partner and limited partner, respectively. Defendant's Proposed Findings of Uncontroverted Facts ("DPFUF") ¶ 3. JBS, MORI, and MICC were, at all times relevant to this case, controlled subsidiaries of Marriott International, Inc ("Marriott International")[7] and Marriott Resorts was wholly owned initially by MORI and JBS and subsequently by MICC and JBS. Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts ("PRDPFUF") at 6, 9-10.

During the periods at issue, MORI engaged in the business of selling timeshare interests in resort properties. Compl. ¶ 9. As part of this business, MORI offered buyers the opportunity to finance their purchases by having the buyer execute a promissory note, secured by a mortgage on the timeshare unit ("Mortgage Notes"). Compl. ¶ 9. The Mortgage Notes issued by MORI to the purchasers of its time-share units bore interest at a fixed interest rate. *See* Heltzer Decl., Ex.

---

[5]The recitations that follow do not constitute findings of fact by the court. Instead, the recitals are taken from the parties' filings and are undisputed or alleged and assumed to be true for purposes of the pending motions, except where a factual controversy is explicitly noted.

[6]References to "Compl. ¶ __" are to the complaint filed in No. 01-256T. References to "Compl. in No. 01-257T ¶ __" are to the complaint in No. 01-257T.

[7]In October of 1993, Marriott International was spun off from its former parent, Marriott Corporation. Pls.' Opp'n to Def.'s Mot. for Summary Judgment and Pls.' Cross-Mot. for Partial Summary Judgment ("Pls.' Cross-Mot."), Attached Decl. of Harold J. Heltzer (Mar. 25, 2008) ("Heltzer Decl."), Ex. 6 (Dep. of M. Lester Pulse, Jr. (Dec. 11, 2002)) at 87; Ex. 7 (Dep. of Michael E. Dearing (Dec. 12, 2002)) at 24.

1 (Pls.' Resp. to Def.'s First Set of Interrogs. (Oct. 8, 2002) ("Pls.' Interrog. Resp.")) at 3; Ex. 2 (Mem. to Growth Committee regarding "Hedging MORI Note Exposure" (Apr. 22, 1994)) at MAR-008867. On November 22, 1993, MORI and another Marriott entity, MTMG Corporation, entered into an agreement with Teachers Insurance and Annuity Association of America ("TIAA"), an unrelated third party, in which the Marriott entities agreed to sell and TIAA agreed to buy up to $175,000,000 of Mortgage Notes. Def.'s Mot. for Summary Judgment ("Def.'s Mot."), Attached Decl. of G. Robson Stewart (Feb. 1, 2008) ("First Stewart Decl."), Ex. 1 (MTMG Corp. Purchase Agreement, (Nov. 22, 1993)) at 1-2.[8]

On January 3, 1994, Philip Hamon of the investment banking firm CS First Boston, sent by facsimile to Lester Pulse, Senior Vice President of Marriott International, a document which described a series of transactions that might enable Marriott to recognize a loss for Federal income tax purposes based upon the premise that a short-sale obligation would not be considered a liability for partnership tax-basis purposes. First Stewart Decl., Ex. 3 (Facsimile from Hamon to Pulse (Jan. 3, 1994)). The transactions described in the CS First Boston tax document consisted of the following steps:

- Marriott International sells short two-year Treasury notes and invests the proceeds in five-year Treasury notes.
- Marriott International, as a limited partner, and a third party, as the general partner, form a partnership.
- Marriott International contributes the five-year Treasury notes, subject to the short-sale obligations, to the partnership and the general partner contributes some cash.

---

[8]MORI's sale of the Mortgage Notes to TIAA in 1994 was priced to provide TIAA with a yield of 240 basis points (a 2.4% spread) above the average yields on U.S. Treasury securities adjusted to a constant maturity of four years. Heltzer Decl., Ex. 2 (Mem. to Growth Committee) at MAR-008866; Ex. 3 (Mem. to Corp. Growth Comm. entitled "MORI Note Sale to TIAA Closed" (Dec. 7, 1994)) at MAR-008673. Because the interest rate on the Mortgage Notes was fixed, and the yield TIAA received at the time of its purchase of the Mortgage Notes changed with the prevailing interest rate, MORI was exposed to interest-rate risk on the sale of the Mortgage Notes to TIAA. Heltzer Decl., Ex. 1 (Pls.' Interrog. Resp.) at 2-5; Ex. 2 (Mem. to Growth Committee) at MAR-008866-67.

The Mortgage Notes were sold by MORI to TIAA in the form of interests in securitized portfolios, referred to as "pass-through certificates." First Stewart Decl., Ex. 1 (MTMG Corp. Purchase Agreement) at 1. The securitization of the Mortgage Notes involved the use of a bankruptcy-remote special purpose entity, with Marriott Resorts functioning in that role. Heltzer Decl., Ex. 1 (Pls.' Interrog. Resp.) at 3-5. The use of such an entity allowed the securitized Mortgage Notes to receive a higher credit rating, and thus be sold at a higher price. Heltzer Decl., Ex. 1 (Pls.' Interrog. Resp.) at 3-5; Ex 6 (Dep. of M. Lester Pulse, Jr., (Dec. 11, 2002)) at 35-36; Ex. 7 (Dep. of Michael E. Dearing (Dec. 12, 2002)) at 101-02.

- The partnership obtains additional assets and subsequently sells the five-year Treasury notes and closes the short sale obligation on the two-year Treasury notes.
- Marriott International transfers its partnership interest to another Marriott subsidiary.
- No gain or loss is recognized on the transfer, but the partnership-interest transfer results in a technical termination of the partnership which causes a deemed distribution of the assets to each partner and a re-contribution of the assets to a new partnership.
- The tax basis of the assets takes on the "outside" tax basis of Marriott International's interest, *i.e.*, the value of the five-year Treasury notes Marriott International contributed to the first partnership, which value is not reduced by the short-sale obligation.[9]
- The remaining additional assets later are depreciated or are sold, and Marriott International recognizes the resulting tax losses.

First Stewart Decl., Ex. 3 (Facsimile from Hamon to Pulse); *see also* First Stewart Decl., Ex. 4 (Letter from Hamon to Michael Dearing (June 24, 1994) ("Intent Letter")), Ex. 5 (Letter from Hamon to Dearing (June 24, 1994) ("Agreement Letter")).

Thereafter, on or about April 25, 1994, MORI established a short position in five-year Treasury securities with a face amount of $65,000,000 ("First Short Sale"). Compl. ¶ 13. The First Short Sale was executed through CS First Boston. First Stewart Decl., Ex. 6 (Letter from Brit Bartter, CS First Boston, to Dearing (July 8, 1994)) at 1. MORI received cash proceeds in the amount of $63,703,816 that were invested in repurchase obligations ("Repos") yielding a fixed return. Compl. ¶ 13; Gov't's Summary.[10]

On May 9, 1994, JBS was incorporated in the State of Delaware.[11] On May 10, 1994, MORI and JBS entered into a partnership agreement and created Marriott Resorts with the filing of a Certificate of Limited Partnership. First Stewart Decl., Ex. 8 (Marriott Resorts Limited Partnership Agreement).[12] JBS was the general partner of Marriott Resorts holding a 1% interest,

---

[9]The distinction between a partner's "outside" basis in its partnership interest and the partnership's "inside basis" is addressed *infra*, at 12-13.

[10]The Repos were repurchase transactions in 30-day Eurodollar equivalent investments adjusted to the prevailing 30-day LIBOR rate. First Stewart Decl., Ex. 4 (Intent Letter).

[11]Although the Complaint recites the date of incorporation as May 6, 1994, documentary evidence shows that incorporation actually occurred on May 9, 1994. *See* First Stewart Decl., Ex. 7 (Certificate of Incorporation of Marriott International JBS Corporation).

[12]The Complaint states this date as May 6, 1994, but documentary evidence indicates that it occurred on May 10, 1994. *See* First Stewart Decl., Ex. 8 (Marriott Resorts Limited

and MORI was a limited partner of Marriott Resorts holding a 99% interest. Compl. ¶ 22. Contemporaneously, MORI contributed to Marriott Resorts (i) the Repos, and (ii) Mortgage Notes with a face amount of approximately $65,200,000, and Marriott Resorts also assumed MORI's obligations to close the First Short Sale. Compl. ¶¶ 16-17; First Stewart Decl., Ex. 8 (Marriott Resorts Limited Partnership Agreement) ¶ 10. JBS also contributed $1,000,000 to Marriott Resorts. Compl. ¶ 18; Gov't's Summary; First Stewart Decl., Ex. 8 (Marriott Resorts Limited Partnership Agreement) ¶ 9.

On or about August 15, 1994, MORI established a short position in five-year Treasury securities with a face amount of $10,000,000 ("the Second Short Sale"). Compl. ¶ 14. The Second Short Sale was also executed through CS First Boston. First Stewart Decl., Ex. 10 (Facsimile from Timothy Lu, CS First Boston, to Dearing (Oct. 12, 1994)) at 2. MORI received cash proceeds in the amount of $9,463,451 that were invested through CS First Boston in Repos. Compl. ¶ 14; Gov't's Summary. On August 16, 1994, MORI contributed to Marriott Resorts (i) the Repos and (ii) Mortgage Notes with a face amount of approximately $11,900,000, and Marriott Resorts also assumed the obligation to close the Second Short Sale. Compl. ¶¶ 19-20; Gov't's Summary. On October 1, 1994, MORI contributed additional Mortgage Notes with a face amount of approximately $6,200,000. Compl. ¶ 21.

On September 29, 1994, Marriott Resorts closed the First Short Sale with CS First Boston by using the funds invested in the Repos to purchase replacement Treasury notes with a face amount of $65,000,000 at a cost of $62,667,034. First Stewart Decl., Ex. 9 (Facsimile from Lu to Dearing (Sept. 29, 1994)) at 2; Gov't's Summary. On October 17, 1994, Marriott Resorts closed the Second Short Sale with CS First Boston by purchasing replacement Treasury notes with a face amount of $10,000,000 at a cost of $9,279,811. Compl. ¶ 23; First Stewart Decl., Ex. 10 (Facsimile from Lu to Dearing) at 2, 5.[13] The short sales were closed by liquidating the Repos and using those funds to buy back the Treasury securities, which then were returned to CS First Boston. Joint Submission at 5; Gov't's Summary. In connection with the transactions related to the short sales and Repos, Marriott paid CS First Boston a "structuring fee" of $200,000 and expenses of $22,540.22, for a total transaction cost of $222,540.22. First Stewart Decl., Ex. 6 (Letter from Bartter to Dearing (July 8, 1994)) at 2, Ex. 9 (Facsimile from Lu to Dearing (Sept. 29, 1994)) at 2, Ex. 11 (Marriott Resorts' partnership return (Form 1065) for the taxable year ended Oct. 28, 1994) at 3. In addition, the trading price of the transactions included a bid-ask spread of $50,000. First Stewart Decl., Ex. 9 (Facsimile from Lu to Dearing) at 2.

On October 28, 1994, MORI transferred its entire partnership interest in Marriott Resorts to MICC. Joint Submission at 6; Compl. ¶ 24. The transfer of MORI's interest in Marriott Resorts to MICC triggered a technical termination of Marriott Resorts under I.R.C.

---

Partnership Agreement) at MAR-009198.

[13]The net gain on the short sales reported by Marriott Resorts after trading and transaction costs was $819,532.

§ 708(b)(1)(B). Joint Submission at 7; Compl. ¶ 25. Under I.R.C. § 708(b)(1), the termination resulted in a deemed distribution of Marriott Resorts's assets to its partners (JBS and MICC) followed by the creation of a new partnership by JBS and MICC, and contribution of the assets previously held by Marriott Resorts to the new partnership, which also was named Marriott Resorts. Compl. ¶ 26. The actual assets held by Marriott Resorts prior to, and after, the termination consisted of the Mortgage Notes, $1 million cash, and a receivable with a face amount of $3,303,164. Compl. ¶¶ 26, 28.

Prior to the termination, MICC had a purported basis of $159,444,635 in its interest in Marriott Resorts (*i.e.*, not reduced by the obligation to close the short sales by purchasing replacement Treasury securities), attributable to the bases of the Mortgage Notes, the Repos, and minor adjustments due to Marriott Resorts' operations (*i.e.*, interest and investment income). Compl. ¶ 27. After the termination, JBS's and MICC's partnership bases were allocated to the new Marriott Resorts' assets (the Mortgage Notes, cash, and the receivable). Compl. ¶ 29. Thus, the new Marriott Resorts was assigned a purported basis in the Mortgage Notes of $155,141,472. Compl. ¶ 29.

On or about November 14, 1994, Marriott Resorts conveyed the Mortgage Notes to a grantor trust and received a certificate representing all of the interest in the trust other than the residual interest. Compl. ¶¶ 30-31. On the same date, Marriott Resorts sold to TIAA the certificate for $81,974,204 less transaction fees of $522,093, for a net amount realized of $81,452,111. Compl. ¶ 31. The purported basis of the certificate of interest in the timeshare mortgages sold to TIAA was $150,894,679 (*i.e.*, not reduced by the obligation to close the short sales by purchasing replacement Treasuries), and on its partnership return (Form 1065) for the period ended December 30, 1994, Marriott Resorts reported a loss on the sale of the interest in the timeshare mortgages of $71,189,461. First Stewart Decl., Ex. 12 (Marriott Resorts' Form 1065 for the taxable year ended Dec. 30, 1994); Gov't's Summary.[14]

B. Disallowance by the IRS

On February 2, 2001, the IRS issued an FPAA with respect to Marriott Resorts' taxable year ended October 28, 1994. Compl. ¶ 35 and Ex. A (FPAA). In the FPAA, for Marriott Resorts' October 28, 1994, taxable year, the IRS reduced the partnership basis by $75,000,000 to reflect the obligation to complete the short sale by returning the Treasury notes to CS First Boston. Compl. Ex. A.

---

[14]In its Complaint, Marriott states that the loss on the sale of the interest in the timeshare mortgages was $69,442,568 ($81,452,111 minus $150,894,679). Compl. ¶ 33. Plaintiffs' position is that the loss alleged in the Complaint is correct. PRDPFUF at 11 n.1. Both parties agree that the difference is immaterial to the resolution of the pending motions. Def.'s Mot. at 12 n.15; PRDPFUF at 11 n.1.

Also on February 2, 2001, the IRS issued an FPAA with respect to Marriott Resorts's taxable year ended December 30, 1994. Compl. in No. 01-257T ¶ 35 and Ex. A (FPAA). In the FPAA for Marriott Resorts' December 30, 1994 taxable year, the IRS determined that Marriott Resorts realized a gain on the sale of the Mortgage Notes of $1,757,378, not the loss reported on the Marriott Resorts' Form 1065 of $71,189,461. This determination was based on the reduction in the partnership basis of $75,000,000 which reflected the obligation to return Treasury notes to CS First Boston. Compl. in No. 01-257T Ex. A.

## JURISDICTION

Marriott Resorts and JBS filed their complaints in this court pursuant to 28 U.S.C. § 1508 and I.R.C. § 6226. In accord with I.R.C. § 6226(e)(1), Marriott Resorts and JBS deposited funds with the Secretary of the Treasury in amounts that at least equaled the tax liability including interest that would arise if the treatment of the partnership items on Marriott Resorts' return was made consistently with the FPAAs. Compl. ¶ 7; Compl. in No. 01-257T ¶ 7.

## STANDARD FOR DECISION

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of the Court of Federal Claims; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The moving party carries the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A "genuine" dispute is one that "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248. In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If no rational trier of fact could find for the non-moving party, a genuine issue of material fact does not exist and the motion for summary judgment may be granted. *Id*.

With respect to cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). To the extent there is a genuine issue of material fact, both motions must be denied. *Id*.

## ANALYSIS

This case turns on I.R.C. § 752, which governs the change in basis that occurs when a partner's liabilities are either increased or decreased.[15] The government asserts that under I.R.C.

---

[15]In full, Section 752 provides:

**§ 752. Treatment of certain liabilities**

§ 752, "[Marriott Resorts] must include in its partnership basis the short sale obligations it 'assumed' from [MORI], because [(1)] the short sale obligations to replace the borrowed Treasury Notes are legal liabilities secured by the proceeds from the Treasury short sale, and [(2)] the proceeds from the short sales quantify the amount of liability for purposes of § 752, irrespective of the term of the underlying securities." Def.'s Supp. Br. at 2. In opposition, Marriott contends that the obligation to close a short sale is not a "liability" under I.R.C. § 752 for the purposes of calculating partnership basis. Pls.' Cross-Mot. at 1.

A. Short Sales

In a short sale, the seller trades securities that he does not own, "seek[ing] to profit by trading stocks which he expects to decline in value." *Zlotnick v. TIE Commc'ns*, 836 F.2d 818,

---

> **(a) Increase in partner's liabilities.**–Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
> **(b) Decrease in partner's liabilities.**–Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.
> **(c) Liability to which property is subject.**–For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.
> **(d) Sale of exchange of an interest.**–In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

I.R.C. § 752. Section 752 has remained unchanged since its enactment as part of the Internal Revenue Code of 1954.

In 1984, Section 752 was affected by enactment of a collateral statute that overruled the decision rendered in *Raphan v. United States*, 3 Cl. Ct. 457 (1983), which had interpreted Section 752. *See* Pub. L. No. 98-369, Div. A, Title I, § 79, 98 Stat. 597 (July 18, 1984), set out at I.R.C. § 752 note. *Raphan* held that a guarantee by a general partner of an otherwise nonrecourse debt of the partnership did not require the partner to be treated as personally liable for that debt. 3 Cl. Ct. at 465-66.

820 (3d Cir. 1988); *see also Provost v. United States*, 269 U.S. 443, 450-53 (1926).[16] In *Zlotnick*, the Third Circuit provided a useful description of short sales:

> Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price. The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares. In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock. Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk. There is no time limit on this obligation to cover.
>
> "Selling short," therefore, actually involves two separate transactions: the short sale itself and the subsequent covering purchase.

836 F.2d at 820; *see also* James W. Christian, Robert Shapiro, & John-Paul Whalen, *Naked Short Selling: How Exposed are Investors?*, 43 Hous. L. Rev. 1033, 1041-42 (2006) (describing short sales).

Short sales are federally regulated. *See Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 705 (2d Cir. 1998). The Securities and Exchange Act of 1934 (the "Act") provides the general authority for the imposition of rules with respect to the extensions of credit by brokers and dealers to customers for purchasing and carrying securities. 15 U.S.C. § 78g(a). The Act directs the Board of Governors of the Federal Reserve System to prescribe rules and regulations with respect to the amount of credit that may be initially extended and maintained by a broker or dealer on any security. *Id*. Section 10(a) of the Act gives the Federal Reserve Board authority to regulate short sales and the withdrawals by a customer of funds or securities, 15 U.S.C. § 78j(a); the Federal Reserve Board promulgated Regulation T in 1938. *Levitin*, 159 F.3d at 705.

The purpose of Regulation T is "to regulate extensions of credit by and to brokers and dealers; it also covers related transactions within the Board's authority under the Act. It imposes, among other obligations, initial margin requirements and payment rules on securities

[16]Although the decision in *Zlotnick* addresses the short sale of stocks, the same basic principles apply to a short sale of Treasury notes or other securities. *See Kornman v. Assocs., Inc. v. United States*, 527 F.3d 443, 450-51 (5th Cir. 2008).

transactions." 12 C.F.R. § 220.1(a) (1994).[17] The margin requirements are designed to protect brokerage houses by guaranteeing that their loans to short sellers are repaid. *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 472 (S.D.N.Y. 2001). Regulation T governs all short sales executed by United States broker-dealers. 12 C.F.R. §§ 220.1(a), 220.18(c)-(d) (1994).

Under Regulation T, a creditor is "any broker or dealer," and a customer is any person "to or for whom a creditor extends, arranges, or maintains any credit." 12 C.F.R. §§ 220.2(b), (c) (1994). Thus, CS First Boston is a creditor and MORI is a customer for purposes of Regulation T. As a creditor, CS First Boston was required to maintain a record for MORI's account showing the full details of all transactions. 12 C.F.R. § 220.3(a) (1994). MORI's short sale transactions were required to be maintained in a margin account. 12 C.F.R. §§ 220.1(b)(1), 220.4(a)(1) (1994). MORI was required to post initial margin for the short sales of Treasury notes equal to 100 percent of the market value of the notes – the short sale proceeds – plus any additional margin that may have been required by CS First Boston. 12 C.F.R. §§ 220.5(b)(1), 220.12(d) (1994).[18] Only items in MORI's margin account in which the short sales were conducted could be considered by CS First Boston to determine whether MORI had posted the required margin collateral. 12 C.F.R. § 220.3(b) (1994). Moreover, MORI was prohibited from withdrawing any funds or securities from its CS First Boston margin account if doing so would create or increase any margin deficiency. 12 C.F.R. § 220.4(e)(1)(ii) (1994); *see United States v. Russo*, 74 F.3d 1383, 1388 (2d Cir. 1996) ("[A]ny proceeds from the [short] sale are frozen under [Regulation T] until the seller covers the short sale."); *see also* Federal Reserve Staff Opinion, Nov. 21, 1979, F.R.R.S. 5-693 (stating that even when the short seller covers some of his short sales, the broker may only release the frozen funds to the extent that the customer's account balance exceeds the margin requirements established by Regulation T).

Regulation T thus forms a linkage that binds the two steps of the short-sale transaction together. The practical effect of Regulation T on short sales was explained by the Second Circuit in *Levitin*:

> [A] broker who lends a customer stock for a short sale does not typically pay the proceeds of the sale to the customer to be spent when and how she wants, waiting for the customer to cover when and if it suits her. If a broker did that, the price might increase and the customer become insolvent or disappear, leaving the broker out the entire value of the stock – the price at the time of the sale plus its increase. Brokers therefore demand collateral, usually by taking an amount from the customer's account equal to the security

---

[17]Citations to Regulation T in this opinion are to the version in effect in 1994 because that was the date of the transactions at issue.

[18]Under Regulation T, a United States Treasury Note is considered an "exempt" security because it is a government security. 12 C.F.R. § 220.2 (r) (1994); 15 U.S.C. §§ 78c(a)(12), (42). By contrast, a "nonexempt" security requires a higher initial posted margin, equal to 150 percent of the market value of the security. 12 C.F.R. § 220.12(c) (1994).

> required. The proceeds from the sale will, of course, usually be available as security, but if those proceeds and the balance in the customer's account are not sufficient to satisfy the security requirement, the customer will have to post additional collateral. . . . The collateral posted must satisfy federal margin requirements associated with short trades.

159 F.3d at 700.

In its reply brief, the government has argued that because Regulation T requires collateral be maintained with the broker-dealer while the short sale is outstanding, it is relevant to the issue at hand. *See* Def.'s Reply at 2, 4-5, 17-18. The government contends that "short sale obligations are binding, secured liabilities because the short sale proceeds are 'frozen' as collateral until the short sales are closed," "the short sale obligations are [thus] fixed and determinable for partnership basis purposes on the date the obligations become partnership obligations, and the amount of the obligations equals the amount of the proceeds from the short sales that were contributed to [Marriott Resorts]." Def.'s Reply at 2 (citing Rev. Rul. 95-45, 1995-1 C.B. 53). Accordingly, "[b]ecause [Marriott Resorts] increased its tax basis by the amount of the short sale proceeds, the corresponding short sale obligation is similar to a conventional purchase-money financing that would be included in partnership liabilities under [I.R.C.] § 752. . . . Unlike short sales, a liability that is truly contingent does not immediately create or increase the borrower's tax basis in any property precisely because the obligation is contingent." Def.'s Reply at 18.

Marriott replies that "[t]he existence of collateral . . . does not change the fundamental reality that the ultimate cost of closing the short sale simply *cannot* be determined until the replacement securities have been purchased by the short seller," and the obligation thus is not "fixed" in amount. Pls.' Reply at 6. Rather, Marriott asserts that the margin requirements fluctuate with the value of the short security subject to a "maintenance margin," which is not specifically addressed in Regulation T but rather is established by the applicable Exchange rule, typically New York Stock Exchange Rule 431 ("NYSE Rule 431"). Pls.' Supp. Br. at 3 (citing Charles F. Rechlin, *Securities Credit Regulation in* 22 *West's Securities Law Series* §§ 3:32 & 3:33 (2d ed. 2007); Steven Lofchie, *Lofchie's Guide to Broker-Dealer Regulation* 564-65, 569, 589, 596 (2005)). Marriott contends that until the short seller purchases the securities he must deliver to the broker-dealer to close the short sale, "the cost of closing the short sale is contingent and undetermined, and the obligation thus cannot constitute a 'liability' for purposes of Section 752," with the consequence that the partnership basis is not adjusted on account of the obligation. Pls.' Supp. Br. at 3.

The government responds that Marriott's argument that a short sale obligation is a contingent liability "is impossible to square with Regulation T's requirement that the full market value of the short sale liability be posted as collateral for the binding obligation to replace the shorted securities." Def.'s Supp. Br. at 5.

B. "Inside" Basis and "Outside" Basis for Partnerships and Partners

A partnership's basis in its assets is referred to as its "inside basis," and a partner's basis in his or her partnership interest is called his or her "outside basis." *Kligfeld Holdings v. Commissioner*, 128 T.C. 192, 195-96 (2007). Generally, I.R.C. § 723 provides the rule for calculating "inside basis":

> The basis of property contributed to a partnership by a partner shall be the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under [S]ection 721(b) to the contributing partner at such time.

I.R.C. § 723. A partner's basis in the interest it owns in the partnership itself, or "outside basis," is governed by I.R.C. § 705 which provides that such basis is calculated by applying I.R.C. § 722 for "contributions to a partnership" or I.R.C. § 742 for "transfers of a partnership interest."[19] Section 722 provides:

> The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under [S]ection 721(b) to the contributing partner at such time.

I.R.C. § 722. Apart from Section 721(b), a partnership and its partners do not recognize a gain or loss if the partner contributes property to the partnership in exchange for a partnership interest. I.R.C. § 721(a).

C. Applicability of Section 752

1. *Statutory language.*

Section 752 of the I.R.C. specifies the adjustments that are made in a partner's basis in his or her partnership interest to reflect his or her share of the partnership's liabilities. In relevant part, Section 752 provides that: "[a]ny increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by

---

[19]Section 705 states that once the outside basis is determined under Sections 722 or 742, the basis is increased by the partner's respective share of income items. I.R.C. § 705(a)(1). The basis calculation continues by decreasing basis by (1) "distributions" that are set forth in Section 733, *i.e.*, money or property that the partnership transfers to its partners, (2) "losses of the partnership," and (3) certain expenditures of the partnership which are "not deductible in computing taxable income and not properly chargeable to a capital account." I.R.C. § 705(a)(2).

such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership." I.R.C. § 752(a). Conversely, "[a]ny decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership." I.R.C. § 752(b). The legislative history does not address the meaning of the term "liability," but rather merely explains that Section 752 was intended to deal with the effect of a partner's assumption of partnership liabilities and the partnership's assumption of a partner's liabilities. *See* S. Rep. No. 83-1622, at 405 (1954), *as reprinted in* 1954 U.S.C.C.A.N. 4621, 5047; *accord* H.R. Rep. No. 83-1337, at S236-237 (1954), *as reprinted in* 1954 U.S.C.C.A.N. 4017, 4376-77.

In 1994, at the time the transactions at issue in this case occurred, there was no regulatory definition of "liability" for purposes of Section 752. A revenue ruling and judicial precedents delineated the statutory framework as it existed during Marriott Resorts' short sale transactions. A subsequently issued chain of revenue rulings, Treasury Regulations, and judicial precedents significantly changed that framework after the transactions at issue here were completed.

2. *The* Helmer, Long *and* La Rue *decisions.*

The first significant interpretation of Section 752 came in *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975). In *Helmer*, a partnership received payments in accord with an agreement that gave a third-party corporation the option to buy certain real estate in which the partnership held a two-thirds interest. *Id*. at 728. During the term of the option agreement, the partnership retained the right to possess and enjoy profits from the property in question, and there was no provision in the option agreement for repayment of the amounts paid under the option agreement should the agreement terminate. *Id*. at 729. The taxpayers received payments directly from the third party pursuant to the option agreement during the years in issue, and listed these amounts as distributions to the taxpayers on the partnership's books and tax returns. The taxpayers received partnership distributions during the years in issue, and had the partnership pay personal expenses, in excess of their adjusted bases in the partnership. *Id*.

The Tax Court held in *Helmer* that the option agreement and receipt of the option payments "created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future . . . [N]o liability arose under [S]ection 752 and the partners' bases cannot be increased by such amounts." 34 T.C.M. (CCH) at 731. The court noted that there were no provisions in the option agreement for repayment of, or restrictions on, the option payments. *Id*. Further, the court emphasized that income attributable to the option payments was subject to deferral at the partnership level due only to the inability of the partnership to determine the character of the gain, not because the partnership was subject to a liability to repay the funds paid or to perform any services in the future. *Id*.

A few years after *Helmer*, the Tax Court again considered the reach of Section 752 in *Long v. Commissioner*, 71 T.C. 1 (1978), *aff'd in part and rev'd in part on other grounds*, 660

F.2d 416 (10th Cir. 1981). *Long* addressed an estate's recognition of taxable gain on the liquidation of the decedent's partnership interest. 71 T.C. at 5. The partnership was a construction company that had pending against it claims in litigation, and the question presented was whether those claims could be considered liabilities includable in the estate's outside basis under Section 752. *Id*. at 6-7. The Tax Court in *Long* held that the claims were not sufficiently definite to be treated as liabilities that could be included in the decedent's outside basis because they had been in contested litigation at the time of decedent's death. *Id*. at 7-8 ("Although they may be considered 'liabilities' in the generic sense of the term, contingent or contested liabilities . . . are not 'liabilities' for partnership basis purposes at least until they have become fixed or liquidated. . . . Those liabilities should be taken into account only when they are fixed or paid.").

This emerging line of precedent was extended ten years later by the Tax Court's decision in *La Rue v. Commissioner*, 90 T.C. 465 (1988). That case concerned reserves reflecting "back office" errors of a brokerage partnership. The reserves were established to cover the brokerage's potential failure to execute trade orders by customers. To correct such errors, the brokerage had to purchase securities and deliver them to customers. *Id*. at 468. "Gain or loss was incurred on these transactions measured by the difference between the customer's contract price and what the broker had to pay to obtain the securities." *Id*. "The precise amount of gain or loss was not determinable until the securities in question were actually bought or sold." *Id*. at 475. The question was whether the partnership's reserves for the "back office" errors was a liability within the meaning of Section 752 that increased the partners' outside basis. 90 T.C. at 477-78. The IRS argued that the reserves were not liabilities for purposes of Section 752. The Tax Court concurred. Citing its opinion in *Long*, the court held that the "all-events" test determines when a liability is includable in basis under Section 752. *Id*. at 478. As that test would have it, a liability can only be included in basis "for the taxable year in which all the events have occurred which determine the fact of liability and the amount thereof can be determined with reasonable accuracy." *Id*. The court concluded that the amount of liabilities was not determinable "until the securities are actually purchased . . . and the transaction closed." *Id*. at 479.

Notably, the Tax Court in *Helmer*, *Long*, and *La Rue* determined in each case that the obligations at issue were not sufficiently free from contingencies to be deemed liabilities that would give rise to a change in a partner's outside basis under Section 752. However, the IRS soon indicated that there were circumstances in which some degree of contingency would not prevent recognition of a liability that changed a partner's basis under Section 752.

3. *Revenue Rulings and Treasury Regulations.*

Six months after *La Rue* was decided by the Tax Court, on September 19, 1988, the IRS issued Revenue Ruling 88-77, 1988-2 C.B. 128, 1988 WL 546796, which defined liability under Section 752. The ruling states:

> For purposes of section 752 of the Code, the terms 'liabilities of a partnership' and 'partnership liabilities' include an obligation only if and to the extent that incurring the

> liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), gives rise to any immediate deduction to the partnership, or, under section 705(a)(2)(B), currently decreases a partner's basis in the partner's partnership interest.

Rev. Rul. 88-77.

A few months after issuing Revenue Ruling 88-77, the Commissioner issued a temporary regulation containing a similar definition of "liability" under Section 752:

> [U]nder section 752, an obligation is a liability of the obligor for purposes of [S]ection 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such obligation gives rise to –
> (1) The creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);
> (2) A deduction that is taken into account in computing the taxable income of the obligor; or
> (3) An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.

Temp. Treas. Reg. § 1.752-1T(g), 1989-1 C.B. 180, 192, 53 Fed. Reg. 53,140, 53,150-51 (Dec. 30, 1988). However, the final regulations adopted in 1991 omitted any definition of "liability." *See* 1992-1 C.B. 218, 56 Fed. Reg. 66,348 (Dec. 23, 1991). According to the IRS, "[t]his change was made only for the purpose of simplification and not to change the substance of the regulation." IRS Field Service Advisory, 1997 WL 33313960 (Nov. 21, 1997).

Thereafter, in 1995, the Commissioner issued Revenue Ruling 95-26, which addressed whether a partnership's short sale of securities creates a liability within the meaning of Section 752. Rev. Rul. 95-26, 1995-1 C.B. 131. The revenue ruling concludes that a liability under Section 752 includes an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets, including cash attributable to borrowings. The Commissioner reasoned that a short sale creates such a liability inasmuch as (1) the partnership's basis in its assets is increased by the amount of cash received on the sale of the borrowed securities, and (2) a short sale creates an obligation to return the borrowed securities. *See* Rev. Rul. 95-26, 1995-1 C.B. at 132. In this respect, the Commissioner relied on Revenue Ruling 88-77. *Id*. Accordingly, for those partners directly affected by Revenue Ruling 95-26, the Commissioner concluded that the partners' bases in their partnership interests were increased under Section 722 to reflect their shares of the partnership's liability under Section 752.[20]

---

[20]Revenue Ruling 95-45 held that a corporation's assumption of its shareholders' "obligation to deliver replacement securities to close out a short-sale constitutes the assumption of a liability for purposes of [S]ections 357 and 358 of the Code." Rev. Rul. 95-45, 1995-1 C.B.

4. *Treasury Regulation § 1.752.*

On May 26, 2005, the IRS published regulations dealing with the assumption of some fixed and contingent obligations in connection with the issuance of a partnership interest. Treas. Reg. § 1.752-1(a)(4)(I) (effective May 26, 2005); *see* Prop. Treas. Reg. § 1.752-1(a)(1)(ii), 68 Fed. Reg. 37,434, 37,436 (proposed June 24, 2003). These final regulations include a new definition of liability, expanding the definition to include "any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code." Treas. Reg. § 1.752-1(a)(4)(ii); *see also* Treas. Reg. § 1.752-6(a); Treas. Reg. § 1.752-7(b)(3). The Treasury Department made this new regulation and the attendant definition of "liability" retroactive, applying it to all assumptions of "liabilities" (as newly defined) by partnerships occurring on or after June 24, 2003 (*i.e.*, the date the regulation was proposed). *See* Treas. Reg. 1.752-1(a)(4)(iv). In addition, the new regulation also reached back in part to transactions occurring during the period between October 18, 1999 and June 24, 2003, by requiring a partner to reduce his basis in his partnership interest by the amount of any contingent obligation assumed by the partnership between October 18, 1999 and June 24, 2003. *See* Treas. Reg. § 1.752.6(a), (d). However, unlike the statute, the new regulation "would not allow the partner to increase his [or her] basis for the share of the new partnership liability." *Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608, 620 & n.9 (E.D. Tex. 2006).

By promulgating the regulation, the government intended to change the law governing liabilities under Section 752. The regulation itself indicates that it modifies settled law regarding "liabilities" for Section 752: "The definition of a liability contained in these proposed regulations does not follow *Helmer v. Commissioner*, TC Memo 1975-160. (The Tax Court . . . in *Helmer* held that a partnership's issuance of an option to acquire property did not create a partnership liability for purposes of Section 752.)." *See* Notice of Proposed Rulemaking, 68 Fed. Reg. 37,434, 37,436 (June 24, 2003).

5. *Marriott's transactions predate regulations.*

Generally, retroactive regulations are prohibited, except under limited circumstances. *See* I.R.C. § 7805(b)(1)(A), (b)(3) (allowing treasury regulations to operate retroactively to "prevent abuse"), or (b)(6) (permitting retroactivity if authorized by Congress).[21] However, because

---

53, 1995 WL 335770 (June 6, 1995). Further, "the amount of the short-sale liability is the amount of basis to which the short sale gave rise." *Id*. In other words, "[t]he amount of the liability assumed equals the proceeds of the original short sale." *Id*.; *see also* IRS Field Service Advisory, 1997 WL 33313960 (Nov. 21, 1997) (stating that the liability-basis principles contained in Revenue ruling 95-45 are applicable to partnerships).

[21]Courts have struggled with the question whether the retroactivity provisions of Treasury Regulation § 1.752 are valid and enforceable. *Compare Cemco Investors, LLC v. United States*,

Marriott's transactions occurred in 1994 and thus predate even the retroactive portions of Treasury Regulation § 1.752, the new regulatory definition of "liability" put forth in that regulation does not apply to the case at hand. Rather, the pertinent analysis focuses on the law as it stood in 1994 at the time of Marriott's transactions, prior to Revenue Ruling 95-26 and Treasury Regulation § 1.752.

D. Treatment of Short Sales As Of 1994 Under Section 752

None of the precedents extant at the time of Marriott's transactions addressed short sales and the effect of Regulation T. *See La Rue*, 90 T.C. 465; *Long*, 71 T.C. 1; *Helmer*, 34 T.C.M. (CCH) 727; Rev. Rul. 88-77. The short-sale concept was introduced into an analysis of Section 752 in Revenue Ruling 95-26, which was issued a year after the transactions at issue.

The courts that have addressed the issue of whether short sales involve contingent obligations have tended to hold that the obligation to close such sales is a liability under Section 752. *See*, *e.g., Kornman Assocs., Inc. v. United States*, 527 F.3d 443, 452 (5th Cir. 2008). However, because of timing, *Kornman* is not a precedent squarely applicable to Marriott's transactions. The transactions here preceded the Revenue Ruling 95-26 while the transactions at issue in *Kornman* occurred in 1999, five years after the Revenue Ruling was issued. *See Kornman*, 527 F.3d at 447. The Fifth Circuit in *Kornman* was able to state that the taxpayer there had adequate notice of the IRS's position:

> We do not believe that the Appellants were unfairly surprised or prejudiced by the IRS's challenge to this tax shelter because they were on notice as early as 1988, and certainly by 1995, that the IRS considered the obligation to close a short sale to be a liability under section 752. Revenue Ruling 95-26 is distinguishable from the earlier cases and revenue rulings cited by the Appellants, and it is fully consistent with regulations promulgated by the IRS after 1995.

*Id*. at 462. The same observation could not be made in this instance. Marriott was not put on explicit notice. Its transaction in 1994 preceded Revenue Ruling 95-26 which addressed short sales. The earlier revenue ruling issued in 1988, Revenue Ruling 88-77, neither expressly mentioned short sales nor cited the Federal Reserve Board's Regulation T.

---

515 F.3d 749, 752 (7th Cir. 2008) (applying Treas. Reg. § 1.752 retroactively), *with Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d. 608, 619-25 (E.D. Tex. 2006) (declining to apply Treas. Reg. § 1.752 retroactively). *See generally Jade Trading LLC v. United States*, 80 Fed. Cl. 11, 44-45 & n.64 (2007) (opining that a "sold call option" contributed to a partnership "would not be considered a liability for purposes of section 752" as it was interpreted prior to the regulations issued by the Department of Treasury in 2005, but noting that under those regulations the option would be treated as a liability).

Nonetheless, in 1994 Marriott had indirect notice that the obligation to close a short sale might well give rise to a liability under Section 752. Revenue Ruling 88-77 emphasized that the IRS considered that symmetry had a bearing on the interpretation of Section 752. As the Fifth Circuit pointed out in *Kornman*, "Revenue Ruling 88-77 . . . defined liability under section 752 to 'include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings).'" 527 F.3d at 458 (quoting Rev. Rul. 88-77). Here, as in *Kornman*, the cash received in the short sale was an asset of the partnership and the basis of the partnership's assets was increased by those receipts. Symmetrical treatment would call for recognition of the corresponding obligation to replace the borrowed Treasury notes.

This case has a relatively close parallel to a second precedent, *Salina P'ship v. Commissioner*, 80 T.C.M. (CCH) 686, 2000 WL 1700928 (2000), which involved, among other things, a short sale of Treasury bills in 1992. The timing of the transaction in *Salina* thus was pragmatically the same as those carried out by the Marriott entities. At issue in *Salina* was "whether Salina's obligation to close out its short sale transaction by returning the Treasury bills that it borrowed from ABN and Goldman Sachs represent[ed] a liability within the meaning of section 752." 80 T.C.M. (CCH) at 697. The Tax Court began its analysis by noting the absence of a statutory definition of liabilities and then turned to Revenue Ruling 88-77 and the definition of liabilities set out in Temp. Treas. Reg. § 1.752-1T(g) issued late in 1988. *Id*. at 697-98. After taking account of the interpretation of Revenue Ruling 88-77 that had been set out in Revenue Ruling 95-26, the Tax Court focused on the difference that would exist between the partnership's inside basis and the partners' outside basis if the taxpayer's position were to prevail. *See* 80 T.C.M. (CCH) at 698. The taxpayer had argued that the differential was dictated by I.R.C. § 1233 and Treas. Reg. § 1.1233-(1)(a), which require a short sale to be treated as an "open transaction" for income tax purposes. *Id*. For such transactions, income recognition is deferred until the transaction is closed with the return of the borrowed securities. The Tax Court refused to apply Section 1233 by analogy, however, viewing Sections 1233 and 752 as serving different purposes. 80 T.C.M. (CCH) at 698. It considered that Section 1233 was intended to clarify and simplify the recognition of gain or loss on the two steps of a short sale transaction, while the basis adjustment provisions of I.R.C. §§ 705 and 752 were "intended to avoid distortions in the tax reporting of partnership items by promoting parity between a partnership's aggregate inside basis in its assets and its partners' outside bases in their partnership interests." *Id*. Because Salina "had a legally enforceable financial obligation to return the borrowed Treasury bills" and had "reported the obligation as a liability on its opening balance sheet," the Tax Court sustained the IRS' adjustments in Salina's partners' "outside bases" to reflect their shares of the liability arising with the obligation to return the borrowed Treasury bills. *Id*. at 700.

The decision in *Salina* is persuasive insofar as it refuses to apply the "open transaction" principles reflected in I.R.C. § 1233 to the definition of liability in I.R.C. § 752. The concepts do not fit conformably. The partnership basis rules embodied in Sections 705, 722, and 752 contemplate adjustments to basis at the time the transaction occurs and do not leave basis open to be resolved definitively when a stepped transaction is closed. Hr'g Tr. 35:21-25 (May 19, 2008)

("Under [Section] 722, . . . [you make the basis calculation] at the time of the contribution. That's when [the] partnership interest came into being."); *see also* Hr'g Tr. 30:12-16 ("[Section 722] specifies that the partnership basis has to be calculated at the time of the contribution of the asset to the partnership."). Moreover, the intention that symmetry will apply with the partnership basis rules is a strong consideration. Otherwise, manipulation of basis could readily generate distortion of gain or loss. These precepts supplied the analytical foundation for Rev. Rul. 88-77 and provided indirect notice to Marriott that the short sales in 1994 might well not produce the tax consequences it sought.

The government urges the court to adopt the broad rationale that any short sale of borrowed securities, ranging from a traded speculative common stock to a short-term Treasury bill, generates an obligation to return securities that is cognizable as a liability under Section 752. Def.'s Mot. at 26-29; Def.'s Supp. Br. at 6-7.[22] The court considers that it is not necessary to go that far to resolve the dispute in this case. Rather, where Treasury bills or notes are involved, the risks in closing the short sale transaction are relatively circumscribed and the resulting liability should be recognized for basis-adjustment purposes under Section 752.[23] Other unusual circumstances may exist where a basis adjustment may not be appropriate, notwithstanding the symmetrical considerations that underpin basis adjustments generally under Sections 705, 722, and 752.

The court thus concludes that the IRS properly adjusted the outside basis of the Marriott partners to reflect the Marriott partnership's obligation to return the borrowed Treasury notes. Constraints on short sales established by the Federal Reserve Board's Regulation T were always implicitly present in Section 752 from the date of that Section's adoption in 1954. Marriott's argument about the short sales "treats [their] contingent assets and . . . contingent liabilities asymmetrically." *See* Robert Bird & Alan Tucker, *Tax Sham or Prudent Investment: Deconstructing the Government's Pyrrhic Victory in* Salina Partnership v. Commissioner, 22 Va.

---

[22]As the government's counsel explained at the hearing:

> "[E]ach individual asset would and the type of transaction would need to be looked at individually. We thought about that kind of a situation, if you're talking about a stock, as opposed to a Treasury note. But, that would make a difference with respect to the contingent nature of the obligation. I don't really think it will, because . . . the unique aspect of the short sale is that [the] obligation to return the property exists until the short sale is done.

Hr'g Tr. 40:7-16 (May 19, 2008).

[23]In this instance, Marriott's contingency in closing the short sales of Treasury notes was constrained both by the Federal Reserve Board's Regulation T and by the nature of the securities involved. The only risk involved was interest-rate risk, not credit risk. Even the interest-rate risk with the Treasury notes Marriott borrowed was relatively small because the notes had a maturity of less than five years.

Tax Rev. 231, 254 (2002). Regulation T seeks to prevent just such treatment, albeit for the purpose of preventing a loss to a broker dealer stemming from a short seller who would borrow securities, sell them short, and then abscond with or otherwise impair the proceeds before completing the purchase and return of the securities. Here, when MORI contributed the obligation to close the short sales to Marriott Resorts, it treated the contribution as a contingent obligation that did not require a decrease in its outside basis in Marriott Resorts under Section 752. Pls.' Cross-Mot. at 7-8. However, when MORI contributed the $73 million in Repos to Marriott Resorts, it treated the transaction as a contribution of a fixed asset, entitling it to increase its outside basis in Marriott Resorts. *Id*. This asymmetry distorted the tax laws pertaining to outside basis. As the Fifth Circuit commented in *Kornman*: "If the obligation to replace the borrowed securities was a 'contingent liability' that did not increase the amount realized on the sale, then the proceeds from the short sale should also be treated as a 'contingent asset' that has no effect on the outside basis calculation under [S]ection 722." *Kornman*, 527 F.3d at 460. The initial short sale, which generates the cash proceeds, and the subsequent covering transaction are "inextricably intertwined," because under Regulation T the proceeds are chained to the obligation to close the short sale. Thus, the proceeds of the first step in the short sale transactions are also subject to the uncertainties of closing the short sale. *Id.* (citing *Zlotnick*, 836 F.2d at 820). In short, if contribution of the proceeds of the short sale increased the partners' outside basis, the contribution of the obligation to return the Treasury notes that had been sold short required a decrease in the partners' outside basis.

**CONCLUSION**

For the reasons stated, the government's motion for summary judgment is GRANTED and Marriott's cross-motion for summary judgment is DENIED. In accord with IRC § 6226(h), this disposition shall be considered as a decision of the court that the notice of final partnership administrative adjustment issued by the IRS was correct. The clerk shall enter judgment for the defendant.

No costs.

IT IS SO ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge